A

# Harrisburg International Airport
www.flyHIA.com

October 5, 1999

Mr. Mark Stambaugh
Stambaugh Aviation, Inc.
P.O. Box 149
Middletown, PA 17057

Dear Mr. Stambaugh:

The Susquehanna Area Regional Airport Authority invites your company to submit information in response to the enclosed Request for Qualifications (RFQ). The Authority seeks an exceptional business partner to conduct a Fixed Base Operation (FBO) at Harrisburg International Airport (MDT). A 50,000-square foot former corporate hangar is available for lease.

Please review the RFQ thoroughly and prepare a submission consistent with its requirements. The deadline for submissions is 4:00 P.M., EST, Tuesday, November 2, 1999. Also, the Authority will afford companies an opportunity to tour the hangar facility and ask questions concerning the RFQ at a pre-submission conference, scheduled for October 19, 1999.

We look forward to your interest in this partnership.

Sincerely,

Robert L. Hendricks
Property and Retail Manager

/rlh

Enclosure

Cc:     Mr. David M. Fleet, Airport Director
        Mr. David Holdsworth, SARAA Executive Director



# REQUEST FOR QUALIFICATIONS

## FULL SERVICE FIXED BASE OPERATOR
## HARRISBURG INTERNATIONAL AIRPORT (MDT)

**Issued by:**

**SUSQUEHANNA AREA REGIONAL AIRPORT AUTHORITY**
**135 York Drive**
**Suite 100**
**Middletown, PA  17057**

**October 5, 1999**

Full Service Fixed Base Operator RFQ
Susquehanna Area Regional Airport Authority
Harrisburg International Airport
October 5, 1999

I.   Introduction
     1.  Purpose of Request
     2.  Description of Facility and Desired Services
     3.  Description of Existing FBO Operations
     4.  Airport Background

II.  Minimum Standards, Qualifications Submittal and Financial Questionnaire
     1.  Minimum Standards
     2.  Qualifications Submittal
             Identification of Aviation Services for Operations at MDT
             Copies of certifications and updates
             Security Procedures
             Employee Requirements
             Training Programs
             Subtenants/Subcontractors
     3.  Financial Information Questionnaire
             Company Ownership and Structure
             Business Plan
             Financial Information
             Experience Statement
             Other Required Proposal Information

III. Submittal Requirements
     1.  Submittal Format and Content
     2.  Submittal Deadline

IV.  Selection Process

V.   Miscellaneous

Exhibits
A.   AMP/Tyco Hangar Drawings and Related Personal Property
B.   Factsheet
C.   Airport Master Plan
D.   Financial Questionnaire
E.   Fuel Sales Summary 1997 through 1999
F.   Based Aircraft
G.   Annual Aircraft Operations

Full Service Fixed Base Operator RFQ
Susquehanna Area Regional Airport Authority
Harrisburg International Airport

## I.    Introduction

### 1.    Purpose of Request

The Susquehanna Area Regional Airport Authority (SARAA), owner of Harrisburg International Airport (MDT) and Capital City Airport (CXY), invites interested Fixed-Base Operators to submit Statements of Qualifications to provide high-quality aviation service, repair, maintenance, fueling and related products from an existing hangar facility at MDT. SARAA expects interested parties to conduct business under a non-exclusive right and privilege in a manner that exceeds established minimum standards in order to successfully handle commercial and based general aviation aircraft as well as attract transient aircraft to MDT.

### 2.    Description of Facility and Desired Services

SARAA is purchasing the corporate hangar facility of AMP, Inc., recently acquired by Tyco International, Inc. Tyco has determined that the hangar is excess to its needs. This transaction will be completed by January 2000. It has been determined that occupancy could occur by April 2000.

The hangar is a divisible 50,000 square-foot Class A building with two large bays for aircraft storage and maintenance. Each bay is approximately 17,125 square feet with 85-foot door openings. The hangar sits on approximately 5.2 acres at the west-end corporate hangar area of HIA. Additionally, the site and hangar include the following amenities:

> Areas for shops, catering, snack bar, lounges and offices
> 97-space paved automobile parking lot (used in common with other tenants)
> 63,000 square-foot ramp/aircraft parking apron
> 48,000-gallon AVFUEL fuel farm (4 12,000-gallon USTs, compliant)

The site and facility are shown in Exhibit A, attached to this RFQ. Also, a list of residual personal property is available for use by the FBO (same Exhibit).

INTERESTED PARTIES ARE HEREBY NOTIFIED THAT SARAA HAS ARRANGED A PRE-SUBMISSION CONFERENCE AND TOUR OF THE HANGAR FOR TUESDAY, OCTOBER 19, 1999 AT 10:00 A.M. IN THE CONFERENCE ROOM ON THE MAIN LEVEL OF THE AMP, INC. HANGAR, 517 AIRPORT DRIVE, HARRISBURG INTERNATIONAL AIRPORT, MIDDLETOWN, PENNSYLVANIA. ATTENDANCE AT THIS MEETING IS MANDATORY IN ORDER FOR YOUR COMPANY TO BECOME A CANDIDATE FOR CONSIDERATION. Directions are available by calling (717) 948-4643.

3.    Brief Description of Existing FBO Operations

SARAA currently has lease and authorization agreements with two FBOs.  Aero Services International, Inc. has operated on the airfield since 1997 with fueling services, commercial and GA maintenance and repair, tie-down and limited aircraft storage facilities.  Stambaugh's Air Service, Inc. was established in 1974 and has supplied fueling, maintenance and repair, tie-down and storage services continuously in concert with the company's heavy aircraft maintenance operation in two large hangars.  Both existing FBOs are situate in the central portion of the airfield.

Existing FBOs, including Harrisburg Jet Center, Inc. at Capital City Airport, are eligible to submit a Statement of Qualifications in order to become a candidate for consideration.


4.    Airport Background

The Susquehanna Area Regional Airport Authority airport system serves central Pennsylvania with commercial passenger and cargo service through two facilities – Harrisburg International Airport and Capital City Airport.  The two airports are under the ownership of the Susquehanna Area Regional Airport Authority.  The authority is directed by representatives of the counties of York, Dauphin and Cumberland; the cities of York and Harrisburg; the townships of Fairview and Lower Swatara; and, the town of Middletown.  Both airports are managed under a long-term contract by BAA Harrisburg, Inc.

A multi-page factsheet is attached at Exhibit B, providing background on the Airport.

A preliminary Master Plan for Harrisburg International Airport has recently been developed with assistance from Leigh Fisher Associates.  An illustrative version is provided as Exhibit C.


II.    Minimum Standards, Qualifications Submittal and Financial Requirements

1.    Minimum Standards

A fixed-base operator is hereby defined as a firm or corporation engaging in full-scale commercial aviation services and activities, as set forth in the minimum standards as indicated here and under the appropriate lease or legal arrangement.

SARAA expects the successful FBO to serve all needs of the Airlines and general aviation public, in a non-discriminatory manner, as a full-service fixed base operator.  The hours of operation and required aeronautical/aviation services are described beginning on the next page.

4

*Hours of Operation*

5:00 A.M. through 12:00 A.M., seven (7) days per week including holidays; after-hours services shall be available by prior arrangement

*Required Services*

1.  Fuel and Oil Sales
2.  Ground Handling and Customer Services
3.  Aircraft, Engine and Accessory Maintenance
4.  Aircraft Parts and Supply Sales
5.  Aircraft Storage

2.  Qualifications Submittal

*1.   Identification of Aviation Services for Operations at MDT*

The Submittal must clearly identify the set of required and any optional services which the FBO will provide at MDT. Further, each service should be described in a manner that conveys the company's familiarity and understanding of the specific needs and expectations of commercial and general aviation partners at MDT and how each of its services will meet or exceed expectations.

*2.   Copies of Certifications and Updates*

The FBO will furnish in its Submittal true and correct copies of all current Federal, state and/or local certifications and updates thereto required to permit it to operate at Airports in the United States. Additionally, the FBO is required to provide a record of any violations of FAA Part 139, Part 145 and any other applicable FAA regulation having occurred at any of its operations during the past three years.

*3.   Company Security and Customer Service Procedures*

The FBO will supply its written security procedures/manuals, applicable to all personnel when in conduct of its business. Likewise, the FBO will provide its written customer service standards and practices used to educate its employees in providing high-quality aviation services to customers.

*4.   Employee Requirements*

The FBO shall furnish an illustrative staffing plan for providing the services described in Item 1 above. The plan must indicate the number of A & P technicians and the coverage anticipated during any 24-hour period. Also, the FBO shall sufficiently describe its employee hiring and disciplinary procedures, including all requirements for screening and background verifications as well as drug and alcohol testing.

5.    *Employee Training and Recruitment Program*
The submittal shall include a description of the FBO's training and
recruitment efforts in support of its operation at MDT. The FBO shall
describe the types and number of hours per year of training for each staff
position. The FBO shall describe the strategies it will use to recruit new
employees such as trade school outreach, job placement services and the
like.

6.    *Subtenants/Subcontractors*
The FBO shall disclose any tenants which it knows now will occupy the
hangar if a lease with SARAA is approved. This information will not be
released. The FBO shall also disclose any sublease or co-venture
arrangement with another reputable party for maintenance or any other
required or optional aviation service.

3.    Financial Information Questionnaire

A financial questionnaire is attached at Exhibit D. The submittal MUST include a fully
completed questionnaire. Any submittal that does not include a substantially complete
questionnaire, solely based upon SARAA's discretion, will be rejected.

III.    Submittal Requirements

1.    Submittal Format and Content

To be considered for evaluation, the length of submittals shall not exceed 15 pages (one-
sided and double-spaced) of data developed for responding to this RFQ. The limitation
does not include index sheets, general promotional materials, a brief transmittal letter or
required attachments such as certification forms or the Financial Questionnaire.

Submittals shall be organized as follows:

> Cover
> Transmittal Letter
> Index/Table of Contents
> Items 1 through 6, as described in Section II.2. above
> Financial Questionnaire
> List of Current References/Operations
> Attachments

The materials presented in the Statements of Qualifications is expected to clearly reflect
qualifications that demonstrate the FBOs superior ability and experience in managing and
providing aviation services to commercial and general aviation customers.



2.    Submittal Deadline

Twelve (12) copies of the Statements of Qualifications must be submitted to Mr. David
M. Fleet, Airport Director, Harrisburg International Airport at 135 York Drive, Suite 100,
Harrisburg International Airport, Middletown, Pennsylvania 17057. Express delivery of
the Statement of Qualifications can be sent to the same address.

Statements of Qualifications shall be submitted in a sealed package marked, "Statement
of Qualifications, Full Service Fixed Base Operator, Harrisburg International Airport".
Submittals must be received no later than 4:00 p.m., EST, on November 2, 1999.

Only those submittals received prior to this date and time and meeting all the
requirements of the RFQ will be considered. No submittal will be considered or accepted
which is submitted by an FBO that is in default under the terms of any existing agreement
with SARAA or which has failed to faithfully perform its obligations under any previous
agreement with SARAA. Submittal transmittal letters shall be signed by an authorized
representative of the FBO.

