A

Service: **LEXSEE®**
Citation: **1992 U.S. Dist LEXIS 9042**

*1992 U.S. Dist. LEXIS 9042, ***

QUEEN CITY AVIATION, INC., Plaintiff v. CITY OF ALLENTOWN, et al., Defendant

CIVIL ACTION No. 91-7776

UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF PENNSYLVANIA

1992 U.S. Dist. LEXIS 9042

June 5, 1992, Decided
June 8, 1992, Filed

**CORE TERMS:** airport, lease, antitrust claim, civil rights, motion to dismiss, bid, bidding, equal protection, discriminatory, conspiracy, dealer, competitor, Sherman Act, disappointment, negotiations, manufacturer, distributor, antitrust, animus, bidding process, Local Government Antitrust Act, failed to state, protected class, state action, new lease, et seq, geographic, monopolize, exhibited, franchise

**COUNSEL:** [*1] For the Plaintiff: GARY C. BENDER, CRAMP, D'IORIO, MC CONCHIE & FORBES, P.C., 215 N. OLIVE STREET, P.O. BOX 568, MEDIA, PA 19063, USA.

For the Defendants: CHARLES J. FONZONE, FONZONE & ASHLEY, 33 SOUTH SEVENTH STREET, P.O. BOX 4180, ALLENTOWN, PA 18105-4180, USA.

**JUDGES:** TROUTMAN

**OPINIONBY:** E. MAC TROUTMAN

**OPINION: MEMORANDUM**

Plaintiff, the former Fixed Based Operator ("FBO") at the Queen City Municipal Airport ("airport"), Allentown, Pennsylvania, filed a three count complaint against the City of Allentown and various city officials alleging that defendants violated its civil rights and certain of the antitrust laws. These claims arise out of the invitation to bid procedures used by the defendants and, ultimately, their award of the exclusive rights to service and operate the airport to another FBO. Defendants have filed a motion to dismiss. Since we agree with defendants that the complaint should be dismissed pursuant to Fed.R.Civ.P. 12(b)(6), but for reasons that differ somewhat from those articulated by defendants, we will grant the motion to dismiss.

I. BACKGROUND.

The facts, as alleged in plaintiff's complaint are as follows. The City of Allentown is a municipal corporation subject [*2] to the laws of Pennsylvania and the individual defendants are employees or elected officials of the City of Allentown. The City of Allentown obtained control of the Queen City Airport by a quitclaim deed granted by the United States in 1948.

Plaintiff was the FBO at the airport from 1981 under the terms of a ten year lease granted by the City of Allentown. The lease expired in May 1991 and continued on a month to month basis thereafter until the City of Allentown terminated the lease in February 1992. Plaintiff's sole operations were those at the airport and included air charter and taxi service, fuel sales,

Get a Document - by Citation - 1992 U.S. Dist. LEXIS 9042    Page 3 of 75

Case 1:00-cv-00660-YK-1992 U.S. Dist. LEXIS 9042    Filed 05/30/2000    Page 2 of 6

hanger and tie down leases, office space leasing, aircraft maintenance, sale of supplies, flight school and instruction training, aircraft rental, ground handling and customer services, snow removal, and grounds maintenance.

In June 1991, the defendants made public a proposal package for Request for Proposals to lease the airport to a full service FBO. The bids were to be received by October 10, 1991. Plaintiff and Cole Aviation submitted the only bids to be a full service FBO at the airport. In a letter dated November 27, 1991, plaintiff was informed that, pursuant to [*3] the Request for Proposals, the City of Allentown had selected a competitor, Cole Aviation, to be the FBO at the airport. Plaintiff was informed that its lease would be terminated on February 1, 1992, and that Cole Aviation would become the FBO on that date.

In counts I and II, plaintiff asserts claims pursuant to 42 U.S.C. § 1983 and 1985 against all the defendants for violating its civil rights. Plaintiff alleges in count I that the individual defendants were members of a selection committee chosen to represent the City of Allentown, and thus acted under color of state law, when they issued the Request for Proposals and selected Cole Aviation. The bid specifications and procedures, the plaintiff claims, were inconsistent, ambiguous, vague and contrary to law for a variety of reasons. Plaintiff also asserts that the selection of Cole Aviation was arbitrary, capricious, an abuse of discretion, contrary to law, and discriminatory for a variety of reasons. Plaintiff's complaint further alleges that the City of Allentown has exhibited an animus toward the plaintiff and has acted in an unfair and discriminatory manner. Thus, plaintiff concludes, the actions of the defendants amount [*4] to a taking of its property without due process or notice in violation of the 5th and 14th Amendments and in violation of the equal protection of law, as well as a conspiracy to deprive plaintiff of its business and property. Count II alleges that the actions of the individual defendants constituted an official policy and decision of the City of Allentown.

Count III assets an antitrust claim against the City of Allentown, and alleges in support thereof and in addition to the above described events, that plaintiff requested on numerous occasions to enter into lease negotiations with the City of Allentown regarding the airport and that the City of Allentown refused to enter into such negotiations. Plaintiff concludes that the refusal to negotiate a new lease with plaintiff and, instead, entering into a lease with Cole Aviation pursuant to the public bidding, is a restraint of trade prohibited by section 1 of the Sherman Act, 15 U.S.C. § 1. Plaintiff also claims that the City of Allentown and Cole Aviation have conspired to monopolize services at the airport in violation of section 2 of the Sherman Act, 15 U.S.C. § 2. Plaintiff, therefore, requests the Court to enjoin Cole Aviation [*5] and the City of Allentown from entering into a lease pursuant to the Request for Proposal.

II. STANDARDS FOR A MOTION TO DISMISS PURSUANT TO RULE 12(b)(6).

The Court, when faced with a motion to dismiss pursuant to Fed.R.Civ.P. 12(b)(6) must accept as true all the averments in plaintiff's well pleaded complaint; the court must construe the complaint in a light most favorable to plaintiff; and the court must determine whether, "under any reasonable reading of the pleadings, the plaintiff may be entitled to relief." Colburn v. Upper Darby Township, 838 F.2d 663, 665-666 (3rd Cir. 1988). The pleading requirements that a civil rights complaint must meet to survive a motion to dismiss, however, are heightened: the complaint is sufficient if, e.g., it alleges specific conduct which violates plaintiff's rights, the time and place of the conduct, and identifies the responsible officials. Id. at 666.

III. DISCUSSION.

Like the complaint in Dunn & Mavis, Inc. v. Nu-Car Driveaway, Inc., 691 F.2d 241 (6th Cir. 1982) (an antitrust action, discussed infra), plaintiff's complaint is nothing more that the expression [*6] of its disappointment that city officials, after inviting bids, decided to offer its franchise, its grant of an exclusive lease, to someone else. The Civil Rights laws were

never intended to establish liability under the current circumstances. We find that plaintiff's civil rights claims are nothing more than an attempt to federalize a routine dispute with local officials over municipal planning or procedures, i.e., bidding practices.

Further, and more specifically, plaintiff's section 1985 claim fails to show that it is a member of any protected class. Though paragraph 18 of the complaint states that the City of Allentown has exhibited an animus toward the plaintiff and has acted in an unfair and discriminatory manner, plaintiff has failed to state a claim under section 1985(3), the only subpart of section 1985 within which plaintiff could possibly and reasonably fall, n1 as it has showed no immutable characteristic, membership in a protected class, or any class based discriminatory animus. See, United Brotherhood of Carpenters and Joiners of America, Local 610 v. Scott, 463 U.S. 825, 103 S. Ct. 3352, 77 L.Ed.2d 1049 (1983);  [*7]  Burt v. Ferrese, 871 F.2d 14 (3rd Cir. 1989).

- - - - - - - - - - - - - - - - - -Footnotes- - - - - - - - - - - - - - - - - -

n1 Once again the court is faced with a complaint brought by a frustrated business entity, represented by counsel, alleging broad and sweeping civil rights violations yet fails to identify with any particularity which subpart of section 1985 was supposedly violated, thus leaving the court to determine which of the three differing parts is to apply.

- - - - - - - - - - - - - - - - - -End Footnotes- - - - - - - - - - - - - - - - -

Regarding the section 1983 claims, plaintiff needs to show (1) that defendants acted under color of law and (2) that they deprived it of its constitutionally protected rights. Plaintiff's complaint meets the first requirement. As to the second requirement, however, we cannot discern from the complaint what constitutionally protected rights have been violated.

While plaintiff alleges that the defendants violated its constitutional rights to equal protection and due process, n2 which are protectable rights, the allegations of plaintiff's complaint do not rise to a constitutional violation. The only fact  [*8]  that could possibly, yet remotely, give rise to an equal protection claim is the allegation that "the City of Allentown improperly made contact with Cole Aviation after the bid proposals were submitted;. . . ." (Complaint at P16(f)). Presumably, plaintiff is concluding that this lead to an unfair advantage for Cole Aviation and thus implicated plaintiff's interest in equal protection. There is no support offered for why it was improper in constitutional proportions, or that it in fact could reasonably be construed to implicate constitutional equal protection.

- - - - - - - - - - - - - - - - - -Footnotes- - - - - - - - - - - - - - - - - -

n2 Once again the court is faced with a complaint brought by a frustrated business entity, represented by counsel, alleging broad and sweeping violations of due process without specifying what aspect of its due process rights, procedural or substantive, was violated, thus leaving the court to determine which the plaintiff believes is implicated. In this case, we find that we need not make such a determination. For example, plaintiff has not pleaded that it never received notice of the Request for Proposals, or that it had a vested property interest in a lease beyond the ten year term, or that the bidding procedures violated some local ordinance or Pennsylvania law or that it is foreclosed from pursuing a claim that the bidding procedures violated some local ordinance or Pennsylvania law in the courts or other forums provided by the state and local governments.

- - - - - - - - - - - - - - - - - -End Footnotes- - - - - - - - - - - - - - - -  [*9]

In addition, from the complaint, it appears that plaintiff merely had a lease for a certain term, which expired, and thereafter the lease was month to month. We know of no requirement that the City of Allentown, as the landlord of the airport, must even consider entering into a new lease with plaintiff, or that it structure the Request for Proposals in a manner acceptable

to or approved by plaintiff. Plaintiff's complaint or its brief in opposition to the motion has not brought any such requirement to our attention. Absent that, there is no constitutional interest violated by the City of Allentown's decision to seek bids from competing companies and to chose one of plaintiff's competitors.

At best, plaintiff has alleged that it does not agree with the procedures employed by the defendants, that the Request for Proposal did not require, it seems, enough information, and that, in plaintiff's estimation, Cole Aviation is not as qualified as it to be the FBO at the airport. Plaintiff's complaint, read in its entirety, simply airs its disappointment that it is no longer the exclusive FBO at the airport. n3

- - - - - - - - - - - - - - - - - - -Footnotes- - - - - - - - - - - - - - - - - - - -

n3 A reading of plaintiff's complaint gives the impression that it is proper for the City of Allentown to convey it the right to be the exclusive FBO at the airport, but not anyone else; that it is proper to convey these exclusive rights through private, non-competitive negotiations, but not through a public bidding process. Plaintiff's complaint, in short, leaves the impression that it is proper for the City of Allentown to disregard the public interest in competitive bidding and in open and public government, so long as it is treated specially. The fact that the bidding process may not have been perfect, which is plaintiff's basic claim, is not by itself a constitutional violation and is a matter best pursued at the state or local level. See note 6, infra.

- - - - - - - - - - - - - - - - -End Footnotes- - - - - - - - - - - - - - - - - [*10]

Defendants have argued that such a civil rights action against them is barred by the Federal Aviation Act, 49 U.S.C. § 1300 et seq., citing Montauk-Caribbean Airways, Inc. v. Hope, 784 F.2d 91 (2nd Cir. 1986). Because we conclude, as discussed above, that plaintiff has failed to state a civil rights claim against the defendants, we do not need to reach and, so, do not address, the issue regarding whether the claims are barred.

Plaintiff's final count is an antitrust claim. This sort of claim, when made in circumstances similar to those currently before us, was characterized in Dunn & Mavis, Inc. v. Nu-Car Driveaway, Inc., 691 F.2d 241 (6th Cir. 1982): n4

> The complaint states no set of facts which, if true, would constitute an antitrust offense, notwithstanding its conclusory language regarding the elimination of competition and improper purpose. When stripped to its essential allegations, the complaint does no more than state plaintiffs' commercial disappointment at losing Chrysler's patronage - the recurrent case of the jilted customer, dealer or supplier who loses a manufacturer's franchise and accuses the manufacturer and the [*11] new suitor of attempting to monopolize something. See Burdett v. Altec Corp., 515 F.2d 1245, 1249 (5th Cir. 1975). [footnote omitted] An agreement promising a new dealer the old dealer's business is presumptively reasonable, and the old dealer does not have an antitrust claim unless the conduct is incident to an unlawful arrangement or an attempt to monopolize an identifiable market. A contrary rule limiting a buyer's right to displace an old seller in favor of a new one would undermine the principle of competition the antitrust laws are designed to secure.

Id. at 243-244. In the footnote that was omitted from the above quote, the Court in Dunn & Mavis quoted from Burdett v. Altec Corp., 515 F.2d 1245, 1249 (5th Cir. 1975): "Lest any other former distributors succumb to the temptation of treble damages, we reiterate that it is

simply not an antitrust violation for a manufacturer to contract with a new distributor, even if the effect of the new contract is to seriously damage the former distributor's business." We find the thrust of these cases sufficiently analogous and entirely persuasive.

- - - - - - - - - - - - - - - - -Footnotes- - - - - - - - - - - - - - - - - -

n4 In Dunn & Mavis, the plaintiff had been the exclusive provider of auto transport services between Chrysler assembly plants in the Detroit area and railheads and other distribution points. When Chrysler replaced plaintiff with a competitor as the exclusive provider of these services, plaintiff asserted antitrust claims against Chysler and the competitor.

- - - - - - - - - - - - - - - - -End Footnotes- - - - - - - - - - - - - - - - -  [*12]

To recover on its antitrust claim, plaintiff would need to prove "(1) that the defendants contracted, combined or conspired among each other; (2) that the combination or conspiracy produced adverse, anti-competitive effects within the relevant product and geographic markets; (3) that the objects of and the conduct pursuant to that contract or conspiracy were illegal; and (4) that the plaintiffs were injured as a proximate result of that conspiracy." Tunis Bros. Co., Inc. v. Ford Motor Co., 763 F.2d 1482, 1489 (3rd Cir. 1985) ("Tunis I") (vacated and remanded for other reasons, 475 U.S. 1105, 106 S. Ct. 1509, 89 L. Ed. 2d 909 (1986), as explained in Tunis Bros. Co., Inc. v. Ford Motor Co., 952 F.2d 715, 720 (3rd Cir. 1991) ("Tunis II")).

We note that plaintiff's complaint does not plead certain details of an antitrust claim, such as, inter alia, the appropriate product and geographic markets, the effects upon interstate commerce, nor does plaintiff inform us whether its claim proceeds on a per se or rule of reason theory. More detrimental to plaintiff's complaint is that, as explained above,  [*13] the circumstances plaintiff alleges simply do not rise to the level of a violation of the Sherman Act §§ 1 and 2.

Finally, defendants argue that the antitrust claim is barred due to the Local Government Antitrust Act, 15 U.S.C. § 34 et seq. As with the defendants' argument that the civil rights claims against them are barred, since we conclude that the plaintiff has failed to allege circumstances sufficient to state an antitrust claim, we do not reach the issue. n5

- - - - - - - - - - - - - - - - -Footnotes- - - - - - - - - - - - - - - - - -

n5 Plaintiff's brief in opposition argues that it is seeking only injunctive relief, not money damages, and therefore, the Local Government Antitrust Act does not bar its claim. On this point, considering the stage of the proceedings and the facts of the complaint, but for our determination otherwise, we would agree.

We note, however, that defendants might have asserted the "state action doctrine" which, it seems, would bar even the injunctive relief plaintiff seeks, Northeast Jet Center v. Lehigh-Northampton Airport Authority, 767 F. Supp. 672 (E.D. Pa. 1991), but for the dearth of infomation in the complaint. The exact authority of the defendants regarding their actions related to the entire bidding process, and from whence that authority stems, e.g., based upon a state statute requiring competitive public bidding, id., cannot be discerned from the complaint. Such information is crucial to determine if the "state action doctrine" would apply. Absent amendment to the complaint, which the defendants have sought in the alternative to their motion to dismiss, we would not be able to determine this issue on a motion to dismiss, which is presumably the reason why defendants did not raise the issue and instead sought a more definite statement.

- - - - - - - - - - - - - - - - -End Footnotes- - - - - - - - - - - - - - - - -  [*14]

IV. CONCLUSION.

Based upon the foregoing reasons we conclude that plaintiff's complaint fails to state a claim for which relief can be granted. n6 Hence, an appropriate order follows.

- - - - - - - - - - - - - - - - - -Footnotes- - - - - - - - - - - - - - - - - - -

n6 At best, plaintiff's complaint may allege the violation of some state or local law, although it has not specifically alleged. Regardless, "a violation of state law in itself does not constitute a denial of . . . due process. Federal courts do not sit in federal question cases to grant remedies for mere violations of state law. [footnote omitted]" Midnight Sessions, Ltd. v. City of Philadelphia, 945 F.2d 667, 684 (3rd Cir. 1991).

- - - - - - - - - - - - - - - - - -End Footnotes- - - - - - - - - - - - - - - - - -

## ORDER

And now, this 5th day of June, 1992, upon consideration the Motion of Defendants City of Allentown, Mayor Joseph Daddona, Carl Kercher, Donald Bernhard, Michael Hefele, Al Salinger, Linda Bodnar, William Cramsey, Michael Rosenfeld, Charles Burianek, and Jill Winters Pursuant to Federal Rule of Civil Procedure 12(b)(6) (Doc. #3), the response thereto and the complaint, [*15] IT IS **ORDERED** that the motion is **GRANTED** and the complaint is **DISMISSED** as to all defendants and the case is closed.

E. Mac Troutman, S.J.

Service: **LEXSEE®**
Citation: **1992 U.S. Dist LEXIS 9042**
View: Full
Date/Time: Friday, May 26, 2000 - 8:44 AM EDT

About LEXIS-NEXIS | Terms and Conditions

Copyright © 2000 LEXIS-NEXIS Group. All rights reserved.



Service: **LEXSEE®**
Citation: **1992 U.S. Dist. LEXIS 11456**

*1992 U.S. Dist. LEXIS 11456, \**

QUEEN CITY AVIATION, INC., Plaintiff vs. CITY OF ALLENTOWN, et al., Defendant

CIVIL ACTION NO. 91-7776

UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF PENNSYLVANIA

1992 U.S. Dist. LEXIS 11456

August 3, 1992, Filed

**DISPOSITION:** [\*1] Plaintiff's motion will be denied.

**CORE TERMS:** memorandum, bid, animosity, civil rights, awarding, cure, reasons stated, plead

**COUNSEL:** For QUEEN CITY AVIATION, INC., PLAINTIFF: GARY C. BENDER, CRAMP, D'IORIO, MC CONCHIE & FORBES, P.C., 215 N. OLIVE STREET, P.O. BOX 568, MEDIA, PA 19063, USA.

For CITY OF ALLENTOWN, JOSEPH DADDONA, MAYOR, CARL KERCHER, DONALD BERNHARD, MICHAEL HEFELE, AL SALINGER, LINDA BODNAR, WILLIAM CRAMSEY, MICHAEL ROSENFELD, CHARLES BURIANEK, JILL WINTERS, DEFENDANTS: CHARLES J. FONZONE, FONZONE & ASHLEY, 33 SOUTH SEVENTH STREET, P.O. BOX 4180, ALLENTOWN, PA 18105-4180, USA.

**JUDGES:** Troutman

**OPINIONBY:** E. MAC TROUTMAN

**OPINION: MEMORANDUM**

Previously we dismissed plaintiff's complaint in the above captioned matter due to the deficiency of its pleading averments and its failure to state a claim. Slip Op., CA No. 91-7776 (June 8, 1992). Plaintiff has filed a Motion to Alter or Amend Judgment Pursuant to Fed. R. Civ. P. 59(e) and For Reconsideration under E.D. Loc. Civ. R. 20(g). For the reasons stated in our original memorandum and for reasons stated herein, we conclude that plaintiff's motion should be denied.

Plaintiff requests that we alter our previous order to allow it to amend its complaint, and in support thereof, incorporates in its Brief in Support certain averments that [\*2] it would include in an amended complaint. Plaintiff has not attached as an exhibit to its motion a proposed amended complaint for our review and which could also be filed if such were appropriate. n1 Plaintiff's memorandum, however, is insufficient for us to find that the filing of an amended complaint is justified in this case.

- - - - - - - - - - - - - - - - - -Footnotes- - - - - - - - - - - - - - - - - - - -

n1 Defendants point out that plaintiff has not filed such any amended complaint which we could review. while it is true, as plaintiff states, that it could not "file" an amended complaint at this point, plaintiff could have provided a proposed amended complaint along with its motion. We have not asked plaintiff to supplement its motion in this manner since it has chosen to incorporate suitable material in its memorandum and we find that this additional information would not make a sufficient amended complaint.



- - - - - - - - - - - - - - - -End Footnotes- - - - - - - - - - - - - - - - -

Plaintiff reiterates that the defendants denied its constitutionally protected property rights. Plaintiff asserts that it has a property right in the procedures leading to the award  [*3]  of the lease to be a fixed based operator at the Queen City Airport, in other words, that it has a constitutional right to a fair and even handed decision by the defendants. Plaintiff repeatedly asserts that it was not so treated by the defendants, that the defendants awarded the bid in an arbitrary, capricious and discriminatory manner. Such conclusory allegations are not a sufficient statement of a civil rights complaint, no matter how often repeated. For support, plaintiff cites Teleprompter of Erie, Inc. v. City of Erie, 537 F. Supp. 6 (W.D. Pa. 1981). In Teleprompter, however, among the allegations to show wrongful treatment by city officials when awarding a contract was that at least one of the council members was accepting bribes. Id. at 8-9. Such specific pleading properly supports a civil rights action. Plaintiff's complaint and memorandum are void of any such specific instances from which it could be found that the defendants did not correctly exercise their discretion. n2

- - - - - - - - - - - - - - - - -Footnotes- - - - - - - - - - - - - - - - -

n2 Plaintiff writes: "Plaintiff can cite many examples of this long standing animosity and antagonism [between defendants and plaintiff] although plaintiff believes that these are more evidentiary matters as opposed to pleading matters . . . ." (Brief in Support at 4.) Contrary to plaintiff's statement, such matters are indeed pleadings matters as our original memorandum explains. Further, if indeed there exists a long standing animosity between defendants and plaintiff, certainly plaintiff would not need discovery to be aware of such animosity; plaintiff may need discovery to prove such, but not to specifically plead such.

- - - - - - - - - - - - - - - -End Footnotes- - - - - - - - - - - - - - - -  [*4]

Plaintiff, as appears from the face of the complaint and its Memorandum in Support, is simply challenging the discretion of the defendants. We agree with defendants that "plaintiff, at best, contests the City's evaluation of the various factors that were considered and the respective weight that it placed upon them is awarding the bid to Cole Aviation." (Brief in Opposition at 2.) "The plaintiff merely takes issue with the defendants' evaluation of the bid proposals." (Id. at 4.) If the discretion of local officials may be challenged in federal court on the basis of some nebulous, unfounded allegations, local officials will be subjected to deluge of frivolous claims. See, Colburn v. Upper Darby Township, 838 F.2d 663, 666 (3d Cir. 1988). If plaintiff wishes to challenge the decision making of the defendants, a state court would provide a better forum to question decisions made pursuant to 53 Pa. Con. Stat. Ann. § 36901 et seq. (See, Brief in Support at 3.)

Finally, while not permitting leave to amend a civil rights complaint for failure to plead specifically may be an abuse of our discretion, such is not an abuse of our discretion  [*5]  if amendment of the complaint "would be insufficient to cure the deficiency in the original complaint." Colburn, 838 F.2d at 666. Since it was our opinion, initially, that an amendment would not be able to cure the defects in the original complaint, and it is our opinion, currently, as well, leave to amend will not be permitted.

Based upon the foregoing, and for the reasons addressed in our Memorandum and Order entered June 8, 1992, plaintiff's motion will be denied. An appropriate order follows.

## ORDER

And now, this 30th day of July, 1992, upon consideration of the Motion of Plaintiff to Alter or Amend Judgment and for Reconsideration (Doc. #13), the response thereto and our

Memorandum and Order entered June 8, 1992, IT IS ORDERED that the motion is DENIED.

E. Mac Troutman S.J.

Service:    **LEXSEE®**
Citation:   **1992 U.S. Dist. LEXIS 11456**
View:       Full
Date/Time:  Friday, May 26, 2000 - 8:45 AM EDT

About LEXIS-NEXIS | Terms and Conditions

Copyright © 2000 LEXIS-NEXIS Group.  All rights reserved.

Service: **LEXSEE®**
Citation: **1997 U.S. Dist. LEXIS 6493**

*1997 U.S. Dist. LEXIS 6493, \**

NORTHEAST JET CENTER, LTD., Plaintiff v. LEHIGH-NORTHAMPTON AIRPORT AUTHORITY; JACK YOHE; and STANFORD WARTELL, Defendants.

Civil Action No. 90-CV-1262

UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF PENNSYLVANIA

1997 U.S. Dist. LEXIS 6493

May 5, 1997, Decided
May 5, 1997, FILED, ENTERED

**DISPOSITION:** [*1] Defendants' Motion to Amend Answer GRANTED; Defendants' Motion for Partial Summary Judgment on Count One GRANTED; case DISMISSED without prejudice.

**CORE TERMS:** summary judgment, lease, defamation, property interest, Fourteenth Amendment, through-the-fence, custom, license, deprivation, deprive, genuine issue, airport, equal protection, arbitrarily, qualified immunity, affirmative defense, color of state law, municipality, municipal, deprived, judicata, privy, res judicata, final authority, prior suit, policymaker, discovery, equal protection claim, intentionally, certificate

**COUNSEL:** For NORTHEAST JET CENTER, LTD., PLAINTIFF: JOEL E. LAIKS, GALLAND, KHARASCH, MORSE & GARFINKLE, P.C., WASHINGTON, DC USA. DAVID K. MONROE, GALLAND, KHARASCH, & GARFINKLE, P.C., WASHINGTON, DC USA.

For LEHIGH-NORTHAMPTON AIRPORT AUTHORITY, DEFENDANT: STEVEN M. JANOVE, TERESA N. CAVENAGH, WENDY R. HUGHES, DUANE, MORRIS & HECKSCHER, PHILA, PA USA. J. BRUCE MC KISSOCK, MC KISSOCK & HOFFMAN, P.C., PHILA, PA USA. RICHARD FEDER, FINE, KAPLAN & BLACK, PHILA, PA USA. JODY A.G. WERNER, DUANE, MORRIS & HECKSCHER, PHILA, PA USA. INGRID B. HOPKINSON, MC KISSOCK AND HOFFMAN, P.C., PHILA, PA USA. For JACK YOHE, Airport Director, DEFENDANT: STEVEN M. JANOVE, (See above), TERESA N. CAVENAGH, (See above), WENDY R. HUGHES, (See above). J. BRUCE MC KISSOCK, (See above). RICHARD FEDER, (See above). JODY A.G. WERNER, (See above). INGRID B. HOPKINSON, (See above). For SANFORD WARTELL, Chairman of the Board of Directors, DEFENDANT: STEVEN M. JANOVE, (See above), TERESA N. CAVENAGH, (See above), WENDY R. HUGHES, (See above). J. BRUCE MC KISSOCK, (See above). [*2] RICHARD FEDER, (See above). JODY A.G. WERNER, (See above). INGRID B. HOPKINSON, (See above).

