

# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

STAMBAUGH'S AIR SERVICE, INC.,    :

           Plaintiff    :

vs.    :    No. 1:CV-00-0660

SUSQUEHANNA AREA REGIONAL AIRPORT :    (Judge Kane)
AUTHORITY, BAA HARRISBURG, INC.,    :    (Magistrate Smyser)
DAVID FLEET, individually, DAVID    :
HOLDSWORTH, individually, and DAVID C. :
MCINTOSH, individually    :

           Defendants    :

## EXHIBITS TO
## BRIEF OF PLAINTIFF STAMBAUGH'S AIR SERVICE, INC.
## <u>IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS</u>

THOMAS B. SCHMIDT, III (19196)
BRIAN P. DOWNEY (59891)
RANDY L. VARNER (81943)
KELLY ANN RYAN (84096)
Pepper Hamilton LLP
200 One Keystone Plaza
North Front and Market Streets
Post Office Box 1181
Harrisburg, PA 17108-1181
(717) 255-1155
(717) 238-0575 (Fax)
Attorneys for Plaintiff
Stambaugh's Air Service, Inc.

DATE: June 23, 2000

A

Get a Document - by Citation - 1997 U.S. Dist. LEXIS 1025    Page 1 of 7

Case 1:00-cv-00860-YK-JAS    Document 16    Filed 06/23/2000    Page 3 of 75

Service: **LEXSEE®**
Citation: **1997 us dist lexis 1025**

*1997 U.S. Dist. LEXIS 1025, \**

RENTAL GUIDE, INC., et al., v. JEFFREY T. BROWN, ESQ.

CIVIL ACTION 96-3820

UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF PENNSYLVANIA

1997 U.S. Dist. LEXIS 1025

February 5, 1997, Decided
February 5, 1997, FILED, ENTERED

**DISPOSITION:** [\*1] Defendant's Motion to Dismiss Plaintiffs' initial Complaint is DENIED as moot. Defendant's Motion to Dismiss Plaintiffs' Amended Complaint is DENIED insofar as Plaintiffs' Complaint alleges a violation of substantive due process in connection with Defendant's alleged coercive conduct toward three licensed real estate agents who had filed managerial applications on behalf of Rental Guide Incorporated. Defendant's Motion to Dismiss Plaintiffs' Amended Complaint is GRANTED and Plaintiffs' Complaint is DISMISSED insofar as Plaintiffs' Complaint alleges a claim against Defendant in connection with Defendant's filing of an Order to Show Cause and filing of a protest to Rental Guide Incorporated's license application. Defendants' Motion to Dismiss Plaintiffs' Amended Complaint is GRANTED and Plaintiffs' Amended Complaint is DISMISSED insofar as Plaintiffs' Complaint alleges a violation of procedural due process.

**CORE TERMS:** prosecutor, license, absolute immunity, protest, listing, rental, Occupations Act, immunity, withdraw, referral, profession, contacted, et seq, quasi-judicial, initiated, prosecutorial immunity, license application, real estate salesperson, licensed real estate, conducting business, duly licensed, prosecutorial, withdrawing, wrongfully, deprived, coerced, Fourteenth Amendment, qualified immunity, process violation, conduct business

**COUNSEL:** For RENTAL GUIDE, INC., FREDRICK W. ROYER, JOSEPHINE C. DANAS, LON M. WARNER, PLAINTIFFS: GERALD S. BERKOWITZ, SWEDESFORD CORPORATE CENTER, MALVERN, PA USA.

For JEFFREY T. BROWN, ESQUIRE, Commonwealth of Pennsylvania Bureau of Professional and Occupational Affairs, DEFENDANT: [\*2] CLAUDIA M. TESORO, OFFICE OF ATTORNEY GENERAL, PHILA, PA USA.

**JUDGES:** RAYMOND J. BRODERICK, J.

**OPINIONBY:** RAYMOND J. BRODERICK

**OPINION: MEMORANDUM**

**Broderick, J.**

**February 5, 1997**

**This civil action arises from Plaintiff Rental Guide Incorporated's application to the Pennsylvania Real Estate Commission for an initial license to conduct business as a Rental Listing Referring Agent. On April 30, 1996, the Pennsylvania Real Estate Commission (the "Commission") tabled the application filed by Rental Guide**

Incorporated ("RGI"), pending the Commission's resolution of disciplinary charges against RGI which were initiated by Defendant Jeffrey T. Brown, the Prosecuting Attorney for the Commonwealth of Pennsylvania, Bureau of Professional and Occupational Affairs. Plaintiff RGI, as well as Plaintiffs Fredrick Royer, the President of RGI, Josephine Danas, an employee of RGI, and Lon Warner, an employee of RGI (hereinafter collectively "Plaintiffs") have filed this legal action against Jeffrey Brown under 42 U.S.C. § 1983 et seq. Plaintiffs allege that Defendant Brown violated their Fourteenth Amendment rights to due process of law.

In their initial Complaint, Plaintiffs named the Commission [*3] as a defendant, as well as Jeffrey Brown. The Commission and Brown jointly filed a Motion to Dismiss pursuant to Fed.R.Civ.P. 12(b)(6) for failure to state a claim upon which relief could be granted. Before the Court could rule on Defendants' Motion, Plaintiffs filed an Amended Complaint which named Jeffrey T. Brown as the sole Defendant. Defendant Brown subsequently filed a Motion to Dismiss Plaintiffs' Amended Complaint pursuant to Fed.R.Civ.P. 12(b)(6) for failure to state a claim upon which relief could be granted.

In light of Plaintiffs' Amended Complaint, the Court will deny as moot Defendants' Motion to Dismiss Plaintiffs' initial Complaint.

For the reasons stated below, the Court will grant Defendant's Motion to Dismiss Plaintiffs' Amended Complaint in part and deny the Motion in part.

In deciding a Motion to Dismiss pursuant to Fed.R.Civ.P. 12(b)(6), the Court accepts as true all factual allegations contained in the complaint, as well as all reasonable inferences which could be drawn therefrom, and views them in the light most favorable to the plaintiff. H.J. Inc. v. Northwestern Bell Tel. Co., 492 U.S. 229, 249-50, 106 L. Ed. 2d 195, 109 S. Ct. 2893 (1989); Zlotnick v. TIE Communications, 836 F.2d 818, 819 [*4] (3d Cir. 1988).

Plaintiffs' Amended Complaint alleges the following facts:

RGI was incorporated on or about June 8, 1995 for the purpose of conducting business as a "Rental Listing Referring Agent," as defined in 63 P.S. § 455.201.

On or about September 29, 1995, RGI submitted a complete application to the Pennsylvania Real Estate Commission for issuance of an initial license to conduct business as a rental listing referral agent. The Pennsylvania Real Estate Commission, which is created by statute and part of the Pennsylvania Department of State, is authorized to issue licenses to practice in the profession of real estate. 63 P.S. §§ 455.401 et seq.

In conjunction with its application for a license to practice as a rental listing referral agent, RGI submitted a Manager Initial License Application signed by Nancy Carbaugh, a duly licensed real estate salesperson. In October, 1995, Defendant Jeffrey Brown, the Prosecuting Attorney for the Pennsylvania Bureau of Professional and Occupational Affairs, allegedly contacted Nancy Carbaugh and "coerced" her into withdrawing her Application on behalf of RGI.

In December, 1995, Lori J. James, a duly licensed real estate [*5] salesperson, submitted a Manager Initial License Application on behalf of RGI. Defendant Brown allegedly contacted Lori James and "coerced" her into withdrawing her Application on behalf of RGI.

In January, 1996, Lon Warner, a duly licensed real estate salesperson, and one of the plaintiffs in this case, submitted a Manager Initial License Application on behalf

of RGI. In February, 1996, Defendant Brown allegedly contacted Plaintiff Warner and attempted to coerce him into withdrawing his Application on behalf of RGI. Plaintiff Warner refused to withdraw his Application.

On March 15, 1996, Defendant Brown, acting in his official capacity as Prosecuting Attorney for the Pennsylvania Bureau of Professional and Occupational Affairs, filed an Order to Show Cause before the Commission. The Order to Show Cause charged that Plaintiffs Royer, Danas and Warner were conducting business as a rental listing referral agent without a license. Practicing as a rental listing referral agent without a license is explicitly prohibited by the Professions and Occupations Act. 63 P.S. § 455.604(a)(21).

On the same day that he filed an Order to Show Cause, Defendant Brown filed a protest to RGI's pending  [*6]  application for a license to practice as a rental listing referral agent. Brown cited the pending disciplinary charges as grounds for his protest.

Plaintiffs' Amended Complaint alleges that Defendant Brown filed the charges against Plaintiffs and filed the protest against RGI's license in retaliation for Plaintiff Lon Warner's refusal to withdraw his Managerial Application on behalf of RGI.

On April 15, 1996, Plaintiffs responded to the Order to Show Cause, and contested the charge of practicing without a license. On April 30, 1996, the Commission tabled RGI's license application, pending the outcome of the Commission's disciplinary hearing.

Plaintiffs' Amended Complaint alleges that Defendant Brown violated their Fourteenth Amendment rights to procedural and substantive due process of law.

**Procedural Due Process**

Assuming that Plaintiffs were deprived of a protected property interest in their license, Plaintiffs have failed to establish that the state procedure for challenging the deprivation of their license does not satisfy the requirements of procedural due process.

The Third Circuit has stated that in order "to establish a cause of action for a violation of procedural  [*7]  due process, a plaintiff, in addition to proving that a person acting under color of state law deprived it of a protected property interest, must establish that the state procedure for challenging the deprivation does not satisfy the requirements of procedural due process." <u>Midnight Sessions v. City of Philadelphia, et al., 945 F.2d 667, 680 (3d Cir. 1991).</u>

As the Supreme Court has defined it, procedural due process "requires that a state or state agency provide a person with an opportunity for some kind of notice and hearing before that person is deprived of a protected property or liberty interest." <u>Board of Regents v. Roth, 408 U.S. 564, 570, 33 L. Ed. 2d 548, 92 S. Ct. 2701 (1972).</u>

The Pennsylvania Professions and Occupations Act provides Plaintiffs with adequate procedural due process. The Professions and Occupations Act provides that the Commission may refuse a license "for cause" if an applicant is found guilty of performing certain prohibited acts, such as conducting business without a license. 63 P.S. § 455.604(a).

Plaintiffs admit in their Amended Complaint that they have received notice of the charges against them, and they admit that they were given an opportunity to show

Get a Document - by Citation - 1997 U.S. Dist. LEXIS 1025    Page 6 of 75

Case 1:00-cv-00860-YK-DB    Document 16    Filed 06/23/2000    Page 4 of 7

cause why the Commission  [*8]  should not reject their license application. According to Plaintiffs' Amended Complaint, the Commission has not yet ruled on the issue.

The Professions and Occupations Act, 63 P.S. § 455.701, provides that the proceedings before the Real Estate Commission are governed by the Pennsylvania Administrative Agency Act, 2 Pa. C.S. § 501 et seq. The Administrative Agency Act provides that "no adjudication of a Commonwealth Agency shall be valid as to any party unless he shall have been afforded reasonable notice of a hearing and an opportunity to be heard." 2 Pa. C.S. § 504. Moreover, the Administrative Agency Act provides that any adjudications of a Commonwealth agency are subject to judicial review by the Commonwealth court. 2 Pa. C.S. § 702.

In light of the process provided by the Pennsylvania Professions and Occupations Act, Plaintiffs can not establish a violation of procedural due process.

Moreover, even if Plaintiffs could establish a deficient state procedure, Plaintiffs could not establish Defendant Brown's liability for this deficiency. The Third Circuit has stated that an individual state official can be held liable for a violation of procedural due process only if  [*9]  that official is shown to be responsible for establishing or maintaining a state process that does not comport with due process. Sample v. Diecks, 885 F.2d 1099, 1116 (3d Cir. 1989).

Defendant Brown is the Prosecuting Attorney for the Pennsylvania Bureau of Professional and Occupational Affairs. Plaintiffs have not alleged any facts that would tend to show that Brown has any responsibility for establishing or maintaining the procedures in the Pennsylvania Real Estate Commission.

Accordingly, the Court will grant Defendant's Motion in part by dismissing Plaintiffs' Amended Complaint insofar as it alleges a violation of procedural due process.

Substantive Due Process

The Third Circuit has recognized that "notwithstanding a constitutionally procedurally adequate scheme, a plaintiff may maintain a claim of substantive due process violation upon allegations that the government deliberately and arbitrarily abused its power." Midnight Sessions, 945 F.2d at 683. According to the Third Circuit, "allegations that the government's actions in a particular case were motivated by bias, bad faith or improper motive, such as partisan political reasons or personal reasons unrelated  [*10]  to the merits of the plaintiffs' application, may support a finding of substantive due process violation." Id.

Plaintiffs' Amended Complaint adequately states a cause of action under substantive due process. Plaintiffs' Amended Complaint alleges that Defendant Brown, a state actor, deliberately and arbitrarily abused his power to prevent Plaintiffs from obtaining open access to the Pennsylvania Real Estate Commission.

Prosecutorial Immunity

Defendant Brown contends that he is entitled to absolute immunity for all of his alleged actions because he was acting in his role as a prosecutor.

In deciding a Rule 12(b)(6) Motion based on official immunity, the Court is "concerned neither with the accuracy of the facts alleged nor the adequacy of" a plaintiff's claims. Kulwicki v. Dawson, 969 F.2d 1454, 1462 (3d Cir. 1992). The Court's "only duty is to construe the facts in the manner most favorable to... [the plaintiff] in order to determine whether the official behavior he describes falls

Get a Document - by Citation - 1997 U.S. Dist. LEXIS 1025    Page 5 of 7

Case 1:00-cv-00888-YK-JAS   Document 16   Filed 06/23/2000   Page 7 of 75

outside the cloak of official immunity." Id.

In Kulwicki v. Dawson, the Third Circuit addressed the issue of prosecutorial immunity:

> Prosecutors are subject to varying  [*11]  levels of official immunity. Absolute immunity attaches to all actions performed in a "quasi-judicial" role... By contrast, a prosecutor acting in an investigative or administrative capacity is protected only by qualified immunity... In addition, there may be instances where a prosecutor's behavior falls completely outside the prosecutorial role...[and] no absolute immunity is available. 969 F.2d at 1463.

In Kulwicki, the plaintiff had filed a complaint against a prosecutor alleging, among other things, that the prosecutor had wrongfully initiated charges against him and had wrongfully contacted and interrogated some of the plaintiff's clients. The Third Circuit examined the facts alleged in plaintiff's complaint, and employed a "functional" analysis to determine which of the prosecutor's alleged actions were subject to absolute immunity.

The Third Circuit found that the defendant prosecutor was absolutely immune from liability in connection with his decision to initiate prosecution against the plaintiff. The Third Circuit noted that the prosecutor's decision to file charges is "at the core of a prosecutor's judicial role," and shall always be subject to absolute immunity.  [*12]  Id. at 1463.

However, the Third Circuit found that some of the defendant prosecutor's actions could not be properly characterized as quasi-judicial, and were therefore not covered by absolute immunity. These actions included the defendant prosecutor's interview of the plaintiff's clients two weeks before he filed charges against the plaintiff. The Third Circuit held that, from the facts alleged in the Complaint, these alleged actions were investigative, and therefore subject to the "objective reasonableness" standard of qualified immunity.

In the instant case, Plaintiffs' Amended Complaint alleges that Brown "coerced" certain licensed real estate agents to withdraw their applications on behalf of RGI, and that Brown filed charges against the Plaintiffs and lodged a protest against RGI in the Commission in retaliation for Plaintiff Warner's refusal to withdraw his application.

Defendant Brown is entitled to absolute immunity with respect to Plaintiffs' allegations that he wrongfully initiated charges against them and filed a protest in the Commission against RGI. In undertaking these actions, Brown was performing actions which lay at the core of the prosecutor's quasi-judicial  [*13]  role.

Assuming for the purposes of this Motion that Brown had filed the charges against Plaintiffs and lodged the protest against RGI because of a wrongful retaliatory motive, Brown would still be entitled to absolute immunity. As the Third Circuit has noted, "consideration of personal motives is directly at odds with the Supreme Court's simple functional analysis of prosecutorial immunity." Id. at 1464.

However, Defendant Brown is not entitled to absolute immunity with respect to his alleged "coercion" of the two licensed real estate agents who withdrew their applications, and his attempt to "coerce" Plaintiff Warner to withdraw his application. According to the facts alleged in Plaintiffs' Amended Complaint,

Defendant Brown undertook these coercive actions several months before he began any prosecutorial action against the Plaintiffs. Based solely upon the facts alleged in Plaintiffs' Amended Complaint, Defendant Brown's actions can not be characterized as purely prosecutorial activities which are entitled to absolute immunity.

Accordingly, the Court will deny Defendant's Motion to Dismiss Plaintiffs' Complaint insofar as Plaintiffs' Complaint alleges that Defendant Brown's [*14] coercive contacts with certain real estate agents violated Plaintiffs' rights of substantive due process. Of course, the Court shall issue its Order without prejudice to Defendant Brown moving for summary judgment on the basis of official immunity after more facts have come to light.

An appropriate Order follows.
ORDER

AND NOW, this 5th day of February, 1997; Plaintiffs having filed an initial Complaint against Jeffrey Brown and against the Pennsylvania Real Estate Commission; Defendants having filed a Motion to Dismiss Plaintiffs' Complaint pursuant to Fed.R.Civ.P. 12(b)(6); Plaintiff's having filed a Response and having filed an Amended Complaint which names Jeffrey T. Brown as the sole Defendant; Defendant having filed a Motion to Dismiss Plaintiffs' Amended Complaint pursuant to Fed.R.Civ.P. 12(b)(6); and Plaintiffs having filed a Response; for the reasons stated in this Court's accompanying Memorandum;

IT IS ORDERED: Defendants' Motion to Dismiss Plaintiffs' initial Complaint is DENIED as moot;

IT IS FURTHER ORDERED: Defendant's Motion to Dismiss Plaintiffs' Amended Complaint is DENIED insofar as Plaintiffs' Complaint alleges a violation [*15] of substantive due process in connection with Defendant's alleged coercive conduct toward three licensed real estate agents who had filed managerial applications on behalf of Rental Guide Incorporated;

IT IS FURTHER ORDERED: Defendant's Motion to Dismiss Plaintiffs Amended Complaint is GRANTED and Plaintiffs' Complaint is DISMISSED insofar as Plaintiffs' Complaint alleges a claim against Defendant in connection with Defendant's filing of an Order to Show Cause and filing of a protest to Rental Guide Incorporated's license application; and

IT IS FURTHER ORDERED: Defendants' Motion to Dismiss Plaintiffs' Amended Complaint is GRANTED and Plaintiffs' Amended Complaint is DISMISSED insofar as Plaintiffs' Complaint alleges a violation of procedural due process.

    RAYMOND J. BRODERICK, J.

Service: LEXSEE®
Citation: 1997 us dist lexis 1025
View: Full
Date/Time: Thursday, June 22, 2000 - 1:35 PM EDT

About LEXIS-NEXIS | Terms and Conditions

Copyright © 2000 LEXIS-NEXIS Group. All rights reserved.

Get a Document - by Citation - 1997 U.S. Dist. LEXIS 1025    Page 7 of 7

Case 1:00-cv-00860-YK-JAS   Document 16   Filed 06/23/2000   Page 9 of 75





Get a Document - by Citation - 1992 U.S. Dist. LEXIS 9042    Page 1 of 6

Case 2:00-cv-00860-YBS   Document 16-9042   Filed 06/23/2000   Page 11 of 75

Service: **LEXSEE®**
Citation: **1992 US DIST LEXIS 9042**

*1992 U.S. Dist. LEXIS 9042, ***

QUEEN CITY AVIATION, INC., Plaintiff v. CITY OF ALLENTOWN, et al., Defendant

CIVIL ACTION No. 91-7776

UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF PENNSYLVANIA

1992 U.S. Dist. LEXIS 9042

June 5, 1992, Decided
June 8, 1992, Filed

**CORE TERMS:** airport, lease, antitrust claim, civil rights, motion to dismiss, bid, bidding, equal protection, discriminatory, conspiracy, dealer, competitor, Sherman Act, disappointment, manufacturer, distributor, negotiations, animus, bidding process, antitrust, Local Government Antitrust Act, failed to state, protected class, state action, new lease, et seq, geographic, monopolize, exhibited, conspired

**COUNSEL:** [*1] For the Plaintiff: GARY C. BENDER, CRAMP, D'IORIO, MC CONCHIE & FORBES, P.C., 215 N. OLIVE STREET, P.O. BOX 568, MEDIA, PA 19063, USA.

For the Defendants: CHARLES J. FONZONE, FONZONE & ASHLEY, 33 SOUTH SEVENTH STREET, P.O. BOX 4180, ALLENTOWN, PA 18105-4180, USA.

**JUDGES:** TROUTMAN

**OPINIONBY:** E. MAC TROUTMAN

**OPINION: MEMORANDUM**

Plaintiff, the former Fixed Based Operator ("FBO") at the Queen City Municipal Airport ("airport"), Allentown, Pennsylvania, filed a three count complaint against the City of Allentown and various city officials alleging that defendants violated its civil rights and certain of the antitrust laws. These claims arise out of the invitation to bid procedures used by the defendants and, ultimately, their award of the exclusive rights to service and operate the airport to another FBO. Defendants have filed a motion to dismiss. Since we agree with defendants that the complaint should be dismissed pursuant to Fed.R.Civ.P. 12(b)(6), but for reasons that differ somewhat from those articulated by defendants, we will grant the motion to dismiss.

I. BACKGROUND.

The facts, as alleged in plaintiff's complaint are as follows. The City of Allentown is a municipal corporation subject [*2] to the laws of Pennsylvania and the individual defendants are employees or elected officials of the City of Allentown. The City of Allentown obtained control of the Queen City Airport by a quitclaim deed granted by the United States in 1948.

Plaintiff was the FBO at the airport from 1981 under the terms of a ten year lease granted by the City of Allentown. The lease expired in May 1991 and continued on a month to month basis thereafter until the City of Allentown terminated the lease in February 1992. Plaintiff's sole operations were those at the airport and included air charter and taxi service, fuel sales,

Get a Document - by Citation - 1992 U.S. Dist. LEXIS 9042    Page 12 of 75

Case 2:00-cv-00680-JAG   Document 16   Filed 06/23/2000   Page 2 of 6

hanger and tie down leases, office space leasing, aircraft maintenance, sale of supplies, flight school and instruction training, aircraft rental, ground handling and customer services, snow removal, and grounds maintenance.

In June 1991, the defendants made public a proposal package for Request for Proposals to lease the airport to a full service FBO. The bids were to be received by October 10, 1991. Plaintiff and Cole Aviation submitted the only bids to be a full service FBO at the airport. In a letter dated November 27, 1991, plaintiff was informed that, pursuant to  [*3]  the Request for Proposals, the City of Allentown had selected a competitor, Cole Aviation, to be the FBO at the airport. Plaintiff was informed that its lease would be terminated on February 1, 1992, and that Cole Aviation would become the FBO on that date.

In counts I and II, plaintiff asserts claims pursuant to 42 U.S.C. § 1983 and 1985 against all the defendants for violating its civil rights. Plaintiff alleges in count I that the individual defendants were members of a selection committee chosen to represent the City of Allentown, and thus acted under color of state law, when they issued the Request for Proposals and selected Cole Aviation. The bid specifications and procedures, the plaintiff claims, were inconsistent, ambiguous, vague and contrary to law for a variety of reasons. Plaintiff also asserts that the selection of Cole Aviation was arbitrary, capricious, an abuse of discretion, contrary to law, and discriminatory for a variety of reasons. Plaintiff's complaint further alleges that the City of Allentown has exhibited an animus toward the plaintiff and has acted in an unfair and discriminatory manner. Thus, plaintiff concludes, the actions of the defendants amount  [*4]  to a taking of its property without due process or notice in violation of the 5th and 14th Amendments and in violation of the equal protection of law, as well as a conspiracy to deprive plaintiff of its business and property. Count II alleges that the actions of the individual defendants constituted an official policy and decision of the City of Allentown.

