IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF PENNSYLVANIA

STAMBAUGH'S AIR SERVICE, INC.,          :

　　　　　　　　Plaintiffs          :

　　　　v.          :          CASE NO. 1:CV-00-0660

SUSQUEHANNA AREA REGIONAL          :          Judge Yvette Kane
AIRPORT AUTHORITY, BAA          :          Magistrate Judge J. Andrew Smyser
HARRISBURG, INC., DAVID FLEET,          :
individually, DAVID HOLDSWORTH,          :
individually, and DAVID C. McINTOSH,          :
individually,          :
　　　　　　　　Defendants          :
. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . :

**DEFENDANTS' REPLY BRIEF IN SUPPORT OF
MOTION TO DISMISS COMPLAINT**

I.    **STAMBAUGH'S FAILS TO STATE A CONSTITUTIONAL CLAIM**

　　A.  **STAMBAUGH'S SUBSTANTIVE DUE PROCESS CLAIM SHOULD BE
　　　　DISMISSED BECAUSE STAMBAUGH'S HAS FAILED TO IDENTIFY A
　　　　CONSTITUTIONALLY PROTECTED INTEREST**

　　　　In an attempt to resurrect its constitutional claims, Stambaugh's ignores the critical

distinction between procedural and substantive due process.  Stambaugh's asserts that the terms

of the RFQ entitled it to receive the FBO contract for the AMP Hangar and that Defendants'

decision not to renew Stambaugh's FBO contract constituted a violation of its constitutionally

protected property interest.  Stambaugh's further asserts that Defendants' decision not to renew

its FBO contract has deprived it of its Fourteenth Amendment liberty interest to engage in the "common occupations of life." Such arguments, however, run contrary to the Third Circuit case law addressing substantive due process claims similar to Stambaugh's. Furthermore, the important distinction between constitutionally protected property and liberty interests and Stambaugh's interest in the instant case is manifested in the cases Stambaugh's cites to support its argument.[1]

## 1. STAMBAUGH'S CLAIM THAT IT HAD A LEGALLY ENFORCEABLE PROPERTY INTEREST IN THE AMP HANGAR CONTRACT IS UNFOUNDED.

In arguing that its property interest in the AMP Hangar lease arises from the RFQ specifications, Stambaugh's misapplies procedural due process concepts to its substantive due process claim. Stambaugh's contends that because Defendants "set up rules limiting their discretion as to what entities could be awarded" the AMP contract, it possessed an entitlement to the contract. Response Brief at 12.[2] In Independent Enter., Inc. v. Pittsburgh Water and Sewer Auth., 103 F.3d 1165 (3d Cir. 1997), however, the Third Circuit flatly rejected this argument. On almost the same facts as the instant case, the plaintiff in Independent argued that the municipal authority interfered with its ability to be awarded a contract thus violating its procedural and substantive due process rights under Section 1983. Independent Enter., Inc., 103 F.3d at 1169.

---

[1] Since Stambaugh's Response Brief is devoid of mention of its allegations of FAA violations and the impact of these alleged violations on its constitutional claims, Defendants' do not address this issue. By way of follow up, however, as Defendants' Brief states in footnote 2, page 8, there is an ongoing action between Stambaugh's and SARAA with the FAA. SARAA's most recent response to Stambaugh's FAA Complaint is attached hereto for the Court's reference as Exhibit "A."

[2] Stambaugh's Brief in Opposition to Defendant's Motion to Dismiss (hereinafter "Response Brief"). Defendants' Brief in Support of its Motion to Dismiss will hereinafter be referred to as "Defendants' Brief."

Independent involved claims by Independent Enterprises, Inc. ("Independent"), a construction company, against the Pittsburgh Water and Sewer Authority ("Authority") for, inter alia, procedural and substantive due process violations. Independent alleged that the Authority's actions of disqualifying and rejecting Independent's bids on water and sewer projects impermissibly violated Independent's constitutional rights. Id. at 1177. In support of its procedural due process argument, Independent argued that the limitations placed on the Authority's discretion to award the contract for which Independent was the low bidder, rendered Independent entitled to receive the contract. Id. at 1177-79. Independent's position was that the competitive bidding statutes conferred upon it an entitlement to the contracts. Id. Independent's substantive due process argument was grounded in the claim that the Authority's arbitrary actions deprived it of a fundamental property interest. Id. at 1179-80.

In support of its procedural due process argument, Independent argued that the limitations placed on the Authority's discretion to award the contract for which Independent was the low bidder, entitled Independent to receive the contract, thus creating a property right. Id. at 1177-79. In rejecting this argument the Third Circuit dismissed as inapposite the very case law cited by Stambaugh's in support of its substantive due process claim. Id. at 1179. The Independent court explained that under the Supreme Court's decision in Board of Regents v. Roth, 408 U.S. 564 (1972), a "legitimate claim of entitlement to be awarded a municipal contract" rests only on the existence of "an independent source such as state law." Id. at 1177. Concluding that the Pennsylvania competitive bidding statutes, enacted for the benefit of the taxpayers only, did not constitute a legally enforceable right with respect to the contract at issue, the court instructed:

> Midnight Sessions and Winsett are inapposite here, however. Midnight Sessions involved the deprivation of a portion of a property owner's interest in the use of his real property. Winsett involved prison regulations that mandated work release for an inmate when he satisfied certain criteria. We held that state regulations conferred on the inmate a legally enforceable right to work release. As a result, the inmate had a liberty

interest that warranted due process protection.  Here, however, under Pennsylvania law Independent clearly had no legally enforceable interest in receiving the contracts and thus had no "entitlement" to the benefit sought.

Id. at 1179.

Here, Stambaugh's uses a procedural due process argument in order to support a substantive due process claim.  Nevertheless, despite the misapplication of the analysis to its alleged claim, Stambaugh's argument that the RFQ constituted an "independent source such as state law" and conferred upon it a legally enforceable right to the AMP Hangar contract is flawed.  Stambaugh's does not, and cannot, point to any case law where a court has held that RFQ specifications rise to the level of state law or regulation.  As the court in Independent recognized:

> [O]ne who bids on a public contract has no legitimate expectation of receiving it until the contract is actually awarded.  See Highway Express Lines v. Winter, 414 Pa. 340, 200 A.2d 300, 303 (1964) ("By their bid [the unsuccessful bidders] proposed to contract for certain work; that bid was not accepted.  It was a mere proposal that bound neither party, and as it was never consummated by a contract, the city acquired no right against the [bidders] nor they against the city.")  Since Independent's bids were never accepted, it never acquired an enforceable right with respect to the contract being awarded.  It, therefore, has not been deprived of a property interest that warrants procedural due process protection.

Id. at 1178.

