# ORIGINAL

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

**FILED**
HARRISBURG, PA
JUL 26 2000
MARY E. D'ANDREA, CLERK

STAMBAUGH'S AIR SERVICE, INC.,    :
                                  :
                                  :
            Plaintiff             :
                                  :
        vs.                       :    No. 1:CV-00-0660
                                  :
SUSQUEHANNA AREA REGIONAL AIRPORT :    (Judge Kane)
AUTHORITY, BAA HARRISBURG, INC.,  :    (Magistrate Smyser)
DAVID FLEET, individually, DAVID  :
HOLDSWORTH, individually, and DAVID C. :
MCINTOSH, individually            :
                                  :
            Defendants            :

## EXHIBITS TO MOTION OF PLAINTIFF STAMBAUGH'S AIR SERVICE, INC. TO STRIKE EXHIBIT A TO DEFENDANTS' REPLY BRIEF OR, IN THE ALTERNATIVE, FOR LEAVE TO FILE A SURREPLY BRIEF

THOMAS B. SCHMIDT, III (19196)
BRIAN P. DOWNEY (59891)
RANDY L. VARNER (81943)
KELLY ANN RYAN (84096)
Pepper Hamilton LLP
200 One Keystone Plaza
North Front and Market Streets
Post Office Box 1181
Harrisburg, PA  17108-1181
(717) 255-1155
(717) 238-0575 (Fax)
Attorneys for Plaintiff
Stambaugh's Air Service, Inc.

July 26, 2000



NATIONAL NO. 22201/6  EDI  RECYCLED

# Pepper Hamilton LLP
#### Attorneys at Law

200 One Keystone Plaza
North Front and Market Streets
P.O. Box 1181
Harrisburg, PA 17108-1181
717.255.1155
Fax 717.238.0575

717.255.1192
downeyb@pepperlaw.com

May 2, 2000

**VIA CERTIFIED MAIL**
**RETURN RECEIPT REQUESTED**

Ms. Evelyn J. Martinez
Airport Certification and Compliance Inspector
U.S. Department of Transportation
Airports Division
Fitzgerald Federal Building
John F. Kennedy
International Airport
Jamaica, NY  11430

Re:     *Stambaugh's Air Service, Inc./Susquehanna Area*
        *Regional Airport Authority*

Dear Ms. Martinez:

This letter responds to your letter dated April 21, 2000, regarding the dispute between the above-referenced parties. Stambaugh's Air Service, Inc. ("Stambaugh's") wishes to file a request for Federal Aviation Authority enforcement action against the Susquehanna Area Regional Airport Authority ("SARAA"). SARAA has violated the prohibitions against exclusive arrangements and economic discrimination contained in 49 U.S.C. §§ 47107(a)(4) and (5) and in the assurances which are a part of its grant agreements. I understand from our conversation that the FAA prefers that the informal efforts be undertaken prior to the filing of a formal complaint. Therefore, Stambaugh's is submitting this letter to you. To assist you in your investigation, the factual basis for Stambaugh's claim is set forth below.

Stambaugh's is a Pennsylvania corporation with its principal place of business at Harrisburg International Airport, P.O. Box 149, Middletown, PA, 17057. SARAA is a municipal authority created pursuant to the Pennsylvania Municipal Authorities Act of 1945, 53

**Pepper Hamilton** LLP
Attorneys at Law

Ms. Evelyn J. Martinez
Page 2
May 2, 2000

P.S. § 301, *et seq.*, located at 135 York Drive, Suite 100, Harrisburg International Airport, Middletown, PA 17057. SARAA owns and operates the Harrisburg International Airport ("HIA"), having assumed ownership of HIA from the Commonwealth of Pennsylvania on January 1, 1998. BAA is a Pennsylvania corporation located at 135 York Drive, Suite 100, Harrisburg International Airport, Middletown, PA 17057. BAA manages HIA on behalf of SARAA. SARAA receives funds from the Federal Aviation Administration ("FAA"). As a recipient of such funds, SARAA and HIA are prohibited, by virtue of 49 U.S.C. §§ 47107(a)(4) and (5) and the assurances which are a part of its grant agreements, from creating exclusive arrangements or engaging in economic discrimination.

Stambaugh's has operated continuously as a tenant at HIA since 1975, where it is engaged in the business of, *inter alia*, repairing and maintaining airplanes, and has also provided fixed base operator ("FBO") services, including fueling, maintenance, and cargo handling. Stambaugh's provided those FBO and maintenance operation services out of the hangar that it currently rents from SARAA and which it had rented previously from the Commonwealth of Pennsylvania ("Stambaugh's Hangar"). At various times prior to 1997, Stambaugh's was the only FBO at HIA. Beginning in 1997, AERO Services International Incorporated ("AERO") also began to provide certain FBO services at HIA. AERO continues, for the time being, to provide those services.

This dispute arises out of SARAA's creation of an exclusive FBO right at HIA by refusing to permit Stambaugh's to continue to provide FBO services at HIA. As you are aware, FAA Order 5190.1A defines an exclusive right as follows:

> [A] power, privilege, or other right excluding or debarring another from enjoying or exercising a like power, privilege, or right. An exclusive right may be conferred either by express agreement, by imposition of unreasonable standards or requirements, or by any other means. *Such a right conferred on one or more parties but excluding others from enjoying or exercising a similar right or rights would be an exclusive right.* (emphasis supplied)

FAA Order 5190.6A utilizes the same definition of the term "exclusive right." Additionally, FAA Advisory Circular No. 15015190-2A contains the same definition of "exclusive right." Once federal funds have been expended at an airport, the "exclusive rights prohibition is applicable for as long as it is operated as an airport." FAA Order 5190.6A, ¶ 3-8(c). As you know, HIA has received, and continues to receive, substantial federal funds. As a result, it is prohibited as a matter of law from conferring a right on one or more parties but excluding others from enjoying or exercising a similar right or rights. Put differently, the prohibition against exclusive rights forbids HIA from permitting some parties to provide FBO

**Pepper Hamilton LLP**
Attorneys at Law

Ms. Evelyn J. Martinez
Page 3
May 2, 2000

services while, at the same time, excluding similarly situated parties from providing the same. As is set forth below, SARAA has violated the prohibition against exclusive arrangements by refusing to permit Stambaugh's to continue to provide FBO services at HIA.

During the time that it owned and operated HIA, the Commonwealth of Pennsylvania developed and published minimum standards required in order to operate at HIA as an FBO ("HIA Minimum Standards"). 67 Pa. Code § 476.1, *et seq.* Stambaugh's has always met or exceeded the HIA Minimum Standards for operating as an FBO. Subsequent to assuming ownership of HIA, SARAA abandoned the HIA Minimum Standards. As a result, as of the time the events described below took place there were no minimum standards in place for FBOs at HIA.

Stambaugh's had a lease agreement for the Stambaugh Hangar with SARAA that terminated as of January 19, 2000. When negotiating with Stambaugh's regarding its new lease, SARAA refused to offer Stambaugh's any lease that would permit it to continue to provide FBO services at HIA, even though Stambaugh's did not require any additional leased space to continue to provide FBO services beyond that which was leased to it previously and that which it currently leases. SARAA thereby prohibited Stambaugh's from providing FBO services despite the facts that HIA had no minimum standards in place which FBO providers were required to meet, and that Stambaugh's did not require any additional leased space in which to conduct this business.

During that same time period and subsequent thereto, SARAA did permit AERO to continue to provide FBO services at HIA. As part of its effort to force Stambaugh's out of HIA to establish an exclusive FBO arrangement, SARAA has not enforced lease terms against AERO that have been enforced against Stambaugh's. Specifically, on information and belief, SARAA has permitted AERO to continue to operate at HIA despite its failure to pay rent. As a result, SARAA has engaged in economic discrimination in violation of 49 U.S.C. § 47107(a)(5).

SARAA has engaged in a policy of intimidation and harassment directed at Stambaugh's and its employees. SARAA has repeatedly harassed Stambaugh's employees and forced them to discontinue working on Stambaugh's projects under the guise of checking the identities of the employees. In order to continue this harassment, SARAA representatives routinely require Stambaugh's employees to stop working and to produce identification despite the fact that the SARAA representatives involved know both the identity of the Stambaugh's employees and are aware that the people involved are employed by Stambaugh's. SARAA does not engage in this harassing conduct with any other tenant at HIA and specifically does not engage in this conduct with AERO.

**Pepper Hamilton LLP**
Attorneys at Law

Ms. Evelyn J. Martinez
Page 4
May 2, 2000

In 1999, Stambaugh's learned that an aircraft hangar at HIA that was owned by the AMP Corporation ("AMP Hangar") was going to be available for purchase. Stambaugh's entered into negotiations with AMP to purchase the AMP Hangar. Stambaugh's intended to use the AMP Hangar to provide FBO services at HIA. In an effort to drive Stambaugh's out of HIA to create an exclusive FBO arrangement and to interfere with Stambaugh's contracts and business operations, SARAA interfered in those negotiations and threatened that it would refuse to allow any purchaser of the AMP Hangar to extend the AMP lease despite the fact that the AMP lease permitted such extensions. As a result of this interference, Stambaugh's was unable to purchase the AMP Hangar.

SARAA then purchased the AMP Hangar itself to lease it to an entity to provide FBO services out of that hangar. As part of that process, SARAA issued a Request for Qualifications from FBO service providers on October 5, 1999 ("RFQ")(a copy of the RFQ is enclosed with this letter). The RFQ required that anyone who wished to submit a proposal was required to participate in a pre-submission conference and a tour of the AMP Hangar on October 19, 1999. The RFQ specifically provided that "ATTENDANCE AT THIS MEETING IS MANDATORY IN ORDER FOR YOUR COMPANY TO BECOME A CANDIDATE FOR CONSIDERATION" to provide FBO services from the AMP Hangar. Stambaugh's participated in the pre-submission conference and tour of the AMP Hangar.

The RFQ also provided that anyone who wished to be considered to provide FBO services out of the AMP Hangar was required to submit a proposal by 4:00 p.m. EST, on November 2, 1999. The RFQ specifically provided that "only those submittals received prior to this date and time and meeting all the requirements of the RFQ will be considered." Stambaugh's submitted its proposal on November 2, 1999, before 4:00 p.m. EST.

