ORIGINAL

FILED
HARRISBURG, PA

AUG 17 2000

MARY E. D'ANDREA, CLERK
Per_____

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

STAMBAUGH'S AIR SERVICE, INC.,

    Plaintiff

vs. : No. 1:CV-00-0660

SUSQUEHANNA AREA REGIONAL AIRPORT : (Judge Kane) ✓
AUTHORITY, BAA HARRISBURG, INC., : (Magistrate Judge Smyser)
DAVID FLEET, individually, DAVID
HOLDSWORTH, individually, and DAVID C.
MCINTOSH, individually

    Defendants

**EXHIBIT "A" TO BRIEF IN SUPPORT OF OBJECTIONS OF STAMBAUGH'S AIR SERVICE, INC. TO THE REPORT AND RECOMMENDATION OF THE MAGISTRATE JUDGE TO GRANT IN PART DEFENDANTS' MOTION TO DISMISS**

THOMAS B. SCHMIDT, III (19196)
BRIAN P. DOWNEY (59891)
RANDY L. VARNER (81943)
KELLY ANN RYAN (84096)
Pepper Hamilton LLP
200 One Keystone Plaza
North Front and Market Streets
Post Office Box 1181
Harrisburg, PA 17108-1181
(717) 255-1155
(717) 238-0575 (Fax)

Attorneys for Plaintiff
Stambaugh's Air Service, Inc.

August 17, 2000

A

U.S. Department
of Transportation

Federal Aviation
Administration

# Advisory Circular

Subject: EXCLUSIVE RIGHTS AND MINIMUM STANDARDS FOR COMMERCIAL AERONAUTICAL ACTIVITIES

Date: 4/7/00
Initiated by: AAS-400
AC No: 150/5190-5

**1. PURPOSE.** This advisory circular (AC) provides basic information pertaining to the Federal Aviation Administration's (FAA) exclusive rights and minimum standards policies which, in part, describe the contractual grant obligations assumed by the operators of public airports. For airports that have accepted Federal assistance, compliance with the statutory prohibition on exclusive rights is mandatory. Advice made with respect to minimum standards is optional but highly recommended.

**2. CONTENT.** This AC contains a general discussion of the FAA's exclusive rights and minimum standards policies, as well as a brief discussion of their impetus and background. Section 1 explains the FAA's policy on exclusive rights in more detail and discusses the general rule and some of its exceptions. Section 2 provides an in-depth discussion of minimum standards. Along with addressing FAA policy, the AC discusses the objective behind minimum standards. Section 3 presents hypothetical questions to guide airport owners/operators in the development of standards for their airports. Finally, Section 4 presents a brief description of the FAA's enforcement process, how it works, and where additional information can be obtained.

Airport owners/operators who receive Federal airport development assistance administered by the FAA will benefit from studying the concepts in this AC. A thorough understanding of the assurances to which the sponsors have obligated themselves and their airports will foster better compliance with the assurances discussed here. Airport users will also benefit from a clear understanding of the responsibilities and obligations incurred by the airport owners/operator's acceptance of Federal airport development assistance.

**3. RELATED READING MATERIALS.**

(a) Federal Aviation Agency Policy Statement, *Exclusive Rights at Airports*, Order 5190.1A, as published in the Federal Register (30 FR 13661), October 27, 1965.

(b) *Rules of Practice for Federally Assisted Airport Proceedings*, as published in the Federal Register (61 FR 53998) October 16, 1996.

(c) *FAA Airport Compliance Requirements*, Order 5190.6A, dated October 16, 1989.

**4. CANCELLATIONS.** AC 150/5190-2, *Exclusive Rights at Airports*, dated April 4, 1972, and AC 150/5190-1A, *Minimum Standards*, dated December 12, 1985, are cancelled.

**5. DEFINITIONS.** Definitions for the specific purpose of this AC are found in Appendix 1

**6. BACKGROUND.** In accordance with the Airport and Airway Improvement Act of 1982, 49 U.S.C Section 47101, *et seq.*, and the Airport Improvement Program sponsor assurances, the owner or operator of any airport that has been developed or improved with Federal grant assistance is required to operate the airport for the use and benefit of the public, and to make it available for all types, kinds, and classes of aeronautical activity.

The Surplus Property Act of 1944 (as amended by 49 U.S.C., Section 47151-153) contains a parallel obligation under its terms for the conveyance of Federal property for airport purposes.

Grant obligations involve several distinct requirements. Most important is that the airport and its facilities must be available for public use. The terms imposed on those who use the airport and its services must be reasonable and applied without

unjust discrimination, whether by the owner or by a licensee or tenant who has been granted airport management rights to offer services or commodities normally required at the airport.