It is believed that this RFQ document contains all the information that is needed to
prepare an adequate response. However, any questions or requests for information that
may arise must be submitted in writing by 4:00 p.m., EST, on October 14, 1999 to Mr.
David M. Fleet at the address noted above. Responses, where deemed appropriate, will
be given during the pre-submittal conference. Discussions concerning any matter related
to this request with BAA Harrisburg, Inc. staff, SARAA staff or members of SARAA's
Board of Directors are expressly prohibited and shall result in the rejection of the
offender's submittal.

IV.    Selection Process

The provision of quality FBO services at MDT is essential to meeting the expectations of
SARAA's commercial and general aviation partners. The successful candidate will be
that FBO which, through its experience, reputation, demonstrated ability and level of
interest, possesses, in SARAA's opinion, the best overall qualifications.

The procedure for selection is described in the following steps:

    1.    A committee of SARAA Board members and BAA Harrisburg staff will
          review Statements of Qualifications from FBOs. The selection committee
          may identify a short list of FBO candidates for further review, depending
          upon the response to this RFQ.
    2.    At the discretion of SARAA, candidates may be required to make a
          presentation and be interviewed at the SARAA offices by the selection
          committee. If this step is used, the FBO must be represented by a
          corporate officer(s) of the company, along with the individual who would
          likely be general manager of the operation at MDT. The potential general

        manager must play a lead or equal role in the presentation and interview, discussing the company's ability to satisfy the requirements for services.

3.    A ranking of candidates will be accomplished by the selection committee whereby a recommended FBO will be selected. The recommended FBO will enter into negotiations with SARAA on a lease agreement setting out the rights, obligations, terms and conditions to operate an FBO at MDT.

4.    If a mutually satisfactory lease agreement cannot be reached with the first ranked FBO, negotiations will be terminated with that candidate and a negotiation may be initiated with the second ranked FBO. The process may be repeated until a mutually satisfactory lease agreement is reached.

When a lease agreement is reached, a recommendation will be made to the SARAA Board of Directors to execute the lease agreement.

SARAA reserves the right to reject any proposal at its discretion for any reason.

V.    Miscellaneous

This RFQ is not to be construed as a contract or a commitment of any kind, nor does it commit SARAA to pay for any costs incurred in the preparation of a Statement of Qualifications or of any costs incurred prior to the execution of a lease agreement.

A FINANCIAL PROPOSAL OR BID ADDRESSING PAYMENTS TO SARAA INCLUDING, BUT NOT LIMITED TO, RENTS, SALES COMMISSIONS, FUEL FLOWAGE FEES, AND/OR PERCENTAGES ON OTHER SALES OR SERVICES, IS EXPRESSLY EXCLUDED FROM THIS REQUEST.

SARAA reserves the sole right to: (1) evaluate Statements of Qualifications; (2) waive any irregularities therein; (3) select candidates for selection interviews; (4) request supplemental or additional information as deemed necessary; (5) contact other parties or references to verify information provided in the Statements of Qualifications; or (6) reject any and all submittal(s), should it be deemed in the best interest of SARAA.

No communications, meetings, briefings or debriefings shall occur with SARAA or BAA Harrisburg, Inc. officials or staff unless specifically authorized by the Airport Director. Again, a pre-submission conference has been scheduled on Tuesday, October 19, 1999 for all questions and information sharing concerning the RFQ.

Exhibit A

AMP/TYCO Hangar Drawings and Related Personal Property



# AMP Hangar Inventory
## Harrisburg International Airport

August 12, 1999

| Remove | Stay | ITEM DESCRIPTION |
|--------|------|------------------|
| | | 2 ea large pallet racks, tan color, with used paint (1st flr SE) |
| | | 2 ea large pallet racks with 1 shelve, tan color, (storage rm 1st flr W) |
| | | 1 ea 2 shelf unit, tan color (storage rm 1st flr W) |
| | | 1 ea server connection rack (elect rm 1st flr W) |
| | | 1 ea Aircraft generator tester (battery rm 1st flr W) |
| | | 1 ea work bench small with drawer and shelf (hall 1st flr W) |
| | | 1 ea 3 shelf unit, white color (paint shop 1st flr E) |
| | | 1 ea 3 shelf unit, gray color (utility rm 1st flr E) |
| | | 1 ea Aircraft tug (1st flr W) |
| | | 1 ea Aircraft tow-bars |
| | | 6 ea oxygen bottles (1st flr W) |
| | | 5 ea Nitrogen bottles (1st flr W) |
| | | 1 ea Acetylene bottle (1st flr W) |
| | | 1ea Hazardous Waste Storage Rm, see photos (1st flr SW corner) |
| | | 6 ea wall cabinets, (avionics repair shop 1st flr W) |
| | | 3 walls of work bench, (avionics repair shop(1st flr W) |
| | | 3 walls of wall cabinets, (avionics repair shop 1st flr W) |
| | | 4 ea base cabinets with double doors in W hangar, white (1st flr W) |
| | | 1 ea work platform, 2 story (1st flr W hangar) |
| | | 1 ea sink base cabinet w/ sink, wood grain , (hall 1st flr W) |
| | | 1 ea metal partition with 1 door & 2 windows, (maint.off 1st flr W) |
| | | 15 door wall cabinets, (maint. office 1st flr W) |
| | | 24 cabinet wall unit with 14 shelves, (maint. office 1st flr W) |
| | | 3 ea large pallet racks, tan color, (N hall 1st flr W) |
| | | 1 ea stainless slope sink, (N hall 1st flr W) |
| | | 1 ea wall mount welding hood, (N hall 1ST flr W) |
| | | 3 ea double sided pallet rack with center bin section (2nd flr SW) |
| | | 1 ea metal 3 shelf storage rack, white (2nd flr SW) |
| | | 1 ea metal 4 shelf storage rack, white (2nd flr SW) |

# AMP Hangar Inventory

Harrisburg International Airport

August 12, 1999

| | | |
|---|---|---|
| | | 4 ea base cabinets with wood grain top (2nd flr SW) |
| | | 1 ea small air compressor , (mechanical rm 2nd flr W) |
| | | 1 ea boiler, large, (mechanical rm 2nd flr W) |
| | | 1 ea water pressure system, (mechanical rm 2nd flr W) |
| | | 1 ea large air compressor for air tools, (storage rm 2nd flr W) |
| | | 1 ea metal storage rack 4 shelf, white, (2nd flr W) |
| | | 1 ea metal partition with 1 door, 1 window, white (2nd flr W) |
| | | 2 ea metal partitions with 1 door, 1 window (2nd flr W) |
| | | 1 ea metal storage rack 3 shalves, white (2nd flr SW) |
| | | 2 ea metal double door cabinets, white (2nd flr SW) |
| | | 1 ea metal shelf unit 6 shelves, white (2nd flr SW) |
| | | 8 ea metal 3 drawer file cabinets, brown, (hall 2nd flr SW) |
| | | 1 ea metal 1 drawer file cabinet, green, (hall 2nd flr SW) |
| | | 1 ea metal 4 drawer open file cabinet, white, (hall 2nd flr SW) |
| | | 1 ea metal base cabinet 3 door, white w/ wood grain doors (2nd flr) |
| | | 1 ea security system (2nd flr W) |
| | | 1 ea un-interuptable power supply for security system (2nd flr W) |
| | | 2 ea eye wash stations (battery rm & brake shop,1st flr E) |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

Exhibit B

Harrisburg International Airport Factsheet





*This information may not be accurate or current and is not valid for navigation, flight planning, or for use in flight. Always consult the official publications for current and correct information. No warranty of fitness for any purpose is made or implied. If you find errors in the information provided, here is how to report them.*

# MDT - HARRISBURG INTERNATIONAL AIRPORT

## HARRISBURG, PA

### AIRPORT INFORMATION AS PUBLISHED ON 09 SEPTEMBER 1999

### Location

```
Lat/Long: 40-11-36.583N / 076-45-48.253W
          (40.1934953 / -76.7634036)
          (estimated)
Elevation: 310 ft. / 94.5 m (surveyed)
Variation: 11W (1990)
From city: 8 miles SE of HARRISBURG, PA
```



### Airport Operations

```
      Facility use: Open to the public
   Sectional chart: NEW YORK
     Control tower: yes
             ARTCC: NEW YORK CENTER
               FSS: WILLIAMSPORT FLIGHT SERVICE STATION [1-800-WX-BRIEF]
   NOTAMs facility: MDT (NOTAM-D service available)
        Attendance: CONTINUOUS
  Pattern altitude: TPA 1300 FT MSL (990 FT AGL) PROPS; 1800 FT MSL (1490
                    FT AGL) JETS.
   Segmented circle: no
            Lights: DUSK-DAWN
            Beacon: white-green (lighted land airport)
       Landing fee: yes
   Fire and rescue: ARFF index C
 Airline operations: Full FAR Part 139 certification, currently receiving
                     scheduled air carrier service
                     PPR 24 HRS FOR UNSKED ACR OPNS WITH MORE THAN 30 PSGR
                     SEATS CALL AMGR 717-948-3921. ARFF INDEX C SVC AVBL
                     0600-0000 DLY; ARFF INDEX B SVC AVBL 0000-0600 DLY.
   Int'l operations: customs landing rights airport
```

### Airport Communications

```
          ATIS: 118.8
```

```
        HARRISBURG INTL GROUND: 121.7
                                348.6
         HARRISBURG INTL TOWER: 124.8
                                231.1
           HARRISBURG APPROACH: 118.25(310-079)
                                124.1(180-309)
                                126.45(080-179)
          HARRISBURG DEPARTURE: 118.25(310-079)
                                124.1(180-309)
                                126.45(080-179)
                         EMERG: 121.5
                                243.0
                     STAGE-III: 118.25(310-079)
                                124.1(180-309)
                                126.45(080-179)
                       VFR-ADV: 124.8
```

## Radio aids to navigate to the Airport

| VOR radial/distance | VOR name | Freq | Var |
| --- | --- | --- | --- |
| HARr125/15.5 | HARRISBURG VORTAC | 112.50 | 10W |
| LRPr291/22.1 | LANCASTER VORTAC | 117.30 | 09W |
| RAVr210/22.9 | RAVINE VORTAC | 114.60 | 11W |
| SEGr179/36.3 | SELINSGROVE VORTAC | 110.40 | 08W |

| NDB name | Hdg/Dist | Freq | Var | ID | |
| --- | --- | --- | --- | --- | --- |
| YORK | 029/17.2 | 285 | 11W | EUD | . ..- -.. |
| BELLGROVE | 223/17.4 | 328 | 10W | BZJ | -... --.. .--- |

## Airport Services

```
        Fuel available: 100LL A
      Airframe service: MAJOR
    Powerplant service: MAJOR
        Bottled oxygen: LOW
           Bulk oxygen: HIGH/LOW
```