**JUDGES:** Franklin S. Van Antwerpen, United States District Court

**OPINIONBY:** Franklin S. Van Antwerpen

**OPINION: MEMORANDUM AND ORDER**

Van Antwerpen, J.

May 5, 1997

I. INTRODUCTION

Plaintiff brought this action in its Second Amended Complaint under 42 U.S.C. §§ 1983,

1985; 15 U.S.C. §§ 1, 2; 15 U.S.C. § 15; the Fourteenth Amendment to the United States Constitution; 53 Pa. C.S.A. § 306; Article I, Section 1, 9, and 26 of the Pennsylvania Constitution; 42 Pa. C.S.A. § 8343 and the common law of the Commonwealth of Pennsylvania. However, pursuant to our order of August 1, 1996 granting partial summary judgment the only remaining claims are those contained in Count I, and two state claims: intentional interference with a prospective contractual relationship and defamation. We have jurisdiction over this action pursuant to 28 U.S.C. §§ 1331, 1337 and the doctrine of supplemental jurisdiction, 28 U.S.C. § 1367. Venue for this action lies in the Eastern District of Pennsylvania pursuant to 28 U.S.C. § 1391(b) and (c).

## II. PROCEDURAL HISTORY

This is not a case which is new to this court. Plaintiff [*3] filed a complaint on February 22, 1990. On May 31, 1991 we granted Defendants' Motion to Dismiss in part and denied it in part. 767 F. Supp. 672 (E.D. Pa. 1991). Plaintiff then filed its Second Amended Complaint on June 21, 1991. Subsequently, this case was delayed pending the criminal trials and subsequent conviction of Plaintiff's President, Mr. Earl M. Holtz for conspiracy to defraud the United States through improper filings with Federal Aviation Administration. See United States v. Holtz, 1993 U.S. Dist. LEXIS 16705, 1993 WL 482953 (E.D. Pa. Nov. 15, 1993), aff'd 31 F.3d 1174 (3d Cir. 1994); United States v. Holtz, 1994 WL 750674 (E.D. Pa. Feb. 6, 1994); United States v. Holtz, 1995 WL 106895 (E.D. Pa. March 13, 1995); United States v Holtz, 1995 WL 312537 (E.D. Pa. May 19, 1995). Thereafter, Defendants filed for summary judgment through two motions on January 22, 1996 and February 8, 1996. We granted those motions in part, but denied them as to the constitutional violations alleged in Count One, and the state claims alleged in count three (intentional interference with a prospective contractual relationship) and count six (defamation). We noted in our opinion of August 1, 1996 that neither [*4] party had sufficiently discussed the charges alleged in Count One, and we denied summary judgment pending further briefing on the issues. Northeast Jet Center v. Lehigh-Northampton Airport Authority, 1996 U.S. Dist. LEXIS 11177, 1996 WL 442784 (E.D. Pa. Aug. 1, 1996). In a letter dated September 3, 1996 to Defendants' counsel, Plaintiff's counsel outlined its Constitutional claims to ease discussion of this issue; he specified that Plaintiff's claims in Count One are brought under 42 U.S.C. § 1983, and are based upon a violation of equal protection and substantive due process. Consequently, on February 19, 1997, Defendants filed a Motion for Partial Summary Judgment on Count One, and Plaintiffs responded thereto on March 21, 1997. We therefore focus our discussion on Count One, and on whether Defendants' actions rise to the level of a violation of Section 1983. Due to the large quantity this court has previously written on this matter, we will not repeat the detailed facts we set out in our May 31, 1991 and August 1, 196 opinions; rather we will simply make reference to them as the need arises.

## III. GENERAL STANDARD

Rule 56(c) of the Federal Rules of Civil Procedure provides that a motion for summary judgment [*5] shall be granted where:

> the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law.

Rule 56(e) further provides that, when a properly supported motion for summary judgment is made, the adverse party then "must set forth specific facts showing that there is a genuine issue for trial."

Of course, we must view all inferences in a light most favorable to the non-moving party and

facts asserted by the non-moving party, if supported by sufficient affidavits and other evidentiary matter, must be regarded as true. United States v. Diebold, Inc., 369 U.S. 654, 655, 8 L. Ed. 2d 176, 82 S. Ct. 993, (1962); Aman v. Cort Furniture Rental, 85 F.3d 1074, 1080 (3d Cir. 1996). However, the nonmoving party's burden is more than insignificant; "the plaintiff must present affirmative evidence in order to defeat a properly supported motion for summary judgment." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 257, 91 L. Ed. 2d 202, 106 S. Ct. 2505 (1986); see also J.F. Feeser Inc. v. Serv-A-Portion, [*6] Inc., 909 F.2d 1524, 1531 (3d Cir. 1990), cert. denied, 499 U.S. 921, 113 L. Ed. 2d 246, 111 S. Ct. 1313 (1991) (stating that, "the nonmovant must establish the existence of each element on which it bears the burden of proof") (citing Celotex Corp. v. Catrett, 477 U.S. 317, 323, 91 L. Ed. 2d 265, 106 S. Ct. 2548 (1986)). "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." Anderson, 477 U.S. at 252; Matsushita Electrical Industry Co. v. Zenith Radio Corp., 475 U.S. 574, 587, 89 L. Ed. 2d 538, 106 S. Ct. 1348 (1986). See also Coolspring Stone Supply, Inc. v. American States Life Ins. Co., 10 F.3d 144, 148 (3d Cir. 1993); Petruzzi's IGA Supermarkets, Inc. v. Darling Delaware Co., Inc., 998 F.2d 1224, 1230 (3d Cir.), cert. denied, 510 U.S. 994, 126 L. Ed. 2d 455, 114 S. Ct. 554 (1993)(nonmovant cannot rest on pleadings and must do more than create some metaphysical doubt).

Therefore, summary judgment must be entered "after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient [*7] to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. In such a situation, there can be no genuine issue as to any material fact, since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." Celotex, 477 U.S. at 322. More generally, a genuine issue of fact is only present, precluding summary judgment, "when a reasonable trier of fact, viewing all the evidence, could rationally find in favor of the nonmoving party in light of the burden of proof placed on the nonmover." U.S. v. Premises Known as RR No. 1 Box 224, Dalton Tp. and North Abington Tp., Lackawanna County, Pa., 14 F.3d 864, 870 (3d Cir. 1994)[citations omitted]. "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." Anderson, 477 U.S. at 248. See also Kowalski v. L&F Products, 82 F.3d 1283, 1288 (3d Cir. 1996).

While the nature of its remedy is indeed powerful, the "summary judgment procedure is properly regarded not as a disfavored procedural shortcut, [*8] but rather as an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy and inexpensive determination of every action.'" Celotex, 477 U.S. at 327 [citations omitted]. As the Third Circuit noted, "we are, after all, attempting to balance the defendants' need for protection from unfounded claims and vexatious litigation, with the plaintiff's rights to vindicate his or her constitutional guaranteed rights." Grant v. City of Pittsburgh, 98 F.3d 116, 126 (3d Cir. 1996).

IV. DISCUSSION

**A. 42 U.S.C. § 1983 Standard**

Section 1983 provides for the imposition of liability on any person who, acting under color of state law, deprives another of rights, privileges, or immunities secured by the Constitution or the laws of the United States. 42 U.S.C.A. § 1983 (1996). The statute is not a source of substantive rights, but merely provides "'a method for vindicating federal rights elsewhere conferred.'" Graham v. Connor, 490 U.S. 386, 393-94, 104 L. Ed. 2d 443, 109 S. Ct. 1865 (1989) (quoting Baker v. McCollan, 443 U.S. 137, 144 n.3, 61 L. Ed. 2d 433, 99 S. Ct. 2689 (1979)).

In conjunction with the Due Process Clause of the Fourteenth [*9] Amendment, Section 1983 allows plaintiffs to assert three kinds of federal claims: (1) claims for the deprivation by

Get a Document - by Citation - 1997 U.S. Dist. LEXIS 6493          Page 4 of 13

Case 1:00-cv-00660-YK-JAS     Document 105-2     Filed 05/30/2000     Page 16 of 75

state officials of any of the specific protections defined in the Bill of Rights; (2) claims under the substantive component of the Due Process Clause that bar certain arbitrary, wrongful government actions, regardless of the fairness of the procedures used to implement them; and (3) claims under the procedural component of the Due Process Clause relating to the deprivations of life, liberty, or property without due process of law. Zinermon v. Burch, 494 U.S. 113, 108 L. Ed. 2d 100, 110 S. Ct. 975 (1990).

To state a claim under Section 1983, a plaintiff must show both that (1) the offending conduct deprived the plaintiffs of rights secured by the Constitution of the United States, and (2) that such conduct was committed by a person acting under color of state law. Parratt v. Taylor, 451 U.S. 527, 535, 68 L. Ed. 2d 420, 101 S. Ct. 1908 (1981), overruled in part on other grounds, Daniels v. Williams, 474 U.S. 327, 88 L. Ed. 2d 662, 106 S. Ct. 662 (1986). The first issue we address is whether the plaintiff has presented evidence of a deprivation of a right  [*10]  secured by the Constitution. See Baker, 443 U.S. at 140; Collins v. City of Harker Heights, Texas, 503 U.S. 115, 121, 117 L. Ed. 2d 261, 112 S. Ct. 1061 (1992) ("when a § 1983 claim is asserted against a municipality, [look at] : (1) whether plaintiff's harm was caused by a constitutional violation, and (2) if so, whether the city is responsible for that violation"). In the instant case, Plaintiff alleges that the Defendants acted to deprive it of equal protection and to deprive it of substantive due process. We will address each of these in turn.

## B. Deprivation of Right

### 1. Res Judicata

Before we can reach Plaintiff's equal protection claim, we must decide the extent to which Plaintiff's claim is precluded by *res judicata*. Defendants did not include *res judicata* as an affirmative defense in their answer as is required by Fed.R.Civ.P. 8(c). Affirmative defenses not raised at that time are usually deemed waived pursuant to Rule 8(C); however, Rule 15 (a) permits a party to amend its answer at any time by leave of the court and states that "leave shall freely be given when justice so requires." In an on-the-record telephone conference with the parties on  [*11]  April 10, 1997, a stipulation was entered into whereby Defendants' Motion for Partial Summary Judgment on Count One was deemed as also being a Motion to Amend Defendants' Answer to Plaintiff's Second Amended Complaint. Both Plaintiff and Defendants were given leave to address themselves more fully to this issue.

The Third Circuit has recognized that "failure to raise an affirmative defense by responsive pleading or appropriate motion ... does not always result in waiver." Charpentier v. Godsil, 937 F.2d 859, 863 (3d Cir. 1991). Indeed, we should permit an amendment unless the opposing party will be prejudiced. Plaintiff contends prejudice because of the length of time since the answer, and the fact that discovery is closed. However, neither of these actually prejudice Plaintiff to the extent that Defendants should be precluded from amending their answer.

Certainly, the passage of time alone is insufficient to create prejudice. Adams v. Gould, Inc., 739 F.2d 858, 867 (3d Cir. 1984). In addition, due to the intense similarities between the prior suit and the instant one, Plaintiff cannot credibly claim that it is surprised by the affirmative defense, or that the defense is  [*12]  unexpected. Finally, the fact that discovery is closed does not greatly prejudice Plaintiff, because the amendment that Defendants seek to make presents only a legal question for which all of the relevant facts are already before the court. As such, the addition of *res judicata* as an affirmative defense does not require any further discovery. See Kleinknecht v. Gettysburg College, 989 F.2d 1360, 1376 (3d Cir. 1993); Brathwaite v. St. John's Episcopal Hospital, 1987 WL 25911, *2 (E.D.N.Y. Nov. 18, 1987). Therefore, we will permit Defendants to amend their answer to assert the affirmative defense of *res judicata*, and for purposes of the present motion will deem it to be so amended.

We now turn to the merits of the affirmative defense. The doctrine of *res judicata* provides that "a subsequent suit based on the same cause of action as a prior suit that involved the same parties or their privies is barred where there has been a final judgment on the merits in the prior suit." Labelle Processing Co. v. Swarrow, 72 F.3d 308, 313 (3d Cir. 1995), (citing Board of Trustees of Trucking Employees v. Centra, 983 F.2d 495, 504 (3d Cir. 1992)). Of course, the party asserting  [*13]  the defense bears the burden of showing that it applies. United States v. Athlone Industries, Inc., 746 F.2d 977, 983 (3d Cir. 1984). Defendants must show that "there has been (1) a final judgment on the merits in a prior suit involving (2) the same parties or their privies and (3) a subsequent suit based on the same causes of action" has presently been filed. Arab African International Bank v. Epstein, 10 F.3d 168, 171 (3d Cir. 1993); see also A.C. Elfman & Sons, Inc. v. Clime, 355 Pa. Super. 394, 513 A.2d 488, 489 (Pa. Super. 1986).

Defendants here assert that Plaintiff's equal protection claim based on the denial of a "through-the-fence" agreement is precluded because it was the subject of a prior federal suit that was dismissed with prejudice. We agree. In 1986, the Northeast Jet Company filed a complaint in this court against the Lehigh-Northampton County Airport Authority alleging, inter alia, a cause of action under Section 1983 for violation of its equal protection rights because the Authority had not granted it a "through-the-fence" agreement and had granted one to another company, ITT. Northeast Jet Company v. Lehigh-Northampton County Airport Authority,  [*14]  No. 86-CV-0179 (E.D. Pa. 1986). This case was dismissed with prejudice upon settlement of the parties. "Dismissal with prejudice constitutes an adjudication of the merits as fully and completely as if the order had been entered after trial." Gambocz v. Yelencsics, 468 F.2d 837, 840 (3d Cir. 1972). Therefore, the dismissal with prejudice of the earlier suit in this case fulfills the first requirement of *res judicata*.

The second requirement is also satisfied, as the parties in the first and present suits are either the same or their privies. A party is considered a privy to an action when it has a mutual interest in the same action by some relationship with a party to an action, or when its interests are represented by that party. See Lawlor v. National Screen Service Corporation, 349 U.S. 322, 329-30, 99 L. Ed. 1122, 75 S. Ct. 865 (1955). Certainly, given the closeness of the relationship between Northeast Jet Center and Northeast Jet Company, the fact that they are both controlled by the same man, and the fact that Jack Yohe and Sanford Wartell act at and for the direction of the Lehigh-Northampton Airport Authority, all of the parties involved in the instant suit can  [*15]  be considered either parties or privies of the first suit.

Finally, the third prong, a subsequent suit based on the same causes of action, is also satisfied. The instant suit alleges, *inter alia*, that Defendants violated Section 1983 by unconstitutionally discriminating against Plaintiff because Defendants refused to give Plaintiff a "through-the-fence" agreement subsequent to granting one to another company, ITT. This claim is virtually identical to the one in the original suit which was dismissed with prejudice. As such, to the extent that the instant claim of a violation of Section 1983 is based on the equal protection allegation concerning the desired 1985 "through-the-fence" agreement, that claim is barred from consideration by this court by *res judicata*.

2. Equal Protection Claim

To the extent that Plaintiff's equal protection claims are not barred by *res judicata*, we will discuss the merits of each. Plaintiff asserts that its equal protection rights were violated because the Defendants intentionally discriminated against it by enforcing fixed-base operator ("FBO") standards that were both (1) not in effect and (2) not enforced against other FBOs at the airport;  [*16]  and by (3) not granting Plaintiff a "through-the-fence" agreement although they had granted one to another company previously. However, Plaintiff has failed to present sufficient evidence of discrimination, intentional or otherwise.

The Supreme Court has repeatedly held that a law which is "fair on its face and impartial in its appearance may nonetheless constitute illegal discrimination between persons if it is

applied and administered by public authority with an evil eye and an unequal hand." Holder v. Allentown, 987 F.2d 188, 197 (3d Cir. 1993), quoting Yick Wo v. Hopkins, 118 U.S. 356, 30 L. Ed. 220, 6 S. Ct. 1064 (1886). Even if the duty imposed by the applicable statute or standard is "mandatory," public officials engage in unconstitutional discrimination when they seek to enforce the statute in order "to prevent the exercise of a fundamental right." Holder 987 F.2d at 197, quoting United States v. Schoolcraft, 879 F.2d 64, 68 (3d Cir.), cert. denied, 493 U.S. 995, 107 L. Ed. 2d 543, 110 S. Ct. 546 (1989). In an equal protection claim of this sort, though, the plaintiff must provide evidence of intentional, or purposeful, discrimination by the defendants. [*17] Snowden v. Hughes, 321 U.S. 1, 8, 88 L. Ed. 497, 64 S. Ct. 397 (1944). Mere unequal treatment via a standard fair on its face is insufficient; there must be a showing of "clear and intentional discrimination." Id., citing Gundling v. City of Chicago, 177 U.S. 183, 186, 44 L. Ed. 725, 20 S. Ct. 633 (1900). Moreover, "to establish such intentional or purposeful discrimination, it is axiomatic that a plaintiff must [provide evidence] that similarly situated persons have been treated differently." Gagliardi v. Village of Pawling, 18 F.3d 188, 193 (2nd Cir. 1994).

Plaintiff points out that issues of intent are generally unsuited for summary judgment because courts should not resolve any genuine issues of credibility. Coolspring Stone Supply, Inc. v. American States Life Insurance Company, 10 F.3d 144, 148 (3d Cir. 1993); Ness v. Marshall, 660 F.2d 517, 519 (3d Cir. 1981). Nevertheless, if the plaintiff is unable to make an initial evidentiary showing of intent, there is no genuine issue of credibility for the jury to sort out, and summary judgment is appropriate.

In the instant case, Plaintiff has not met even this light burden; it has instead made mere conclusory [*18] allegations without support in evidence. It alleges that Defendants enforced FBO standards against it and did not enforce them against other companies; however, there is no reference to the record or any evidence to support this argument. It alleges that Defendants gave another company, ITT, a "through-the-fence" agreement but intentionally did not give it one; again, there is no reference to any evidence to support this. Plaintiff cannot survive at this stage solely on the statement that "there is ample evidence of animus against Center and its owner Earl Holtz by Defendants," Plaintiff's Brief at 22, without providing us with at least one example of this evidence.

Defendants, to the contrary, point us to many places in the record where an absence of an intent to discriminate is clear. They note that the lease which Plaintiff held with Defendants specifically references the applicable FBO standards; that those standards required that tenants providing FBO services have an FAA license which permitted them to do so; and that when Plaintiff turned in that license to the FAA, Defendants properly considered Plaintiff to be in breach of its lease. Defendant's Brief at 21-25 and [*19] included cites to the record therein. These actions seem eminently reasonable to us in light of the evidence which has been presented to us. There has been no evidence of the requirements within the leases of the other companies involved, or of whether there are differences or similarities therein to Plaintiff's lease that would require certain action by Defendants.

Plaintiff places a great deal of reliance on our dicta in our August 1, 1996 opinion that there is no mention of a Part 145 certificate in the lease or the applicable standards; however, this reliance is misplaced. Upon further review of the lease and standards, we find that fourth requirement under "Aircraft Maintenance" on page 10 of the FBO minimum standards incorporated into the lease states that, "The Fixed Base Operator must be able to obtain from the F.A.A. a license to operate a Class One and Three repair station." This statement, as Defendants point out, is a direct reference to a Part 145 certificate, and was relied upon by them in finding the plaintiff to be in breach of its lease.

Defendants also provide evidence to contradict Plaintiff's bare allegations regarding the "through-the-fence" agreement. n1 They [*20] state that they had provided anther company, ITT, with such an agreement in 1984; however, the FAA subsequently informed them that it did not approve of these agreements, it did not want Defendants to grant any

Get a Document by Citation 1997 U.S. Dist. LEXIS 6493    Page 7 of 13

Case 1:00-cv-00660-YK-JAS   Document 102   Filed 05/30/2000   Page 19 of 75

more, and it then provided Defendants with a copy of its new policy "Minimum Compliance Standards for Through-the-Fence Operations" in July 1985. Therefore, Defendants declined to provide such an agreement with Plaintiff in 1985 not out of a desire to discriminate, but solely to acquiesce to a recent FAA mandate. Defendants Brief at 26-27 and included cites to the record therein. Plaintiff has provided us with absolutely no evidence to rebut this. As such, its claim cannot survive.

- - - - - - - - - - - - - - - - - -Footnotes- - - - - - - - - - - - - - - - - -

n1 Although we have decided that this claim is barred by *res judicata*, above, we will discuss the issue for clarity.

- - - - - - - - - - - - - - - -End Footnotes- - - - - - - - - - - - - - - - - -

2. Substantive Due Process

Plaintiff also bases its Section 1983 claim on an allegation of a violation of substantive due process. Plaintiff argues that Defendants, under color of state law, intentionally [*21] acted to deprive it of property rights protected by the Constitution. Specifically, it claims that Defendants forced Plaintiff into financial despair, destroyed Plaintiff's FBO business, and forced Plaintiff to leave the Lehigh Valley International Airport through defamation and intentional interference with potential business relations. Defendants' Brief, Exhibit A at 1. Regardless of the extent to which Plaintiff makes a state cause of action, it has not provided us with any evidence of a constitutional violation.

The Due Process Clause of the Fourteenth Amendment declares that no state shall deprive any person of life, liberty, or property, without due process of law. The clause has a substantive component that bars "certain government actions regardless of the fairness of the procedures used to implement them." Planned Parenthood v. Casey, 505 U.S. 833, 846, 120 L. Ed. 2d 674, 112 S. Ct. 2791 (1992) (quoting Daniels v. Williams, 474 U.S. 327, 331, 88 L. Ed. 2d 662, 106 S. Ct. 662 (1986)). Thus, where public officials "invoke administrative processes with an illicit purpose, they are violating substantive due process." Grant v. City of Pittsburgh, 98 F.3d 116, 125 [*22] (3d Cir. 1996). In order to succeed on a substantive due process claim, Plaintiff "must prove that the governmental authority acted to infringe a property interest encompassed by the Fourteenth Amendment." DeBlasio v. Zoning Board of Adjustment for the Township of West Amwell, 53 F.3d 592, 600 (3d Cir.) [citations omitted], cert. denied, 133 L. Ed. 2d 247, ___ U.S. ___, 116 S. Ct. 352 (1995).

The first question, whether a basic property interest has been alleged and supported with evidence, is a question of state law. Acierno v. Cloutier, 40 F.3d 597, 616 (3d Cir. 1994). However, "under the law of this circuit, 'not all property interests worthy of procedural due process protections are protected by the concept of substantive due process.'" Homar v. Gilbert, 89 F.3d 1009, 1021 (3d Cir. 1996) (quoting Reich v. Beharry, 883 F.2d 239, 244 (3d Cir. 1989)), cert. granted, ___ U.S. ___, 117 S. Ct. 678 (U.S. Jan. 3, 1997) (No. 96-651). Therefore, plaintiff must instead have been deprived of "'a certain quality of property interest.'" Homar, 89 F.3d at 1021 (quoting DeBlasio, 53 F.3d at 600). This is because, "substantive due process protects [*23] fundamental interests, not state-created contract rights." Charles v. Baesler, 910 F.2d 1349, 1353 (6th Cir. 1990). Indeed, what constitutes a property interest for the purposes of procedural due process might not so constitute for the purposes of substantive due process, because "property rights for procedural due process purposes are created by state law, [and] substantive due process rights are created by the Constitution." DeBlasio, 53 F.3d at 599. The Supreme court has held that where claims are more analogous to state-law tort claims, substantive due process is usually not implicated. Collins v. City of Harker Heights, Texas, 503 U.S. 115, 128, 117 L. Ed. 2d 261, 112 S. Ct. 1061 (1992).

The second question to be considered is whether, in the context of a governmental


deprivation, the government authority "deliberately and arbitrarily abused its power." Independent Enterprises Inc. v. Pittsburgh Water and Sewer Authority, 103 F.3d 1165, 1179 (3d Cir. 1997) (citing Midnight Sessions, Ltd. v. City of Philadelphia, 945 F.2d 667, 683 (3d Cir. 1991), cert. denied, 503 U.S. 984, 118 L. Ed. 2d 389, 112 S. Ct. 1668 (1992)); see also Rogers v. Bucks County Domestic [*24] Relations Section, 959 F.2d 1268, 1277 (3d Cir. 1992) ("the fundamental question underlying a substantive due process claim is whether a statute or regulation irrationally or arbitrarily deprives an individual of an established right"). n2 This abuse occurs where actions are taken that are intentional or "motivated by bias, bad faith, or partisan or personal motives unrelated to the merits of the matter before it." Id.

- - - - - - - - - - - - - - - - - -Footnotes- - - - - - - - - - - - - - - - - - -

n2 While Defendants contend that the appropriate standard is that the government action "shocks the conscience" per Fagan v. City of Vineland, 22 F.3d 1296, 1303 (3d Cir. 1994), this is incorrect. The Third Circuit has suggested, albeit not very clearly, that this standard is used only in police pursuit cases, or where there is a state created danger. See, Evans v. Avery, 100 F.3d 1033, 1037 (3d Cir. 1996), petition for cert. filed, 65 U.S.L.W. 3611 (U.S. Feb. 28, 1997) (No. 96-1390); Kneipp v. Tedder, 95 F.3d 1199, 1207 (3d Cir. 1996); Mark v. Borough of Hatboro, 51 F.3d 1137, 1153 n.13 (3d Cir. 1995), cert. denied, U.S. , 116 S. Ct. 165, 133 L. Ed. 2d 107 (1995). We note, though, that Defendants' actions are not only not arbitrary, they do not "shock the conscience."

- - - - - - - - - - - - - - -End Footnotes- - - - - - - - - - - - - - - - - [*25]

Plaintiff frames its claim by saying that Defendants "undertook an intentional course of conduct designed to destroy plaintiff's FBO business, undertook the value of plaintiff's assets, force plaintiff off of the ABE Airport, and acquire plaintiff's hangar and business for less than it was worth." Defendants' Brief, Exhibit A at 1. Certainly, "ownership is a property interest worthy of substantive due process protection." DeBlasio, 53 F.3d at 600. However, a closer examination of Plaintiff's claim demonstrates that it boils down to a claim of defamation (lost reputation), loss of the backing of a bank, and loss of a potential contract with another company, Union Pacific. Therefore, despite the ultimate result, Plaintiff has demonstrated no evidence that supports a tangible property interest protected by the Fourteenth Amendment.