Count III assets an antitrust claim against the City of Allentown, and alleges in support thereof and in addition to the above described events, that plaintiff requested on numerous occasions to enter into lease negotiations with the City of Allentown regarding the airport and that the City of Allentown refused to enter into such negotiations. Plaintiff concludes that the refusal to negotiate a new lease with plaintiff and, instead, entering into a lease with Cole Aviation pursuant to the public bidding, is a restraint of trade prohibited by section 1 of the Sherman Act, 15 U.S.C. § 1. Plaintiff also claims that the City of Allentown and Cole Aviation have conspired to monopolize services at the airport in violation of section 2 of the Sherman Act, 15 U.S.C. § 2. Plaintiff, therefore, requests the Court to enjoin Cole Aviation  [*5]  and the City of Allentown from entering into a lease pursuant to the Request for Proposal.

II. STANDARDS FOR A MOTION TO DISMISS PURSUANT TO RULE 12(b)(6).

The Court, when faced with a motion to dismiss pursuant to Fed.R.Civ.P. 12(b)(6) must accept as true all the averments in plaintiff's well pleaded complaint; the court must construe the complaint in a light most favorable to plaintiff; and the court must determine whether, "under any reasonable reading of the pleadings, the plaintiff may be entitled to relief." Colburn v. Upper Darby Township, 838 F.2d 663, 665-666 (3rd Cir. 1988). The pleading requirements that a civil rights complaint must meet to survive a motion to dismiss, however, are heightened: the complaint is sufficient if, e.g., it alleges specific conduct which violates plaintiff's rights, the time and place of the conduct, and identifies the responsible officials. Id. at 666.

III. DISCUSSION.

Like the complaint in Dunn & Mavis, Inc. v. Nu-Car Driveaway, Inc., 691 F.2d 241 (6th Cir. 1982) (an antitrust action, discussed infra), plaintiff's complaint is nothing more that the expression  [*6]  of its disappointment that city officials, after inviting bids, decided to offer its franchise, its grant of an exclusive lease, to someone else. The Civil Rights laws were

Get a Document - by Citation - 1992 U.S. Dist. LEXIS 9042    Page 3 of 6

Case 5:00-cv-03860-YK-AS    Document 16    Filed 06/23/2000    Page 13 of 75

never intended to establish liability under the current circumstances. We find that plaintiff's civil rights claims are nothing more than an attempt to federalize a routine dispute with local officials over municipal planning or procedures, i.e., bidding practices.

Further, and more specifically, plaintiff's section 1985 claim fails to show that it is a member of any protected class. Though paragraph 18 of the complaint states that the City of Allentown has exhibited an animus toward the plaintiff and has acted in an unfair and discriminatory manner, plaintiff has failed to state a claim under section 1985(3), the only subpart of section 1985 within which plaintiff could possibly and reasonably fall, n1 as it has showed no immutable characteristic, membership in a protected class, or any class based discriminatory animus. See, United Brotherhood of Carpenters and Joiners of America, Local 610 v. Scott, 463 U.S. 825, 103 S. Ct. 3352, 77 L.Ed.2d 1049 (1983); [*7] Burt v. Ferrese, 871 F.2d 14 (3rd Cir. 1989).

- - - - - - - - - - - - - - - - - -Footnotes- - - - - - - - - - - - - - - - - -

n1 Once again the court is faced with a complaint brought by a frustrated business entity, represented by counsel, alleging broad and sweeping civil rights violations yet fails to identify with any particularity which subpart of section 1985 was supposedly violated, thus leaving the court to determine which of the three differing parts is to apply.

- - - - - - - - - - - - - - -End Footnotes- - - - - - - - - - - - - - - - - -

Regarding the section 1983 claims, plaintiff needs to show (1) that defendants acted under color of law and (2) that they deprived it of its constitutionally protected rights. Plaintiff's complaint meets the first requirement. As to the second requirement, however, we cannot discern from the complaint what constitutionally protected rights have been violated.

While plaintiff alleges that the defendants violated its constitutional rights to equal protection and due process, n2 which are protectable rights, the allegations of plaintiff's complaint do not rise to a constitutional violation. The only fact [*8] that could possibly, yet remotely, give rise to an equal protection claim is the allegation that "the City of Allentown improperly made contact with Cole Aviation after the bid proposals were submitted;. . . ." (Complaint at P16(f)). Presumably, plaintiff is concluding that this lead to an unfair advantage for Cole Aviation and thus implicated plaintiff's interest in equal protection. There is no support offered for why it was improper in constitutional proportions, or that it in fact could reasonably be construed to implicate constitutional equal protection.

- - - - - - - - - - - - - - - - - -Footnotes- - - - - - - - - - - - - - - - - -

n2 Once again the court is faced with a complaint brought by a frustrated business entity, represented by counsel, alleging broad and sweeping violations of due process without specifying what aspect of its due process rights, procedural or substantive, was violated, thus leaving the court to determine which the plaintiff believes is implicated. In this case, we find that we need not make such a determination. For example, plaintiff has not pleaded that it never received notice of the Request for Proposals, or that it had a vested property interest in a lease beyond the ten year term, or that the bidding procedures violated some local ordinance or Pennsylvania law or that it is foreclosed from pursuing a claim that the bidding procedures violated some local ordinance or Pennsylvania law in the courts or other forums provided by the state and local governments.

- - - - - - - - - - - - - - -End Footnotes- - - - - - - - - - - - - - - - [*9]

In addition, from the complaint, it appears that plaintiff merely had a lease for a certain term, which expired, and thereafter the lease was month to month. We know of no requirement that the City of Allentown, as the landlord of the airport, must even consider entering into a new lease with plaintiff, or that it structure the Request for Proposals in a manner acceptable

Get a Document - by Citation - 1993 U.S. Dist. LEXIS 9042    Page 14 of 75    Page 4 of 6

Case 00-00000    1993 U.S. Dist. LEXIS 9042    Filed 06/23/2000    Page 14 of 75    Page 4 of 6

to or approved by plaintiff. Plaintiff's complaint or its brief in opposition to the motion has not brought any such requirement to our attention. Absent that, there is no constitutional interest violated by the City of Allentown's decision to seek bids from competing companies and to chose one of plaintiff's competitors.

At best, plaintiff has alleged that it does not agree with the procedures employed by the defendants, that the Request for Proposal did not require, it seems, enough information, and that, in plaintiff's estimation, Cole Aviation is not as qualified as it to be the FBO at the airport. Plaintiff's complaint, read in its entirety, simply airs its disappointment that it is no longer the exclusive FBO at the airport. n3

- - - - - - - - - - - - - - - - - -Footnotes- - - - - - - - - - - - - - - - - - -

n3 A reading of plaintiff's complaint gives the impression that it is proper for the City of Allentown to convey it the right to be the exclusive FBO at the airport, but not anyone else; that it is proper to convey these exclusive rights through private, non-competitive negotiations, but not through a public bidding process. Plaintiff's complaint, in short, leaves the impression that it is proper for the City of Allentown to disregard the public interest in competitive bidding and in open and public government, so long as it is treated specially. The fact that the bidding process may not have been perfect, which is plaintiff's basic claim, is not by itself a constitutional violation and is a matter best pursued at the state or local level. See note 6, infra.

- - - - - - - - - - - - - - - - -End Footnotes- - - - - - - - - - - - - - - - - [*10]

Defendants have argued that such a civil rights action against them is barred by the Federal Aviation Act, 49 U.S.C. § 1300 et seq., citing Montauk-Caribbean Airways, Inc. v. Hope, 784 F.2d 91 (2nd Cir. 1986). Because we conclude, as discussed above, that plaintiff has failed to state a civil rights claim against the defendants, we do not need to reach and, so, do not address, the issue regarding whether the claims are barred.

Plaintiff's final count is an antitrust claim. This sort of claim, when made in circumstances similar to those currently before us, was characterized in Dunn & Mavis, Inc. v. Nu-Car Driveaway, Inc., 691 F.2d 241 (6th Cir. 1982): n4

> The complaint states no set of facts which, if true, would constitute an antitrust offense, notwithstanding its conclusory language regarding the elimination of competition and improper purpose. When stripped to its essential allegations, the complaint does no more than state plaintiffs' commercial disappointment at losing Chrysler's patronage - the recurrent case of the jilted customer, dealer or supplier who loses a manufacturer's franchise and accuses the manufacturer and the [*11] new suitor of attempting to monopolize something. See Burdett v. Altec Corp., 515 F.2d 1245, 1249 (5th Cir. 1975). [footnote omitted] An agreement promising a new dealer the old dealer's business is presumptively reasonable, and the old dealer does not have an antitrust claim unless the conduct is incident to an unlawful arrangement or an attempt to monopolize an identifiable market. A contrary rule limiting a buyer's right to displace an old seller in favor of a new one would undermine the principle of competition the antitrust laws are designed to secure.

Id. at 243-244. In the footnote that was omitted from the above quote, the Court in Dunn & Mavis quoted from Burdett v. Altec Corp., 515 F.2d 1245, 1249 (5th Cir. 1975): "Lest any other former distributors succumb to the temptation of treble damages, we reiterate that it is

Get a Document - by Citation - 1992 U.S. Dist. LEXIS 9042    Page 5 of 6

Case 5:00-cv-60860-JAG    U.S. Document 16 9042    Filed 06/23/2000    Page 15 of 75

simply not an antitrust violation for a manufacturer to contract with a new distributor, even if the effect of the new contract is to seriously damage the former distributor's business." We find the thrust of these cases sufficiently analogous and entirely persuasive.

- - - - - - - - - - - - - - - - -Footnotes- - - - - - - - - - - - - - - - - -

n4 In Dunn & Mavis, the plaintiff had been the exclusive provider of auto transport services between Chrysler assembly plants in the Detroit area and railheads and other distribution points. When Chrysler replaced plaintiff with a competitor as the exclusive provider of these services, plaintiff asserted antitrust claims against Chysler and the competitor.

- - - - - - - - - - - - - - - - -End Footnotes- - - - - - - - - - - - - - - -  [*12]

To recover on its antitrust claim, plaintiff would need to prove "(1) that the defendants contracted, combined or conspired among each other; (2) that the combination or conspiracy produced adverse, anti-competitive effects within the relevant product and geographic markets; (3) that the objects of and the conduct pursuant to that contract or conspiracy were illegal; and (4) that the plaintiffs were injured as a proximate result of that conspiracy." Tunis Bros. Co., Inc. v. Ford Motor Co., 763 F.2d 1482, 1489 (3rd Cir. 1985) ("Tunis I") (vacated and remanded for other reasons, 475 U.S. 1105, 106 S. Ct. 1509, 89 L. Ed. 2d 909 (1986), as explained in Tunis Bros. Co., Inc. v. Ford Motor Co., 952 F.2d 715, 720 (3rd Cir. 1991) ("Tunis II")).

We note that plaintiff's complaint does not plead certain details of an antitrust claim, such as, inter alia, the appropriate product and geographic markets, the effects upon interstate commerce, nor does plaintiff inform us whether its claim proceeds on a per se or rule of reason theory. More detrimental to plaintiff's complaint is that, as explained above,  [*13] the circumstances plaintiff alleges simply do not rise to the level of a violation of the Sherman Act §§ 1 and 2.

Finally, defendants argue that the antitrust claim is barred due to the Local Government Antitrust Act, 15 U.S.C. § 34 et seq. As with the defendants' argument that the civil rights claims against them are barred, since we conclude that the plaintiff has failed to allege circumstances sufficient to state an antitrust claim, we do not reach the issue. n5

- - - - - - - - - - - - - - - - -Footnotes- - - - - - - - - - - - - - - - - -

n5 Plaintiff's brief in opposition argues that it is seeking only injunctive relief, not money damages, and therefore, the Local Government Antitrust Act does not bar its claim. On this point, considering the stage of the proceedings and the facts of the complaint, but for our determination otherwise, we would agree.

We note, however, that defendants might have asserted the "state action doctrine" which, it seems, would bar even the injunctive relief plaintiff seeks, Northeast Jet Center v. Lehigh-Northampton Airport Authority, 767 F. Supp. 672 (E.D. Pa. 1991), but for the dearth of infomation in the complaint. The exact authority of the defendants regarding their actions related to the entire bidding process, and from whence that authority stems, e.g., based upon a state statute requiring competitive public bidding, id., cannot be discerned from the complaint. Such information is crucial to determine if the "state action doctrine" would apply. Absent amendment to the complaint, which the defendants have sought in the alternative to their motion to dismiss, we would not be able to determine this issue on a motion to dismiss, which is presumably the reason why defendants did not raise the issue and instead sought a more definite statement.

- - - - - - - - - - - - - - - - -End Footnotes- - - - - - - - - - - - - - - -  [*14]

IV. CONCLUSION.

Based upon the foregoing reasons we conclude that plaintiff's complaint fails to state a claim for which relief can be granted. n6 Hence, an appropriate order follows.

- - - - - - - - - - - - - - - - - -Footnotes- - - - - - - - - - - - - - - - - -

n6 At best, plaintiff's complaint may allege the violation of some state or local law, although it has not specifically alleged. Regardless, "a violation of state law in itself does not constitute a denial of . . . due process. Federal courts do not sit in federal question cases to grant remedies for mere violations of state law. [footnote omitted]" Midnight Sessions, Ltd. v. City of Philadelphia, 945 F.2d 667, 684 (3rd Cir. 1991).

- - - - - - - - - - - - - - - - -End Footnotes- - - - - - - - - - - - - - - - -

## ORDER

And now, this 5th day of June, 1992, upon consideration the Motion of Defendants City of Allentown, Mayor Joseph Daddona, Carl Kercher, Donald Bernhard, Michael Hefele, Al Salinger, Linda Bodnar, William Cramsey, Michael Rosenfeld, Charles Burianek, and Jill Winters Pursuant to Federal Rule of Civil Procedure 12(b)(6) (Doc. #3), the response thereto and the complaint, [*15] IT IS **ORDERED** that the motion is **GRANTED** and the complaint is **DISMISSED** as to all defendants and the case is closed.

E. Mac Troutman, S.J.

Service: **LEXSEE®**
Citation: **1992 US DIST LEXIS 9042**
View: Full
Date/Time: Friday, June 23, 2000 - 8:50 AM EDT

About LEXIS-NEXIS I Terms and Conditions

Copyright © 2000 LEXIS-NEXIS Group. All rights reserved.





Service: **LEXSEE®**
Citation: **1996 us dist lexis 5323**

*1996 U.S. Dist. LEXIS 5323, \**

HOLT CARGO SYSTEMS, INC. et al. v. DELAWARE RIVER PORT AUTHORITY et al.

CIVIL ACTION NO. 94-7778

UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF PENNSYLVANIA

1996 U.S. Dist. LEXIS 5323

April 19, 1996, Decided
April 19, 1996, FILED, ENTERED

**CORE TERMS:** lease, port, terminal, admiralty jurisdiction, navigable waters, entity, marine, conspiracy, stevedoring, unification, process protection, motion to dismiss, vessel, breach of contract, competitor, admiralty, maritime, similarly situated, property interest, barge, restraint of trade, common law, intentionally, container, antitrust, ship, maritime contract, equal protection, conspiracy claim, maritime tort

**COUNSEL:** [*1] For HOLT CARGO SYSTEMS, INC., ASTRO HOLDINGS, INC., HOLT HAULING AND WAREHOUSING SYSTEMS, INC., PLAINTIFFS: PAUL R. ROSEN, [COR LD NTC], SPECTOR, GADON & ROSEN, P.C., PHILA, PA.

For DELAWARE RIVER PORT AUTHORITY, DEFENDANT: HENRY F. SIEDZIKOWSKI, [COR LD NTC], MICHAEL P. WALSH, [COR LD NTC], ELLIOTT, REIHNER, SIEDZIKOWSKI, NORTH & EGAN, P.C., BLUE BELL, PA. For PORTS OF PHILADELPHIA AND CAMDEN, DEFENDANT: RICHARD A. SPRAGUE, [COR LD NTC], GEOFFREY C. JARVIS, [COR LD NTC], SPRAGUE & SPRAGUE, PHILA, PA. For PHILADELPHIA REGIONAL PORT AUTHORITY, DEFENDANT: RICHARD M. ROSENBLEETH, [COR LD NTC], WILLIAM H. ROBERTS, [COR LD NTC], LISA A. ROSENBLATT, [COR LD NTC], BLANK, ROME, COMISKY & MC CAULEY, PHILA, PA.

**JUDGES:** JUDGE NORMA L. SHAPIRO

**OPINIONBY:** NORMA L. SHAPIRO

**OPINION:** MEMORANDUM and ORDER

NORMA L. SHAPIRO, J.

APRIL 19, 1996

TPlaintiffs Holt Cargo Systems, Inc., Astro Holdings, Inc., and Holt Hauling and Warehousing Systems, Inc. filed a multi-count complaint against defendants Delaware River Port Authority ("DRPA"), the Port of Philadelphia and Camden, Inc., ("PPC") and the Philadelphia Regional Port Authority ("PRPA"). All defendants filed motions to dismiss. After [*2] a pretrial conference, the court granted plaintiffs' request to amend the complaint; defendants have now moved to dismiss the amended complaint. Oral argument was held on the motions. Defendants' motions will be denied as to plaintiffs' § 1983 claim (Count VI) and granted as to plaintiffs' admiralty claim (Count VII). Counts I-V (federal antitrust law), VIII (common law restraint of trade), IX (declaratory judgment) and X (breach of contract) will be severed and stayed pending a determination of this court's jurisdiction in view of federal maritime law and the Shipping Act of 1984.

Get a Document - by Citation - 1996 U.S. Dist. LEXIS 5323    Page 19 of 75

Case 1:00-cv-00860-YK-JAS    Document 16-5323    Filed 06/23/2000    Page 2 of 8

## FACTUAL AND PROCEDURAL HISTORY

"Holt" n1 is the "most significant independent private competitor in the market for stevedoring and marine terminal services in the port of Philadelphia." Amended Complaint ("Complaint") at P 16. Holt Cargo Systems, Inc. provides stevedoring, warehousing, and terminal services; Holt Hauling and Warehousing Systems, Inc. holds title to a marine terminal warehouse complex in Gloucester City, New Jersey; and Astro Holdings is the assignee of a lease between Holt Cargo and the PRPA for the Packer Avenue Marine Terminal ("PAMT"). Complaint at PP 10, 11, 14.

- - - - - - - - - - - - - - - - - -Footnotes- - - - - - - - - - - - - - - - - -

n1 Although plaintiffs are separate companies involved in different business sectors, plaintiffs persist in identifying themselves as one, see Complaint at P 15; this is unnecessarily confusing. Plaintiffs have not specified who the defendants are for each count. In their pretrial memorandum or in a response to a motion for summary judgment, plaintiffs will be required to specify the plaintiffs and defendants for each remaining claim in the complaint.

- - - - - - - - - - - - - - - - -End Footnotes- - - - - - - - - - - - - - - - [*3]

Defendants are state-created entities. DRPA was created by the legislatures of Pennsylvania and New Jersey to promote and develop the Delaware River Port District. Complaint at P 19. PRPA was created by the Pennsylvania legislature to promote port development in Southeastern Pennsylvania. Complaint at P 26. PPC was created by DRPA on May 12, 1994 as part of the port unification plan authorized by the legislatures of Pennsylvania and New Jersey. Complaint at PP 40, 43. Non-defendant South Jersey Port Corporation ("SJPC"), an organization created by the legislature of New Jersey, corresponds to PRPA. Complaint at PP 48-49. PPC is to assume the duties of PRPA and SJPC. Complaint at PP 71-72.

Plaintiffs' voluminous amended complaint, consisting of 10 counts, 76 pages, and 255 paragraphs, alleges that the defendants conspired in violation of federal and state antitrust law, civil rights law, and state contract law to harass plaintiffs, appropriate plaintiffs' assets and customers, and drive plaintiffs out of business. Count I alleges an unlawful agreement or conspiracy in restraint of trade in violation of Section I of the Sherman Act. Counts II, III, IV, and V allege unlawful conspiracy [*4] to monopolize, unlawful conspiracy to attempt to monopolize, unlawful attempt to monopolize, and unlawful unilateral monopolization in violation of Section 2 of the Sherman Act. Count VI alleges a violation of 42 U.S.C § 1983. Count VII, invoking the court's admiralty jurisdiction, alleges unlawful acts impacting navigable waters. Count VIII alleges a violation of common law restraint of trade. Count IX seeks relief under the Declaratory Judgment Act. Count X is a common law breach of contract claim.

Plaintiffs allege that recent legislation has increased the statutory power of DRPA to unify the ports of the Delaware River Port District and that PPC, a subsidiary of DRPA, is assuming the duties of PRPA and SJPC as part of the port unification plan. See Complaint at PP 71-72. DRPA, PRPA, SJPC and PPC have "conferred and agreed on the creation, operating procedures, and marketing and competitive strategies of the PPC." Complaint at P 55.

Defendants are profit-making entities, and are plaintiffs' competitors in the market for stevedoring and marine terminal services. Complaint at P 58. Before the unification process, defendant PRPA and SJPC were competitors. See Complaint [*5] at P 97. Plaintiffs allege that defendants are attempting to monopolize the market under the guise of port unification. Complaint at P 24. The market for stevedoring and marine terminal services consists of defendants, SJPC, Holt, and other small operators; n2 defendants and Holt have been intense competitors. Defendants are both customer of Holt and suppliers of Holt. Complaint at PP 17-18.

- - - - - - - - - - - - - - - - -Footnotes- - - - - - - - - - - - - - - - - -

n2 The other companies must be very small as plaintiffs allege that defendants control 80-85% of the market and Holt possesses 15-20% of the market. See Complaint at P 82.

- - - - - - - - - - - - - - - -End Footnotes- - - - - - - - - - - - - - - - -

Holt has invested heavily in terminal and port infrastructure, Complaint at P 86, because a Holt entity had secured a long term lease on the PAMT and believed defendants had a general policy of encouraging competition in marketing stevedoring and marine terminal services. Complaint at P 85. Defendants have abandoned support for competition in favor of market control to achieve port unification: defendants have undertaken a deliberate course of anticompetitive [*6] activity intended to drive Holt entities out of business, obtain their assets, and prevent them from developing or maintaining competitive facilities on the Delaware. Complaint at P 90.

Plaintiffs allege six specific predatory acts on the part of defendants as the basis of their claims: (1) defendants agreed to support plaintiffs' applications for environmental permits to develop property plaintiffs purchased from PRPA and then intentionally withheld approval, Complaint at PP 100-18; (2) defendants are preventing them from occupying and developing Pier 96 (the "Pasha property") in violation of the PAMT lease, Complaint PP 119-23; (3) defendants propose dredging between Pier 96 South and Pier 98 that will cause the collapse of Pier 98 and prevent Holt from using it, Complaint at PP 124-32; (4) defendants threatened to evict Holt from the PAMT in violation of the lease because Holt agreed to lease container cranes to its tenant at the Gloucester Marine Terminal, Complaint at PP 133-145; (5) defendants engaged in a campaign of false and deceptive advertising by publishing a brochure failing to acknowledge Holt's operation of the PAMT, Complaint at PP 146-58; (6) defendants refused to [*7] grant a lease to a Holt affiliate, a per se illegal boycott, Complaint at PP 159-61. Plaintiffs contend that these predatory acts were undertaken in an effort to harass plaintiffs, injure plaintiffs' business, and appropriate plaintiffs' business and property. Complaint at P 192.

## DISCUSSION

In considering a motion to dismiss, the court must accept as true all factual allegations in the complaint and all reasonable inferences drawn therefrom and view them in the light most favorable to the non-moving party. Rocks v. City of Philadelphia, 868 F.2d 644, 645 (3d Cir. 1989). A motion to dismiss may be granted only if the court finds that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief. Conley v. Gibson, 355 U.S. 41, 45-46, 78 S. Ct. 99, 2 L. Ed. 2d 80 (1957).

PPC argues that it is not liable for any of the conduct alleged because it was only beginning its corporate existence when the complaint was filed and did not participate in any of the alleged predatory acts. However, the complaint alleges that PPC has already assumed certain functions including advertising and marketing activities such as the publication of the advertising supplement, and is [*8] to "assume regional port operations and replace PRPA, SJPA, and the World Trade Division of DRPA by 1995." Complaint at P 44, 72. Accepting plaintiffs' allegation as true, PPC may be liable not only for its acts but for acts of defendants PRPA and DRPA as their successor; PPC will not be dismissed at this stage.

42 U.S.C. § 1983

In a Section 1983 action, two elements must be established: (1) the conduct complained of was committed by a person acting "under color of state law"; and (2) the conduct deprived a person of rights, privileges, or immunities secured by the Constitution or laws of the United States. Mark v. Borough of Hatboro, 51 F.3d 1137, 1141 (3d Cir. 1995), cert. denied, 133 L. Ed. 2d 107, 116 S. Ct. 165 (1995) (citing Moore v. Tartler, 986 F.2d 682, 685 (3d Cir.