Similarly, since Stambaugh's bid was not accepted, it never acquired an enforceable property interest in the AMP Hangar contract.  Stambaugh's is merely a disappointed bidder and cannot demonstrate more than "an abstract" or "unilateral expectation" of the entitlement it seeks

- 4 -

therefore compelling the dismissal of its claim based on this hybrid argument.  Id. at 1177 (quoting Board of Regents v. Roth, 408 U.S. 564 (1972)).[3]

### 2. STAMBAUGH'S HAS NOT ALLEGED A CONSTITUTIONALLY PROTECTED PROPERTY INTEREST.

In arguing that its property interest is similar to those asserted in the cases cited in support of its argument, Stambaugh's also misses the mark.[4]  All of these cases involved constitutionally fundamental property ownership interests and are therefore inapplicable here. See Id. at 1179 (discussing the inapplicability of DeBlasio, Homar, Midnight Sessions and Neiderheiser to Independent's claim of a substantive due process property interest in a government contract).

Relying on the Independent decision, the Third Circuit recently emphasized that "a substantive due process claim grounded in an arbitrary exercise of government authority," such as Stambaugh's, "may be maintained only where the plaintiff has been deprived of a 'particular quality of property interest.'" Boyanowski v. Capital Area Intermediate Unit, 2000 WL 768775, *7 (3d Cir. Pa.) (quoting Independent Enter., Inc., 103 F.3d at 1179).[5]  Boyanowski involved

---

[3] Finally, Stambaugh's would have this Court believe that the terms of the RFQ somehow prevented Defendant from exercising its discretion in the award of the AMP Hangar contract.  To the contrary, the RFQ specifically states:  (1) "SARAA reserves the right to reject any proposal at its discretion for any reason."; (2) "This RFQ is not to be construed as a contract or a commitment of any kind. . . ."; and (3) "SARAA reserves the sole right to . . . reject any and all submittal(s). . . ."  See RFQ at 8 attached to Stambaugh's Complaint as Exhibit "A."

[4] See Woodward Estates, Ltd. v. Gretowski, 205 F.3d 118 (3d Cir. 2000) (regarding developer's ownership interest in real property and denial of subdivision plan); DeBlasio v. Zoning Board of Adjustment, 53 F.3d 592 (3d Cir. 1995) (involving plaintiff's real property and request for a use variance; Parkway Garage, Inc. v. City of Philadelphia, 5 F.3d 685 (3d Cir. 1993) (regarding plaintiff's parking garage ownership interest and lease of land with the City of Philadelphia); Midnight Sessions, Ltd. v. City of Philadelphia, 945 F. 2d 667 (3d Cir. 1991) (regarding ownership interest in a business seeking a dance hall license); Neiderhiser v. Borough of Berwick, 840 F.2d 213 (3d Cir. 1988) (addressing video business owner's challenge to zoning ordinance).

[5] Accordingly, Stambaugh's insistence that it has properly pled the arbitrary and irrational acts of Defendants and therefore deserves to survive a motion to dismiss is meaningless.  Without a constitutionally protected property interest, the most artful of allegations must fail.

allegations that a transportation contractor's property and liberty interests had been constitutionally violated by a governmental entity and its members who refused to contract with it. Similar to Stambaugh's claims, Mr. Boyanowski argued that the government officials acted in concert to deprive him of his substantive due process rights. Boyanowski, at *6-9.

Although acknowledging that little guidance exists regarding what specific property interests are worthy of substantive due process protection, the Third Circuit has been clear that the infringed property interest must be fundamental and concrete. Id.; see also Independent Enter., Inc., 103 F.3d at 1179-80. Applying this reasoning to the claims of property interests in government contracts alleged in Boyanowski and Independent, the Third Circuit has had no trouble concluding that the alleged interests "[w]ere not the sort of fundamental interest[s] protected by substantive due process." Boyanowski, at *7; Independent Enter., Inc., 103 F.3d at 1180.

Thus, Stambaugh's claim of a constitutionally protected property interest in the award of the AMP Hangar contract and in the renewal of its lease to provide FBO services "bears 'little resemblance to the fundamental interests that previously have been viewed as implicitly protected by the Constitution.'" Independent Enter., Inc., 103 F.3d at 1180 (citations omitted). As discussed in Boyanowski, precedent on this issue has never been read to extend substantive due process protection to an individual's allegations of arbitrary governmental action regarding a governmental contract. Boyanowski, at *8.

### 3. STAMBAUGH'S HAS NOT PLED A CONSTITUTIONALLY PROTECTED LIBERTY INTEREST.

Stambaugh's claim of a liberty interest deprivation is also meritless. Response Brief at 15-16. Equating the failure to be awarded a government contract and lease termination "to a frustrated plaintiff's legal right to engage in the common occupations of life in a manner

protected by the Fourteenth Amendment goes too far." Boyanowski, at *8. As illustrated by the
Boyanowski court, Meyer v. Nebraska, as well as all of the other cases cited by Stambaugh's, do
not support its substantive due process claim.[6] Such cases involve governmental interference
with, or direct prohibition of, the liberty to pursue a chosen occupation or a particular calling, not
the right to a government contract or the renewal of a lease agreement. See, e.g., Hampton v.
Mow Sun Wong, 426 U.S. 88 (1976) (involving a Civil Service regulation baring non-citizens
from employment in the federal competitive civil service); Meyer v. Nebraska, 262 U.S. 390
(1923) (involving a direct prohibition to teachers to teach languages other than the English
language); Hoffman v. Lehman, 926 F.Supp. 510 (M.D. Pa. 1996) (involving early termination
of contract for medical services and complete disbarment from contracting with the
Commonwealth); Santos v. City of Houston, Texas, 852 F.Supp. 601 (S.D. Tex. 1994)
(involving an absolute ban on all jitney operations in the city of Houston).[7]

---

[6] In Boyanowski, the court found Meyer v. Nebraska, 262 U.S. 390 (1923) inapplicable to the plaintiff's claim of a
constitutionally protected liberty interest to engage in the transportation business through government contracts.
The court instructed that Meyer "turned . . . on a direct bar to the teacher's teaching, as well as the concurrent
interference in parental rights over children." Boyanowski, at *8. The court opined that if Meyer were relevant,
Boyanowski's situation would have to involve a prosecution targeted at him for merely bidding on transportation
contracts. Id. Boyanowski's "actual situation was too remote from the facts of Meyer for that case to have
particular applicability." Id. (stating that the Supreme Court has held "that Meyer cannot be read to constitutionalize
all executive actions that affect the pursuit of a profession in any way"). The fact that Stambaugh's has not alleged
that it has been targeted for simply bidding on the AMP Hangar project coupled with the fact that Stambaugh's is
complaining about the failure to be awarded a single contract makes Meyer "too slender a reed on which to rest" its
substantive due process argument. Id.

[7] The case of Sammon v. New Jersey Board of Medical Examiners, 66 F.3d 639 (3d Cir. 1996) cited by
Stambaugh's is wholly inapplicable to the instant case. Whether the plaintiff midwives asserted a liberty interest
appears not to have been raised by the litigants or addressed by the Sammon court. Moreover, the case dealt with
the issue of standing and whether the statutory scheme at issue passed muster under the rational basis test. Sammon,
66 F.3d at 642, 645. The court concluded it had. Id. at 643. Finally, the case involved a statutory scheme that was
attacked for preventing people from pursuing their chosen profession of midwifery. Id. at 644. Stambaugh's
allegations that its failure to receive one contract and the termination of its lease, by its own terms, hardly compares
to the Sammon plaintiffs' argument that they had been completely statutorily barred from pursuing their chosen
career.