As part of its efforts to create an exclusive FBO at HIA, SARAA solicited proposals from entities that had not attended the pre-submission conference and tour and accepted proposals from after November 2, 1999. By accepting these proposals, SARAA violated the express terms of the RFQ. SARAA accepted these non-conforming proposals secretly without providing any notice to Stambaugh's or any other potential bidder that it had changed the requirements of the RFQ and did so to ensure that Stambaugh's would not be able to lease the AMP Hangar and, thereby, to create an exclusive FBO. It is Stambaugh's understanding that SARAA solicited and accepted non-conforming proposals that were conditioned on the requirement that SARAA create an exclusive arrangement by forcing Stambaugh's out of the FBO business at HIA. In other words, SARAA promised to grant an exclusive arrangement to potential bidders in order to get them to submit bids to provide FBO services out of the AMP Hangar.

**Pepper Hamilton LLP**
Attorneys at Law

Ms. Evelyn J. Martinez
Page 5
May 2, 2000

Stambaugh's was the only company that both participated in the pre-submission conference and tour and submitted a proposal in a timely fashion. Pursuant to the express terms of the RFQ, Stambaugh's was the only company that qualified to provide FBO services at the AMP Hangar. Nonetheless, SARAA refused to permit Stambaugh's to provide FBO services at the AMP Hangar just as it had refused to permit Stambaugh's to provide FBO services from Stambaugh's Hangar. Instead, SARAA awarded an exclusive FBO arrangement to Piedmont Hawthorne.

Stambaugh's further understands that, on January 10, 2000, David Fleet, the Airport Director at HIA, contacted various customers of Stambaugh's and informed them that Stambaugh's would not be awarded the lease to the AMP Hangar and would not have FBO rights at HIA. The timing of these contacts is particularly significant. SARAA had not yet voted on the issue of whether Stambaugh's would receive a lease at the AMP Hangar. In fact, SARAA was not even been presented with that issue until January 11, 2000, the day after Fleet informed Stambaugh's customers that Stambaugh's would not receive the lease to the AMP Hangar and would not have FBO rights. As a result, it appears that the RFQ process was merely a subterfuge to create an exclusive FBO and to interfere with Stambaugh's rights.

SARAA's efforts did not end with its decision to prohibit Stambaugh's from providing FBO services at HIA. As I mentioned above, HIA currently has two FBO providers, Piedmont Hawthorne and AERO. Additionally, as I mentioned previously, SARAA had abandoned the HIA Minimum Standards. Now having excluded Stambaugh's from providing FBO services at HIA, SARAA has adopted minimum standards for HIA. It is Stambaugh's understanding that AERO cannot satisfy these standards. Stambaugh's, on the other hand, was able to satisfy all of these standards at the time SARAA refused to allow it to provide FBO services at HIA. As a result of its recent action, SARAA will have furthered the exclusive FBO arrangement by prohibiting AERO from providing FBO services at HIA as well.

As the result of SARAA's refusal to allow Stambaugh's to provide FBO services at the Stambaugh's Hangar or the AMP Hangar and by permitting AERO and Piedmont Hawthorne to operate as FBOs while forcing Stambaugh's to discontinue its FBO operations, SARAA has excluded or debarred Stambaugh's from exercising a like power, privilege, or right in violation of the prohibition against exclusive rights contained in 49 U.S.C. § 47107(a)(4). SARAA has also engaged in economic discrimination in violation of 49 U.S.C. § 47107(a)(5) by permitting AERO to continue to operate as an FBO at HIA despite its failure to pay rent.

Stambaugh's has suffered substantial harm as the result of SARAA's illegal actions. Stambaugh's understands that public airports which violate the assurances are not

**Pepper Hamilton LLP**
Attorneys at Law

Ms. Evelyn J. Martinez
Page 6
May 2, 2000

entitled to continue to receive federal funding.  Based on our discussion, I am sending you this request for Federal Aviation Authority enforcement action to resolve this issue.

I trust that this is helpful  To the extend that you require any additional information about this matter, please call me.

Sincerely,



Brian P. Downey

Enclosure

2

# Pepper Hamilton LLP
Attorneys at Law

200 One Keystone Plaza
North Front and Market Streets
P.O. Box 1181
Harrisburg, PA 17108-1181
717.255.1155
Fax 717.238.0575

717.255.1192
downeyb@pepperlaw.com

July 11, 2000

Ms. Evelyn J. Martinez
Airport Certification and Compliance Inspector
U.S. Department of Transportation
Airports Division
Fitzgerald Federal Building
John F. Kennedy International Airport
Jamaica, NY  11430

Re:  *Stambaugh's Air Service, Inc./Susquehanna Area*
     *Regional Airport Authority*

Dear Ms. Martinez:

I am in receipt of your letter of June 19, 2000, and the letter of Thomas R. Devine,
Esquire, counsel for the Susquehanna Area Regional Airport Authority ("SARAA") regarding the
concerns raised by Stambaugh's Air Services, Inc. ("Stambaugh's") in the above-referenced matter.
This letter responds to the various allegations set forth in the SARAA Letter.  Unfortunately, the
SARAA Letter, while lengthy, fails to address the actual issues raised in Stambaugh's complaint.
Those concerns arise out of SARAA's unlawful campaign to destroy Stambaugh's FBO business and
to create an exclusive FBO at Harrisburg International Airport ("HIA").  Rather than responding to
those concerns, SARAA makes unsupportable or illogical arguments, attributes those arguments to
Stambaugh's, and then proceeds to explain why those arguments are unsupportable.  Whatever the
validity of SARAA's criticisms of the arguments it has crafted, they have little to do with the issues
raised by Stambaugh's.

Stambaugh's complaint is two-fold: (1) SARAA created an exclusive right at HIA
by refusing to allow Stambaugh's to continue to provide the FBO services that it had provided there
for twenty-five (25) years and used a sham Request for Qualifications (RFQ) procedure to do so; and
(2) SARAA engaged in economic discrimination by permitting AERO Services International to

**Pepper Hamilton LLP**
Attorneys at Law

Ms. Evelyn J. Martinez
Page 2
July 11, 2000

operate at HIA without paying rent while refusing the same privilege to Stambaugh's and by utilizing inspections under the guise of airport security to disrupt Stambaugh's business operations.

## SARAA's Creation of an Exclusive FBO Right at HIA

SARAA misstates both the nature of Stambaugh's claim and the law governing exclusive rights. Stambaugh's has not claimed that only a single FBO provider is operating at HIA nor has it claimed that the presence of a single FBO is a *per se* violation of the prohibition against exclusive rights. Rather, Stambaugh's complaint is that SARAA has created an exclusive right at HIA in violation of 49 U.S.C. §§ 47107(a)(4) by refusing to permit Stambaugh's to continue to provide FBO services at HIA while, at the same time, permitting AERO and Hawthorne Aviation ("Hawthorne") to do so.

SARAA suggests that, as long as more than one FBO is operating at an airport (independent of whether that FBO is providing any substantial services, providing any competition, or even being required to pay any rent to operate at the airport), the prohibition against exclusive rights has been satisfied. (SARAA Letter p.3). This is incorrect. The FAA has long made clear the act of conferring a right "*on one or more parties* but excluding others from enjoying or exercising a similar right or rights would be an exclusive right." FAA Order 5190.1A (emphasis added). *See also* FAA Order 5190.6A (same); FAA Advisory Circular No. 15015190-2A (same). Thus, the fact that an airport allows "one or more parties" to provide FBO services does not satisfy the prohibition against the creation of exclusive rights if it simultaneously excludes "others from enjoying or exercising a similar right or rights."

This conduct is particularly egregious in cases such as the one at HIA where SARAA has taken actions designed to prevent competition among FBOs. Contrary to the suggestion in the SARAA Letter, Stambaugh's is not asking that SARAA be required to provide it any additional space beyond that which Stambaugh's already rents at HIA. Stambaugh's is merely asking that it be permitted to compete as an FBO utilizing the space that it already rents. In order to preserve the exclusive right at HIA, however, SARAA is refusing it permission to do so.

SARAA suggests that its actions have promoted competition at HIA and increased service by eliminating a monopoly. (SARAA Letter p. 3) Once again, SARAA has misstated the historical record. First, SARAA has not eliminated a monopoly at HIA because Stambaugh's did not have a monopoly at HIA. Rather, Stambaugh's and AERO both provided FBO services at HIA. All that SARAA has done is to replace one FBO, Stambaugh's, with another, Hawthorne. As a result, the level of competition has remained the same. This points inevitably to one of two results: (1) the presence of two FBO providers (Stambaugh's and AERO) at HIA provided sufficient competition to promote quality of service and there was no legitimate reason to destroy Stambaugh's

**Pepper Hamilton LLP**
—— Attorneys at Law ——

Ms. Evelyn J. Martinez
Page 3
July 11, 2000

business; or (2) the presence of two FBO providers at HIA is insufficient to provide sufficient competition to promote quality of service and Stambaugh's should have been permitted to continue to provide FBO services out of the Stambaugh Hangar at HIA as it had done for twenty-five (25) years. In either case, SARAA's decision to destroy Stambaugh's FBO business was unwarranted.

Additionally, SARAA's claims that it intended only to promote competition ring hollow in light of the terms of the License between it and Hawthorne. Paragraph 4(a) of the License excuses Hawthorne from having to pay rent on the Eastern Portion of the space that it is renting from SARAA if Stambaugh's was able to provide fueling services at HIA. (Hawthorne License, Attachment 3 to SARAA Letter at ¶4(a)).[1] Far from promoting competition, Hawthorne's entry onto the airport was predicated on the condition that it *not* be required to compete with Stambaugh's. That rental obligation only arose if Hawthorne was not required to compete with Stambaugh's. It is difficult to imagine a more egregious example of an anti-competitive exclusive right.

### Stambaugh's Complaint Does Not Implicate FAA Security Regulations

SARAA's response misstates and then attacks Stambaugh's complaint regarding SARAA's inspection practice. The gist of Stambaugh's complaint, one which has been made to SARAA previously, is that SARAA employees use security as a ruse to check the identifications of Stambaugh employees who are performing work on aircraft. This matter was discussed specifically in a letter from Stambaugh's to David Fleet, the Airport Director of HIA, on July 20, 1999, a copy of which is attached as Exhibit 1. As is set forth in that letter, HIA personnel have routinely conducted identification inspections while Stambaugh's employees were working on aircraft and starting or running engines. As Stambaugh's has explained previously, by choosing this time to conduct inspections, HIA personnel not only place themselves at risk of injury, they also increase the likelihood that Stambaugh's employees will be injured. SARAA's supposed security concerns could be addressed easily by performing the inspections before the work is commenced or after this work has been completed. What SARAA has done, however, is to target those times in which its inspections will be most disruptive to Stambaugh's (and most dangerous to all involved) to conduct inspections. This conduct, while maximizing the level of disruption to Stambaugh's business, certainly cannot be justified on the grounds of promoting airport security.