The legislative background for the provisions discussed in this AC began as early as 1938 and evolved under the Federal-Aid Airport Program (FAAP), Airport Development Aid Program (ADAP), and Airport Improvement Program (AIP) Federal law requires that recipients of Federal grants (administered by the FAA) sign a grant agreement or covenants in a conveyance of property that sets out the obligations that an airport sponsor assumes in exchange for assistance and establishes the FAA's enforcement authority. The FAA's policy on exclusive rights and its recommendation for the development of minimum standards stem from the airport sponsor's general assurances to make the airport available for public use on reasonable conditions and without unjust discrimination. (*See* 49 USC Section 47101, *et seq.*)

DAVID L. BENNETT
Director, Office of Airport Safety and Standards

## SECTION 1. EXCLUSIVE RIGHTS.

1. **ASSURANCE AGAINST EXCLUSIVE RIGHTS.** The FAA has determined that most exclusive rights agreements violate the assurances contained in grant agreements. With few exceptions, an airport sponsor is prohibited from granting an exclusive right to a single operator for the provision of an aeronautical activity to the exclusion of others (see definition of exclusive right). Accordingly, FAA policy prohibits the creation or continuance of exclusive rights agreements at obligated airports where the airport sponsor has received Federal airport development assistance for the airport's improvement or development. This prohibition applies regardless of how the exclusive right was created, whether by express agreement or the imposition of unreasonable minimum standards and/or requirements (inadvertent or otherwise).

2. **AGENCY POLICY.** The FAA has concluded that the existence of an exclusive right to conduct any aeronautical activity at an airport limits the usefulness of the airport and deprives the using public of the benefits that flow from a competitive enterprise. In effect, the FAA considers it inappropriate to grant Federal funds for improvements to airports where the benefits of such improvements will not be fully realized due to the inherent restrictions of a local monopoly on aeronautical activities at the airport.

An exclusive rights violation occurs when the airport sponsor excludes others, either intentionally or unintentionally, from participating in an on-airport aeronautical activity. The effect of a prohibited exclusive rights agreement can be manifested by an express agreement, unreasonable minimum standards, or by any other means. Significant to an understanding of the exclusive rights policy is the recognition that it is the impact of the activity, and not the sponsor's intent to create such an impact, that constitutes an exclusive rights violation.

3. **EXCEPTIONS TO THE GENERAL RULE.** The following text addresses those situations where an arrangement tantamount to an exclusive rights scenario exists but does not violate agency policy due to the surrounding circumstances that make such an arrangement necessary.

a. **Aeronautical Activities Conducted by the Airport Sponsor (Proprietary Exclusive).** The owner of a public-use airport (public or private owner) may elect to provide any or all of the aeronautical activities needed by the public at the airport. As a practical matter, most public agencies recognize that these activities are best provided by profit-motivated private enterprise. The exceptions are usually those instances in which a municipality or other public agency elects to provide fuel service or aircraft parking. If it does so, whether on an exclusive or nonexclusive basis, it may not refuse to permit an air carrier, air taxi, or flight school to fuel its own aircraft. *(See Definition: Aeronautical Activity)*

b. **Single Activity.** The fact that a single business or enterprise is conducting most or all of the on-airport aeronautical activities is not, in itself, evidence of an exclusive rights violation. The absence of competition alone is not a violation of the exclusive rights policy. When an exclusive rights violation is alleged, whether the opportunity to engage in an on-airport aeronautical activity was available to everyone who met the relevant and reasonable minimum standards determines whether enforcement action will be necessary. The fact that only one party pursued the opportunity to do so would not subject the airport sponsor to an exclusive rights violation.

**Statutory Requirement Relating to Single Activities:** Since 1938, there has been a statutory prohibition on exclusive rights, 49 U.S.C. § 40103(e), independent of the parallel grant assurance requirement at 49 U.S.C. § 47107(a)(4). This statutory prohibition currently states, "A person does not have an exclusive right to use an air navigation facility on which Government money has been expended." (An "air navigation facility" includes, among other things, an airport. See, "Definitions" at 49 U.S.C § 40102.) The statutory prohibition, however, contains an exception relating to single activities. Specifically, providing services at an airport by only one fixed-base operator is not an exclusive right if it is unreasonably costly, burdensome, or impractical for more than one fixed-base operator to provide the services; **and** (emphasis added) allowing more than one fixed-based operator to provide the services requires a reduction in space leased under an agreement existing on September 3, 1982, between the operator and the airport.

The grant assurance relating to exclusive rights contains similar language.

    c. **Space Limitation.** A single enterprise may expand as needed, even if its growth ultimately results in the complete occupancy of all space available. However, an exclusive rights violation occurs when an airport sponsor unreasonably excludes a qualified applicant from engaging in an on-airport aeronautical activity without just cause. An exclusive rights violation can be effected through the use of leases where, for example, all the available airport land or facilities suitable for aeronautical activities are leased to a single user. A sponsor's refusal to permit a single Fixed Base Operator (FBO) to expand based on the sponsor's desire to open the airport to competition is not violative of the exclusive rights prohibition. Additionally, a sponsor can exclude an FBO from responding to a request for proposals, based on the sponsor's desire to create competition at the airport. A lease that confers an exclusive rights agreement will be construed as having the intent to do so and, therefore, be in violation of FAA policy.

Airport sponsors may be better served by requiring that leases to a single user be limited to the amount of land the user can demonstrate is actually needed and can be put to immediate use. In the event that additional space is required later, the incumbent should be required to compete along with all other qualified bidders for the available land. The grant of options or preferences on future sites to a single incumbent may be construed as an intent to grant an exclusive right.

(1) **Land Use Identification Plan.** The primary function of this plan is to indicate the current and proposed use for each identifiable segment of property and activities, as well as the airport sponsor's intentions for the future allocation of airport property. The plan should identify areas dedicated to aeronautical activities such as fuel storage, general aviation, passenger loading, air freight and cargo handling, common use aircraft parking and public automobile parking. Additionally, the plan should identify areas dedicated to future expansion.