## Runway Information

### Runway 13/31

```
                 Dimensions: 9510 x 200 ft. / 2899 x 61 m
                    Surface: asphalt/grooved, in good condition
         Runway edge lights: high intensity
```

|  | RUNWAY 13 | RUNWAY 31 |
| --- | --- | --- |
| Traffic pattern: | left | right |
|  |  | VFR DEPS MAKE RIGHT TURN TO 050 DEGS WI 2 MI. |
| Runway heading: | 128 magnetic, 117 true | 308 magnetic, 297 true |
| Markings: | precision instrument | precision instrument |
| Markings condition: | good | good |
| Latitude: | 40-11-57.752N | 40-11-15.407N |
| Longitude: | 076-46-42.957W | 076-44-53.558W |
| Elevation: | 310.1 ft. | 309.3 ft. |
| Threshold crossing height: | 51 ft. AGL | 51 ft. AGL |
| Visual glide path angle: | 3.00 degrees | 3.00 degrees |
| Visual slope indicator: | 12-box VASI | 12-box VASI |
|  |  | VASI OTS INDEFLY. |

```
                  RVR equipment: touchdown
                Approach lights: MALSR: 1,400 foot
                                 medium intensity
                                 approach lighting
                                 system with runway
                                 alignment indicator
                                 lights
    Runway end identifier lights: yes                        yes
               Centerline lights: yes                        yes
             Instrument approach: ILS                        ILS
            DISPLACED THRESHOLD: yes                         yes
                     DT distance: 993 ft.                    503 ft.
                     DT latitude: 40-11-53.331N              40-11-17.645N
                    DT longitude: 076-46-31.530W             076-44-59.338W
                    DT elevation: 308.1 ft.                  308.2 ft.
                TOUCHDOWN POINT: yes                         yes
                    TD elevation: 308.0 ft.                  308.0 ft.
                       TD lights: no                         no
                     OBSTRUCTIONS: BRUSH                     TREES
                          Height: 12 ft.                     52 ft.
                  Slope to clear: 1:1                        9:1
         Distance from threshold: 212 ft.                    697 ft.
        Distance from centerline: 267 ft. right             488 ft. right
  Additional obstruction remarks: APCH SLOPE 50:1 TO        APCH SLOPE 23:1 TO
                                   DSPLCD THR.               DSPLCD THR.
```

## Airport Inspection

```
        Inspected by: FAA Airports field personnel from the Eastern Region: Jamaica,
      Last inspection: 17 November 1998
   Federal agreements: - National Plan of Integrated Airport Systems (NPIAS)
                       - Grant agreements under FAAP/ADAP/AIP
                       - Surplus property agreement under Public Law 289
                       - Advance planning agreement under FAAP
                       - Assurances pursuant to Title VI, Civil Rights Act of 1964
```

## Airport Operational Statistics

```
   Aircraft based on the field: 86      Aircraft operations: average 225/day
         Single engine airplanes:  7        62% commercial
          Multi engine airplanes: 45        21% transient general aviation
              Jet airplanes: 24             11% military
               Helicopters:  2               5% local general aviation
                  Military:  8
```

## Remarks

- ANG: PPR ONLY. CTC BASE OPS DSN 430-9312; C717-948-2312; 0730-1600
  WEEKDAYS; CLSD WEEKENDS & HOLS.
- FOR OFFL BUS WITH ANG CTC ANG OPNS ON UHF OR BASE OPNS V430-9313.
- ANG PPR AUTOVON 430-9313 OR 717-948-2313.
- EAST APRON CLSD TO TSNT ACFT WITHOUT PRIOR PERMISSION; CALL AMGR
  717-948-3919.
- BIRD FLOCKS ON & INVOF ARPT.
- NO TOUCH & GO TFC 1230-1330 & 2300-0600.
- ANG OPNS - NO ACFT PARKING AVBL; CALL 717-944-1787 EXT 231 FOR PARK &
  FUEL.

## Airport Diagram

Case 1:00-cv-00660-YK-JAS    Document 1-2    Filed 04/10/2000    Page 19 of 52



Diagram by the FAA Office of System Capacity
Any areas in blue represent projected expansions

## Services or Facilities at this Airport

**Aero Services International**  Fuel, Parking, Catering, Car rentals, Public telephone, Restrooms
**BAA Harrisburg**  Airport management
**Stambaugh's Air Service** Fuel

Please add to or correct this list of services and facilities at MDT.

## Fuel Prices

| FBO | Brand | 100LL | Jet A | Mogas | Date |
|---|---|---|---|---|---|
| Aero Services International | AVFUEL | $1.92 | $2.00 | | 30 Jul 1999 |
| Stambaugh's Air Service | 66 | $2.15 | $2.00 | $1.54 | 22 May 1999 |

Please help us keep these prices current. Click here to update these prices.

## Other Web Pages about this Airport

- http://www.hiahbg.org/
- http://www.cumberlink.com/transportation/airports.html
- http://www.faa.gov/ats/asc/Airport_Data/MDT_Data.html
- http://www.cap.af.mil/airfield/ViewAirport.asp?view=Thumb&state=PA&code=MDT&filetype

Please tell us about other pages about MDT or corrections of the page addresses shown above.

AirNav created by Paulo Santos, <pas@airnav.com>

Exhibit C

Airport Master Plan – Illustrative Development



**LEGEND**

- ■ Phase 1 (1996-2000)*
- ■ Phase 2 (2004-2008)*
- ▨ Phase 3 (2006-2018)*
- ▨ Phase 4 (Beyond 2018)*
- ░ Buildings to be demolished

Approximate proposed PaANG boundary**

- *Development shown for Phases 1-3 is based on the baseline growth scenario shown for Phase 4 is based on the high growth scenario. Approximate forecasts under the high growth scenario would occur in the year 2018 aviation activity forecasts.
- **Approximate PaANG boundary (listed in: Pennsylvania Air National Guard 1996 Special Operations Wing 193rd Air Plan, November 1997.

░ Potential right-of-way for future
Train Launch and Bank to Terminal

**(A) Parking Garage A**
- Phase 1 - 1,000 spaces (2 levels)
- Phase 2 - Additional 500 spaces (3rd level)

**(B) Parking Garage B**
- Phase 3 - 1,000 spaces (2 levels)
- Phase 4 - 500 spaces (3rd level)

**Building Demolition Phasing**
- Phase 1 - Buildings 58, 157, 142
- Phase 2 - Building 28
- Phase 3 - Buildings 29, 96, 133, 134, 135, 136, 208, 249, 268
- Phase 4 - None

Note: The phasing shown for PaANG development is generally based on the 1997 PaANG (Fallback) Master Plan. Actual project timing will be determined by the PaANG.

Graphic Scale in Feet
400  0  400  800

↑ N

**PREFERRED MASTER PLAN CONCEPT (MODIFIED OPTION 3) — PHASING PLAN**

Harrisburg International Airport
September 1999

Figure 5-2

LEIGH FISHER ASSOCIATES

Exhibit D

Financial Information Questionnaire

Exhibit E

Fuel Sales Summary 1997 through 1999

9/22/99

## HARRISBURG INTERNATIONAL AIRPORT
## FUEL FLOWAGE
## CALENDER YEAR 1997

| SIGNATORY PASSENGER AIRLINES: | Stambaugh Gallons | Piedmont Gallons | Stambaugh Flowage Fees | Piedmont Flowage Fees | TOTAL GALLONS | TOTAL FUEL FLOWAGE FEE |
|---|---|---|---|---|---|---|
| Air Ontario | 220,179 | | $11,008.95 | | 220,179 | $11,008.95 |
| Air Trans Airways | 394,385 | | $19,719.25 | | 394,385 | $19,719.25 |
| Atlantic Coast - United Express | 37,264 | | $1,863.20 | | 37,264 | $1,863.20 |
| American Airlines | 1,450,675 | | $72,533.75 | | 1,450,675 | $72,533.75 |
| Comair Airlines | 239,514 | | $11,975.70 | | 239,514 | $11,975.70 |
| Continental Airlines | 130,975 | 23,381 | $6,548.75 | $1,169.05 | 154,356 | $7,717.80 |
| Delta Airlines | 544,715 | | $27,235.75 | | 544,715 | $27,235.75 |
| Mesaba Aviation | 85,996 | 14,641 | $4,299.80 | $732.05 | 100,637 | $5,031.85 |
| North West Airlines | 940,889 | 218,982 | $47,044.45 | $10,949.10 | 1,159,871 | $57,993.55 |
| United Airlines | 1,366,342 | | $68,317.10 | | 1,366,342 | $68,317.10 |
| USAir | 1,321,168 | | $66,058.40 | | 1,321,168 | $66,058.40 |
| USAir Express | 558,371 | 120,522 | $27,918.55 | $6,026.10 | 678,893 | $33,944.65 |
| **PASSENGER TOTAL** | 7,290,473 | 377,526 | $364,523.65 | $18,876.30 | 7,667,999 | $383,399.95 |
| | | | | | | |
| SIGNATORY CARGO AIRLINES: | | | | | | |
| Airborne Express | 112,808 | 36 | $5,640.40 | $1.80 | 112,844 | $5,642.20 |
| Burlington Air Freight | 125,276 | 77,401 | $6,263.80 | $3,870.05 | 202,677 | $10,133.85 |
| Emery | 559,266 | | $27,963.30 | | 559,266 | $27,963.30 |
| Federal Express | 1,161,329 | | $58,066.45 | | 1,161,329 | $58,066.45 |
| Federal Express Feeder | 53,737 | | $2,686.85 | | 53,737 | $2,686.85 |
| UPS | 407,656 | 83,369 | $20,382.80 | $4,168.45 | 491,025 | $24,551.25 |
| **CARGO TOTAL** | 2,420,072 | 160,806 | $121,003.60 | $8,040.30 | 2,580,878 | $129,043.90 |
| | | | | | | |
| NON-SIGNATORY/JET A TOTAL | 835,506 | 5,503 | $41,775.30 | $275.15 | 841,009 | $42,050.45 |
| NON-SIGNATORY/AV GAS TOTAL | 37,836 | 107 | $1,891.79 | $5.35 | 37942.7 | $1,897.14 |
| **FBO TOTALS** | 873,341.7 | 5,610 | $43,667.09 | $280.50 | 878,951.7 | $43,947.59 |
| RESIDENT CORPORATE: | | | | | | |
| AMP | | | | | 649,371 | $32,468.55 |
| Select Transport  @ $.07/GAL | | | | | 46,463 | $3,252.41 |
| Hershey | | | | | 160,937 | $8,046.85 |
| RiteAid | | | | | 225,651 | $11,282.55 |
| **RESIDENT CORPORATE TOTAL** | | | | | 1,082,422 | $55,050.36 |
| | | | | | | |
| **GRAND TOTAL** | | | | | 12,210,250.7 | $611,441.80 |

*Footnote: All Fuel Flowage Commissions Collected @ $.05/gal.*
*Unless Otherwise Noted*