In Paul v. Davis, 424 U.S. 693, 701, 47 L. Ed. 2d 405, 96 S. Ct. 1155 (1976), the Supreme Court held that injury to reputation is not a liberty or property interest protected by the due process clause of the Fourteenth Amendment. To state a claim for defamation under Section 1983, "a plaintiff must allege loss of a recognizable property or liberty [*26] interest in conjunction with the allegation of injury to reputation." Cooper v. Dupnik, 924 F.2d 1520, 1532 (9th Cir. 1991). This has been called the "stigma-plus" or "defamation-plus" test. To meet the "plus", the plaintiff must demonstrate that the defamation caused the denial of a federally protected right, or that the defamation occurred in connection with a federally protected right. Business losses and public scorn have been held to not meet the "plus" requirements, because such consequences would not usually be the direct result of any affirmative conduct by the parties making the defamation. Id.; Buckey v. County of Los Angeles, 957 F.2d 652, 655 (9th Cir. 1992); Green v. DeCamp, 612 F.2d 368, 371 (8th Cir. 1980).

In the instant case, Plaintiff has not brought forth any evidence which connects the alleged defamation with any specific property or liberty interest protected by the Fourteenth Amendment. Plaintiff appears to assert that merely because this court found that Plaintiff had sufficiently pled a Section 1983 action following Defendants' Motion to Dismiss, we should consequently find, without more, that the claim withstands summary judgment. This is a gross [*27] misstatement of summary judgment law, as discussed above; Plaintiff cannot avert summary judgment by simple denials, and must at the very least produce sufficient evidence to support each element of its claim. Our earlier memorandum on Defendants' First Motion for Summary Judgment also does not provide Plaintiff with the support it seeks; we

Get a Document by Citation 97 U.S. Dist. LEXIS 6493

Case 1:00-cv-00069-YK-JAS    Document 105    Filed 05/30/2000    Page 21 of 75

Page 9 of 13

ruled only that the issues of equal protection and substantive due process had not adequately been briefed and thus the motion would be denied pending further briefing. Northeast Jet Center, 1996 WL 442784 at *7.

Plaintiff also argues without evidentiary support that the "plus" part of their defamation can be found in the loss of prospective business relationships. Plaintiff's Brief at 29. However, we do not believe there is any support for the proposition that there is a constitutionally protected property interest in potential business. As the Ninth Circuit held in Cooper, business loss generally does not create the "plus" needed to turn defamation into a Section 1983 violation. Cooper, 924 F.2d at 1534. Plaintiff's reliance on DeBlasio, 53 F.3d 592 (3d Cir. 1995), is misplaced, as the statement regarding potential property [*28] interests came in dicta in the context of a procedural due process claim, not substantive due process. Plaintiff's reference to Petrone v. City of Reading, 541 F. Supp. 735 (E.D.Pa. 1982), in a footnote is similarly unavailing. That case, which is not controlling to us, held that the plaintiff had satisfied the "plus" requirement by asserting a direct loss of his business and his employment, not a loss of potential business relationships. Despite the interest that tort and contract law has in preserving business relationships, this is not a property interest worthy of constitutional protection. See Charles v. Baesler, 910 F.2d 1349, 1354 (6th Cir. 1990) (citing Regents of the University of Michigan v. Ewing, 474 U.S. 214, 229-30, 88 L. Ed. 2d 523, 106 S. Ct. 507 (1985)(Powell, J., concurring)); Reich v. Beharry, 883 F.2d 239, 243-44 (3d Cir. 1989). Simply, Plaintiff has not provided us with any evidence that would create a genuine issue as to the existence of a property or liberty interest protected by the Fourteenth Amendment. n3

- - - - - - - - - - - - - - - -Footnotes- - - - - - - - - - - - - - - - - -

n3 Nor does Plaintiff have the required level of property interest in the loss of potential business, relationships in and of themselves. Because actions which may state a claim in tort do not necessarily rise to the level of Constitutional protection, Plaintiff's must produce evidence of something more. Baker v. McCollan, 443 U.S. 137, 146, 61 L. Ed. 2d 433, 99 S. Ct. 2689 (1979). They have not done so, and thus have not met their very limited burden in this regard.

- - - - - - - - - - - - - - - -End Footnotes- - - - - - - - - - - - - - - - - [*29]

Even assuming a property interest, Plaintiff has not offered any evidence that Defendants "deliberately and arbitrarily" abused their power. Plaintiff argues rather summarily, and without reference to the record, that because there is no reference to a Part 145 license in the lease or the FBO standards, Defendants acted arbitrarily by finding Plaintiff in breach of its lease in October 1988. Further, Plaintiff states that Defendants acted arbitrarily by refusing to release Plaintiff from its breach of lease following the reissuance of its Part 145 license from the FAA in February of 1989 and instead waiting to do so until May, 1989. Finally Plaintiff states, without more, that "Defendants embarked upon a year-long campaign to undermine [Plaintiff's] business and drive it off the Airport." Plaintiff's Brief at 32.

None of these statements create a genuine issue of material fact in light of the evidence currently before the court. Rather, it is apparent that, as we noted above, the standards incorporated into the lease do require that Plaintiff, if acting as an FBO, to obtain the appropriate FAA license. When Plaintiff voluntarily forfeited its license to the FAA, it was in breach [*30] of that lease, and it was far from arbitrary for the Defendants to so inform Plaintiff. The "consultant's opinion" to which Plaintiff refers does state that Plaintiff was not in breach of its lease when its sister company lost its Part 135 operating license following a plane crash; however, the opinion does not discuss the issue of whether the loss of a Part 145 license would create a breach and is therefore irrelevant. The lease additionally required Defendants to inform those holding a first mortgage lien on Plaintiff's leasehold of any breach. Defendant's Motion for Summary Judgment, January 22, 1996, Exhibit C at III D.1.. Therefore, the notice provided to Plaintiff's bank was not done by arbitrary or bad faith

decisions. As for the delay in the release of the breach, Plaintiff offers no evidence to contradict the testimony and evidence offered by Defendants that the sole reason Defendants did not declare Plaintiff to have repaired its breach as early as February, 1989 was that they were awaiting the final report from their consultants, Airport Corporation; when they received a report stating the conclusion that Plaintiff was in compliance with the lease on April 22, 1989,  [*31]  Defendants placed it on the agenda for the next board meeting in May. See Plaintiff's Brief, Exhibit 11 at 1740. Finally, despite the plethora of exhibits attached to Plaintiff's brief, Plaintiff makes no reference to any evidence therein which would create a genuine issue as to the arbitrariness or inappropriate nature of Defendants' actions regarding Union Pacific. It is clear to us that Defendants acted carefully and reasonably in the context of the situation, and in the absence of evidence to the contrary, summary judgment is appropriate.

## C. Under Color of State Law

To set forth a claim under Section 1983, the plaintiff must not only show that it has been intentionally and arbitrarily deprived of a constitutionally protected right, but must also demonstrate that the person who deprived him of this right did so under the color of state law. We have found that Plaintiff has not been so deprived of a right protected by the Constitution, above; however, we will discuss the matter further for clarity.

1. Official Custom or Policy

It is well established that respondeat superior is not a basis for municipal liability under § 1983; however, municipalities may be directly  [*32]  liable under § 1983 for acts implementing a policy, practice, or custom which deprive a person of constitutional rights. Colburn v. Upper Darby Township, 946 F.2d 1017, 1027 (3d Cir. 1991); Monell v. City of New York Dep't of Social Services, 436 U.S. 658, 691-95, 56 L. Ed. 2d 611, 98 S. Ct. 2018 (1978). There are two predicates to direct municipal liability under section 1983: (1) identification of the relevant policymakers and (2) evidence that the policymakers' decisions caused the deprivation of rights at issue by policies which affirmatively commanded that such deprivation occur or by acquiescence in a longstanding practice or custom which constituted the "'standard operating procedure'" of the local government entity. Simmons v. Philadelphia, 947 F.2d 1042, 1062 (3d Cir. 1991). cert. denied, 503 U.S. 985, 118 L. Ed. 2d 391, 112 S. Ct. 1671 (1992); Bielevicz v. Dubinon, 915 F.2d 845, 850 (3d Cir. 1990). Execution of the government's policy or custom must inflict the injury. Simmons, 947 F.2d at 1059 (citing Monell, 436 U.S. at 694).

To show the first prong, the plaintiff must show that an official who has the final power to make policy is responsible  [*33]  for the particular course of action which caused the deprivation at issue. Bielevicz, 915 F.2d at 850. That is, "scienter-type evidence must have been adduced with respect to a high-level official determined ... in accordance with local law, to have final policymaking authority in the areas in question." Simmons, 947 F.2d at 1063. The Supreme Court has held that to be an "authorized decision maker," that official must be vested with full policy making authority; it is not enough that the official have discretionary authority to make a decision if that decision can be overturned by another who has the final authority to make policy that binds the municipality. Pembaur v. City of Cincinnati, 475 U.S. 469, 481, 89 L. Ed. 2d 452, 106 S. Ct. 1292 (1986); Bielevicz, 915 F.2d at 850 (the official must have "final, unreviewable discretion to make a decision or take an action"). Indeed, municipal liability attaches "where -- and only where -- a deliberate choice to follow a course of action is made from among various alternatives by the official or officials responsible for establishing final policy with respect to the subject matter in question. Pembaur, 475 U.S. at 483-84.  [*34]  Whether an individual or group is a policymaker for purposes of Section 1983 is a question of state law. Pembaur, 475 U.S. at 483.

In the case at bar, it is clear that the Board of Governors for the Airport Authority is the group responsible for establishing final airport policy. See Pa. Stat. Ann. tit. 53, § 309(A)

(1996) ("Governing Body"). See also Jett v. Dallas Independent School District, 7 F.3d 1241, 1245-6 (5th Cir. 1994) (holding that pursuant to relevant municipal code, neither Superintendent nor Principal had final authority because the code vested such authority in the district's board of trustees). Neither Defendant Yohe nor Defendant Wartell have the final discretion required for their actions to bind the Authority, and Plaintiff has not demonstrated any evidence to the contrary.

The second prong can be satisfied in a variety of ways. Certainly, the existence of a policy or custom authorizing the conduct is sufficient. A "policy" is a "statement, ordinance, regulation, or decision officially adopted and promulgated by [the municipality's] officers." Simmons, 947 F.2d at 1059 (quoting Monell, 436 U.S. at 690). It is also made when "a decisionmaker [*35] possessing final authority to establish municipal policy with respect to the action issues an official proclamation, policy, or edict." Bielevicz, 915 F.2d at 850. A "custom" lacks formal approval but is a given course of conduct that is so well settled and permanent that it has the force of law. Monell, 436 U.S. at 651. In addition, the Supreme Court has held that the second prong can be satisfied for "a single decision by municipal policymakers under appropriate circumstances." Pembaur, 475 U.S. at 480.

Plaintiff points to the decision to find it in breach of its lease, the FBO standards, and the "through-the-fence" policy as policies approved and authorized by the Board of Governors. However, these examples disguise what appears to be Plaintiff's true argument: that Defendants "undertook an intentional course of conduct designed to destroy plaintiff's FBO business." Defendants Brief, Exhibit A at 1. Plaintiff is really contending that Defendants made specific decisions to destroy its business and force it off the Airport, but has produced no evidence to the effect that the Board of Governors either affirmatively approved such decisions or were deliberately indifferent [*36] to them. Moreover, even if Plaintiff could demonstrate that Defendants Yohe and Wartell had the requisite position of final authority, it has pointed us to no evidence that would support the conclusion that Defendants had made any decisions or actions to ruin Plaintiff's business or force it to leave the Airport.

2. Qualified Immunity

To the extent that it is necessary to discuss the qualified immunity of Defendants Yohe and Wartell, given the above, we find that they are so protected. The Supreme Court established the standard for a grant of qualified immunity in Harlow v. Fitzgerald, 457 U.S. 800, 73 L. Ed. 2d 396, 102 S. Ct. 2727 (1982). The Court stated that "government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow, 457 U.S. at 818. In order to apply this test, the Court concluded that on summary judgment, the trial judge must determine "whether the law was clearly established at the time the action occurred." Id.

The Third Circuit expanded on this, saying [*37] that, "the right an official is alleged to have violated must have been 'clearly established' in a 'particularized' sense. That is, the contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." Abdul-Akbar v. Watson, 4 F.3d 195, 202 (3d Cir. 1993) (citing Anderson v. Creighton, 483 U.S. 635, 640, 97 L. Ed. 2d 523, 107 S. Ct. 3034 (1987) (holding that the question revolves around whether the official would know that his specific conduct was violate a clearly established right). Indeed, qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law." Malley v. Briggs, 475 U.S. 335, 341, 89 L. Ed. 2d 271, 106 S. Ct. 1092 (1986). We note that the Third Circuit has also delineated the tension between the Supreme Court's instruction that qualified immunity be determined preferably at the summary judgment stage, and the need to carefully examine the specific conduct of the defendants. Grant v. City of Pittsburgh, 98 F.3d 116, 122 (3d Cir. 1996).

In the instant case, we have reviewed the conduct of the Defendants in detail, and it is plain

that Defendants Yohe [*38] and Wartell were neither incompetent nor knowingly violating the law. As we discussed more fully, above, express provisions in the lease warranted the notice of default, and FAA policy required the denial of the 'through-the-fence' agreement. Moreover, there has been no evidence that Defendants were acting to violate any law when they negotiated with Union Pacific, or issued a statement that the Airport did not have a satisfactory FBO operator. Rather, the evidence suggests legitimate reasons for Defendants actions such that qualified immunity for Mr. Yohe and Mr. Wartell is appropriate.

## D. Proximate Cause

Finally, Plaintiff has also failed to produce evidence which demonstrates a genuine issue with regard to the final element of a Section 1983 claim, that the alleged unlawful policy or custom was the proximate cause of the injuries suffered. To do so, "a plaintiff must demonstrate a 'plausible nexus' or 'affirmative link' between the municipality's custom and the specific deprivation of constitutional rights at issue." Bielevicz, 915 F.2d at 850 (citing City of Oklahoma City v. Tuttle, 471 U.S. 808, 823, 85 L. Ed. 2d 791, 105 S. Ct. 2427 (1985)). The question of proximate [*39] cause is generally a question for the fact-finder; however, if the causal link is so tenuous or without evidence as to be implausible, it may be decided at summary judgment. Bielevicz, 915 F.2d at 851.

In the instant case, Plaintiff attempts to combat a very tenuous causal link with blanket, conclusory statements and no reference to the record. The evidence demonstrates that as a result of a 1988 plane crash and FAA investigation, Plaintiff's sister company was required to turn in its Part 135 (flying) certificate. The ensuing business loss greatly affected Plaintiff's ability to provide FBO services, and consequently it turned in its Part 145 (FBO) certificate to the FAA. This put Plaintiff in breach of its lease, and caused Union Pacific, a potential business partner, a great deal of concern about the viability of any co-projects. This court therefore sees little causal connection between any of Defendants' actions and Plaintiffs loss of business. As such, Plaintiff has failed to create any genuine issues of material fact relating to its Section 1983 claims, and summary judgment for the Defendants is appropriate at this time.

## V. CONCLUSION

For the foregoing reasons, we will [*40] grant Defendants' Motion for Partial Summary Judgment on Count One.

The two remaining counts, defamation and interference with a prospective contractual relationship, are state counts. There is no diversity in this action, and we decline to retain supplemental jurisdiction now that all of the federal claims have been eliminated.

An appropriate order follows.

## ORDER

AND NOW, this 5th day of May, 1997, upon consideration of Defendants' Motion for Partial Summary Judgment on Count One, filed February 19, 1997 and which we previously deemed to also be a Motion to Amend Answer, Plaintiff's Opposition to Defendants' Motion, filed March 21, 1997, Defendants' response thereto, filed April 16, 1997, Plaintiff's Opposition to Defendants' Motion to Amend Answer, filed April 17, 1997, and Defendants' response thereto, filed April 21, 1997, it is hereby ORDERED, consistent with the foregoing memorandum, that:

1. Defendants' Motion to Amend Answer is GRANTED;

2. Defendants' Motion for Partial Summary Judgment on Count One is GRANTED;

3. This court no longer has jurisdiction over the remaining two state claims, and therefore this case is DISMISSED without prejudice to Plaintiffs' ability  [*41]  to bring those claims in the appropriate state court. We express no opinion as to the merits of those claims; and

4. This case is CLOSED.

BY THE COURT

Franklin S. Van Antwerpen

United States District Court

Service: **LEXSEE®**
Citation: **1997 U.S. Dist. LEXIS 6493**
View: Full
Date/Time: Friday, May 26, 2000 - 8:47 AM EDT

About LEXIS-NEXIS | Terms and Conditions

Copyright © 2000 LEXIS-NEXIS Group.  All rights reserved.



Service: **LEXSEE®**
Citation: **1998 U.S. Dist. LEXIS 16439**

*1998 U.S. Dist. LEXIS 16439, ***

JOAN GRUENKE, individually and as a parent and natural guardian of LEAH GRUENKE, a minor, Plaintiffs, v. MICHAEL SEIP, Defendant.

Civil No. 97-5454

UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF PENNSYLVANIA

1998 U.S. Dist. LEXIS 16439

October 21, 1998, Decided
October 21, 1998, Filed

**DISPOSITION:** [*1] Defendant's Motion GRANTED with respect to the § 1983 claims which are all DISMISSED. Plaintiffs' state law claims DISMISSED without prejudice.

**CORE TERMS:** pregnancy, qualified immunity, swim, team, privacy, familial, pregnant, state law, constitutional violation, constitutional right, summary judgment, first amendment, disclosure, constitutional rights, upbringing, abortion, school official, approached, talk, objectively reasonable, right to privacy, matter of law, unborn child, non-moving, coach, favorable, religious, public school, daughter, testing

**COUNSEL:** For JOAN GRUENKE, PLAINTIFF: RICHARD J. ORLOSKI, ORLOSKI & HINGA, ALLENTOWN, PA USA.

For MICHAEL SEIP, DEFENDANT: RICHARD A. POLACHEK, LAW OFFICES OF POLACHEK, PECILE AND SMITH, P.C., WILKES-BARRE, PA USA.

**JUDGES:** Franklin S. Van Antwerpen, U.S.D.J.

**OPINIONBY:** FRANKLIN S. VAN ANTWERPEN

**OPINION:** OPINION AND ORDER

Van Antwerpen, J.

October 21, 1998

## I. INTRODUCTION

On August 26, 1997, Plaintiffs, Joan and Leah Gruenke, filed this action against Defendant, Michael Seip, under 42 U.S.C. § 1983 (" § 1983") and state tort law, 42 Pa. C.S.A. § 8550 *et. seq.* Plaintiffs essentially claim that their rights were violated when Leah Gruenke was forced to take a pregnancy test at the behest of the Defendant, a swim team coach. In their Amended Complaint filed on November 4, 1997, n1 the Plaintiffs alleged the following claims: (1) an illegal search in violation of Leah Gruenke's fourth amendment right, see PP 6-28; (2) a violation of Joan and Leah Gruenke's right to familial privacy, PP 36-49; (3) a violation of Leah Gruenke's [*2] right to privacy, PP 29-35; (4) a violation of Leah Gruenke's right of free speech and association, PP 50-56; and (5) violations of Joan and Leah Gruenke's rights under state tort law, PP 57-76.

- - - - - - - - - - - - - - - - - - -Footnotes- - - - - - - - - - - - - - - - - - -

n1 Hereinafter referred to as "Am. Compl. at P  ."

- - - - - - - - - - - - - - - - -End Footnotes- - - - - - - - - - - - - - - - -

Presently before the court is the Motion for Summary Judgment filed by the Defendant on September 4, 1998, and the Plaintiffs' Opposition to this Motion, filed on September 16, 1998. For the reasons set forth below, we will grant Defendant's Motion with regard to all § 1983 claims and dismiss all Plaintiffs' state law claims without prejudice.

## II. STANDARD OF REVIEW

The court shall render summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). An issue is "genuine" only if there is a sufficient evidentiary basis on which a reasonable  [*3]  jury could find for the non-moving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249, 91 L. Ed. 2d 202, 106 S. Ct. 2505 (1986) ("Anderson I"). A factual dispute is "material" only if it might affect the outcome of the suit under governing law. Id. at 248. All inferences must be drawn and all doubts resolved in favor of the non-moving party. United States v. Diebold, Inc., 369 U.S. 654, 655, 8 L. Ed. 2d 176, 82 S. Ct. 993 (1962); Gans v. Mundy, 762 F.2d 338, 341 (3d Cir. 1985).

On motion for summary judgment, the moving party bears the initial burden of identifying those portions of the record that it believes demonstrate the absence of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323, 91 L. Ed. 2d 265, 106 S. Ct. 2548 (1986). To defeat summary judgment, the non-moving party must respond with facts of record that contradict the facts identified by the movant and may not rest on mere denials. Id. at 321 n.3 (quoting Fed.R.Civ.P. 56(e)); see also First Nat'l Bank of Pennsylvania v. Lincoln Nat'l Life Ins. Co., 824 F.2d 277, 282 (3d Cir. 1987). The non-moving party must demonstrate the existence of evidence that would support a jury finding  [*4]  in its favor. See Anderson I, 477 U.S. at 249.

## III. FACTUAL BACKGROUND

Discovery in this matter is complete, and the facts are essentially as follows. n2 In January of 1997, Leah Gruenke, daughter of Joan Gruenke, was seventeen years old and in the eleventh grade. L. Gruenke Dep. 2/20/98 at 5, 8. She was also a member of the Emmaus High School varsity swim team, coached by Defendant, Michael Seip. Seip Dep. 2/20/98 at 17. In January of 1997, Defendant began to have suspicions that Leah was pregnant because she was "nauseated at practice on several occasions during Christmas, New Year's practice [sic] repeated trips to urinate to the bathroom during the two-hour span. She was complaining profusely about her energy levels being down. Her body was changing rapidly." Id. at 40-41.

- - - - - - - - - - - - - - - - -Footnotes- - - - - - - - - - - - - - - - -

n2 On April 21, 1998, this court ordered that discovery be completed by July 13, 1998. We have resolved any conflicts in the testimony in favor of the non-moving party. See discussion and footnotes.

- - - - - - - - - - - - - - - -End Footnotes- - - - - - - - - - - - - - - - -

At some point in  [*5]  February, Defendant talked to assistant coach Kim Kryzan about Leah Gruenke. Id. at 64-65. Ms. Kryzan had also noticed similar changes to Leah Gruenke's physical condition and approached Leah Gruenke to talk about her changed performance. Id. at 65; Kryzan Dep. 3/18/98 at 21. There is some conflict in testimony as to what was actually discussed, but Leah Gruenke did not volunteer any information. L. Gruenke Dep. 2/20/98 at

Get a Document by Citation 2000 U.S. Dist. LEXIS 16439    Page 3 of 15

Case 2:00-cv-00660-JK-JAS8  Document 10-2  Filed 05/30/2000    Page 29 of 75

20.

Soon after Leah Gruenke failed to give information to Ms. Kryzan, Defendant approached Leah Gruenke and attempted to broach an informative discussion on sex and pregnancy. L. Gruenke Dep. 2/20/98 at 21; Seip Dep. 2/20/98 at 69. Defendant claims that Leah Gruenke emphatically denied the possibility of pregnancy. Seip Dep. 2/20/98 at 64, 69.

Meanwhile, parents and other members of the swim team began to suspect that Leah Gruenke might be pregnant. See, e.g., Seip Dep. 2/20/98 at 60-63, 72-74; Hochella Dep. 3/16/98 at 12-13; Ritter Dep. 3/16/98 at 58-59. It is unclear whether anyone approached Leah Gruenke, although she did tell some of her fellow swimmers that she could not be pregnant because she had never had sexual intercourse. L. Gruenke Dep. [*6] 2/20/98 at 19. Leah Gruenke stated that she denied any possibility of pregnancy because she did not think that it was any of their business. Id.

Leah Gruenke also testified that she was called into both the offices of the nurse and the guidance counselor at school. L. Gruenke 2/20/98 at 27. It is clear from the record that the Defendant had asked the guidance counselor to talk to Leah Gruenke after his discussion with her produced nothing. Seip Dep. 2/20/98 at 79. Leah Gruenke testified that she found out that a mother of one of the swim team members had asked the nurse to talk to her. L. Gruenke Dep. 2/20/98 at 25. In both interviews Leah Gruenke did not volunteer any information, but was upset at the time: "I was sick of people like talking to me about pregnancy tests; and if I was pregnant, it's none of their business." Id. at 25.

Defendant testified that mothers of swim team members were still approaching him about Leah Gruenke and suggested that a pregnancy test should be administered. Seip Dep. 2/20/98 at 91-92. There is conflicting testimony as to whether some mothers of swim team members had actually tried to talk to Leah Gruenke's mother about this issue. See [*7] J. Gruenke Dep. 5/29/98 at 58-61; L. Gruenke Dep. 2/20/98 at 39. Lynn Williams, the mother of a swim team member, suggested to the Defendant that a pregnancy test be purchased. Williams Dep. 5/29/98 at 13. The test was eventually purchased by Lynn Williams and the Defendant reimbursed her for the test and kept it at school. Id. at 15-16; Seip Dep. 2/20/98 at 92, 101.

The progression of events that followed are unclear in the record because of conflicting testimony. On about March 5, 1997, Leah Gruenke was approached by female swim team members Abby Hochella and Kathy Ritter who asked her to take a pregnancy test which she refused. L. Gruenke Dep. 2/20/98 at 50-51. According to Leah Gruenke, on March 6, 1997, Ms. Hochella and Ms. Ritter again approached her and stated "we still have this pregnancy test that Seip gave us, and he wants us to get you to take it." Id. at 51. Ritter and Hochella testified, however, that the Defendant told them that "if she [Leah Gruenke] was willing to take one, there was one in the back room." Ritter Dep. 3/16/98 at 14; Hochella Dep. 3/16/98 at 20. Defendant claimed that he did not urge L. Gruenke to take the test, but did tell Ms. Hochella and [*8] Ms. Ritter that "if it were a friend of mine, I would start with asking her to take a pregnancy test." Seip Dep. 2/20/98 at 102.

Leah Gruenke then wrote a letter to the Defendant, which he refused to accept, stating that Defendant had no right to make her take a pregnancy test because she wasn't showing any symptoms of being pregnant and that she had never had sexual intercourse. L. Gruenke Dep. 2/20/98 at 53-54; Seip Dep. 2/20/98 at 123. She also told Ms. Ritter and Ms. Hochella that she did not have sexual intercourse "because I didn't want them to harass me anymore." L. Gruenke Dep. 2/20/98 at 54.

On the same day, Ms. Ritter approached Leah Gruenke once more and according to Leah Gruenke stated "you have to take the test because if you don't, Mr. Seip said he'll take you out of the relay." Id. at 55. Leah Gruenke finally conceded to take the test. Id. at 56. Ms. Hochella testified differently stating that she tried to convince Leah Gruenke because it would

solve a lot of problems for her if she could prove that she wasn't pregnant. Hochella Dep. 3/16/98 at 20. Ms. Hochella and Ms. Ritter then testified that Leah Gruenke came back to them and voluntarily decided to be [*9] tested. Id.; Ritter Dep. 3/16/98 at 17.

Ms. Ritter, Ms. Hochella and an additional female swimmer, Sara Cierski, were present when Leah Gruenke took the test in the locker room bathroom stall. L. Gruenke Dep. 2/20/98 at 62-63. This test proved positive. Id. at 65. Sara Cierski suggested that Leah Gruenke take another test. Id. at 66. The girls went to the parking lot and got money from their parents. Id. Leah Gruenke drove with Abby Hochella and Kathy Ritter and bought two more tests. Id. at 67. Leah Gruenke took both tests and they came out negative. Id. at 69, 72.