1993)). There is no question the conduct complained of was committed under color of state law. See Peters v. DRPA, 16 F.3d 1346, 1352 (3d Cir. 1994), cert. denied, 115 S. Ct. 62 (DRPA is a "person" for purposes of § 1983). Plaintiffs assert that state actors violated their rights to substantive due process and equal protection, as well as rights under the Commerce Clause.

To state a violation of substantive [*9] due process, the plaintiffs must allege that a governmental authority acted to "infringe[] a property interest encompassed by the Fourteenth Amendment," Acierno v. Cloutier, 40 F.3d 597, 616 (3d Cir. 1994); Midnight Sessions, Ltd. v. City of Philadelphia, 945 F.2d 667, 679 (3d Cir. 1991) cert. denied, 503 U.S. 984, 112 S. Ct. 1668, 118 L. Ed. 2d 389 (1992), and that the infringement "contains some element of abuse of government power, for the 'touchstone of due process is protection of the individual against arbitrary action of the government.'" See Bello v. Walker, 840 F.2d 1124, 1129 (3d Cir. 1988) (quoting Davidson v. Cannon, 474 U.S. 344, 353, 88 L. Ed. 2d 677, 106 S. Ct. 668 (1974)). "The substantive component of the Due Process Clause can only be violated by government employees when their conduct amounts to an abuse of official power that 'shocks the conscience'" Fagan v. City of Vineland, 22 F.3d 1296 (3d Cir. 1994) (citing Collins v. City of Harker Heights, 503 U.S. 115, 112 S. Ct. 1061, 1069, 117 L. Ed. 2d 261 (1992).

The Supreme Court has not yet determined what property interests merit substantive due process protection. Plaintiffs allege that they own a marine terminal complex in New Jersey, have a leasehold interest in the Packer Avenue [*10] Marine Terminal, and operate a stevedoring business. It is clear that "ownership is a property interest worthy of substantive due process protection." DeBlasio v. Zoning Board of Adjustment, 53 F.3d 592, 600 (3d Cir. 1995), cert. denied, 133 L. Ed. 2d 247, 116 S. Ct. 352 (1995) (reversing the district court's grant of summary judgment for defendants and holding that "in the context of land use regulation . . . where the governmental decision in question impinges upon a land-owner's use and enjoyment of property, a land-owning plaintiff states a substantive due process claim where he or she alleges that the decision limiting the use of the property was arbitrarily or irrationally reached"). The Court of Appeals has accorded substantive due process protection to a lessee's property interest. Id. at 601 n. 10 n3 (citing Neiderhiser v. Borough of Berwick, 840 F.2d 213, 217 (3d Cir. 1988)), cert. denied, 488 U.S. 822, 102 L. Ed. 2d 44, 109 S. Ct. 67 (1989) (business owner denied a zoning variance for a leased store stated a substantive due process claim if it alleged that the denial was arbitrary or irrational). Business assets and relationships have also been accorded substantive due process protection. Northeast Jet [*11] Center, Ltd. v. Lehigh-Northampton Airport, 767 F. Supp. 672 (E.D. Pa. 1991) (infringement of "actual and prospective business relationships" as a result of defendant's alleged defamatory conduct states a substantive due process claim). Plaintiffs' allegations in the complaint, drawing all permissible inferences therefrom in plaintiff's favor, state a property interest worthy of substantive due process protection.

- - - - - - - - - - - - - - - - - -Footnotes- - - - - - - - - - - - - - - - - - -

n3 The court refers to the plaintiff in Neiderhiser as a "lessor"; however, it is clear from both the context in the DeBlasio opinion and the Neiderhiser opinion that the plaintiff business owner was the lessee, not the owner of the building for which he sought a zoning variance.

- - - - - - - - - - - - - - - - -End Footnotes- - - - - - - - - - - - - - - - - - -

As to the alleged abuse of government power, defendants argue that their acts were not arbitrary or irrational; they were necessary to fulfill their legislative duty to unify the ports. As part of the port unification plan, defendants are authorized to operate terminals and exercise eminent domain power, but defendants [*12] cannot engage in a campaign of harassment and disparagement to destroy Holt's business and obviate the necessity for exercise of eminent domain. Nor can defendants conspire to reduce the value of plaintiffs' businesses to acquire plaintiffs' assets for less than their actual worth. Regardless of the

Get a Document - by Citation - 1996 U.S. Dist. LEXIS 5323 — Page 22 of 75 — Page 5 of 8

Case 2:00-cv-00684-JF Document 15 Filed 06/23/2000



presumption of legislative rationality, legislative authority to unify the ports cannot constitutionally authorize destroying a business to take property without compensation. If Holt proves that defendants took unlawfully what they were authorized to take lawfully with due compensation, defendant's conduct could "shock the conscience." Holt's claim under § 1983 for violation of substantive due process will not be dismissed.

In order to state an equal protection claim where a statute or policy is facially neutral, plaintiffs must allege intentional discrimination, i.e., that plaintiffs are intentionally being singled out from a group of similarly situated persons. Northeast Jet Center, 767 F. Supp. at 677 (citing Snowden v. Hughes, 321 U.S. 1, 88 L. Ed. 497, 64 S. Ct. 397 (1944)).

Plaintiffs allege that defendants "have applied existing port development, investment and purchasing policies in a discriminatory  [*13]  manner by enforcing arbitrary policies solely against Holt and not similarly situated persons and entities in the market, and by denying financial benefits and subsidies to Holt which are freely granted to other similarly situated persons and entities." Complaint at P 191. Holt also alleges that defendants are acting intentionally to injure Holt's business relationships and potential business relationships. Id. Holt alleges that other companies have received more generous lease terms and conditions than Holt and this conduct has injured Holt's ability to compete. This is sufficient to survive a motion to dismiss the equal protection claim even though it is not clear whether in fact any other entity is similarly situated. n4 Even if defendants need only show a rational basis for their conduct, plaintiffs have alleged a conspiracy to discriminate intentionally; intentional discrimination to destroy or reduce the value of a particular business would not be rationally related to a legitimate government purpose.

- - - - - - - - - - - - - - - - - -Footnotes- - - - - - - - - - - - - - - - - -

n4 See, e.g., Complaint at P 83 ( ". . . besides Holt, there is no other competitor, actual or potential, private or public, with the financial wherewithal sufficient to prevent the PPC from exercising monopoly power.")

- - - - - - - - - - - - - - - -End Footnotes- - - - - - - - - - - - - - - - -  [*14]

Holt asserts a conspiracy claim under § 1983, and has withdrawn a conspiracy claim under § 1985(3). See Plaintiffs' Br. at 93, n. 29. A conspiracy to violate § 1983 is "an agreement between two or more individuals, where one individual acts in furtherance of the objective of the conspiracy, which causes an injury to a person or property, or deprives a person of exercising any right or privilege as a United States citizen." McKenzie v. Doctors' Hospital of Hollywood, Inc., 765 F. Supp. 1504, 1507 (S.D. Fla. 1991), aff'd, 974 F.2d 1347 (11th Cir. 1992). Holt has alleged violations of substantive due process and equal protection sufficient to withstand a motion to dismiss. Holt also alleges that the defendants have conducted meetings, both public and private, where they have plotted to carry out the acts that form the basis for the substantive due process and equal protection claims. This is sufficient to survive a motion to dismiss Holt's conspiracy claim.

Violation of the Commerce Clause is actionable by an injured party under § 1983. Dennis v. Higgins, 498 U.S. 439, 112 L. Ed. 2d 969, 111 S. Ct. 865 (1991). In Dennis, the plaintiff, a motor carrier with a principal place of business in Ohio,  [*15]  alleged that "retaliatory" taxes and fees on motor carriers with vehicles registered in other states and operated in Nebraska constituted an unlawful burden on interstate commerce. His claim that the Commerce Clause confers "rights, privileges or immunities" within the meaning of § 1983 was sustained by the Supreme Court.

Here, Holt alleges that the lease for the PAMT requires it to move Holt's current container business to Pennsylvania and conduct all future container business in Pennsylvania rather than in New Jersey. Holt asserts that this violates the Commerce Clause because it impedes the movement of goods in interstate commerce as ships wishing to utilize Holt's container

Get a Document - by Citation - 1996 U.S. Dist. LEXIS 5323    Page 6 of 8

Case 1:00-cv-00860-YK-KAS    U.S. Document 16    Filed 06/23/2000    Page 23 of 75

facilities must go to Pennsylvania instead of New Jersey. Under Dennis, the operators of the ships would have a cause of action, but not Holt. Cited cases involving the invalidity of state measures designed to protect or prefer in-state economic interests at the cost of out-of-state market participants are inapposite; Holt contracted to conduct one arm of its business in one state instead of the other. To the extent that DRPA and PPC are implicated in the alleged violation of the Commerce Clause, they [*16] are bi-state organizations authorized by Congress to regulate interstate commerce.

Admiralty Jurisdiction

Holt alleges that the acts complained of were committed on navigable waters, and had an intimate relationship to maritime service, commerce, and navigation. Complaint at P 210, 211. Holt also alleges that lease agreements between the parties were concerned solely or primarily with maritime subject matter. Complaint at P 212. Holt asserts that this court has admiralty jurisdiction under 28 U.S.C. § 1333(1) because the defendants' acts constitute a maritime tort, and because the lease agreement is a maritime contract.

The Extension of Admiralty Jurisdiction Act states that "the admiralty and maritime jurisdiction of the United States shall extend to and include all cases of damage or injury, to persons or property, caused by a vessel on navigable water, notwithstanding that such damage or injury be consummated on land." 46 U.S.C. § 740. "A party seeking to invoke federal admiralty jurisdiction pursuant to 28 U.S.C. § 1333(1) over a tort claim must satisfy conditions both of location and of connection with maritime activity." Jerome B. Grubart, Inc. v. Great Lakes Dredge [*17] & Dock Co., 130 L. Ed. 2d 1024, 115 S. Ct. 1043, 1048 (1995). The location test requires that the tort occur on navigable waters, or if the injury was suffered on land, it was caused by a vessel on navigable waters. Id. In Grubart, the defendant barge owner sought to limit its liability for damages resulting from a flood; the barge owner was engaged to replace the pilings of a bridge with a crane situated on its barge, the process of replacing the piling weakened an underwater tunnel and caused land based damages. The Court found the location test "readily satisfied" because the defendant's allegedly tortious conduct took place on navigable waters (the river) and the flood victim's injuries on land were caused by a vessel (the barge), and held the Limitation of Liability Act applied to the admiralty action.

Holt alleges that there was a maritime tort because "defendants unlawful acts, conduct, and conspiracies complained of herein were committed on navigable waters." Complaint at P 211. Holt argues that the "the strict locality test has been replaced with an analysis which examines the impact of the alleged tort." The Supreme Court implicitly rejected that argument in Grubart; in order [*18] to satisfy the locality test, the tort must occur on navigable waters and be caused by a vessel. The conduct alleged in the complaint -- e.g., conspiracy, breach of a lease, interference with business relationships, defamation -- was neither physically located on navigable waters, nor caused by a vessel; the dredging referred to in the complaint is as yet proposed and has not yet caused an injury. Holt does not allege a maritime tort.

Holt also alleges admiralty jurisdiction based on maritime contracts. Admiralty jurisdiction in breach of contract cases arises "only when the subject matter of the contract is 'purely' or 'wholly' maritime in nature." See Berkshire Fashions, Inc. v. The M.V. Hakusan II, 954 F.2d 874, 880 (3d Cir. 1992) (remanding for additional fact finding regarding whether contract was for transport by sea, which would invoke the court's admiralty jurisdiction, or by a combination of sea and land, which would not). Admiralty jurisdiction is appropriate when the contract "solely concerns the operation of a ship or its navigation or management." Id. Contracts that are partly maritime and partly non-maritime invoke admiralty jurisdiction only if the non-maritime [*19] portion can be severed, or if the non-maritime aspects are "merely incidental." Id. (citations omitted). The complaint refers to "lease agreements" between Holt and the defendants, Complaint at P 212, but the only lease agreement before the court is the PAMT lease. That contract does not concern the "operation of a ship or its

Get a Document - by Citation - 1996 U.S Dist. LEXIS 5323     Page 7 of 8

Case 1:00-cv-00860-YK-AS   Document 16   Filed 06/23/2000   Page 24 of 75

navigation or management" in whole or in part; it is a lease of a marine terminal, "additional parcels," and PRPA cranes, See PAMT Lease at Article 1.1. Plaintiffs have failed to state a claim for breach of a maritime contract. There is no admiralty jurisdiction; Count VII is dismissed without prejudice to amend to specify a maritime contract in dispute other than the PAMT lease.

Jurisdiction of the Federal Maritime Commission

The PAMT lease was filed with the Federal Maritime Commission; defendants contend the Commission has exclusive jurisdiction over claims arising under it. The court made inquiry of the Commission whether it wished to participate amicus curie, the Commission has recently moved for leave to appear as amicus curie and filed a Statement of Points and Authorities in support of positions relevant to the remaining issues.  [*20]  The Court will give the parties ten days to respond to the Commission's positions. The court will sever and stay Counts I-V (federal antitrust), VIII (common law restraint of trade), IX (declaratory judgment) and X (breach of contract) pending response to the Commission's motion.

An appropriate order follows.

**ORDER**

AND NOW this 19th day of April, 1996, it is hereby **ORDERED** that:

1. Defendants' motions to dismiss are **GRANTED IN PART; DENIED IN PART**. Defendants' motions are denied as to Count VI (42 U.S.C. § 1983). Defendants' motions to dismiss are granted as to Count VII (admiralty jurisdiction).

2. Plaintiffs' motion to lift discovery stay is **GRANTED** as to Count VI (42 U.S.C. § 1983) only; said discovery shall be in accordance with a schedule approved by Magistrate Judge Angell.

3. Counts I-V (federal antitrust), VIII (state antitrust), IX (declaratory judgment) and X (breach of contract) are severed and stayed pending comment on the position of the Federal Maritime Commission ("FMC"). The parties shall respond to the papers filed by the FMC within ten days.

4. Upon receipt of the parties responses, the court will schedule a status hearing. The  [*21] court will hear argument on the jurisdiction of the FMC over disputes involving the Packer Avenue lease, and the antitrust immunity conferred by the Shipping Act.

Norma L. Shapiro, J.

Service: **LEXSEE®**
Citation: **1996 us dist lexis 5323**
View: **Full**
Date/Time: Thursday, June 22, 2000 - 1:37 PM EDT

About LEXIS-NEXIS | Terms and Conditions

Copyright © 2000 LEXIS-NEXIS Group.  All rights reserved.

Get a Document - by Citation - 1996 U.S. Dist. LEXIS 5323

Case 1:00-cv-00580-YK-AC   Document 16   Filed 06/23/2000   Page 25 of 75   Page 8 of 8



Get a Document - by Citation - 1997 U.S. Dist. LEXIS 18073    Page 1 of 11

Case 1:00-cv-00860-YK-JAS    Document 16    Filed 06/23/2000    Page 27 of 75

Service: **LEXSEE®**
Citation: **1997 us dist lexis 18073**

*1997 U.S. Dist. LEXIS 18073, \**

HOLT CARGO SYSTEMS, INC., et al. v. DELAWARE RIVER PORT AUTHORITY, et al.

CIVIL ACTION NO. 94-7778

UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF PENNSYLVANIA

1997 U.S. Dist. LEXIS 18073

November 13, 1997, Decided
November 13, 1997, Filed; November 14, 1997, Entered

**DISPOSITION:** Defendants' motions granted in part and denied in part.

**CORE TERMS:** lease, predatory, port, unification, arbitrarily, motions to dismiss, injunctive relief, terminal, equal protection, motion to dismiss, stevedoring, competitors, similarly situated, cause of action, marine, conspiracy, customers, destroy, entity, Fourteenth Amendment, property interest, state statute, classification, sector, notice, unify, join, process protection, substantive right, warehousing

**COUNSEL:** [*1] For HOLT CARGO SYSTEMS, INC., ASTRO HOLDINGS, INC., HOLT HAULING AND WAREHOUSING SYSTEMS, INC., PLAINTIFFS: PAUL R. ROSEN, SPECTOR, GADON & ROSEN, P.C., PHILA, PA USA. BRUCE S. MARKS, SPECTOR GADON & ROSEN, P.C., PHILADELPHIA, PA USA. JEFFREY M. GOLDSTEIN, SPECTOR, GADON & ROSEN, P.C., PHILA, PA USA. RICHARD J. PERR, SPECTOR, GADON AND ROSEN, PHILA, PA USA.

For DELAWARE RIVER PORT AUTHORITY, DEFENDANT: HENRY F. SIEDZIKOWSKI, JOHN M. ELLIOTT, TIMOTHY T. MYERS, MICHAEL P. WALSH, ELLIOTT, REIHNER, SIEDZIKOWSKY AND EGAN, P.C., BLUE BELL, PA USA. For PORTS OF PHILADELPHIA AND CAMDEN, DEFENDANT: TRACY MOONEY SCHAEFFER, SPRAGUE, CREAMER & SPRAGUE, PHILA, PA USA. RICHARD A. SPRAGUE, DENISE PALLANTE, SPRAGUE & SPRAGUE, PHILA, PA USA. CHARLES HARDY, PHILA, PA USA. GEOFFREY C. JARVIS, SPRAGUE AND SPRAGUE, PHILA, PA USA. For PHILADELPHIA REGIONAL PORT AUTHORITY, DEFENDANT: PATRICK J. O'CONNOR, COZEN & O'CONNOR, PHILA, PA USA. KARL L. PRIOR, COZEN AND O'CONNOR, PHILA, PA USA. RICHARD M. ROSENBLEETH, WILLIAM H. ROBERTS, LISA A. ROSENBLATT, BLANK ROME COMISKY & MCCAULEY, PHILADELPHIA, PA USA.

For JOSE DIAZ, TIOGA FRUIT TERMINAL, INC., CHILEAN LINE, INC., RESPONDENTS: RICHARD J. CAMPBELL, [*2] PEPPER, HAMILTON & SCHEETZ, LLP, PHILA, PA USA. For DELAWARE RIVER STEVEDORES INC., RESPONDENT: JOHN W. BUTLER, ANNE E. MICKEY, SHER AND BLACKWELL, WASHINGTON, DC USA. For CROWLEY AMERICAN TRANSPORT, INC., RESPONDENT: STEVEN L. FRIEDMAN, DILWORTH, PAXSON, KALISH & KAUFFMAN LLP, PHILA, PA USA. For JOSEPH BALZANO, AL CASTAGNOLA, SOUTH JERSEY PORT CORPORATION, RESPONDENTS: ALAN A. TURNER, TURNER AND MC DONALD, PHILA, PA USA. For BARWIL WIGHTMAN SHIPPING, RESPONDENT: MATTHEW H. ADLER, PEPPER, HAMILTON & SCHEETZ, PHILA, PA USA.

For PENN TERMINALS, INC., INCHCAPE SHIPPING SERVICES, RICE, UNRUH, REYNOLDS CO., NORTON LILLY INTERNATIONAL INC., MOVANTS: JOHN A. LORD, HEPBURN, WILLCOX, HAMILTON AND PUTNAM, PHILA, PA USA. For GEOFFREY C. JARVIS, ESQUIRE, MOVANT: GEOFFREY C. JARVIS, SPRAGUE AND SPRAGUE, PHILA, PA USA.

**JUDGES:** Norma L. Shapiro, J.

**OPINIONBY:** NORMA L. SHAPIRO

**OPINION: MEMORANDUM and ORDER**

**Norma L. Shapiro, J.**

November 13, 1997

Plaintiffs Holt Cargo Systems, Inc. ("Holt Cargo"), Astro Holdings, Inc. ("Astro") and Holt Hauling and Warehousing Systems, Inc. ("Holt Hauling") in their Second Amended Complaint against defendants Delaware River Port Authority ("DRPA"), [*3] Philadelphia Regional Port Authority ("PRPA") and Port of Philadelphia and Camden ("PPC") allege constitutional violations actionable under 42 U.S.C. § 1983. All defendants filed motions to dismiss the Second Amended Complaint. For the reasons stated below, defendants' motions will be granted in part and denied in part.

**ALLEGED FACTS**

Plaintiff Holt Cargo is a Delaware corporation with its principal place of business in Philadelphia, Pennsylvania. (Compl. P 3). Holt Cargo is in the business of stevedoring, warehousing and providing terminal services in the Port District of Philadelphia and Camden (the "Port District"). Holt Cargo entered into an amended and restated lease and operating agreement dated December 30, 1990, with PRPA (the "amended lease") for the Packer Avenue Marine Terminal ("Packer Avenue Terminal") in the Port District. See id. at PP 4,8. The amended lease is for a term of fifty years. See id. at P 46. On June 14, 1991, Holt Cargo assigned its interest in the amended lease to plaintiff Astro. On the same date, Astro entered into a sublease with Holt Cargo for the Packer Avenue Terminal. See id. at PP 6-7. Holt Cargo currently occupies and operates [*4] the Packer Avenue Terminal. See id. at P 7.

Plaintiff Holt Hauling is a Pennsylvania corporation with its principal place of business in New Jersey. See id. at P 9. Holt Hauling holds title to a marine terminal warehouse complex in Gloucester City, New Jersey (the "Gloucester Terminal") and leases this facility to tenants providing stevedoring, warehousing and terminal services in the Port District. See id. at P 10.

Defendants are all state-created entities. Defendant DRPA is a public corporate entity created by the Commonwealth of Pennsylvania and the State of New Jersey by interstate compact (the "Amended Compact"). Congress and the President approved the Amended Compact under the Interstate Compact Clause, U.S. Const. art. I, § 10, cl. 3. See id. at P 12.

Defendant PPC is a public corporate entity of the Commonwealth of Pennsylvania and the State of New Jersey created under the Amended Compact by DRPA in 1994 to unify the Port District. See id. at PP 13, 35.

Defendant PRPA, a public entity of the Commonwealth of Pennsylvania, was formed to promote port development in southeastern Pennsylvania. PRPA owns marine terminals and other facilities in the Philadelphia [*5] region of the Port District. See id. at P 11. PRPA owns the Packer Avenue Terminal, Piers 84, 86 and 96 South, the Tioga Marine Terminal, the Tioga Container Terminal and Piers 96, 98 and 100 (the "additional parcels"). See id. at P 11.

Plaintiffs have named a variety of non-defendant co-conspirators. These include: South Jersey Port Corporation ("SJPC"), a public entity of the State of New Jersey analogous to PRPA; it owns and operates Broadway Marine Terminal ("Broadway") and Beckett Marine Terminal ("Beckett") in the Port District; PASHA Auto Warehousing, Inc. ("Pasha"), a party to two PRPA leases (the "Pasha leases") of Pier 96 South in the Philadelphia region of the Port

Get a Document - by Citation - 1992 U.S. Dist. LEXIS 18073                    Page 29 of 75

Case 1:00-cv-00860-YK-JAS   Document 16   Filed 06/23/2000   Page 3 of 11

District; James McDermott ("McDermott"), PRPA's executive director; Paul DiMariano ("DiMariano"), PPC's president and chief executive officer; Paul Drayton ("Drayton"), DRPA's executive director; and Joseph Balzano ("Balzano"), SJPC's chief executive officer (collectively the "executive directors"). See id. at PP 14-17.

In 1992, Pennsylvania and New Jersey agreed to unify the Port District to eliminate intra-port competition and "churning" of cargo and to strengthen the Port District's ability to [*6] compete against other regional ports. See id. at PP 22, 25. Pennsylvania and New Jersey both enacted legislation (the "Unification Acts") to unify the Port District. See Pa. Stat. Ann. tit. 36 § 3503; N.J. Stat. Ann. § 32:3-1, et seq.; (Compl. P 26.) Congress and the President approved the Amended Compact on October 27, 1992. See 106 Stat. 3576 (1992); (Compl. P 26.)

Unification of the Port District was intended to place the power to maintain the Port District in DRPA and its subsidiary, PPC. (Compl. P 31). Unification of the Port District was supposed to occur within two years of the Amended Compact's approval, i.e., October 27, 1994 (the "unification date"). See id. at P 32. After unification, PPC was to take over PRPA's and SJPC's functions. See id. at P 34. The executive boards of PRPA, SJPC and DRPA approved a Term Sheet in 1994 to govern the merger of PRPA and SJPC into PPC. See id. at 36. Plaintiffs assert all port development activities after unification were to be conducted solely by DRPA or its subsidiary PPC.