Contrary to Stambaugh's assertions, the analysis in <u>Homar v. Gilbert</u>, 63 F.Supp. 2d 559 (M.D. Pa. 1999) applies with equal vigor to Plaintiff's claims.[8]  In <u>Homar</u>, this Court thoroughly examined case law involving public employment and substantive due process claims, and Third Circuit precedent in general, regarding fundamental property interests.  Supporting Defendants' position herein, Judge Vanaskie denied Homar's substantive due process claim emphasizing that "[t]he Third Circuit . . . has determined that service contracts with the state fail to merit substantive due process protection" and that "<u>DeBlasio</u> involved a fundamental property interest dating to the foundation of the American colonies, i.e., real property ownership." <u>Homar</u>, 63 F. Supp. 2d at 572, 577.

Additionally, Stambaugh's argument in its brief that it has been deprived of the opportunity to operate its business <u>at all</u> is factually incorrect and contradicts the very allegations in its Complaint.  Nowhere in the Complaint does Stambaugh's allege that it has been completely barred from operating its repair and maintenance business at HIA or its FBO business at another location. (Complaint ¶ 1 (listing Stambaugh's principal place of business at HIA); Complaint ¶ 9 (admitting that Stambaugh's is presently engaged in the business of repairing and maintaining airplanes at HIA); Complaint ¶ 20 (admitting that Stambaugh's has a present lease for its business at HIA until 2003); Complaint ¶¶ 86, 87, 88, 95, 96 (confirming that Stambaugh's intends to continue in the FBO business after relocation to another location).)  Accordingly, Stambaugh's claim of a constitutional deprivation of its liberty interest is a sham and further compels the dismissal of its substantive due process claim.

---

[8] In keeping with Stambaugh's misreading of constitutional law concepts, Stambaugh's cites <u>Homar</u> in the liberty interest section of its brief. <u>Homar</u>, however, did not involve a claim of deprivation of liberty interest, but rather a claim of a constitutionally protected property right in public employment.



**B. STAMBAUGH'S EQUAL PROTECTION CLAIM SHOULD BE DISMISSED BECAUSE ITS ALLEGED INJURIES ARE NOT SUBJECT TO CONSTITUTIONAL PROTECTION.**

In support of its equal protection argument, Stambaugh's attempts to avoid the application of the rational basis test to the facts as alleged in the Complaint by protesting that it has pled all of the right words in order to survive a motion to dismiss. Response Brief at 20-23. See Holt Cargo Sys., Inc. v. Delaware River Port Auth., 20 F. Supp. 2d 803, 825 (E.D. Pa. 1998) (instructing that under the rational basis test a governmental action that does not burden a fundamental right or target a suspect class will be upheld so long as the action bears a rational relationship to some legitimate end). As discussed more fully in Defendants' Brief in Support of Motion to Dismiss, Defendants can present ample contractual and security reasons for the challenged actions. Defendants' Brief at 14-15. Accordingly, despite the fact that Stambaugh's has alleged that it has received disparate treatment at the hands of Defendants, the governmental actions alleged do not rise to the level of constitutional proportions.

Additionally, Stambaugh's fails to identify how the governmental action in question caused any injury to its business. In fact, Stambaugh's entire argument calls into question the strength of this claim and intimates that it is nothing more than an expression of frustration of a disappointed bidder. As the court in Queen City Aviation, Inc. v. City of Allentown, No. 91-7776, 1992 U.S. LEXIS 9042 (E.D. Pa. June 5, 1992), aff'd 993 F.2d 225 (3d Cir. 1993) insightfully noted "[t]he Civil Rights laws were never intended to establish liability" in government contract cases such as Stambaugh's. Queen City Aviation, Inc., at *6. Accordingly, Stambaugh's equal protection claim fails the appropriate level of scrutiny required for such a claim and must be dismissed.

## II.    THE INDIVIDUAL DEFENDANTS ARE ENTITLED TO QUALIFIED IMMUNITY

As discussed in Defendant's Brief at pages 16-19, and as explained at length herein, Stambaugh's has not alleged claims implicating constitutionally protected rights. Moreover, if this court decides that Stambaugh's has alleged a violation of a constitutional right, such a right can hardly be said to be clearly established in light of recent Third Circuit case law addressing virtually identical constitutional issues as those in the instant case. See Boyanowski v. Capital Area Intermediate Unit, 2000 WL 768665, *7 (3d Cir. Pa.) and Independent Enter., Inc. v. Pittsburgh Water and Sewer Auth., 103 F.3d 1165 (3d Cir. 1997). Also, here, the court need not reach the issue of whether historical material facts are at issue since the unlawfulness of the individual defendants' alleged actions is not legally apparent under any set of facts. Accordingly, under the "objectively reasonable" standard discussed in Sharrar v. Felsing, 128 F.3d 810 (3d Cir. 1997), a decision regarding the individual defendants' qualified immunity defense is proper at this stage in the case. See Sharrar, 128 F.3d at 828-29 (instructing that the government official's objective good faith is purely a legal question).

## III.   STAMBAUGH'S PENNSYLVANIA CONSTITUTIONAL CLAIMS SHOULD BE DISMISSED BECAUSE VIOLATIONS OF THE PENNSYLVANIA CONSTITUTION DO NOT GIVE RISE TO ACTIONS FOR MONEY DAMAGES

In its Complaint, Stambaugh's alleges that the Defendants violated Article I, Sections 1 and 26 and Article III, Section 32 of the Pennsylvania Constitution. In all instances, Stambaugh's seeks money damages for these alleged constitutional violations. Interestingly, in its Brief, Stambaugh's does not argue that a private right of action exists for violations of Article I, Section 26 and Article III, Section 32. Instead, Stambaugh's focuses entirely on Article I, Section 1 and, in the context of that section, concedes that the Pennsylvania Supreme Court has not decided whether a private right of action exists for money damages under that provision. Response Brief at 29. Counts II and IV of Stambaugh's Complaint should be dismissed because Stambaugh's seeks only money damages in this matter, yet acknowledges that there is no right to

money damages for violations of the Pennsylvania Constitution, and because Stambaugh's apparently concedes that there is no private right of action for violations of Article I, Section 26 and Article III, Section 32 of the Pennsylvania Constitution.