---

[1]Pursuant to Paragraph 4(b), Hawthorne does not have to pay any rent on the Western Portion of the property unless it rents that space to a third party at which point it only needs to pay SARAA 75% of what it collects from that third party. (Hawthorne License, Attachment 3 to SARAA Letter at ¶4(b).

**Pepper Hamilton LLP**
Attorneys at Law

Ms. Evelyn J. Martinez
Page 4
July 11, 2000

SARAA's description of the incidents involving two employees without badges (apparently the only two incidents of such conduct in twenty-five years) are misleading at best. What SARAA neglects to mention is that SARAA experienced substantial problems in producing badges for new employees, a problem which Stambaugh's brought to the attention of the HIA police responsible for this task. Additionally, and perhaps more important, when SARAA made Stambaugh's aware of the two incidents described in this letter, corrective action was taken and there has been no recurrence.

SARAA's attack on Mr. Stambaugh himself is particularly unwarranted. SARAA asserts that Mr. Stambaugh made written statements (copies of which it does not provide) defending the improper actions of employees and that certain attitudes are "embedded in the company culture . . . ." (SARAA Letter p. 5). In fact, when Mr. Stambaugh learned of the conduct complained of by SARAA in this letter, the employees involved were terminated. After the incidents with the employees who were not wearing badges, Mr. Stambaugh wrote to the airport director and specifically complimented the HIA police for their handling of these situations. Exhibit 1, p. 3. It is difficult to imagine facts which speak more favorably to the company's "culture" with respect to security issues.

What SARAA describes as Mr. Stambaugh's implausible response to a citation for improper fueling practices is particularly troubling because Mr. Stambaugh did not make that claim at all. (SARAA Letter p. 5). Rather, this was the claim of the employee who had engaged in the impermissible conduct. Stambaugh's rejected this explanation and SARAA apparently agrees that the employee's explanation was unacceptable. Its attempt to assign that explanation to Mr. Stambaugh, rather than admitting that Stambaugh's responded appropriately to the actions of an individual employee, evidence the lengths to which it is willing to go in order to justify its illegal conduct.

As part of this effort, it is not surprising that SARAA has mentioned a fuel spill at HIA. (SARAA Letter p. 5). It is similarly not surprising that SARAA has not provided any detail regarding that incident because the facts speak so favorably for Stambaugh's. That spill, the only one to have occurred at Stambaugh's in a quarter century of fueling aircraft at HIA, was caused by the actions of a now former employee. When the spill occurred, the Stambaugh's Spill Response Program responded immediately and the spill was entirely contained. In other words, Stambaugh's commitment to safety ensured that an accidental spill resulted in no harm. It is that company culture which SARAA should be applauding rather than attacking. It is that company culture which is reflected in Stambaugh's sterling record, over more than three decades with the FAA.



**Pepper Hamilton LLP**
Attorneys at Law

Ms. Evelyn J. Martinez
Page 5
July 11, 2000

## Stambaugh's Claim of Economic Discrimination is Well-Founded

SARAA suggests that Stambaugh's should not be permitted to complain about SARAA's discriminatory treatment in favor of AERO because Stambaugh's had lease disputes with its former landlord, the Commonwealth of Pennsylvania. (SARAA Letter p. 6). As you will have seen by reviewing the documents, the agreement to which SARAA refers related to a payment arrangement to resolve a legal disputes between Stambaugh's and the Commonwealth, a dispute to which SARAA was not a party, and which arose out of the Commonwealth's violation of its lease. These disputes related principally to Stambaugh's heavy maintenance operation, not its FBO operation. Stambaugh's withheld payments to protest the Commonwealth's lease breaches. That dispute was resolved by an agreement that Stambaugh would make the payments set forth in the lease and that the Commonwealth, apparently recognizing its liability, would forgive fifty percent (50%) of the rent to which it would have been entitled in the absence of these breaches.

Stambaugh's has not made any complaints about how it or AERO were treated by the Commonwealth nor does it seek to challenge the agreement it reached with the Commonwealth. Rather, Stambaugh's has complained only about SARAA's disparate treatment of it and AERO. SARAA's complaint appears to be that the Commonwealth should have treated Stambaugh's differently from the way it chose to do, or should have resolved the legal dispute on different terms. Whatever the merits of such a complaint, it is immaterial to the questions in this matter. The question raised by Stambaugh's is whether SARAA should be permitted to require Stambaugh's to pay rent and should be permitted to excuse AERO from doing so. As is set forth in my earlier correspondence to you, 49 U.S.C. §§ 47107(a)(5) forbids it from doing so.

SARAA attempts to perform a sleight of hand with numbers to create the impression that the amount of money that Stambaugh's owed to the Commonwealth (as the result of the settlement of a legal dispute which SARAA neglects to mention) was substantially greater than the amount of money that AERO owes to SARAA. (SARAA Letter p. 6). It does so by identifying all moneys that Stambaugh's agreed to pay to the Commonwealth (rent, fuel flowage fees, and interest) and compares that to the rental payments owed by AERO to SARAA. To place those numbers in perspective, SARAA admits that it has allowed AERO to operate while it was $80,000.00 behind in rental payments (SARAA Letter p. 6). According to its lease, AERO's rental payments are approximately $4,400.00 per month (Attachment 5 to SARAA Letter, Section 4). Accepting SARAA's representation of the amount of AERO's arrearages as true, SARAA permitted AERO to operate for approximately one and one-half (1 ½) years without paying any rent. This is exclusive of any other payments (fuel flowage and interest) that AERO owed, and likely did not pay, to SARAA.

**Pepper Hamilton LLP**
Attorneys at Law

Ms. Evelyn J. Martinez
Page 6
July 11, 2000

SARAA's treatment of Hawthorne is equally troublesome. As set forth above, Hawthorne is excused from paying rent to SARAA if it is required to compete with Stambaugh's for the sale of fuel at HIA (Hawthorne License, Attachment 3 to SARAA Letter, ¶ 4(a)). Apparently, lack of competition was insufficiently exclusive and Hawthorne ultimately was excused from paying rent at all for the first two months of the License. (*See* Attachment 3 to SARAA Letter, "First Amendment to Temporary License for Access to the Harrisburg International Airport").

To put this in perspective, the only issue that arose regarding Stambaugh's payment of rent to SARAA arose in April 1999 when SARAA amended the Stambaugh lease, increased the rent by 115% on two hangars, and made the effective date of the lease January 19, 1999. Because of this backdating of the lease, Stambaugh's owed additional rent to SARAA, rent which it was required to pay. Other FBOs are not being held to a similar standard. It is that disparate treatment of which Stambaugh's has complained and which violates 49 U.S.C. §§ 47107(a)(5).

### SARAA Has Misrepresented Stambaugh's Complaint Regarding the RFQ Process

In order to conceal its violations of the governing statutes, SARAA creates a complaint, assigns it to Stambaugh's, and then attacks that complaint. Specifically, SARAA claims (inaccurately) that Stambaugh's has complained because other bidders were permitted to participate in the RFQ process. (SARAA Letter 6-7). Stambaugh's has made no such complaint. Rather, Stambaugh's has identified the RFQ process as part of SARAA's pattern of creating an exclusive FBO at HIA by forbidding Stambaugh's from providing those services. Stambaugh's has not complained because other bidders were afforded the opportunity to participate in the RFQ process. Stambaugh's has complained that it was the only bidder that actually did participate in the RFQ process and, nonetheless, was not awarded the lease to the AMP Hangar. The RFQ process was nothing more than a subterfuge to provide cover for SARAA in its efforts to drive Stambaugh's out of the FBO business at HIA. That conduct has given rise to this complaint. Additionally, Stambaugh's was forbidden from continuing to provide FBO services out of the Stambaugh Hangar despite the fact that it met the minimum standards which had been incorporated into its lease.[2]

---

[2]Although SARAA now claims there were defects in the Stambaugh bid it took a different position at the time of the bid. David Fleet, the Airport Director, wrote to Stambaugh's that he needed only to meet with and view certain information, a meeting which was held, and the RFQ would be complete. (A copy of Mr. Fleet's letter dated December 1, 1999, is enclosed as Exhibit 2). Apparently the concession that Stambaugh's submission was "complete" no longer fits with the position that SARAA wants to take before the FAA.

**Pepper Hamilton LLP**
Attorneys at Law

Ms. Evelyn J. Martinez
Page 7
July 11, 2000

SARAA points weakly to form language in its bid and lease documents as evidence that no exclusive right has been created HIA. (SARAA Letter n. 2). Initially, as discussed previously, SARAA's position that there can be no exclusive right unless the airport restricts the provision of FBO services to one provider is incorrect. Thus, the mere fact that SARAA has allowed AERO to operate without paying rent, at least until it installs another FBO provider, does not mean that it has not created an exclusive right. When it refused to permit Stambaugh's to continue to operate as an FBO at HIA, whether out of the AMP Hangar or the Stambaugh Hangar, despite the fact that it met the minimum standards of its lease, while permitting others to do so, it violated the prohibition on exclusive rights.

SARAA's suggestion that it has done this because it wants to improve FBO services by having them provided out of the AMP Hangar rings particularly hollow because *AERO does not operate out of the AMP Hangar.* (SARAA Letter p.7). SARAA has conferred a right on AERO to operate an FBO outside of the AMP Hangar but has refused that same privilege to Stambaugh's. In doing so it has created an exclusive right.