(2) **Airport Property Map/Exhibit A.** The airport property map, also called Exhibit A to the grant agreement, is required to be submitted with the application for a grant and should delineate all the property owned or to be acquired by the airport owner as part of the airport. Whether or not the Federal Government participates in the cost of acquiring any or all such land, it relies on this map in any subsequent grant of funds. Any land identified on the Property Map/Exhibit A may not thereafter be disposed of or used for other than those purposes without FAA consent.

    d. **Restrictions Based on Safety.** An airport sponsor can deny a prospective business operator the right to engage in an on-airport aeronautical activity for reasons of safety and efficiency under some circumstances. A denial based on safety must be based on sound reasoning. The airport sponsor should have firm evidence demonstrating that safety will be compromised if the applicant is allowed to engage in the proposed aeronautical activity. However, airport sponsors should carefully scrutinize the safety reasons for denying an applicant the opportunity to engage in an aeronautical activity if the denial has the appearance of shielding an established enterprise from competition. The FAA is the final authority in determining what, in fact, constitutes a compromise of safety. As such, an airport sponsor that is contemplating the denial of a proposed on-airport aeronautical activity is encouraged to contact the local Airports District Office (ADO) or the Regional Airports Office for assistance in determining whether or not safety would be compromised.

    e. **Restrictions on Self-Service.** An aircraft owner, who is entitled to use the landing area of an airport, may tie-down, adjust, repair, refuel, clean, and otherwise service his/her own aircraft, provided the service is performed by the aircraft owner or his/her employees with resources supplied by the aircraft owner. Moreover, the service must be conducted in accordance with reasonable rules or standards established by the sponsor. Any unreasonable restriction imposed on the owners or operators of aircraft regarding the servicing of their own aircraft may violate the exclusive rights prohibition.

    (1) In accordance with FAA policy, airport sponsors may not exercise a grant, right, or privilege that would have the effect of preventing the operator of an aircraft from performing services on his/her own aircraft with his/her own employees and equipment. Restrictions imposed by a sponsor that have the effect of channeling self-service activities to a commercial operator may violate the exclusive rights prohibition.

(2) All grant agreements contain an assurance that establishes a privilege (to service one's own aircraft) but does not, by itself, compel the sponsor to lease such facilities which may be necessary to exercise that right. However, a sponsor must provide or make available an area for self-servicing activities.

(3) An airport owner is under no obligation to permit aircraft owners to introduce on the airport equipment, personnel or practices which would be unsafe, unsightly, detrimental to the public welfare, or which would affect the efficient use of airport facilities by others. Reasonable rules and regulations should be adopted to confine aircraft maintenance and fueling operations to appropriate locations with equipment commensurate to the job being done.

(a) **Self-Service Fueling**, as defined in Appendix 1, is not considered self-service under FAR Part 43. Rather, self-fueling is the concept of having an unmanned fuel pump available for general use through the use of a credit card reader.

(b) Safety concerns are not limited to aeronautical issues alone but may also include Occupational Safety and Health Administration (OSHA) standards, fire safety standards, building codes, or sanitation concerns. The objective for sponsors who are about to impose restrictions is to be reasonable. Examples of reasonable restrictions include restrictions placed on the handling practices for aviation fuel and other flammable products, including aircraft paint and thinners; requirements to keep fire-lanes open; weight limitations placed on vehicles and aircraft to protect pavement from over-stress, etc.

f **Monopolies Beyond the Airport Sponsor's Control.** Certain exclusive franchises exist on public airports that are sanctioned by local or Federal law and do not contravene the FAA's policy against exclusive rights agreements. One such franchise that exists at most public airports is UNICOM, which provides frequencies for air-to-ground communications at airports. The Federal Communications Commission (FCC), which regulates and authorizes the use of UNICOM frequencies, will not issue more than one ground station license at the same airport. Thus, an exclusive franchise is created. A legally supported franchise, such as UNICOM, grants the recipient licensee an advantage over competitors, but does not result in a violation of the agency's prohibition against exclusive rights agreements. In cases such as this, the FAA recommends that the airport sponsor obtain the subject license in its own name. Using droplines, the airport sponsor can then make the facility available to all fixed base operations on an as needed basis. Regardless of which method the airport sponsor uses, control over the facility must be held by the individual or entity that holds the license.

We recommend that the aeronautical activities area be platted, because this will facilitate the efficient and expeditious reference to plat sections when dealing with the grant of leasehold rights.

**4. THROUGH 5.    RESERVED.**

## SECTION 2. MINIMUM STANDARDS.

**6. POLICY.** The sponsor of a Federally obligated airport agrees to make the opportunity to engage in commercial aeronautical activities available to any person, firm, or corporation that meets reasonable minimum standards established by the airport sponsor  In exchange for this opportunity, a business operator agrees to comply with minimum standards developed by the airport sponsor. The minimum standards then, by virtue of the business operator's agreement, become mandatory. The FAA suggests that airport sponsors establish reasonable minimum standards that are relevant to the proposed aeronautical activity with the goal of protecting the level and quality of services offered to the public  Once the airport sponsor has established minimum standards, it should apply them objectively and uniformly to all similarly-situated on-airport aeronautical activities and services. The failure to do so may result in a violation of the prohibition against exclusive rights agreements and/or a finding of unjust economic discrimination.