9/22/99

HARRISBURG INTERNATIONAL AIRPORT
FUEL FLOWAGE
CALENDER YEAR 1998

| SIGNATORY PASSENGER AIRLINES: | TOTAL GALLONS | TOTAL FUEL FLOWAGE FEE | FBO |
|---|---|---|---|
| Air Ontario | 328,700 | $16,435.00 | Stambaugh |
| Atlantic Coast - United Express | 69,133 | $3,456.65 | Stambaugh |
| American Airlines | 1,302,286 | $65,114.30 | Stambaugh |
| Comair Airlines | 331,185 | $16,559.25 | Stambaugh |
| Continental Airlines | 160,413 | $8,020.65 | Piedmont |
| Delta Airlines | 1,369,148 | $68,457.40 | Piedmont |
| Mesaba Aviation | 88,496 | $4,424.80 | Piedmont |
| North West Airlines | 918,900 | $45,945.00 | Piedmont |
| United Airlines | 1,091,373 | $54,568.65 | Stambaugh |
| USAir | 1,551,533 | $77,576.65 | Stambaugh |
| USAir Express | 907,394 | $45,369.70 | Piedmont |
| **PASSENGER TOTAL** | 8,118,561 | $405,928.05 | |
| | | | |
| SIGNATORY CARGO AIRLINES: | | | |
| Airborne Express | 152,591 | $7,629.55 | Piedmont |
| Burlington Air Freight | 505,209 | $25,260.45 | Piedmont |
| Emery | 605,365 | $30,268.25 | Stambaugh |
| Federal Express | 1,369,594 | $68,479.70 | Stambaugh |
| Federal Express Feeder | 80,541 | $4,027.05 | Stambaugh |
| Superior Airlines | 2,390 | $119.50 | Stambaugh |
| UPS | 419,786 | $20,989.30 | Piedmont |
| **CARGO TOTAL** | 3,135,476 | $156,773.80 | |
| ***STAMBAUGH*** | | | Stambaugh |
| NON-SIGNATORY/JET A TOTAL | 659,584 | $32,979.20 | $34,600.72 |
| NON-SIGNATORY/AV GAS TOTAL | 32,430.3 | $1,621.52 | |
| ***PIEDMONT*** | | | Piedmont |
| NON-SIGNATORY/JET A TOTAL | 343,320 | $17,166.00 | $17,521.15 |
| NON-SIGNATORY/AV GAS TOTAL | 7,103 | $355.15 | |
| **FBO TOTALS** | 1,042,437.3 | $52,121.87 | |
| RESIDENT CORPORATE: | | | |
| AMP | 607,205.6 | $30,360.28 | |
| Select Transport @ $.07/GAL. | 38,607 | $2,702.49 | |
| Hershey | 179,650 | $8,982.50 | |
| RiteAid | 296,029 | $14,801.45 | |
| **RESIDENT CORPORATE TOTAL** | 1,121,491.6 | $56,846.72 | 8.5% |
| | | | |
| ***STAMBAUGH TOTAL*** | 7,424,114.3 | $371,205.72 | 55.3% |
| ***PIEDMONT TOTAL*** | 4,872,360.0 | $243,618.00 | 36.3% |
| | | | |
| **GRAND TOTAL** | 13,417,965.9 | $671,670.44 | 100% |

*Footnote: All Fuel Flowage Commissions Collected @ $.05/gal.*
        *Unless Otherwise Noted*

FBO.FUEL FLOWAGE.9899.xls

9/22/99

HARRISBURG INTERNATIONAL AIRPORT
FUEL FLOWAGE
CALENDER YEAR 1999
(Information Received To Date)

| SIGNATORY PASSENGER AIRLINES: | TOTAL GALLONS | TOTAL FUEL FLOWAGE FEE | FBO |
|---|---|---|---|
| Air Ontario | 230,693 | $11,534.65 | Stambaugh |
| Atlantic Coast - United Express | 66,907 | $3,345.35 | Stambaugh |
| American Airlines | 872,921 | $43,646.05 | ambaugh/Aero Services |
| Comair Airlines | 253,008 | $12,650.40 | Stambaugh |
| Continental Airlines | 144,289 | $7,214.45 | Aero Services |
| Delta Airlines | 1,164,079 | $58,203.95 | Aero Services |
| Mesaba Aviation | 62,615 | $3,130.75 | Aero Services |
| North West Airlines | 641,078 | $32,053.90 | Aero Services |
| TWA | 43,047 | $2,152.35 | Aero Services |
| United Airlines | 1,195,170 | $59,758.50 | Stambaugh |
| USAir | 869,539 | $43,476.95 | Stambaugh |
| USAir Express | 628,529 | $31,426.45 | Aero Services |
| **PASSENGER TOTAL** | 6,171,875 | $308,593.75 | |
| | | | |
| SIGNATORY CARGO AIRLINES: | | | |
| Airborne Express | 104,754 | $5,237.70 | Aero Services |
| Burlington Air Freight | 385,144 | $19,257.20 | Aero Services |
| Emery | 358,523 | $17,926.15 | Stambaugh |
| Federal Express | 934,678 | $46,733.90 | Stambaugh |
| Federal Express Feeder | 46,720 | $2,336.00 | Stambaugh |
| Superior Airlines | 0 | $0.00 | Stambaugh |
| UPS | 371,564 | $18,578.20 | Aero Services |
| **CARGO TOTAL** | 2,201,383 | $110,069.15 | |

| | | | |
|---|---|---|---|
| *STAMBAUGH* | | | Stambaugh |
| NON-SIGNATORY/JET A TOTAL | 627,503 | $31,375.15 | $32,226.45 |
| NON-SIGNATORY/AV GAS TOTAL | 17,025.9 | $851.30 | |
| *AERO SERVICES* | | | Aero Services |
| NON-SIGNATORY/JET A TOTAL | 243,019 | $12,150.95 | $13,340.25 |
| NON-SIGNATORY/AV GAS TOTAL | 23,786 | $1,189.30 | |
| **FBO TOTALS** | 911,333.9 | $45,566.70 | |
| RESIDENT CORPORATE: | | | |
| AMP | 153,403.0 | $7,670.15 | |
| Select Transport  @ $.07/GAL. | 30,880 | $2,161.60 | |
| Hershey | 96,847 | $4,842.35 | |
| RiteAid | 218,416 | $10,920.80 | |
| **RESIDENT CORPORATE TOTAL** | 499,546.0 | $25,594.90 | 5.2% |
| | | | |
| ***STAMBAUGH TOTAL*** | 5,472,687.9 | $273,634.40 | 55.9% |
| ***AERO SERVICES TOTAL*** | 3,768,857.0 | $188,442.85 | 38.5% |
| | | | |
| **GRAND TOTAL** | 9,784,137.9 | $489,824.50 | 100% |

*Footnote: All Fuel Flowage Commissions Collected @ $.05/gal.*
*Unless Otherwise Noted*

FBO.FUEL FLOWAGE.9899.xls

Exhibit F

Based Aircraft

## Robert Hendricks

**From:**          Airport Operations
**Sent:**          Wednesday, June 16, 1999 4:19 PM
**To:**            Robert Hendricks
**Subject:**       Based Aircraft at MDT

Bob, here is what we have based here at MDT.  AMPs planes have been sold and are no longer on the field.  This list takes that into account.

42 Dash 8-100 - all belonging to Allegheny (they are never all here at the same time)
4 single-engine prop planes - Stambaugh Aviation
2 single engine prop planes - Sutliff
3 jets - Hershey
3 jets - Rite Aid
2 jets - Select Aviation
1 jet - L.B. Smith

57 aircraft total based here at MDT.

Hope this helps you!

B.T.

Exhibit G

Annual Aircraft Operations

| 1998 HIA OPERATIONS | JANUARY | FEBRUARY | MARCH | APRIL | MAY | JUNE | JULY | AUGUST | SEPTEMBER | OCTOBER | NOVEMBER | DECEMBER | TOTAL |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| AIR CARRIER (AC) | 1702 | 1585 | 1709 | 1640 | 1689 | 1670 | 1743 | 1765 | 1597 | 1830 | 1673 | 1790 | 20401 |
| AIR TAXI (AT) | 2301 | 2306 | 2556 | 2730 | 2699 | 2635 | 2764 | 2609 | 2732 | 2950 | 2775 | 2923 | 31980 |
| GENERAL AVIATION (GA) | 1177 | 1259 | 1396 | 1558 | 1439 | 1455 | 1548 | 1544 | 1747 | 1739 | 1359 | 1321 | 17541 |
| CIVIL (LOCAL) | 192 | 284 | 272 | 492 | 226 | 318 | 614 | 626 | 532 | 444 | 338 | 290 | 4628 |
| SUBTOTAL | 1369 | 1543 | 1668 | 2050 | 1665 | 1773 | 2162 | 2170 | 2279 | 2183 | 1698 | 1611 | 22169 |
| MILITARY (MI) | 305 | 424 | 365 | 327 | 341 | 318 | 412 | 506 | 554 | 712 | 335 | 412 | 5011 |
| MILITARY (LOCAL) | 200 | 358 | 262 | 356 | 288 | 234 | 318 | 468 | 616 | 830 | 206 | 462 | 4670 |
| SUBTOTAL | 505 | 782 | 627 | 683 | 629 | 552 | 730 | 974 | 1170 | 1542 | 621 | 874 | 9689 |
| TOTAL | 6877 | 6216 | 6560 | 7103 | 6682 | 6638 | 7399 | 7518 | 7778 | 8505 | 6765 | 7198 | 84239 |

works two shifts, seven days a week. Mechanics are on call for the times when the normal shifts are not working. Hiring of ramp service employees includes a review of applications and resumes. After an interview, the five-year work history is verified. If employed, the employee is entered into the SAS Drug Free Workplace Program. Mechanics, when hired, are entered into the FAA Anti Drug and Alcohol Programs.

(5.) *Employee Training and Recruitment Program.* As stated above, SAS is in the midst of a recruitment program for its current operations, which include the FBO Function. The FBO is a separate function within the Company, and trains the Fuel and Ground Handling personnel in Security, Fueling on aircraft specific manuals, Ground Handling on equipment specific operation, Drug, and Alcohol requirements, the drug testing program, and the employee benefits. Additionally, the employees are given the company medical and leave policy as well as the expectations on comportment. Recruiting is taking place with several technical schools and on the general industry news networks.

(6.) *Subtenants and Subcontractors.* This section is fully discussed within the Business Plan, and includes the use of subcontractors for the rendering of the other FBO services that are discussed in the FAA Advisory Circular, as well as the use of Subtenants in order to employ the extensive space of the AMP/TYCO building to its highest and best use.


Financial Questionnaire


See the attached document.


List of Current References and Operations


Attachments





**ORDER**

U.S. DEPARTMENT OF TRANSPORTATION
**FEDERAL** AVIATION ADMINISTRATION

5190.1A

10/10/85 ——

SUBJ: <u>EXCLUSIVE RIGHTS AT AIRPORTS</u>

1. <u>PURPOSE</u>. This order sets forth agency policy on the conduct of aeronautical activities at public-use airports on **which** Federal funds, administered by the agency, have been expended. It does not apply to the conduct of aeronautical activities by a governmental authority using its own employees, facilities, and resources.

2. <u>DISTRIBUTION</u>. This order is distributed to the director level in Washington **with** a branch level distribution in the Offices of Airport Planning and Programming, Airport Standards, and the Chief Counsel; to the branch level in the **regional** Airports) Airway **Facilities, and** Flight Standards Division and the **Regional** Counsel; **and** a standard distribution to all Airport District/Field Offices.

3. <u>CANCELLATION</u>. Order **5190.1**, Exclusive Rights at Airports, dated **10/12/65.**

4. <u>BACKGROUND</u>. Since the enactment of the Civil Aeronautics Act of **1938, there** have been statutory prohibitions against the grant of an exclusive right to **conduct** an aeronautical activity at an airport on **which** Federal funds have been expended. **This** exclusive right provision has been extended since **1938** through various **laws** and now applies to approximately **2800** airports open to the public. .

5. <u>EXPLANATION OF CHANGES</u>. The Airport Improvement Act of **1982** changed the exclusive rights provision of previous statutes. The new provision **provided** for economic evaluation of a single fixed-base operator being required to give up leased space for a second fixed-base operator to come on the airport. The agency has refined and clarified its policies as referred to in paragraph 8 to reflect this statute change.