Later that evening, Leah Gruenke discussed with her mother what had happened that evening. Id. at 74. Joan Gruenke was clearly upset. Id. at 74-75. Abby Hochella called her in the evening to ask Leah Gruenke to take another pregnancy test and that her mother (Abby Hochella's mother) would be willing to take her to a doctor. Id. at 76-77. Leah Gruenke rose early the next day to take the fourth and final pregnancy test in the locker room with Ms. Hochella and Ms. Ritter. Id. at 79. This test was purchased by Ms. Hochella and her mother. Hochella Dep. 3/16/98 at 32. This test also [*10] came out negative. L. Gruenke Dep. 2/20/98 at 80.

The record is clear that Defendant did not, beyond consulting a guidance counselor and other assistant coaches, ever make an attempt to talk directly to Leah Gruenke's parents or to higher levels of the school administration. Seip Dep. 2/20/98 at 74. After receiving information about positive pregnancy test, Defendant did, however, ask volunteer assistant coach Dr. Meade whether it was okay for a pregnant swimmer to compete and made the decision that there was no basis on which to pull her from the subsequent competitions. Seip Dep. 2/20/98 at 134-137.

It is also clear from the record that Leah Gruenke, for whatever reasons, chose to deny to herself and others the possibility of her being pregnant. See L. Gruenke Dep. 2/20/98 at 33, 36, 54. It was not until her appointment with Dr. Greybush, scheduled by her mother on March 10, 1997, that she was confronted with the fact that she was in fact five to six months pregnant. Id. at 84. Even then, Leah Gruenke did not tell her mother or anyone on the swim team that she was pregnant because she wanted to compete in the states tournament. Id. at 92, 95.

Finally, there are several [*11] acts after this whole incident which Plaintiffs allege alienated Leah Gruenke from her peers. At a Franklin and Marshall swim meet sometime in the summer, Defendant saw Leah Gruenke for her first time after she had given birth. Seip Dep. 2/20/98 at 156-57. At that point in time, Leah Gruenke was swimming independently and Defendant was there in the capacity as coach of the Emmaus Aquatic Team (part of a private swimming club). Id. Leah Gruenke testified that the Defendant ordered students not to sit with her. Id. at 157; L. Gruenke Dep. 2/20/98 at 115-116. During the following school year, Leah Gruenke's last year of high school, she testified that the Defendant never talked to her and she felt she was being retaliated against because she was taken out of several swim meets. L. Gruenke Dep. 2/20/98 at 149-151.

## IV. DISCUSSION

Section 1983 provides for the imposition of liability on any person who, acting under color of state law, deprives another of rights, privileges, or immunities secured by the Constitution or the laws of the United States. To state a claim under § 1983, the plaintiffs must show both that: (1) the offending conduct was committed by a person acting [*12] under color of state law; and (2) that such conduct deprived the plaintiffs of rights secured by the Constitution of the United States. Parratt v. Taylor, 451 U.S. 527, 535, 68 L. Ed. 2d 420, 101 S. Ct. 1908 (1981), overruled in part on other grounds, Daniels v. Williams, 474 U.S. 327, 88 L. Ed. 2d 662, 106 S. Ct. 662 (1986). In this case, no party disputes that Defendant was acting under

color of state law. n3

- - - - - - - - - - - - - - - -Footnotes- - - - - - - - - - - - - - - -

n3 Plaintiffs have brought claims against the Defendant in only his individual capacity. Individual capacity suits seek to impose personal liability upon a government official's personal assets. Kentucky v. Graham, 473 U.S. 159, 166, 87 L. Ed. 2d 114, 105 S. Ct. 3099 (1985).

- - - - - - - - - - - - - - - -End Footnotes- - - - - - - - - - - - - - - -

Generally, in a § 1983 action, the first issue to be determined is whether the plaintiff has sufficiently alleged a deprivation of a right secured by the Constitution. See Baker v. McCollan, 443 U.S. 137, 140, 61 L. Ed. 2d 433, 99 S. Ct. 2689 (1979). However, when a defendant asserts the affirmative defense of [*13] immunity, as in the present case, we must first determine whether he is entitled to such a defense before reaching the merits of the case. Harlow v. Fitzgerald, 457 U.S. 800, 819-19, 73 L. Ed. 2d 396, 102 S. Ct. 2727 (1982). This preliminary determination is necessary because unlike a mere defense to liability which involves the essence of the wrong, one who enjoys qualified immunity is immune from suit. Richardson v. McKnight, 521 U.S. 399, 117 S. Ct. 2100, 2103, 138 L. Ed. 2d 540 (1997). Moreover, the policy underlying the qualified immunity doctrine is "to spare a defendant not only unwarranted liability, but unwarranted demands customarily imposed upon those defending a long drawn out lawsuit." Siegert v. Gilley, 500 U.S. 226, 232, 114 L. Ed. 2d 277, 111 S. Ct. 1789 (1991).

## A. Qualified Immunity

Defendant asserts that qualified immunity should shield him from liability. Under the doctrine of qualified immunity, the inquiry is divided into two separate issues. First, this court must examine whether the conduct of the Defendant violated clearly established constitutional rights. See Harlow, 457 U.S. at 818. Next, we must assess whether an objectively [*14] reasonable person in the Defendant's position would have known that his conduct would have violated such constitutional rights. Id. The analysis generally turns on the "'objective legal reasonableness' of the action . . . assessed in light of the legal rules that were 'clearly established' at the time it was taken." Anderson v. Creighton, 483 U.S. 635, 639, 97 L. Ed. 2d 523, 107 S. Ct. 3034 (1987) (quoting Harlow, 457 U.S. at 818-19) ("Anderson II"). Qualified immunity is applicable even where officials "of reasonable competence could disagree" that such acts were objectively reasonable, see Malley v. Briggs, 475 U.S. 335, 341, 89 L. Ed. 2d 271, 106 S. Ct. 1092 (1986), and "as the qualified immunity defense has evolved, it provides ample protection to all but the plainly incompetent or those who knowingly violate the law." Id.

The determination of qualified immunity upon a motion for summary judgment is entirely appropriate. See, e.g., Harlow, 457 U.S. at 818; Siegert, 500 U.S. at 231; Grant v. City of Pittsburgh, 98 F.3d 116, 122 (3d Cir. 1996). The first issue, whether a plaintiff asserts the violation of a clearly established constitutional [*15] right, is purely a question of law. Sharrar v. Felsing, 128 F.3d 810, 828 (3d Cir. 1997). The second issue, whether the officer reasonably believed in the lawfulness of his or her conduct, is also generally an issue of law to be decided by the court. n4 Id.

- - - - - - - - - - - - - - - -Footnotes- - - - - - - - - - - - - - - -

n4 In Sharrar, the Third Circuit noted that there may be some instances where a court may choose to resolve disputed facts by resorting to a jury in deciding the qualified immunity question. 128 F.3d at 828.

- - - - - - - - - - - - - - - -End Footnotes- - - - - - - - - - - - - - - -

There is, however, a tension between the "insistence that the immunity defense be decided as a matter of law when the reality is that factual issues must frequently be resolved in order to determine whether the defendant violated clearly established federal law." Grant, 98 F.3d at 122 (quoting Schwartz, *Section 1983 in the Second Circuit*, 59 Brook. L.Rev. 285, 309 (1993)). Courts have resolved such tension by a careful examination of the record viewed in a light most favorable to the plaintiff upon a summary judgment motion. Id  [*16]  .; see, e.g., Moniz v. City of Fort Lauderdale, 145 F.3d 1278, 1281 (11th Cir. 1998); King v. Beavers, 148 F.3d 1031, 1032 (8th Cir. 1998). In the present case before us, therefore, we will undergo the analysis by assuming the facts in a light most favorable to the Plaintiffs and proceed to consider whether the qualified immunity defense is established as a matter of law. n5

- - - - - - - - - - - - - - - - -Footnotes- - - - - - - - - - - - - - - - - -

n5 In other words, when there is a conflict of evidence presented in the record, we will assume that Plaintiffs' version is true. At this stage of the proceedings, however, this court will not accept all of Plaintiffs' allegations as true because we have often found Plaintiffs' characterization of the facts to be widely divergent from the deposition testimony.

- - - - - - - - - - - - - - - -End Footnotes- - - - - - - - - - - - - - - - -

The threshold question for this court is whether the constitutional rights asserted by Plaintiffs are clearly established at the time Defendant acted. Siegert, 500 U.S. at 232. Only if this question is answered affirmatively may this court move on to the analysis  [*17]  of whether the Defendant's conduct was objectively reasonable. See Johnson v. Horn, 150 F.3d 276, 286 n.7 (3d Cir. 1998).

The Supreme Court has explained what it means by clearly established law for the purposes of qualified immunity:

> The contours of the right must be sufficiently clear that a reasonable official would understand what he is doing violates that right. This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful, but it is to say . . . the unlawfulness must be apparent.

Anderson II, 483 U.S. at 640 (citation omitted). In determining whether a defendant's conduct impinged upon clearly established constitutional rights, the courts are required to conduct more than a generalized inquiry into whether an abstract constitutional right is implicated. Id. at 639-40. Moreover, the Third Circuit has similarly held that when there is a lack of substantially similar authority on point, the law cannot be said to be clearly established. See, e.g., Sharrar, 128 F.3d at 810, 828-29; Johnson, 150 F.3d at 286; Pro v. Donatucci, 81 F.3d 1283, 1292 (3d Cir.  [*18]  1996).

Moreover, a necessary concomitant to the determination of whether the constitutional right asserted by a plaintiff is clearly established is whether the plaintiff has asserted a violation of a constitutional right at all. Siegert v. Gilley, 500 U.S. at 233; County of Sacramento v. Lewis, 523 U.S. 833, 140 L. Ed. 2d 1043, 118 S. Ct. 1708, 1714 n.5 (1998). If the actions of the government official, as alleged by the plaintiff, do not even rise to a level of a constitutional violation, then that official is clearly entitled to qualified immunity. City of Philadelphia Litigation v. City of Philadelphia, 158 F.3d 711, 1998 U.S. App. LEXIS 21907, 1998 WL 569362, at *7-8 (3d Cir. 1998). n6

- - - - - - - - - - - - - - - -Footnotes- - - - - - - - - - - - - - - - - -

n6 There seems to be some confusion as to whether the failure to assert an alleged deprivation of a constitutional right by a plaintiff means that the immunity question need not be reached, see Sameric Corp. of Delaware, Inc. V. City of Philadelphia, 142 F.3d 582, 590 n.6 (3d Cir. 1998), or merely that the official is entitled to qualified immunity. City of Philadelphia Litigation, 1998 WL 569362, at *7-8. We choose to follow the latter analysis as it is supported by a more recent Third Circuit opinion and by other sister circuits. See, e.g., Jones v. Collins, 132 F.3d 1048, 1052 (5th Cir. 1998); Roe v. Sherry, 91 F.3d 1270, 1273-74 (9th Cir. 1996).

- - - - - - - - - - - - - - - -End Footnotes- - - - - - - - - - - - - - - - -  [*19]

## 1. Fourth Amendment Claim

Plaintiffs allege that Leah Gruenke was forced by the Defendant to take a pregnancy test in violation of her fourth amendment rights. Pls.' Br. 19-23. n7 We will assume for the purposes of this motion that the Defendant did have the intention of giving Leah Gruenke the test and that Leah Gruenke was pressured to take the pregnancy test. Id. at 22. The question before us, then, is whether Defendant's actions violated clearly established constitutional law.

- - - - - - - - - - - - - - - -Footnotes- - - - - - - - - - - - - - - - - -

n7 Plaintiff's Brief in Opposition to Defendant's Motion for Summary Judgment is hereinafter referred to as "Pls.' Br. at  ."

- - - - - - - - - - - - - - - -End Footnotes- - - - - - - - - - - - - - - -

The administration of a pregnancy test by a school official appears to be a matter of first impression in the federal courts. There are no cases that we can find that address pregnancy testing in the public school context under the fourth amendment. Plaintiffs' argue that Leah Gruenke's constitutional rights were violated because the Supreme Court has "deemed to prohibit the pregnancy testing  [*20]  of student athletes" under the fourth amendment. Id. at 20. For the reasons set forth below, we find Plaintiffs' statement to be a misinterpretation of current law.

The fourth amendment guarantees the privacy of persons against certain arbitrary and invasive acts by officers of the government. See Skinner v. Railway Labor Executives' Ass'n, 489 U.S. 602, 616, 103 L. Ed. 2d 639, 109 S. Ct. 1402 (1989). By virtue of the fourteenth amendment, the fourth amendment embodies the right to be free from unreasonable searches by state officers. Elkins v. United States, 364 U.S. 206, 213, 4 L. Ed. 2d 1669, 80 S. Ct. 1437 (1960). State officers include public school officials for the purposes of the fourth amendment. New Jersey v. T.L.O., 469 U.S. 325, 336, 83 L. Ed. 2d 720, 105 S. Ct. 733 (1985); Vernonia School Dist. 47J v. Acton, 515 U.S. 646, 115 S. Ct. 2386, 2390, 132 L. Ed. 2d 564 (1995).

The administration of a pregnancy test by a school official clearly constitutes a search within the meaning of the fourth amendment because such tests invade reasonable expectations of privacy. Vernonia, 115 S. Ct. at 2390; Skinner, 489 U.S. at 617. The pregnancy test given  [*21]  in this case, therefore, must meet the reasonableness requirement. Although a search or seizure is usually not reasonable unless it is accomplished pursuant to a judicial warrant issued upon probable cause, there is a well-defined exception when "special needs, beyond the normal need for law enforcement, make the warrant and probable-cause requirement impracticable." Griffin v. Wisconsin, 483 U.S. 868, 873, 97 L. Ed. 2d 709, 107 S. Ct. 3164 (1987). The Supreme Court has chosen to apply the "special needs" analysis in numerous occasions relating to a school setting because of the non-criminal investigatory nature of the searches. See, e.g., T.L.O., 469 U.S. at 341-42; Vernonia, 115 S. Ct. at 2390-91. In

Get a Document - by Citation - 2000 U.S. Dist. LEXIS 6435    Page 34 of 75

Case 1:00-cv-00660-YK-JAS   Document 82   Filed 05/30/2000   Page 8 of 15

determining the reasonableness of the pregnancy test at issue, we will follow the "special needs" balancing test set forth by the Supreme Court. n8

- - - - - - - - - - - - - - - - -Footnotes- - - - - - - - - - - - - - - - - -

n8 We diverge, therefore, from Ascolese v. Southeastern Pennsylvania Transp. Auth. in which the court analyzed a pregnancy test requirement by an employer under the probable cause and the warrant requirement. 902 F. Supp. 533, 550 (E.D. Pa. 1995), on reconsideration, 925 F. Supp. 351 (E.D. Pa. 1996). The court in Ascolese reasoned that the unified "special needs" analysis eradicating the probable cause and warrant requirements was applied in public school contexts because of the need for "swift and informal disciplinary procedures" not relevant in pregnancy testing by an employer. 902 F. Supp. at 550 n.25 (quoting Vernonia, 115 S. Ct. at 2391).

We choose to follow other cases which apply the "special needs" analysis under the rationale that a search in this type of case is outside the scope of law enforcement activities. See, e.g., O'Connor v. Ortega, 480 U.S. 709, 725, 94 L. Ed. 2d 714, 107 S. Ct. 1492 (1987) (special needs applies for legitimate work-related, non-investigatory intrusions); Yin v. State of California, 95 F.3d 864, 869 (9th Cir. 1996) (medical examinations not conducted as part of a criminal investigation are generally subject to "special needs" analysis); Skinner, 489 U.S. at 620 (urinalysis of railroad employees to ensure safety presents a "special needs" question).

- - - - - - - - - - - - - - - - -End Footnotes- - - - - - - - - - - - - - - -  [*22]

The "special needs" analysis under the fourth amendment requires a court to balance the nature of the privacy interest at stake versus its promotion of legitimate governmental interests. Vernonia, 115 S. Ct. at 2390. In Vernonia, the governmental interest in having student athletes tested was sufficient to invade their privacy. 115 S. Ct. at 2396. Unlike Plaintiffs' characterization, the Vernonia Court did not conclude that an unreasonable search or seizure would automatically occur if a school official conducted a pregnancy test. Pls' Br. at 20. Rather, the Court merely recognized that pregnancy information carried with it a heightened standard of privacy compared to information on drug use. Vernonia, 115 S. Ct. at 2393 (citing Skinner, 489 U.S. at 617).

We could not, however, find any clearly established law on the issue of how to balance the privacy interest of pregnancy information with the interest of a school official in obtaining such information. While we found some guidance from school cases involving a search for drugs, the special needs inquiry in such cases were primarily concerned with searches directed at promoting discipline or the safety interests  [*23]  of a broader student population, rather than the health and safety of the tested individual. See, e.g., T.L.O., 469 U.S. at 339-40; Vernonia, 115 S. Ct. at 2396; Schaill v. Tippecanoe County School Corp., 864 F.2d 1309 (7th Cir. 1988). Moreover, we believe that the present case is also distinguished from cases involving fourth amendment claims and mandatory pregnancy tests given by employers. The interest of an employer in such pregnancy information must be compelling, Ascolese, 902 F. Supp. at 550; Norman-Bloodsaw v. Lawrence Berkeley Laboratory, 135 F.3d 1260, 1269-70 (9th Cir. 1998), while schools have a broader "custodial and tutelary responsibility for children" that might change the outcome of such fourth amendment balancing. n9 Vernonia, 115 S. Ct. at 2392; T.L.O., 469 U.S. at 349 (Powell, J., concurring). Moreover, Vernonia stated "legitimate privacy expectations are even less with regard to student athletes . . .they require 'suiting up' before each practice or event, and showering and changing afterwards." 115 S. Ct. at 2392.

- - - - - - - - - - - - - - - - -Footnotes- - - - - - - - - - - - - - - - - -

n9 We do find that the "custodial and tutelary responsibility for children" would apply to this situation absent qualified immunity. Plaintiffs have alleged that Defendant did not have Leah Gruenke's best interests in mind when ordering the pregnancy test. They claim that

Defendant ordered the test for his own personal satisfaction and because he was concerned about the competitive performance of the swim team. Pls.' Br. at 23, 31. While this court is examining the facts in a light most favorable to the Plaintiffs, we do not find any facts in the depositions that support such a claim. Plaintiffs support their allegation by claiming that Defendant's conduct in not seeking medical attention and allowing Leah Gruenke to compete is evidence that he was not concerned about her health. Id. Such evidence contradicts their assertion that he was only concerned about performance of the swim team as Leah Gruenke's competitive times were slowing due to her pregnancy. L. Gruenke Dep. 2/20/98 at 95.

- - - - - - - - - - - - - - - - -End Footnotes- - - - - - - - - - - - - - - - - [*24]

We decline to decide today whether a fourth amendment violation may be established by the facts in this case. We merely wish to indicate that as in Anderson II, we cannot say that the right allegedly violated has been clearly established by prior law. 483 U.S. at 639-40. Taking the Plaintiffs' assertions as true for the purposes of this motion, we certainly do believe the Defendant's conduct was questionable and wonder why he failed to discreetly refer any concerns about Leah Gruenke directly to her parents or to higher levels of the school administration. Indeed, without the qualified immunity issue, we might well find that material issues of fact exist as to whether the Defendant violated Plaintiffs' fourth amendment rights. However, as a matter of law, we cannot say that the law on this issue has been clearly established, and therefore must hold that the Defendant is entitled to qualified immunity on this fourth amendment claim.

## 2. Substantive Due Process Claims

Plaintiffs allege two different claims under substantive due process: (1) Plaintiffs claim that Defendant's conduct violated their constitutional right to be free from state interference with family relations; [*25] and (2) Plaintiffs argue that Leah Gruenke's own constitutional right to privacy was violated not only by disclosure of personal medical information, but also by the alleged publication of such information which interfered with Leah Gruenke's right to make independent decisions. Pls.' Br. at 24-27.

The substantive component of the due process clause bars "certain government actions regardless of the fairness of the procedures used to implement them ... [and thereby] serves to prevent governmental power from being 'used for purposes of oppression.'" Daniels v. Williams, 474 U.S. 327, 331-32, 88 L. Ed. 2d 662, 106 S. Ct. 662 (1986) (internal citations omitted). When determining whether an action violates a right protected by this element of the due process clause, the court must balance "the liberty of the individual" and "the demands of an organized society." Youngberg v. Romeo, 457 U.S. 307, 320, 73 L. Ed. 2d 28, 102 S. Ct. 2452 (1982) (quoting Poe v. Ullman, 367 U.S. 497, 542, 6 L. Ed. 2d 989, 81 S. Ct. 1752 (1961) (Harlan, J., dissenting)).

## a. Familial Right to Privacy

The substantive due process right to which Plaintiffs refer is the right to familial [*26] integrity. In particular, Plaintiff Joan Gruenke claims that she was denied the opportunity to have been "the sole influence" and to "have guided" her daughter, Leah Gruenke, through the issues surrounding her pregnancy. Pls.' Br. at 29. Plaintiffs also allege that Defendant's conduct interfered with Leah Gruenke's familial right to privacy as a daughter and future mother. Id.

We agree that the Supreme Court has clearly recognized a fundamental liberty interest in familial integrity and privacy. Many of the cases recognizing this fundamental liberty interest do so in the context of the creation or sustenance of a family. Roberts v. United States Jaycees, 468 U.S. 609, 619-20, 82 L. Ed. 2d 462, 104 S. Ct. 3244 (1984); see, e.g., M.L.B. v. S.L.J., 519 U.S. 102, 117 S. Ct. 555, 136 L. Ed. 2d 473 (1996) (a statute prohibiting an appeal in forma pauperis from a decision to sever the parent-child bond violated due

process); Moore v. City of East Cleveland, 431 U.S. 494, 52 L. Ed. 2d 531, 97 S. Ct. 1932 (1977) (local ordinance that restricted certain family living arrangements was unconstitutional). We believe that the intrusion upon familial rights complained of [*27] in the present case does not amount to state termination or restriction of familial rights.

The courts have also recognized a right of familial integrity in the upbringing of children in specific instances. See, e.g., Prince v. Massachusetts, 321 U.S. 158, 88 L. Ed. 645, 64 S. Ct. 438 (1944) (parents have fundamental interest in the religious upbringing of children); Meyer v. Nebraska, 262 U.S. 390, 67 L. Ed. 1042, 43 S. Ct. 625 (1923) (parents and teachers have a fundamental interest in the education of their children in foreign languages); Wisconsin v. Yoder, 406 U.S. 205, 32 L. Ed. 2d 15, 92 S. Ct. 1526 (1972) (state may not impinge upon the interest of parents with respect to the religious upbringing of their children).

Plaintiffs argue that Defendant's conduct was not unlike that of the school officials in Arnold v. Board of Education of Escambia County, where a student was coerced into obtaining an abortion. 880 F.2d 305, 313 (11th Cir. 1989). While the court in Arnold found that the parents had established a cause of action for the invasion in the familial right to privacy, the court stated:

> We find that a parent's constitutional right [*28] to direct the upbringing of a minor is violated when the minor is coerced to refrain from discussing with the parent an intimate decision such as whether to obtain an abortion; a decision which touches fundamental values and religious beliefs parents wish to instill in their children.

Id. at 312. Here, the Defendant's alleged efforts to get Leah Gruenke to take a pregnancy test and a disclosure of the results do not amount to actual interference with Joan Gruenke's right as a parent to make decisions for her child regarding a fundamental right. Nor do the alleged efforts of the Defendant in any way concern Joan Gruenke's right to control her child's religious upbringing as in Prince or Yoder.

Upon closer inspection of the Arnold facts, this court finds that the present case is easily distinguishable because the school officials in Arnold coerced a minor to refrain from consulting her parents about an abortion decision. Id. at 314. Assuming that many of the Plaintiffs assertions are true for the purposes of this motion, it is without question very unfortunate that Leah Gruenke's parents were not the first to know of her possible pregnancy, but we [*29] are at a loss in discovering how the Defendant's conduct seriously intruded on the relationship between Joan Gruenke and her daughter. After finding out about the positive results of the pregnancy test, Defendant did not coerce or compel Plaintiffs to make any kind of decisions regarding the pregnancy and the so-called "outside influences of the public," cannot be attributed to the Defendant. See Pls.' Br. at 28. At best, any burden on Plaintiffs' right to family integrity is very indirect and thus will not give rise to a violation of substantive due process. Compare Philadelphia Police Force & Fire Ass'n for Handicapped Children, Inc. v. City of Philadelphia, 874 F.2d 156, 168 (3d Cir. 1989). Defendant, therefore, is entitled to qualified immunity because Plaintiffs have failed to assert a violation of the constitutional right to familial privacy. Siegert, 500 U.S. at 233.

Even assuming that Defendant's conduct did sufficiently interfere with familial integrity to trigger substantive due process analysis, the right to familial privacy has never been absolute or unqualified, see Lehr v. Robertson, 463 U.S. 248, 256, 77 L. Ed. 2d 614, 103 S. Ct. 2985 (1983) (relationship [*30] between parent and child merits constitutional protection in "appropriate cases"), and has been balanced against the compelling government interest in the health, education, and welfare of children as future citizens. See, e.g., Santosky II v.

Kramer, 455 U.S. 745, 766, 71 L. Ed. 2d 599, 102 S. Ct. 1388 (1982)(state has parens patriae interest in welfare of child); Stanley v. Illinois, 405 U.S. 645, 31 L. Ed. 2d 551, 92 S. Ct. 1208 (1972) (state has the right and duty to protect minor children); Quilloin v. Walcott, 434 U.S. 246, 54 L. Ed. 2d 511, 98 S. Ct. 549 (1978) (upheld state law that denied an unwed father authority to prevent adoption of his illegitimate child). A school's interest in the health, education and welfare of its students has traditionally been strong. As no other case has previously balanced the state's interest in such pregnancy information with the interference it may cause to familial integrity, a legitimate question remains as to the outcome of such a balancing test. Therefore if we got to this point, the Defendant would be alternatively entitled to qualified immunity because the law is not clearly established on this point. Anderson II, 483 U.S. at 640.

No relevant [*31] cases exist, furthermore, to support Plaintiffs claim that Leah Gruenke's own parental right of decisionmaking concerning her unborn child was violated by the Defendant. Pls.' Br. at 31. While a privacy right between a woman and her unborn child relating to the abortion decision is clearly established, see Planned Parenthood of Southeastern Pennsylvania v. Casey, 505 U.S. 833, 120 L. Ed. 2d 674, 112 S. Ct. 2791 (1992), upon searching the relevant law, we could not find any cases that held the relationship itself to be a fundamental right. In fact, we found a Third Circuit case that left precisely the issue of whether woman's "relationship with her unborn child during pregnancy is a fundamental interest" undetermined. Alexander v. Whitman, 114 F.3d 1392, 1403-4 (3d Cir. 1997). Even assuming that such a right did exist, we fail to see how Defendant's conduct interfered with Leah Gruenke's relationship with her unborn child as he did not coerce her to have an abortion, nor mandate any particular conduct on her part because she was pregnant. Plaintiffs claim that Defendant's conduct violated Leah Gruenke's right to familial privacy with her unborn child, does not rise to the level [*32] of a constitutional violation. Defendant, therefore, is also entitled to qualified immunity for this claim on the grounds that his conduct does not even amount to a constitutional violation, see City of Philadelphia Litigation, 1998 WL 569362, at *7-8, and that the constitutional right he assertedly violated was not clearly established. Pro, 81 F.3d at 1292.