Plaintiffs claim unification occurred de jure on the unification date. Alternatively, unification occurred de facto "because [*7] DRPA, PPC, PRPA and SJPC have joined together to control the Port District, both pursuant to the Term Sheet approved in 1994 and by joint adoption of business plans and goals by the boards and Executive Directors of DRPA, PPC, PRPA and SJPC, even though a final merger has technically not taken place." Id. at PP 37-38. PPC's 1994-95 Handbook states unification "became a reality in 1994." Id. at PP 39-40.

The Amended Compact provides that DRPA shall prepare a comprehensive master plan (the "master plan") for the development of the Port District to include "plans for construction, financing, development, reconstruction, purchase, lease, improvement and operation of any terminal, terminal facility, transportation facility or any other facility of commerce or economic development activity." Amended Compact, art. XII(7); Compl. P 27.

"Prior to adopting such master plan, the commission shall give written notice to, afford a reasonable opportunity for comment, consult with and consider any recommendations from State, county and municipal government, as well as commissions, public corporations and authorities from the private sector." Id. If DRPA modifies or changes the master [*8] plan, it must follow these same procedures. See id.

When DRPA authorizes any "project or facility," it must provide the governor and legislature of both states with a "detailed report on the project." Amended Compact, art. XII(7). In those reports to the two states, DRPA "shall include therein its findings which fully set forth that the facility or facilities operated by private enterprise within the Port District and which it is intended shall be supplanted or added to are not adequate." Amended Compact, art. IV(q); Compl. P 28.

In 1994, DRPA, PPC, PRPA and SJPC produced a "Strategic Business Plan" providing for "a unified government agency to take over the entire Port District" by purchasing PRPA leases with private businesses so that "the private sector would not be the operator of the facilities." Id. at PP 41-42. PRPA sought "not only to be a lessor, but to operate its marine terminals with the aid of SJPC and in competition with Holt Cargo, Astro, and Holt Hauling." Id. at P 45.

Holt Cargo's fifty-year amended lease, its plan to develop the Publicker Site, Pier 96 South and the additional parcels, and Holt Hauling's ownership and operation of the Gloucester

Get a Document - by Citation - 1983 U.S. Dist. LEXIS 18073    Page 4 of 11

Case 00-00600-JKM    Doc    Document LEXIS 18073    Filed 06/23/2000    Page 30 of 75

Terminal [*9] "stood in the way of the hidden goal of total government ownership, operation, and control of the Port District." Id. at P 46. PRPA informed the other defendants it had no right to condemn the property covered by the amended lease. See id. at P 47. PRPA, SJPC, DRPA and PPC could not afford to purchase the property of the plaintiffs. See id. at P 48.

Therefore, DRPA, PPC, PRPA and SJPC allegedly entered into a conspiracy to obtain control of the entire Port District, including the marine terminals controlled by the plaintiffs, by driving Holt Cargo, Astro and Holt Hauling from the Port District. See id. at PP 49, 50. DRPA, PPC, PRPA and SJPC sought to obtain the customers of Holt Cargo and Holt Hauling. See id. at P 53. During a meeting between Thomas Holt, a shareholder of Holt Cargo, Astro and Holt Hauling, McDermott threatened to "destroy Holt." Id. at P 51. DRPA, PPC, PRPA and SJPC sought to "destroy" Holt to "control the entire Port District under the guise of Unification ... [and] maximize their profits, to the detriment of private enterprise." Id. at P 54.

The plaintiffs in their Second Amended Complaint allege ten specific predatory acts by the [*10] defendants: (1) PRPA agreed to join with Holt Cargo and Astro in an application for environmental permits to develop the Publicker Site and the additional parcels and then arbitrarily and in bad faith withdrew its support, see id. at PP 55-60; (2) PRPA and Pasha have arbitrarily and in bad faith denied Holt Cargo and Astro their rights under the amended lease to use and develop Pier 96 South, see id. at PP 61-65; (3) in October, 1994, PRPA arbitrarily threatened to evict Holt Cargo and Astro from the Packer Avenue Terminal, and knew Holt would have to report this eviction notice to the attention of its lenders, customers and prospective financing sources, see id. at PP 66-70; (4) PRPA arbitrarily refused to honor its obligations under the amended lease "to dredge berths, provide capital improvements, and repair property, including container cranes," and DRPA arbitrarily refused to provide funds to PRPA for dredging, see id. at PP 71-75; (5) DRPA, PPC and PRPA jointly published advertisements falsely attributing operation of the Packer Avenue Terminal to them in order to mislead customers into contacting them for business, see id. at PP 76-78; (6) PRPA arbitrarily [*11] refused to lease Piers 82 and 84 to Holt Cargo and to another company that planned to use Holt Cargo for its stevedoring needs, see id. at PP 79-83; (7) PRPA and SJPC have diverted customers from Holt Cargo and Holt Hauling by offering subsidized rates, free rent and other benefits to competitors, solely to cause economic loss to Holt Cargo and Holt Hauling, see id. at PP 84-86; (8) DRPA approved a master plan in 1996 that concealed numerous subsidized leases between PRPA and plaintiffs' competitors, including leases with American Transport Lines, Inc. (the "Crowley lease"), Tioga Fruit Terminal, Inc. (the "Tioga lease"), Marine Terminals of Pennsylvania (the "Marine Terminal lease") and Delaware River Stevedores, Inc. (the "DRS lease") (collectively the "unauthorized leases), see id. at PP 87-94; (9) DRPA's master plan and capital budget, approved by DRPA, PRPA and SJPC, concealed numerous capital projects included in PPC's budget, see id. at PP 95-101; and (10) DRPA failed to give an opportunity for notice and comment regarding the unauthorized leases and capital projects as required under the Amended Compact, see id. at PP 102-107. Plaintiffs did not raise predatory [*12] acts seven through ten prior to their Second Amended Complaint. Plaintiffs contend these predatory acts were undertaken in an effort to destroy or appropriate plaintiffs' business.

The plaintiffs claim DRPA, PPC, PRPA, SJPC, Pasha and the executive directors have "conspired together by joint meetings, joint understandings and agreements, joint participation in unlawful conduct, and joint adoption of (i) budgets, (ii) capital, (iii) approval of leases, (iv) term sheets, (v) management agreements, (vi) interlocking board members, (viii) combined strategy meetings, (ix) joint adoption of [a] Sham Master Plan, (x) joint adoption of Amendments to the Sham Master Plan, all to effect each of the above predatory acts." Id. at P 107.

Plaintiffs have stated three counts under 42 U.S.C. § 1983 n1 for violations of the Fourteenth Amendment n2 by all three defendants and against all three defendants: Count I alleges violations of substantive due process; Count II alleges violations of equal protection; and

Get a Document - by Citation - 1993 U.S. Dist. LEXIS 18073          Page 5 of 11

Case 00-cv-00800-KJ-AES   Document 15   Filed 06/23/2000   Page 31 of 75

Count III alleges procedural due process violations. n3 All defendants have filed motions to dismiss the Second Amended Complaint, either in part or in its entirety.

- - - - - - - - - - - - - - - - - -Footnotes- - - - - - - - - - - - - - - - - -

n1 42 U.S.C. § 1983 provides:

Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.... [*13]

n2 The Fourteenth Amendment provides no "State shall deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend XIV.

n3 In their earlier complaints, the plaintiffs attempted to raise a cause of action for violation of the Amended Compact either directly under the Amended Compact itself or as a violation of a federal statute, under 42 U.S.C. § 1983. The plaintiffs have not presented these claims in their revised Second Amended Complaint.

- - - - - - - - - - - - - - - - -End Footnotes- - - - - - - - - - - - - - - - -

DISCUSSION

## I. Standard of Review

In considering a motion to dismiss under Rule 12(b)(6), the court "must take all the well pleaded allegations as true, construe the complaint in the light most favorable to the plaintiff, and determine whether, under any reasonable reading of the pleadings, the plaintiff may be entitled to relief." Colburn v. Upper Darby Township, 838 F.2d 663, 665-66 (3d Cir. 1988) (citations omitted), cert. denied, 489 U.S. 1065, 103 L. Ed. 2d 808, 109 S. Ct. 1338 (1989); see Rocks v. City of Philadelphia, 868 F.2d 644, 645 (3d Cir. [*14] 1989). The court must decide whether "relief could be granted on any set of facts which could be proved." Ransom v. Marrazzo, 848 F.2d 398, 401 (3d Cir. 1988). A motion to dismiss may be granted only if the court finds the plaintiff can prove no set of facts in support of his claim which would entitle him to relief. See Conley v. Gibson, 355 U.S. 41, 45-46, 78 S. Ct. 99, 2 L. Ed. 2d 80 (1957).

## II. Substantive Due Process

Substantive due process is implicated where a governmental authority "infringed a property interest encompassed by the Fourteenth Amendment." Acierno v. Cloutier, 40 F.3d 597, 616 (3d Cir. 1994); see Midnight Sessions, Ltd. v. City of Philadelphia, 945 F.2d 667, 679 (3d Cir. 1991), cert. denied, 503 U.S. 984, 118 L. Ed. 2d 389, 112 S. Ct. 1668 (1992). "'The touchstone of due process is protection of the individual against arbitrary action of the government.'" Bello v. Walker, 840 F.2d 1124, 1129 (3d Cir. 1988) (quoting Davidson v. Cannon, 474 U.S. 344, 353, 88 L. Ed. 2d 677, 106 S. Ct. 668 (1974)), cert. denied, 488 U.S. 851 (1988). "The substantive component of the Due Process Clause can only be violated by government employees when their conduct amounts to an abuse of official power that 'shocks the conscience.'" Fagan [*15] v. City of Vineland, 22 F.3d 1296, 1303 (quoting Collins v. City of Harker Heights, 503 U.S. 115, 126, 117 L. Ed. 2d 261, 112 S. Ct. 1061 (1992)).

Property ownership, an interest protected by substantive due process, cannot be "arbitrarily or irrationally" restricted. DeBlasio v. Zoning Bd. of Adjustment, 53 F.3d 592, 600 (3d Cir.),

cert. denied, 133 L. Ed. 2d 247, 116 S. Ct. 352 (1995). A lessee's property interest has been accorded substantive due process protection. See id. at 601 n.10 (citing Neiderhiser v. Borough of Berwick, 840 F.2d 213, 217 (3d Cir. 1988), cert. denied, 488 U.S. 822, 102 L. Ed. 2d 44, 109 S. Ct. 67 (1989). "Actual and prospective business relationships" have received substantive due process protection. Northeast Jet Center, Ltd. v. Lehigh-Northampton Airport, 767 F. Supp. 672, 677 (E.D. Pa. 1991).

Holt Cargo is a lessee and sub-lessee of the Packer Avenue Terminal. Holt Cargo also provides stevedoring and other marine services. Astro is the assignee of Holt Cargo's leasehold interest in the Packer Avenue Terminal. Holt Hauling owns the Gloucester Terminal and leases this facility to tenants providing various services in the Port District. Plaintiffs have alleged property interests protected by the Due Process Clause. [*16] See DeBlasio, 53 F.3d at 601 n.10 (citing Neiderhiser, 840 F.2d at 217).

The plaintiffs have alleged predatory acts that, if true, evidence harassment and an attempt to destroy the business and property interests of the plaintiffs. As the court stated in its April 19, 1996 Memorandum and Order, the defendants cannot "conspire to reduce the value of plaintiffs' businesses to acquire plaintiffs' assets for less than their actual worth. Regardless of the presumption of legislative rationality, legislative authority to unify the ports cannot constitutionally authorize destroying a business to take property without compensation." Holt Cargo Systems, Inc. v. Delaware River Port Auth., 1996 U.S. Dist. LEXIS 5323, *16, No. 94-7778 (E.D. Pa. April 19, 1996) ["Holt I"].

PPC, admitting Holt I precludes dismissal of the plaintiffs' substantive due process claims, does not seek dismissal of Count I. DRPA and PRPA argue they cannot be liable for the actions of each other, so the predatory acts committed by each of them cannot form the basis of a substantive due process claim against the other. The plaintiffs have alleged the three defendants conspired to drive them out of business. On a motion [*17] to dismiss, the court will assume government agencies can be liable for conspiracy. See, e.g., Billups v. Millet, 1996 U.S. Dist. LEXIS 2645, No. 91-6326, 1996 WL 99399, *6 (S.D.N.Y. Mar. 6, 1996); Peavey v. Polytechnic Institute, 775 F. Supp. 75, 77 (E.D.N.Y. 1991), aff'd, 969 F.2d 1042 (2d Cir.), cert. denied, 506 U.S. 922, 121 L. Ed. 2d 257, 113 S. Ct. 341 (1992). n4 If a conspiracy is proved, DRPA and PRPA may be held accountable for the actions of one another in furtherance of that conspiracy. See N.A.A.C.P. v. Claiborne Hardware Co., 458 U.S. 886, 927, 73 L. Ed. 2d 1215, 102 S. Ct. 3409 (1982); McKenzie v. Doctors' Hosp., 765 F. Supp. 1504, 1507 (S.D. Fla. 1991), aff'd, 974 F.2d 1347 (11th Cir. 1992).

- - - - - - - - - - - - - - - - - -Footnotes- - - - - - - - - - - - - - - - - - -

n4 No party has addressed this issue.

- - - - - - - - - - - - - - - - -End Footnotes- - - - - - - - - - - - - - - - - -

Plaintiffs have abandoned their causes of action arising directly under the Amended Compact, but they still base alleged predatory acts on violation of the terms of the Amended Compact by defendants' failure to make findings that private enterprise was "inadequate" before authorizing port projects, failure to adopt a master plan by October [*18] 27, 1994, concealment of various leases and independent funding of fund port development projects by PRPA and SJPC rather than by DRPA or PPC having assumed total control. The court will not entertain the claims raised in predatory acts eight and nine. The Amended Compact does not create a private cause of action to enforce the terms of the Amended Compact. See Blessing v. Freestone, 137 L. Ed. 2d 569, 117 S. Ct. 1353, 1359 (1997); Cort v. Ash, 422 U.S. 66, 78, 45 L. Ed. 2d 26, 95 S. Ct. 2080 (1975). The court will not intervene to micro-manage the entire Port District. Such judicial interference "would be disruptive of state efforts to establish a coherent policy with respect to a matter of substantial public concern": the development and management of the Port District. Colorado River Water Conservation Dist. v. United States, 424 U.S. 800, 814-16, 47 L. Ed. 2d 483, 96 S. Ct. 1236 (1976); see Louisiana Power

Get a Document - by Citation - 1995 U.S. Dist. LEXIS 18073

Case 2:00-cv-00800-JKG Document 16 Filed 06/23/2000 Page 33 of 75

Page 7 of 11

& Light Co. v. City of Thibodaux, 360 U.S. 25, 79 S. Ct. 1070, 1072-73, 3 L. Ed. 2d 1058 (1959); Alabama Pub. Serv. Comm'n v. Southern R. Co., 341 U.S. 341, 349-50, 95 L. Ed. 1002, 71 S. Ct. 762 (1951); Burford v. Sun Oil Co., 319 U.S. 315, 332-33, 87 L. Ed. 1424, 63 S. Ct. 1098 (1943).

Taking the plaintiffs' allegations as true, they have stated a cause of action against all three defendants for a violation of substantive due process. [*19] The court will deny the motions to dismiss Count I.

## III. Equal Protection

The Equal Protection Clause does not require that all persons be treated alike; it provides "a direction that all persons similarly situated should be treated alike." City of Cleburne v. Cleburne Living Center, 473 U.S. 432, 439, 87 L. Ed. 2d 313, 105 S. Ct. 3249 (1985). "The level of scrutiny applied to ensure that classifications comply with this guarantee differs depending on the nature of the classification." Artway v. Attorney General of the State of N.J., 81 F.3d 1235, 1267 (3d Cir. 1996). "Classifications involving suspect or quasi-suspect class, or impacting certain fundamental constitutional rights, are subject to heightened scrutiny. Other classifications, however, need only be rationally related to a legitimate government goal." Id.; see Chapman v. United States, 500 U.S. 453, 465, 114 L. Ed. 2d 524, 111 S. Ct. 1919 (1991); Taylor Inv., Ltd. v. Upper Darby Township, 983 F.2d 1285, 1294 (3d Cir. 1993), cert. denied 510 U.S. 914, 126 L. Ed. 2d 252, 114 S. Ct. 304 (1993). Under a rational basis analysis, the government's action will be upheld as long as it was not "irrational." Vance v. Bradley, 440 U.S. 93, 97, 59 L. Ed. 2d 171, 99 S. Ct. 939 (1979); Rogin v. Bensalem Township, 616 F.2d 680, 687 (3d [*20] Cir. 1980), cert. denied sub nom., Mark-Garner Assoc. v. Bensalem Township, 450 U.S. 1029, 68 L. Ed. 2d 223, 101 S. Ct. 1737 (1981).

The plaintiffs have alleged PRPA arbitrarily refused to lease facilities to Holt Cargo and another company planning to rely on Holt Cargo's stevedoring services, offered subsidized leases to competitors of Holt Cargo, Astro and Holt Hauling in order to draw customers away from the plaintiffs and made millions of dollars of capital improvements to competing facilities in the Port District. At the same time, PRPA failed to fulfill its obligations to dredge and develop facilities operated by the plaintiffs. Plaintiffs state DRPA arbitrarily refused to provide funding to PRPA for dredging plaintiffs' facilities. Plaintiffs claim PRPA and DRPA engaged in these acts to drive them out of business. Allegedly, all three defendants acted in concert to achieve this goal.

The plaintiffs claim American Transport Lines, Inc., Tioga Fruit Terminal, Inc., Marine Terminals of Pennsylvania and the Delaware River Stevedores, Inc. are similarly situated, non-public companies that have received leases from the PRPA on terms more favorable than any offered to plaintiffs. Allegedly, these other companies [*21] are involved in stevedoring, warehousing and other port-related activities. DRPA argues that public entities (such as SJPC) cannot be similarly situated to private companies, such as plaintiffs. Accepting that as true, see Wood v. Rendell, 1995 U.S. Dist. LEXIS 17052, No. 94-1489, 1995 WL 676418, *4 (E.D. Pa. Nov. 3, 1995) (non-profit entity and for-profit entity not similarly situated), the port companies listed by the plaintiffs appear to be private entities. DRPA also asks the court narrowly to distinguish between the plaintiffs and each of the listed companies, because "land is unique." The companies need not be exactly like the plaintiffs if they all engage in the same kinds of port-related commercial activity; plaintiffs' allegations are sufficient to allow their equal protection claim to survive a motion to dismiss. Whether the competitors are similarly situated will be an issue of fact.

Taking all of the plaintiffs' allegations as true, the three defendants have conspired together to drive Holt Cargo, Holt Hauling and Astro out of business. DRPA, PRPA and PPC intentionally and arbitrarily offered the plaintiffs' competitors more favorable lease terms, provided extensive development and construction [*22] of facilities used by plaintiffs' competitors

Get a Document - by Citation - 1992 U.S. Dist. LEXIS 18073    Page 8 of 11

Case 1:00-cv-00860-YK-JAS   Document 16   Filed 06/23/2000   Page 34 of 75

while refusing to fulfill their obligations under the amended lease to dredge areas operated by Holt Cargo. Each defendant is responsible for the acts of its co-conspirator in furtherance of the conspiracy. See McKenzie, 765 F. Supp. at 1507.

Government agencies may legitimately act to ensure competition in the marketplace, but "intentional discrimination to destroy or reduce the value of a particular business would not be rationally related to a legitimate government purpose." Holt I, at 10. The defendants' motions to dismiss Count II of the revised Second Amended Complaint will be denied. n5

- - - - - - - - - - - - - - - - -Footnotes- - - - - - - - - - - - - - - - -

n5 Plaintiffs may not base their equal protection claim on alleged predatory acts involving certain defendants' failure to comply with the Amended Compact by not making findings that private enterprise was "inadequate" before authorizing port projects, by failing to adopt a master plan by October 27, 1994, and by allowing PRPA and SJPC to fund port development projects independently rather than having DRPA or PPC assume total control. See Colorado River, 424 U.S. at 814-16.

- - - - - - - - - - - - - - - -End Footnotes- - - - - - - - - - - - - - - - [*23]

## IV. Procedural Due Process

Plaintiffs raised a procedural due process claim for the first time in their Second Amended Complaint. To prevail on a procedural due process claim, the plaintiffs must demonstrate the defendants deprived them of a protected property interest without affording an adequate opportunity to be heard in connection with that deprivation. See Taylor Inv., Ltd., 983 F.2d at 1293.

"Property interests are not created by the Constitution, 'they are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law ....'" Cleveland Bd. of Ed. v. Loudermill, 470 U.S. 532, 538, 84 L. Ed. 2d 494, 105 S. Ct. 1487 (1985) (quoting Board of Regents v. Roth, 408 U.S. 564, 577, 33 L. Ed. 2d 548, 92 S. Ct. 2701 (1972)).

The plaintiffs argue DRPA violated their procedural due process rights by failing to provide notice in the master plan and a chance to comment on the various capital improvements and leases PRPA was associated with directly (and that were attributed to DRPA as a co-conspirator). n6 Article XII of the Amended Compact states: "Prior to adopting [a] master plan, [DRPA] shall give written notice to, afford a reasonable opportunity for comment, [*24] consult with and consider any recommendations from State, county and municipal government, as well as commissions, public corporations and authorities and the private sector."

- - - - - - - - - - - - - - - - -Footnotes- - - - - - - - - - - - - - - - -

n6 The plaintiffs also attempt to base a procedural due process violation on DRPA's failure to make findings that private industry was inadequate before supporting PRPA's expenditures. The court will not consider DRPA's failure to make findings of industrial inadequacy in the Port District. See Colorado River, 424 U.S. at 814-16.

- - - - - - - - - - - - - - - -End Footnotes- - - - - - - - - - - - - - - - -

The Procedural Due Process Clause only applies to substantive rights granted by the Constitution or statutory law. But "a state statute that merely prescribes procedure, yet 'places no substantive limitations on official discretion ... creates no liberty interest entitled to protection under the Due Process Clause.'" Townsend v. Cramblett, 892 F.2d 80, 1989 WL 153979, **3 (6th Cir. 1989) (quoting Olim v. Wakinekona, 461 U.S. 238, 249, 75 L. Ed. 2d

Get a Document - by Citation - 1992 U.S. Dist. LEXIS 18073          Page 35 of 75

Case 1:00-cv-00860-WLJ-AS   Document 16   Filed 06/23/2000   Page 9 of 11

813, 103 S. Ct. 1741 (1983)), cert. denied, 497 U.S. 1026 (1990). "Process is not an end in itself. [*25] Its constitutional purpose is to protect a substantive interest to which the individual has a legitimate claim of entitlement." Olim, 461 U.S. at 250. "The State may choose to require procedures for reasons other than protection against deprivation of substantive rights, of course, but in making that choice the State does not create an independent substantive right." Id., 461 at 250-51; see Shango v. Jurich, 681 F.2d 1091, 1100-1101 (7th Cir. 1982).

"The violation of a state statute outlining procedure does not necessarily equate to a due process violation under the federal constitution. If otherwise, federal courts would have the task of insuring strict compliance with state procedural regulations and statutes." Harris v. Birmingham Bd. of Ed., 817 F.2d 1525, 1527-28 (11th Cir. 1987) (citing Hewitt v. Helms, 459 U.S. 460, 471-72, 74 L. Ed. 2d 675, 103 S. Ct. 864 (1983), implicitly overruled on other grounds, Sandin v. Conner, 515 U.S. 472, 132 L. Ed. 2d 418, 115 S. Ct. 2293 (1995)).

The Amended Compact outlines a procedure by which DRPA is supposed to inform the private sector of proposed projects included in its master plan. The fact that it describes a notice and comment process does not mean the plaintiffs' interest [*26] in receiving that notice is protected by the Fourteenth Amendment. Procedural due process protections only apply if plaintiffs have an independent, substantive right that is being taken away.

In Harris, the plaintiff was deprived of a tenured position in a public school. A state statute required a detailed description of the reasons for termination in the notice provided to an employee. The plaintiff argued the school violated his procedural due process rights by failing to give him the detailed notice required under the statute. The court held the state statute was a "purely procedural requirement" and did not give the plaintiff a property interest worthy of procedural due process protection. Harris, 817 F.2d at 1527. The plaintiff had no procedural due process right to receive the process specified in the statute, because the statute accorded no substantive rights. See id. at 1528.