## IV.  STAMBAUGH'S CLAIM FOR VIOLATION OF THE MUNICIPAL AUTHORITIES ACT SHOULD BE DISMISSED BECAUSE THE ACTIVITIES COMPLAINED OF ARE NOT OF THE TYPE PROHIBITED BY THE ACT AND NO PRIVATE RIGHT OF ACTION FOR DAMAGES EXISTS UNDER THE ACT

The actions of Defendants alleged by Stambaugh's are not within the prohibitions of the Municipal Authorities Act of 1945, 53 P.S. § 306 et seq. (the "Act").  Moreover, pursuant to the Act, Stambaugh's argument overlooks the fact that Section 306A(b)(2) of the Act, "by its own terms is intended to benefit the people of the Commonwealth."  Commonwealth v. Evansburg Water Co. v. Perkiomen Twp., 131 Pa. Commw. 89, 94, 569 A.2d 428, 430 (1990).  It is not designed to afford Stambaugh's the private right of action for damages it seeks.  Stambaugh's fails to provide any authority to the contrary.  Dismissal of the claim, therefore, is warranted.

## V.  STAMBAUGH'S CONSPIRACY CLAIM SHOULD BE DISMISSED BECAUSE IT DOES NOT IDENTIFY THE UNDERLYING TORT THAT WAS ALLEGEDLY COMMITTED AND THE ALLEGED CONSPIRACY WAS COMMITTED BY AGENTS AND EMPLOYEES OF SARAA

Stambaugh's claim that "BAA and Fleet are not alleged to be agents or employees of SARAA, and SARAA, McIntosh and Holdsworth are not employees or agents of BAA or Fleet" is spurious based upon the allegations in the Complaint.  The Complaint unequivocally provides that Holdsworth and McIntosh are employees of SARAA, that BAA manages HIA on behalf of SARAA and that Fleet is an employee of BAA.  (Complaint ¶¶3, 4, 5, 6.)  Thus, it is alleged in the Complaint that all of the Defendants are agents or employees of SARAA, and, as such, the Defendants cannot conspire with each other.  See, e.g., Thompson Coal Co. v. Pike Coal Co., 488 Pa. 212-13, 412 A.2d 466, 470 (1979).  Additionally, the Complaint is silent on the

argument now raised by Stambaugh's that the Defendants were somehow acting outside of their official capacities. Absent such an allegation, the Tyler v. O'Neill, 994 F. Supp. 603 (E.D. Pa. 1998) decision has no bearing on this matter. Accordingly, the civil conspiracy claim should be dismissed.

Likewise, irrespective of what it says in its Brief, Stambaugh's conspiracy claim fails to identify what separate underlying tort the alleged conspirators committed. In attempting to justify this omission in its Complaint, Stambaugh's tries to characterize the Third Circuit's holding in In re Orthopedic Bone Screw Prod. Liab. Litig., 193 F.3d 781 (3d Cir. 1999) as standing for the proposition that in addition to a tort, a "wrong" (whatever that may be) can lead to a conspiracy claim. Response Brief at 39. The Orthopedic Bone Screw case, however, specifically held that there must be an underlying tort for a civil conspiracy claim to exist. Orthopedic Bone Screw Prod. Liab. Litig., 193 F.3d 792. In reaching that decision, the Court determined the violation of a federal statute that did not provide for a private right of action could not provide the predicate for a civil conspiracy claim. Id. at 790 (stating that "[a] claim of civil conspiracy cannot rest solely upon the violation of a federal statute for which there is no corresponding private right of action."). Thus, the Third Circuit's decision in Orthopedic Bone Screw supports the Defendants' argument that there must be a separate, underlying cause of action identified for there to be a civil conspiracy claim. In light of the Third Circuit's decision, Stambaugh's failure to identify what predicate torts form the basis for the civil conspiracy claim dictates that the civil conspiracy claim be dismissed.

## VI.   STAMBAUGH'S TORTIOUS INTERFERENCE WITH CONTRACT CLAIM SHOULD BE DISMISSED BECAUSE THE DEFENDANTS' ACTIONS WERE DIRECTED AT STAMBAUGH'S AND NOT STAMBAUGH'S CUSTOMERS

Stambaugh's claim that Section 766A of the Restatement (Second) of Torts is "irrelevant" to the instant action is an attempt by Stambaugh's to wish away case law that is fatal

to its claim. The Defendants' reliance on Section 766A is anything but irrelevant. Rather, the only thing that is irrelevant to the analysis of Stambaugh's tortious interference claim is the case cited by Stambaugh's as authority for its position, Beidelman v. Stroh Brewing Co., 182 F.3d 225 (3d Cir. 1999), which never addresses the interplay between Sections 766 and 766A of the Restatement (Second) of Torts, and never reaches any decision on the contours of tortious interference. In Beidelman the Third Circuit determined only that the plaintiff's tortious interference with a contract claim was preempted by the Labor Relations Management Act. Id. at 235. As such, that decision has no relevance to the instant action and, even if it did, the decision merely recites the elements of the tort of tortious interference.

Furthermore, Stambaugh's admits "that defendants caused the customers of Stambaugh's not to perform contracts due to the fact that Stambaugh's was no longer able to provide FBO services at HIA." Response Brief at 42. In other words, by not awarding an FBO contract to Stambaugh's, Stambaugh's customers could not use Stambaugh's for FBO services. As conceded in its Brief, Stambaugh's Complaint alleges injury not from the Defendants' actions directed at Stambaugh's customers, but rather from the actions allegedly directed at Stambaugh's, i.e., Stambaugh's failure to provide FBO services at HIA because it did not receive the FBO contract. (Complaint ¶¶230-232.) This is a classic example of acts allegedly directed at the plaintiff that impedes the plaintiff's performance of a contract and that the Third Circuit has recognized does not give rise to a tortious interference with contract claim. See Gemini Physical Therapy & Rehabilitation, Inc. v. State Farm Mut. Auto. Ins. Co., 40 F.3d 63, 66 (3d Cir. 1994); Windsor Sec., Inc. v. Hartford Life Ins., 986 F.2d 655, 660 (3d Cir. 1993). Thus, Stambaugh's tortious interference with existing contractual relationship claim must be dismissed.

- 13 -

## VII.    SARAA, MR. HOLDSWORTH AND MR. McINTOSH ARE ENTITLED TO OFFICIAL IMMUNITY

SARAA, as a municipal authority is entitled to the protection of governmental immunity. See Weinerman v. City of Philadelphia, 785 F. Supp. 1174, 1178 (E.D. Pa. 1992); Marshall v. Port Auth. of Allegheny County, 106 Pa. Commw. 120, 134-36, 525 A.2d 857, 858-59 (1987). Since the causes of action raised by Stambaugh's do not fall within the narrow exceptions of the Political Subdivision Tort Claims Act, 42 Pa.C.S.A. §8542, Stambaugh's state law claims against SARAA must be dismissed because they are barred by governmental immunity.

With respect to Mr. Holdsworth and Mr. McIntosh, they, by virtue of being employees of SARAA, are protected by governmental immunity. 42 Pa. C.S.A. § 8545. As such, the state law claims against these individuals should be dismissed.

## VIII.    CONCLUSION

For the foregoing reasons, as well as for the reasons set forth in Defendants' Brief, Stambaugh's Complaint should be dismissed.