### The Airport Director Did Contact Airport Users and Informed Them of the Authority Decision Prior to That Decision Having Been Made

SARAA asserts that its Airport Director did not contact any customers regarding the fact that Stambaugh's would not longer be providing FBO services at HIA until after January 11, 2000, when the Board made its decision on the RFQ. (SARAA Letter p. 8). On January 10, 2000, however, Stambaugh's received a telephone call from a representative of Emery Air who questioned Stambaugh's because the Airport Director had told him that Stambaugh's would no longer be able to provide fueling services. (For your convenience I have enclosed a copy of the telephone message as Exhibit 3). Additionally, Stambaugh's understands that Mr. Fleet contacted USAir on that same date and made the same representation. As set forth in my initial correspondence to you, those contacts which were made *before* the question of who would be awarded the right to provide FBO services at HIA was even presented to the SARAA Board. The fact that the Airport Director knew the results of the RFQ even before the SARAA Board had been given the opportunity to vote on that question suggests strongly that the RFQ process was nothing more than a shield behind which SARAA sought to hide in its efforts to create an exclusive FBO at HIA.

### SARAA's Representation Regarding Minimum Standards is Incorrect

SARAA relies principally on the fact that the Commonwealth's minimum standards were incorporated in the Stambaugh's and AERO leases as support for its claim that SARAA had not abandoned minimum standards at HIA. (SARAA Letter p. 8-10). This current claim, however, is different from the claims made at the time of the RFQ. In the RFQ, a copy of which I provided

**Pepper Hamilton LLP**
Attorneys at Law

Ms. Evelyn J. Martinez
Page 8
July 11, 2000

to you previously, SARAA referred to "the minimum standards as indicated here . . . ." (RFQ ¶III(1)). The RFQ does not otherwise identify the minimum standards to which this refers. When Stambaugh's inquired about this provision, HIA personnel informed it that "we have done away with the Minimum Standards referenced in the [Stambaugh's] lease." This was the first time that Stambaugh's had learned of this policy. The import of this exchange, however, is that Stambaugh's met both the minium standards in its lease and those which were subsequently adopted by SARAA. Thus, SARAA cannot legitimately point to any minimum standard as a reason for refusing to permit Stambaugh's to continue to provide FBO services.

In its continued effort to change the nature of Stambaugh's claim, SARAA develops positions which it describes as "absurd" and then attributes them to Stambaugh's. (SARAA Letter p. 9). Contrary to SARAA's assertions, Stambaugh's has never suggested that anyone should be permitted to provide FBO services, independent of ability or willingness to comply with minimum standards or applicable laws. Stambaugh's complaint is that, having complied with all applicable federal laws and having met the minimum standards of its lease, it should have been permitted to continue to provide those services. Certainly, if the assertions in SARAA's letter regarding its desire to increase competition at HIA contain even a kernel of truth, its decision to decrease competition by granting rights to others which it precluded to Stambaugh's not only violated the prohibition against exclusive arrangements, it also is counterproductive.

### SARAA's Treatment of AERO

SARAA also misconstrues Stambaugh's allegations with respect to SARAA's treatment of AERO. Stambaugh's allegation is that AERO does not meet, nor has it ever met, the FBO Minimum Standards at HIA, both those developed by the Commonwealth and those developed by SARAA. As opposed to providing the variety of services outlined by the Commonwealth at 67 Pa. Code §476.13 (a copy of which is Attachment 4 to the SARAA Letter), AERO has provided only fueling services at HIA. AERO does not provide airframe or avionics services, which are specifically required by Section 3.1 of the SARAA Minimum Standards (a copy of which is Attachment 5 to the SARAA Letter). Not surprisingly, AERO does not provide any of the optional secondary services outlined in Section 3.2 of those standards.

This problem is not unique to AERO. Despite the existence of the SARAA Minimum Standards, Hawthorne similarly provides only fueling services at HIA. It also does not provide airframe or avionics services which are specifically required by Section 3.1 of the SARAA Minimum Standards and, to the best of Stambaugh's knowledge, has no personnel at HIA qualified to perform such work. In fact, the only entity at HIA with personnel capable of performing this work and, therefore, meeting these standards, is Stambaugh's, the one entity which is prohibited from doing so.

**Pepper Hamilton LLP**
Attorneys at Law

Ms. Evelyn J. Martinez
Page 9
July 11, 2000

   SARAA also suggests that access to Stambaugh's FBO was something of a problem. (SARAA Letter p. 10). This is simply not the case. The vast majority of Stambaugh's FBO customers accessed the facilities through a gate adjacent to the air freight building. They were provided with a telephone by which they could announce their arrival and were transported by an FBO van, or were escorted in their own vehicles as appropriate and as required by applicable FAA regulations.

### Conclusion

   The FAA has long made clear the act of conferring a right on one or more parties but excluding others from enjoying or exercising a similar right or rights constitutes an exclusive right. SARAA has taken steps to decrease the level of competition at HIA and to ensure that exclusive FBO rights have been granted to Hawthorne and AERO to the exclusion of Stambaugh's. In fact, SARAA has gone so far as to ensure that Hawthorne does not even have to pay any rent if it is required to compete against Stambaugh's. Not only is that substantial evidence of an exclusive right, it is also evidence that SARAA knew that its conduct was illegal and knew that Stambaugh's should be given the right to perform FBO services at HIA. Stambaugh's has not asked for any special treatment from SARAA. Rather, it has asked only that it be given the same rights as others and that it be afforded the opportunity to compete at HIA. SARAA has forbidden it from doing so in order to create an exclusive FBO at HIA. It has made a mockery of its own RFQ process as well as the FAA's prohibition against exclusive rights and economic discrimination. The result has been a decrease in the quality of service to the public and substantial injury to Stambaugh's. It is that conduct which has given rise to this claim.

   I trust that this is helpful. Please call me if you have any questions about this matter.

          Sincerely,

          Brian P. Downey

Enclosures

**EXHIBIT 1**

S T A M B A U G H  A V I A T I O N

COPY

July 20, 1999

Mr. David M. Fleet, Airport Director
BAA Harrisburg, Inc.
135 York Drive, Suite 100, HIA
Middletown  PA  17057

Dear Mr. Fleet:

We have, on several occasions, requested a copy of the
currently approved Airport Security Program, required by Federal
Aviation Regulation Part 107.  This document has not been made
available.  The only copy available to us is dated April 2, 1991.

The BAA pamphlet, "Airport Security is Everyone's Business",
has been useful as a means of furnishing current security
information to tenants of HIA.  It is, however, somewhat limited in
scope.

I am taking this opportunity to discuss some areas that
require attention in order to improve safety and security of all
persons who access the AOA at HIA.

I understand the interest and concern of BAA Operations Duty
personnel in ensuring that everyone on the AOA is authorized to be
there.  We are, however, concerned about safety on the ramp when we
are moving or working on large aircraft, especially when we are
starting and running engines.  Anytime we are working on an
aircraft with the rotating beacon operating, no one who is not a
part of the work crew should approach the aircraft or any member of
the work crew.  This includes by vehicle or on foot.

Some of the work we do on the ramp has an element of risk.
That is no time to be interrupting our employees to check their
ID's.  To do so is not only unsafe for BAA staff, it also tends to
break concentration of our personnel who are involved in work which
requires their complete attention.

It should be obvious that when we have a crew working on an
aircraft on the ramp, for safety and security reasons, we would not
allow any unauthorized person in the vicinity of the aircraft.

-continued-

ATCH 1



S T A M B A U G H    A V I A T I O N

Mr. David M. Fleet                    -2-            July 20, 1999


    Some staff personnel of BAA are not aware of the risks they
take, nor are they aware of the distraction they cause by checking
ID's during these operations.

    We are prepared to provide safety training to your personnel
in order to improve safety on the ramp.

    Another area of concern is that of escorting individuals on to
the AOA during unusual incidents.

    On July 13, 1999, when the Russian aircraft was on the ramp,
media personnel called our FBO office from our telephone outside
the gate requesting access to the ramp. One of our managers asked
an Operations Duty Manager if they should be admitted. She said
yes and requested we escort them through the gate. When they
arrived at the FBO, she asked our manager to arrange escort for
them because she was too busy. We complied. However, we are not
staffed adequately to escort anyone on the AOA unless their
presence is required for official business with our Company.

    A similar incident occurred later. After the SARAA meeting,
several members went through our hangar and out to the ramp
unescorted.

    During both incidents, there was an HIA Police Officer in a
car and numerous BAA staff in the vicinity of the aircraft.

    There seems to be a need to have a plan to control activity on
the AOA during such events.

    We are making every effort to ensure all our employees comply
with security rules available to us. We have been told that one of
the Operations Staff walked unchallenged through our hangar out on
to the AOA. I do not think this is unusual because this individual
is recognized by most of our employees and well aware of the
position she holds, and that she is certainly authorized to be on
the AOA.

    If there are any real security problems at HIA, it would
appear more emphasis needs to be placed on providing currently

-continued-

S T A M B A U G H  A V I A T I O N

Mr. David M. Fleet                -3-              July 20, 1999

approved security information to the tenants.    Working with
responsible managers to ensure compliance would be more productive
than creative activities designed to issue Notices of Violation to
employees who obviously are not a threat.

During the past two weeks, we have had reports of incidents in
which the SARAA Police played some part.    After our discussions
with Chief Jack Damon, we found his review of each incident
revealed the actions of his personnel were well within the law and
in accordance with established procedures.    He has responded to our
inquiries in a courteous and highly professional manner reflecting
high standards for this SARAA activity.

We must work together if we are to furnish the best possible
service to our customers.

Sincerely,

STAMBAUGH'S AIR SERVICE, INC.

Mark R. Stambaugh, President

MS:ldk

**EXHIBIT 2**



# Harrisburg International Airport
www.flyHIA.com

December 1, 1999

Charles Beard
Stambaugh's Air Service
PO Box 149
Middletown, PA 17057

Dear Charlie:

To confirm our phone conversation from yesterday, at our meeting scheduled on Dec. 2 at 9:00 .m., please provide us with the Stambaugh Aviation financial services information. My staff will "view only" the documents and immediately return to you.

This will complete your RFQ that was submitted on November 2, 1999.

Thank you in advance.

Sincerely,

David M. Fleet
Airport Director

DMF/bap

ATCH 2

**EXHIBIT 3**

**PHONE CALL**

FOR _____ DATE _10-20_ TIME _447_ A.M. / P.M.