**7. DEVELOPING MINIMUM STANDARDS.**

a. **Objective.** The FAA policy for recommending the development of minimum standards serves the objective of promoting safety in all airport activities, maintaining a higher quality of service for airport users, protecting airport users

from unlicensed and unauthorized products and services, enhancing the availability of adequate services for all airport users and promoting the orderly development of airport land. Therefore, airport sponsors should strive to develop minimum standards that are fair and reasonable to all on-airport business operators, and relevant to the activity that the minimum standards concern.

**NOTE:** The use of minimum standards as a vehicle to effect an exclusive business operation is prohibited. The FAA recognizes that some sponsors might attempt to design their minimum standards to protect only the interests of one business operator, which can be interpreted as the grant of an exclusive right and a potential violation of FAA's policy

b. When specialized aviation service operations (SASO), sometimes known as single service operators or special fixed base operators (FBO), apply to do business on an airport, difficulties can arise if the airport sponsor requires that all businesses on the airport comply with all provisions of the published minimum standards. This is not to say that all SASOs providing the same or similar services should not equally comply with all applicable minimum standards. However, an airport should not, without adequate justification, require that an operator desiring to provide a single service also meet the criteria for a full-service FBO. An airport sponsor should develop reasonable, relevant, and applicable standards for each type and class of service. Examples of these specialized services may include aircraft flying clubs, flight training, aircraft airframe and powerplant repair/maintenance, aircraft charter, air taxi or air ambulance, aircraft sales, avionics, instrument or propeller services, or other specialized commercial flight support businesses.

## 8. THROUGH THE FENCE OPERATOR

The owner of an airport may, at times, enter into an agreement which permits access to the public landing area by independent operators offering an aeronautical activity or by aircraft based on land adjacent to, but not a part of, the airport property.

a. If individual operators are to be allowed to perform aeronautical services on the airport (aircraft washing, maintenance, etc.), the airport should have a licensing or permitting process in place that provides a level of regulation and compensation satisfactory to the airport. Frequently, a yearly fee or percentage of the gross profits is a satisfactory way of allowing this type of operation.

b. **Authority Vested in Airport Sponsors.** FAA law and policy requiring airport sponsors to allow airport use by all types, kinds, and classes of aeronautical activity as well as by the general public (passengers, visitors, etc.), include certain exceptions. Exceptions to the general rule apply whenever airport safety or efficiency is compromised by the existence of any type of activity. Under these circumstances, the sponsor may deny the business operator's application to operate on the airport, or limit or restrict the business operator's manner of operation.

(1) A sponsor may also impose restrictions on the manner in which an activity is conducted on the airport. This type of restriction should be based on safety concerns and may affect on which runways or taxiways certain aircraft types are allowed to operate, based on specified maximum gross weight or wheel loading or operating efficiency. The sponsor may also impose restrictions that apply to the general public. For example, the use of airport facilities by the general public is subject to restrictions in areas concerning vehicular access, security, and crowd control regulations.

(2) Assistance can be obtained from FAA personnel in either the local Airports District Office (ADO) or the Regional Airports Office in determining the reasonableness of restrictions such as or similar to those described above. Ultimately, the FAA will make the final determination of the reasonableness of an airport owner's restrictions, which deny or restrict use of the airport.

c. **How to Develop Minimum Standards.** When developing minimum standards, the most critical consideration is the particular nature of the activity and operating environment at the airport. Minimum standards should be tailored to the airport to which they will apply. For example, consider the requirements for an (FBO) located at a small, rural airport that serves only small general aviation aircraft. A minimum standard would be unreasonable requiring the FBO to make jet fuel available, if jet aircraft are not going to land there. The imposition of unreasonable requirements illustrates why "fill-in-the-blanks" minimum standards and the blanket adoption of another airport's standards are not effective. The FAA will not endorse "fill-in-the-blanks" minimum standards because of the high probability that many airport

sponsors would adopt the document without modifying it to the needs of their particular airport. This could result in the imposition of irrelevant and unreasonable standards. Instead, the FAA has provided guidance in the form of questions and examples to illustrate an approach to the development and implementation of its minimum standards. It is critical for the reader to understand that what follows does not constitute a complete model for minimum standards, but rather a source of ideas to which the airport sponsor can turn when developing minimum standards.

d. **Factors to Consider.** Numerous factors can and should be considered when developing minimum standards. It is impossible for the FAA to present every possible factor necessary to such a task, mostly because of the vast differences that exist between individual airports. Suggestions on the more obvious points one should consider are:

(1) What type of airport is at issue? Is it a large airport or a small rural airport? Will the airport provide service to only small general aviation aircraft, or will it serve air taxi operators as well?

(2) What types of aeronautical activities will be conducted on the airport? Is there a demand for the business?

(3) How much space will be required for each type of aeronautical activity that may prospectively operate at the airport?

(4) What type of documentation will business applicants be required to present as evidence of financial stability and good credit?

(5) To what extent will each different type of aeronautical activity be required to demonstrate to the sponsor compliance with sanitation, health, and safety codes?

(6) What requirements will be imposed regarding minimum insurance coverage and indemnity provisions?