6. <u>DEFINITIONS</u>.

   a. <u>Exclusive Right</u> — a power, privilege, or other right excluding or debarring another from enjoying or exercising a like power, privilege, or right. An exclusive right may be conferred either by express agreement, by imposition of unreasonable standards or requirements, or by any other means. Such a right conferred on one or more parties but excluding others from enjoying or exercising a similar right or rights would be an exclusive right.

   b <u>Aeronautical Activity</u> — any activity which involves, makes possible, or **is** required for the operation of aircraft, **or** which contributes to or is **required** for the safety of such operations.

      (1) The following activities, commonly on airports, are aeronautical **activi-** **i'ies** within this definition: charter operations, pilot training, aircraft rental a d sightseeing, aerial photography, crop dusting, aerial advertising and **surveying**.

5190.1A                                                                                          10/10/85

air carrier operations, aircraft sales and services, sale of aviation petroleum
products whether or not conducted in conjunction with other included activities,
repair and maintenance of aircraft, sale of aircraft parts, and any other **activi-**
ties which because of their direct relationship to the operation of aircraft can
appropriately be regarded as an "aeronautical activity."

     (2) The **following** are examples of what are not considered aeronautical
activities:  ground transportation (taxis, car rentals, and limousines) ;
restaurants;  barber shops ;  and auto parking lots.

    c.  Minimum Standards — the qualifications which **may be** established by an air-
port owner as the minimum requirements to **be** met as a **condition** for the right 'to
conduct an aeronautical activity on the airport.

7.  PERTINENT LAWS AND 'REGULATIONS.

    a.  **Section 308(** a) of the Federal Aviation Act, as amended in **1982,** provides
that **"there** shall be no exclusive **right** for the use of any **landing** area or air
navigation facility upon which Federal funds **have** been expended. For purposes of
the preceding sentence, **the** providing of **services** at an **airport by a** single **fixed-**
base operator shall not be construed **as** an exclusive right if it **would be** unreason-
ably costly, burdensome, or impractical for more than one fixed-base operator to
provide such services, and if **allowing** more than one **fixed-base** operator to provide
such services would require the reduction of space leased pursuant to an existing
agreement between such single fixed-base operator and such airport." Section 303 of
the Civil Aeronautics Act of 1938 contained identical language to the **above** quoted
Section 308(a) of the Federal Aviation Act **except** for' the second sentence.
Section 308(a) of the Federal Aviation Act also applies to all-airports developed
or improved pursuant to AP—4 Agreements.  Although all AP—4 -Agreements **have**
expired, termination of the agreement only relieves the airport owner of contrac-
tual obligations imposed by it.  Since the airport is one upon which Federal funds
have been expended, it is still subject to the exclusive rights prohibition for as
long as it is operated as an airport.  Recipients of grant agreements and
agreements under the **F & E** Program for the installation of navigational equipment
on privately owned airports are also subject to the continuing **obligation** of
Section 308(a), as amended in 1982, regardless of the date of the agreement.

    b.  Following World War II, a large number of former military installations
were conveyed under provisions of the Surplus Property Act of 1944 to local public
agencies without monetary consideration.  The Act, which was amended by **P.L. 80—289,**
provides in Section 13(**g**) that:

        "(c) No exclusive right for the use of the airport at which
            the property disposed of is located shall be vested
            (either directly or indirectly) in any person or
            persons to the exclusion of others in the same class.
            For the purpose of the conditions, an exclusive
            right is defined to mean --

        (1) **any** exclusive right to use the airport for
            conducting **any** particular aeronautical activity
            requiring operation of aircraft;

10/10/85                                                          5190.1A

     (2) any **exclusive** right to engage in the sale or
        supplying of aircraft, aircraft accessories,
        equipment, or supplies or aircraft- services
        necessary for the operations of aircraft
        **(including** the maintenance and repair of
        aircraft, aircraft engines, propellers, and
        appliances)."

    c.  Section 511(a)( 1) of the Airport and Airway Improvement Act of 1982
requires that the Administrator shall receive assurances in writing, satisfactory
to him, that

        **"the** airport to which the project relates will be
        available for public use on fair and reasonable
        terms and without unjust discrimination --;"

    d   Section 51 1(a) (2) of the Airport and Airway Improvement Act of 1982
requires the airport owner to assure that

        **"There** will be no exclusive right for the use of
        the airport by any person providing, or intending
        to provide, aeronautical services to the public.
        **For** purposes of this paragraph, the providing of
        **services** at an airport by a single fixed-base
        operator shall not be construed as an exclusive
        right if it would be unreasonably costly, burdensome,
        or impractical for more than one fixed-base operator
        to provide such services, and if allowing more than
        one fixed-based operator to provide such services
        would require the reduction of space leased
        pursuant to an existing agreement between such
        **single** fixed-base operator and such airport."

8   POLICY.  The grant of an exclusive right for the conduct of any aeronautical
activity, on an airport to which this **order** applies, is regarded as contrary to the
requirements of applicable laws, whether such exclusive right results from an
express agreement, from the imposition of unreasonable standards or requirements,
or by **any** other means.

9.  INTERPRETATION OF POLICY.

    a.  Single Activity Not Necessarily an Exclusive Right. The presence on an
airport of only one person engaged in an aeronautical **activity** as herein defined
will not itself be considered a violation of this **policy** if there is no intent by
express **agreement**, imposition of unreasonable standards or requirements, or by any
other means to exclude others.  This would occur where the volume of business may
not be sufficient to attract more than one person.  As long as the **opportunity** to
**engage** in an aeronautical activity is available to those **meeting** reasonable quali-
fications and standards relevant to such activity, the fact that only one person
takes advantage of the  opportunity does not constitute the grant of an exclusive
right.

5190.1A                                                                    10/10/85

b.  <u>Single Activity Due to Space Limitation</u>.  The **leasing Of all** available airport land or improvements suitable for an aeronautical **activity to one** person **will** be construed as evidence of an intent to exclude others unless it can be **reasonably** demonstrated that the entire leased area is presently **required -and will be immediately** used to conduct that activity.  In some instances an **aeronautical activity** may be limited, as the result of this policy or otherwise, to the lease of such space as is demonstrably needed.  If additional space **is needed at a** later date, it must be made available to all qualified proponents or bidders, **Including the incumbent**.  The advance grant of options or **preferences on all future sites** to the incumbent is an exclusive right.  On the **other hand, nothing in this policy** should be construed as limiting the expansion of such aeronautical **activities** when **additional** space is required, even though it could ultimately **result in complete** saturation of all space by the one activity.

c.  <u>Single Activity to Delete Space for **Second** Fixed-B&se **Operator**</u>.  If an airport has only a single aeronautical activity which has a demonstrable need for all the space leased (paragraph 9b) and it would be required to give up a portion of its leased space to accommodate a second aeronautical -activity, then a determination must be made by the airport owner if it would **be unreasonably costly**, burdensome, or impractical for more than one aeronautical **activity to** provide such aeronautical services on the airport.  The justification for **this** determination must be fully documented.  If a complaint in opposition to **the** airport owner's determination is filed with **FAA,** the responsible region **will review** and evaluate the documentation used by the airport owner for Its determination.  **If** further investigation is needed to review the determination, **it will be done by the region**.

d.  <u>Restrictions Based on Safety</u>.  Under some circumstances, **a** person may be denied the right to engage in an aeronautical activity at an airport. for reasons of safety.  The justification for such denials should be fully documented.

e.  <u>Restrictions on Self-Service</u>.  Any unreasonable restriction imposed on the owners or operators of aircraft regarding the servicing of their own aircraft and equipment will be construed as a violation of this policy. Owners of an aircraft should be permitted to fuel, wash, repair, paint, and otherwise **take** care of their own aircraft.  A restriction which has the effect of diverting such business to an operator of such an aeronautical activity will be deemed to be an exclusive right violation contrary to law.  However , local airport regulations may include such restrictions on these self-service activities as are reasonably necessary for safety, preservation of facilities, and protection of the public interest.

10/10/85                                                                    5190.1A

10. **ENFORCEMENT** .

   a. __Remedies__. At any airport where there **has been a grant of an exclusive**
right contrary to law and this policy, that **airport** and **any other airport owned or**
controlled by the offending airport owner **will be Ineligible for assistance** under
the Airport Improvement Program **and the agency will not expend Facilities** and
Equipment (F&E) funds for installations **designed to benefit traffic** at such air-
ports unless necessary to remedy **a safety problem.** **No grant agreement may be exe-
cuted,** and no payment of **funds due** under **prior grant agreements shall be made, nor,**
shall any **F&E** equipment funds be expended until the **exclusive right has been**
terminated.

   b. __National Defense and National Interest__. This order shall **not be construed**
as precluding the grant or expenditure of Federal **funds** when required for the
national defense, or when determined by the Administrator to **be In** the national
interest.

11. **ADMINISTRATION OF POLICY**.

   a. __Intent__. The FAA does not routinely conduct a special investigation or
inquiry solely to determine whether an exclusive **right** may **have** been granted.
However, **the** agency will review any complaint by a person who claims to have been
denied the right **to** exercise an aeronautical activity because **of** the grant of an
exclusive right which is contrary to law and the provisions hereof. Further, the
agency will investigate any apparent violation which is discovered during routine
visits to, and inspection of, airports.

   b. **Project Application.** As **a** material part of any grant agreement' in **antici-
pation** of financial assistance under the Airport and Airway Improvement Act **of**
**1982,** all applicants for such assistance will be required **to assure** that there
is no grant of exclusive right which would preclude expenditure **of** funds by the
FAA under the provisions hereof at any public-use airport then owned or controlled
by the applicant.

   c. __Imposition of Standards__. It is the intent of the foregoing policies to
promote fair competition at public-use airports. It is expected that public-use
airport owners will adopt and enforce minimum standards and qualifications to be
met by those who propose to engage in commercial aeronautical activities.
Primarily such standards should protect the interest of the public. The applica-
tion of any unreasonable requirement or standard to **the** proposed activities, or any
requirement or standard which **is** applied In a discriminatory manner, shall be con-
sidered to be a constructive grant of an exclusive right contrary to applicable laws
and the provisions hereof.

*Donald D. Engen*

Donald D. **Engen**
Administrator



**ORDER**

**5190.6A**

# AIRPORT COMPLIANCE
# REQUIREMENTS



## OCTOBER 2, 1989

## DEPARTMENT OF TRANSPORTATION
### FEDERAL AVIATION ADMINISTRATION



installations under the surplus property laws. Many of the surplus property conveyances did not literally require conformity to the prohibition against exclusive rights' in Section 303 of the Civil Aeronautics Act, but they contained the far more specific restrictions quoted in paragraph 31d above.

**b. Early Interpretations of Aeronautical Activity.** In approving grants of funds for airport development the CAA/FAA has always insisted that there could be no exclusive right for the use of such airports. Any activity which involved use of the landing area (e.g., flight school, airline, charter service, etc.) was considered to be subject to the statutory prohibition. However, a nonaeronautical activity, such as a restaurant or ground transportation service, was viewed as not subject to the prohibition. In early policy interpretations there were many activities which cater to or support flight operations, but which do not actually use the landing area (such as storage hangars, repair services, aircraft parts sales, and especially the sale of fuel

and oil) and were viewed as not being subject to the prohibition. The FAA, as a matter of policy, advised against monopolies for such activities. However, in 1962 the FAA Policy on Exclusive Rights was published in the Federal Register and it declared the exclusive rights of these activities to be in violation of the law.