**b. Right to Privacy Concerning Personal Matters**

Plaintiffs also allege that Leah Gruenke's substantive due process right to privacy was violated. Pls.' Br. at 24. They claim that Defendant both violated her right to independently make certain decisions and avoid disclosure of highly personal matters. n10 Id.

- - - - - - - - - - - - - - - - - - -Footnotes- - - - - - - - - - - - - - - - - - -

n10 In count four of the Complaint, Plaintiffs raised a right to privacy claim on behalf of Joan Gruenke, individually. See Am. Compl. at PP 44-49. This right to privacy claim is the right to familial privacy claim discussed under subsection (2)(a). See Pls.' Br. at 27-32.

- - - - - - - - - - - - - - - - -End Footnotes- - - - - - - - - - - - - - - - -

Within the "zone of privacy" carved out by the [*33] Supreme Court, there are two lines of cases that have discussed the constitutional right of privacy. "One is the individual interest in avoiding disclosure of personal matters, and another is the interest in independence in making certain kinds of important decisions." Whalen v. Roe, 429 U.S. 589, 599-600, 51 L. Ed. 2d 64, 97 S. Ct. 869 (1977). Plaintiffs argue that both of these interests were violated by the Defendant.

Clearly the kind of privacy "in making certain kinds of important decisions" implicates the right to make decisions regarding certain fundamental rights. These fundamental rights have been carefully delineated by the Supreme Court, including the rights: to marry, Loving v. Virginia, 388 U.S. 1, 18 L. Ed. 2d 1010, 87 S. Ct. 1817 (1967); to have children, Skinner v. Oklahoma, 316 U.S. 535, 86 L. Ed. 1655, 62 S. Ct. 1110 (1942); to direct the education and



upbringing of one's children, Meyer, 262 U.S. at 390; to marital privacy, Griswold v. Connecticut, 381 U.S. 479, 14 L. Ed. 2d 510, 85 S. Ct. 1678 (1965); to use contraception, Eisenstadt v. Baird, 405 U.S. 438, 31 L. Ed. 2d 349, 92 S. Ct. 1029 (1972); to bodily integrity, Rochin v. California, [*34] 342 U.S. 165, 96 L. Ed. 183, 72 S. Ct. 205 (1952), and to abortion, Casey, 505 U.S. at 833. See Washington v. Glucksberg, 521 U.S. 702, 138 L. Ed. 2d 772, 117 S. Ct. 2258, 2267 (1997). Clearly Plaintiffs' claim does not fall under any of these cases because Leah Gruenke was not impaired of any decision making relating to a fundamental right. n11

- - - - - - - - - - - - - - - - - -Footnotes- - - - - - - - - - - - - - - - - -

n11 The claims by Plaintiffs that their opportunities of adoption or moving Leah Gruenke to Florida were foreclosed because of "the eyes of the public" do not rise to the level of policies or state statutes that have prohibited personal choices in fundamental rights cases. Pls.' Br. at 26.

- - - - - - - - - - - - - - - -End Footnotes- - - - - - - - - - - - - - - - -

Plaintiffs claim does, however, fall under the right to be free from disclosure of personal matters. Whalen, 429 U.S. at 599-600. The Third Circuit has clearly recognized that private medical information is "well within the ambit of materials entitled to privacy protection." United States v. Westinghouse Electric Corp., 638 F.2d 570, 577 (1980). Such a right, however, is not absolute and [*35] "public health or other public concerns may support access to facts an individual might otherwise choose to withhold." Id. at 578. The Third Circuit employs an "intermediate" standard of review and balances the government interest in disclosure against the individual's privacy interest. Id.; Doe v. Southeastern Pennsylvania Transportation Authority, 72 F.3d 1133, 1139 (3d Cir. 1995); Fraternal Order of Police, Lodge No. 5 v. City of Philadelphia, 812 F.2d 105, 110 (3d Cir. 1987).

While the Third Circuit has clearly addressed the compelled disclosure of medical records in possession of an employer in the specific instances of Fraternal Order, Doe and Westinghouse, it has not yet addressed the compelled disclosure by a school official of a student's health records. As we have noted in the fourth amendment context, the concerns of schools differ from those of employers. As a result, the contours of a constitutional right to privacy of pregnancy information in the school context are less than clear, although there are undoubtedly limits in this context. To add to the uncertainty of the law in this area, different kinds of medical information -- including the [*36] quality and quantity of information -- have been given varying importance by courts analyzing the privacy right that attaches to such information. See Westinghouse, 638 F.2d at 577 n.5. As a matter of first impression, the balancing of interests requirement leaves a legitimate question for qualified immunity analysis as to whether the alleged disclosure of the results of the pregnancy test in this case violated any constitutional privacy rights. Accord Doe v. Attorney General, 941 F.2d 780, 796-97 (9th Cir. 1991). Without any cases where some factual correspondence exists with the present case, therefore, this court must conclude that there is no relevant clearly established law and that the Defendant is entitled to qualified immunity. Pro, 81 F.3d at 1292.

Even considering the facts in a light most favorable to the Plaintiffs, it is also highly uncertain that Leah Gruenke's test information was in fact confidential or that its disclosure was compelled by the Defendant. Leah Gruenke allowed other female swim team members to be present during the testing in a public school lavatory which might be more equated with inadvertent rather than compelled disclosure. n12 L. Gruenke [*37] Dep. 2/20/98 at 62-63. The test results were conflicting and did not clearly point to pregnancy. Id. at 65, 69, 72, 80. Moreover, competition swimwear leaves little to the imagination and Leah Gruenke was at that point five to six months pregnant. Id. at 84. A question exists as to whether the confidentiality of pregnancy information fades when the information involved already appears to be apparent to the public. Cf. Cox Broadcasting Corp. v. Cohn, 420 U.S. 469, 494, 43 L.

Ed. 2d 328, 95 S. Ct. 1029 (1975). With more scrutiny, Plaintiffs' claim may not even rise to the level of a constitutional violation. We need not decide this issue today, however, because the Defendant is entitled to qualified immunity.

- - - - - - - - - - - - - - - - - -Footnotes- - - - - - - - - - - - - - - - - -

n12 Plaintiffs allege that the swim team members involved (Abby Hochella, Kathy Ritter and Sara Cierski) were present as "agents" of the Defendant. Pls.' Br. At 25. We find, however, that this assertion is both unsupported in law and facts as Plaintiffs have presented no evidence that there is a conspiracy to which these swim team members were willful participants. See Adickes v. S.H. Kress & Co., 398 U.S. 144, 152, 26 L. Ed. 2d 142, 90 S. Ct. 1598 (1970).

- - - - - - - - - - - - - - - - -End Footnotes- - - - - - - - - - - - - - - - [*38]

### 3. First Amendment Claim

Plaintiffs next allege that Defendant violated the first amendment by using his authority to forbid students form associating with Leah Gruenke. n13 Pls.' Br. at 32-33. Leah Gruenke testified that the Defendant refused to talk to her throughout the year and at one swim competition (where Leah Gruenke was not part of the team) said "I don't want any of you talking to people that aren't on my team." L. Gruenke Dep. 2/20/98 at 115-116, 149-151. Plaintiffs argue that attempts to characterize Leah Gruenke's right to freely associate with other swim team members as social is wrong because it more closely approximates the right to education characterized in Brown v. Board of Education, 347 U.S. 483, 98 L. Ed. 873, 74 S. Ct. 686 (1954). Pls.' Br. at 32. Even assuming that all factual assertions by Plaintiffs are true, the claim by Plaintiffs falls far short of establishing any kind of constitutional violation.

- - - - - - - - - - - - - - - - - -Footnotes- - - - - - - - - - - - - - - - - -

n13 In one paragraph of their Complaint, Plaintiffs assert that this free speech issue is a violation of state constitutional law. Am. Compl. P 53. We do not know if this reference was an error or intentional, however, Plaintiffs subsequent discussions of this issue have only involved federal first amendment law. See Pls.' Br. at 32-33. Even if Plaintiffs did intend to plead under state constitutional law, this court will dismiss any such state constitutional claims with other state law claims below in subsection (c).

- - - - - - - - - - - - - - - - -End Footnotes- - - - - - - - - - - - - - - - [*39]

While the first amendment does not in terms protect a "right of association," cases have recognized "a right to associate for the purpose of engaging in those activities protected by the First Amendment -- speech, assembly, petition for the redress of grievances, and the exercise of religion. The Constitution guarantees freedom of association of this kind as an indispensable means of preserving other individual liberties." Roberts, 468 U.S. at 618. Even assuming that Defendant's conduct reached more than Leah Gruenke's social rights with other students, this action does not rise to the level of a constitutional violation. Otherwise, it would be "possible to find some kernel of expression in almost every activity a person undertakes -- for example, walking down the street or meeting one's friends at a shopping mall -- but such a kernel is not sufficient to bring the activity within the protection of the First Amendment." Dallas v. Stanglin, 490 U.S. 19, 25, 104 L. Ed. 2d 18, 109 S. Ct. 1591 (1989). We think the activity of talking to swim team members during a swimming competition is not an individual liberty protected by the first amendment.

We fail to understand why the [*40] Plaintiffs cite to Brown as a situation similar to their own. There is no equal protection claim in the present case and the "right to interact with fellow students" elucidated in Brown concerned racially segregated schools. n14 It borders on the outrageous for Plaintiffs to even try to compare very serious issues of state mandated

racial segregation to the facts of the instant case. n15

- - - - - - - - - - - - - - - - -Footnotes- - - - - - - - - - - - - - - - -

n14 Freedom of association, furthermore, has often been used in the equal protection context as a justification against mandatory integration. See, e.g., Romer v. Evans, 517 U.S. 620, 635, 134 L. Ed. 2d 855, 116 S. Ct. 1620 (1996).

n15 Perhaps Plaintiffs' confusion is related to the freedom of association cases under to the substantive due process clause. Under these cases, the formation and preservation of certain kinds of highly personal relationships are protected from a substantial measure of unjustified interference by the state. See, e.g., Pierce v. Society of Sisters, 268 U.S. 510, 69 L. Ed. 1070, 45 S. Ct. 571 (1925); Meyer, 262 U.S. at 390. It is clear, however, that such a constitutional claim does not apply to the freedom of association of Leah Gruenke with other members of the swim team.

- - - - - - - - - - - - - - - -End Footnotes- - - - - - - - - - - - - - - -  [*41]

As stated in City of Philadelphia Litigation, "if the actions of the government official, as alleged by the plaintiff do not even rise to a level of a constitutional violation, then that official is clearly entitled to qualified immunity." 1998 WL 569362, at *7-8. Defendant, therefore, is entitled to qualified immunity on this first amendment claim because the Plaintiffs have fallen short of asserting the violation of their first amendment right.

**4. Objective Reasonableness**

We need not reach the question of whether the Defendant's actions were objectively reasonable under the qualified immunity analysis because, as elucidated above, because Defendant's conduct neither amounts to a constitutional violation nor violates clearly established law. See, e.g., Johnson, 150 F.3d at 286 n.7; Sharrar, 128 F.3d at 828-29. Thus, it is irrelevant whether an objectively reasonable school official in Defendant's position would have believed that his conduct violated Plaintiffs' constitutional rights because this court has determined the threshold issue that entitles Defendant to qualified immunity.

**B. Pendent State Law Claims**

We now turn to address  [*42]  the disposition of the claims raised by Plaintiffs arising under state law. Plaintiffs' state law claims are before us under supplemental jurisdiction brought in connection with claims "arising under [the] Constitution, [and] the Laws of the United States." U.S. Const., art. III, § 2.

Plaintiffs allege that Defendant's actions amount to the intentional tort of battery under 42 Pa. C.S.A. § 8550. Pls.' Br. at 34-35. More specifically, Plaintiffs argue that Defendant's alleged administration of the pregnancy test violated their right to be free from unconsented medical treatment. Id.

Prior to Congress' codification of supplemental jurisdiction in 28 U.S.C. § 1367, it had "consistently been recognized that pendent jurisdiction [was] a doctrine of discretion, not of plaintiff's right." United Mine Workers of America v. Gibbs, 383 U.S. 715, 726, 16 L. Ed. 2d 218, 86 S. Ct. 1130 (1966) (citing Massachusetts Universalist Convention v. Hildreth & Rogers Co., 183 F.2d 497 (1st Cir. 1950)); Moynahan v. Pari-Mutuel Employees Guild, 317 F.2d 209, 211-212 (9th Cir. 1963). This discretionary aspect of pendent jurisdiction has always allowed federal courts to decline to  [*43]  decide cases that are primarily state law claims. Gibbs, 383 U.S. at 727. Finally, "if the federal claims are dismissed . . . the state claims should be dismissed as well." Id. at 726.

In the absence of any federal question or constitutional issue, this court has the discretion to

Get a Document by Citation 1998 U.S. Dist. LEXIS 16439

Case 1:00-cv-00660-YK-JAS   Document 52   Filed 05/30/2000   Page 41 of 75   Page 15 of 15

dismiss Plaintiffs' state law claims on jurisdictional grounds. Plaintiffs, however, are not without remedy. On the contrary, the statute of limitations on Plaintiffs' state law claims is tolled for a minimum of 30 days from the date of dismissal. With the codification of supplemental jurisdiction, Congress has allowed for the dismissal of state claims, arising under article III jurisdiction and brought under § 1367(a), to benefit from a tolling of the statute of limitations. 28 U.S.C. § 1367(d). Thus, Plaintiffs' state law claims are dismissed without prejudice and may be filed in state court.

## V. CONCLUSION

As a matter of law, however, this court must grant summary judgment in favor of the Defendant on the basis of qualified immunity. Moreover, we dismiss the state claims without prejudice. We have also found that much of the conduct complained of did not rise to a constitutional violation, [*44] although we believe this entire matter could have been much better handled by those involved. An appropriate order follows.

## ORDER

AND NOW, this 21st day of October, 1998, upon, consideration of Defendant's Motion and Memorandum of Law in Support of its Motion for Summary Judgment, filed September 4, 1998, and Plaintiffs' Brief in Opposition to Defendant's Motion for Summary Judgment, filed September 16, 1998, it is hereby ORDERED that Defendant's Motion is GRANTED with respect to the § 1983 claims which are all DISMISSED. Plaintiffs' state law claims are DISMISSED without prejudice. This case is closed.

BY THE COURT:
Franklin S. Van Antwerpen U.S.D.J.

Service: **LEXSEE®**
Citation: **1998 U.S. Dist. LEXIS 16439**
View: Full
Date/Time: Friday, May 26, 2000 - 8:49 AM EDT

About LEXIS-NEXIS | Terms and Conditions

Copyright © 2000 LEXIS-NEXIS Group. All rights reserved.





Get a Document - by Citation - 1999 U.S. Dist. LEXIS 12820    Page 1 of 4

Case 2:00-cv-00560-JK-JAB    Document EX18-2 2825    Filed 05/30/2000    Page 43 of 75

Service: **LEXSEE®**
Citation: **1999 U.S. Dist. LEXIS 12820**

*1999 U.S. Dist. LEXIS 12820, ***

DONALD S. SABATINI v. ROBERT J. REINSTEIN, DEAN OF TEMPLE UNIVERSITY SCHOOL OF LAW AND VICE PRESIDENT, TEMPLE UNIVERSITY and TEMPLE UNIVERSITY SCHOOL OF LAW and TEMPLE UNIVERSITY

Civil Action No. 99-2393

UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF PENNSYLVANIA

1999 U.S. Dist. LEXIS 12820

August 18, 1999, Decided
August 20, 1999, Filed

**DISPOSITION:** [*1] Motion to dismiss of defendants Robert J. Reinstein, Temple University School of Law, and Temple University granted. Counts III, IV, V, and VI dismissed against all defendants. Counts I and II dismissed without prejudice as to defendant Reinstein.

**CORE TERMS:** cause of action, leaflets, Temple University School Of Law, motion to dismiss, equal protection, first amendment, personally, distributing, equal protection clause, equal protection claim, constitutional rights, treated differently, freedom of speech, protected class, civil rights, free speech, self-executing, supplemental, participated, selectively, acquiesced, police officers, compl, graduation, supervisor, ceremony, campus

**COUNSEL:** DONALD S. SABATINI, PLAINTIFF, Pro se, PHILADELPHIA, PA USA.

For ROBERT J. REINSTEIN, DEAN OF TEMPLE UNIVERSITY SCHOOL OF LAW AND VICE PRESIDENT, TEMPLE UNIVERSITY; TEMPLE UNIVERSITY SCHOOL OF LAW; TEMPLE UNIVERSITY, DEFENDANTS: CARRIE E. WATT, BALLARD, SPAHR, ANDREWS AND INGERSOLL, PHILA, PA USA.

**JUDGES:** Edmund V. Ludwig, J.

**OPINIONBY:** EDMUND V. LUDWIG

**OPINION:** MEMORANDUM

Ludwig, J.

August 18, 1999

Defendants Robert J. Reinstein, Temple University School of Law, n1 and Temple University move to dismiss the complaint for failure to state a claim. Fed. R. Civ. P. 12(b)(6). n2 Jurisdiction is federal question and supplemental. 28 U.S.C. §§ 1331, 1367.

- - - - - - - - - - - - - - - - - -Footnotes- - - - - - - - - - - - - - - - - -

n1 Defendants note that the case-caption incorrectly designates James E. Beasley School of Law as Temple University School of Law.

n2 Under Rule 12(b)(6), the allegations of the complaint are accepted as true and all reasonable inferences are drawn in the light most favorable to plaintiff. See Weiner v. Quaker

Oats Co., 129 F.3d 310, 315 (3d Cir. 1997). Claims alleging civil rights violations are held to a "liberal standard," and should not be dismissed "unless it is readily discernable that the facts cannot support entitlement to relief." Lake v. Arnold, 112 F.3d 682, 684-85 (3d Cir. 1997) (quoting Carter v. City of Philadelphia, 989 F.2d 117, 118 (3d Cir. 1993)).

- - - - - - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - - - - - [*2]

The following is alleged in the complaint. Both in May 1997 and May 1998, Temple campus police officers ordered plaintiff to stop distributing leaflets in the lobby of McGonigle Hall while law school's graduation ceremonies were being held. Compl. P 30. The leaflets consisted of newspaper articles accusing Temple University of having a poor civil rights record. Id. at PP 23-24. Thereafter, a campus police supervisor threatened to arrest plaintiff unless he stopped distributing the leaflets on Temple property. Id. at PP 32-39.

On May 10, 1999, plaintiff filed this § 1983 action asserting violations of freedom of speech and equal protection under the federal constitution together with supplemental claims under the Pennsylvania Constitution were also alleged. Defendants moved to dismiss the first amendment claims against defendant Reinstein (Counts I and II) as well as those under the equal protection clause of the fourteenth amendment (Counts III and IV) and article I of the Pennsylvania Constitution (Counts V and VI) against all defendants. The motion to dismiss will be granted and the claims dismissed.

1. Claims solely against defendant Robert J. Reinstein - "It is [*3] well-settled that liability under § 1983 may not be based on the doctrine of respondeat superior." Rouse v. Plantier, 1999 U.S. App. LEXIS 14608, 182 F.3d 192, 200 (3d Cir. 1999) (citation omitted). To hold individual supervisors liable under § 1983, plaintiff must prove "that they personally 'participated in violating [plaintiff's] rights, . . . that [they] directed others to violate them, or that [they] . . . had knowledge of and acquiesced in [their] subordinates' violations.'" Robinson v. City of Pittsburgh, 120 F.3d 1286, 1293 (3d Cir. 1997) (quoting Baker v. Monroe Twp, 50 F.3d 1186, 1190-91 (3d Cir. 1995).

Here, the complaint does not specify that Reinstein personally participated in the disputed incidents or that he approved of or acquiesced in the actions taken against plaintiff. Nor are the allegations sufficient to support such inferences. The only persons alleged to have been personally involved are Temple police officers - who are not named as defendants. Plaintiff's statement that "at all times material thereto, defendants acted through their agents and employees, whose conduct defendants had a duty to supervise and control," compl. P 10, sounds in [*4] respondeat superior liability. Accordingly, the claims against Reinstein must be dismissed. n3

- - - - - - - - - - - - - - - - - Footnotes- - - - - - - - - - - - - - - - - -

n3 The factual matters set forth in plaintiff's rebuttal brief may not be considered in determining whether Reinstein had the requisite personal involvement. "It is axiomatic that the complaint may not be amended by the briefs in opposition to a motion to dismiss." Commonwealth of Pa. v. Pepsico, Co., 836 F.2d 173, 181 (3d Cir. 1988) (quoting Car Carriers, Inc. v. Ford Motor Co., 745 F.2d 1101, 1107 (7th Cir. 1984)). However, plaintiff's request for leave to amend will be granted. "Leave [to amend] shall be freely given when justice so requires." Fed. R. Civ. P. 15(a).

- - - - - - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - - - - -

2. Equal protection claims (Counts III and IV) - To state an equal protection claim, plaintiff must show that:

     (1) the person, compared with others similarly situated, was selectively treated,

and (2) the selective treatment was motivated by an intention to discriminate on the basis of impermissible considerations,  [*5]  such as race or religion, to punish or inhibit the exercise of constitutional rights, or by a malicious or bad faith intent to injure the person."

Homan v. City of Reading, 963 F. Supp. 485, 490 (E.D. Pa. 1997) (quoting Zahra v. Town of Southold, 48 F.3d 674, 683 (2d Cir. 1995)); see also Government of Virgin Islands v. Harrigan, 791 F.2d 34, 36 (3d Cir. 1986); Knepp v. Lane, 848 F. Supp. 1217, 1221 (E.D. Pa. 1994). n4

- - - - - - - - - - - - - - - - - -Footnotes- - - - - - - - - - - - - - - - - - -

n4 Plaintiff correctly maintains that it is not necessary for the complaint to plead that he is a member of a protected class in order to state a claim under the fourteenth amendment equal protection clause. A complaint need only allege that plaintiff was intentionally treated differently from those similarly situated. See Jubilee v. Horn, 975 F. Supp. 761, 766-67 (E.D. Pa. 1997); see also Esmail v. Macrane, 53 F.3d 176 at 176-80 (7th Cir. 1995) ("Neither in terms nor in interpretation is the [fourteenth amendment's equal protection] clause limited to protecting members of identifiable groups."). Whether the alleged discrimination is based on membership in a protected class or, as here, exercise of a fundamental right implicates the level of scrutiny required. See Artway v. Attorney General of State of N.J., 81 F.3d 1235, 1267 (3d Cir. 1996).

- - - - - - - - - - - - - - - - -End Footnotes- - - - - - - - - - - - - - - - -  [*6]

Here, no facts have been averred that demonstrate that plaintiff was selectively treated. The basis of his equal protection claim is the same as that of his first amendment claim - that he was prevented from distributing leaflets at the law school graduation ceremony. Plaintiff does not contend that other persons or groups were engaged in similar conduct or that they were treated differently. It is not enough to allege that defendants violated plaintiff's first amendment rights; his rights must have been violated while the rights of others engaged in like conduct were not. Accordingly, Counts III and IV must be dismissed.

3. Pennsylvania Constitutional law claims (Counts V and VI) - The complaint also alleges violations of Pennsylvania's constitutional rights to freedom of expression and petition. Pa. Const. art. I, §§ 7, 20.

Although its courts have not decided whether a private cause of action exists under sections 7 and 20 of the Pennsylvania Constitution, federal courts have held that there is no such right. See Lees v. West Greene School Dist., 632 F. Supp. 1327, 1335 (W.D. Pa. 1986) (article 1, § 7 "contains no provision, express or implied, which creates  [*7]  a private right of action for violations of an individual's right to free speech"); Pendrell v. Chatham College, 386 F. Supp. 341, 344 (W.D. Pa. 1974) ("Article I, Section 7 . . . imposes a limitation upon the power of the State to interfere with freedom of the press and freedom of speech, but contains no self-executing private cause of action, express or implied."); Holder v. City of Allentown, 1994 U.S. Dist. LEXIS 7220, 1994 WL 236546, at *3 (E.D. Pa. May 27, 1994) (granting summary judgment as to § 7 claim because no such cause of action exists); cf. Western Pa. Socialist Workers 1982 Campaign v. Conn. General Life Ins. Co., 335 Pa. Super. 493, 500, 485 A.2d 1, 5 (1985) (section 7 "is not a self-executing, affirmative declaration" of an individual's right to free speech; constitutional provisions "are usually only commands to the legislature to enact laws to carry out the purposes of the framers of the Constitution, or mere restrictions upon the power of the legislature to pass laws") (citations omitted). n5 Accordingly, these claims will also be dismissed.

- - - - - - - - - - - - - - - - - -Footnotes- - - - - - - - - - - - - - - - - -

Get a Document by Citation 1999 U.S. Dist. LEXIS 12820    Page 4 of 4

Case 1:00-cv-00660-YK-IAW    Document 18-2    Filed 05/30/2000    Page 46 of 75

n5 Although case law has not specifically dealt with the right to bring a cause of action under § 20, the prohibition against such claims under § 7 applies with equal force to the analogous freedom of petition provision. See Western Pa. Socialist Workers 1982 Campaign v. Conn. General Life Ins. Co., 335 Pa. Super. 493, 499, 485 A.2d 1, 4 (1985) (the court's "interpretation of section 7 is controlling also of any interpretation of section[] . . . 20.").

- - - - - - - - - - - - - - - - -End Footnotes- - - - - - - - - - - - - - - - - [*8]

Edmund V. Ludwig, J.

**ORDER**

AND NOW, this 18th day of August, 1999, the motion to dismiss of defendants Robert J. Reinstein, Temple University School of Law, and Temple University is granted. Fed. R. Civ. P. 12(b)(6). Counts III, IV, V, and VI are dismissed against all defendants. Counts I and II are dismissed without prejudice as to defendant Reinstein.

Edmund V. Ludwig, J.

Service: **LEXSEE®**
Citation: **1999 U.S. Dist. LEXIS 12820**
View: Full
Date/Time: Friday, May 26, 2000 - 8:57 AM EDT

About LEXIS-NEXIS | Terms and Conditions

Copyright © 2000 LEXIS-NEXIS Group. All rights reserved.