Plaintiffs can only state a procedural due process claim if they have been deprived of a substantive right created by the Amended Compact; there is no such right. Plaintiffs' procedural due process claim based on or related to alleged predatory act number ten will be dismissed.

## V. Injunctive [*27] Relief

DRPA, arguing the alleged acts do not violate the plaintiffs' constitutional rights, moves to dismiss the plaintiffs' request for permanent injunctive relief. See DRPA's Mem. Supp. Mot. Dismiss at 56. Because the court concludes the plaintiffs have stated a cause of action for violation of substantive due process and equal protection, DRPA's argument is premature.

Plaintiffs also request the court enjoin all three defendants from future "violation of the Amended Compact and Unification Acts." Plaintiffs are attempting to insert the court into the midst of local political policy over the appropriate role of the DRPA, PPC, PRPA and SJPC in developing and maintaining the Port District. This is a unique and highly important matter of local policy. The court will address plaintiffs' claims for constitutional violations but will not interpret the Amended Compact or intervene in vital matters of state policy. See supra note 4. Accordingly, DRPA's motion to dismiss plaintiffs' request for injunctive relief will be granted to the extent plaintiffs seek an injunction based on the Amended Compact itself.

## VI. Joinder of Pennsylvania and New Jersey

DRPA and PRPA move [*28] to dismiss the Second Amended Complaint for failure to join Pennsylvania and New Jersey as indispensable parties under Federal Rule of Civil Procedure 19. They base their argument on the fact that the plaintiffs seek a permanent injunction, barring all other state-related entities from funding development in the Port District. The

court will dismiss plaintiffs' request for injunctive relief concerning the terms and scope of the Amended Compact. See Baltimore Bank for Coops. v. Farmers Cheese Coop., 583 F.2d 104, 108 (3d Cir. 1978). Joinder of Pennsylvania and New Jersey is not possible under the Eleventh Amendment. Because Pennsylvania and New Jersey cannot be joined, the court must determine "whether in equity and good conscience the action should proceed among the parties before it, or should be dismissed." Fed. R. Civ. P. 19(b). Rule 19(b) enumerates four factors to consider:

first, to what extent a judgment rendered in a person's absence might be prejudicial to the person or those already parties; second, the extent to which, by protective provisions in the judgment, by shaping of relief, or other measures, the prejudice can be lessened or avoided; third, whether a judgment [*29] rendered in the person's absence will be adequate; fourth, whether the plaintiff will have an adequate remedy if the action is dismissed for nonjoinder.

The court can render judgment in the absence of Pennsylvania and New Jersey; the Amended Compact created DRPA as an independent agency that operates distinctly from either Pennsylvania and New Jersey. If the plaintiffs are successful on their claims, the court can fashion any relief in a manner avoiding any restriction on the ability of either Pennsylvania or New Jersey independently to engage in port development activities. Any judgment rendered in plaintiffs' favor can be adequate even without New Jersey and Pennsylvania joined as parties to this action. Finally, plaintiffs have no other adequate remedy if this court dismisses their action for failure to join Pennsylvania and New Jersey. Therefore, the action will not be dismissed for inability to join Pennsylvania and New Jersey.

**CONCLUSION**

Holt Cargo, Astro and Holt Hauling have stated a cause of action for violations of their substantive due process and equal protection rights, and the defendants' motions to dismiss those claims will be denied. The plaintiffs have [*30] failed to state a claim upon which relief can be granted for violation of their procedural due process rights, and the court will dismiss Count III of the revised Second Amended Complaint. The court will dismiss the portion of plaintiffs' request for injunctive relief dealing with any alleged violations of the terms of the Amended Compact.

An appropriate order follows.

**ORDER**

AND NOW, this 13th day of November, 1997, upon consideration of the motions to dismiss the Second Amended Complaint filed by defendants Delaware River Port Authority ("DRPA"), Port of Philadelphia and Camden ("PPC") and Philadelphia Regional Port Authority ("PRPA"), their supplemental memoranda, the response by plaintiffs Holt Cargo Systems, Inc. ("Holt Cargo"), Astro Holdings, Inc. ("Astro") and Holt Hauling and Warehousing Systems, Inc. ("Holt Hauling"), after a hearing in which counsel for all parties were heard, and in accordance with the attached Memorandum, it is hereby ORDERED that:

1. As to Count I, alleging violations of substantive due process, the defendants' motions to dismiss are **DENIED**; the court will not consider alleged predatory acts eight (8) or nine (9).

2. As to Count II, [*31] alleging violations of equal protection, the defendants' motions to dismiss are **DENIED**.

3. As to Count III, alleging violations of procedural due process, defendants' motions to dismiss are **GRANTED**; the court will not consider alleged predatory act ten (10).

4. DRPA's motion to dismiss plaintiffs' claim for injunctive relief is **GRANTED IN PART AND DENIED IN PART**; the motion is **GRANTED** as to any claim for injunctive relief arising out

Get a Document - by Citation - 1997 U.S. Dist. LEXIS 18073

Case 1:00-cv-00660-KAJAS U.S. Document 46 1807 Filed 06/23/2000    Page 37 of 75    Page 11 of 11

of alleged violations of the Amended Compact's terms; the motion is **DENIED** as to any claim for injunctive relief arising out of alleged violations of substantive due process or equal protection.

Norma L. Shapiro, J.

Service: **LEXSEE®**
Citation: **1997 us dist lexis 18073**
View: Full
Date/Time: Thursday, June 22, 2000 - 1:38 PM EDT

About LEXIS-NEXIS I Terms and Conditions

Copyright © 2000 LEXIS-NEXIS Group.  All rights reserved.





#124

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

VARTAN ENTERPRISES, INC.,            :
VARTAN SUPPLY COMPANY,               :
VARTAN CONSTRUCTION CO.,             :
THE AINJAR TRUST, and                :
JOHN O. VARTAN,                      :
                    Plaintiffs       :
                                     :     CIVIL ACTION NO. 1:CV-98-1944
        v.                           :
                                     :                    FILED
SUSQUEHANNA TOWNSHIP, et al.         :             HARRISBURG, PA
                                     :
                    Defendants       :                FEB 2 5 2000

                                           MARY E. D'ANDREA, CLEI
            MEMORANDUM AND ORDER           Per _____
                                                   Deputy Clerk

        Before the Court are Plaintiffs' motion for partial summary judgment, which seeks the

Court's finding that Plaintiffs have a property interest subject to substantive due process

protections, and Defendants' motion for summary judgment. For the reasons discussed below,

Defendants' motion will be granted in part and denied in part, and the parties will be directed to

file supplemental briefs further addressing Plaintiffs' motion, as provided below.

I.      **Background**

        Plaintiffs Vartan Enterprises, Inc., Vartan Supply Company, Vartan Construction

Company, The Ainjar Trust, and John O. Vartan commenced this action against Defendants

Susquehanna Township, Board of Commissioners of Susquehanna Township, Commissioners

Michael Pender, Robert Mendelsohn, Jack Solomon, Harry Thomas, Stanley Lawson, Steven

Condes, Brian Allen, James Klein, and Thomas McArthur, Zoning Officer Francis Kessler, and

Building Inspector William Garber by writ of summons filed in Dauphin County Court of

Common Pleas on April 9, 1998. Plaintiffs filed their complaint in that court on November 20,

1998, seeking declaratory relief under state law as well as damages under 42 U.S.C. § 1983 for

violation of Plaintiffs' substantive and procedural due process rights. On December 2, 1998, Defendants removed the action to this Court.

Plaintiffs' complaint arises out of the efforts of Plaintiff John O. Vartan and his affiliated entities to use certain property in Susquehanna Township to fabricate precast concrete building products. The following facts forming the basis of Plaintiffs' claims are generally undisputed; factual disputes are noted where applicable.

In March 1997, Plaintiff Vartan met with Zoning Officer Kessler regarding the proposed use of certain property in Susquehanna Township. On March 26, 1997, after consultation with the Township Solicitor, Zoning Officer Kessler issued a building permit to Plaintiff Vartan Construction Company for the construction of two concrete pads "for precast casting beds and columns" on the property. No appeal from the issuance of this building permit was taken. Two months later, the Township Board of Commissioners notified Vartan that his building permit was revoked. Asserting that the Board of Commissioners did not have the right to revoke the permit, Vartan continued the construction authorized by the permit.

The Township subsequently initiated an action in equity in the Dauphin County Court of Common Pleas to enjoin Vartan from proceeding under the permit. The Dauphin County Court granted the injunctive relief sought by the Township, and Vartan appealed to Commonwealth Court. On April 3, 1998, Commonwealth Court reversed the lower court's decision and vacated the injunction, holding that "the Township Commissioners, as the governing body of the municipality, are powerless under the MPC and their own zoning ordinance to issue, deny, or revoke a building permit."

It is undisputed that, following the issuance of the Commonwealth Court decision, Zoning Officer Kessler sent a letter dated April 6, 1998 notifying Vartan that the building permit

2

was being revoked for a second time.   The precise role of the Commissioners and Zoning

Officer Kessler in the April 6, 1998 revocation determination, however, is disputed.

Vartan subsequently filed the instant lawsuit and appealed the second revocation to the

Susquehanna Township Zoning Hearing Board.   The Zoning Hearing Board has conducted

extensive hearings on the matter.   A decision on the appeal is expected in March 2000.

II.   **Discussion**

A.   **Summary Judgment Standard**

Federal Rule of Civil Procedure 56 provides that summary judgment is proper when "the

pleadings, depositions, answers to interrogatories, and admissions on file, together with the

affidavits, if any, show that there is no genuine issue as to any material fact and that the moving

party is entitled to a judgment as a matter of law."   A factual dispute is "material" is if might

affect the outcome of the suit under the applicable law.   See Anderson v. Liberty Lobby, Inc.,

477 U.S. 242, 248 (1986).   A factual dispute is "genuine" only if there is a sufficient evidentiary

basis which would allow a reasonable fact-finder to return a verdict for the non-moving party.

See id. at 249.   The court must resolve all doubts as to the existence of a genuine issue of

material fact in favor of the non-moving party.   See White v. Westinghouse Elec. Co., 862 F.2d

56, 59 (3d Cir. 1988).

Once the moving party has shown that there is an absence of evidence to support the

claims of the non-moving party, the non-moving party may not simply sit back and rest on the

allegations in its complaint; instead, it must "go beyond the pleadings and by [its] own affidavits,

or by the depositions, answers to interrogatories, and admissions on file, designate specific facts

showing that there is a genuine issue for trial." Celotex Corp. v. Catrett, 477 U.S. 317, 324

(1986) internal quotations omitted).   Summary judgment should be granted where a party "fails

3

to make a showing sufficient to establish the existence of an element essential to that party's case and on which that party will bear the burden at trial." Id.

### B.   Plaintiffs' Motion for Partial Summary Judgment

As noted above, Plaintiffs' motion for partial summary judgment seeks the Court's finding that Plaintiffs have a property interest subject to substantive due process protections. Plaintiffs allege that Defendants limited the use or enjoyment of certain property owned by Plaintiffs, and that they did so for partisan political or personal reasons unrelated to the merits of Plaintiffs' intended use of the property.

Upon consideration of Plaintiffs' motion and supporting brief, and Defendants' opposition thereto, the Court finds that, pursuant to the standards articulated by the Third Circuit in DeBlasio v. Zoning Board of Adjustment, 53 F.3d 592 (3d Cir. 1995), as a landowning plaintiff whose use or enjoyment of property has been limited by a governmental decision alleged to be based on partisan political or personal reasons unrelated to the merits of the proposed use of the property, at least one of the Plaintiffs has established possession of a property interest worthy of substantive due process protection.

However, in briefing the property interest question the parties have not addressed which named plaintiffs possess a protected property interest under the DeBlasio standard. It is not contested that Plaintiff The Ainjar Trust holds title to the property in question, that Plaintiff John O. Vartan is the trustee of The Ainjar Trust, and that Plaintiff Vartan Construction Company obtained the building permit at issue in this action. In order to assist the Court in determining which Plaintiff(s) possesses the DeBlasio interest, both parties will be directed to file a supplemental brief addressing that issue.

4

C.    Defendants' Motion for Summary Judgment

Defendants move for summary judgment on a number of grounds. Those grounds will be

addressed seriatim.

1.    Punitive damage claims against Defendants Susquehanna Township and Board of
Commissioners of Susquehanna Township.

Defendants first move for summary judgment as to Plaintiffs' claims for punitive

damages against Defendants Susquehanna Township ("Township") and the Board of

Commissioners of Susquehanna Township ("Board"), pursuant to the authority of City of

Newport et al. v. Fact Concerts. Inc., 453 U.S. 247 (1981). Plaintiffs acknowledge that City of

Newport precludes their claims for punitive damages against the Township and the Board.

Accordingly, Defendants' motion for summary judgment as to Plaintiffs' claims for punitive

damages against the Township and the Board will be granted.

2.    Alleged violations of Fifth, Eighth, and Ninth Amendments to the Constitution.

Defendants also move for summary judgment on Plaintiffs' claims under the Fifth,

Eighth, and Ninth Amendments to the Constitution, arguing that there are no facts asserted in

Plaintiffs' complaint to support such claims. Plaintiffs acknowledge that the only constitutional

claims they are pursuing are claims of violation of substantive and procedural due process rights

guaranteed by the Fourteenth Amendment. Accordingly, Defendants' motion for summary

judgment as to Plaintiffs' claims based on alleged violations of the Fifth, Eighth, and Ninth

Amendments to the Constitution will be granted.

3.    Absolute Legislative Immunity.

Defendants next move for summary judgment as to Plaintiffs' claims against

Commissioners Pender, Mendelsohn, Solomon, Thomas, Lawson, Condes, Allen, Klein, and

McArthur, based on the doctrine of absolute legislative immunity. The revocation of the permit was an administrative, not legislative, act, and therefore, is not entitled to absolute legislative immunity. See Cellco Partnership v. Hess, 1999 WL 178364 at *7 (E.D. Pa. Mar. 30, 1999) (in denying application for conditional use approval, borough council engaged in administrative rather than legislative act); Northpoint Breeze Coalition v. City of Pittsburgh, 431 A.2d 398 (Pa. Cmwlth. 1981) (holding that granting conditional use application was not legislative act); see also Epstein v. Twp. of Whitehall, 639 F.Supp. 309, 315 (E.D.Pa. 1988) (holding that legislators acting as zoning board members were acting in administrative capacity by applying already enacted ordinance to single plan for development). Accordingly, Defendants' motion for summary judgment as to Plaintiffs' claims against Commissioners Pender, Mendelsohn, Solomon, Thomas, Lawson, Condes, Allen, Klein, and McArthur on the ground of absolute legislative immunity will be denied.

    4.    Ripeness Grounds.

    Defendants' motion for summary judgment on ripeness grounds, based on Sameric Corp. of Delaware v. City of Philadelphia, 142 F.3d 582 (3d Cir. 1998), must also fail. Defendants argue that Plaintiffs' claims will not be ripe until the Zoning Hearing Board renders its decision on Vartan's appeal, yet acknowledge that the decision of the Zoning Hearing Board is due to be issued prior to the scheduled trial date in this matter, and that "[t]he ripeness issue should not result in dismissal." Plaintiffs' claims for relief based on constitutional violations are not dependent on any zoning board action or nonaction. The claims presented are ripe for adjudication. Accordingly, Defendants' motion for summary judgment on this ground will be denied.

5.   Substantive Due Process Claim.

As discussed supra, Plaintiffs have alleged a violation of a property interest subject to substantive due process protections under the standards articulated in DeBlasio v. Zoning Board of Adjustment, 53 F.3d 592 (3d Cir. 1995). Defendants argue that, even assuming that Plaintiffs have a protectible interest, they are entitled to summary judgment because there is no genuine issue of material fact as to the reasons for the Defendants' actions regarding the property at issue. They argue that the actions of the Defendants with regard to revocation of the Vartan permit were rationally related to a legitimate governmental interest.

Plaintiffs cite the following record evidence to support their claim that Defendants' actions were motivated by partisan political and personal reasons unrelated to the merits of the proposed use of the property:

- Commissioner Pender was defeated in a primary election two weeks before any concerns arose regarding the Vartan permit.

- Commissioner Pender first raised the issue and sought to publicize the project.

- The McNaughton Company, a business competitor of Vartan and owner of adjoining lands, also raised concerns.

- Mr. Francis McNaughton, principal of the McNaughton Company, commands significant influence with members of the Board and specifically Commissioner Mendelsohn.

- Following the revocation and subsequent revocation, Commissioners Pender, Solomon and Thomas all used the Vartan issue as a political campaign tool.

- During this period, various Commissioners received financial support from a Political Action Committee controlled by Commissioner Mendelsohn and receiving contribution from McNaughton interests.

Plaintiffs also counter Defendants' contention that the permit was revoked because it was issued in error by pointing to the following evidence:

7

- The Township Solicitor issued a written, legal opinion stating that the use was allowable.

- When the permit was issued, Zoning Officer Kessler had every opportunity to secure additional information but did not ask even one further question.

- Zoning Officer Kessler testified that the permit application contained no error sufficient to revoke the permit.

- Zoning Officer Kessler testified that he had no knowledge of any misstatement or misrepresentation that would lead to revocation.

- Zoning Officer Kessler can point to no "new" evidence or conditions which would cause revocation.

Plaintiffs further point to evidence from which a trier of fact could conclude that the Commissioners, not Zoning Officer Kessler, were responsible for the second revocation of the permit after the Commonwealth Court decision was issued, and that they then attempted to cover-up their involvement. Plaintiffs point to the following evidence:

- The permit was revoked three days after the Commonwealth Court voided the first revocation.

- Before the permit was revoked the Commissioners were contacted and polled regarding their desires in relation to revocation of the Vartan permit.

- Zoning Officer Kessler stated under oath that he would not have revoked the permit absent "approval" by the Commissioners.

- Following the revocation, Commissioner Pender announced at a township meeting that the Commissioners had "instructed" Zoning Officer Kessler to revoke the permit.

- The Township memorializes township meetings in two ways: official minutes and audiotapes.

- The first draft of the Official Minutes of the April 9, 1999 meeting following the second revocation contained a reference to the fact that the Zoning Officer was "instructed" to revoke the permit.

- The minutes were changed at the direction of the Township Solicitor.

8

- The audiotape which should have recorded the comments of Commissioner Pender is inexplicably blank.

- The audiotape which should have captured the discussion regarding the change in the minutes contains a 14 second gap caused by an overrecording (erasure) covering the relevant discussions.

The evidence cited by Plaintiffs represents a genuine issue of material fact as to (1) which of the Defendants was responsible for the second revocation of the permit, and (2) the reasons for the Defendants' actions related to the revocations of the permit. The resolution of these issues is for the trier of fact. Accordingly, Defendants' motion for summary judgment on Plaintiffs' claim of violation of substantive due process rights will be denied.

    6.    <u>Procedural Due Process Claim.</u>

Both parties agree that, to establish a violation of the right to procedural due process, a plaintiff must prove that a person acting under color of state law deprived him of a protected property interest and that the state procedure for challenging the deprivation does not satisfy the requirements of due process. <u>See</u> <u>DeBlasio</u>, 53 F.3d at 597 (citing <u>Midnight Sessions, Ltd. v. City of Philadelphia</u>, 945 F.2d 667, 680 (3d Cir. 1991)). As the Court has found that Plaintiffs have alleged a violation of a property interest subject to due process protections under <u>DeBlasio</u>, the Court addresses the second prong of the procedural due process inquiry – whether the state procedures for challenging the deprivation satisfy the requirements of due process. A state provides constitutionally adequate procedural due process when it provides reasonable remedies to rectify a legal error by a local administrative body. <u>See</u> <u>DeBlasio</u>, 53 F.3d at 597 (citing <u>Bello v. Walker</u>, 840 F.2d 1124, 1128 (3d Cir. 1988)).

With regard to the initial revocation of the permit, Defendants argue that the various legal avenues Plaintiffs' claims have taken demonstrate that procedural due process has been provided

9

to Plaintiffs, citing the proceedings before Dauphin County Judge Turgeon, and the appeal to Commonwealth Court. Plaintiffs point out that there was no legally recognized mechanism for appeal of the Commissioners' revocation, as there exists no statutory appeal from a Commissioner revocation under the Municipalities Planning Code, because the Zoning Hearing Board has no jurisdiction over decisions of the Commissioners. See 53 P.S. § 10909.1. Moreover, Plaintiffs point out that they were provided no notice or opportunity to be heard prior to the revocation.

Defendants' arguments with regard to the sufficiency of the post-revocation process must fail. The situation in which Plaintiffs found themselves after the initial revocation of the permit by the Commissioners afforded them absolutely no "full judicial mechanism with which to challenge the administrative decision." Bello, 840 F.2d at 1128. Elements of due process include "(1) notice of the basis of the governmental action; (2) a neutral arbiter; (3) an opportunity to make an oral presentation; (4) a means of presenting evidence; (5) an opportunity to cross-examine witnesses or to respond to written evidence; (6) the right to be represented by counsel; and (7) a decision based on the record with a statement of reasons for the result." Rogin v. Bensalem Twp., 616 F.2d 680, 694 (3d Cir. 1980) (citation omitted). Plaintiffs received none of these with regard to the initial revocation. The revocation was overturned only after Plaintiffs challenged the decision by ignoring it, and Defendants sought to enforce it through a cease and desist order which led, eventually, to the voiding of the revocation by the Commonwealth Court.

Accepting as true Plaintiffs' factual averments,[1] the second revocation of the permit,

---

[1]    Defendants argue that the second revocation was an independent action of the Zoning Officer, and the Plaintiffs have availed themselves of the statutory process to challenge it – appeal of the Zoning Officer decision to the Zoning Hearing Board. As the Court has previously noted, which Defendant(s) is responsible for the second revocation is a disputed

10

which took place in April 1998, was similarly an action of the Commissioners, taken in direct

contravention of the Commonwealth Court decision just issued.   If the trier of fact credits

Plaintiffs' version of the facts with regard to the second revocation, as noted above, there exists

no statutory appeal from a Commissioner revocation under the Municipalities Planning Code.

Accordingly, Defendants' motion for summary judgment on Plaintiffs' claim of violation of

procedural due process will be denied.

7.    Qualified Immunity.[2]

Defendants next argue that the individual defendants are entitled to summary judgment

on Plaintiffs' claims because they are entitled to qualified immunity.   The Third Circuit recently

summarized the qualified immunity doctrine and analysis.   Under this

> doctrine, "government officials performing discretionary functions generally
> are shielded from liability for civil damages insofar as their conduct does not
> violate clearly established statutory or constitutional rights of which a reasonable
> person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982).
> "The contours of the right must be sufficiently clear that a reasonable official
> would understand that what he is doing violates that right." Anderson v. Creighton,
> 483 U.S. 635, 640 (1987); see also Acierno v.Cloutier, 40 F.3d 597, 616 (3d Cir.
> 1994) (en banc).
>
> In determining whether defendants are entitled to claim qualified immunity, we
> engage in a three-part inquiry: (1) whether the plaintiffs alleged a violation of
> their constitutional rights; (2) whether the right alleged to have been violated was
> clearly established in the existing law at the time of the violation; and (3) whether
> a reasonable official knew or should have known that the alleged action violated

question of fact for the jury.

[2]       Plaintiffs argue in their opposition to Defendants' motion that the Court should
summarily reject Defendants' qualified immunity defense pursuant to the law of the case, as
Defendants previously raised the defense in connection with their motion for judgment on the
pleadings, which was denied by the Court.   That decision does not preclude the Court from
examining the qualified immunity issue in the context of Defendants' motion for summary
judgment, in light of the evidence that has been produced in connection with Defendants'
motion.

11

the plaintiff's rights.

Rouse v. Plantier, 182 F.3d 192, 196-97 (3d Cir. 1999). In Hunter v. Bryant, 520 U.S. 224, 228 (1991), the Supreme Court stated that qualified immunity ordinarily is to be resolved by the court, not the jury.

Under both Supreme Court and Third Circuit precedent, the first two issues in the qualified immunity analysis, whether the plaintiffs alleged a violation of their constitutional rights and whether the right alleged to have been violated was clearly established in the existing law at the time of the violation, are legal questions for the court. See Sharrar v. Felsing, 128 F.3d 810, 826 (3d Cir. 1997).

In Sharrar the Third Circuit also indicated that the third issue, whether a reasonable official knew or should have known that the action alleged violated plaintiffs' rights, will in all but the rarest of cases be decided by the court.