Respectfully Submitted,

RHOADS & SINON LLP

By: _____
Dean F. Piermattei
Timothy J. Nieman
Susan E. Schwab
One South Market Square
P. O. Box 1146
Harrisburg, PA 17108-1146
(717) 233-5731
Attorneys for Defendants

Date: July 13, 2000

- 14 -

**EXHIBIT "A"**

# H O P K I N S  &  S U T T E R

(A PARTNERSHIP INCLUDING PROFESSIONAL CORPORATIONS)

888 SIXTEENTH STREET, N. W., WASHINGTON, D.C.  20006-4103  (202) 835-8000

FAX (202) 835-8136

INTERNET http://www.hopsut.com

CHICAGO OFFICE  THREE FIRST NATIONAL PLAZA  60602-4209

THOMAS R. DEVINE
(202) 835-8096
Direct Fax: (202) 835-8238
E-Mail: TDevine@hopsut.com

June 14, 2000

**VIA FEDERAL EXPRESS**

Ms. Evelyn J. Martinez
Airport Certification and Compliance Inspector
Airports Division
U.S. Department of Transportation
Federal Aviation Administration
Fitzgerald Federal Building
John F. Kennedy International Airport
Jamaica, NY  11430

> Re:   Stambaugh's Air Service, Inc. Letter Complaint
>        Against Susquehanna Area Regional Airport Authority

Dear Ms. Martinez:

This is in response to your letter of May 11, 2000 forwarding the May 2, 2000 letter of Pepper Hamilton (the "Pepper Letter"), counsel for Stambaugh's Air Service, Inc. ("Stambaugh's"). As you may know, Stambaugh's had previously filed a Part 16 complaint against the Susquehanna Area Regional Airport Authority ("SARAA" or the "Authority"), but the FAA dismissed that complaint for failure to attempt informal resolution of the issues raised in the complaint. (*See* April 17, 2000 Letter of Dismissal, from David Bennett, Director of Office of Airport Safety and Standards, attached at Tab 1). The Pepper Letter, while not acknowledging the dismissal of the complaint, is apparently an attempt to meet the requirement to undertake informal resolution. (*See* Pepper Letter at 1, "I understand from our conversation that the FAA prefers that the informal efforts be undertaken prior to the filing of a formal complaint. Therefore, Stambaugh's is submitting this letter to you.")

In the Pepper Letter, Stambaugh's requests that FAA take enforcement action against SARAA. Seeking FAA sanctions against the Authority does not strike us as an attempt at informal resolution. Rather, it appears to be a backdoor way for

P32110-1

Ms. Evelyn J. Martinez
June 14, 2000
Page 2


Stambaugh's to obtain what it had sought in the dismissed complaint – the imposition of FAA sanctions against the Authority.  We question whether this request would qualify as an attempt at informal resolution should Stambaugh's ultimately file another Part 16 complaint.  Nonetheless, because you have requested that SARAA respond to Stambaugh's letter, we are doing so, and we are enclosing the materials you requested, as well.[1]  In so doing, however, SARAA does not waive any objection to procedural defects that may be pertinent in further proceedings.

At the outset, the Authority emphasizes that it takes seriously its compliance with the applicable statutory and regulatory requirements imposed on it by the federal government, as well as the grant assurances that are conditions of accepting federal Airport Improvement Program ("AIP") grants.  This includes requirements relating to safety, security, and protection of the environment, as well as exclusive rights and economic discrimination.

The Authority supports the avowed goals of the FAA in the various advisory circulars and orders (which are not regulatory documents) concerning exclusive rights

---

[1]  Enclosed are the following:

April 17, 2000 Letter of Dismissal, from David Bennett, Director of Office of Airport Safety and Standards, copy attached at Tab 1;

Lease and Fixed Base Operator Agreement Between Stambaugh's Air Service and Commonwealth of Pennsylvania, Agreement No. 814690 (Dec. 19, 1997), copy attached at Tab 2 ("Stambaugh's Lease");

Temporary License for Access to the Harrisburg International Airport (between Susquehanna Area Regional Airport Authority and Hawthorne Aviation, dated Jan. 14, 2000), copy attached at Tab 3 ("License");

Minimum Standards for Conducting Fixed Base Operations at Commonwealth-Owned Airports, 67 Pa. Code Ch. 476 (1997), copy attached at Tab 4 ("Pennsylvania Minimum Standards");

Lease and Fixed Base Operator Agreement Between AERO Services International, Incorporated and Commonwealth of Pennsylvania, Agreement No. 814683 (March 1, 1997), copy attached at Tab 5 ("AERO Lease");

First Amendment to Lease and Fixed Base Operator Agreement (between Susquehanna Area Regional Airport Authority and Stambaugh's Air Service, Inc., effective Jan. 19, 1999), copy attached at Tab 6 ("First Amendment"); and

FBO Minimum Standards for Harrisburg International Airport and Capital City Airport, effective April 11, 2000, copy attached at Tab 7 ("HIA Minimum Standards").

Ms. Evelyn J. Martinez
June 14, 2000
Page 3

and minimum standards. For example, the FAA states that existence of exclusive rights at an airport "deprives the using public of the benefits that flow from a competitive enterprise." *Advisory Circular 150/5190-5 (4/7/00)* ("*AC 5190-5*") at §1(2). Moreover, "the FAA considers it inappropriate to grant Federal funds for improvements to airports where the benefits of such improvements will not be fully realized due to the inherent restrictions of a local monopoly on aeronautical activities at the airport." *Id.* In summary, the FAA states that "With few exceptions, an airport sponsor is prohibited from granting an exclusive right to a single operator for the provision of an aeronautical activity to the exclusion of others (see definition of exclusive right)." *Id.* at §1(1).

In its order on Exclusive Rights, the FAA states that "It is the intent of the foregoing policies to promote fair competition at public-use airports. It is expected that public-use airport owners will adopt and enforce minimum standards and qualifications to be met by those who propose to engage in commercial aeronautical activities. *Primarily such standards should protect the interest of the public.*" *Order 5190.1A Exclusive Rights At Airports* (10/10/85) at § 11(c) (Emphasis added).

In short, the FAA's avowed purpose is to foster a high level of service to the aeronautical public through the promotion of competition and the elimination of monopolies. The actions taken by the Authority have promoted these goals. Today, there is more competition in the provision of FBO services and a higher level of service to FBO customers than at any other time at Harrisburg International Airport ("HIA" or the "Airport").

Indeed, the Pepper Letter acknowledges that, at various times from 1975 through 1996, Stambaugh's was the *only* FBO operating at the Airport. (*See* Pepper Letter at 2.) Stambaugh's never complained about exclusive rights being granted to an FBO when it had a monopoly on FBO services at the Airport. Now that there are *two* FBOs (AERO Services International Incorporated ("AERO") and Piedmont Hawthorne ("Hawthorne")) providing competing FBO services, Stambaugh's complains of the granting of an "exclusive right." In fact, the Authority has successfully injected competition into the provision of FBO services at the Airport in an effort to raise the quality of the services provided to the aeronautical public.