M _Rick Jaynes_        _Jet Fuel Purchasing_

OF _Brreny_

PHONE ☐ FAX ☐ MOBILE _937-264-6704_

MESSAGE _Airport Director_

_Held Film Ski wouldn't_

_to funding Envirg Ski 1974_

| | |
|---|---|
| PHONED | ✓ |
| RETURNED YOUR CALL | |
| PLEASE CALL | ✓ |
| WILL CALL AGAIN | |
| CAME TO SEE YOU | |
| WANTS TO SEE YOU | |

SIGNED _____ HighMark FORM C4-400

_ATCH 3_

3

U.S. Department
of Transportation

**Federal Aviation
Administration**

# Advisory Circular

| | |
|---|---|
| Subject: EXCLUSIVE RIGHTS AND MINIMUM STANDARDS FOR COMMERCIAL AERONAUTICAL ACTIVITIES | Date: 4/7/00      AC No: 150/5190-5 <br> Initiated by: AAS-400 |

1. **PURPOSE.** This advisory circular (AC) provides basic information pertaining to the Federal Aviation Administration's (FAA) exclusive rights and minimum standards policies which, in part, describe the contractual grant obligations assumed by the operators of public airports. For airports that have accepted Federal assistance, compliance with the statutory prohibition on exclusive rights is mandatory. Advice made with respect to minimum standards is optional but highly recommended.

2. **CONTENT.** This AC contains a general discussion of the FAA's exclusive rights and minimum standards policies, as well as a brief discussion of their impetus and background. Section 1 explains the FAA's policy on exclusive rights in more detail and discusses the general rule and some of its exceptions. Section 2 provides an in-depth discussion of minimum standards. Along with addressing FAA policy, the AC discusses the objective behind minimum standards. Section 3 presents hypothetical questions to guide airport owners/operators in the development of standards for their airports. Finally, Section 4 presents a brief description of the FAA's enforcement process, how it works, and where additional information can be obtained.

Airport owners/operators who receive Federal airport development assistance administered by the FAA will benefit from studying the concepts in this AC. A thorough understanding of the assurances to which the sponsors have obligated themselves and their airports will foster better compliance with the assurances discussed here. Airport users will also benefit from a clear understanding of the responsibilities and obligations incurred by the airport owners/operator's acceptance of Federal airport development assistance.

3. **RELATED READING MATERIALS.**

(a) Federal Aviation Agency Policy Statement, *Exclusive Rights at Airports, Order 5190.1A,* as published in the Federal Register (30 FR 13661), October 27, 1965.

(b) *Rules of Practice for Federally Assisted Airport Proceedings,* as published in the Federal Register (61 FR, 53998) October 16, 1996.

(c) *FAA Airport Compliance Requirements, Order 5190.6A, dated October 16, 1989.*

4. **CANCELLATIONS.** AC 150/5190-2, *Exclusive Rights at Airports,* dated April 4, 1972, and AC 150/5190-1A, *Minimum Standards,* dated December 12, 1985, are cancelled.

5. **DEFINITIONS.** Definitions for the specific purpose of this AC are found in Appendix 1.

6. **BACKGROUND.** In accordance with the Airport and Airway Improvement Act of 1982, 49 U.S.C Section 47101, *et seq.,* and the Airport Improvement Program sponsor assurances, the owner or operator of any airport that has been developed or improved with Federal grant assistance is required to operate the airport for the use and benefit of the public, and to make it available for all types, kinds, and classes of aeronautical activity.

The Surplus Property Act of 1944 (as amended by 49 U.S.C., Section 47151-153) contains a parallel obligation under its terms for the conveyance of Federal property for airport purposes.

Grant obligations involve several distinct requirements. Most important is that the airport and its facilities must be available for public use. The terms imposed on those who use the airport and its services must be reasonable and applied without

AC 150/5190-5

unjust discrimination, whether by the owner or by a licensee or tenant who has been granted airport management rights to offer services or commodities normally required at the airport.

The legislative background for the provisions discussed in this AC began as early as 1938 and evolved under the Federal-Aid Airport Program (FAAP), Airport Development Aid Program (ADAP), and Airport Improvement Program (AIP). Federal law requires that recipients of Federal grants (administered by the FAA) sign a grant

agreement or covenants in a conveyance of property that sets out the obligations that an airport sponsor assumes in exchange for assistance and establishes the FAA's enforcement authority. The FAA's policy on exclusive rights and its recommendation for the development of minimum standards stem from the airport sponsor's general assurances to make the airport available for public use on reasonable conditions and without unjust discrimination. (See 49 USC Section 47101, et seq.)

DAVID L. BENNETT
Director, Office of Airport Safety and Standards

AC 150/5190-5

# SECTION 1. EXCLUSIVE RIGHTS.

**1. ASSURANCE AGAINST EXCLUSIVE RIGHTS.** The FAA has determined that most exclusive rights agreements violate the assurances contained in grant agreements  With few exceptions, an airport sponsor is prohibited from granting an exclusive right to a single operator for the provision of an aeronautical activity to the exclusion of others (see definition of exclusive right)  Accordingly, FAA policy prohibits the creation or continuance of exclusive rights agreements at obligated airports where the airport sponsor has received Federal airport development assistance for the airport's improvement or development. This prohibition applies regardless of how the exclusive right was created, whether by express agreement or the imposition of unreasonable minimum standards and/or requirements (inadvertent or otherwise)

**2. AGENCY POLICY.** The FAA has concluded that the existence of an exclusive right to conduct any aeronautical activity at an airport limits the usefulness of the airport and deprives the using public of the benefits that flow from a competitive enterprise   In effect, the FAA considers it inappropriate to grant Federal funds for improvements to airports where the benefits of such improvements will not be fully realized due to the inherent restrictions of a local monopoly on aeronautical activities at the airport.

An exclusive rights violation occurs when the airport sponsor excludes others, either intentionally or unintentionally, from participating in an on-airport aeronautical activity   The effect of a prohibited exclusive rights agreement can be manifested by an express agreement, unreasonable minimum standards, or by any other means  Significant to an understanding of the exclusive rights policy is the recognition that it is the impact of the activity, and not the sponsor's intent to create such an impact, that constitutes an exclusive rights violation.

**3. EXCEPTIONS TO THE GENERAL RULE.** The following text addresses those situations where an arrangement tantamount to an exclusive rights scenario exists but does not violate agency policy due to the surrounding circumstances that make such an arrangement necessary

**a.   Aeronautical Activities Conducted by the Airport Sponsor (Proprietary Exclusive).**  The owner of a public-use airport (public or private owner) may elect to provide any or all of the aeronautical activities needed by the public at the airport. As a practical matter, most public agencies recognize that these activities are best provided by profit-motivated private enterprise  The exceptions are usually those instances in which a municipality or other public agency elects to provide fuel service or aircraft parking.  If it does so, whether on an exclusive or nonexclusive basis, it may not refuse to permit an air carrier, air taxi, or flight school to fuel its own aircraft. *(See Definition: Aeronautical Activity)*

**b.   Single Activity.**  The fact that a single business or enterprise is conducting most or all of the on-airport aeronautical activities is not, in itself, evidence of an exclusive rights violation   The absence of competition alone is not a violation of the exclusive rights policy.  When an exclusive rights violation is alleged, whether the opportunity to engage in an on-airport aeronautical activity was available to everyone who met the relevant and reasonable minimum standards determines whether enforcement action will be necessary.  The fact that only one party pursued the opportunity to do so would not subject the airport sponsor to an exclusive rights violation.

**Statutory Requirement Relating to Single Activities:**  Since 1938, there has been a statutory prohibition on exclusive rights, 49 U.S.C.  § 40103(e), independent of the parallel grant assurance requirement at 49 U.S.C. § 47107(a)(4)  This statutory prohibition currently states, "A person does not have an exclusive right to use an air navigation facility on which Government money has been expended."  (An "air navigation facility" includes, among other things, an airport   See, "Definitions" at 49 U.S.C. § 40102 )  The statutory prohibition, however, contains an exception relating to single activities.  Specifically providing services at an airport by only one fixed-base operator is not an exclusive right if it is unreasonably costly, burdensome, or impractical for more than one fixed-base operator to provide the services; **and** (emphasis added) allowing more than one fixed-based operator to provide the services requires a reduction in space leased under an agreement existing on September 3, 1982, between the operator and the airport.

AC 150/5190-5

The grant assurance relating to exclusive rights contains similar language

c. **Space Limitation.** A single enterprise may expand as needed, even if its growth ultimately results in the complete occupancy of all space available. However, an exclusive rights violation occurs when an airport sponsor unreasonably excludes a qualified applicant from engaging in an on-airport aeronautical activity without just cause. An exclusive rights violation can be effected through the use of leases where, for example, all the available airport land or facilities suitable for aeronautical activities are leased to a single user. A sponsor's refusal to permit a single Fixed Base Operator (FBO) to expand based on the sponsor's desire to open the airport to competition is not violative of the exclusive rights prohibition. Additionally, a sponsor can exclude an FBO from responding to a request for proposals, based on the sponsor's desire to create competition at the airport. A lease that confers an exclusive rights agreement will be construed as having the intent to do so and, therefore, be in violation of FAA policy.

Airport sponsors may be better served by requiring that leases to a single user be limited to the amount of land the user can demonstrate is actually needed and can be put to immediate use. In the event that additional space is required later, the incumbent should be required to compete along with all other qualified bidders for the available land. The grant of options or preferences on future sites to a single incumbent may be construed as an intent to grant an exclusive right

(1) **Land Use Identification Plan.** The primary function of this plan is to indicate the current and proposed use for each identifiable segment of property and activities, as well as the airport sponsor's intentions for the future allocation of airport property. The plan should identify areas dedicated to aeronautical activities such as fuel storage, general aviation, passenger loading, air freight and cargo handling, common use aircraft parking and public automobile parking Additionally, the plan should identify areas dedicated to future expansion.