(7) Is each minimum standard relevant to the aeronautical activity for which it was designed to apply? For example, the minimum space required for repair station might not be relevant to an air taxi operation. Avoid unreasonable standards by selecting elements that accurately reflect the nature of the aeronautical activity in question.

e. **New versus Existing Business Operators.** Airport sponsors are encouraged to develop generic minimum standards in advance of receiving a request to conduct business at the airport, and to review them regularly, revising where necessary to maintain meaningful standards that are applicable to current airport operations. Once the sponsor receives an application for a proposed aeronautical business, the sponsor must ascertain whether the existing minimum standards can be used on the new business. Some points of concern are as follows:

(1) Was the standard designed to address the needs of pre-existing businesses already on the airport, or is it generic in nature?

(2) Is the minimum standard relevant to the activity the new applicant proposes to conduct?

(3) Was the minimum standard created as a contractual agreement between the existing operator and the airport sponsor so that the performance of the subject standard would result in conduct or expenses that exceed minimum standard requirements?

(4) Was the minimum standard developed in reaction to a business operator's voluntary agreement to make the improvement? If so, it may be unreasonable to impose the same minimum standard on the new business applicant.

(5) Has the airport either improved or declined in its revenue generating prospects since the time the minimum standards were developed?

**NOTE:** Minimum standards can be modified to reflect the airport's desire to learn from experience and to be watchful for improvements in the way it does business in order to protect the public interest. Caveat: While minimum standards can be flexible, an airport sponsor may elect to forgo frequent changes in order to avoid the appearance of engaging in preferential treatment.

9. THROUGH 10.    RESERVED.

SECTION 3. Guidance on Developing Minimum Standards.

**11. SAMPLE QUESTIONS.** As a guide for the airport sponsor, the following series of questions are provided to address some of the various types of specific services or activities frequently offered to the public:

   a. **Fuel and Oil Sales.** The on-airport sale of fuel and oil requires numerous considerations that include, but are not limited to, the physical requirements for a safe and environmentally sound operation. Recommended considerations are listed below.

      (1) Where on the airport will the fuel/oil receptacle be constructed?

      (2) Will the receptacle be installed above or below ground?

      (3) Has the decision to use this location factored in the type of aircraft that will be using the airport?

      (4) Will the fuel container have sufficient holding capacity to refuel the largest aircraft likely to be serviced by this airport?

      (5) Can the selected fueling equipment pump fuel with sufficient force to service the largest aircraft likely to be serviced within a specified maximum time frame?

   b. **Personnel Requirements.** A business operator's need for personnel is dictated by the size of the airport and the public demand for its service. In all instances, an airport sponsor will be well advised to ensure that business operators provide sufficient personnel to run their operation safely and efficiently, as this factor can greatly affect the level and quality of service provided by the business operator.

      (1) How many full-time employees should be scheduled for each day of the week?

      (2) What requirements, if any, will be imposed upon on-airport businesses to have employees participate, for a minimum number of hours, in fire, rescue, or other emergency training, when the training is made available to tenants by the sponsor.

   c. **Airport And Passenger Services.** This is a necessary consideration in those instances where the airport has business operators engaged in air transportation or air cargo activities:

      (1) Which of the following equipment or services will be provided by the business operator?

         (a) Energizers, parking areas, towing equipment, starters, tie-down areas, jacks, office space, oxygen, compressed air, tire repair, etc., are among such equipment and services.

         (b) Provide a list of other equipment and supplies that may be required to serve the aircraft using the airport.

      (2) What considerations have been made regarding passenger conveniences and services?

         (a) Passenger loading steps, sanitary rest rooms, heated waiting rooms, public telephones, etc., are among such considerations.

         (b) Have the needs of the crews of itinerant aircraft been considered.

         (c) Have the utilities or services that are provided for the benefit of passengers or itinerant crew members been conveniently located?

   d. **Airport Upkeep and Maintenance.** The question of what constitutes special airport upkeep and maintenance provisions is best answered by considering the location of the airport and the amount of usage it receives. Airports, by their nature, will be affected strongly by the seasonal changes at their location. An airport located in Denver or Utah will have significant concerns with snow removal, unlike an airport located in Florida. A need for a minimum standard in this area will most likely relate to the safety of airport patrons and the operation of aircraft.

      (1) In the event of snowfall, what provisions have been made for snow removal-- business operator or independent contractor?

      (2) If snow removal is provided by an independent contractor, what training will be provided, and what type of equipment will be used?

      (3) Does the contract between the sponsor and the contractor clearly provide which areas of the airport are required to be cleared of snow and

deiced? What provisions are made to address heavily traveled areas or emergency parking areas?

(4) What provisions, if any, have been made for fire detection and firefighting equipment?

e. **Flight Training Activities.** On-airport flight training can be provided by the airport sponsor/owner or by a business operator. The minimum standards imposed on flight instruction operations may take the following information into consideration:

(1) What arrangements have been made for the office space the school is required to maintain under 14 C.F.R. §141.25? For example, what is the minimum amount of classroom space that the business operator must obtain?

(2) Will flight training be provided on a full-time or part-time basis?

(3) What type of aircraft and how many will be available for training at the on-airport location?

(4) What provisions have been made for the storage and maintenance of the aircraft?

(5) Is the aircraft proposed by the business operator compatible to the type of training provided?

(6) What type of training will the business operator provide?