**c. Definition of Aeronautical Activity.** On July 17, 1962, the FAA issued Order 0A 5250.1 which defined those aeronautical activities prohibited on an exclusive basis by Section 308(a) of the Federal Aviation Act. On October 12, 1965, this Order was superseded by Order 5190.1, Exclusive Rights at Airports, to further clarify the application of the statutory prohibition. Section 2 of this Chapter explains in detail the types of aeronautical activity covered by the prohibition and the FAA policies for interpreting and applying Section 308(a).

**3-4.-3-7. RESERVED.**

## SECTION 2.   POLICY

### 3-8. BASIS OF POLICY

**a. Agency Position.** The FAA has concluded that the existence of exclusive right to conduct any aeronautical activity at an airport limits the usefulness of the airport and deprives the using public of the benefits of a competitive enterprise. Apart from legal considerations, the FAA considers it inappropriate to provide Federal funds for improvements to airports where the benefits of such improvements will not be fully realized due to the inherent restrictions of an exclusive monopoly on aeronautical activities.

**b. Application of Law.** The grant of an exclusive right to conduct an aeronautical activity at an airport on which Federal funds have been expended is considered a violation of Section 308(a) of the Federal Aviation Act, whether such exclusive right results from an express agreement, from the imposition of unreasonable standards or requirements, or by any other means. As an exception, the existence of an exclusive right to sell only fuel and oil will not be considered to be in violation of Section 308(a) where such right is specifically exempted from the activities prohibited by a deed under the Surplus Property Act of 1944, as amended (P.L. 80-289). However, presence of such an exclusive right would preclude issuance of a grant under the AAIA Act of 1982, as amended. (See Chapter 6, Section 2.)

**c. Duration of Prohibition Against Exclusive Rights.** Once any Federal funds have been expended

at an airport, including a surplus property conveyance, the exclusive rights prohibition is applicable for as long as it is operated as an airport.

### 3-9. INTERPRETATION.

**a. Single Activity Not Necessarily an Exclusive Right.** The presence on an airport of only one enterprise engaged in any aeronautical activity will not be considered a violation of this policy if there is no understanding, commitment, express agreement, or apparent intent to exclude other reasonably qualified enterprises. In many instances, the volume of business may not be sufficient to attract more than one such enterprise. As long as the opportunity to engage in an aeronautical activity is available to those meeting reasonable qualifications and standards relevant to such activity, the fact that only one enterprise takes advantage of the opportunity does not constitute the grant of an exclusive right.

**b. Single Activity as Treated by Law.** The AAIA (P.L. 97-248) includes the following sponsor assurance under Section 511(a)(2):

"...There will be no exclusive right for the use of the airport by any person providing, or intending to provide, aeronautical services to the public. For purposes of this paragraph, the providing of services at an airport by a single fixed-based operator shall not be construed as an exclusive right if it would be unreasonably costly, burdensome, or impractical for more

than one fixed–based operator to provide such services, and if allowing more than one fixed–based operator to provide such services would require the reduction of space leased pursuant to an existing agreement between such single fixed–based operator and such airport..."

The Chief Counsel rendered an opinion dated December 21, 1982, which concludes that this amendment to Section 308(a) applies to those airports previously obligated under Section 308(a) where a single fixed–based operator (FBO) now exists. This assurance obligates the grant recipients to the same terms and conditions of amended Section 308(a). (Reference Order 5190.1.)

The exclusive rights policies that are outlined herein remain unchanged except for those airports which have a single FBO whose lease agreement with the airport owner must be amended to delete space for a second FBO to do business on the airport. In these cases, it must be determined if it would be unreasonably costly, burdensome, or impractical for more than one FBO to provide such services on the airport. This does not apply where the lease is being amended to delete space due to lack of demonstrable need (see below).

c. **Single Activity Due to Space Limitation.** The leasing to one enterprise of all available airport land and improvements planned for aeronautical activities will be construed as evidence of an intent to exclude others unless: (1) the lease meets the criteria of and contains the special provisions described in paragraph 6–5c; or (2) it can be demonstrated that the entire leased area is presently required and will be immediately used to conduct the activities contemplated by the lease.

(1)   The complete saturation of space available for the service, storage, and repair of aircraft is prima facie evidence of a serious imbalance in the development of airport facilities. At a new or recently developed airport such saturation reflects poor planning and unrealistic forecasts of need. However, an arbitrary division or restriction to create an opportunity for a competitive enterprise is not required merely to comply with the exclusive rights policy.

(2)   A single aeronautical enterprise although meeting all reasonable standards and qualifications should be limited, as a result of this policy, to the lease of such space as is demonstrably needed. If the need for additional space becomes apparent at a later date, such space, as well as any new areas developed for the service and support of aeronautical activities, must be made available to all qualified proponents or bidders, including the incumbent. The advance grant of options or preferences (including right of first refusal)

on all future sites to the incumbent enterprise must be viewed as an exclusive right. On the other hand, nothing in this policy should be construed as limiting the expansion of such an enterprise when space requirements become critical and where the proposed lease area will be immediately used to conduct activities, even though it could ultimately result in complete saturation of all space by the one enterprise.

d. **Aeronautical Activities Conducted by the Airport Owner (Proprietary Exclusive).**   The owner of a public–use airport (public or private owner) may elect to provide any or all of the aeronautical services needed by the public at the airport. In fact, the statutory prohibition against exclusive rights does not apply to these owners and they may exercise but not grant the exclusive right to conduct any aeronautical activity. However, these owners must engage in such activities as principals using their own employees and resources. An independent commercial enterprise that has been designated as agent of the owner may not exercise nor be granted an exclusive right. (Reference Chief Counsel opinion dated April 13, 1984.)

(1)   As a practical matter most public agencies recognize that these services are best provided by profit–motivated private enterprise. The exceptions are usually those instances in which a municipality or other public agency elects to provide fuel service or aircraft parking. If it does so, whether on an exclusive or nonexclusive basis, it may not refuse to permit an air carrier, air taxi, or flight school to fuel its own aircraft.

(2)   The airport owner may establish reasonable standards covering the refueling, washing, painting, repairing, etc., of aircraft, but it may not refuse to negotiate for the space and facilities needed to meet such standards by an activity offering aeronautical services to the public. If the airport owner reserves unto itself the exclusive right to sell fuel, it can prevent an airline or air taxi from selling fuel to others but it must deal reasonably to permit such operators to refuel their own aircraft. The self–service fueling by such flight operators, however, must be done with their own employees and equipment.

(3)   An aircraft operator does not have a right to bring a third party, such as an oil company, on the airport to refuel his aircraft. This would be an aeronautical activity undertaken by the fuel company which has only such rights as the airport owner may confer. It should be noted that air carriers invariably insist on a standard condition in their airport contracts reserving the right to obtain fuel from a supplier of their choice. However, this is not a right guaranteed by the terms of a grant agreement.

e.  **Restrictions on Self–Service.**

(1)  Any unreasonable restriction imposed on the owners or operators of aircraft regarding the servicing of their own aircraft and equipment may be construed as a violation of this policy. Where no attempt has been made to perform such services for others, aircraft owners should be permitted to fuel, wash, repair, paint and otherwise take care of their own aircraft. A restriction which has the effect of diverting such business to a commercial operator amounts to an exclusive monopoly of an aeronautical activity contrary to law.

(2)  Servicing one's own aircraft is not an aeronautical activity that can be preempted by the airport owner which elects to exercise the exclusive right to sell fuel. Quite apart from the prohibition against exclusive rights, the sponsor of an obligated airport is required to operate the airport for the use and benefit of the public on fair and reasonable terms. It may not, as a condition for the use of its airport, impose unreasonable requirements on aircraft operators to procure parts, supplies or services from specified sources. It can however, require the self-fueler, both individuals and operators, to pay the same fuel flowage fee as those operators on the airport who provide fueling services to the public. As long as the aircraft operators do not attempt to offer commodities or services to others, they have a right to furnish their own supplies and to do what is necessary to their aircraft in order to use the facilities of a public use airport.

(3)  An airport owner is under no obligation to permit aircraft owners to introduce on the airport equipment, personnel or practices which would be unsafe, unsightly, detrimental to the public welfare, or which would affect the efficient use of airport facilities by others. Reasonable rules and regulations should be adopted to confine aircraft maintenance and fueling operations to appropriate locations with equipment commensurate to the job being done. Unless the aircraft owner is in a position to meet such standards with his own equipment and personnel, his right to service his own aircraft does not override the prerogative of the airport owner to control the sources of providing fuel and other aeronautical services. For example, airport agreements do not permit the owner of a private aircraft to contract with an off-airport company to enter upon the airport and refuel his aircraft. This would clearly be the conduct of an aeronautical activity, not by the aircraft owner, but by the fuel company. Also, the airport owner is under no obligation by the terms of the grant assurances to recognize a "CO–OP" (an organization formed by several aircraft owners for the purpose of self fueling) as a single aircraft owner for self fueling purposes. However, fueling activities by a "CO–OP" could be allowed by the air-

port owner provided appropriate agreements (safety standards, fees, conditions, etc.) were consummated. Where the sponsor has retained, on an exclusive basis, this right to fuel or service the aircraft of others it may prohibit such entries. With respect to fuel, therefore, the aircraft owner may assert the right to obtain fuel where he pleases and bring it onto the airport to service his own aircraft, but only with his own employees and only in conformance with the reasonable safety standards or other reasonable requirements of the airport. This policy also applies to aircraft owners who have obtained supplemental type certificates authorizing the use of automotive gasoline (mogas) in their aircraft and who wish to self service their aircraft with mogas.

(4)  Local airport regulations may and should include such restrictions as are reasonably necessary for safety, preservation of facilities and protection of the public interest. For example:

(a)  The use of paints, dopes, and thinners should be confined to structures meeting appropriate safety criteria.

(b)  Storage and transport of aviation fuel, though not procured for resale, should be subject to reasonable restrictions and minimum standards for equipment, location and handling practices.

(c)  Restraints should be placed on the use of aircraft washing solvents to protect sewage and drainage facilities.

(d)  Weight limitations should be imposed on delivery trucks (including fuel trucks) and special purpose vehicles such as cranes where needed to protect airport roads and paving.

(e)  Time limits should be placed on the open storage of nonairworthy aircraft, wreckage, or unsightly major components.

(f)  Such restrictions as may be required by appropriate Federal or state agencies to protect the environment and minimize pollution or other adverse effects.

(g)  Restraints should be placed on the storage of nonaeronautical vehicles such as boats, cars, trailers and mobile homes, etc., in hangars or on the aeronautical facilitie areas.

f.  **Licenses Not Controlled by Airport Owner.** The Federal Communications Commission (FCC) authorizes use of special UNICOM frequencies for air-to-ground communication at airports. The primary purpose of the communications station is to disseminate aeronautical data, such as weather, wind direction, runway information, etc. To preclude the issuance of

conflicting reports, the FCC will not license more than one UNICOM station at the same airport. An aeronautical activity having a UNICOM station or similar exclusive privilege has an advantage over competitors in attracting aeronautical users. However, since such an exclusive right is not subject to the airport owner's control, it does not constitute a grant of exclusive rights to which the statutory prohibition of Section 308(a) applies. Airport owners should be encouraged to obtain the UNICOM license in their own names. Through droplines they can make the facility available to all FBO's on an equal basis.