Service: **LEXSEE®**
Citation: **1994 U.S. Dist. LEXIS 7220**

*1994 U.S. Dist. LEXIS 7220, \*; 9 BNA IER CAS 1170*

JOHN W. HOLDER, Plaintiff v. CITY OF ALLENTOWN, EMMA TROPIANO, BENJAMIN HOWELLS, JOSEPH S. DADDONA, CHARLES F. WILSON, HOWARD D. KUNIK, Defendants

CIVIL ACTION No. 91-240

UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF PENNSYLVANIA

1994 U.S. Dist. LEXIS 7220; 9 BNA IER CAS 1170

May 19, 1994, Decided
May 27, 1994, Filed

**CORE TERMS:** summary judgment, custom, ordinance, termination, genuine issue, residency, uniformly, entirety, moving party, deprivation, terminated, terminate, memorandum, first amendment, protected activity, preclusive effect, burden of proof, matter of law, factual issue, motivation, non-moving, referee, civil rights action, expressing, resident, license, openly, voted

**COUNSEL:** [*1] For JOHN W. HOLDER, PLAINTIFF: MALCOLM J. GROSS, GROSS, MC GINLEY, LA BARRE & EATON, ALLENTOWN, PA, JOHN D. LYCHAK, GROSS, MC GINLEY, LABARRE, & EATON, ALLENTOWN, PA.

For CITY OF ALLENTOWN, JOSEPH S. DADDONA, Individually and in his official capacity as the Mayor of the City of Allentown, CHARLES F. WILSON, Individually and in his official capacity as the Manager of Personnel and Labor Relations for the City of Allentown, HOWARD D. KUNIK, Individually and in his official capacity formerly as the Director of Administration and Finance of the City of Allentown, DEFENDANTS: ALAN M. BLACK, BLACK, MC CARTHY, EIDELMAN & FEINBERG, ALLENTOWN, PA, ALAN M. BLACK, BLACK, MC CARTHY, EIDELMAN, FEINBERG, ANEWALT & KERCHER, P.C., ALLENTOWN, PA. For EMMA TROPIANO, Individually and in her official capacity as a Councilwoman of the City of Allentown, BENJAMIN HOWELLS, Individually and in his official capacity as a Councilman of the City of Allentown, DEFENDANTS: CHARLES J. FONZONE, FONZONE & ASHLEY, ALLENTOWN, PA, ALAN M. BLACK, BLACK, MC CARTHY, EIDELMAN & FEINBERG, ALLENTOWN, PA, ALAN M. BLACK, BLACK, MC CARTHY, EIDELMAN, FEINBERG, ANEWALT & KERCHER, P.C., ALLENTOWN, PA.

**JUDGES:** HUYETT, J.

**OPINIONBY:** HUYETT

**OPINION: MEMORANDUM** [*2]

**HUYETT, J.**

Plaintiff and Defendants have filed cross-motions for summary judgment in this civil rights action. For the reasons set forth below, both motions are **DENIED** in their entirety.

I. FACTS

The City of Allentown ("Allentown") employed John W. Holder ("Plaintiff") as a systems analyst and supervisor in Allentown's Bureau of Information Systems from 1985 until 1990. Section 121.07 of the Codified Ordinances for the City of Allentown ("Residency Ordinance")

Get a Document - by Citation - 1994 U.S. Dist. LEXIS 7220      Page 2 of 5

Case 1:00-cv-00660-YK-1954   Document X0S2722   Filed 05/30/2000      Page 49 of 75

required that all new municipal employees reside in Allentown within twelve (12) months of commencing employment. The Residency Ordinance mandated that violations would result in termination.

Although Plaintiff and his wife searched for suitable housing, for various reasons they never moved to Allentown. In or about December of 1989, Plaintiff began openly expressing opposition to the Residency Ordinance to city council members who were soon to vote on a proposal to abolish the Ordinance. On February 7, 1990, the city council voted to retain the Residency Ordinance. On February 16, 1990, the Morning Call, an Allentown newspaper, published a letter to the editor (the "Letter"), submitted by Plaintiff which criticized [*3] the Residency Ordinance and the council members who voted to retain it.

Around this time and following his meetings with council members and an incident in which Plaintiff's driver's license was reviewed by an Allentown employee n1 , several council members suspected that Plaintiff was not an Allentown resident. Defendant council members Tropiano and Howells requested that an investigation be conducted by Defendant Kunik, the former Director of Administration and Finance for the City of Allentown. The investigation, consisting of vehicle and voter registration checks, inquiries with the post office and utilities, and consultation with the City Solicitor revealed that Plaintiff was not a resident. The findings were summarized in a memorandum from Kunik to Mayor Daddona recommending termination. n2

- - - - - - - - - - - - - - - - - -Footnotes- - - - - - - - - - - - - - - - - -

n1 Plaintiff's driver's license listed a Bethlehem address.

n2 The memorandum was dated February 28, 1990.

- - - - - - - - - - - - - - - - -End Footnotes- - - - - - - - - - - - - - - - -

On March 5, 1990, Mayor Daddona confronted Plaintiff with the results of the investigation and requested that [*4] he resign. Plaintiff was at that time suspended for thirty days without pay. He resigned on March 28, 1990. Plaintiff brings this action pursuant to 42 U.S.C. § 1983, against the City of Allentown and several of its officials, claiming that he was terminated in retaliation for openly expressing his opposition to the residency requirements in violation of his first, fifth and fourteenth amendment rights. n3

- - - - - - - - - - - - - - - - - -Footnotes- - - - - - - - - - - - - - - - - -

n3 By Order dated March 26, 1992, this Court dismissed Plaintiff's complaint in its entirety. On appeal, the Third Circuit reversed, holding that Plaintiff had stated a claim for the violation of his rights to freedom of speech.

- - - - - - - - - - - - - - - - -End Footnotes- - - - - - - - - - - - - - - - -

II. DISCUSSION

A. Plaintiff's Motion for Summary Judgment

Following his termination, Plaintiff applied for unemployment compensation benefits. The Office of Employment Security denied his application on the grounds that he had been constructively terminated for the wilful violation of a city ordinance. Plaintiff appealed and the Unemployment Compensation [*5] Board of Review ("UCBR") reversed, finding that Plaintiff had not wilfully violated the Residency Ordinance because there was no history of enforcement of the residency requirement. In so holding, the referee found that the City had not uniformly applied the Residency Ordinance. Plaintiff moves for summary judgment on the grounds that the factual findings of the UCBR are preclusive and, therefore, Defendants are

collaterally estopped from relitigating the issue of whether the residency ordinance was applied uniformly. The Court of Appeals for the Third Circuit recently held that findings of the UCBR are not to be given preclusive effect in Section 1983 actions. Swineford v. Snyder County, Pa. 15 F.3d 1258 (3d Cir. 1994). Unemployment benefits proceedings determine whether a petitioner wilfully violated a law or regulation whereas the issue in a Section 1983 action is whether the defendant terminated the plaintiff for engaging in a protected activity. Id. at 1268. Accordingly, the issues are not sufficiently identical for preclusion purposes.

Further, the nature of the adjudicative process at the agency level and in the [*6] district court are too dissimilar to permit the findings of the agency to have preclusive effect in the district court. Because the goals of Pennsylvania Unemployment Compensation Law are to provide quick and basic compensation for workers who become unemployed through no fault of their own, the procedures to determine benefit eligibility are quick and informal. Id. Additionally, referees lack the expertise to issue binding pronouncements in the area of federal constitutional law. The Court concluded that these policy reasons warrant a blanket prohibition against issue preclusion.

In accordance with the mandate of Swineford, Plaintiff's motion for summary judgment is **DENIED**.

B. Defendants' Motion for Summary Judgment

Summary judgment is proper when the record shows "that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). This Court's role is to determine "whether there is a genuine issue for trial." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249, 91 L. Ed. 2d 202, 106 S. Ct. 2505 (1986); Josey v. John R. Hollingsworth Corp., 996 F.2d 632, 637 (3d Cir. 1993). [*7] The moving party has the burden of demonstrating that no genuine issue of fact exists. Celotex Corp. v. Catrett, 477 U.S. 317, 323, 91 L. Ed. 2d 265, 106 S. Ct. 2548 (1986). Further, the evidence must be viewed in the light most favorable to the non-moving party. United States v. Diebold, Inc., 369 U.S. 654, 655, 8 L. Ed. 2d 176, 82 S. Ct. 993 (1962). However, if the non-moving party fails to adduce sufficient evidence in connection with an essential element of the case for which it has the burden of proof, the moving party is entitled to summary judgment as a matter of law. Celotex, 477 U.S. at 322.

There are several requisite elements which Plaintiff must prove to establish a Section 1983 claim arising out of the termination of public employment based on allegations of conduct protected by the First Amendment. Plaintiff must first establish that the activity in question was protected. Czurlanis v. Albanese, 721 F.2d 98, 103 (3d Cir. 1983). The parties do not dispute that [*8] Plaintiff's conduct constituted protected first amendment activity.

Next, Plaintiff must prove that the protected activity was a substantial or motivating factor in the termination. Mt. Healthy City School Dist. Bd. of Ed. v. Doyle, 429 U.S. 274, 50 L. Ed. 2d 471, 97 S. Ct. 568 (1977). Defendants fail to demonstrate that no genuine issue of fact exists with respect to whether the motivation to terminate Plaintiff was the Morning Call Letter. Motivation is an inherently factual issue. Moreover, Plaintiff has adduced evidence that the Residency Ordinance was not uniformly enforced.

With respect to any particular defendant, Plaintiff must demonstrate that the defendant caused the wrongful termination or that the deprivation is fairy attributable to the defendant's conduct. Commonwealth Bank & Trust Co. v. Russell, 825 F.2d 12, 14 (3d Cir. 1987). The lack of authority personally to terminate Plaintiff does not necessarily alleviate Defendants Tropiano, Howells, Kunik and Wilson from responsibility. In Bartholomew v. Fischl, 782 F.2d 1148 (3d Cir. 1986), the Third [*9] Circuit held that allegations that policy making officials with no specific authority to discharge had conducted a retaliatory campaign against a public employee in order to suppress free speech was sufficient to establish a civil rights action. See also Burns v. County of Cambria, 764 F. Supp. 1031, 1037-39 (W.D. Pa.

Get a Document - by Citation - 1994 U.S. Dist. LEXIS 7220

Case 1:00-cv-00660-YK-JAS    Document 10-2    Filed 05/30/2000    Page 51 of 75

Page 4 of 5

1991), aff'd, 971 F.2d 1015 (3d Cir. 1992), cert. denied 113 S. Ct. (1993).

Genuine issues of fact exist as to causation with respect to each defendant. With respect to Defendants Daddona, Tropiano, Howells, Kunik and Wilson, it is unclear from the record the extent of influence each defendant had in urging the dismissal of Plaintiff, but the evidence suggests that any of these Defendants could have influenced the decision.

Once plaintiff has met his burden of proof, a defendant may defeat plaintiff's claim by demonstrating that the termination would have occurred even absent the protected conduct. Czurlanis, 721 F.2d at 103. This is clearly a factual issue, and the evidence suggesting uneven enforcement of the Residency Ordinance is sufficient on this issue to preclude summary [*10] judgment.

With respect to the City of Allentown, in order for a local governing body to be subject to Section 1983 liability, Plaintiff must demonstrate that constitutional deprivations occurred pursuant to a government custom or policy. Schwartz v. Montgomery, 823 F. Supp. 296, 300 (E.D. Pa. 1993). Thus, municipal liability attaches only when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts may be said to represent official policy, inflicts the injury. Id. A course of conduct is considered a "custom when, though not authorized by law, such practices of state officials are so well settled as to virtually constitute law." Andrews v. City of Philadelphia, 895 F.2d 1469, 1480 (3d Cir. 1990). A Plaintiff must show that a policy maker is responsible for the policy or through acquiescence, for the custom. A Plaintiff must also demonstrate a plausible link or nexus between the municipality policy or custom and the specific deprivation of the constitutional rights at issue. Id. at 1480, citing Jett v. Dallas Independent School District, 491 U.S. 701, 105 L. Ed. 2d 598, 109 S. Ct. 2702 (1989). [*11]

The City of Allentown has in effect a residency ordinance which ostensibly requires the mayor of the city to terminate any employee not residing in Allentown. Evidence suggests that the Ordinance was not uniformly enforced. Plaintiff's deposition testimony suggests that other incidents occurred where the city retaliated for expression of an employee's views. The issue of whether the City of Allentown engaged in a custom of enforcing the residency ordinance in a discriminatory and unconstitutional manner is factual, precluding summary judgment.

C. Article I, Section 7 Claim

Defendants maintain that no private right of action exists for violations of article I, section 7 of the Pennsylvania Constitution. Plaintiff does not contest this aspect of Defendants' motion for summary judgment. Because the Court concludes that no cause of action exists under article I, section 7, this claim is dismissed. Western Pa. Socialist Workers 1982 Campaign v. Connecticut General Life Ins. Co., 335 Pa. Super. 493, 485 A.2d 1 (Pa. Super. 1984), aff'd, 512 Pa. 23, 515 A.2d 1331 (Pa. 1986); Pendrell v. Chatham College, 386 F. Supp. 341 (W.D. Pa. 1974).
 [*12]
III. Conclusion

For the reasons set forth above, Plaintiff's motion for summary judgment is **DENIED**. Defendants' motion for summary judgment is **DENIED** with respect to each defendant. An appropriate Order is attached.

**Daniel H. Huyett, 3rd, Judge**

**ORDER**

**HUYETT, J.**

Upon consideration of Plaintiff's motion for summary judgment and Defendants' motion for

summary judgment and the parties' respective responses:

(1) Plaintiff's motion for summary judgment is **DENIED** in its entirety;

(2) Defendants' motion for summary judgment is **DENIED** in its entirety.

**IT IS SO ORDERED.**

**Daniel H. Huyett, 3rd, Judge**


Service: **LEXSEE®**
Citation: **1994 U.S. Dist. LEXIS 7220**
View: Full
Date/Time: Friday, May 26, 2000 - 8:51 AM EDT


About LEXIS-NEXIS | Terms and Conditions

Copyright © 2000 LEXIS-NEXIS Group. All rights reserved.



Service: **LEXSEE®**
Citation: **1996 U.S. Dist. LEXIS 11177**

*1996 U.S. Dist. LEXIS 11177, \**

NORTHEAST JET CENTER, LTD., Plaintiff v. LEHIGH-NORTHAMPTON AIRPORT AUTHORITY; JACK YOHE; and SANFORD WARTELL, Defendants

CIVIL ACTION No. 90-1262

UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF PENNSYLVANIA

1996 U.S. Dist. LEXIS 11177

August 1, 1996, Decided
August 1, 1996, FILED, ENTERED

**DISPOSITION:** [*1] Said motions are DENIED with respect to count one alleging constitutional violations. Said motions are DENIED with respect to that part of count three alleging intentional interference with a prospective contractual relationship. Said motions are DENIED with respect to count six alleging defamation. Said motions are GRANTED In all other respects and judgment is entered in favor of Defendants and against Plaintiff on all claims except those above. This is not a final judgment.

**CORE TERMS:** hangar, summary judgment, airport, lease, aircraft, defamatory, tenant, defamation, contractual, default, charter, repair, lease agreement, intentional interference, genuine issue, certificate, financing, space, deposition testimony, defamatory meaning, respect to count, completion, revocation, precluding, station, duty, reasonably find, innuendo, entities, contractual relationship

**COUNSEL:** For NORTHEAST JET CENTER, LTD., PLAINTIFF: DAVID K. MONROE, JOEL E. LAIKS, GALLAND, KHARASCH, MORSE & GARFINKLE, P.C., WASHINGTON, DC USA.

For LEHIGH-NORTHAMPTON AIRPORT AUTHORITY, JACK YOHE, Airport Director, SANFORD WARTELL, Chairman of the Board of Directors, DEFENDANTS: STEVEN M. JANOVE, TERESA N. CAVENAGH, WENDY R. HUGHES, DUANE, MORRIS & HECKSCHER, PHILA, PA USA. J. BRUCE MC KISSOCK, INGRID B. HOPKINSON, MC KISSOCK & HOFFMAN, P.C., PHILA, PA USA.

**JUDGES:** Franklin S. Van Antwerpen, United States District Judge

**OPINIONBY:** Franklin S. Van Antwerpen

**OPINION: MEMORANDUM AND ORDER**

Van Antwerpen, J.

August 1, 1996

## I. INTRODUCTION

Plaintiff makes claims in this case under 42 U.S.C. §§ 1983, [*2] 1985; 15 U.S.C. §§ 1 and 2; 15 U.S.C. § 15; the Fourteenth Amendment to the United States Constitution; 53 Pa C.S.A. § 306; Article I, Sections 1,9, and 26 of the Pennsylvania Constitution; 42 Pa.C.S.A. § 8343 and the common law of the Commonwealth of Pennsylvania. This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331, 1337 and the doctrine of supplemental jurisdiction, 28 U.S.C. § 1367. Venue for this action lies in the Eastern District of

Pennsylvania pursuant to 28 U.S.C. § 1391(b) and (c). It is alleged that the matter in controversy exceeds the sum or value of $ 50,000, exclusive of interest and costs.

On May 31, 1991, we previously addressed this case in our prior opinion and order, at 767 F. Supp. 672 (1991). At that time, we granted a motion to dismiss in part and denied it in part. In particular, we held that: (1) the Plaintiff had failed to show how its right to be free of certain alleged misconduct rose to the level of federal right protected by § 1983 but that Plaintiff had adequately alleged a denial of equal protection actionable under § 1983; and (2) under the Local Government Antitrust Act, Defendant Airport Authority was absolutely immune [*3] from a damage claim based upon alleged violation of Sherman Act but that plaintiff had managed to avoid application of the state action exemption to the antitrust laws with respect to its claim for injunctive relief. This case was delayed pending the trial and subsequent conviction of Plaintiff's President, Mr. Earl M. Holtz for conspiracy to defraud the United States through improper filings with the Federal Aviation Administration. That prosecution has been the subject of several decisions of the District Court. See 1993 WL 482953; 1994 WL 750674; 1995 WL 106895; and 1995 WL 312537.

In its second amended complaint, filed June 21, 1991, Plaintiff Northeast Jet Center has alleged seven causes of action arising out of circumstances surrounding the closing of its operations and those of its affiliate, Northeast Jet Company, at the Allentown-Bethlehem-Easton Airport. n1 Defendants -- the airport authority, its director and board chairman -- through two motions filed on January 22, 1996 and one on February 8, 1996, have moved for summary judgment on all counts as well as partial summary judgment on most counts separately. n2

- - - - - - - - - - - - - - - - - -Footnotes- - - - - - - - - - - - - - - - - - -

n1 We take notice of the fact that this airport is now called the Lehigh Valley International Airport. [*4]

n2 In their motions filed on January 22, 1996, Defendants moved for summary judgment on counts three through seven. Their motion filed on February 8, 1996 seeks summary judgment on all counts based on our Order of January 22, 1996, precluding Plaintiff from presenting expert testimony. That order was in turn based on Plaintiff's failure to comply with the parties' stipulated scheduling order, approved by this Court on August 2, 1995 and filed August 3, 1995.

- - - - - - - - - - - - - - - -End Footnotes- - - - - - - - - - - - - - - - -

## II. STATEMENT OF FACTS

We have taken the facts from the Plaintiffs' papers wherever they are supported by citations to the record. For the purpose of deciding these summary judgment motions, we assume they are true.

Plaintiff Northeast Jet Center, Ltd. was engaged in the business of providing ground-based aviation services at A.B.E. Airport from 1986 until February 1990. Plaintiff operated out of a large hangar on land leased from A.B.E. Airport. As a so-called fixed-base operator ("FBO"), Plaintiff provided a range of aviation services including aircraft parking, tie-down and storage services; aircraft repair, maintenance [*5] and inspection services; flight-line servicing, including the sale and delivery of aviation petroleum products; ground transportation services for crew and passengers within the Airport's boundaries; aircraft charter, rental and air taxi services; brokerage services for new and used aircraft; purchase and sale of aircraft parts and accessories; and lease of hangar space to aircraft owners.

During most of the period from 1986 until 1990, Plaintiff had a "Part 145" License from the Federal Aviation Administration (FAA) to provide certain specialized maintenance and

Get a Document by Citation - 1996 U.S. Dist. LEXIS 21117     Page 56 of 75

Case 1:00-cv-00660-YK-1996 U.S. Dist. LEXIS 21117     Filed 05/30/2000     Page 3 of 21

inspection services. Plaintiff also employed FAA-licensed mechanics to provide routine aircraft maintenance and repair independently of its Part 145 Certificate. Plaintiff's major tenants for hangar space included two local business corporations, Union Pacific and Mack Truck.

Plaintiff provided substantial maintenance, inspection, fueling and other services for Northeast Jet Company, Inc. an affiliated company, which operated an air taxi service out of Plaintiff's hangar. Northeast Jet Company had a "Part 135" Certificate from the FAA permitting it to operate as an on-demand air taxi charter airline. Although Plaintiff and  [*6] Northeast Jet Company were jointly owned, and both operated out of Plaintiff's hangar, for purposes of this motion they were different corporations and were in different lines of business. (See Earl M. Holtz Deposition Transcript, hereinafter "Holtz Dep.," Exhibit 24, Plaintiff's Opposition to Defendants' Motions for Summary Judgment, filed February 8, 1996 at 25.) In particular, Northeast Jet Company operated as a charter airline under Part 135 which Plaintiff did not. Similarly, Plaintiff operated as an FBO at A.B.E. Airport which Northeast Jet Company did not do. Id. at 185.

Plaintiff and the Defendant Airport Authority had an agreement which included a forty-year lease of the property from the airport. At the end of 20 years, or sooner if the lease was terminated, the Airport Authority was to take title to the hangar facility itself. Id. Exhibit 1, at Art. III.

In March 1988, Union Pacific planned to expand its airplane fleet at A.B.E. Airport. Union Pacific approached Plaintiff about obtaining additional hangar space for its use at the Center facility. Following negotiations, Plaintiff and Union Pacific entered into a written agreement whereby Plaintiff agreed to  [*7]  lease half of the expanded portion of a new hangar for 10 years upon its completion. Pursuant to the Center/Union Pacific agreement, the hangar expansion was scheduled to be completed by February 1989. Id., Exhibit 24, at p. 460. The extension agreement committed Union Pacific to lease the new hangar, but allowed Union Pacific to opt out of the project under certain conditions.

Plaintiff obtained financing for the hangar expansion from Northeastern Bank, and began the process of hiring professionals to design and build the expansion. During the summer of 1988, Plaintiff retained the services of architectural and construction companies and began the process of obtaining permits for the construction. Id. Exhibit 24, at 328-330. The hangar expansion, like the original hangar, was to be built upon the land Plaintiff had leased from the Airport.

In the Summer of 1988, The FAA began an investigation of the operations of Northeast Jet Company and the air taxi charter service it operated out of Plaintiff's hangar. On September 30, 1988, the FAA issued an emergency revocation order revoking Northeast Jet Company's Part 135 Certificate, thereby grounding Northeast Jet Company's aircraft.  [*8]  Id. Exhibit 24, at 53. Northeast Jet Company contested the revocation order and a hearing was scheduled before the National Transportation Safety Board (NTSB) for November 7-9, 1988.

That hearing was subsequently canceled following a settlement reached by Northeast Jet Company and the FAA on October 27, 1988. Pursuant to that settlement, the FAA authorized Northeast Jet Company to apply for recertification as a Part 135 charter air carrier. The recertification was granted in May 1990.

The issues raised in the revocation order were addressed solely to Northeast Jet Company's air charter service -- not the Plaintiff's FBO operations. The FAA took no direct action against Plaintiff, nor was its Part 145 repair station license involved in the investigation. Nonetheless, the FAA enforcement action against Northeast Jet Company did have a substantial indirect effect upon Plaintiff's business operations. Because Northeast Jet Company could not fly its aircraft following the revocation, and in fact sold off most of its aircraft, Plaintiff was faced with losing a substantial amount of maintenance and repair business which normally would have arisen from Northeast Jet Company's aircraft.  [*9]  Id., Exhibit 24, at 82-83.

Get a Document - by Citation - 1996 U.S. Dist. LEXIS 21177    Page 57 of 75

Case 2:00-cv-00660-NK-LPL    Document 13-2    Filed 05/30/2000    Page 4 of 21

Shortly after the revocation, Plaintiff took responsive measures in light of the loss of maintenance and repair work. Plaintiff laid off a number of personnel and voluntarily turned in its Part 145 repair station certificate on October 21, 1988. Id., at 342. Plaintiff also advised its general contractor to halt work on the hangar expansion project on October 7, 1988. Although Plaintiff hoped to recommence construction at a later date. Plaintiff conferred with its bank which expressed willingness to continue financing. During this time Plaintiff's tenant, Union Pacific, continued to express interest in Plantiff's plans for hangar expansion. That interest continued into early 1989.

The Airport sought the advice of an airport consultant as to whether the revocation of Northeast Jet Company's Part 135 License constituted an event of default under Plaintiff's lease with the Airport. The consultant advised the Airport against placing Plaintiff in default because Northeast Jet Company was no longer operating an air taxi service. He suggested that the Airport await the outcome of the scheduled November 7-9, 1988 NTSB hearing regarding the revocation order.  [*10]

On November 4, 1988, after consultation with its attorneys, the Airport notified Plaintiff that it was in breach of its lease. Plaintiff's Opposition to Defendants' Motions for Summary Judgment, filed February 8, 1996, Exhibit 5. The Airport sent the breach notice without prior discussion with Plaintiff. The Airport also sent a copy of the breach notice to Plaintiff's bank. The Airport's director was also quoted in a newspaper article that Plaintiff was in breach of its lease. Id., Exhibit 6. In that article, Defendant Yohe stated that Plaintiff had surrendered its "ground maintenance certificate" and therefore it could no longer meet the terms of the lease. Id.

Plaintiff reapplied to the FAA for a new Part 145 repair station certificate on December 8, 1988. Around the same time, Defendant Yohe, Airport Director, contacted several FAA officials in Washington with regard to the reapplication. Id Exhibits 9, 24 (at 506-510, and 25 (at 146-147, 170-171). Plaintiff was recertified in February 1989. Defendants once again hired the same consultant who again advised them there was no basis for placing Plaintiff in default of its lease. Id., Exhibits 10 and 25 (at 120-122). [*11]  On May 25, 1989, the Airport notified Plaintiff that it had rescinded its November 4, 1988 notice of default. Id., Exhibits 11 and 25 (at 122-125). During the period in which Plaintiff had been held in breach of its lease by Airport, Plaintiff's bank withdrew its financing for the proposed hangar expansion. The Airport held Plaintiff in breach of its lease from November 4, 1988 until May 25, 1989.

Also at this time, Defendants had numerous discussions with Plaintiff's tenant, Union Pacific. These discussions involved possible alternatives for Union Pacific's increasing hangar needs. Union Pacific continued to be interested in the hangar expansion originally proposed by Plaintiff. Union Pacific's interest in a new Northeast Jet Center hangar expansion continued into March 1989, one month after the completion date specified in their binding agreement. On April 25, 1989, Union Pacific notified Plaintiff that it was pulling out of the project because it had found a satisfactory alternative. Id., Exhibit M.

In October 1989, the Airport director sent a letter to all tenants of the A.B.E. Airport -- except Plaintiff itself -- indicating that the Airport was making plans to deal  [*12]  with "A.B.E.'s lack of an adequate and reliable fixed-base operator." Id., Exhibit 21. The Airport also drafted a new FBO and charter requirements at this time. By early 1990, Plaintiff was in poor financial condition. It had lost the opportunity of constructing a hangar expansion with a 10-year commitment from its anchor tenant. Union Pacific had notified Plaintiff that it would be vacating its space in the original hangar in a short period. Plaintiff was forced to sell.