> We thus hold, following the Supreme Court's decision in Hunter, that in deciding whether defendant officers are entitled to qualified immunity it is not only the evidence of "clearly established law" that is for the court but also whether the actions of the officers were objectively reasonable. Only if the historical facts material to the latter issue are in dispute, as in Karnes,[3] will there be an issue for the jury. The reasonableness of the officers' beliefs or actions is not a jury question, as the Supreme Court explained in Hunter.

Id. at 828.

With respect to the first question in the qualified immunity analysis, whether the

---

[3]     In Karnes v. Skrutski, 62 F.3d 485 (3d Cir. 1995), the Third Circuit reversed the district court's grant of judgment as a matter of law on the issue of qualified immunity. Plaintiff had alleged that defendant police officers unlawfully searched his vehicle following an investigatory stop. The Third Circuit held that because there was a genuine issue of material fact as to whether the officers in fact believed that certain "vegetable matter" seen on the floor of the car was or likely could have been marijuana, the issue of the officers' right to qualified immunity was an issue of fact for the jury.

12

plaintiffs alleged a violation of constitutional rights, the Court's holding supra that Plaintiffs have established a property interest subject to substantive due process protections under the standards articulated in DeBlasio v. Zoning Board of Adjustment, 53 F.3d 592 (3d Cir. 1995), resolves this issue in the affirmative.

The second issue, whether the right alleged to have been violated was clearly established in the existing law at the time of the violation, must similarly be resolved in the affirmative. The Third Circuit's DeBlasio decision was issued in 1995, and the deprivations alleged in Plaintiffs' complaint occurred in 1997 and 1998. Accordingly, DeBlasio, decided several years before the alleged constitutional violations in the instant case, warrants the conclusion that plaintiffs' due process rights were clearly established at the time of the alleged violation because, had township officials applied the general principles of DeBlasio to the facts in this case, they would have been aware that their alleged conduct violated the Third Circuit's conception of due process.

Finally, with regard to the third inquiry, whether a reasonable official knew or should have known that the alleged action violated the plaintiffs' rights, resolution of this issue should be made by the Court, unless there is a dispute regarding material facts relevant to this issue, as was the case in Karnes. See Sharrar, 128 F.3d at 828. The instant case presents a dispute as to the material historical facts relevant to a determination whether the Defendants' actions were objectively reasonable. For example, relevant factual disputes include who made the second revocation determination and why, as well as the motivation behind the Commissioner Defendants' actions with regard to the first revocation. The Defendants' potential right to qualified immunity depends on the resolution of factual issues which are properly presented to the trier of fact. Accordingly, as the Court finds that there are genuine issues of fact as to historical facts material to a determination whether the actions of the individual defendants were

13

objectively reasonable, the Court will deny Defendants' motion for summary judgment on qualified immunity grounds.

      8.    <u>Punitive Damage Claims against the individual defendants.</u>

      Defendants argue that they are entitled to summary judgment as to Plaintiffs' claims for punitive damages against the individual defendants. Punitive damages are available in a Section 1983 suit against a municipal official in his individual capacity[4] when the official's "conduct is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others." <u>Smith v. Wade</u>, 461 U.S. 30, 56 (1983). Defendants argue that the evidence offered by Plaintiffs does not give rise to the type of conduct punishable by punitive damages, particularly with regard to Zoning Officer Kessler and Building Inspector Garber. However, in light of the existence of disputed questions of fact regarding which Defendants took certain actions related to the revocations and why, Defendants' motion as to Plaintiffs' punitive damage claims against the individual defendants must be denied.

---

      [4]      Although neither party has addressed the issue explicitly, both parties appear to agree that Plaintiffs' claims are asserted against the individual Defendants in their individual, rather than official, capacities.

## III.  Order

Accordingly, for all of the reasons discussed above, IT IS ORDERED THAT:

1.  With regard to Plaintiffs' motion for partial summary judgment, both parties are directed to file a supplemental brief addressing the issue of which Plaintiff(s) possesses the DeBlasio interest.  Plaintiffs and Defendants shall file briefs addressing the issue within ten (10) days of the date of this Order.

2.  Defendants' motion summary judgment is GRANTED IN PART and DENIED IN PART, as follows:

    a.  Defendants' motion for summary judgment as to Plaintiffs' claims for punitive damages against Defendants Susquehanna Township and the Board of Commissioners of Susquehanna Township is GRANTED.

    b.  Defendants' motion for summary judgment as to Plaintiffs' claims based on alleged violations of the Fifth, Eighth, and Ninth Amendments to the Constitution is GRANTED.

    c.  Defendants' motion for summary judgment as to Plaintiffs' claims against Commissioners Pender, Mendelsohn, Solomon, Thomas, Lawson, Condes, Allen, Klein, and McArthur based on the doctrine of absolute legislative immunity is DENIED.

    d.  Defendants' motion for summary judgment as to Plaintiffs' claims based on ripeness grounds is DENIED.

    e.  Defendants' motion for summary judgment as to Plaintiffs' substantive due process claim is DENIED.

    f.  Defendants' motion for summary judgment as to Plaintiffs' procedural due process claim is DENIED.

    g.  Defendants' motion for summary judgment as to Plaintiffs' claims against the individual defendants based on qualified immunity is DENIED.

    h.  Defendants' motion for summary judgment as to Plaintiffs' claims for punitive damages against the individual defendants is DENIED.

Yvette Kane
United States District Judge

Dated: February 25, 2000.

15

F

Service: **LEXSEE®**
Citation: **1996 us dist lexis 11177**

*1996 U.S. Dist. LEXIS 11177, **

NORTHEAST JET CENTER, LTD., Plaintiff v. LEHIGH-NORTHAMPTON AIRPORT AUTHORITY;
JACK YOHE; and SANFORD WARTELL, Defendants

CIVIL ACTION No. 90-1262

UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF PENNSYLVANIA

1996 U.S. Dist. LEXIS 11177

August 1, 1996, Decided
August 1, 1996, FILED, ENTERED

**DISPOSITION:** [*1] Said motions are DENIED with respect to count one alleging constitutional violations. Said motions are DENIED with respect to that part of count three alleging intentional interference with a prospective contractual relationship. Said motions are DENIED with respect to count six alleging defamation. Said motions are GRANTED in all other respects and judgment is entered in favor of Defendants and against Plaintiff on all claims except those above. This is not a final judgment.

**CORE TERMS:** hangar, airport, summary judgment, lease, aircraft, defamatory, tenant, defamation, contractual, default, repair, charter, lease agreement, partial, intentional interference, genuine issue, certificate, financing, space, deposition testimony, defamatory meaning, respect to count, completion, precluding, revocation, station, duty, reasonably find, aviation, innuendo

**COUNSEL:** For NORTHEAST JET CENTER, LTD., PLAINTIFF: DAVID K. MONROE, JOEL E. LAIKS, GALLAND, KHARASCH, MORSE & GARFINKLE, P.C., WASHINGTON, DC USA.

For LEHIGH-NORTHAMPTON AIRPORT AUTHORITY, JACK YOHE, Airport Director, SANFORD WARTELL, Chairman of the Board of Directors, DEFENDANTS: STEVEN M. JANOVE, TERESA N. CAVENAGH, WENDY R. HUGHES, DUANE, MORRIS & HECKSCHER, PHILA, PA USA. J. BRUCE MC KISSOCK, INGRID B. HOPKINSON, MC KISSOCK & HOFFMAN, P.C., PHILA, PA USA.

**JUDGES:** Franklin S. Van Antwerpen, United States District Judge

**OPINIONBY:** Franklin S. Van Antwerpen

**OPINION: MEMORANDUM AND ORDER**

Van Antwerpen, J.

August 1, 1996

## I. INTRODUCTION

Plaintiff makes claims in this case under 42 U.S.C. §§ 1983, [*2] 1985; 15 U.S.C. §§ 1 and 2; 15 U.S.C. § 15; the Fourteenth Amendment to the United States Constitution; 53 Pa C.S.A. § 306; Article I, Sections 1,9, and 26 of the Pennsylvania Constitution; 42 Pa.C.S.A. § 8343 and the common law of the Commonwealth of Pennsylvania. This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331, 1337 and the doctrine of supplemental jurisdiction, 28 U.S.C. § 1367. Venue for this action lies in the Eastern District of

Get a Document - by Citation - 1996 U.S. Dist. LEXIS 11117    Page 56 of 75

Case 2:00-cv-00684-JM Document 18    Filed 06/23/2000    Page 2 of 21

Pennsylvania pursuant to 28 U.S.C. § 1391(b) and (c). It is alleged that the matter in controversy exceeds the sum or value of $ 50,000, exclusive of interest and costs.

On May 31, 1991, we previously addressed this case in our prior opinion and order, at 767 F. Supp. 672 (1991). At that time, we granted a motion to dismiss in part and denied it in part. In particular, we held that: (1) the Plaintiff had failed to show how its right to be free of certain alleged misconduct rose to the level of federal right protected by § 1983 but that Plaintiff had adequately alleged a denial of equal protection actionable under § 1983; and (2) under the Local Government Antitrust Act, Defendant Airport Authority was absolutely immune [*3] from a damage claim based upon alleged violation of Sherman Act but that plaintiff had managed to avoid application of the state action exemption to the antitrust laws with respect to its claim for injunctive relief. This case was delayed pending the trial and subsequent conviction of Plaintiff's President, Mr. Earl M. Holtz for conspiracy to defraud the United States through improper filings with the Federal Aviation Administration. That prosecution has been the subject of several decisions of the District Court. See 1993 WL 482953; 1994 WL 750674; 1995 WL 106895; and 1995 WL 312537.

In its second amended complaint, filed June 21, 1991, Plaintiff Northeast Jet Center has alleged seven causes of action arising out of circumstances surrounding the closing of its operations and those of its affiliate, Northeast Jet Company, at the Allentown-Bethlehem-Easton Airport. n1 Defendants -- the airport authority, its director and board chairman -- through two motions filed on January 22, 1996 and one on February 8, 1996, have moved for summary judgment on all counts as well as partial summary judgment on most counts separately. n2

- - - - - - - - - - - - - - - - -Footnotes- - - - - - - - - - - - - - - - - -

n1 We take notice of the fact that this airport is now called the Lehigh Valley International Airport. [*4]

n2 In their motions filed on January 22, 1996, Defendants moved for summary judgment on counts three through seven. Their motion filed on February 8, 1996 seeks summary judgment on all counts based on our Order of January 22, 1996, precluding Plaintiff from presenting expert testimony. That order was in turn based on Plaintiff's failure to comply with the parties' stipulated scheduling order, approved by this Court on August 2, 1995 and filed August 3, 1995.

- - - - - - - - - - - - - - - -End Footnotes- - - - - - - - - - - - - - - - -

## II. STATEMENT OF FACTS

We have taken the facts from the Plaintiffs' papers wherever they are supported by citations to the record. For the purpose of deciding these summary judgment motions, we assume they are true.

Plaintiff Northeast Jet Center, Ltd. was engaged in the business of providing ground-based aviation services at A.B.E. Airport from 1986 until February 1990. Plaintiff operated out of a large hangar on land leased from A.B.E. Airport. As a so-called fixed-base operator ("FBO"), Plaintiff provided a range of aviation services including aircraft parking, tie-down and storage services; aircraft repair, maintenance [*5] and inspection services; flight-line servicing, including the sale and delivery of aviation petroleum products; ground transportation services for crew and passengers within the Airport's boundaries; aircraft charter, rental and air taxi services; brokerage services for new and used aircraft; purchase and sale of aircraft parts and accessories; and lease of hangar space to aircraft owners.

During most of the period from 1986 until 1990, Plaintiff had a "Part 145" License from the Federal Aviation Administration (FAA) to provide certain specialized maintenance and

Get a Document - by Citation - 1996 U.S. Dist. LEXIS 11177

Case 1:00-cv-00660-YK-JAS   Document 18   Filed 06/23/2000   Page 57 of 75   Page 3 of 21

inspection services. Plaintiff also employed FAA-licensed mechanics to provide routine aircraft maintenance and repair independently of its Part 145 Certificate. Plaintiff's major tenants for hangar space included two local business corporations, Union Pacific and Mack Truck.

Plaintiff provided substantial maintenance, inspection, fueling and other services for Northeast Jet Company, Inc. an affiliated company, which operated an air taxi service out of Plaintiff's hangar. Northeast Jet Company had a "Part 135" Certificate from the FAA permitting it to operate as an on-demand air taxi charter airline. Although Plaintiff and  [*6] Northeast Jet Company were jointly owned, and both operated out of Plaintiff's hangar, for purposes of this motion they were different corporations and were in different lines of business. (See Earl M. Holtz Deposition Transcript, hereinafter "Holtz Dep.," Exhibit 24, Plaintiff's Opposition to Defendants' Motions for Summary Judgment, filed February 8, 1996 at 25.) In particular, Northeast Jet Company operated as a charter airline under Part 135 which Plaintiff did not. Similarly, Plaintiff operated as an FBO at A.B.E. Airport which Northeast Jet Company did not do. Id. at 185.

Plaintiff and the Defendant Airport Authority had an agreement which included a forty-year lease of the property from the airport. At the end of 20 years, or sooner if the lease was terminated, the Airport Authority was to take title to the hangar facility itself. Id. Exhibit 1, at Art. III.

In March 1988, Union Pacific planned to expand its airplane fleet at A.B.E. Airport. Union Pacific approached Plaintiff about obtaining additional hangar space for its use at the Center facility. Following negotiations, Plaintiff and Union Pacific entered into a written agreement whereby Plaintiff agreed to  [*7] lease half of the expanded portion of a new hangar for 10 years upon its completion. Pursuant to the Center/Union Pacific agreement, the hangar expansion was scheduled to be completed by February 1989. Id., Exhibit 24, at p. 460. The extension agreement committed Union Pacific to lease the new hangar, but allowed Union Pacific to opt out of the project under certain conditions.

Plaintiff obtained financing for the hangar expansion from Northeastern Bank, and began the process of hiring professionals to design and build the expansion. During the summer of 1988, Plaintiff retained the services of architectural and construction companies and began the process of obtaining permits for the construction. Id. Exhibit 24, at 328-330. The hangar expansion, like the original hangar, was to be built upon the land Plaintiff had leased from the Airport.

In the Summer of 1988, The FAA began an investigation of the operations of Northeast Jet Company and the air taxi charter service it operated out of Plaintiff's hangar. On September 30, 1988, the FAA issued an emergency revocation order revoking Northeast Jet Company's Part 135 Certificate, thereby grounding Northeast Jet Company's aircraft.  [*8] Id. Exhibit 24, at 53. Northeast Jet Company contested the revocation order and a hearing was scheduled before the National Transportation Safety Board (NTSB) for November 7-9, 1988.

That hearing was subsequently canceled following a settlement reached by Northeast Jet Company and the FAA on October 27, 1988. Pursuant to that settlement, the FAA authorized Northeast Jet Company to apply for recertification as a Part 135 charter air carrier. The recertification was granted in May 1990.

The issues raised in the revocation order were addressed solely to Northeast Jet Company's air charter service -- not the Plaintiff's FBO operations. The FAA took no direct action against Plaintiff, nor was its Part 145 repair station license involved in the investigation. Nonetheless, the FAA enforcement action against Northeast Jet Company did have a substantial indirect effect upon Plaintiff's business operations. Because Northeast Jet Company could not fly its aircraft following the revocation, and in fact sold off most of its aircraft, Plaintiff was faced with losing a substantial amount of maintenance and repair business which normally would have arisen from Northeast Jet Company's aircraft.  [*9] Id., Exhibit 24, at 82-83.

Shortly after the revocation, Plaintiff took responsive measures in light of the loss of maintenance and repair work. Plaintiff laid off a number of personnel and voluntarily turned in its Part 145 repair station certificate on October 21, 1988. Id., at 342. Plaintiff also advised its general contractor to halt work on the hangar expansion project on October 7, 1988. Although Plaintiff hoped to recommence construction at a later date. Plaintiff conferred with its bank which expressed willingness to continue financing. During this time Plaintiff's tenant, Union Pacific, continued to express interest in Plantiff's plans for hangar expansion. That interest continued into early 1989.

The Airport sought the advice of an airport consultant as to whether the revocation of Northeast Jet Company's Part 135 License constituted an event of default under Plaintiff's lease with the Airport. The consultant advised the Airport against placing Plaintiff in default because Northeast Jet Company was no longer operating an air taxi service. He suggested that the Airport await the outcome of the scheduled November 7-9, 1988 NTSB hearing regarding the revocation order.  [*10]

On November 4, 1988, after consultation with its attorneys, the Airport notified Plaintiff that it was in breach of its lease. Plaintiff's Opposition to Defendants' Motions for Summary Judgment, filed February 8, 1996, Exhibit 5. The Airport sent the breach notice without prior discussion with Plaintiff. The Airport also sent a copy of the breach notice to Plaintiff's bank. The Airport's director was also quoted in a newspaper article that Plaintiff was in breach of its lease. Id., Exhibit 6. In that article, Defendant Yohe stated that Plaintiff had surrendered its "ground maintenance certificate" and therefore it could no longer meet the terms of the lease. Id.

Plaintiff reapplied to the FAA for a new Part 145 repair station certificate on December 8, 1988. Around the same time, Defendant Yohe, Airport Director, contacted several FAA officials in Washington with regard to the reapplication. Id Exhibits 9, 24 (at 506-510, and 25 (at 146-147, 170-171). Plaintiff was recertified in February 1989. Defendants once again hired the same consultant who again advised them there was no basis for placing Plaintiff in default of its lease. Id., Exhibits 10 and 25 (at 120-122).  [*11]  On May 25, 1989, the Airport notified Plaintiff that it had rescinded its November 4, 1988 notice of default. Id., Exhibits 11 and 25 (at 122-125). During the period in which Plaintiff had been held in breach of its lease by Airport, Plaintiff's bank withdrew its financing for the proposed hangar expansion. The Airport held Plaintiff in breach of its lease from November 4, 1988 until May 25, 1989.

Also at this time, Defendants had numerous discussions with Plaintiff's tenant, Union Pacific. These discussions involved possible alternatives for Union Pacific's increasing hangar needs. Union Pacific continued to be interested in the hangar expansion originally proposed by Plaintiff. Union Pacific's interest in a new Northeast Jet Center hangar expansion continued into March 1989, one month after the completion date specified in their binding agreement. On April 25, 1989, Union Pacific notified Plaintiff that it was pulling out of the project because it had found a satisfactory alternative. Id., Exhibit M.

In October 1989, the Airport director sent a letter to all tenants of the A.B.E. Airport -- except Plaintiff itself -- indicating that the Airport was making plans to deal  [*12]  with "A.B.E.'s lack of an adequate and reliable fixed-base operator." Id., Exhibit 21. The Airport also drafted a new FBO and charter requirements at this time. By early 1990, Plaintiff was in poor financial condition. It had lost the opportunity of constructing a hangar expansion with a 10-year commitment from its anchor tenant. Union Pacific had notified Plaintiff that it would be vacating its space in the original hangar in a short period. Plaintiff was forced to sell.

Plaintiff sold its facilities to Jaindl Aviation on February 2, 1990. Id., Exhibit 23. Jaindl subsequently assigned its rights in that purchase to the Defendant Airport Authority. The Airport subsequently installed an "interim FBO" on a management fee basis to operate out of

Get a Document - by Citation - 1996 U.S. Dist. LEXIS 11177    Page 59 of 75

Case 2:00-cv-00680-KJR-RS  Document 18  Filed 06/23/2000  Page 5 of 21

Plaintiff's former hangar. Thus, eventually, the Airport essentially replaced Plaintiff as the sole FBO at A.B.E. Airport.

## III. GENERAL LEGAL STANDARD

Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment shall be rendered where:

> the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material [*13] fact and the moving party is entitled to judgment as a matter of law.

Rule 56(e) further provides that, when a properly supported motion for summary judgment is made, the adverse party "must set forth specific facts showing that there is a genuine issue for trial."

In making its ruling on a summary judgment motion, the court must view all inferences in a light most favorable to the non-moving party. United States v. Diebold, Inc., 369 U.S. 654, 655, 82 S. Ct. 993, 994, 8 L. Ed. 2d 176 (1962). A "genuine issue of fact" is present, precluding summary judgment, when a reasonable trier of fact, viewing all the evidence, could rationally find in favor of the nonmoving party in light of the burden of proof placed on the nonmover. U.S. v. Premises Known as RR No.1 Box 224, Dalton Tp. and North Abington Tp., Lackawanna County, Pa., 14 F.3d 864 (3d Cir. 1994). The substantive law identifies which facts are material. "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S. Ct. 2505, 2510, 91 L. Ed. 2d 202 (1986). See also [*14] Josey v. John R. Hollingsworth, 996 F.2d 632 (3d Cir. 1993) on remand 1993 WL 523686 (summary judgment is precluded if disputed fact exists which might affect outcome of suit under controlling substantive law).

The Supreme Court has held that:

> Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. In such a situation, there can be "no genuine issue as to any material fact," since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial."

Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S. Ct. 2548, 2552, 91 L. Ed. 2d 265 (1986).

In a motion for summary judgment, the nonmoving plaintiff's burden is more than insignificant. See J.F. Feeser Inc. v. Serv-A-Portion, Inc., 909 F.2d 1524, 1531 (3d Cir. 1990) cert. denied, 499 U.S. 921, 113 L. Ed. 2d 246, 111 S. Ct. 1313 (1991) (although the moving party has the initial burden of identifying [*15] the evidence that demonstrates the absence of a genuine issue of material fact, the nonmovant must establish the existence of each element on which it bears the burden of proof). "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." Anderson, supra, 477 U.S. 242, 252, 106 S. Ct.

2505, 2512 (1986). See also Coolspring Stone Supply, Inc. v. American States Life Ins. Co., 10 F.3d 144, 148 (3d Cir. 1993); Petruzzi's IGA Supermarkets, Inc. v. Darling Delaware Co., Inc., 998 F.2d 1224, 1230 (3d Cir. 1993) cert. denied 126 L. Ed. 2d 455, 114 S. Ct. 554 (nonmovant must do more than create some metaphysical doubt).

While the nature of its remedy is indeed powerful, the "summary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy and inexpensive determination of every action.'" Celotex, supra, 477 U.S. 327, 106 S. Ct. 2555 [citation omitted].

## IV. DISCUSSION

### A. *Piercing the Corporate* [*16] *Veil*

In deposition, Mr. Earl Holtz testified that he was the President, sole shareholder and sole director of both Northeast Jet Center and Northeast Jet Company. Holtz Deposition, August 8, 1990 at 28-29., filed as Exhibit A to Defendants' Motion for Partial Summary Judgment, filed January 22, 1996. He further testified that the two corporations kept separate records, conducted separate director and shareholder meetings, and kept separate minutes. Northeast Jet Company purchased maintenance, fuel and hangar space from Northeast Jet Center. Mr. Holtz testified that the two companies were cross-guaranteed and cross-collateralized in addition to being backed by his personal guarantee. Exhibit A to Defendants Motion for Partial Summary Judgment, filed January 22, 1996, also includes a letter on Northeast Jet *Company* stationary requesting Twin County construction company to cease its efforts to build a new hangar addition for Northeast Jet *Center*. This letter was signed by Mr. Earl Holtz with the title "President."

While the similarity of interests and personnel might lead us to consider piercing the corporate veil that separates these companies, n3 such action would be [*17] inappropriate at this time in light of the presumption that corporations are separate entities, n4 and without a full record before us. In Re Cohn, 54 F.3d 1108, 1116 (3d Cir. 1995). Accordingly, at this time we treat the two companies herein as distinct entities from each other and from Mr. Holtz.

- - - - - - - - - - - - - - - - - -Footnotes- - - - - - - - - - - - - - - - - - -

n3 See Kaplan v. First Options of Chicago, Inc., 19 F.3d 1503, 1521 (3d Cir. 1994); Manville Sales Corp. v. Paramount Systems, Inc., 917 F.2d 544, 552 (Fed. 1990); Joyce v. Super Fresh Food Markets, Inc., 815 F.2d 943, 945 (3d Cir. 1987); Solomon v. Klein, 770 F.2d 352, 353 (3d Cir. 1985).

n4 See Mellon Bank, N.A. v. Metro Communications, Inc., 945 F.2d 635, 643 (3d Cir. 1991), cert. denied, 503 U.S. 937, 112 S. Ct. 1476, 117 L. Ed. 2d 620; Craig v. Lake Asbestos of Quebec, Ltd., 843 F.2d 145, 150 (3d Cir. 1988); American Bell Inc. v. Federation of Tel. Workers, 736 F.2d 879, 886 (3d Cir. 1984); Jiffy Lube International, Inc. v. Jiffy Lube of Pennsylvania, 848 F. Supp. 569, 580 (E.D.Pa. 1994).