Moreover, the Authority did not make its decisions concerning FBOs in isolation. It kept the local FAA Airports District Office ("ADO") apprised of the issues it was facing and the decisions it was making. The ADO recognized that the Authority was making business decisions based on valid reasons, and advised that there was no problem with the Authority's decisions from the standpoint of compliance with federal requirements.

In support of its letter complaint, Stambaugh's makes a number of allegations that are either frivolous on their face or completely unsupported by the facts. The following is a brief response to those allegations.

Ms. Evelyn J. Martinez
June 14, 2000
Page 4

### Stambaugh's Would Have SARAA Violate FAA's Security Regulations

Stambaugh's complains that "SARAA has engaged in a policy of intimidation and harassment directed at Stambaugh's and its employees." Pepper Letter at 3.  As "evidence" of this, Stambaugh's states that "SARAA has repeatedly harassed Stambaugh's employees and forced them to discontinue working on Stambaugh's projects under the guise of checking the identities of the employees.  In order to continue this harassment, SARAA representatives routinely require Stambaugh's employees to stop working and to produce identification despite the fact that the SARAA representatives involved know both the identity of the Stambaugh's employees and are aware that the people involved are employed by Stambaugh's." *Id.*

Anyone familiar with aviation security issues knows that FAA's own regulations *require* airport employees (and any other badge holders) to challenge anyone who is in the Air Operations Area ("AOA") who is not displaying the proper, airport-issued identification demonstrating that the person is authorized to have access to the AOA. *See* 14 CFR §§ 107.13 and 107.14.  The airport must have in place a system, method, or procedure to "ensure that only those persons authorized to have access to secured areas by the airport operator's security program are able to obtain that access and shall specifically provide a means to ensure that such access is denied immediately at the access point or points to individuals whose authority to have access changes." *Id.*, § 107.14(a).  Thus, airport officials (as well as Stambaugh's own employees) must challenge any person on the AOA who is not displaying proper identification (unless escorted by an authorized person with proper identification) even if that person had the proper identification the day before, or even earlier that same day.  One reason for this requirement is that a worker who has just been fired may pose a security risk as great as – or greater than – anyone else who does not have authorization to enter the AOA.

In short, Stambaugh's characterizes as "harassment" the Authority's compliance with FAA's own security regulations.  Were the Airport not to challenge anyone failing to display the proper identification while in the AOA – whether a Stambaugh's employee or not – the Authority could be cited by the FAA for a violation of its security requirements.  Moreover, the Authority has not singled out Stambaugh's employees, but rather, challenges *anyone* failing to display proper identification in the AOA.

The fundamental difference between Stambaugh's situation and that of other companies relates to the number of times that Stambaugh's employees appeared unbadged and unaccompanied on the AOA – in several instances because those employees had never obtained the necessary airport identification before Stambaugh's sent them out onto the AOA – and to the reaction of the individuals and the company to the Authority's efforts in fulfilling its security responsibilities.  Two examples illustrate this point.

Ms. Evelyn J. Martinez
June 14, 2000
Page 5

In one case, a Stambaugh's employee flagged down an Airport police officer and asked him to open a gate (to the AOA) for him. The officer questioned him, and the Stambaugh's employee stated that he did not have an HIA ID card issued to him. The officer escorted him back to Stambaugh's, and spoke there with another employee, who said that he did not have an ID badge either, because of a background check hold up. The second employee actually became upset that the officer challenged the unbadged employees!

In another instance, a Stambaugh's employee was standing on top of a fuel truck with no visible airport ID. To make matters worse, he had tied the "deadman" cutoff rope from the fuel line to a truck – a practice that had led to a 350-gallon fuel spill by another Stambaugh's employee earlier in the year. He was challenged by the Airport's manager of operations and security and told to untie the deadman rope to stop the flow of fuel prior to coming down from the truck to produce his identification. The employee stated that he was a new employee, had not obtained an airport ID, and had been left at the ramp by himself.

The response of Stambaugh's president to the citation of his employee for this incident was to claim that the employee tied off the deadman when asked to produce identification so as to avoid delay in the refueling of the truck which "was urgently needed." (That is, Stambaugh's president implausibly claimed that the employee committed a violation of airport safety rules in plain view of an airport official in order to comply with the request to produce ID.) Further, Stambaugh's president wrote that "There should be no interference with individuals, who are obviously employees engaged in duties which involve some risk, just to check ID's unless there is reason to suspect they are a security threat." This is not the Authority's understanding of the FAA's security requirements, and Stambaugh's was told by the airport operations and security manager that it is mandatory that unbadged persons be challenged on the ramp, regardless of whether they appear to be working.

Stambaugh's president did not acknowledge any wrongdoing in sending an employee out onto the AOA who, not only did not *display* the proper ID, but who, in fact, had never *obtained* the proper ID. The practice of sending employees out into the AOA before a background check has been completed and they have been issued proper identification undercuts FAA's carefully crafted program of security access regulations and requirements. Stambaugh's lack of proper compliance disposition on security matters, and its continuing hostility towards airport personnel carrying out *their* security responsibilities is a cause of serious concern to the Authority. That this attitude is embedded in the company culture, and not merely isolated to individual employees, is evidenced by the indignant statement by Stambaugh's president, and the fact that the company to this day, in the Pepper Letter as well as in the aborted March 28, 2000 Part 16 Complaint, complains of the Airport's actions in challenging its unbadged employees.


Ms. Evelyn J. Martinez
June 14, 2000
Page 6

### Stambaugh's Claims that the Authority has Engaged in Economic Discrimination By Permitting AERO to Operate at the Airport Despite Its Failure to Remit Rental Payments – But AERO's Arrearages Were Dwarfed by Stambaugh's Own Arrearages

The Pepper Letter states that ". . . SARAA has not enforced lease terms against AERO that have been enforced against Stambaugh's. Specifically, on information and belief, SARAA has permitted AERO to continue to operate at HIA despite its failure to pay rent. As a result, SARAA has engaged in economic discrimination in violation of 49 U.S.C. § 47107(a)(5)." Pepper Letter at 3. This is an astonishing statement in light of the fact that the enclosed lease documents demonstrate that when the Airport entered into a new lease with Stambaugh's in 1997, Stambaugh's was seriously behind in its rent and fuel flowage payments.

At that time, the Commonwealth of Pennsylvania, the Authority's predecessor in interest, allowed Stambaugh's to enter into a new lease despite the fact that it owed the Airport $298,034.53 in past due rentals, fuel flowage fees, and interest dating back *prior to 1992*, i.e. five years earlier. *See* Stambaugh's Lease (under Tab 2) at §45 (p. 35) and § 4(f) (p. 6). To provide perspective as to the magnitude of Stambaugh's shortfall, its annual rental (but not fuel flowage) payments under the 1997 lease totaled approximately $117,000.

Stambaugh's was allowed, under the lease, to make payments of $10,000 per month for 29 months (with a 30th payment of $8,034.53) to make up the $298,034.53. In fact, it wasn't until Stambaugh's was about to enter into a new lease for its heavy maintenance facility in January of this year that Stambaugh's finally brought its account current.