(2) **Airport Property Map/Exhibit A.** The airport property map, also called Exhibit A to the grant agreement, is required to be submitted with the application for a grant and should delineate all the property owned or to be acquired by the airport owner as part of the airport. Whether or not the

Federal Government participates in the cost of acquiring any or all such land, it relies on this map in any subsequent grant of funds. Any land identified on the Property Map/Exhibit A may not thereafter be disposed of or used for other than those purposes without FAA consent.

d. **Restrictions Based on Safety.** An airport sponsor can deny a prospective business operator the right to engage in an on-airport aeronautical activity for reasons of safety and efficiency under some circumstances. A denial based on safety must be based on sound reasoning. The airport sponsor should have firm evidence demonstrating that safety will be compromised if the applicant is allowed to engage in the proposed aeronautical activity. However, airport sponsors should carefully scrutinize the safety reasons for denying an applicant the opportunity to engage in an aeronautical activity if the denial has the appearance of shielding an established enterprise from competition. The FAA is the final authority in determining what, in fact, constitutes a compromise of safety. As such, an airport sponsor that is contemplating the denial of a proposed on-airport aeronautical activity is encouraged to contact the local Airports District Office (ADO) or the Regional Airports Office for assistance in determining whether or not safety would be compromised

e. **Restrictions on Self-Service.** An aircraft owner, who is entitled to use the landing area of an airport, may tie-down, adjust, repair, refuel, clean, and otherwise service his/her own aircraft, provided the service is performed by the aircraft owner or his/her employees with resources supplied by the aircraft owner. Moreover, the service must be conducted in accordance with reasonable rules or standards established by the sponsor. Any unreasonable restriction imposed on the owners or operators of aircraft regarding the servicing of their own aircraft may violate the exclusive rights prohibition.

(1) In accordance with FAA policy, airport sponsors may not exercise a grant, right, or privilege that would have the effect of preventing the operator of an aircraft from performing services on his/her own aircraft with his/her own employees and equipment. Restrictions imposed by a sponsor that have the effect of channeling self-service activities to a commercial operator may violate the exclusive rights prohibition.

(2) All grant agreements contain an assurance that establishes a privilege (to service one's own aircraft) but does not, by itself, compel the sponsor to lease such facilities which may be necessary to exercise that right. However, a sponsor must provide or make available an area for self-servicing activities.

(3) An airport owner is under no obligation to permit aircraft owners to introduce on the airport equipment, personnel or practices which would be unsafe, unsightly, detrimental to the public welfare, or which would affect the efficient use of airport facilities by others. Reasonable rules and regulations should be adopted to confine aircraft maintenance and fueling operations to appropriate locations with equipment commensurate to the job being done.

(a) Self-Service Fueling, as defined in Appendix 1, is not considered self-service under FAR Part 43. Rather, self-fueling is the concept of having an unmanned fuel pump available for general use through the use of a credit card reader.

(b) Safety concerns are not limited to aeronautical issues alone but may also include Occupational Safety and Health Administration (OSHA) standards, fire safety standards, building codes, or sanitation concerns. The objective for sponsors who are about to impose restrictions is to be reasonable. Examples of reasonable restrictions include restrictions placed on the handling practices for aviation fuel and other flammable products, including aircraft paint and thinners; requirements to keep fire-lanes open; weight limitations placed on

vehicles and aircraft to protect pavement from over-stress, etc.

**f   Monopolies   Beyond   the   Airport Sponsor's Control.** Certain exclusive franchises exist on public airports that are sanctioned by local or Federal law and do not contravene the FAA's policy against exclusive rights agreements   One such franchise that exists at most public airports is UNICOM, which provides frequencies for air-to-ground communications at airports.   The Federal Communications   Commission   (FCC),   which regulates and authorizes the use of UNICOM frequencies, will not issue more than one ground station license at the same airport. Thus, an exclusive franchise is created. A legally supported franchise, such as UNICOM, grants the recipient licensee an advantage over competitors, but does not result in a violation of the agency's prohibition against exclusive rights agreements.   In cases such as this, the FAA recommends that the airport sponsor obtain the subject license in its own name. Using droplines, the airport sponsor can then make the facility available to all fixed base operations on an **as needed** basis.   Regardless of which method the airport sponsor uses, control over the facility must be held by the individual or entity that holds the license.

We recommend that the aeronautical activities area be platted, because this will facilitate the efficient and expeditious reference to plat sections when dealing with the grant of leasehold rights.

**4. THROUGH 5.    RESERVED.**

## SECTION 2.  MINIMUM STANDARDS.

**6.   POLICY.**   The sponsor of a Federally obligated airport agrees to make the opportunity to engage   in   commercial   aeronautical   activities available to any person, firm, or corporation that meets reasonable minimum standards established by the airport sponsor     In exchange for this opportunity, a business operator agrees to comply with minimum standards developed by the airport sponsor. The minimum standards then, by virtue of the   business   operator's   agreement,   become mandatory. The FAA suggests that airport sponsors establish reasonable minimum standards that are relevant to the proposed aeronautical activity with the goal of protecting the level and quality of services offered to the public.   Once the airport

sponsor has established minimum standards, it should apply them objectively and uniformly to all similarly-situated on-airport aeronautical activities and services.   The failure to do so may result in a violation of the prohibition against exclusive rights agreements and/or a finding of unjust economic discrimination

## 7. DEVELOPING MINIMUM STANDARDS.

a.   Objective.   The   FAA   policy   for recommending   the   development   of   minimum standards serves the objective of promoting safety in all airport activities, maintaining a higher quality of service for airport users, protecting airport users

AC 150/5190-5

from unlicensed and unauthorized products and services, enhancing the availability of adequate services for all airport users and promoting the orderly development of airport land. Therefore, airport sponsors should strive to develop minimum standards that are fair and reasonable to all on-airport business operators, and relevant to the activity that the minimum standards concern.

**NOTE:** The use of minimum standards as a vehicle to effect an exclusive business operation is prohibited. The FAA recognizes that some sponsors might attempt to design their minimum standards to protect only the interests of one business operator, which can be interpreted as the grant of an exclusive right and a potential violation of FAA's policy.

b. When specialized aviation service operations (SASO), sometimes known as single service operators or special fixed base operators (FBO), apply to do business on an airport, difficulties can arise if the airport sponsor requires that all businesses on the airport comply with all provisions of the published minimum standards. This is not to say that all SASOs providing the same or similar services should not equally comply with all applicable minimum standards. However, an airport should not, without adequate justification, require that an operator desiring to provide a single service also meet the criteria for a full-service FBO. An airport sponsor should develop reasonable, relevant, and applicable standards for each type and class of service. Examples of these specialized services may include aircraft flying clubs, flight training, aircraft airframe and powerplant repair/maintenance, aircraft charter, air taxi or air ambulance, aircraft sales, avionics, instrument or propeller services, or other specialized commercial flight support businesses.

## 8. THROUGH THE FENCE OPERATOR

The owner of an airport may, at times, enter into an agreement which permits access to the public landing area by independent operators offering an aeronautical activity or by aircraft based on land adjacent to, but not a part of, the airport property.

a. If individual operators are to be allowed to perform aeronautical services on the airport (aircraft washing, maintenance, etc.), the airport should have a licensing or permitting process in place that provides a level of regulation and compensation satisfactory to the airport. Frequently, a yearly fee

or percentage of the gross profits is a satisfactory way of allowing this type of operation.

b. **Authority Vested in Airport Sponsors.** FAA law and policy requiring airport sponsors to allow airport use by all types, kinds, and classes of aeronautical activity as well as by the general public (passengers, visitors, etc.), include certain exceptions. Exceptions to the general rule apply whenever airport safety or efficiency is compromised by the existence of any type of activity. Under these circumstances, the sponsor may deny the business operator's application to operate on the airport, or limit or restrict the business operator's manner of operation.

(1) A sponsor may also impose restrictions on the manner in which an activity is conducted on the airport. This type of restriction should be based on safety concerns and may affect on which runways or taxiways certain aircraft types are allowed to operate, based on specified maximum gross weight or wheel loading or operating efficiency. The sponsor may also impose restrictions that apply to the general public. For example, the use of airport facilities by the general public is subject to restrictions in areas concerning vehicular access, security, and crowd control regulations.

(2) Assistance can be obtained from FAA personnel in either the local Airports District Office (ADO) or the Regional Airports Office in determining the reasonableness of restrictions such as or similar to those described above. Ultimately, the FAA will make the final determination of the reasonableness of an airport owner's restrictions, which deny or restrict use of the airport.

c. **How to Develop Minimum Standards.** When developing minimum standards, the most critical consideration is the particular nature of the activity and operating environment at the airport. Minimum standards should be tailored to the airport to which they will apply. For example, consider the requirements for an (FBO) located at a small, rural airport that serves only small general aviation aircraft. A minimum standard would be unreasonable requiring the FBO to make jet fuel available, if jet aircraft are not going to land there. The imposition of unreasonable requirements illustrates why "fill-in-the-blanks" minimum standards and the blanket adoption of another airport's standards are not effective. The FAA will not endorse "fill-in-the-blanks" minimum standards because of the high probability that many airport

sponsors would adopt the document without modifying it to the needs of their particular airport. This could result in the imposition of irrelevant and unreasonable standards. Instead, the FAA has provided guidance in the form of questions and examples to illustrate an approach to the development and implementation of its minimum standards. It is critical for the reader to understand that what follows does not constitute a complete model for minimum standards, but rather a source of ideas to which the airport sponsor can turn when developing minimum standards.

d  **Factors to Consider.**    Numerous factors can and should be considered when developing minimum standards. It is impossible for the FAA to present every possible factor necessary to such a task, mostly because of the vast differences that exist between individual airports. Suggestions on the more obvious points one should consider are:

(1)  What type of airport is at issue? Is it a large airport or a small rural airport? Will the airport provide service to only small general aviation aircraft, or will it serve air taxi operators as well?

(2)  What types of aeronautical activities will be conducted on the airport? Is there a demand for the business?

(3)  How much space will be required for each type of aeronautical activity that may prospectively operate at the airport?

(4)  What type of documentation will business applicants be required to present as evidence of financial stability and good credit?

(5)  To what extent will each different type of aeronautical activity be required to demonstrate to the sponsor compliance with sanitation, health, and safety codes?

(6)  What requirements will be imposed regarding minimum insurance coverage and indemnity provisions?

(7)  Is each minimum standard relevant to the aeronautical activity for which it was designed to apply? For example, the minimum space required for repair station might not be relevant to an air taxi

operation.  Avoid unreasonable standards by selecting elements that accurately reflect the nature of the aeronautical activity in question.

c.  **New     versus     Existing     Business Operators.**  Airport sponsors are encouraged to develop generic minimum standards in advance of receiving a request to conduct business at the airport, and to review them regularly, revising where necessary to maintain meaningful standards that are applicable to current airport operations. Once the sponsor receives an application for a proposed aeronautical business, the sponsor must ascertain whether the existing minimum standards can be used on the new business. Some points of concern are as follows:

(1)  Was the standard designed to address the needs of pre-existing businesses already on the airport, or is it generic in nature?