(7) What provisions will be made for rest rooms, briefing rooms, and food service?

f. **Aircraft Charter and Taxi.** As a general rule, the public's need or demand for air charter or taxi service dictates the nature of service that should be provided. In deciding what the appropriate minimum standards should be for air-charter and air-taxi services, the FAA recommends the following considerations:

(1) What is the demand for the proposed service?

(2) What type of aircraft will be used by the business operator?

(3) What arrangements have been made to assure that the business operator will provide for the continued availability of suitable aircraft located at the airport?

(4) Does the business operator have sufficient capital to start the business? Has the business operator obtained the necessary insurance?

(5) Has the business operator complied with all applicable laws, regulations, and rules, whether Federal, state, or local?

(6) What arrangements have been made for passenger shelter, rest rooms, public telephone, etc.? Are these services already provided by another on-airport business? If so, is there a good reason to duplicate the service?

(7) What arrangements have been made for passenger check-in, ticketing, and luggage handling?

(8) Will provisions need to be made for ground transportation?

g. **Aircraft Engine/Accessory Repair and Maintenance.** The business applicant for an on-airport repair station is subject to several regulatory requirements under 14 C.F.R. § 145. Depending on the type and size of repair station the business applicant is proposing, the following questions may provide helpful guidelines:

(1) What qualifications will be required of the repair station employees? Typically, the holder of a domestic repair station certificate must provide adequate personnel who can perform, supervise, and inspect the work for which the station is rated.

(2) What repair station ratings does the business applicant hold?

(3) What types of services will the repair station offer to the public? These services can vary from repair to maintenance of aircraft and include painting, upholstery, etc.

(4) Can the business applicant afford to secure sufficient airport space to provide facilities so that work being done is protected from weather elements, dust, and heat? The amount of space required will be directly related to the largest item or aircraft to be worked under the operator's rating.

(5) Will the workers be protected so that the work will not impair their physical efficiency?

(6) Will maintenance operations have efficient and proper facilities to carry out the repair, inspection, alteration or assembly intended for that area?

(7) Will suitable shop space exist to provide a place for machine tools and equipment in sufficient proximity to where the bench work is done so as to facilitate the safe and efficient performance of the maintenance in question?

(8) How will the business applicant control the temperature and humidity in the workspace area?

(9) What amount of space will be necessary for the storage of standard parts, spare parts, raw materials, etc.?

(10) What type of lighting and ventilation will the work areas have? Will the ventilation be adequate to protect the health and efficiency of the workers?

(11) If the business applicant is the holder of an airframe rating, what is proposed with regard to housing at least one of the heaviest aircraft within the weight class of the rating the applicant holds?

(12) If spray painting, cleaning, or machining is performed, has sufficient distance between the operations performed and the testing operations been provided so as to prevent adverse affects on testing equipment?

h. **Skydiving.** Skydiving is an aeronautical activity. Any restriction, limitation, or ban on skydiving on the airport must be based on the grant assurance which provides that the sponsor may prohibit or limit aeronautical use for the safe operation of the airport, or when necessary to serve the civil aviation needs of the public. The following questions present reasonable factors the sponsor might contemplate when developing minimum standards that apply to skydiving:

(1) Will this activity present or create a safety hazard to the normal operations of aircraft arriving or departing from the airport?

(2) Can a drop zone be safely established within the boundaries of the airport?

(3) What reasonable time periods can be designated for jumping?

(4) What is a reasonable fee that the jumpers and/or their organizations can pay for the privilege of using airport property?

(5) Will an FAA airspace study be necessary to determine the efficiency and utility of the airport when considering the proposed activity?

(6) Has a reasonable amount of liability insurance, naming the airport as an additional insured party, been obtained by the jumpers and/or their organizations that is reasonably related to the airport's liability exposure and will not be unjustly discriminatory?

i. **Ultralight Vehicles.** The operation of ultralights is an aeronautical activity and must, therefore, be generally accommodated on airports that have been developed with Federal airport development assistance. However, an airport sponsor is not required to allow such operation on the designated runways if they cannot be operated safely in the designated area. Airport sponsors are encouraged to consider some of the following questions:

1 Can ultralight aircraft be operated safely on the airport?

2. Will this activity present or create a safety hazard to the normal operations of aircraft arriving or departing from the airport?

3. Will an FAA airspace study be necessary to determine the efficiency and utility of the airport when considering the proposed activity?

j. **Practical Considerations.** Many communities choose to state their standards only in actual use agreements at the time of execution. While standards implemented in this manner can be effective, they also render the airport sponsor vulnerable to the challenges of prospective business operators on the grounds that they are not objective. FAA encourages sponsors to periodically publish its minimum standards. Arguably, a certain amount of flexibility exists in the timing of the implementation of minimum standards. The standards can be raised or lowered as new tenants arrive or existing tenants leave. But, the constant juggling of standards will create the appearance that certain operators may be receiving preferential treatment. As such, it is recommended that the airport sponsor exercise some reticence before changing already-published standards. Changes to the standards can be most

easily facilitated by demonstrating to the business operators that the sole purpose for the change is to improve the quality of service to the public. An airport sponsor can provide for periodic reviews of the business operator's minimum standards which would insure that the established minimum standards continue to be reasonable through the passage of time and as businesses and business operators change.