**g. Flying Clubs.** Flying clubs are nonprofit entities (corporations, associations or partnerships) organized for the express purpose of providing its members with an aircraft or aircraft for their personal use and enjoyment only. The ownership of the aircraft, or aircraft, must be vested in the name of the flying club (or owned ratable by all its members). The property rights of the members of the club shall be equal and no part of the net earnings of the club will inure to the benefit of any form (salaries, bonuses, etc.). The club may not derive greater revenue from the use of its aircraft than the amount for the operation, maintenance and replacement of its aircraft. A flying club qualifies as an individual under the grant assurances and, as such, has the right to fuel and maintain the aircraft with its members. The airport owner has the right to require the flying club to furnish such documents, insurances policies, and maintain a current list of members as reasonably necessary to assure that the flying club is a nonprofit organization rather than a FBO masquerading as a flying club. (See Appendix 8, Sample Flying Club Lease.)

**3-10. IMPLEMENTATION OF POLICY.**

**a. Voluntary Compliance.** The FAA will consider as a breach of compliance obligations by the airport owner, any grant of an exclusive right in violation of the policy outlined herein at any airport obligated to the United States as a result of a grant agreement (FAAP/ADAP/AIP), AP-4 agreement, or a conveyance of Federal property under the Surplus Property Act, or under Section 16, 23, or 516. Every reasonable effort shall be made to influence a voluntary termination of the objectionable exclusive right using the guidance and techniques suggested in Chapter 5.

**b. Remedies.** At any airport where there has been a grant of an exclusive right contrary to law and this policy, that airport and any other airport owned or controlled by the offending airport owner will be ineligible for assistance under AIP and the FAA will not expend Facilities and Equipment (F&E) funds for installations designed to benefit traffic at such airports unless necessary to remedy a safety problem. See Chapter 6, Section 2 for discussion of procedural enforcement matters.

**c. Exceptions.** Nothing herein shall be construed as precluding the grant of Federal funds where required for the national defense, or when determined by the Administrator to be essential to the national interest.

**3-11. IMPROVEMENTS BY OTHER FEDERAL AGENCIES.**

**a. Expenditures on Civil Airports.** From time to time various Federal agencies and activities other than the FAA have expended Federal funds to bring about permanent or temporary improvement of civil airports, usually in furtherance of essential Federal programs for which they are responsible. The Chief Counsel of the FAA has determined that any such expenditures which result in the improvement of airport facilities constitute an expenditure of funds within the meaning of the Federal Aviation Act. Consequently, such action has the effect of imposing the prohibition against the grant of exclusive rights at such an airport. In instances of this kind, the Chief Counsel has concluded that the FAA has primary responsibility for enforcing the prohibition regardless of the source of the Federal funds.

**b. Statutory Requirement.** As noted in paragraph 31a of this Order the language of Section 308(a) of the Federal Aviation Act not only prohibits exclusive rights but restricts the use of Federal funds for airport development (other than military) to those landing areas certified by the FAA Administrator as being reasonably needed for air commerce or national defense. FAA approval of the National Plan of Integrated Airport System (NPIAS) satisfies this requirement for federally-funded airport development projects. Federal agencies proposing to expend Federal funds on airport improvements not included in the NPIAS are responsible for obtaining a Certificate of Air Navigation Facility Necessity.

**c. FAA Responsibility.** Whenever consulted, FAA personnel will advise the representatives of other Federal agencies contemplating the improvement of airport facilities as to the applicability of the above described statutory provision. Both the airport owner and the Federal agency involved should understand that the expenditure of such funds will result in the imposition of the prohibition against exclusive rights at such airports.

**d. Federally-Owned Airports.**

**(1) Military and Special Purpose Airports.** The prohibition against exclusive rights contained in the Federal Aviation Act does not apply to the actions





# AC No: 150/5190-2A EXCLUSIVE RIGHTS AT AIRPORTS

## REPRINTED MARCH 1976

## INCORPORATES CHG 1

| Initiated by: AS-680 | Date: 4 Apr 72 |
|---|---|

**1. PURPOSE.** This circular is issued to make available to public airport owners, and to other interested persons, basic information and guidance on this agency's policy regarding exclusive rights at public airports on which Federal fluids, administered by the agency, have been expended.

**2. CANCELLATION.** AC 150/5190-2 dated 2 September 1966 is cancelled.

**3. CONTENT.** Included in this circular are discussions of the exclusive rights policy in general, the legislation requiring it, the history of its development and an explanation of how it applies to aeronautical activities conducted on public airports developed or improved with Federal assistance. Descriptions of some typical situations are presented to illustrate the agency's interpretation and administration of the policy. The material offered here is nonregulatory and is intended only to foster a better understanding of the exclusive rights policy by those public airport owners to whom it applies. For owners of public airports who have not received Federal aid, this circular will illustrate how they would be affected should they seek such aid in the future. Those engaged in a commercial activity on an airport should also find this information of interest.

**4. REFERENCES.**

**a.** Policy Statement "Exclusive Rights at Airports" as published in the Federal Register (30 FR 13661), 27 October 1965.

**b.** FAA Advisory Circular AC 150/5190-1, Minimum Standards for Commercial Aeronautical Activities on Public Airports. This circular can be obtained from the Department of Transportation (DOT) Distribution Unit, TAD-484.3, Washington, D.C. 20590.

**5. LEGISLATIVE BACKGROUND.**

**a.** There have been statutory prohibitions against the granting of exclusive rights at an airport ever since the enactment of the Civil Aeronautics Act of 1938. Section 303 of that Act provided "there shall be no exclusive right for the use of any landing area or air navigation facility upon which Federal funds have been expended." More recently, this identical language was incorporated in section 308(a) of the Federal Aviation Act of 1958.

**b.** During the course of World War II many civil airports were improved with Federal funds. This program was carried out under agreements requiring that these airports be operated "without the grant or exercise of any exclusive right for use of the airport within the meaning of section 303 of the Civil



Aeronautics Act of 1938." Following World War II, a great many former military airports were conveyed to public agencies under the provisions of the Surplus Property Act of 1944. Initially, the deeds which transferred these surplus airports included a covenant that there would be no exclusive right contrary to the provisions of section 303. Subsequently, however, in 1947, the Surplus Property Act was amended by P.L. 80-289 which defined an exclusive right, but excluded from the definition the sale of gas and oil.

c. Since 1947, the Civil Aeronautics Administration (CAA) and its successors, the Federal Aviation Agency (FAA) and the Federal Aviation Administration (FAA), administered the Federal-aid Airport Program (FAAP) under the authority of the Federal Airport Act of 1946. The Federal Airport Act of 1946 was repealed by the Airport and Airway Development Act of 1970 and under the authority of the latter Act the Airport Development Aid Program (ADAP) was formulated. In approving grants of Federal funds under these programs, the CAA, and later the FAA, always maintained that there could be no exclusive right for any aeronautical activity which involved use of the airport's landing area. The acceptance of a grant under either of these programs prohibits the granting of an exclusive right of any aeronautical activity as long as the facility is operated as an airport. In recent years, the agency has refined and clarified its policies as referenced in paragraph 4. The following paragraphs explain how this policy will be administered and how it applies to specific circumstances frequently encountered.

6. **DEFINITIONS.** For the purpose of this circular, the following definitions apply:

a. **Exclusive Right.** A power, privilege, or other right excluding or debarring another from enjoying or exercising a like power, privilege, or right. An exclusive right may be conferred either by express agreement, by imposition of unreasonable standards or requirements, or by any other means. Such a right conferred on one or more parties but excluding others from enjoying or exercising a similar right or rights would be an exclusive right.

b. **Aeronautical Activity.** Any activity which involves, makes possible, or is required for the operation of aircraft, or which contributes to or is required for the safety of such operations.

(1) The following activities, commonly conducted on airports, are aeronautical activities within this definition: charter operations, pilot training, aircraft rental and sightseeing, aerial photography, crop dusting, aerial advertising and surveying, air carrier operations, aircraft sales and services, sale of aviation petroleum products whether or not conducted in conjunction with other included activities, repair and maintenance of aircraft, sale of aircraft parts, and any other activities which because of their direct relationship to the operation of aircraft can appropriately be regarded as an "aeronautical activity."

(2) The following are examples of what are not considered aeronautical activities: ground transportation (taxis, car rentals, limousines); restaurants; barber shops; auto parking lots.

c. **Minimum Standards.** The qualifications which may be established by an airport owner as the minimum requirements to be met as a condition for the right to conduct an aeronautical activity on the airport.



**d.  Federal-aid Airport Program (FAAP).** A grant-in-aid program administered by the agency under the authority of the Federal Airport Act of 1946 (49 USC-1101), as amended, to assist public agencies in the development of a nationwide system of public airports. The Federal Airport Act of 1946 was repealed by the Airport and Airway Development Act of 1970.

**e.  Airport Development Aid Program (ADAP).** A grant-in-aid program administered by the FAA under the authority of the Airport and Airway Development Act of 1970 (49 USC-1701) to assist public agencies in the substantial expansion and improvement of the Nation's airport system.

**7.  POLICY.** The grant of an exclusive right for the conduct of any aeronautical activity, on an airport on which Federal funds, administered by the FAA, have been expanded, is regarded as contrary to the requirements of applicable laws, whether such exclusive right results from an express agreement, from the imposition of unreasonable standards or requirements, or by any other means. However, the existence of an exclusive right to sell gasoline and oil will not be considered to be in violation of section 308(a) where such right has been specifically exempted by a deed under the Surplus Property Act, except where an agreement not to grant an exclusive right for the sale of gasoline and oil is controlling. (See subparagraph b.)

**a.  Agency Position.** The agency considers that the existence of an exclusive right to conduct any aeronautical activity limits the usefulness of an airport and deprives the using public of the benefits of competitive enterprise. Apart from legal considerations, the agency believes it clearly. inappropriate to apply Federal funds to improvement of an airport where full realization of the benefits would be restricted by the exercise of an exclusive right to engage in aeronautical activities."

**b.  Application of Law.** The exemption contained in a surplus property deed permitting the grant of an exclusive right for the sale of gas and oil does not operate to confer a positive privilege. If the airport was already obligated by a prior agreement prohibiting an exclusive right, the deed does not relieve the owner from such obligation. Conversely, where such an exemption for gas and oil is in effect, any subsequent grant of Federal funds, administered by the agency, requires the airport owner to agree not to permit the establishment of an exclusive right to engage in aeronautical activities, including the sale of gas and oil, in the future and to terminate any existing agreement which permits such an exclusive right as soon as possible.

**8.  INTERPRETATION OF POLICY.** The circumstances involved in arranging for the availability of adequate aeronautical services vary widely from airport to airport. The following material has been prepared in an effort to furnish general guidance based on experience with exclusive rights problems.

**a.  Single Activity.** The presence on an airport of only one enterprise conducting aeronautical activities does not necessarily mean that an exclusive right has been granted. If there is no intent by express agreement, by the imposition of unreasonable standards, or by other means to exclude others, the absence of a competing activity is not a violation of this policy.  This sort of situation frequently arises where the market potential is insufficient to attract additional aeronautical activities.  So long as the opportunity to engage in an aeronautical activity is available to those who meet reasonable and relevant standards, the fact that only one enterprise takes advantage of the opportunity does not



constitute a grant of an exclusive right.