Plaintiff sold its facilities to Jaindl Aviation on February 2, 1990. Id., Exhibit 23. Jaindl subsequently assigned its rights in that purchase to the Defendant Airport Authority. The Airport subsequently installed an "interim FBO" on a management fee basis to operate out of

Get a Document - by Citation - 1996 U.S. Dist. LEXIS 21177    Page 58 of 75    Page 5 of 21

Case 2:00-cv-00060-MK-1996 U.S. Dist. LEXIS 21177 Filed 05/30/2000

Plaintiff's former hangar. Thus, eventually, the Airport essentially replaced Plaintiff as the sole FBO at A.B.E. Airport.

## III. GENERAL LEGAL STANDARD

Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment shall be rendered where:

> the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material [*13] fact and the moving party is entitled to judgment as a matter of law.

Rule 56(e) further provides that, when a properly supported motion for summary judgment is made, the adverse party "must set forth specific facts showing that there is a genuine issue for trial."

In making its ruling on a summary judgment motion, the court must view all inferences in a light most favorable to the non-moving party. United States v. Diebold, Inc., 369 U.S. 654, 655, 82 S. Ct. 993, 994, 8 L. Ed. 2d 176 (1962). A "genuine issue of fact" is present, precluding summary judgment, when a reasonable trier of fact, viewing all the evidence, could rationally find in favor of the nonmoving party in light of the burden of proof placed on the nonmover. U.S. v. Premises Known as RR No.1 Box 224, Dalton Tp. and North Abington Tp., Lackawanna County, Pa., 14 F.3d 864 (3d Cir. 1994). The substantive law identifies which facts are material. "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S. Ct. 2505, 2510, 91 L. Ed. 2d 202 (1986). See also [*14] Josey v. John R. Hollingsworth, 996 F.2d 632 (3d Cir. 1993) on remand 1993 WL 523686 (summary judgment is precluded if disputed fact exists which might affect outcome of suit under controlling substantive law).

The Supreme Court has held that:

> Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. In such a situation, there can be "no genuine issue as to any material fact," since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial."

Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S. Ct. 2548, 2552, 91 L. Ed. 2d 265 (1986).

In a motion for summary judgment, the nonmoving plaintiff's burden is more than insignificant. See J.F. Feeser Inc. v. Serv-A-Portion, Inc., 909 F.2d 1524, 1531 (3d Cir. 1990) cert. denied, 499 U.S. 921, 113 L. Ed. 2d 246, 111 S. Ct. 1313 (1991) (although the moving party has the initial burden of identifying [*15] the evidence that demonstrates the absence of a genuine issue of material fact, the nonmovant must establish the existence of each element on which it bears the burden of proof). "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." Anderson, supra, 477 U.S. 242, 252, 106 S. Ct.

2505, 2512 (1986). See also Coolspring Stone Supply, Inc. v. American States Life Ins. Co., 10 F.3d 144, 148 (3d Cir. 1993); Petruzzi's IGA Supermarkets, Inc. v. Darling Delaware Co., Inc., 998 F.2d 1224, 1230 (3d Cir. 1993) cert. denied 126 L. Ed. 2d 455, 114 S. Ct. 554 (nonmovant must do more than create some metaphysical doubt).

While the nature of its remedy is indeed powerful, the "summary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy and inexpensive determination of every action.'" Celotex, supra, 477 U.S. 327, 106 S. Ct. 2555 [citation omitted].

## IV. DISCUSSION

### A. *Piercing the Corporate* [*16] *Veil*

In deposition, Mr. Earl Holtz testified that he was the President, sole shareholder and sole director of both Northeast Jet Center and Northeast Jet Company. Holtz Deposition, August 8, 1990 at 28-29., filed as Exhibit A to Defendants' Motion for Partial Summary Judgment, filed January 22, 1996. He further testified that the two corporations kept separate records, conducted separate director and shareholder meetings, and kept separate minutes. Northeast Jet Company purchased maintenance, fuel and hangar space from Northeast Jet Center. Mr. Holtz testified that the two companies were cross-guaranteed and cross-collateralized in addition to being backed by his personal guarantee. Exhibit A to Defendants Motion for Partial Summary Judgment, filed January 22, 1996, also includes a letter on Northeast Jet *Company* stationary requesting Twin County construction company to cease its efforts to build a new hangar addition for Northeast Jet *Center.* This letter was signed by Mr. Earl Holtz with the title "President."

While the similarity of interests and personnel might lead us to consider piercing the corporate veil that separates these companies, n3 such action would be [*17] inappropriate at this time in light of the presumption that corporations are separate entities, n4 and without a full record before us. In Re Cohn, 54 F.3d 1108, 1116 (3d Cir. 1995). Accordingly, at this time we treat the two companies herein as distinct entities from each other and from Mr. Holtz.

- - - - - - - - - - - - - - - -Footnotes- - - - - - - - - - - - - - - - - -

n3 See Kaplan v. First Options of Chicago, Inc., 19 F.3d 1503, 1521 (3d Cir. 1994); Manville Sales Corp. v. Paramount Systems, Inc., 917 F.2d 544, 552 (Fed. 1990); Joyce v. Super Fresh Food Markets, Inc., 815 F.2d 943, 945 (3d Cir. 1987); Solomon v. Klein, 770 F.2d 352, 353 (3d Cir. 1985).

n4 See Mellon Bank, N.A. v. Metro Communications, Inc., 945 F.2d 635, 643 (3d Cir. 1991), cert. denied, 503 U.S. 937, 112 S. Ct. 1476, 117 L. Ed. 2d 620; Craig v. Lake Asbestos of Quebec, Ltd., 843 F.2d 145, 150 (3d Cir. 1988); American Bell Inc. v. Federation of Tel. Workers, 736 F.2d 879, 886 (3d Cir. 1984); Jiffy Lube International, Inc. v. Jiffy Lube of Pennsylvania, 848 F. Supp. 569, 580 (E.D.Pa. 1994).

- - - - - - - - - - - - - - - -End Footnotes- - - - - - - - - - - - - - - - - [*18]

### B. *Preclusion Order Barring Expert Testimony*

Defendants contend that our preclusion order barring Plaintiff from presenting expert testimony fatally injures Plaintiff's entire case because without such testimony Plaintiff would be unable to establish the amount of damages it suffered. Defendants' Supplemental Motion for Summary Judgment on All Counts, filed February 8, 1996 (hereinafter "Defendants' Supplemental Motion"). The law of this circuit is to the contrary.

Federal Rule of Evidence 701 provides that:

> If the witness is not testifying as an expert, the witness' testimony in the form of opinions or inferences is limited to those opinions or inferences which are (a) rationally based on the perception of the witness and (b) helpful to a clear understanding of the witness' testimony or the determination of a fact in issue.

In interpreting this Rule, the Third Circuit has repeatedly recognized that "the modern trend favors the admission of lay opinion testimony, provided that it is well founded on personal knowledge and susceptible to specific cross-examination." Lightning Lube, Inc. v. Witco Corp., 4 F.3d 1153, 1175 (3d Cir. 1993) (citations [*19] omitted). More recently, the Third Circuit has said that "Rule 701 requires that a lay opinion witness have a reasonable basis grounded either in *experience or specialized knowledge* for arriving at the opinion that he or she expresses." Asplundh Mfg. Div. v. Benton Harbor Engineering, 57 F.3d 1190, 1201 (3d Cir. 1995) (emphasis in original).

At this stage in the litigation, prior to any hearings before us, it appears that Mr. Holtz, as President of both Plaintiff Northeast Jet Center and its affiliate, Northeast Jet Company, has relevant first-hand experience and specialized knowledge of both companies' operations. In his deposition of September 5, 1995, Mr. Holtz testified as to how he prepared financial documents purporting to show Plaintiff's projected income as well as the value of Plaintiff and each of its components. Plaintiff's Opposition to Defendants' Supplemental Motion, and Exhibit 2 thereto, filed February 22, 1996. Defendants have asserted Mr. Holtz's subsequent deposition testimony of September 8, 1995 demonstrates that Mr. Holtz is "unable to elaborate on how he allegedly calculated [plaintiff's] damages." Defendants' Supplemental Motion, at 4. Nonetheless, [*20] in addition to his position as President, Mr. Holtz was the sole shareholder and director of Plaintiff Northeast Jet Center and its affiliate, Northeast Jet Company. In those positions, his personal experience and knowledge of Plaintiff's operations appears to be "germane to the lay opinion offered." Asplundh Mfg. Div. 57 F.3d at 1201. We believe that "at least some of" Mr. Holtz's assumptions are valid and that his testimony would be helpful to a jury. Lightning Lube, 4 F.3d at 1175. Taking the Plaintiff's claims as true for our purposes here, Mr. Holtz's lay opinion qualifies under Federal Rule of Evidence 701. That opinion represents the "best evidence available -- first-hand knowledge versus second-hand knowledge" that must be presented to the jury. Joy Mfg. Co. v. Sola Basic Indus., Inc., 697 F.2d 104, 111 (3d Cir. 1982). While Mr. Holtz's assumptions may well be subject to vigorous cross examination, their credibility is ultimately a question for a jury to decide. Douglas v. Owens, 50 F.3d 1226, 1230, n.6 (3d Cir. 1995).

Defendants' Supplemental Motion to Dismiss on all grounds, filed February 8, 1996, must accordingly be DENIED at this time.

**C. Count** [*21] **One: Violation of Plaintiff's Constitutional Rights.**

Plaintiff broadly asserts that Defendants deprived and conspired to deprive Plaintiff of its equal protection and due process rights under the Fourteenth Amendment to the United States Constitution and Article I, §§ 2, 9 and 26 of the Pennsylvania Constitution. This alleged deprivation consisted of selective enforcement of "certain regulations and requirements which the Airport Defendants knew were not in effect." Second Amended Complaint, filed June 21, 1991, P41. n5

- - - - - - - - - - - - - - - - - -Footnotes- - - - - - - - - - - - - - - - - - -

n5 Specifically, Plaintiff alleges seven instances of purposeful discrimination that evidence a

"pervasive pattern of arbitrary, capricious and discriminatory acts." Second Amended Complaint, P42. Additionally, Plaintiff asserts Defendants have violated its Due Process rights in at least four instances. Id., P44. A demand is made for money damages. Id., P46.

- - - - - - - - - - - - - - - - -End Footnotes- - - - - - - - - - - - - - - - -

With the possible exception of their Motion to Dismiss on All Counts discussed above, Defendants have yet to address Plaintiff's  [*22]  equal protection and due process claim. Defendants maintain that Plaintiff cannot recover on its constitutional claims without first showing a quantified business loss. Defendants' Supplemental Motion at 3. Although Plaintiff has been precluded from presenting expert testimony, for purposes of the summary judgment motions we must view all facts and inferences in favor of Plaintiff. United States v. Diebold, Inc., 369 U.S. 654, 655, 82 S. Ct. 993, 994, 8 L. Ed. 2d 176 (1962). At this stage, we believe a jury could reasonably find Mr. Holtz's testimony sufficiently credible to form the basis of a damages award. As set forth above, because we do not find our order precluding presentation of expert testimony fatal to Plaintiff's entire case.

Defendants have not otherwise briefed or argued this count before us, and we believe it clearly merits further consideration. We would like to know the exact nature of Plaintiff's constitutional claims. n6 We are also concerned about what evidence, if any, supports Plaintiff's claims and whether qualified immunity applies to some defendants.

- - - - - - - - - - - - - - - - -Footnotes- - - - - - - - - - - - - - - - -

n6 Some limitations on these claims are obvious. If plaintiff is making claims directly under the Constitution, these claims are deemed stricken because if they do have merit, they can be sufficiently vindicated by an action under 42 U.S.C. § 1983. Rogin v. Bensalem, 616 F.2d 680, 686-87 (3d Cir. 1980); Mahone v. Waddle, 564 F.2d 1018, 1024 (3d Cir. 1977); Hammond v. Creative Planning Organization, 800 F. Supp. 1244, 1248 (E.D.Pa. 1992); La Plant v. Frazier, 564 F. Supp. 1095, 1097-1098 (E.D.Pa. 1983); DiGiovanni v. City of Philadelphia, 531 F. Supp. 141, 144 (E.D.Pa. 1982).

We note additionally that if Plaintiff is making procedural due process claims for the taking of legal property, as the result of random and unauthorized conduct, then resort must be had to state rights and procedures rather than a § 1983 action. Hudson v. Palmer, 468 U.S. 517, 533, 104 S. Ct. 3194, 3204, 82 L. Ed. 2d 393 (1984); Williamson Co. Regional Planning v. Hamilton Bank, 473 U.S. 172, 195, 105 S. Ct. 3108, 3121, 87 L. Ed. 2d 126 (1985). Zilich v. Lucht, 981 F.2d 694, 696 (3d Cir. 1992); Hicks v. Feeney, 770 F.2d 375, 378 (3d Cir. 1985); Berlanti v. Bodman, 780 F.2d 296, 301 (3d Cir. 1985).

- - - - - - - - - - - - - - - - -End Footnotes- - - - - - - - - - - - - - - -  [*23]

### D. *Count Two: Violation of the Sherman Act*

In our prior opinion, we dismissed Plaintiff's claim for damages under the Sherman Act with prejudice. See 767 F. Supp. 672, 681. We further allowed Plaintiff to amend its complaint to seek injunctive relief. Id. at 682. Defendants' now argue that this claim is moot due to the hypothetical nature of Plaintiff's claim. We agree that the case law of the Third Circuit supports Defendants' position.

In Acierno v. New Castle County, 40 F.3d 645 (3d Cir. 1994), the Court stated that for an injunction to be granted,

> more than a risk of irreparable harm must be demonstrated. The requisite for injunctive relief has been characterized as a 'clear showing of immediate

irreparable injury,' or a 'presently existing actual threat; an injunction may not be used simply to eliminate a possibility of a remote future injury.'

Id., at 655 (citing Continental Group, Inc. v. Amoco Chem. Corp., 614 F.2d 351, 359 (3d Cir. 1980); Ammond v. McGahn, 532 F.2d 325, 329 (3d Cir. 1976); Holiday Inns of America, Inc. v. B & B Corp., 409 F.2d 614, 618 (3d Cir. 1969); and Campbell Soup Co. v. Conagra, Inc. 977 [*24] F.2d 86, 91-92 (3d Cir. 1992). Plaintiff is no longer in business. Plaintiff asserts however that "Center and/or its principal *may at some point in time seek to re-enter the FBO market,"* Defendants' Supplemental Motion, at 12 (emphasis added). We believe the basis of Plaintiff's Count Two represents a mere possibility of a remote injury, and presently nothing more. "[A] permanent injunction will issue only where a threat of harm exists, not just where potential harm exists." McLendon v. Continental Can Co., 908 F.2d 1171, 1182 (3d Cir. 1990). See also Natural Footwear Ltd. v. Hart, Schaffner & Marx, 760 F.2d 1383, 1404 (3d Cir. 1985); Northeast Women's Center, Inc. v. McMonagle, 665 F. Supp. 1147, 1154 (E.D.Pa. 1987).

Defendants' Motion for summary judgment, filed February 8, 1996 is accordingly GRANTED with respect to count two of Plaintiff's second amended complaint.

### E. *Count Three: Tortious Interference with Business Relations*

Count three of Plaintiff's second amended complaint claims that Defendants intentionally disrupted an agreement between Plaintiff Northeast Jet Center and Union Pacific by: (1) wrongfully declaring Plaintiff in default of [*25] its lease; (2) contacting Plaintiff's bank in late 1988 and early 1989, falsely informing it that Plaintiff was in default of the lease, and expressing doubts as to Plaintiff's financial viability to discourage the bank's financing of the proposed new hangar; and (3) attempting to persuade Union Pacific to abandon Plaintiff's facility and move to an alternative facility at the A.B.E. airport.

The Pennsylvania Supreme Court has adopted the Restatement (Second) of Tort's formulation of the tort of interference with existing contractual relationships. n7 A chief and threshold requirement of this tort is the existence of a contract. As we discuss below, we do not believe the agreement and the proposed lease were one and the same nor that Defendants' alleged interference with the lease (in draft form) relates back to the agreement itself. We conclude that the agreement was a binding agreement to enter into a lease upon the fulfillment of conditions precedent.

- - - - - - - - - - - - - - - - - -Footnotes- - - - - - - - - - - - - - - - - - - -

n7 As recited in Silver v. Mendel, 894 F.2d 598 (3d Cir. 1990), the elements of a claim for intentional interference with existing contractual relations are:

> (1) the existence of one or more contracts; (2) the purpose or intent to harm plaintiff by preventing the completion of the contractual relation(s); (3) conduct by defendant which is not proper as a matter of law and which a factfinder could reasonably find improper; and (4) harm actually resulting from defendants' actions.

Id. at 604-605, citing Adler Barish v. Epstein, 482 Pa. 416, 393 A.2d 1175, 1183 (1978).

- - - - - - - - - - - - - - - - - -End Footnotes- - - - - - - - - - - - - - - - [*26]

In their Motion for Partial Summary Judgment filed January 22, 1996, Defendants claim this count must fail as a matter of law because no such lease agreement existed at the time between Plaintiff and Union Pacific. Instead they assert Plaintiff had a contract with Union

Pacific to enter into such a lease agreement. Defendants maintain that Plaintiff has offered no objective proof that there was a reasonable probability that the proposed lease agreement would ever have been executed, as required by Thompson Coal Co. v. Pike Coal Co., 488 Pa. 198, 209, 412 A.2d 466, 471 (1979). Defendants' Brief in support of their motion for partial summary judgment, filed January 22, 1996 at 24.

Defendants further state that prior to their own in actions, it was clear to Plaintiff and to Union Pacific that Plaintiff would not complete the proposed hangar by the deadline specified in their agreement. Defendants claim that the FAA's revocation of Northeast Jet Company's operations and its poor financial condition ended the prospects of its affiliate, Northeast Jet Center, for the proposed new hangar facility. Defendants' Motion for Partial Summary Judgment, filed January 22, 1996 at 25.

According [*27] to Defendants, Union Pacific began searching for an alternative site for their aircraft on their own initiative and were apparently successful through an "internal connection." Id. at 26 and Exhibit M thereto, at 35-38. Union Pacific's Vice President, Mr. John Halan testified that his company was never approached by Defendants, and that Union Pacific initiated conversations with Defendants -- not vice versa -- concerning its desire to acquire land on the airport to build its own hangar. Defendants Motion for Partial Summary Judgment, filed January 22, 1996, Exhibit M, at 24-26. Mr. Halan testified that the accident involving Northeast Jet Company's plane and the FAA's revocation of Northeast Jet Company's operating license was one factor in Union Pacific's decision to look elsewhere for hangar space. Exhibit N to Defendants' Motion for Partial Summary Judgment, filed January 22, 1996, at 79-80. However, he stated repeatedly that the primary factor was that time was running out and the hangar would not be completed in time for the worst period of winter. Mr. Halan stated that Defendants were reluctant to consider providing Union Pacific with land because their objective was to strengthen [*28] Plaintiff's position at A.B.E. Airport. Id. at 83-84. According to Mr. Halan, Defendants went so far as to discourage Union Pacific from acquiring land independently and attempted to reinforce rather than undermine Plaintiff's viability at the airport. Defendants Motion for Partial Summary Judgment, filed January 22, 1996, Exhibit M, at 24-26.

In March and April, 1989, Mr. Halan sent three letters on behalf of Union Pacific to Mr. Holtz as President of Northeast Jet Center, Ltd. Id. On March 6, 1989, Mr. Halan stated that Union Pacific was "concerned about the project" since the initial target occupancy time had passed, but was "encouraged" concerning plans to go forward with the new hangar. "In the meantime," he continued, "we will be reviewing our various options and alternatives should you elect not to go forward with the new facility." Id.

Ten days later, Mr. Halan sent another letter which stated in its entirety:

> With regard to our discussions on the new facility you are planning to build, I would like to confirm that Union Pacific has *no commitment* with respect to this facility unless a new written agreement is signed. *We are not waiving any rights* [*29] *under our previous agreement that we might have because of the passage of the February 1989 completion date.*

Id., (emphasis added). On April 25, Mr. Halan sent a final letter informing Mr. Holtz that Union Pacific had no further interest in the proposed hangar addition because it had found a "satisfactory alternative." Id.

Plaintiff claims that conditions precedent do not render the agreement illusory and that the agreement contains all essential terms of the arrangement between Union Pacific and Plaintiff, including price. Id. at 20. Plaintiff asserts, "Put another way, had Center been able

to construct the hangar expansion, Union Pacific could not have arbitrarily refused to execute the form lease..." Id. Plaintiff further contends both parties intended to honor these obligations -- including executing the form lease --under the lease extension agreement. We cannot help but make the plain observation that Center never was able to build the new hangar and thus by Plaintiff's own reasoning Union Pacific's obligation never arose.

Plaintiff maintains that the 10-year lease extension agreement is not an illusory contract but instead obligates it to use its  [*30]  best efforts to take all steps necessary to construct the hangar extension while simultaneously obligating Union Pacific to lease hangar and office space in the new facility upon its completion. Plaintiff's Opposition to Defendants' Motions for Summary Judgment, filed February 8, 1996 at 19. Plaintiff's maintain that the scheduled completion date set forth in the lease extension agreement was a waivable condition which was indeed waived as "clearly evidenced" until Union Pacific was "lured away by the Airport's offers of alternative hangar space in early 1989." Id. at 21.

Plaintiff has failed to persuade us any such clear evidence exists to counter the plain language of Mr. Halan's letter which specifically and conclusively shows Union Pacific's intention not to waive the time condition. Indeed, Mr. Halan's letters and his deposition testimony make clear that the time condition was the most important consideration in Union Pacific's decision whether to continue to do business with Mr. Holtz and his companies.

> To constitute a waiver of a legal right, there must be a clear, unequivocal and decisive act of the party who is claimed to have waived its rights, with knowledge  [*31]  of such right and an evident purpose to surrender it.

Keenan v. Scott Tp. Authority, 151 Pa. Commw. 226, 616 A.2d 751, 755 (Pa.Cmwlth. 1992) (citation omitted). Even if the language of the March and April 1989 letters could reasonably be construed to evidence a continued willingness on the part of Union Pacific to occupy Plaintiff's proposed hangar, there is absolutely no evidence of record that Union Pacific would have done so under the terms and conditions set forth in the original draft 10-year lease agreement.

Defendants cite and Plaintiff's attempt to distinguish Schulman v. J.P. Morgan Inv. Management, Inc., 829 F. Supp. 782 (E.D.Pa. 1993), which held that where a draft lease agreement was prepared for execution but never signed, that alone did not create a lease. Id at 785. Plaintiff asserts that the agreement involved in Schulman was a draft whereas here it was an "executed final agreement." Plaintiff's Opposition to Defendants' Motions for Summary Judgment, filed February 8, 1996 at 21. In Schulman, the Court held that references to a draft by a real estate developer's employees as a "lease" did not transform an agreement to open a food service  [*32]  operation into a formal lease where the developer never signed the agreement as required. Id. Similarly here, the executed agreement required Union Pacific and Plaintiff to execute a 10-year lease when certain conditions were met. Those conditions were not met; and while the proposed 10-year lease agreement was indeed prepared for execution, we similarly conclude that that proposal alone did not create a lease.

On March 1, 1988 Plaintiff and Union Pacific entered a signed, written Agreement which outlined their relationship with regard to the proposed hangar expansion. Id Exhibit 2. In pertinent part, the Agreement states:

> Subject to the terms and conditions of this Agreement, upon the occurrence or waiver of the conditions precedent set forth...below, Northeast and Union Pacific shall enter the form of lease agreement for the Premises attached hereto...

Get a Document - by Citation - 1996 U.S. Dist. LEXIS 21177    Page 65 of 75

Case 1:00-cv-00860-YK-JAS    Document X32    Filed 05/30/2000    Page 12 of 21

Id. at 1. The Agreement then lists the duties of each side including compliance with the interim lease by both parties and financing and regulatory approval for Northeast Jet Center. Id. at 2-4. Union Pacific's portion of the Agreement states at the outset that Union Pacific's obligations are subject  [*33]  to the condition, among others, that:

> (a) The intended Aviation Complex shall have been substantially completed and the Premises shall be suitable for the intended use by Union Pacific on or before February 1, 1989. Northeast shall give Union Pacific at least 30 days prior written notice of the anticipated date of substantial completion of the Premises.

Id. at 3. The undated and unsigned "Lease Agreement" was attached to the signed "Agreement." The lease purports to concern a "Contemplated Aviation Complex" located at A.B.E. International Airport. Id. It includes the terms of a 10-year lease between Union Pacific and Plaintiff for the proposed hangar expansion, including rents, taxes, services, use, maintenance, regulations, insurance, fire risk, assignment & subletting, condemnation, entry and access, default & remedy, subordination, surrender and waiver. Id.

To defeat summary judgment the non-moving party -- Plaintiff Northeast Jet Center, Ltd. in this case -- must respond with facts of record that contradict the facts identified by the movant, and may not rest on mere denials. Celotex Corp. v. Catrett, 477 U.S. at 321, n.3, 106 S. Ct. at 2552, n.3 [*34]  (quoting Fed. R. Clv. P. 56(e)); see also First National Bank of Pennsylvania v. Lincoln National Life Insurance Co., 824 F.2d 277, 282 (3d Cir. 1987). In a case where the non-moving party is the plaintiff and therefore bears the burden of proof, it must by affidavits or by the depositions and admissions on file, "make a showing sufficient to establish the existence of [every] element essential to that party's case." Celotex Corp., 477 U.S. at 322-24, 106 S. Ct. at 2552-53; Anderson, 106 S. Ct. at 2514; Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986); Fed. R. Clv. P. 56(e). Plaintiff has failed to meet this burden and we find that no such intentional action was taken by Defendants to interfere with the business relationship between Plaintiff and Union Pacific.

In sum, we believe the original agreement was a binding contract subject to conditions precedent. However, we do not believe that those conditions were met. Even if they were, and even if the deadline was waived, Defendants' proffer of Union Pacific's John Halan deposition testimony unequivocally refutes the core of Plaintiff's allegation -- that Defendant's  [*35]  intentionally interfered with the business relationship between Union Pacific and Plaintiff. Plaintiff simply has not offered sufficient testimony or other evidence to counter Mr. Halan's testimony.

Defendants' Motion for partial summary judgment, filed January 22, 1996 is accordingly GRANTED with respect to that portion of count three of Plaintiff's second amended complaint covering intentional interference with existing contract.

## F. *Count Three: Interference with Prospective Business Relations*

Plaintiff has also alleged that Defendants' actions amounted to an intentional interference with Plaintiff's prospective contractual relationship with Union Pacific. Plaintiff's Opposition to Defendants' Motions for Summary Judgment, filed February 8, 1996, at 21.