- - - - - - - - - - - - - - - - -End Footnotes- - - - - - - - - - - - - - - - - [*18]

### B. *Preclusion Order Barring Expert Testimony*

Defendants contend that our preclusion order barring Plaintiff from presenting expert testimony fatally injures Plaintiff's entire case because without such testimony Plaintiff would be unable to establish the amount of damages it suffered. Defendants' Supplemental Motion for Summary Judgment on All Counts, filed February 8, 1996 (hereinafter "Defendants' Supplemental Motion"). The law of this circuit is to the contrary.

Get a Document - by Citation - 1996 U.S. Dist. LEXIS 11177    Page 7 of 21

Case 2:00-cv-00680-KJAS   Document 48   Filed 06/23/2000   Page 61 of 75

Federal Rule of Evidence 701 provides that:

> If the witness is not testifying as an expert, the witness' testimony in the form of opinions or inferences is limited to those opinions or inferences which are (a) rationally based on the perception of the witness and (b) helpful to a clear understanding of the witness' testimony or the determination of a fact in issue.

In interpreting this Rule, the Third Circuit has repeatedly recognized that "the modern trend favors the admission of lay opinion testimony, provided that it is well founded on personal knowledge and susceptible to specific cross-examination." Lightning Lube, Inc. v. Witco Corp., 4 F.3d 1153, 1175 (3d Cir. 1993) (citations [*19] omitted). More recently, the Third Circuit has said that "Rule 701 requires that a lay opinion witness have a reasonable basis grounded either in *experience or specialized knowledge* for arriving at the opinion that he or she expresses." Asplundh Mfg. Div. v. Benton Harbor Engineering, 57 F.3d 1190, 1201 (3d Cir. 1995) (emphasis in original).

At this stage in the litigation, prior to any hearings before us, it appears that Mr. Holtz, as President of both Plaintiff Northeast Jet Center and its affiliate, Northeast Jet Company, has relevant first-hand experience and specialized knowledge of both companies' operations. In his deposition of September 5, 1995, Mr. Holtz testified as to how he prepared financial documents purporting to show Plaintiff's projected income as well as the value of Plaintiff and each of its components. Plaintiff's Opposition to Defendants' Supplemental Motion, and Exhibit 2 thereto, filed February 22, 1996. Defendants have asserted Mr. Holtz's subsequent deposition testimony of September 8, 1995 demonstrates that Mr. Holtz is "unable to elaborate on how he allegedly calculated [plaintiff's] damages." Defendants' Supplemental Motion, at 4. Nonetheless, [*20] in addition to his position as President, Mr. Holtz was the sole shareholder and director of Plaintiff Northeast Jet Center and its affiliate, Northeast Jet Company. In those positions, his personal experience and knowledge of Plaintiff's operations appears to be "germane to the lay opinion offered." Asplundh Mfg. Div. 57 F.3d at 1201. We believe that "at least some of" Mr. Holtz's assumptions are valid and that his testimony would be helpful to a jury. Lightning Lube, 4 F.3d at 1175. Taking the Plaintiff's claims as true for our purposes here, Mr. Holtz's lay opinion qualifies under Federal Rule of Evidence 701. That opinion represents the "best evidence available -- first-hand knowledge versus second-hand knowledge" that must be presented to the jury. Joy Mfg. Co. v. Sola Basic Indus., Inc., 697 F.2d 104, 111 (3d Cir. 1982). While Mr. Holtz's assumptions may well be subject to vigorous cross examination, their credibility is ultimately a question for a jury to decide. Douglas v. Owens, 50 F.3d 1226, 1230, n.6 (3d Cir. 1995).

Defendants' Supplemental Motion to Dismiss on all grounds, filed February 8, 1996, must accordingly be DENIED at this time.

**C. Count** [*21] *One: Violation of Plaintiff's Constitutional Rights.*

Plaintiff broadly asserts that Defendants deprived and conspired to deprive Plaintiff of its equal protection and due process rights under the Fourteenth Amendment to the United States Constitution and Article I, §§ 2, 9 and 26 of the Pennsylvania Constitution. This alleged deprivation consisted of selective enforcement of "certain regulations and requirements which the Airport Defendants knew were not in effect." Second Amended Complaint, filed June 21, 1991, P41. n5

- - - - - - - - - - - - - - - - - -Footnotes- - - - - - - - - - - - - - - - - - -

n5 Specifically, Plaintiff alleges seven instances of purposeful discrimination that evidence a


"pervasive pattern of arbitrary, capricious and discriminatory acts." Second Amended Complaint, P42. Additionally, Plaintiff asserts Defendants have violated its Due Process rights in at least four instances. Id., P44. A demand is made for money damages. Id., P46.

- - - - - - - - - - - - - - - -End Footnotes- - - - - - - - - - - - - - - - -

With the possible exception of their Motion to Dismiss on All Counts discussed above, Defendants have yet to address Plaintiff's [*22] equal protection and due process claim. Defendants maintain that Plaintiff cannot recover on its constitutional claims without first showing a quantified business loss. Defendants' Supplemental Motion at 3. Although Plaintiff has been precluded from presenting expert testimony, for purposes of the summary judgment motions we must view all facts and inferences in favor of Plaintiff. United States v. Diebold, Inc., 369 U.S. 654, 655, 82 S. Ct. 993, 994, 8 L. Ed. 2d 176 (1962). At this stage, we believe a jury could reasonably find Mr. Holtz's testimony sufficiently credible to form the basis of a damages award. As set forth above, because we do not find our order precluding presentation of expert testimony fatal to Plaintiff's entire case.

Defendants have not otherwise briefed or argued this count before us, and we believe it clearly merits further consideration. We would like to know the exact nature of Plaintiff's constitutional claims. n6 We are also concerned about what evidence, if any, supports Plaintiff's claims and whether qualified immunity applies to some defendants.

- - - - - - - - - - - - - - - - -Footnotes- - - - - - - - - - - - - - - - - -

n6 Some limitations on these claims are obvious. If plaintiff is making claims directly under the Constitution, these claims are deemed stricken because if they do have merit, they can be sufficiently vindicated by an action under 42 U.S.C. § 1983. Rogin v. Bensalem, 616 F.2d 680, 686-87 (3d Cir. 1980); Mahone v. Waddle, 564 F.2d 1018, 1024 (3d Cir. 1977); Hammond v. Creative Planning Organization, 800 F. Supp. 1244, 1248 (E.D.Pa. 1992); La Plant v. Frazier, 564 F. Supp. 1095, 1097-1098 (E.D.Pa. 1983); DiGiovanni v. City of Philadelphia, 531 F. Supp. 141, 144 (E.D.Pa. 1982).

We note additionally that if Plaintiff is making procedural due process claims for the taking of legal property, as the result of random and unauthorized conduct, then resort must be had to state rights and procedures rather than a § 1983 action. Hudson v. Palmer, 468 U.S. 517, 533, 104 S. Ct. 3194, 3204, 82 L. Ed. 2d 393 (1984); Williamson Co. Regional Planning v. Hamilton Bank, 473 U.S. 172, 195, 105 S. Ct. 3108, 3121, 87 L. Ed. 2d 126 (1985). Zilich v. Lucht, 981 F.2d 694, 696 (3d Cir. 1992); Hicks v. Feeney, 770 F.2d 375, 378 (3d Cir. 1985); Berlanti v. Bodman, 780 F.2d 296, 301 (3d Cir. 1985).

- - - - - - - - - - - - - - - -End Footnotes- - - - - - - - - - - - - - - - - [*23]

## D. *Count Two: Violation of the Sherman Act*

In our prior opinion, we dismissed Plaintiff's claim for damages under the Sherman Act with prejudice. See 767 F. Supp. 672, 681. We further allowed Plaintiff to amend its complaint to seek injunctive relief. Id. at 682. Defendants' now argue that this claim is moot due to the hypothetical nature of Plaintiff's claim. We agree that the case law of the Third Circuit supports Defendants' position.

In Aclerno v. New Castle County, 40 F.3d 645 (3d Cir. 1994), the Court stated that for an injunction to be granted,

more than a risk of irreparable harm must be demonstrated. The requisite for injunctive relief has been characterized as a 'clear showing of immediate

irreparable injury,' or a 'presently existing actual threat; an injunction may not be used simply to eliminate a possibility of a remote future injury.'

Id., at 655 (citing Continental Group, Inc. v. Amoco Chem. Corp., 614 F.2d 351, 359 (3d Cir. 1980); Ammond v. McGahn, 532 F.2d 325, 329 (3d Cir. 1976); Holiday Inns of America, Inc. v. B & B Corp., 409 F.2d 614, 618 (3d Cir. 1969); and Campbell Soup Co. v. Conagra, Inc. 977 [*24] F.2d 86, 91-92 (3d Cir. 1992). Plaintiff is no longer in business. Plaintiff asserts however that "Center and/or its principal *may at some point in time seek to re-enter the FBO market,*" Defendants' Supplemental Motion, at 12 (emphasis added). We believe the basis of Plaintiff's Count Two represents a mere possibility of a remote injury, and presently nothing more. "[A] permanent injunction will issue only where a threat of harm exists, not just where potential harm exists." McLendon v. Continental Can Co., 908 F.2d 1171, 1182 (3d Cir. 1990). See also Natural Footwear Ltd. v. Hart, Schaffner & Marx, 760 F.2d 1383, 1404 (3d Cir. 1985); Northeast Women's Center, Inc. v. McMonagle, 665 F. Supp. 1147, 1154 (E.D.Pa. 1987).

Defendants' Motion for summary judgment, filed February 8, 1996 is accordingly GRANTED with respect to count two of Plaintiff's second amended complaint.

### E. *Count Three: Tortious Interference with Business Relations*

Count three of Plaintiff's second amended complaint claims that Defendants intentionally disrupted an agreement between Plaintiff Northeast Jet Center and Union Pacific by: (1) wrongfully declaring Plaintiff in default of [*25] its lease; (2) contacting Plaintiff's bank in late 1988 and early 1989, falsely informing it that Plaintiff was in default of the lease, and expressing doubts as to Plaintiff's financial viability to discourage the bank's financing of the proposed new hangar; and (3) attempting to persuade Union Pacific to abandon Plaintiff's facility and move to an alternative facility at the A.B.E. airport.

The Pennsylvania Supreme Court has adopted the Restatement (Second) of Tort's formulation of the tort of interference with existing contractual relationships. n7 A chief and threshold requirement of this tort is the existence of a contract. As we discuss below, we do not believe the agreement and the proposed lease were one and the same nor that Defendants' alleged interference with the lease (in draft form) relates back to the agreement itself. We conclude that the agreement was a binding agreement to enter into a lease upon the fulfillment of conditions precedent.

- - - - - - - - - - - - - - - - - -Footnotes- - - - - - - - - - - - - - - - - - -

n7 As recited in Silver v. Mendel, 894 F.2d 598 (3d Cir. 1990), the elements of a claim for intentional interference with existing contractual relations are:

> (1) the existence of one or more contracts; (2) the purpose or intent to harm plaintiff by preventing the completion of the contractual relation(s); (3) conduct by defendant which is not proper as a matter of law and which a factfinder could reasonably find improper; and (4) harm actually resulting from defendants' actions.

Id. at 604-605, citing Adler Barish v. Epstein, 482 Pa. 416, 393 A.2d 1175, 1183 (1978).

- - - - - - - - - - - - - - - - - -End Footnotes- - - - - - - - - - - - - - - - -  [*26]

In their Motion for Partial Summary Judgment filed January 22, 1996, Defendants claim this count must fail as a matter of law because no such lease agreement existed at the time between Plaintiff and Union Pacific. Instead they assert Plaintiff had a contract with Union

Pacific to enter into such a lease agreement. Defendants maintain that Plaintiff has offered no objective proof that there was a reasonable probability that the proposed lease agreement would ever have been executed, as required by Thompson Coal Co. v. Pike Coal Co., 488 Pa. 198, 209, 412 A.2d 466, 471 (1979). Defendants' Brief in support of their motion for partial summary judgment, filed January 22, 1996 at 24.

Defendants further state that prior to their own in actions, it was clear to Plaintiff and to Union Pacific that Plaintiff would not complete the proposed hangar by the deadline specified in their agreement. Defendants claim that the FAA's revocation of Northeast Jet Company's operations and its poor financial condition ended the prospects of its affiliate, Northeast Jet Center, for the proposed new hangar facility. Defendants' Motion for Partial Summary Judgment, filed January 22, 1996 at 25.

According [*27] to Defendants, Union Pacific began searching for an alternative site for their aircraft on their own initiative and were apparently successful through an "internal connection." Id. at 26 and Exhibit M thereto, at 35-38. Union Pacific's Vice President, Mr. John Halan testified that his company was never approached by Defendants, and that Union Pacific initiated conversations with Defendants -- not vice versa -- concerning its desire to acquire land on the airport to build its own hangar. Defendants Motion for Partial Summary Judgment, filed January 22, 1996, Exhibit M, at 24-26. Mr. Halan testified that the accident involving Northeast Jet Company's plane and the FAA's revocation of Northeast Jet Company's operating license was one factor in Union Pacific's decision to look elsewhere for hangar space. Exhibit N to Defendants' Motion for Partial Summary Judgment, filed January 22, 1996, at 79-80. However, he stated repeatedly that the primary factor was that time was running out and the hangar would not be completed in time for the worst period of winter. Mr. Halan stated that Defendants were reluctant to consider providing Union Pacific with land because their objective was to strengthen [*28] Plaintiff's position at A.B.E. Airport. Id. at 83-84. According to Mr. Halan, Defendants went so far as to discourage Union Pacific from acquiring land independently and attempted to reinforce rather than undermine Plaintiff's viability at the airport. Defendants Motion for Partial Summary Judgment, filed January 22, 1996, Exhibit M, at 24-26.

In March and April, 1989, Mr. Halan sent three letters on behalf of Union Pacific to Mr. Holtz as President of Northeast Jet Center, Ltd. Id. On March 6, 1989, Mr. Halan stated that Union Pacific was "concerned about the project" since the initial target occupancy time had passed, but was "encouraged" concerning plans to go forward with the new hangar. "In the meantime," he continued, "we will be reviewing our various options and alternatives should you elect not to go forward with the new facility." Id.

Ten days later, Mr. Halan sent another letter which stated in its entirety:

> With regard to our discussions on the new facility you are planning to build, I would like to confirm that Union Pacific has *no commitment* with respect to this facility unless a new written agreement is signed. *We are not waiving any rights* [*29] *under our previous agreement that we might have because of the passage of the February 1989 completion date.*

Id., (emphasis added). On April 25, Mr. Halan sent a final letter informing Mr. Holtz that Union Pacific had no further interest in the proposed hangar addition because it had found a "satisfactory alternative." Id.

Plaintiff claims that conditions precedent do not render the agreement illusory and that the agreement contains all essential terms of the arrangement between Union Pacific and Plaintiff, including price. Id. at 20. Plaintiff asserts, "Put another way, had Center been able

to construct the hangar expansion, Union Pacific could not have arbitrarily refused to execute the form lease..." Id. Plaintiff further contends both parties intended to honor these obligations -- including executing the form lease --under the lease extension agreement. We cannot help but make the plain observation that Center never was able to build the new hangar and thus by Plaintiff's own reasoning Union Pacific's obligation never arose.

Plaintiff maintains that the 10-year lease extension agreement is not an illusory contract but instead obligates it to use its [*30] best efforts to take all steps necessary to construct the hangar extension while simultaneously obligating Union Pacific to lease hangar and office space in the new facility upon its completion. Plaintiff's Opposition to Defendants' Motions for Summary Judgment, filed February 8, 1996 at 19. Plaintiff's maintain that the scheduled completion date set forth in the lease extension agreement was a waivable condition which was indeed waived as "clearly evidenced" until Union Pacific was "lured away by the Airport's offers of alternative hangar space in early 1989." Id. at 21.

Plaintiff has failed to persuade us any such clear evidence exists to counter the plain language of Mr. Halan's letter which specifically and conclusively shows Union Pacific's intention not to waive the time condition. Indeed, Mr. Halan's letters and his deposition testimony make clear that the time condition was the most important consideration in Union Pacific's decision whether to continue to do business with Mr. Holtz and his companies.

> To constitute a waiver of a legal right, there must be a clear, unequivocal and decisive act of the party who is claimed to have waived its rights, with knowledge [*31] of such right and an evident purpose to surrender it.

Keenan v. Scott Tp. Authority, 151 Pa. Commw. 226, 616 A.2d 751, 755 (Pa.Cmwlth. 1992) (citation omitted). Even if the language of the March and April 1989 letters could reasonably be construed to evidence a continued willingness on the part of Union Pacific to occupy Plaintiff's proposed hangar, there is absolutely no evidence of record that Union Pacific would have done so under the terms and conditions set forth in the original draft 10-year lease agreement.

Defendants cite and Plaintiff's attempt to distinguish Schulman v. J.P. Morgan Inv. Management, Inc., 829 F. Supp. 782 (E.D.Pa. 1993), which held that where a draft lease agreement was prepared for execution but never signed, that alone did not create a lease. Id at 785. Plaintiff asserts that the agreement involved in Schulman was a draft whereas here it was an "executed final agreement." Plaintiff's Opposition to Defendants' Motions for Summary Judgment, filed February 8, 1996 at 21. In Schulman, the Court held that references to a draft by a real estate developer's employees as a "lease" did not transform an agreement to open a food service [*32] operation into a formal lease where the developer never signed the agreement as required. Id. Similarly here, the executed agreement required Union Pacific and Plaintiff to execute a 10-year lease when certain conditions were met. Those conditions were not met; and while the proposed 10-year lease agreement was indeed prepared for execution, we similarly conclude that that proposal alone did not create a lease.

On March 1, 1988 Plaintiff and Union Pacific entered a signed, written Agreement which outlined their relationship with regard to the proposed hangar expansion. Id Exhibit 2. In pertinent part, the Agreement states:

> Subject to the terms and conditions of this Agreement, upon the occurrence or waiver of the conditions precedent set forth...below, Northeast and Union Pacific shall enter the form of lease agreement for the Premises attached hereto...

Id. at 1. The Agreement then lists the duties of each side including compliance with the interim lease by both parties and financing and regulatory approval for Northeast Jet Center. Id. at 2-4. Union Pacific's portion of the Agreement states at the outset that Union Pacific's obligations are subject [*33] to the condition, among others, that:

> (a) The intended Aviation Complex shall have been substantially completed and the Premises shall be suitable for the intended use by Union Pacific on or before February 1, 1989. Northeast shall give Union Pacific at least 30 days prior written notice of the anticipated date of substantial completion of the Premises.

Id. at 3. The undated and unsigned "Lease Agreement" was attached to the signed "Agreement." The lease purports to concern a "Contemplated Aviation Complex" located at A.B.E. International Airport. Id. It includes the terms of a 10-year lease between Union Pacific and Plaintiff for the proposed hangar expansion, including rents, taxes, services, use, maintenance, regulations, insurance, fire risk, assignment & subletting, condemnation, entry and access, default & remedy, subordination, surrender and waiver. Id.

To defeat summary judgment the non-moving party -- Plaintiff Northeast Jet Center, Ltd. in this case -- must respond with facts of record that contradict the facts identified by the movant, and may not rest on mere denials. Celotex Corp. v. Catrett, 477 U.S. at 321, n.3, 106 S. Ct. at 2552, n.3 [*34] (quoting Fed. R. Civ. P. 56(e)); see also First National Bank of Pennsylvania v. Lincoln National Life Insurance Co., 824 F.2d 277, 282 (3d Cir. 1987). In a case where the non-moving party is the plaintiff and therefore bears the burden of proof, it must by affidavits or by the depositions and admissions on file, "make a showing sufficient to establish the existence of [every] element essential to that party's case." Celotex Corp., 477 U.S. at 322-24, 106 S. Ct. at 2552-53; Anderson, 106 S. Ct. at 2514; Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986); Fed. R. Civ. P. 56(e). Plaintiff has failed to meet this burden and we find that no such intentional action was taken by Defendants to interfere with the business relationship between Plaintiff and Union Pacific.

In sum, we believe the original agreement was a binding contract subject to conditions precedent. However, we do not believe that those conditions were met. Even if they were, and even if the deadline was waived, Defendants' proffer of Union Pacific's John Halan deposition testimony unequivocally refutes the core of Plaintiff's allegation -- that Defendant's [*35] intentionally interfered with the business relationship between Union Pacific and Plaintiff. Plaintiff simply has not offered sufficient testimony or other evidence to counter Mr. Halan's testimony.

Defendants' Motion for partial summary judgment, filed January 22, 1996 is accordingly GRANTED with respect to that portion of count three of Plaintiff's second amended complaint covering intentional interference with existing contract.

## F. *Count Three: Interference with Prospective Business Relations*

Plaintiff has also alleged that Defendants' actions amounted to an intentional interference with Plaintiff's prospective contractual relationship with Union Pacific. Plaintiff's Opposition to Defendants' Motions for Summary Judgment, filed February 8, 1996, at 21.

In Pennsylvania, the elements of the tort of intentional interference with prospective contractual relations are: (1) a prospective contractual relation; (2) intent to harm the plaintiff by preventing the relation from occurring; (3) absence of privilege or justification on

Get a Document - by Citation - 1996 U.S. Dist. LEXIS 11177    Page 67 of 75

Case 00-00680-VAR Document 18    Filed 06/23/2000    Page 13 of 21

the defendant's part; and (4) actual damage resulting from defendant's conduct. Silver v. Mendel, 894 F.2d 598, 601-02 (3d Cir. 1990); [*36] Thompson Coal Co. v. Pike Coal Co., 488 Pa. 198, 412 A.2d 466, 471 (1979), cert. denied, 496 U.S. 926, 110 S. Ct. 2620 (1990)). See also Schulman v. J.P. Morgan Inv. Management, Inc., 829 F. Supp. 782, 786 (E.D.Pa. 1993). As the Pennsylvania Supreme Court has stated:

> We are not dealing with certainties, but with reasonable likelihood or probability. This must be something more than a mere hope or the innate optimism of the salesman...The rule to be applied is that the [plaintiff] may recover when the jury is satisfied that but for the wrongful acts of the defendant it is *reasonable* [sic] *probable* that the plaintiff would have [entered and performed the contract].

Thompson Coal Co. v. Pike Coal Co., 488 Pa. 198, 412 A.2d 466, 471 (Pa. 1979).

Plaintiff has set forth sufficient allegations of Defendants' interference with prospective business relations to proceed beyond the summary judgment stage. Although we do not believe the signed agreement and unsigned draft lease amount to an existing contract, for the purposes of summary judgment they do amount to a prospective business relation. To be "prospective," a contractual relation must have [*37] "objectively appeared to be reasonably probable." Schulman, 829 F. Supp. 782, 786. Plaintiff maintains that Union Pacific would have signed the lease even when a delay in constructing the new hangar was apparent and that the delay itself was caused by Defendants' notice of default to Plaintiff. This version of events markedly contrasts with that of Defendants and should more appropriately be decided at trial.

As already discussed above, Union Pacific expressed to Plaintiff as late as March 6, 1989 that it was "encouraged" concerning plans to proceed with the new hangar and stating Union Pacific's intention to review its options "should [Plaintiff] elect not to go forward with the new facility." Plaintiff has alleged that Defendants wrongfully contacted Plaintiff's bank as early as late 1988 and early 1989, informed the bank that Plaintiff was in default of its lease, and expressed doubts as to Plaintiff's financial viability. P55(b), Plaintiff's Second Amended Complaint, filed June 21, 1991. At this stage, we believe a jury could find a reasonable probability that Plaintiff and Union Pacific would have entered into a lease agreement for the expanded hangar, even if such a lease [*38] agreement were not identical with the original draft lease.

Defendants' Motion for partial summary judgment, filed January 22, 1996 is accordingly DENIED at this time with respect to that portion of count three of Plaintiff's second amended complaint covering intentional interference with a prospective contractual relationship.