In contrast, AERO has, at most, been behind by approximately $80,000 in its rent. Moreover, it has made payments needed to cover its arrearages, and has been paying its bills within 60 to 90 days. In light of these facts relating to the respective payment histories of AERO and Stambaugh's, Stambaugh's claim that it has been economically discriminated against is breathtaking in its audacity.

### While Claiming Exclusive Rights Violations, Stambaugh's Objects to the Fact that the Authority Did Not Limit the Bidding For the AMP Hangar to One Bidder (Stambaugh's)

Stambaugh's objects to the fact that SARAA sought competitive bids from more than one potential bidder to lease the AMP Hangar to provide FBO services from that site. Pepper Letter at 4. Stambaugh's hopes to convince the FAA that the Authority's consideration of more than one bid for the site is evidence of an effort to create an exclusive FBO. Under Stambaugh's twisted reasoning, allowing only one bidder,

P32110-1

Ms. Evelyn J. Martinez
June 14, 2000
Page 7

Stambaugh's, to bid to provide FBO services at the AMP Hangar site will not create an exclusive right, but entertaining more than one bid for the site will "create an exclusive FBO." In fact, neither would create an exclusive FBO, since AERO was already operating as an FBO from another site on the Airport.[2]

Moreover, limiting the number of bidders to one would not have increased the chances that a higher level of service would be provided to the aeronautical public; rather, competitive bidding from more than one bidder enhances the quality of the bids from which a selection may be made. This ultimately benefits the public, through the provision of enhanced service.

Stambaugh's also claims that it was "the only company that qualified to provide FBO services at the AMP Hangar" because it was "the only company that both participated in the pre-submission conference and tour and submitted a proposal in a timely fashion." Pepper Letter at 5. In fact, there were other defects with Stambaugh's bid, particularly the failure to include the required financial information. Thus, in a technical sense, there were no bids that met all of the requirements of the Request for Qualifications ("RFQ"), including Stambaugh's. However, the Authority had included standard language in the RFQ that allowed it to waive irregularities in the bids, if that was in the interest of the Authority to do so.

While the Authority could have required a new round of bids, it was not required to do so. Further, the Authority was perfectly within its rights in extending the response deadline in order to obtain more bids to evaluate. Of course, compliance with procurement requirements is an issue appropriately decided under state law, and Stambaugh's has also filed a civil complaint in court.[3] For the FAA's purposes, however, it is important to understand that Stambaugh's real complaint is not that one bidder was selected to operate an FBO out of the AMP Hangar. Rather, Stambaugh's complaint is merely that it was not selected. The selection of one bidder over another does not create an exclusive right, except, potentially, where the incumbent FBO is selected for the new site. That did not happen here. Instead,

---

[2] Contrary to Stambaugh's assertion that "SARAA promised to grant an exclusive arrangement to potential bidders in order to get them to submit bids to provide FBO services out of the AMP Hangar," Pepper Letter at 4, both the RFQ and the License granted to the successful bidder clearly state that the FBO services to be granted are non-exclusive. See, e.g., License (under Tab 3) at § 7 "The Licensor hereby grants to the licensee the non-exclusive right and privilege to conduct its Fixed Base Operation at the Airport. It is specifically understood and agreed by the Licensee that nothing herein contained shall be construed as granting or authorizing the granting of an exclusive right to operate a Fixed Base Operation at the Airport." (Emphasis added.)

[3] Similarly, Stambaugh's has claimed that the Authority interfered with its contracts and business operations. The Authority denies these charges, and points out that they fall within the purview of the pending court case.

Ms. Evelyn J. Martinez
June 14, 2000
Page 8

whether Stambaugh's or Hawthorne or any other FBO but AERO was selected, there
would be no exclusive right conferred by the selection of an FBO to operate from the
site.   Certainly, it is no more "exclusive" for the Authority to have selected Hawthorne
(which Stambaugh's didn't want) than it would have been to select Stambaugh's
(which Stambaugh's wanted).

Under the guise of protesting the award of an "exclusive" right, however,
Stambaugh's seeks for the FAA to inject itself into state law procurement issues and
airport management prerogatives and determine that, under federal law and the
accompanying grant assurances, the Authority's selection of an FBO for the AMP site
must be made from a pool of *exactly one* candidate, Stambaugh's. The FAA should not
be persuaded by Stambaugh's cynical attempt to manipulate the agency's application
of the exclusive rights prohibition.

### Stambaugh's Assertions of Premature Disclosure of the Authority's Selection Decision are False

Stambaugh's asserts that the Airport Director contacted various customers of
Stambaugh's on January 10, 2000 "and informed them that Stambaugh's would not
be awarded the lease to the AMP Hangar and would not have FBO rights at HIA."
Pepper Letter at 5.  This is simply not true.  The Airport Director did not contact any
such customers to inform them that Stambaugh's had not received the contract until
after the Authority Board had made its selection on January 11, 2000.  In fact, one of
the airline customers complained to the Airport Director about the *lack of* advance
warning that Stambaugh's would not be selected.  However, the Airport Director could
not – and did not – inform the airlines until the Board made its decision.

### Stambaugh's Assertions Concerning Minimum Standards are Incorrect

Stambaugh's claims that "SARAA abandoned the HIA Minimum Standards"
when it assumed ownership of HIA.  Pepper Letter at 3.  This is not accurate.  Under
the Commonwealth's ownership and control, the minimum standards applicable to
FBOs at HIA were codified at 67 Pa. Code Chapter 476.  *See* Pennsylvania Minimum
Standards (under Tab 4).  This provision was incorporated by reference in each FBO
lease entered into by the Commonwealth, to wit, with Stambaugh's and AERO.  *See*
Stambaugh's Lease (under Tab 2) at § 15 (p. 15) and AERO Lease (under Tab 5) at § 15
(p. 14).  The imposition, through the lease, of the requirement to comply with the
minimum standards was not removed from the lease when the Authority assumed
control of the Airport, even when there was an opportunity to do so.  For instance, in
1999, Stambaugh's and the Authority amended the 1997 lease, but did not delete or
modify § 15 concerning minimum standards.  *See* First Amendment (under Tab 6).

Ms. Evelyn J. Martinez
June 14, 2000
Page 9

Thus, the existing FBOs, AERO and Stambaugh's, were obligated to comply with the minimum standards through their leases with the Authority. In addition, the RFQ that the Authority issued concerning the AMP Hangar also had a section containing minimum standards (*see RFQ* (attached to the Pepper Letter) at 4-6). The temporary license granted to the selected bidder, Hawthorne, in January of this year also contained a similar provision concerning minimum standards. *See* License (under Tab 3) at § 7 and at Exhibit G. [4]

Finally, the Airport has adopted, by resolution, minimum standards that apply to FBOs and other providers of aeronautical services. *See* HIA Minimum Standards (under Tab 7). Moreover, as discussed below, the minimum standards adopted by the Authority are substantially similar to the previous standards adopted by the Commonwealth of Pennsylvania and incorporated into the FBO leases.