(2)  Is the minimum standard relevant to the activity the new applicant proposes to conduct?

(3)  Was the minimum standard created as a contractual agreement between the existing operator and the airport sponsor so that the performance of the subject standard would result in conduct or expenses that exceed minimum standard requirements?

(4)  Was the minimum standard developed in reaction to a business operator's voluntary agreement to make the improvement? If so, it may be unreasonable to impose the same minimum standard on the new business applicant.

(5)  Has the airport either improved or declined in its revenue generating prospects since the time the minimum standards were developed?

**NOTE:** Minimum standards can be modified to reflect the airport's desire to learn from experience and to be watchful for improvements in the way it does business in order to protect the public interest. Caveat: While minimum standards can be flexible, an airport sponsor may elect to forgo frequent changes in order to avoid the appearance of engaging in preferential treatment.

**9. THROUGH 10.    RESERVED.**

**SECTION 3.  Guidance on Developing Minimum Standards.**

AC 150/5190-5

**11. SAMPLE QUESTIONS.** As a guide for the airport sponsor, the following series of questions are provided to address some of the various types of specific services or activities frequently offered to the public:

a. **Fuel and Oil Sales.** The on-airport sale of fuel and oil requires numerous considerations that include, but are not limited to, the physical requirements for a safe and environmentally sound operation. Recommended considerations are listed below.

(1) Where on the airport will the fuel/oil receptacle be constructed?

(2) Will the receptacle be installed above or below ground?

(3) Has the decision to use this location factored in the type of aircraft that will be using the airport?

(4) Will the fuel container have sufficient holding capacity to refuel the largest aircraft likely to be serviced by this airport?

(5) Can the selected fueling equipment pump fuel with sufficient force to service the largest aircraft likely to be serviced within a specified maximum time frame?

b. **Personnel Requirements.** A business operator's need for personnel is dictated by the size of the airport and the public demand for its service. In all instances, an airport sponsor will be well advised to ensure that business operators provide sufficient personnel to run their operation safely and efficiently, as this factor can greatly affect the level and quality of service provided by the business operator.

(1) How many full-time employees should be scheduled for each day of the week?

(2) What requirements, if any, will be imposed upon on-airport businesses to have employees participate, for a minimum number of hours, in fire, rescue, or other emergency training, when the training is made available to tenants by the sponsor.

c. **Airport And Passenger Services.** This is a necessary consideration in those instances where the airport has business operators engaged in air transportation or air cargo activities:

(1) Which of the following equipment or services will be provided by the business operator?

(a) Energizers, parking areas, towing equipment, starters, tie-down areas, jacks, office space, oxygen, compressed air, tire repair, etc., are among such equipment and services

(b) Provide a list of other equipment and supplies that may be required to serve the aircraft using the airport.

(2) What considerations have been made regarding passenger conveniences and services?

(a) Passenger loading steps, sanitary rest rooms, heated waiting rooms, public telephones, etc., are among such considerations.

(b) Have the needs of the crews of itinerant aircraft been considered.

(c) Have the utilities or services that are provided for the benefit of passengers or itinerant crew members been conveniently located?

d. **Airport Upkeep and Maintenance.** The question of what constitutes special airport upkeep and maintenance provisions is best answered by considering the location of the airport and the amount of usage it receives. Airports, by their nature, will be affected strongly by the seasonal changes at their location. An airport located in Denver or Utah will have significant concerns with snow removal, unlike an airport located in Florida. A need for a minimum standard in this area will most likely relate to the safety of airport patrons and the operation of aircraft.

(1) In the event of snowfall, what provisions have been made for snow removal--business operator or independent contractor?

(2) If snow removal is provided by an independent contractor, what training will be provided, and what type of equipment will be used?

(3) Does the contract between the sponsor and the contractor clearly provide which areas of the airport are required to be cleared of snow and

deiced?   What provisions are made to address heavily traveled areas or emergency parking areas?

(4)  What provisions, if any, have been made for fire detection and firefighting equipment?

**e   Flight Training Activities.**   On-airport flight training can be provided by the airport sponsor/owner or by a business operator   The minimum standards imposed on flight instruction operations may take the following information into consideration:

(1)  What arrangements have been made for the office space the school is required to maintain under 14 C.F.R §141.25?  For example, what is the minimum amount of classroom space that the business operator must obtain?

(2)  Will flight training be provided on a full-time or part-time basis?

(3)  What type of aircraft and how many will be available for training at the on-airport location?

(4)  What provisions have been made for the storage and maintenance of the aircraft?

(5)  Is the aircraft proposed by the business operator compatible to the type of training provided?

(6)  What type of training will the business operator provide?

(7)  What provisions will be made for rest rooms, briefing rooms, and food service?

**f   Aircraft Charter and Taxi.**  As a general rule, the public's need or demand for air charter or taxi service dictates the nature of service that should be provided.   In deciding what the appropriate minimum standards should be for air-charter and air-taxi services, the FAA recommends the following considerations:

(1)  What is the demand for the proposed service?

(2)  What type of aircraft will be used by the business operator?

(3)  What arrangements have been made to assure that the business operator will provide for the

continued availability of suitable aircraft located at the airport?

(4)  Does the business operator have sufficient capital to start the business?  Has the business operator obtained the necessary insurance?

(5)  Has the business operator complied with all applicable laws, regulations, and rules, whether Federal, state, or local?

(6)  What arrangements have been made for passenger shelter, rest rooms, public telephone, etc.?   Are these services already provided by another on-airport business?  If so, is there a good reason to duplicate the service?

(7)  What arrangements have been made for passenger check-in, ticketing, and luggage handling?

(8)  Will provisions need to be made for ground transportation?

**g   Aircraft Engine/Accessory Repair and Maintenance.**   The business applicant for an on-airport repair station is subject to several regulatory requirements under 14 C.F.R § 145   Depending on the type and size of repair station the business applicant is proposing, the following questions may provide helpful guidelines:

(1)  What qualifications will be required of the repair station employees?  Typically, the holder of a domestic repair station certificate must provide adequate personnel who can perform, supervise, and inspect the work for which the station is rated.

(2)  What repair station ratings does the business applicant hold?

(3)  What types of services will the repair station offer to the public?  These services can vary from repair to maintenance of aircraft and include painting, upholstery, etc

(4)  Can the business applicant afford to secure sufficient airport space to provide facilities so that work being done is protected from weather elements, dust, and heat?  The amount of space required will be directly related to the largest item or aircraft to be worked under the operator's rating.

(5)  Will the workers be protected so that the work will not impair their physical efficiency?

AC 150/5190-5

(6) Will maintenance operations have efficient and proper facilities to carry out the repair, inspection, alteration or assembly intended for that area?

(7) Will suitable shop space exist to provide a place for machine tools and equipment in sufficient proximity to where the bench work is done so as to facilitate the safe and efficient performance of the maintenance in question?

(8) How will the business applicant control the temperature and humidity in the workspace area?

(9) What amount of space will be necessary for the storage of standard parts, spare parts, raw materials, etc.?

(10) What type of lighting and ventilation will the work areas have? Will the ventilation be adequate to protect the health and efficiency of the workers?

(11) If the business applicant is the holder of an airframe rating, what is proposed with regard to housing at least one of the heaviest aircraft within the weight class of the rating the applicant holds?

(12) If spray painting, cleaning, or machining is performed, has sufficient distance between the operations performed and the testing operations been provided so as to prevent adverse affects on testing equipment?

h.  **Skydiving.** Skydiving is an aeronautical activity. Any restriction, limitation, or ban on skydiving on the airport must be based on the grant assurance which provides that the sponsor may prohibit or limit aeronautical use for the safe operation of the airport, or when necessary to serve the civil aviation needs of the public. The following questions present reasonable factors the sponsor might contemplate when developing minimum standards that apply to skydiving:

(1) Will this activity present or create a safety hazard to the normal operations of aircraft arriving or departing from the airport?

(2) Can a drop zone be safely established within the boundaries of the airport?

(3) What reasonable time periods can be designated for jumping?

(4) What is a reasonable fee that the jumpers and/or their organizations can pay for the privilege of using airport property?

(5) Will an FAA airspace study be necessary to determine the efficiency and utility of the airport when considering the proposed activity?

(6) Has a reasonable amount of liability insurance, naming the airport as an additional insured party, been obtained by the jumpers and/or their organizations that is reasonably related to the airport's liability exposure and will not be unjustly discriminatory?

i.  **Ultralight Vehicles.** The operation of ultralights is an aeronautical activity and must, therefore, be generally accommodated on airports that have been developed with Federal airport development assistance. However, an airport sponsor is not required to allow such operation on the designated runways if they cannot be operated safely in the designated area. Airport sponsors are encouraged to consider some of the following questions:

1  Can ultralight aircraft be operated safely on the airport?

2.  Will this activity present or create a safety hazard to the normal operations of aircraft arriving or departing from the airport?

3.  Will an FAA airspace study be necessary to determine the efficiency and utility of the airport when considering the proposed activity?

j.  **Practical Considerations.** Many communities choose to state their standards only in actual use agreements at the time of execution. While standards implemented in this manner can be effective, they also render the airport sponsor vulnerable to the challenges of prospective business operators on the grounds that they are not objective. FAA encourages sponsors to periodically publish its minimum standards. Arguably, a certain amount of flexibility exists in the timing of the implementation of minimum standards. The standards can be raised or lowered as new tenants arrive or existing tenants leave. But, the constant juggling of standards will create the appearance that certain operators may be receiving preferential treatment. As such, it is recommended that the airport sponsor exercise some reticence before changing already-published standards. Changes to the standards can be most

easily facilitated by demonstrating to the business operators that the sole purpose for the change is to improve the quality of service to the public   An airport sponsor can provide for periodic reviews of the business operator's minimum standards which would insure that the established minimum standards continue to be reasonable through the passage of time and as businesses and business operators change.