**12. THROUGH 15. RESERVED.**

## SECTION 4. THE ENFORCEMENT PROCESS.

**16. AIRPORT COMPLIANCE PROGRAM.** The FAA discharges its duty for ensuring airport sponsor compliance with Federal grant obligations through its contractually-based Airport Compliance Program. The contractual nature of the Program arises from requirements in the Airport and Airway Improvement Act of 1982, as amended, 49 U.S.C. Section 47101, *et seq.*, and the airport sponsor's agreement to comply with the assurances contained in the grant agreement in exchange for Federal airport development assistance. Assurances are designed to achieve a system of safe and properly maintained airports that are operated in a manner that protects the public's interest and investment in aviation.

    a. Under the Airport Compliance Program, any person who believes that an airport sponsor may be in noncompliance with an assurance may register their concerns with the local FAA Airports District Office (ADO). ADO personnel are then charged with investigating the allegations of noncompliance on an informal basis, and, in the event that the allegations are confirmed, attempting to persuade the airport sponsor to come back into compliance. Should this measure fail, the concerned party may then file a formal complaint under 14 CFR Part 16, assuming certain requirements are met (i.e., attempts to resolve informally).

    b. Complaints filed with the FAA under 14 CFR Part 16 are subject to an administrative review which entails consideration of the complainant's allegations, the airport sponsor's response to the allegations, and any unique circumstances at the airport in question. A decision will be issued by the FAA to inform the parties of its determination. A determination against the airport sponsor or owner can result in action by the FAA such as the withholding of current grant fund payments or the denial of future applications for grant assistance. A dissatisfied party can appeal the FAA's final determination to the U.S. Court of Appeals.

**17. THROUGH 20. RESERVED.**

## APPENDIX 1. DEFINITIONS.

The following are definitions for the specific purpose of this AC.

a. **Aeronautical Activity.** Any activity that involves, makes possible, or is required for the operation of aircraft, or which contributes to or is required for the safety of such operations.

NOTE: Activities within this definition, commonly conducted on airports, include but are not limited to the following: air taxi and charter operations, scheduled and non-scheduled air carrier services, pilot training, aircraft rental and sightseeing, aerial photography, crop dusting, aerial advertising and surveying, aircraft sales and services, aircraft storage, sale of aviation petroleum products, repair and maintenance of aircraft, sale of aircraft parts, parachute or ultralight activities and any other activities which, because of their direct relationship to the operation of aircraft, can appropriately be regarded as an aeronautical activity.

b. **Assurance.** An assurance is a provision contained in a Federal grant agreement to which the recipient of Federal airport development assistance has voluntarily agreed to comply with in consideration of the assistance provided.

c. **Exclusive Right.** A power, privilege, or other right excluding or debarring another from enjoying or exercising a like power, privilege, or right. An exclusive right can be conferred either by express agreement, by the imposition of unreasonable standards or requirements, or by any other means. Such a right conferred on one or more parties, but excluding others from enjoying or exercising a similar right or rights, would be an exclusive right.

d. **Federal Airport Obligations.** All references to a Federal grant program, Federal airport development assistance, or Federal aid contained in this AC are intended to address obligations arising from the conveyance of land or from grant agreements entered under one of the following Acts.

(1) **Surplus Property Act of 1944 (SPA),** as amended, 49 U.S.C. Section 47151-153. Surplus property instruments of transfer were, and are, issued by the War Assets Administration (WAA) and it's successor, the General Services Administration (GSA). However, Public Law (PL) 81-113 specifically imposes upon FAA the sole responsibility for determining and enforcing compliance with the terms and conditions of all instruments of transfer by which surplus airport property is or has been conveyed to non-federal public agencies pursuant to the Surplus Property Act of 1944. Under 50 U.S.C § 4715 et seq., property can be conferred for airport purposes if the FAA determines that the property is essential, suitable, or desirable for the development, improvement, operation, or maintenance of a public airport. Recipients of surplus property grants are subject to the FAA prohibition against exclusive rights. 14 C.F.R. Part 155 contains procedures which must be followed to release airport property from surplus property disposal restrictions contained in the conveyance instrument. Owners of surplus property airport property are advised to consult this regulation whenever changes in property use are being contemplated.

(2) **Federal-Aid Airport Program (FAAP).** This grant-in-aid program administered by the agency under the authority of the Federal Airport Act of 1946, as amended, assisted public agencies in the development of a nationwide system of public airports. The Federal Airport Act of 1946 was repealed and superseded by the Airport and Airway Act of 1970.

(3) **Airport Development Aid Program (ADAP).** This grant-in-aid program administered by the FAA under the authority of the Airport and Airway Development Act of 1970, as amended, assisted public agencies in the expansion and substantial improvement of the Nation's airport system. The 1970 Act was repealed and superceded by the Airport and Airway Improvement Act of 1982 (AAIA)

(4) **Airport Improvement Program (AIP).** This grant-in-aid program administered by the FAA under the authority of the Airport and Airway Improvement Act of 1982, 49 U.S.C Section 47101, et seq, assists in maintaining a safe and efficient nationwide system of public-use airports that meet the present and future needs of civil aeronautics

f **Land Use Identification Plan.** A scaled, dimensional layout of the entire airport property. The primary function of the plan is to indicate the current and proposed use for each identifiable segment of property and activities, as well as the

airport sponsor's intentions for the future allocation of airport property. The plan should identify areas dedicated to aeronautical activities and services such as fuel storage, general aviation, passenger loading, air freight and cargo handling, common use aircraft parking, and public automobile parking. Additionally, the plan should identify areas dedicated to future expansion. It is recommended that the aeronautical services area be platted because this will facilitate the efficient and expeditious reference to plat sections when dealing with the grant of leasehold rights.