**b.** **Space Limitations.** The leasing of all available airport land or facilities suitable for aeronautical activities to a single enterprise will be construed as evidence of an intent to exclude others. This presumption will not apply if it can be reasonably demonstrated that the total space leased is presently required and will be immediately used to conduct the planned activity. The amount of space leased to a single enterprise should be limited to that for which it can clearly demonstrate an actual, existing need. If additional space becomes necessary at a later date, it must be made available, not only to an incumbent enterprise, but at the same time to all qualified proponents or bidders. The advance grant of options or preferences on future sites to a single incumbent is evidence of an intent to grant an exclusive right. On the other hand, nothing in this policy should be construed as limiting the expansion of a single enterprise when it needs additional space, even though it may ultimately reach complete occupancy of all space available.

**c.** **Restrictions Based on Safety.** Under certain circumstances, it is sometimes necessary to deny the right to engage in an aeronautical activity at an airport for reasons of safety. Where this denial has the effect of shielding an established enterprise from competition, it should be carefully and thoroughly justified by the airport owner.

**d.** **Restrictions on Self-Service.** Any unreasonable restriction imposed on the owners and operators of aircraft regarding the servicing of their own aircraft and equipment may be considered as a violation of agency policy. The owner of an aircraft should be permitted to fuel, wash, repair, paint and otherwise take care of his own aircraft, provided there is no attempt to perform such services for others. Restrictions which have the effect of diverting activity of this type to a commercial enterprise amount to an exclusive right contrary to law. Local airport regulations, however, may and should impose restrictions on these activities necessary for safety, preservation of airport facilities and protection of the public interest. These might cover, for example, restrictions on the handling practices for aviation fuel and other flammable products, such as aircraft paint and thinners; requirements to keep fire lanes open; weight limitations on vehicles and aircraft to protect paving from over-stresses, etc.

**e.** **Monopolies Beyond Control of Airport Owners.** The Federal Communications Commission, which authorizes the use of "UNICOM" frequencies for air-to-ground use at airports, will not license more than one ground station at the same airport. Although these and similar exclusive franchises unquestionably give the recipient an advantage over competitors, they do not constitute a grant of an exclusive right contrary to agency policy. Airport owners are encouraged to obtain the UNICOM license in their own names and through droplines to make the facility available to all fixed base operators on a required basis.

## 9. ENFORCEMENT.

**a.** **Remedies.** At any airport where there has been a grant of an exclusive right contrary to law and this policy, that airport and any other airport owned or controlled by the offending airport owner will be ineligible for assistance under the ADAP, and the agency will not expend Facilities and Equipment funds for installations designed to benefit traffic at such airports. No grant agreement may be



executed, and no payment of funds due under prior grant agreements shall be made, nor shall any Facilities and Equipment funds be expended until the exclusive right has been terminated.

**b.** **National Defense and National Interest.** This policy shall not be construed as precluding the grant or expenditure of Federal funds when required for the national defense, or when determined by the Administrator to be in the national interest.

**c.** **Application to Preexisting Agreements.** On 17 July 1962, the agency defined the aeronautical activities prohibited by section 308(a) of the Federal Aviation Act. Prior to the publication of this definition, exclusive rights to conduct certain activities not involving the actual use of public landing areas were considered not to be in violation of the statute. Also, as noted in paragraph 7 hereof, the grant of an exclusive right to sell only gasoline and oil would not be in violation of the statute where the controlling agreement with the Government is a surplus property deed specifically exempting such sales from the activities otherwise prohibited on an exclusive basis. The agency will continue to participate in airport development in these instances if it can be demonstrated that an exclusive right agreement made prior to 17 July 1962, or pursuant to the exemption in a surplus property deed, will be effectively terminated as soon as possible. The termination date will in no event be later than the earliest renewal or cancellation date specified in the lease or agreement covering such an exclusive right agreement. However, in no case will ADAP participation in airport improvement be authorized where there exists an exclusive right which was prohibited under the interpretation prior to 17 July 1962.

**10.** **PROPRIETARY EXCLUSIVES.** The public agency that owns and operates a public airport may engage in any proprietary aeronautical activity and deny the same right to others without violating this policy. This means that the public agency may provide aeronautical services on an exclusive basis, but only if it does so as a principal, using its own employees and resources. This exemption is not effective where an independent commercial enterprise is designated an "agent" of the airport owner.

**11.** **ADMINISTRATION OF POLICY.**

**a.** As a material part of any grant agreement in anticipation of financial assistance under the Airport and Airway Development Act, all applicants for such assistance will be required to:

(1) Certify that there is no grant of an exclusive right which would preclude expenditure of funds by the agency under applicable law and agency policy at any public airport owned or controlled by the applicant, and

(2) Give assurances that none will be granted on any airport now owned or controlled by the applicant.

**b.** It is the intent of this policy to promote fair competition at public airports and not to expose those who have undertaken to provide commodities and services to irresponsible competition. Prudent airport owners will adopt and enforce minimum standards to be met by those who propose to conduct a commercial aeronautical activity. Such standards, by expressing minimum levels of service that must be offered, relate primarily to the public interest, but appropriate requirements uniformly applied discourage substandard enterprises, thereby protecting both the established aeronautical activity and



the airport patrons. The application of any unreasonable requirement, or standard not relevant to the proposed activity, or any requirement that is applied in a discriminatory manner shall be considered a constructive grant of an exclusive right contrary to applicable law and provisions of agency policy. __

**12.** **HOW TO OBTAIN THIS PUBLICATION.** Obtain additional copies of this publication, AC 150/5190-2A, Exclusive Rights at Airports, from the Department of Transportation, Distribution Unit, TAD-484.3, Washington, D.C. 20590.

CHESTER G. BOWERS
Director Airports Service

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

## I (a) PLAINTIFFS    (1 9 B A).

Stambaugh's Air Service, Inc.

## DEFENDANTS

Susquehanna Area Regional Airport Authority, BAA Harrisburg, Inc., David Fleet, individually, David Holdsworth, individually, and David C. McIntosh, individually

**(b)** COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF __Dauphin__
(EXCEPT IN U.S. PLAINTIFF CASES)

COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT _____
(IN U.S. PLAINTIFF CASES ONLY)
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED

**(c)** ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER)

Thomas B. Schmidt, III, Brian P. Downey,
Randy L. Varner
Pepper Hamilton LLP
200 One Keystone Plaza, N. Front & Market Sts
P.O. Box 1181, Harrisburg, PA 17108-1181

ATTORNEYS (IF KNOWN)

## II. BASIS OF JURISDICTION (PLACE AN × IN ONE BOX ONLY)

☐ 1 U.S. Government Plaintiff

☒ 3 Federal Question
(U.S. Government Not a Party)

☐ 2 U.S. Government Defendant

☐ 4 Diversity
(Indicate Citizenship of Parties in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES (PLACE AN × IN ONE BOX FOR PLAINTIFF AND ONE BOX FOR DEFENDANT)
(For Diversity Cases Only)

|  | PTF | DEF |  | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business in This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business in Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. CAUSE OF ACTION (CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE A BRIEF STATEMENT OF CAUSE.

DO NOT CITE JURISDICTIONAL STATUTES UNLESS DIVERSITY) 42 USC § 1983 - violation of constitutional due process and equal protection rights arising from defendants' efforts to drive plaintiff out of business. State constitutional and tort claims are also part of this action.

## V. NATURE OF SUIT (PLACE AN × IN ONE BOX ONLY)

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 810 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 362 Personal Injury— Med Malpractice | ☐ 620 Other Food & Drug | | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 423 Withdrawal 28 USC 157 | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander | ☐ 365 Personal Injury— Product Liability | ☐ 630 Liquor Laws | | ☐ 450 Commerce/ICC Rates/etc. |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' Liability | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 640 R.R. & Truck | **PROPERTY RIGHTS** | ☐ 460 Deportation |
| ☐ 151 Medicare Act | ☐ 340 Marine | | ☐ 650 Airline Regs | ☐ 820 Copyrights | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 152 Recovery of Defaulted Student Loans (Excl. Veterans) | ☐ 345 Marine Product Liability | **PERSONAL PROPERTY** | ☐ 660 Occupational Safety/Health | ☐ 830 Patent | ☐ 810 Selective Service |
| | | ☐ 370 Other Fraud | ☐ 690 Other | ☐ 840 Trademark | ☐ 850 Securities/Commodities/ Exchange |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 371 Truth in Lending | **LABOR** | **SOCIAL SECURITY** | ☐ 875 Customer Challenge 12 USC 3410 |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle Product Liability | ☐ 380 Other Personal Property Damage | ☐ 710 Fair Labor Standards Act | ☐ 861 HIA (1395ff) | ☐ 891 Agricultural Acts |
| ☐ 190 Other Contract | ☐ 360 Other Personal Injury | ☐ 385 Property Damage Product Liability | ☐ 720 Labor/Mgmt. Relations | ☐ 862 Black Lung (923) | ☐ 892 Economic Stabilization Act |
| ☐ 195 Contract Product Liability | | | ☐ 730 Labor/Mgmt. Reporting & Disclosure Act | ☐ 863 DIWC/DIWW (405(g)) | ☐ 893 Environmental Matters |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | | ☐ 864 SSID Title XVI | ☐ 894 Energy Allocation Act |
| ☐ 210 Land Condemnation | ☐ 441 Voting | ☐ 510 Motions to Vacate Sentence | ☐ 740 Railway Labor Act | ☐ 865 RSI (405(g)) | ☐ 895 Freedom of Information Act |
| ☐ 220 Foreclosure | ☐ 442 Employment | **Habeas Corpus:** | ☐ 790 Other Labor Litigation | **FEDERAL TAX SUITS** | ☐ 900 Appeal of Fee Determination Under Equal Access to Justice |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/ Accommodations | ☐ 530 General | ☐ 791 Empl. Ret. Inc. Security Act | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | |
| ☐ 240 Torts to Land | ☐ 444 Welfare | ☐ 535 Death Penalty | | ☐ 871 IRS—Third Party 26 USC 7609 | ☐ 950 Constitutionality of State Statutes |
| ☐ 245 Tort Product Liability | ☒ 440 Other Civil Rights | ☐ 540 Mandamus & Other | | | ☐ 890 Other Statutory Actions |
| ☐ 290 All Other Real Property | | ☐ 550 Other | | | |

## VI. ORIGIN (PLACE AN × IN ONE BOX ONLY)

☒ 1 Original Proceeding

☐ 2 Removed from State Court

☐ 3 Remanded from Appellate Court

☐ 4 Reinstated or Reopened

☐ 5 Transferred from another district (specify)

☐ 6 Multidistrict Litigation

☐ 7 Appeal to District Judge from Magistrate Judgment

## VII. REQUESTED IN COMPLAINT:

CHECK IF THIS IS A **CLASS ACTION**
☐ UNDER F.R.C.P. 23

**DEMAND $**
$35,000,000.00

Check YES only if demanded in complaint:
**JURY DEMAND:** ☒ YES ☐ NO

## VIII. RELATED CASE(S) IF ANY (See instructions):

JUDGE _____    DOCKET NUMBER_____

DATE
4/10/2000

SIGNATURE OF ATTORNEY OF RECORD

UNITED STATES DISTRICT COURT