In Pennsylvania, the elements of the tort of intentional interference with prospective contractual relations are: (1) a prospective contractual relation; (2) intent to harm the plaintiff by preventing the relation from occurring; (3) absence of privilege or justification on

the defendant's part; and (4) actual damage resulting from defendant's conduct. Silver v. Mendel, 894 F.2d 598, 601-02 (3d Cir. 1990); [*36] Thompson Coal Co. v. Pike Coal Co., 488 Pa. 198, 412 A.2d 466, 471 (1979), cert. denied, 496 U.S. 926, 110 S. Ct. 2620 (1990)). See also Schulman v. J.P. Morgan Inv. Management, Inc., 829 F. Supp. 782, 786 (E.D.Pa. 1993). As the Pennsylvania Supreme Court has stated:

> We are not dealing with certainties, but with reasonable likelihood or probability. This must be something more than a mere hope or the innate optimism of the salesman...The rule to be applied is that the [plaintiff] may recover when the jury is satisfied that but for the wrongful acts of the defendant it is *reasonable* [sic] *probable* that the plaintiff would have [entered and performed the contract].

Thompson Coal Co. v. Pike Coal Co., 488 Pa. 198, 412 A.2d 466, 471 (Pa. 1979).

Plaintiff has set forth sufficient allegations of Defendants' interference with prospective business relations to proceed beyond the summary judgment stage. Although we do not believe the signed agreement and unsigned draft lease amount to an existing contract, for the purposes of summary judgment they do amount to a prospective business relation. To be "prospective," a contractual relation must have [*37] "objectively appeared to be reasonably probable." Schulman, 829 F. Supp. 782, 786. Plaintiff maintains that Union Pacific would have signed the lease even when a delay in constructing the new hangar was apparent and that the delay itself was caused by Defendants' notice of default to Plaintiff. This version of events markedly contrasts with that of Defendants and should more appropriately be decided at trial.

As already discussed above, Union Pacific expressed to Plaintiff as late as March 6, 1989 that it was "encouraged" concerning plans to proceed with the new hangar and stating Union Pacific's intention to review its options "should [Plaintiff] elect not to go forward with the new facility." Plaintiff has alleged that Defendants wrongfully contacted Plaintiff's bank as early as late 1988 and early 1989, informed the bank that Plaintiff was in default of its lease, and expressed doubts as to Plaintiff's financial viability. P55(b), Plaintiff's Second Amended Complaint, filed June 21, 1991. At this stage, we believe a jury could find a reasonable probability that Plaintiff and Union Pacific would have entered into a lease agreement for the expanded hangar, even if such a lease [*38] agreement were not identical with the original draft lease.

Defendants' Motion for partial summary judgment, filed January 22, 1996 is accordingly DENIED at this time with respect to that portion of count three of Plaintiff's second amended complaint covering intentional interference with a prospective contractual relationship.

## G. *Count Four: Tortious Interference with Prospective Business Relations with Other Companies*

In its Count Four, Plaintiff also asserts that there was a reasonable probability of its entering into contractual relationships with various entities other than Union Pacific, n8 and that Defendants interfered with those prospective contractual relationships. Plaintiff's Opposition to Defendants' Motions for Summary Judgment, filed February 8, 1996, at 23-25. It is well-established that summary judgment cannot be avoided unless the non-moving party sets forth *"specific facts"* showing that there is a genuine issue for trial." Matsushita Elec. Ind. Co. v. Zenith Radio Corp., 475 U.S. 574, 587, 89 L. Ed. 2d 538, 106 S. Ct. 1348 (1985) (emphasis added) (quoting Fed.R.Civ.P. 56(e)). Plaintiff has failed to provide the requisite specific facts to [*39] defeat a motion for summary judgment. In their brief, Plaintiff sufficiently states the standard to be applied for determining whether an action for intentional interference with prospective contractual relations will lie. However, they make no citations or

Get a Document - by Citation - 1996 U.S. Dist. LEXIS 11177    Page 14 of 21

Case 1:00-cv-00660-YK-JAS    Document 102-2    Filed 05/30/2000    Page 67 of 75

references whatsoever to deposition testimony or other evidence before us. In contrast, Defendants have in several instances cited to deposition testimony and exhibits strongly supporting their position that Plaintiff did not enjoy a prospective contractual relationship with any of the various entities (other than Union Pacific as discussed above) listed by Plaintiff. Defendants' Motion for Partial Summary Judgment, filed Jan. 22, 1996, at 27-35.

- - - - - - - - - - - - - - - - -Footnotes- - - - - - - - - - - - - - - - - -

n8 Plaintiff claims these entities include USAir, United Airlines, Delta Airlines, Continental Airlines, Northwest Airlines, Union Pacific, Bethlehem Steel, K.C. Aviation, Duncan Aviation and Universal Jet Sales. Plaintiff's Opposition to Defendants' Motion for Summary Judgment, filed February 8, 1996, at 24, n.2.

- - - - - - - - - - - - - - - -End Footnotes- - - - - - - - - - - - - - - - [*40]

Plaintiff bases this count on the supposition that had it stayed in business into early 1990, it would have been, at that point,

> the sole FBO at the Airport, thus greatly increasing its opportunity to service airlines it had not previously served. Moreover, Center had the only useable fuel farm at the Airport, thus assuring it the lion's share of fuel sales at A.B.E.

Plaintiff's Opposition to Defendants' Motions for Summary Judgment, filed February 8, 1996, at 25. Plaintiff suggests that as a result of outside factors, it would have enjoyed a windfall, if not a monopoly, n9 in providing fueling and maintenance services at the A.B.E. Airport. In response, Defendants quite accurately point to Plaintiff's lack of citations to the record to support this assertion. Even before Plaintiff's one and only competitor at A.B.E. airport, Suburban Aviation, closed its doors in March 1990, Plaintiff had agreed to sell its facility and equipment. See Exhibit D-61 attached to Exhibit "V" to Defendants' Motion for Partial Summary Judgment, filed January 22, 1996. Also, the fact that the Airport sought to replace Suburban with an "interim FBO" does not preclude the possibility  [*41]  that another suitable FBO could have entered the Airport at some time. Plaintiff's evidence of prospective contractual relationships more accurately represents the dreams of its president and is simply too weak to sustain a motion for summary judgment.

- - - - - - - - - - - - - - - - - -Footnotes- - - - - - - - - - - - - - - - - -

n9 We find it interesting to compare this explanation with count two of Plaintiff's complaint. There, Plaintiff charges Defendants with anti-trust violations of the Sherman Act by unreasonably restraining trade in the provision of ground-based aviation support services by FBOs at the airport. Specifically, Plaintiff asserts:

> As a result of the Airport Defendants' activities, competition in the provision of ground-based aviation support service by FBOs at A.B.E. has been eliminated and Dynair, operating on behalf of the Airport Authority, will be the only FBO at A.B.E. as of March 1, 1990. Accordingly, Dynair and the Airport Authority will have a total monopoly on FBO services at A.B.E. as of March 1, 1990.

Plaintiff's Second Amended Complaint, filed June 21, 1990, P49. Plaintiff apparently accepts some monopolies while rejecting others.

- - - - - - - - - - - - - - - -End Footnotes- - - - - - - - - - - - - - - - [*42]

Because Plaintiff has failed to raise any objective proof that there was a reasonable

probability that it would have developed a contractual or business relationship with any of the other listed entities other than Union Pacific, Defendants' Motion for Summary Judgment with respect to Count Four is accordingly GRANTED.

## H. *Count Five: Violation of the Municipal Authorities Act of 1945*

Plaintiff contends that the Defendant Airport Authority has violated § 306(2) of their enabling act, the Municipal Authorities Act of 1945, 53 Pa. C.S.A. § 306 (the "Act"). Second Amended Complaint, PP 66, 67. According to Plaintiff, it is entitled to punitive damages because the Authority' maliciously violated the Act by: (1) misusing its powers under the Act "to establish an enterprise to compete" with Plaintiff on an unfair basis; and (2) unlawfully misappropriating Plaintiff's property "in an effort to secure unfair and unlawful advantages contrary to the requirements of the Act." Second Amended Complaint at P 67.

Unless the contrary is proven, the acts of municipal officials are presumed to be valid and in compliance with the Act. Helmerick Drive-It-Yourself v. Erie Municipal [*43] Airport Authority, 149 Pa. Commw. 1, 612 A.2d 562, 564 n.2 (1992). Summary judgment is appropriate on Count Five because Plaintiff has failed to overcome this presumption with evidence sufficient to support either of its claims.

Section 306 A(b)(2) of the Pennsylvania Municipal Authorities Act reads in part:

> None of the powers granted by this act shall be exercised in the construction, financing, improvement, maintenance, extension or operation of any project or projects or providing financing for insurance reserves *which in whole or part shall duplicate or compete with existing enterprises serving substantially the same purpose.*

(emphasis added). Pennsylvania courts have held that in order to violate the Act, the municipal authority must "duplicate" or "compete" with services provided by an "existing" enterprise. Evansburg Water Co. v. Perkiomen Township, 131 Pa. Commw. 89, 569 A.2d 428 (1990). In Evansburg, the plaintiff complained that the township would be providing water service in a geographic area not served by the plaintiff at the time, but which the plaintiff wished to service. The Court held that the Act does not afford a plaintiff the unfettered [*44] right to expand its business into different areas than are already being serviced by a municipal authority, and thus found no violation of the Act. 131 Pa. Commw. at 93, 569 A.2d at 430. In so holding, the Court relied on its earlier decision, Northampton v. Bucks County Water & Sewer Authority, 96 Pa. Commonwealth Ct. 514, 508 A.2d 605 (1986), quoting it as follows:

> The plain wording of the statute is such that it prohibits projects which *'shall* duplicate ... *existing* enterprises *serving* substantially the same purposes.'* This clause of the statute is phrased in the present tense, it is not worded in such a manner that what Northampton could *possibly* do is in any way relevant.

Id., 508 A.2d at 430 (emphasis in original). Plaintiff's claim that the Airport Authority's actions interfered with its operations fail to acknowledge the clear evidence that at the time of those alleged acts, Plaintiff itself was no longer an "existing enterprise[] serving substantially the same purposes" as the operation that succeeded it.

In Lower Bucks County Joint Municipal Authority v. Bristol Township Water Authority, 137 Pa. Commw. 415, 586 A.2d 512 (1991), [*45] the Court held that an attempt by a township

and its associated water authority to "take over" an area to which the plaintiff had long provided water services constituted an act of competition prohibited by the Act. Id., 586 A.2d at 516. While Lower Bucks found a violation of the Act had occurred, we believe the case is distinct from the instant one. In Lower Bucks, The Commonwealth Court agreed with the trial court's reasoning that the defendants' furnishing of water in the contested area "constituted 'existing enterprises' which competed with those of [plaintiff]." Id. By contrast here, the Airport Authority could not and did not violate the Act because Plaintiff was no longer an existing FBO at the airport at the time of the alleged competition. Plaintiff's allegation of the Authority's "misuse" refers to the Authority's selection of DynAir Fueling as an interim provider of FBO services at the airport on February 2, 1990. See Exhibit 2, Brief in Support of Defendants' Motion for Partial Summary Judgment, filed January 22, 1996. By this time, however, Plaintiff and Mr. Holtz had already signed an agreement to sell Plaintiff's assets including hangar and leasehold [*46] rights at the Airport to Jaindl Aviation. According to deposition testimony cited by Defendants, the Authority did enter into an agreement with DynAir to act as an FBO. At the time that agreement was signed, however, Plaintiff had already agreed to sell its assets and was effectively out of business. Further, DynAir did not commence operations until March 1, 1990 -- after Plaintiff closed its sales of assets to Jaindl on February 16, 1990. See Exhibit Y, Brief in Support of Defendants' Motion for Partial Summary Judgment, filed January 22, 1996.

Plaintiff's claim of unlawful misappropriation must also be discounted. There is no evidence of any such misappropriation by the Authority of any property belonging to Plaintiff. The only property the Authority "appropriated" was effectuated by way of Jaindl's assignment to the Authority of its right to purchase Plaintiff's hangar facilities. Furthermore, that assignment was expressly agreed to by Mr. Holtz and Plaintiff. See Exhibit V, Brief in Support of Defendants' Motion for Partial Summary Judgment, filed January 22, 1996.

Despite their frequent assertion that factual disputes exist rendering summary judgment inappropriate on [*47] this count, Plaintiff has made no citations to the record to support its claim. In the record before us on this count, we conclude there is no "genuine issue as to any material fact." Fed. R. Civ. P. 56(c). Partial summary judgment is accordingly GRANTED with respect to count five. n10

- - - - - - - - - - - - - - - - - -Footnotes- - - - - - - - - - - - - - - - - - -

n10 We note in passing that even if Plaintiff could establish a cause of action for unlawful misappropriation (which we have concluded it cannot) Plaintiff would most probably not be entitled to punitive damages against the Authority. 42 Pa. C.S.A. § 8553(c) precludes the award of punitive damages in actions against municipal authorities.

- - - - - - - - - - - - - - - - - -End Footnotes- - - - - - - - - - - - - - - - - -

## I. *Count Six: Defamation*

Plaintiff's count six alleges that Defendants maliciously and falsely published and disseminated false and disparaging statements regarding Plaintiff. At issue are: (1) statements made to Plaintiff's bank that Plaintiff was in default of its lease and that doubts existed as to whether Plaintiff could meet its financial obligations; and (2) communications [*48] made to tenants of A.B.E. Airport that the Airport lacked "an adequate and reliable fixed-base operator." Second Amended Complaint, filed June 21, 1991, P73.

In a claim of defamation, the Court must first make a threshold determination as to whether the statement is capable of defamatory meaning. "The test is the effect the [statement] is fairly calculated to produce, the impression it would naturally engender, in the minds of the average persons among whom it is intended to circulate." U.S. Healthcare v. Blue Cross of Gr. Philadelphia, 898 F.2d 914, 923 (3d Cir. 1990). A critical factor to be considered by the Court in making that determination is the nature of the statement's audience. Id. The

Get a Document - by Citation - 2000 U.S. Dist. LEXIS 11177

Case 1:00-cv-00860-YK-JAS    Document 10-2    Filed 05/30/2000    Page 70 of 75    Page 17 of 21

relevant audiences in this case were the bank officers and the airport tenants who received Defendants' letters. We are confident that both groups were sufficiently sophisticated to understand the plain meaning of Defendants' letters. Nothing in the record has led us to believe otherwise. While we have not concluded that these letters were defamatory in nature, it is reasonably possible that either the bank or the airport tenants could interpret them as attacks on the viability of [*49] Plaintiff's business.

Defendants argue that their statements were good faith opinions based upon two disclosed non-defamatory facts -- (1) that Northeast Jet Company had lost its Part 135 charter license; and (2) that Plaintiff temporarily voluntarily surrendered its Part 145 repair station license. A quick review of the lease in question reveals that it did not require Plaintiff to maintain a Part 135 Certificate. Indeed Plaintiff never did have such a certificate, and never directly provided charter service even prior to the revocation. Similarly, the Airport lease never mentioned a Part 145 repair station certificate. Nor did the Airport's minimum standards for FBO's-- upon which Defendants apparently seek to rely -- require that Plaintiff have a Part 145 repair station certificate.

Plaintiff argues that Defendants' lack of good faith can be seen in the fact that Defendants did not immediately lift the default upon learning that Plaintiff had obtained a Part 145 Certificate. Instead, they waited an additional three months, during which time Plaintiff lost its anchor tenant for the expansion project. Plaintiff's Opposition to Summary Judgment, filed February 8, 1996, at 35-36. [*50] While we need not conclude at this point that Defendants' statements were indeed defamatory, we do believe that they are reasonably capable of such an interpretation.

Once the threshold test has been met, the plaintiff has the burden of showing a prima facie case for defamation under Pennsylvania law. The elements of such a claim are:

> (1) The defamatory character of the communication.
> (2) Its publication by the defendant.
> (3) Its application to the plaintiff.
> (4) The understanding by the recipient of its defamatory meaning.
> (5) The understanding by the recipient of it as intended to be applied to the plaintiff.
> (6) Special harm resulting to the plaintiff from its publication. [and]
> (7) Abuse of a conditionally privileged occasion.

42 Pa. C.S.A. § 8343(a) (1982). Even if a conditional privilege were to apply, a genuine issue might still exist as to whether the Defendants have abused the privilege. Abuse of the privilege is shown where a defendant's defamatory communication is motivated by malice, consisting of a wrongful act, done intentionally without just cause or excuse, or generated from reckless or wanton disregard of another's rights. See Elia v. Erie [*51] Ins. Exchange, 430 Pa. Super. 384, 634 A.2d 657 (1993), 634 A.2d 657, appeal den., 644 A.2d 1200.

When the plaintiff has established these elements, the defendant then has the burden of proving:

> (1) The truth of the defamatory communication.
> (2) The privileged character of the occasion on which it was published. [or]
> (3) The character of the subject matter of defamatory comment as of public concern.

42 Pa. C.S.A. § 8343(b) (1982). See also <u>U.S. Healthcare, supra, at 923.</u>

Defendant Yohe, the Airport Director, sent a letter to all tenants and potential customers at A.B.E. Airport on October 27, 1989. See Exhibit E to Defendants' Motion for Partial Summary Judgment on Count Six, filed January 22, 1996. That letter states, "A.B.E.'s lack of an adequate and reliable fixed-based operator has caused us considerable anxiety during my tenure here." Defendants argue that because the letter does not explicitly identify Plaintiff as an inadequate or unreliable FBO, that the statement cannot reasonably be interpreted as defamatory to Plaintiff. We do not agree.

A communication is capable of defamatory meaning by innuendo even though the words used are not themselves  [*52] defamatory. <u>Livingston v. Murray, 417</u> Pa. <u>Super.</u> 202, 612 A.2d <u>443,</u> appeal den., <u>533 Pa. 601, 617 A.2d 1275 (1992).</u> To establish defamation by innuendo, the "innuendo must be warranted, justified and supported by the publication." Id., citing Thomas Burton Center v. Rockwell International Corp., 497 Pa. 460, 467, 442 A.2d 213, 217 (1981), cert. den., 457 U.S. 1134, 102 S. Ct. 2961, 73 L. Ed. 2d 1351 (1982)). Moreover, innuendo cannot be used to introduce new matter, or to enlarge the natural meaning of words. Id. However, in the present case, the context and circumstances of Defendants' letter are clearly capable of defamatory meaning as to Plaintiff. Since there were only two FBO's at A.B.E. Airport, Defendants' reference to the absence of an adequate and reliable FBO could very reasonably be interpreted as a critique of Plaintiff's adequacy and reliability.

Section 564 of the Restatement (Second) of Torts, comment b, states:

> It is not necessary that the plaintiff be designated by name; it is enough that there is such a description of or reference to him that those who hear or read reasonably understand the plaintiff to be the person intended. Extrinsic  [*53] facts may make it clear that a statement refers to a particular individual although the language used appears to defame nobody.

Where words are reasonably susceptible to defamatory meaning as well as to an innocent one, the plaintiff may by innuendo ascribe defamatory meaning to the statement. See <u>Stompler v. Richman, 125 Pa. Super.</u> 385, 189 A. 730 (1937). See also <u>Saenz v. Playboy Enterprises, Inc.,</u> 653 F. Supp. 552, 559 (N.E.Ill. 1987) ("a statement could be shown to be 'of and concerning' [a plaintiff] through inference as well as direct reference."). Applying this analysis to the circumstances of this case, it is clear at this stage that an inference of defamation to Plaintiff could reasonably be made by a jury.

Defendants claim protection under the Political Subdivision Tort Claims Act, 42 Pa. C.S.A. § 8541 et seq. (1982), on the grounds that nothing in the record establishes that Defendants acted with knowledge of falsity or reckless disregard for the truth. As discussed above, however, there is evidence in the record to support the conclusion that Defendants acted maliciously with knowledge that their statements were false, and with the intent of injuring  [*54] Plaintiff. Under these circumstances, Defendants are not entitled to automatic immunity under the statute.

Courts have been reluctant to grant summary judgment in defamation cases where there remained outstanding issues of fact as to whether defendants acted with malice in defaming plaintiff. See, e.g., <u>Savitsky v. Shenandoah Valley Pub. Corp., 566 A.2d 901, 904, 389 Pa.</u> Super. 176 (1989) (genuine issue of material fact existed, precluding summary judgment for editor and newspaper, on whether they exhibited recklessness necessary to constitute actual malice in publishing report that incumbent union official was transported to polling places by coal company helicopter); <u>Chicarella v. Passant, 343 Pa. Super. 330, 494 A.2d 1109, 1115 (1985)</u> (allegations by plaintiff that credit manager of hospital had made defamatory

statements to employees of investigator hired by insurance company raised genuine issue of material fact as to whether credit manager actually made such statements, in light of manager's specific denial, precluding summary judgment); Braig v. Field Communications, 310 Pa. Super. 569, 456 A.2d 1366, 1376 (Pa. Super. 1983) (in judge's defamation actions against [*55] assistant district attorney and television station owner, there were fact questions, precluding summary judgment, as to existence of actual malice as to defendant and his "state of mind" in deciding to rebroadcast program over judge's objection); and Brophy v. Philadelphia Newspapers Inc., 281 Pa. Super. 588 422 A.2d 625, 632 (1980) (trial court confronted with motion for summary judgment in public official or figure defamation case must deny motion if, viewing evidence and all inferences arising therefrom in light most favorable to plaintiff, there appears genuine issue of fact from which jury could reasonably find actual malice with convincing clarity).

We conclude that a jury could reasonably find that statements made by Defendants were defamatory in nature. Partial summary judgment is accordingly DENIED at this time with respect to count six.

### J. Count Seven: Breach of Contractual Duty of Good Faith Dealing

Count seven alleges that Defendants breached a duty of good faith and fair dealing to Plaintiff. Defendants aver that no such duty existed because: (1) no confidential relationship existed between Plaintiff and Defendants; and (2) an established cause of [*56] action already exists upon which Plaintiff could recover for the alleged wrongdoing.

The Third Circuit has recognized that under Pennsylvania law,

> In the absence of a dispute about the parties' reasonable expectations under a particular term of the contract, an independent duty of good faith has been recognized only in limited situations. After all, if contracting parties cannot profitably use their contractual powers without fear that a jury will second-guess them under a vague standard of good faith, the law will impair the predictability that an orderly commerce requires.

Duquesne Light Co. v. Westinghouse Elec. Corp., 66 F.3d 604, 618 (3d Cir. 1995) (citations omitted). Pennsylvania courts in this District have recognized a duty of good faith performance of contracts only in special limited situations such as a confidential or fiduciary relationship.

> Chrysler Credit Corp. v. B.J.M., Jr., Inc., 834 F. Supp. 813 (E.D.Pa. 1993).
> A confidential or fiduciary relationship exists when "one person has reposed a special confidence in another to the extent that the parties do not deal with each other on equal terms, either because of an over-mastering dominance [*57] on one side, or weakness, dependence or justifiable trust, on the other. A business association may be the basis of a confidential relationship only if one party surrenders substantial control over some portion of the affairs to the other.

Id., 834 F. Supp. 841 (citations omitted). Plaintiff has not shown it enjoyed such a confidential, fiduciary relationship with Union Pacific. There is no evidence before us that Union Pacific exercised an unequal dominance over Plaintiff nor that Plaintiff had surrendered substantial control over its affairs to Union Pacific. As the Third Circuit has concluded,

> In this context -- where two sophisticated business entities have engaged in an

Get a Document - by Citation - 1998 U.S. Dist. LEXIS 11177    Page 20 of 21

Case 1:00-cv-00660-YK-JAS   Document 18-2   Filed 05/30/2000   Page 73 of 75

arms-length transaction -- we do not believe that Pennsylvania courts would impose an independent duty of good faith not tied to a contractual term.

Duquesne Light Co. v. Westinghouse Elec. Corp., 66 F.3d 604, 618 (3d Cir. 1995) (citations omitted). n11

- - - - - - - - - - - - - - - - - -Footnotes- - - - - - - - - - - - - - - - - - -

n11 Plaintiff has cited several decisions of the Pennsylvania Superior Court in support of its assertion that a good faith duty exists for all contracts in Pennsylvania. See Somers v. Somers, 418 Pa. Super. 131, 613 A.2d 1211, 1213 (Pa. Super. 1992) and Liazis v. Kasta, Inc., 613 A.2d 450, 454 (Pa. Super. 1992). We recognize there is some basis for this position. See also Garvey v. National Grange Mutual Ins. Co., 1995 WL 461228, (E.D.Pa), citing Bethlehem Steel Corp v. Litton Indus. Inc., 507 Pa. 88, 488 A.2d 581, 600 (1985) (opinion in support of reversal) and Restatement (Second) of Contracts § 205, (every contract in Pennsylvania also imposes on each party the duty of good faith and fair dealing); Atlantic Richfield Co. v. Razumic, 480 Pa. 366, 390 A.2d 736, 742 n.7a (Pa. 1978) (recognizing Restatement (Second) of Contracts § 231 which imposes standard of good faith on contracting parties). Nonetheless, we follow the Third Circuit's interpretation which we note was based in part on Somers v. Somers, supra, amongst others. Duquesne Light, 66 F.3d 604.

- - - - - - - - - - - - - - - -End Footnotes- - - - - - - - - - - - - - - -  [*58]

Defendants' Motion for partial summary' judgment, filed January 22, 1996 is accordingly GRANTED with respect to count seven of Plaintiff's second amended complaint.

## IV. CONCLUSION

Consistent with the preceding discussion, partial summary judgment for Defendants will be granted at this time with respect to all counts except count 1 (alleging constitutional violations); that part of count 3 alleging intentional interference with a prospective contractual relationship; and count 6 (defamation). Although we will include the entry of judgment in our order, this judgment will not be final or appealable under Fed.R.Civ.P. 54(b).

An appropriate order follows.

AND NOW, this 1st day of August 1996, upon consideration of Defendants' Motions for Summary Judgment, filed on January 22, 1996 and February 8, 1996, it is hereby ORDERED, consistent with the foregoing memorandum, that said motions are GRANTED in part and DENIED in part as follows:

1. Said motions are DENIED with respect to count one alleging constitutional violations. However, the parties are directed to further brief the issues pertaining to this count;

2. Said motions are DENIED with respect to that part of  [*59]  count three alleging intentional interference with a prospective contractual relationship;

3. Said motions are DENIED with respect to count six alleging defamation; and

4. Said motions are GRANTED in all other respects and judgment is entered in favor of Defendants and against Plaintiff on all claims except those enumerated above. This is not a final judgment.

Get a Document by Citation - 1996 U.S. Dist. LEXIS 11177    Page 74 of 75

Case 2:00-cv-00684-DWK-JK    Document 108-2    Filed 05/30/2000    Page 21 of 21

BY THE COURT

Franklin S. Van Antwerpen

United States District Judge


Service: **LEXSEE®**
Citation: **1996 U.S. Dist. LEXIS 11177**
View: Full
Date/Time: Friday, May 26, 2000 - 9:00 AM EDT


About LEXIS-NEXIS | Terms and Conditions


Copyright © 2000 LEXIS-NEXIS Group. All rights reserved.

## **CERTIFICATE OF SERVICE**

I hereby certify that May 30, 2000, a true and correct copy of the foregoing Brief in Support of Motion to Dismiss was served by means of United States mail, first class, postage prepaid, upon the following:

        Thomas B. Schmidt, III, Esquire
        Pepper Hamilton LLP
        200 One Keystone Plaza
        North Front and Market Streets
        P. O. Box 1181
        Harrisburg, PA 17108-1181