## G. *Count Four: Tortious Interference with Prospective Business Relations with Other Companies*

In its Count Four, Plaintiff also asserts that there was a reasonable probability of its entering into contractual relationships with various entities other than Union Pacific, n8 and that Defendants interfered with those prospective contractual relationships. Plaintiff's Opposition to Defendants' Motions for Summary Judgment, filed February 8, 1996, at 23-25. It is well-established that summary judgment cannot be avoided unless the non-moving party sets forth *"specific facts"* showing that there is a genuine issue for trial." Matsushita Elec. Ind. Co. v. Zenith Radio Corp., 475 U.S. 574, 587, 89 L. Ed. 2d 538, 106 S. Ct. 1348 (1985) (emphasis added) (quoting Fed.R.Civ.P. 56(e)). Plaintiff has failed to provide the requisite specific facts to [*39] defeat a motion for summary judgment. In their brief, Plaintiff sufficiently states the standard to be applied for determining whether an action for intentional interference with prospective contractual relations will lie. However, they make no citations or

Get a Document - by Citation - 1996 U.S. Dist. LEXIS 11177    Page 68 of 75

Case 1:00-cv-00680-YK-JAS    Document 18    Filed 06/23/2000    Page 14 of 21

references whatsoever to deposition testimony or other evidence before us. In contrast, Defendants have in several instances cited to deposition testimony and exhibits strongly supporting their position that Plaintiff did not enjoy a prospective contractual relationship with any of the various entities (other than Union Pacific as discussed above) listed by Plaintiff. Defendants' Motion for Partial Summary Judgment, filed Jan. 22, 1996, at 27-35.

- - - - - - - - - - - - - - - - - - -Footnotes- - - - - - - - - - - - - - - - - - -

n8 Plaintiff claims these entities include USAir, United Airlines, Delta Airlines, Continental Airlines, Northwest Airlines, Union Pacific, Bethlehem Steel, K.C. Aviation, Duncan Aviation and Universal Jet Sales. Plaintiff's Opposition to Defendants' Motion for Summary Judgment, filed February 8, 1996, at 24, n.2.

- - - - - - - - - - - - - - - -End Footnotes- - - - - - - - - - - - - - - - -  [*40]

Plaintiff bases this count on the supposition that had it stayed in business into early 1990, it would have been, at that point,

> the sole FBO at the Airport, thus greatly increasing its opportunity to service airlines it had not previously served. Moreover, Center had the only useable fuel farm at the Airport, thus assuring it the lion's share of fuel sales at A.B.E.

Plaintiff's Opposition to Defendants' Motions for Summary Judgment, filed February 8, 1996, at 25. Plaintiff suggests that as a result of outside factors, it would have enjoyed a windfall, if not a monopoly, n9 in providing fueling and maintenance services at the A.B.E. Airport. In response, Defendants quite accurately point to Plaintiff's lack of citations to the record to support this assertion. Even before Plaintiff's one and only competitor at A.B.E. airport, Suburban Aviation, closed its doors in March 1990, Plaintiff had agreed to sell its facility and equipment. See Exhibit D-61 attached to Exhibit "V" to Defendants' Motion for Partial Summary Judgment, filed January 22, 1996. Also, the fact that the Airport sought to replace Suburban with an "interim FBO" does not preclude the possibility  [*41]  that another suitable FBO could have entered the Airport at some time. Plaintiff's evidence of prospective contractual relationships more accurately represents the dreams of its president and is simply too weak to sustain a motion for summary judgment.

- - - - - - - - - - - - - - - - - -Footnotes- - - - - - - - - - - - - - - - - -

n9 We find it interesting to compare this explanation with count two of Plaintiff's complaint. There, Plaintiff charges Defendants with anti-trust violations of the Sherman Act by unreasonably restraining trade in the provision of ground-based aviation support services by FBOs at the airport. Specifically, Plaintiff asserts:

> As a result of the Airport Defendants' activities, competition in the provision of ground-based aviation support service by FBOs at A.B.E. has been eliminated and Dynair, operating on behalf of the Airport Authority, will be the only FBO at A.B.E. as of March 1, 1990. Accordingly, Dynair and the Airport Authority will have a total monopoly on FBO services at A.B.E. as of March 1, 1990.

Plaintiff's Second Amended Complaint, filed June 21, 1990, P49. Plaintiff apparently accepts some monopolies while rejecting others.

- - - - - - - - - - - - - - - -End Footnotes- - - - - - - - - - - - - - - - -  [*42]

Because Plaintiff has failed to raise any objective proof that there was a reasonable

Get a Document - by Citation - 1996 U.S. Dist. LEXIS 11177    Page 69 of 75

Case 1:00-cv-00680-YK-JAS   Document 18   Filed 06/23/2000   Page 15 of 21

probability that it would have developed a contractual or business relationship with any of the other listed entities other than Union Pacific, Defendants' Motion for Summary Judgment with respect to Count Four is accordingly GRANTED.

### H. *Count Five: Violation of the Municipal Authorities Act of 1945*

Plaintiff contends that the Defendant Airport Authority has violated § 306(2) of their enabling act, the Municipal Authorities Act of 1945, 53 Pa. C.S.A. § 306 (the "Act"). Second Amended Complaint, PP 66, 67. According to Plaintiff, it is entitled to punitive damages because the Authority' maliciously violated the Act by: (1) misusing its powers under the Act "to establish an enterprise to compete" with Plaintiff on an unfair basis; and (2) unlawfully misappropriating Plaintiff's property "in an effort to secure unfair and unlawful advantages contrary to the requirements of the Act." Second Amended Complaint at P 67.

Unless the contrary is proven, the acts of municipal officials are presumed to be valid and in compliance with the Act. Helmerick Drive-It-Yourself v. Erie Municipal [*43] Airport Authority, 149 Pa. Commw. 1, 612 A.2d 562, 564 n.2 (1992). Summary judgment is appropriate on Count Five because Plaintiff has failed to overcome this presumption with evidence sufficient to support either of its claims.

Section 306 A(b)(2) of the Pennsylvania Municipal Authorities Act reads in part:

> None of the powers granted by this act shall be exercised in the construction, financing, improvement, maintenance, extension or operation of any project or projects or providing financing for insurance reserves *which in whole or part shall duplicate or compete with existing enterprises serving substantially the same purpose.*

(emphasis added). Pennsylvania courts have held that in order to violate the Act, the municipal authority must "duplicate" or "compete" with services provided by an "existing" enterprise. Evansburg Water Co. v. Perkiomen Township, 131 Pa. Commw. 89, 569 A.2d 428 (1990). In Evansburg, the plaintiff complained that the township would be providing water service in a geographic area not served by the plaintiff at the time, but which the plaintiff wished to service. The Court held that the Act does not afford a plaintiff the unfettered [*44] right to expand its business into different areas that are already being serviced by a municipal authority, and thus found no violation of the Act. 131 Pa. Commw. at 93, 569 A.2d at 430. In so holding, the Court relied on its earlier decision, Northampton v. Bucks County Water & Sewer Authority, 96 Pa. Commonwealth Ct. 514, 508 A.2d 605 (1986), quoting it as follows:

> The plain wording of the statute is such that it prohibits projects which *'shall* duplicate ... *existing* enterprises *serving* substantially the same purposes.' This clause of the statute is phrased in the present tense, it is not worded in such a manner that what Northampton could *possibly* do is in any way relevant.

Id., 508 A.2d at 430 (emphasis in original). Plaintiff's claim that the Airport Authority's actions interfered with its operations fail to acknowledge the clear evidence that at the time of those alleged acts, Plaintiff itself was no longer an "existing enterprise[]" serving substantially the same purposes" as the operation that succeeded it.

In Lower Bucks County Joint Municipal Authority v. Bristol Township Water Authority, 137 Pa. Commw. 415, 586 A.2d 512 (1991), [*45] the Court held that an attempt by a township

and its associated water authority to "take over" an area to which the plaintiff had long
provided water services constituted an act of competition prohibited by the Act. Id., 586 A.2d
at 516. While Lower Bucks found a violation of the Act had occurred, we believe the case is
distinct from the instant one. In Lower Bucks, The Commonwealth Court agreed with the trial
court's reasoning that the defendants' furnishing of water in the contested area "constituted
'existing enterprises' which competed with those of [plaintiff]." Id. By contrast here, the
Airport Authority could not and did not violate the Act because Plaintiff was no longer an
existing FBO at the airport at the time of the alleged competition. Plaintiff's allegation of the
Authority's "misuse" refers to the Authority's selection of DynAir Fueling as an interim
provider of FBO services at the airport on February 2, 1990. See Exhibit 2, Brief in Support of
Defendants' Motion for Partial Summary Judgment, filed January 22, 1996. By this time,
however, Plaintiff and Mr. Holtz had already signed an agreement to sell Plaintiff's assets
including hangar and leasehold [*46] rights at the Airport to Jaindl Aviation. According to
deposition testimony cited by Defendants, the Authority did enter into an agreement with
DynAir to act as an FBO. At the time that agreement was signed, however, Plaintiff had
already agreed to sell its assets and was effectively out of business. Further, DynAir did not
commence operations until March 1, 1990 -- after Plaintiff closed its sales of assets to Jaindl
on February 16, 1990. See Exhibit Y, Brief in Support of Defendants' Motion for Partial
Summary Judgment, filed January 22, 1996.

Plaintiff's claim of unlawful misappropriation must also be discounted. There is no evidence of
any such misappropriation by the Authority of any property belonging to Plaintiff. The only
property the Authority "appropriated" was effectuated by way of Jaindl's assignment to the
Authority of its right to purchase Plaintiff's hangar facilities. Furthermore, that assignment
was expressly agreed to by Mr. Holtz and Plaintiff. See Exhibit V, Brief in Support of
Defendants' Motion for Partial Summary Judgment, filed January 22, 1996.

Despite their frequent assertion that factual disputes exist rendering summary judgment
inappropriate on [*47] this count, Plaintiff has made no citations to the record to support its
claim. In the record before us on this count, we conclude there is no "genuine issue as to any
material fact." Fed. R. Civ. P. 56(c). Partial summary judgment is accordingly GRANTED with
respect to count five. n10

- - - - - - - - - - - - - - - - - -Footnotes- - - - - - - - - - - - - - - - - -

n10 We note in passing that even if Plaintiff could establish a cause of action for unlawful
misappropriation (which we have concluded it cannot) Plaintiff would most probably not be
entitled to punitive damages against the Authority. 42 Pa. C.S.A. § 8553(c) precludes the
award of punitive damages in actions against municipal authorities.

- - - - - - - - - - - - - - - - - -End Footnotes- - - - - - - - - - - - - - - - - -

## I. *Count Six: Defamation*

Plaintiff's count six alleges that Defendants maliciously and falsely published and
disseminated false and disparaging statements regarding Plaintiff. At issue are: (1)
statements made to Plaintiff's bank that Plaintiff was in default of its lease and that doubts
existed as to whether Plaintiff could meet its financial obligations; and (2) communications
[*48] made to tenants of A.B.E. Airport that the Airport lacked "an adequate and reliable
fixed-base operator." Second Amended Complaint, filed June 21, 1991, P73.

In a claim of defamation, the Court must first make a threshold determination as to whether
the statement is capable of defamatory meaning. "The test is the effect the [statement] is
fairly calculated to produce, the impression it would naturally engender, in the minds of the
average persons among whom it is intended to circulate." U.S. Healthcare v. Blue Cross of
Gr. Philadelphia, 898 F.2d 914, 923 (3d Cir. 1990). A critical factor to be considered by the
Court in making that determination is the nature of the statement's audience. Id. The

Get a Document - by Citation - 1996 U.S. Dist. LEXIS 11177    Page 71 of 75

Case 00-cv-00080-KJAS    Document 18    Filed 06/23/2000    Page 17 of 21

relevant audiences in this case were the bank officers and the airport tenants who received Defendants' letters. We are confident that both groups were sufficiently sophisticated to understand the plain meaning of Defendants' letters. Nothing in the record has led us to believe otherwise. While we have not concluded that these letters were defamatory in nature, it is reasonably possible that either the bank or the airport tenants could interpret them as attacks on the viability of  [*49]  Plaintiff's business.

Defendants argue that their statements were good faith opinions based upon two disclosed non-defamatory facts -- (1) that Northeast Jet Company had lost its Part 135 charter license; and (2) that Plaintiff temporarily voluntarily surrendered its Part 145 repair station license. A quick review of the lease in question reveals that it did not require Plaintiff to maintain a Part 135 Certificate. Indeed Plaintiff never did have such a certificate, and never directly provided charter service even prior to the revocation. Similarly, the Airport lease never mentioned a Part 145 repair station certificate. Nor did the Airport's minimum standards for FBO's-- upon which Defendants apparently seek to rely -- require that Plaintiff have a Part 145 repair station certificate.

Plaintiff argues that Defendants' lack of good faith can be seen in the fact that Defendants did not immediately lift the default upon learning that Plaintiff had obtained a Part 145 Certificate. Instead, they waited an additional three months, during which time Plaintiff lost its anchor tenant for the expansion project. Plaintiff's Opposition to Summary Judgment, filed February 8, 1996, at 35-36.  [*50]  While we need not conclude at this point that Defendants' statements were indeed defamatory, we do believe that they are reasonably capable of such an interpretation.

Once the threshold test has been met, the plaintiff has the burden of showing a prima facie case for defamation under Pennsylvania law. The elements of such a claim are:

> (1) The defamatory character of the communication.
> (2) Its publication by the defendant.
> (3) Its application to the plaintiff.
> (4) The understanding by the recipient of its defamatory meaning.
> (5) The understanding by the recipient of it as intended to be applied to the plaintiff.
> (6) Special harm resulting to the plaintiff from its publication. [and]
> (7) Abuse of a conditionally privileged occasion.

42 Pa. C.S.A. § 8343(a) (1982). Even if a conditional privilege were to apply, a genuine issue might still exist as to whether the Defendants have abused the privilege. Abuse of the privilege is shown where a defendant's defamatory communication is motivated by malice, consisting of a wrongful act, done intentionally without just cause or excuse, or generated from reckless or wanton disregard of another's rights. See Elia v. Erie  [*51]  Ins. Exchange, 430 Pa. Super. 384, 634 A.2d 657 (1993), 634 A.2d 657, appeal den., 644 A.2d 1200.

When the plaintiff has established these elements, the defendant then has the burden of proving:

> (1) The truth of the defamatory communication.
> (2) The privileged character of the occasion on which it was published. [or]
> (3) The character of the subject matter of defamatory comment as of public concern.

Get a Document - by Citation - 1996 U.S. Dist. LEXIS 11177

Case 1:00-cv-00680-YK-JAS   Document 18   Filed 06/23/2000   Page 72 of 75   Page 18 of 21

42 Pa. C.S.A. § 8343(b) (1982). See also U.S. Healthcare, supra, at 923.

Defendant Yohe, the Airport Director, sent a letter to all tenants and potential customers at A.B.E. Airport on October 27, 1989. See Exhibit E to Defendants' Motion for Partial Summary Judgment on Count Six, filed January 22, 1996. That letter states, "A.B.E.'s lack of an adequate and reliable fixed-based operator has caused us considerable anxiety during my tenure here." Defendants argue that because the letter does not explicitly identify Plaintiff as an inadequate or unreliable FBO, that the statement cannot reasonably be interpreted as defamatory to Plaintiff. We do not agree.

A communication is capable of defamatory meaning by innuendo even though the words used are not themselves [*52] defamatory. Livingston v. Murray, 417 Pa. Super. 202, 612 A.2d 443, appeal den., 533 Pa. 601, 617 A.2d 1275 (1992). To establish defamation by innuendo, the "innuendo must be warranted, justified and supported by the publication." Id., citing Thomas Burton Center v. Rockwell International Corp., 497 Pa. 460, 467, 442 A.2d 213, 217 (1981), cert. den., 457 U.S. 1134, 102 S. Ct. 2961, 73 L. Ed. 2d 1351 (1982)). Moreover, innuendo cannot be used to introduce new matter, or to enlarge the natural meaning of words. Id. However, in the present case, the context and circumstances of Defendants' letter are clearly capable of defamatory meaning as to Plaintiff. Since there were only two FBO's at A.B.E. Airport, Defendants' reference to the absence of an adequate and reliable FBO could very reasonably be interpreted as a critique of Plaintiff's adequacy and reliability.

Section 564 of the Restatement (Second) of Torts, comment b, states:

> It is not necessary that the plaintiff be designated by name; it is enough that there is such a description of or reference to him that those who hear or read reasonably understand the plaintiff to be the person intended. Extrinsic [*53] facts may make it clear that a statement refers to a particular individual although the language used appears to defame nobody.

Where words are reasonably susceptible to defamatory meaning as well as to an innocent one, the plaintiff may by innuendo ascribe defamatory meaning to the statement. See Stompler v. Richman, 125 Pa. Super. 385, 189 A. 730 (1937). See also Saenz v. Playboy Enterprises, Inc., 653 F. Supp. 552, 559 (N.E.Ill. 1987) ("a statement could be shown to be 'of and concerning' [a plaintiff] through inference as well as direct reference."). Applying this analysis to the circumstances of this case, it is clear at this stage that an inference of defamation to Plaintiff could reasonably be made by a jury.

Defendants claim protection under the Political Subdivision Tort Claims Act, 42 Pa. C.S.A. § 8541 et seq. (1982), on the grounds that nothing in the record establishes that Defendants acted with knowledge of falsity or reckless disregard for the truth. As discussed above, however, there is evidence in the record to support the conclusion that Defendants acted maliciously with knowledge that their statements were false, and with the intent of injuring [*54] Plaintiff. Under these circumstances, Defendants are not entitled to automatic immunity under the statute.

Courts have been reluctant to grant summary judgment in defamation cases where there remained outstanding issues of fact as to whether defendants acted with malice in defaming plaintiff. See, e.g., Savitsky v. Shenandoah Valley Pub. Corp., 566 A.2d 901, 904, 389 Pa. Super. 176 (1989) (genuine issue of material fact existed, precluding summary judgment for editor and newspaper, on whether they exhibited recklessness necessary to constitute actual malice in publishing report that incumbent union official was transported to polling places by coal company helicopter); Chicarella v. Passant, 343 Pa. Super. 330, 494 A.2d 1109, 1115 (1985) (allegations by plaintiff that credit manager of hospital had made defamatory

Get a Document - by Citation - 1996 U.S. Dist. LEXIS 11177    Page 73 of 75

Case 2:00-cv-00680-YK/AS    Document 18    Filed 06/23/2000    Page 19 of 21

statements to employees of investigator hired by insurance company raised genuine issue of material fact as to whether credit manager actually made such statements, in light of manager's specific denial, precluding summary judgment); Braig v. Field Communications, 310 Pa. Super. 569, 456 A.2d 1366, 1376 (Pa. Super. 1983) (in judge's defamation actions against [*55] assistant district attorney and television station owner, there were fact questions, precluding summary judgment, as to existence of actual malice as to defendant and his "state of mind" in deciding to rebroadcast program over judge's objection); and Brophy v. Philadelphia Newspapers Inc., 281 Pa. Super. 588 422 A.2d 625, 632 (1980) (trial court confronted with motion for summary judgment in public official or figure defamation case must deny motion if, viewing evidence and all inferences arising therefrom in light most favorable to plaintiff, there appears genuine issue of fact from which jury could reasonably find actual malice with convincing clarity).

We conclude that a jury could reasonably find that statements made by Defendants were defamatory in nature. Partial summary judgment is accordingly DENIED at this time with respect to count six.

### J. Count Seven: Breach of Contractual Duty of Good Faith Dealing

Count seven alleges that Defendants breached a duty of good faith and fair dealing to Plaintiff. Defendants aver that no such duty existed because: (1) no confidential relationship existed between Plaintiff and Defendants; and (2) an established cause of [*56] action already exists upon which Plaintiff could recover for the alleged wrongdoing.

The Third Circuit has recognized that under Pennsylvania law,

> In the absence of a dispute about the parties' reasonable expectations under a particular term of the contract, an independent duty of good faith has been recognized only in limited situations. After all, if contracting parties cannot profitably use their contractual powers without fear that a jury will second-guess them under a vague standard of good faith, the law will impair the predictability that an orderly commerce requires.

Duquesne Light Co. v. Westinghouse Elec. Corp., 66 F.3d 604, 618 (3d Cir. 1995) (citations omitted). Pennsylvania courts in this District have recognized a duty of good faith performance of contracts only in special limited situations such as a confidential or fiduciary relationship.

> Chrysler Credit Corp. v. B.J.M., Jr., Inc., 834 F. Supp. 813 (E.D.Pa. 1993).
> A confidential or fiduciary relationship exists when "one person has reposed a special confidence in another to the extent that the parties do not deal with each other on equal terms, either because of an over-mastering dominance [*57] on one side, or weakness, dependence or justifiable trust, on the other. A business association may be the basis of a confidential relationship only if one party surrenders substantial control over some portion of the affairs to the other.

Id., 834 F. Supp. 841 (citations omitted). Plaintiff has not shown it enjoyed such a confidential, fiduciary relationship with Union Pacific. There is no evidence before us that Union Pacific exercised an unequal dominance over Plaintiff nor that Plaintiff had surrendered substantial control over its affairs to Union Pacific. As the Third Circuit has concluded,

> In this context -- where two sophisticated business entities have engaged in an

Get a Document - by Citation - 1996 U.S. Dist. LEXIS 11177    Page 74 of 75

Case 1:00-cv-00680-YK-JAS    Document 18    Filed 06/23/2000    Page 20 of 21

arms-length transaction -- we do not believe that Pennsylvania courts would impose an independent duty of good faith not tied to a contractual term.

Duquesne Light Co. v. Westinghouse Elec. Corp., 66 F.3d 604, 618 (3d Cir. 1995) (citations omitted). n11

- - - - - - - - - - - - - - - - - -Footnotes- - - - - - - - - - - - - - - - - - -

n11 Plaintiff has cited several decisions of the Pennsylvania Superior Court in support of its assertion that a good faith duty exists for all contracts in Pennsylvania. See Somers v. Somers, 418 Pa. Super. 131, 613 A.2d 1211, 1213 (Pa. Super. 1992) and Liazis v. Kasta, Inc., 613 A.2d 450, 454 (Pa. Super. 1992). We recognize there is some basis for this position. See also Garvey v. National Grange Mutual Ins. Co., 1995 WL 461228, (E.D.Pa), citing Bethlehem Steel Corp v. Litton Indus. Inc., 507 Pa. 88, 488 A.2d 581, 600 (1985) (opinion in support of reversal) and Restatement (Second) of Contracts § 205, (every contract in Pennsylvania also imposes on each party the duty of good faith and fair dealing); Atlantic Richfield Co. v. Razumic, 480 Pa. 366, 390 A.2d 736, 742 n.7a (Pa. 1978) (recognizing Restatement (Second) of Contracts § 231 which imposes standard of good faith on contracting parties). Nonetheless, we follow the Third Circuit's interpretation which we note was based in part on Somers v. Somers, supra, amongst others. Duquesne Light, 66 F.3d 604.

- - - - - - - - - - - - - - - - -End Footnotes- - - - - - - - - - - - - - - - -  [*58]

Defendants' Motion for partial summary' judgment, filed January 22, 1996 is accordingly GRANTED with respect to count seven of Plaintiff's second amended complaint.

## IV. CONCLUSION

Consistent with the preceding discussion, partial summary judgment for Defendants will be granted at this time with respect to all counts except count 1 (alleging constitutional violations); that part of count 3 alleging intentional interference with a prospective contractual relationship; and count 6 (defamation). Although we will include the entry of judgment in our order, this judgment will not be final or appealable under Fed.R.Civ.P. 54(b).

An appropriate order follows.

AND NOW, this 1st day of August 1996, upon consideration of Defendants' Motions for Summary Judgment, filed on January 22, 1996 and February 8, 1996, it is hereby ORDERED, consistent with the foregoing memorandum, that said motions are GRANTED in part and DENIED in part as follows:

1. Said motions are DENIED with respect to count one alleging constitutional violations. However, the parties are directed to further brief the issues pertaining to this count;

2. Said motions are DENIED with respect to that part of  [*59] count three alleging intentional interference with a prospective contractual relationship;

3. Said motions are DENIED with respect to count six alleging defamation; and

4. Said motions are GRANTED in all other respects and judgment is entered in favor of Defendants and against Plaintiff on all claims except those enumerated above. This is not a final judgment.

BY THE COURT

Franklin S. Van Antwerpen

United States District Judge

Service: **LEXSEE®**
Citation: **1996 us dist lexis 11177**
View: Full
Date/Time: Thursday, June 22, 2000 - 1:42 PM EDT

About LEXIS-NEXIS I Terms and Conditions


Copyright © 2000 LEXIS-NEXIS Group.  All rights reserved.