Those standards require, for example, that fueling operations be conducted in compliance with FAA regulations and advisory circulars and any federal, state, and local regulations. In addition, the Airport's standard leases contain provisions that require compliance with state and federal regulations and Airport rules and regulations. Noncompliance with, and a non-compliant attitude towards, such regulations, is a factor that can, and should, be taken into account by an airport in determining whether to renew a lease or award a lease to one bidder over another.

Stambaugh's would have the FAA determine that any FBO that proposed, for instance, to provide the specified square footage of space for certain activities, and the specified amount of fueling capability, must be granted the opportunity to conduct an FBO operation at an airport, regardless of how egregiously it had violated FAA, EPA state, and airport regulations. Such a proposition is absurd. Equally absurd is Stambaugh's apparent premise that an airport must allow an unlimited number of FBOs to operate on the airport. If this were truly the case, RFQs for FBO sites would be virtually meaningless, as the losing bidders could just force the airport to build additional FBO sites.

Simply put, in order to promote the FAA goals of high levels of service to the public, an airport must be allowed to take into account the changing circumstances at

---

[4]  Moreover, the License requires Hawthorne to comply with "current or future applicable federal or state laws, regulations, ordinances, codes, and rulings." *Id.* at § 7. Furthermore, "the right and privilege to conduct a Fixed Based Operations at the Airport shall exist only so long as the character of the facilities operated or services furnished by the Licensee shall be consistent with the high quality of facilities and services provided by other Fixed Based Operators at the Airport and in accordance with the standards required by the Licensor." *Id.* As a result, the standard the new FBO must meet at the Airport is a level of quality of facilities and services at least as great as that provided by AERO – which could be higher than the Minimum Standards.

Ms. Evelyn J. Martinez
June 14, 2000
Page 10

an airport (for example, whether, as an airport develops, it is appropriate to renew a lease to allow the continuing operation of an FBO facility with no landside access except through a heavy maintenance facility), and the compliance record and compliance disposition of a tenant whose lease is expiring or who is bidding on a new facility.

### Stambaugh's Assertions About the Authority's Treatment of AERO are False

Stambaugh's simultaneously complains that the Authority "improperly" allowed AERO to continue providing FBO services at the Airport (despite AERO's alleged failure to meet its lease obligations), Pepper Letter at 3, and that the Authority is conspiring (through the recent establishment of minimum standards) to drive AERO from the Airport, Pepper Letter at 5. In essence, Stambaugh's alleges that the airport has coddled and then turned against AERO. Together, these allegations make no sense, and neither one is true.

As noted above, the Airport has indulged Stambaugh's far more than it did AERO concerning past due rents, the one specific area Stambaugh's has cited as "evidence" of economic discrimination. Further, Stambaugh's assertions concerning AERO's supposed inability to meet minimum standards are highly speculative and unfounded. AERO currently meets those standards, and the Authority has every expectation that it will continue to do so. Moreover, the minimum standards currently in effect at the Airport are not significantly different from those imposed by the Commonwealth of Pennsylvania and incorporated into the leases of both Stambaugh's and AERO. Thus, there has been no manipulation of the standards to first keep in, and then drive out, AERO.

### Conclusion

The Authority's decision not to allow the continuation of an FBO operation co-located with Stambaugh's maintenance facility was a business decision based on the Authority's desire to upgrade the FBO services provides to the public. The Authority believes that, at this point in the Airport's development, it is not appropriate to have an FBO operation that cannot be accessed from the landside without passing through a storage area containing assorted wreckage and then through a heavy maintenance facility, particularly when there are two other sites on the Airport for FBO services, including the newly available AMP site. No one is or will be allowed to operate an FBO facility that does not provide direct landside access, whether at Stambaugh's location or at any other maintenance facility that may be located on the Airport in the future.

Stambaugh's was not selected as a lessee for the AMP site after an RFQ process that included several competitors. The Authority selected the competitor it believed would provide the best service to the public. Competition for FBO services at the

Ms. Evelyn J. Martinez
June 14, 2000
Page 11

Airport is very vigorous, with the result being an increase in the level and quality of service the public receives. That is the goal of the prohibition against exclusive rights, and the Authority is achieving that goal at the Airport.

Stambaugh's has provided the FAA only with Stambaugh's perspective, and has neglected to mention its past failures to pay huge amounts of rent, its failure to follow proper fueling procedures, even in the wake of a 350 gallon fuel spill, and its noncompliance with – and non-compliant attitude towards – FAA's own security requirements concerning access to the AOA. In light of these factors, the selection of another FBO over Stambaugh's to provide services at the AMP site is perfectly justified.

Stambaugh's argues that, in the name of not establishing an "exclusive right" at the Airport, the Authority should have limited the prospective bidders to only one entity, Stambaugh's, on the grounds that Stambaugh's alone complied with RFQ requirements. In fact, Stambaugh's response was deficient; the RFQ provided that the Authority could waive irregularities; extending the deadline allowed competition for the right to provide FBO services; and this has led to enhanced service at the Airport.

Moreover, by Stambaugh's own reasoning, if the Airport should have defaulted AERO for its arrearages in rents, the Airport should clearly have defaulted Stambaugh's years ago, for far greater arrearages. Thus, Stambaugh's claim of economic discrimination has no merit.

In short, the Authority's determinations concerning FBO facilities and services have enhanced competition at the Airport, with a resulting increase in the level of services provided to the aeronautical public. The Authority's decisions were consistent with the letter and the spirit of the applicable federal provisions concerning exclusive rights and economic discrimination, as demonstrated by the fact that the Authority kept the ADO informed of the actions it was taking and the reasons for them, and the ADO indicated no concerns with those actions.

Ms. Evelyn J. Martinez
June 14, 2000
Page 12


     I trust that the above discussion provides you with sufficient information to determine that the Authority has neither granted an exclusive right nor economically discriminated against Stambaugh's.  If you have any questions or need additional information, please feel free to contact the Airport Director, David Fleet, at (717) 948-4600 or myself at (202) 835-8096.

Sincerely,

Thomas R. Devine

Counsel for Susquehanna Area
Regional Airport Authority

Attachments

## Attachments

**Attachment 1**

      FAA Dismissal of Part 16 Complaint

**Attachment 2**

      Stambaugh's Lease

**Attachment 3**

      License (Hawthorne)

**Attachment 4**

      Pennsylvania Minimum Standards

**Attachment 5**

      AERO Lease

**Attachment 6**

      First Amendment (to Stambaugh's Lease)

**Attachment 7**

      HIA Minimum Standards

## CERTIFICATE OF SERVICE

I hereby certify that July 13, 2000, a true and correct copy of the foregoing Brief in Support of Motion to Dismiss was served by means of United States mail, first class, postage prepaid, upon the following:

Thomas B. Schmidt, III, Esquire
Pepper Hamilton LLP
200 One Keystone Plaza
North Front and Market Streets
P. O. Box 1181
Harrisburg, PA  17108-1181

Paulette E. McGraw