**12. THROUGH 15. RESERVED.**

## SECTION 4.  THE ENFORCEMENT PROCESS.

**16. AIRPORT COMPLIANCE PROGRAM.** The FAA discharges its duty for ensuring airport sponsor compliance with Federal grant obligations through its contractually-based Airport Compliance Program.  The contractual nature of the Program arises from requirements in the Airport and Airway Improvement Act of 1982, as amended, 49 U.S.C. Section 47101, *et seq.*, and the airport sponsor's agreement to comply with the assurances contained in the grant agreement in exchange for Federal airport development assistance.   Assurances are designed to achieve a system of safe and properly maintained airports that are operated in a manner that protects the public's interest and investment in aviation

a.   Under the Airport Compliance Program, any person who believes that an airport sponsor may be in noncompliance with an assurance may register their concerns with the local FAA Airports District Office (ADO)   ADO personnel are then charged with investigating the allegations of noncompliance on an informal basis, and, in the event that the allegations are confirmed, attempting to persuade the airport sponsor to come back into compliance  Should this measure fail, the concerned party may then file a formal complaint under 14 CFR Part 16, assuming certain requirements are met (i.e., attempts to resolve informally).

b.   Complaints filed with the FAA under 14 CFR Part 16 are subject to an administrative review which entails consideration of the complainant's allegations, the airport sponsor's response to the allegations, and any unique circumstances at the airport in question.  A decision will be issued by the FAA to inform the parties of its determination.  A determination against the airport sponsor or owner can result in action by the FAA such as the withholding of current grant fund payments or the denial of future applications for grant assistance.  A dissatisfied party can appeal the FAA's final determination to the U.S. Court of Appeals.

**17. THROUGH 20. RESERVED.**

# APPENDIX 1. DEFINITIONS.

The following are definitions for the specific purpose of this AC.

**a. Aeronautical Activity.** Any activity that involves, makes possible, or is required for the operation of aircraft, or which contributes to or is required for the safety of such operations.

**NOTE:** Activities within this definition, commonly conducted on airports, include but are not limited to the following: air taxi and charter operations, scheduled and non-scheduled air carrier services, pilot training, aircraft rental and sightseeing, aerial photography, crop dusting, aerial advertising and surveying, aircraft sales and services, aircraft storage, sale of aviation petroleum products, repair and maintenance of aircraft, sale of aircraft parts, parachute or ultralight activities and any other activities which, because of their direct relationship to the operation of aircraft, can appropriately be regarded as an aeronautical activity.

**b. Assurance.** An assurance is a provision contained in a Federal grant agreement to which the recipient of Federal airport development assistance has voluntarily agreed to comply with in consideration of the assistance provided.

**c. Exclusive Right.** A power, privilege, or other right excluding or debarring another from enjoying or exercising a like power, privilege, or right. An exclusive right can be conferred either by express agreement, by the imposition of unreasonable standards or requirements, or by any other means. Such a right conferred on one or more parties, but excluding others from enjoying or exercising a similar right or rights, would be an exclusive right.

**d. Federal Airport Obligations.** All references to a Federal grant program, Federal airport development assistance, or Federal aid contained in this AC are intended to address obligations arising from the conveyance of land or from grant agreements entered under one of the following Acts.

**(1) Surplus Property Act of 1944 (SPA), as amended, 49 U.S.C. Section 47151-153.** Surplus property instruments of transfer were, and are, issued by the War Assets Administration (WAA) and it's successor, the General Services Administration (GSA). However, Public Law (PL) 81-113 specifically imposes upon FAA the sole responsibility for determining and enforcing compliance with the terms and conditions of all instruments of transfer by which surplus airport property is or has been conveyed to non-federal public agencies pursuant to the Surplus Property Act of 1944. Under 50 U.S.C § 4715 *et seq*, property can be conferred for airport purposes if the FAA determines that the property is essential, suitable, or desirable for the development, improvement, operation, or maintenance of a public airport. Recipients of surplus property grants are subject to the FAA prohibition against exclusive rights. 14 C.F.R. Part 155 contains procedures which must be followed to release airport property from surplus property disposal restrictions contained in the conveyance instrument. Owners of surplus property airport property are advised to consult this regulation whenever changes in property use are being contemplated.

**(2) Federal-Aid Airport Program (FAAP).** This grant-in-aid program administered by the agency under the authority of the Federal Airport Act of 1946, as amended, assisted public agencies in the development of a nationwide system of public airports. The Federal Airport Act of 1946 was repealed and superseded by the Airport and Airway Act of 1970

**(3) Airport Development Aid Program (ADAP).** This grant-in-aid program administered by the FAA under the authority of the Airport and Airway Development Act of 1970, as amended, assisted public agencies in the expansion and substantial improvement of the Nation's airport system. The 1970 Act was repealed and superceded by the Airport and Airway Improvement Act of 1982 (AAIA)

**(4) Airport Improvement Program (AIP).** This grant-in-aid program administered by the FAA under the authority of the Airport and Airway Improvement Act of 1982, 49 U.S.C Section 47101, *et seq*, assists in maintaining a safe and efficient nationwide system of public-use airports that meet the present and future needs of civil aeronautics.

**f. Land Use Identification Plan.** A scaled, dimensional layout of the entire airport property. The primary function of the plan is to indicate the current and proposed use for each identifiable segment of property and activities, as well as the

AC 150.5190-5
Appendix 1

airport sponsor's intentions for the future allocation of airport property. The plan should identify areas dedicated to aeronautical activities and services such as fuel storage, general aviation, passenger loading, air freight and cargo handling, common use aircraft parking, and public automobile parking. Additionally, the plan should identify areas dedicated to future expansion. It is recommended that the aeronautical services area be platted because this will facilitate the efficient and expeditious reference to plat sections when dealing with the grant of leasehold rights.

g. **Grant agreement.** As used in this AC, a grant agreement represents any agreement made between the FAA (on behalf of the United States) and an airport sponsor, whether it be for the grant of Federal funding or a conveyance of land, each of which the airport sponsor agrees to use for airport or aeronautical purposes.

h. **Minimum standards.** The qualifications or criteria which may be established by an airport owner as the minimum requirements that must be met by businesses engaged in on-airport aeronautical activities for the right to conduct those activities.

i. **Proprietary Exclusive.** The owner of a public-use airport (public or private owner) may elect to provide any or all of the aeronautical services needed by the public at the airport. In fact, the statutory prohibition against exclusive rights does not apply to these owners and they may exercise but not grant the exclusive right to conduct any aeronautical activity. However, the sponsor that elects to engage in a proprietary exclusive must use its own employees and resources to carry out its venture. An independent commercial enterprise that has been designated as agent of the owner may not exercise nor be granted an exclusive right.

j. **Public-use airport.** Means (A) a public airport; or (B) a privately-owned airport used or intended to be used for public purposes that is (i) a reliever airport; or (ii) determined by the Secretary to have at least 2,500 passenger enplanements each year and to receive scheduled passenger aircraft service.

k. **Public Airport.** Means an airport used or intended to be used for public purposes (A) that is under the control of a public agency; and (B) of which the area used or intended to be used for the landing, taking off, or surface maneuvering of aircraft is publicly owned.

l. **Private-use airport.** A publicly-owned or privately-owned airport not open to the public or operated for the public benefit.

m. **Specialized aviation service operation (SASO).** An aeronautical business that offers a single or limited service. Examples of these specialized services may include aircraft flying clubs, flight training, aircraft, airframe and powerplant repair/maintenance, aircraft charter, air taxi or air ambulance, aircraft sales, avionics, instrument or propeller services, or other specialized commercial flight support business.

n. **Self-Service Fueling.** Fueling of an aircraft by the pilot using fuel pumps installed for that purpose. The fueling facility may or may not be attended by the owner/operator of such a facility. The use of this type of facility is not to be considered to be self-service.

o. **Self-service.** Fueling or maintenance of an aircraft on airport property, performed by the aircraft owner or operator in accordance with the airport's reasonable standards or requirements and using fuel obtained by the aircraft owner from the source of his/her preference.

Part 43 of the Federal Aviation Regulations (FAR) permits the holder of a pilot certificate to perform specific types of preventative maintenance on any aircraft owned or operated by the pilot. Some examples of work considered as preventative maintenance are as follows:

(1) Removal, installation, and repair of landing gear tires.

(2) Replacing elastic shock absorber cords on landing gear.

(3) Servicing landing-gear shock struts by adding oil, air, or both.

(4) Servicing landing-gear wheel bearings, such as cleaning and greasing.

(5) Replacing defective safety wiring or cotter keys.

(6) Lubrication not requiring disassembly other than removal of nonstructural items such as cover plates, cowlings, and fairings.

(7) Making simple fabric patches not requiring rib stitching or the removal of structural parts or control services. In the case of balloons, the making of small fabric repairs to envelopes (as defined in and in accordance with, the balloon manufacturers' instructions) not requiring load tape repair or replacement.

(8) Replenishing hydraulic fluid in the hydraulic reservoir.

(9) Refinishing decorative coating of fuselage, balloon baskets, wings, tail group surfaces (excluding balanced control surfaces), fairings, cowlings, landing gear, or cabin or cockpit interior, when removal or disassembly of any primary structure or operating system is not required.

(10) Applying preservative or protective material to components where no disassembly of any primary structure or operating systems is involved and where such coating is not prohibited or is not contrary to good practices.

(11) Repairing upholstery and decorative furnishings of the cabin, cockpit, or balloon basket interior when the repairing does not require disassembly of any primary structure or operating system, interfere with an operating system, or affect the primary structure of the aircraft.

(12) Making small, simple repairs to fairings, nonstructural cover plates, cowlings, and small patches and reinforcements, but not changing the contour so as to interfere with proper airflow.

(13) Replacing side windows where that work does not interfere with the structure or any operating system such as controls, electrical equipment, etc.

(14) Replacing safety belts.

(15) Replacing seats or seat parts with replacement parts approved for the aircraft, not involving disassembly of any primary structure or operating system.

(16) Troubleshooting and repairing broken circuits in landing-light wiring circuits.

NOTE: See also 14 CFR Part 43, *Maintenance, Preventive Maintenance, Rebuilding, and Alteration.*

o. **Sponsor.** A local government body (municipal or state) or a private entity obligated to the Federal government to comply with the assurances contained in grant agreements or property conveyance instruments. A sponsor may be an entity that exists only to operate the airport, such as an airport authority established by state or local law. For the purposes of this AC, the term airport sponsor or airport owner is used interchangeably when discussing grant obligated airports.

p. **Through-the-fence operation.** A commercial activity that is directly related to the use of the airport but is developed or located off airport property beyond the sponsor's control. It also includes services performed on the airport by individuals or companies which may or may not have a lease or permit from the sponsor to perform such services.

## 2. THROUGH 5. RESERVED.