g. **Grant agreement.** As used in this AC, a grant agreement represents any agreement made between the FAA (on behalf of the United States) and an airport sponsor, whether it be for the grant of Federal funding or a conveyance of land, each of which the airport sponsor agrees to use for airport or aeronautical purposes.

h. **Minimum standards.** The qualifications or criteria which may be established by an airport owner as the minimum requirements that must be met by businesses engaged in on-airport aeronautical activities for the right to conduct those activities.

i. **Proprietary Exclusive.** The owner of a public-use airport (public or private owner) may elect to provide any or all of the aeronautical services needed by the public at the airport. In fact, the statutory prohibition against exclusive rights does not apply to these owners and they may exercise but not grant the exclusive right to conduct any aeronautical activity. However, the sponsor that elects to engage in a proprietary exclusive must use its own employees and resources to carry out its venture. An independent commercial enterprise that has been designated as agent of the owner may not exercise nor be granted an exclusive right.

j. **Public-use airport.** Means (A) a public airport; or (B) a privately-owned airport used or intended to be used for public purposes that is (i) a reliever airport; or (ii) determined by the Secretary to have at least 2,500 passenger enplanements each year and to receive scheduled passenger aircraft service.

k. **Public Airport.** Means an airport used or intended to be used for public purposes (A) that is under the control of a public agency; and (B) of which the area used or intended to be used for the landing, taking off, or surface maneuvering of aircraft is publicly owned.

l. **Private-use airport.** A publicly-owned or privately-owned airport not open to the public or operated for the public benefit.

m. **Specialized aviation service operation (SASO).** An aeronautical business that offers a single or limited service. Examples of these specialized services may include aircraft flying clubs, flight training, aircraft, airframe and powerplant repair/maintenance, aircraft charter, air taxi or air ambulance, aircraft sales, avionics, instrument or propeller services, or other specialized commercial flight support business.

n. **Self-Service Fueling.** Fueling of an aircraft by the pilot using fuel pumps installed for that purpose. The fueling facility may or may not be attended by the owner/operator of such a facility. The use of this type of facility is not to be considered to be self-service.

o. **Self-service.** Fueling or maintenance of an aircraft on airport property, performed by the aircraft owner or operator in accordance with the airport's reasonable standards or requirements and using fuel obtained by the aircraft owner from the source of his/her preference.

Part 43 of the Federal Aviation Regulations (FAR) permits the holder of a pilot certificate to perform specific types of preventative maintenance on any aircraft owned or operated by the pilot. Some examples of work considered as preventative maintenance are as follows:

(1) Removal, installation, and repair of landing gear tires.

(2) Replacing elastic shock absorber cords on landing gear.

(3) Servicing landing-gear shock struts by adding oil, air, or both.

(4) Servicing landing-gear wheel bearings, such as cleaning and greasing.

(5) Replacing defective safety wiring or cotter keys.

(6) Lubrication not requiring disassembly other than removal of nonstructural items such as cover plates, cowlings, and fairings.

(7) Making simple fabric patches not requiring rib stitching or the removal of structural parts or control services. In the case of balloons, the making of small fabric repairs to envelopes (as defined in and in accordance with, the balloon manufacturers' instructions) not requiring load tape repair or replacement.

(8) Replenishing hydraulic fluid in the hydraulic reservoir.

(9) Refinishing decorative coating of fuselage, balloon baskets, wings, tail group surfaces (excluding balanced control surfaces), fairings, cowlings, landing gear, or cabin or cockpit interior, when removal or disassembly of any primary structure or operating system is not required.

(10) Applying preservative or protective material to components where no disassembly of any primary structure or operating systems is involved and where such coating is not prohibited or is not contrary to good practices.

(11) Repairing upholstery and decorative furnishings of the cabin, cockpit, or balloon basket interior when the repairing does not require disassembly of any primary structure or operating system, interfere with an operating system, or affect the primary structure of the aircraft.

(12) Making small, simple repairs to fairings, nonstructural cover plates, cowlings, and small patches and reinforcements, but not changing the contour so as to interfere with proper airflow.

(13) Replacing side windows where that work does not interfere with the structure or any operating system such as controls, electrical equipment, etc.

(14) Replacing safety belts.

(15) Replacing seats or seat parts with replacement parts approved for the aircraft, not involving disassembly of any primary structure or operating system.

(16) Troubleshooting and repairing broken circuits in landing-light wiring circuits.

NOTE: See also 14 CFR Part 43, *Maintenance, Preventive Maintenance, Rebuilding, and Alteration*.

o. **Sponsor.** A local government body (municipal or state) or a private entity obligated to the Federal government to comply with the assurances contained in grant agreements or property conveyance instruments. A sponsor may be an entity that exists only to operate the airport, such as an airport authority established by state or local law. For the purposes of this AC, the term airport sponsor or airport owner is used interchangeably when discussing grant obligated airports.

p. **Through-the-fence operation.** A commercial activity that is directly related to the use of the airport but is developed or located off airport property beyond the sponsor's control. It also includes services performed on the airport by individuals or companies which may or may not have a lease or permit from the sponsor to perform such services.

2. **THROUGH 5. RESERVED.**