# ORIGINAL



FILED
HARRISBURG, PA

SEP 2000

MARY E. D'ANDREA, CLERK
Per _____ Deputy Clerk

**IN THE**

**UNITED STATES DISTRICT COURT**

**MIDDLE DISTRICT OF PENNSYLVANIA**

---

**No. 1:CV-00-0660**

---

**STAMBAUGH'S AIR SERVICES, INC.,**

**v.**

**SUSQUEHANNA AREA REGIONAL AIRPORT AUTHORITY, BAA HARRISBURG, INC., DAVID FLEET, individually, DAVID HOLDSWORTH, individually, and DAVID C. McINTOSH, individually**

---

**DEFENDANTS' REPLY TO BRIEF IN SUPPORT OF OBJECTIONS OF STAMBAUGH'S AIR SERVICE, INC. TO THE REPORT AND RECOMMENDATION OF THE MAGISTRATE JUDGE TO GRANT IN PART DEFENDANTS' MOTION TO DISMISS**

---

**RHOADS & SINON LLP**
**Dean F. Piermattei, Esquire**
**Timothy J. Nieman, Esquire**
**Susan E. Schwab, Esquire**
**One South Market Square**
**P. O. Box 1146**
**Harrisburg, PA 17108-1146**
**(717) 233-5731**
**Attorneys For Defendants**

# IN THE UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF PENNSYLVANIA

STAMBAUGH'S AIR SERVICE, INC.,     :
                                      :

          Plaintiff           :

          v.                :        CASE NO. 1:CV-00-0660

                                        :

SUSQUEHANNA AREA REGIONAL     :        Judge Yvette Kane
AIRPORT AUTHORITY, BAA          :        Magistrate Judge J. Andrew Smyser
HARRISBURG, INC., DAVID FLEET,   :
individually, DAVID HOLDSWORTH,  :
individually, and DAVID C. McINTOSH, :
individually,                   :
          Defendants      :
.. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. :

## DEFENDANTS' REPLY TO BRIEF IN SUPPORT OF OBJECTIONS OF STAMBAUGH'S AIR SERVICE, INC. TO THE REPORT AND RECOMMENDATION OF THE MAGISTRATE JUDGE TO GRANT IN PART DEFENDANTS' MOTION TO DISMISS

No matter how many times Plaintiff Stambaugh's Air Service, Inc.'s ("Stambaugh's") attempts to refashion its arguments, the Complaint continues to say one thing – that Stambaugh's government contract to provide Fixed Base Operator ("FBO") services at the Harrisburg International Airport ("HIA") was not renewed. For the reasons set forth herein, Magistrate Judge Smyser correctly found that Stambaugh's due process (Count I), Pennsylvania constitutional (Counts II and IV), conspiracy (Count V) and Municipality Authorities Act (Count

VI) claims should be dismissed and his Report and Recommendation should be approved and adopted.

## I.   PROCEDURAL HISTORY

On or about April 10, 2000, Plaintiff Stambaugh's initiated this action against Susquehanna Area Regional Airport Authority ("SARAA"), BAA Harrisburg, Inc. ("BAA"), David Fleet, David Holdsworth and David C. McIntosh (collectively referred to herein as "Defendants"). In its Complaint, Stambaugh's alleges counts for violation of the Due Process Clause of the United States Constitution (Count I), violation of the Due Process Clause of the Pennsylvania Constitution (Count II), violation of the Equal Protection Clause of the United States Constitution (Count III), violation of the Equal Protection Clause of the Pennsylvania Constitution (Count IV), conspiracy (Count V), violation of the Pennsylvania Municipality Authorities Act (Count VI) and tortious interference with existing contractual relationships (Count VII). The Defendants filed their Motion to Dismiss on May 19, 2000.

On August 3, 2000, Magistrate Judge Smyser issued his Report and Recommendation on the Defendants' Motion to Dismiss. Magistrate Judge Smyser found that Stambaugh's due process, Pennsylvania constitutional, conspiracy and Municipality Authorities Act claims should be dismissed. Stambaugh's now objects to Magistrate Judge Smyser's decision.

## II.   FACTUAL BACKGROUND

Wading through the 237 paragraphs of Stambaugh's Complaint reveals only a handful of relevant facts. The heart of Stambaugh's argument is that the Defendants, all alleged

- 2 -

government actors, improperly awarded an FBO contract at IIIA to Stambaugh's competitor AERO Services International Incorporated ("AERO"). Stambaugh's attempts to transform its disappointment at not receiving the FBO contract into a federal civil rights action based upon the following facts and allegations.

Stambaugh's is a current tenant at HIA where it repairs and maintains airplanes. (Complaint, ¶9). Until recently, Stambaugh's, in addition to the repair and maintenance services it currently provides, also provided FBO services at HIA. (Complaint, ¶9). These FBO services included fueling, maintenance and cargo handling services. (Complaint, ¶9). These services were provided from a hangar that Stambaugh currently leases from SARAA. (Complaint, ¶10).

SARAA is a municipal authority that owns HIA. (Complaint, ¶2). SARAA has retained BAA to manage HIA. (Complaint, ¶3). Mr. Fleet is the Airport Director of HIA and is employed by BAA. (Complaint, ¶4). Mr. Holdsworth is SARAA's Executive Director and Mr. McIntosh is SARAA's Chairman of the Board of Directors. (Complaint, ¶¶5, 6).

The genesis of this dispute is Stambaugh's failure to obtain a renewal of its contract to continue providing FBO services at HIA. Stambaugh's hangar lease expired on January 19, 2000. (Complaint, ¶16). During negotiations to extend the lease, which extension was ultimately granted, the Defendants refused to offer Stambaugh's a lease that would allow it to continue providing FBO services at HIA. (Complaint, ¶¶19, 20). Likewise, on October 5, 1999, SARAA issued a Request for Qualifications from FBO service providers (the "RFQ").

(Complaint, ¶38). Stambaugh's now complains that the FBO contract, which is required for an entity to perform FBO services at HIA, was improperly awarded to another FBO provider.[1]

Stambaugh's alleges that it should have received an FBO contract because it was the only bidder that complied with the requirements of the RFQ. (Complaint, ¶¶39-49). The Complaint goes on to allege that the Defendants contacted Stambaugh's customers prior to the final vote on the FBO contract award to inform them that Stambaugh's would not be renewed as an FBO provider. (Complaint, ¶¶52, 53). Stambaugh's failure to obtain the FBO contract provides the sole basis for all of its claims against the Defendants.

Stambaugh's due process claims recite that Stambaugh's has a constitutionally protected interest in its ability to continue to engage in FBO services at HIA. (Complaint, ¶¶75, 98). Likewise, all of Stambaugh's due process allegations – except those dealing with alleged violations of the Federal Aviation Act – are premised entirely upon Stambaugh's inability to provide FBO services at HIA, in other words, its failure to obtain an FBO contract. (Complaint, ¶¶77-78, 81-96, 100-101, 103-116).

Stambaugh's conspiracy claim focuses entirely on its failure to obtain an FBO contract and the Defendants' alleged conspiracy to not award an FBO contract to Stambaugh's. (Complaint, ¶¶177-202). Stambaugh's Municipal Authorities Act claim focuses on the award of the FBO contracts as well. (Complaint, ¶¶208-225).

---

[1] Interestingly, throughout the Complaint Stambaugh's refers to AERO as the sole FBO provider that was awarded a contract through the RFQ process and that awarding the FBO contract to one entity violates the Federal Aviation Act. However, in Paragraphs 62 and 157 of the Complaint, Stambaugh's acknowledges that there are currently two FBO providers at the airport, Piedmont Hawthorne and AERO. Thus, Stambaugh's claim that the Defendants have allegedly violated the FAA's sole FBO provider requirements is without basis because, as it acknowledges, there are at least two FBO providers operating at HIA

### III.    QUESTIONS PRESENTED

I.    Whether Magistrate Judge Smyser correctly determined that claims for the violation of a business entity's substantive due process rights premised entirely on the business entity's failure to obtain a government contract should be dismissed for failure to state a claim?

        Suggested Answer:  Yes.

II.    Whether Magistrate Judge Smyser correctly determined that a business entity's claims for violation of the Pennsylvania Constitution should be dismissed because there is no private right of action for such violations?

        Suggested Answer:  Yes.

III.    Whether Magistrate Judge Smyser correctly determined that a business entity's conspiracy claim should be dismissed where the claim is pled as a separate tort and the alleged conspirators are employees and agents of the entity that is alleged to have committed the tort?

        Suggested Answer:  Yes.

IV.    Whether Magistrate Judge Smyser correctly determined that a business entity's claim under the Pennsylvania Municipal Authorities Act should be dismissed where there is no allegation of competition by the municipal authority?

        Suggested Answer:  Yes.

### IV.    ARGUMENT

#### A.    STANDARD OF REVIEW

Pursuant to Federal Rule of Civil Procedure 12(b)(6), a complaint should be dismissed for failure to state a claim where it appears that the plaintiff can present no set of facts that would entitle him or her to relief.  Labalokie v. Capitol Area Intermediate Unit, 926 F. Supp. 503, 506 (M.D. Pa. 1996) (citing Conley v. Gibson, 355 U.S. 41, 45-46 (1957)).  In reaching this decision,

a court must consider all well pleaded allegations as true and in the light most favorable to the plaintiff.  Id. (citing Colburn v. Upper Darby Township, 838 F.2d 663, 665-66 (3d Cir. 1988)).

**B.    MAGISTRATE JUDGE SMYSER CORRECTLY DETERMINED THAT STAMBAUGH'S FAILED TO ALLEGE A CONSTITUTIONALLY PROTECTED PROPERTY INTEREST AND THUS STAMBAUGH'S DUE PROCESS CLAIM MUST BE DISMISSED**

**1.    Stambaugh's Has Not Pled a Substantive Due Process Property Right**

Try as hard as it may to repackage its equal protection argument, the fact remains that in its Complaint Stambaugh's alleges that it "has a constitutionally protected interest in its ability to continue to engage in FBO and maintenance operations at HIA."    (Complaint, ¶75). Additionally, all of the damages alleged by Stambaugh's stem from either Stambaugh's inability to provide FBO services at HIA or the Defendants' alleged violation of the Federal Aviation Act. Even the "Introductory Statement" to Stambaugh's Complaint states that "SARAA, BAA, Fleet, Holdsworth and McIntosh conspired together to violate Stambaugh's federal and state constitutional rights by depriving it of its right to provide FBO services at HIA."  As found by Magistrate Judge Smyser, Stambaugh's failure to receive a government contract to operate as an FBO provider is not a constitutionally protected property interest, and accordingly, Stambaugh's due process claim must be dismissed.

In order to survive a motion to dismiss on a substantive due process claim, a plaintiff must allege that it was deprived, through government action, of a constitutionally protected property interest.  See Labalokie v. Capitol Area Intermediate Unit, 926 F. Supp. 503, 508 (M.D. Pa. 1996) (stating "[t]he deprivation of a property or liberty interest is a precondition to either a procedural or substantive due process claim."); Queen City Aviation, Inc. v. City of Allentown,

No. 91-7776, 1992 U.S. Dist. LEXIS 9042, *7 (E.D. Pa. June 5, 1992), aff'd 993 F.2d 225 (3d Cir. 1993)(attached hereto as Exhibit "A").  As found by Magistrate Judge Smyser, no such constitutionally protected property interest is a stake in this case.

It is well settled that there exists no constitutionally protected property interest in a government contract unless the contract involves welfare benefits, tenure or is only terminable for cause. Linan-Faye Constr. Co., Inc. v. Housing Auth. of the City of Camden, 49 F.3d 915, 932 (3d Cir. 1995); Unger v. National Residents Matching Program, 928 F.2d 1392, 1393 (3d Cir. 1991); see also Independent Enter., Inc. v. Pittsburgh Water & Sewer Auth., 103 F.3d 1165, 1177-1180 (3d Cir. 1997). This rationale extends to the failure of a governmental entity to renew a contract or the government's termination of a contract.  See Queen City, 1992 U.S. Dist. LEXIS 9042, at *6; Linan-Faye, 49 F.3d at 932. Likewise in Labalokie, Judge Rambo has recognized that "[i]t is settled law that there can be no property interest in obtaining future government contracts. . . ." Labalokie, 926 F. Supp. at 508. The reason for this rule, as stated by the Third Circuit, is that "a wholesale federalization of state public contract law seems far afield from the great purpose of the due process clause." Unger, 928 F.2d at 1398. This standard was recently relied upon by the United States District Court for the Eastern District of Pennsylvania to dismiss a case factually identical to that presented here.

The plaintiff in the Queen City Aviation case was, pursuant to a 10-year lease, an FBO provider at the Queen City Municipal Airport located in Allentown, Pennsylvania.  1992 U.S. Dist. LEXIS 9042, at *1. After the lease expired in May 1991, the plaintiff continued as an FBO provider on a month-to month basis until February 1992 when the lease was terminated.  Id. at *2. Prior to terminating the plaintiff's lease, the airport issued a request for proposals to provide

FBO services at the airport and awarded the contract to plaintiff's competitor. Id. at *3. In light

of its inability to provide FBO services at the airport, plaintiff brought a Section 1983 claim

against the airport, the City of Allentown and a number of their employees for alleged violations

of plaintiff's rights to due process and equal protection. Id. at *4.

The Court dismissed the plaintiff's due process and equal protection claims. Id. at *1. In

reaching this decision, the Court noted:

> Plaintiff's complaint is nothing more than the expression of its
> disappointment that city officials, after inviting bids, decided to
> offer its franchise, its grant of an exclusive lease, to someone else.
> The Civil Rights laws were never intended to establish liability
> under the current circumstances.  We find that plaintiff's civil
> rights claims are nothing more than an attempt to federalize a
> routine dispute with local officials over municipal planning or
> procedures, i.e., bidding practices.

Id. at *6.  In addressing the due process and equal protection claims in more detail, the Court

continued:

> In addition, from the complaint, it appears that plaintiff merely had
> a lease for a certain term, which expired, and thereafter the lease
> was month to month. We know of no requirement that the City of
> Allentown, as the landlord of the airport, must even consider
> entering into a new lease with plaintiff, or that it structure the
> Request for Proposals in a manner acceptable to or approved by
> plaintiff.  . . .  Absent that, there is no constitutional interest
> violated by the City of Allentown's decision to seek bids from
> competing companies and to choose one of plaintiff's competitors.

Id. at *9.

Likewise, in the instant action there is no constitutional interest violated by the

Defendants' decision to seek bids from competing companies and to choose one of Stambaugh's

competitors for an FBO contract. This action is nothing more than an attempt by Stambaugh's, a

disappointed bidder, to transform its disappointment at not being awarded an FBO contract into a

federal civil rights action and thus federalize a routine disappointed bidder claim.[2]  Since, as a matter of law there is no constitutionally protected right in government contracts or in obtaining future government contracts, Stambaugh's due process claim cannot proceed.

In its Brief in Support of Objections, Stambaugh's, realizing that the precedent cited above bars its claim tries once again to reinvent its property right.  It does this in order to attack the Report and Recommendation and survive Defendants' Motion to Dismiss.  Stambaugh's concedes that the Third Circuit's decision in Independent Enter. Inc. v. Pittsburgh Water and Sewer Auth., 103 F.3d 1165 (3d Cir. 1997) is dispositive of its earlier claim that it has a constitutionally protected property interest in being awarded the contract for the AMP Hangar. (Stambaugh's Brief in Support of Objections, p. 6).  Now, conceding that there is no property right in a government contract, Stambaugh's focuses on its lease contract with SARAA and posits that what it really has is a constitutionally protected property right in not being arbitrarily denied "permission" to provide FBO services from the space it leases at HIA.  Stambaugh's Brief alludes that the Magistrate Judge failed to ascertain the subtleties of this property right, and therefore the Report and Recommendation should be rejected.

Stambaugh's argument is without foundation.  First, Stambaugh's has not been denied "the right" or "permission" to provide FBO services at HIA; it's contract expired and it simply has not been renewed.  As stated above, there is no constitutional interest violated by the Defendants' decision to not renew Stambaugh's FBO contract and to seek bids from competing

---

[2] Pennsylvania law provides redress for taxpayers that claim they were injured because a governmental entity improperly awarded a government contract.  See, e.g., American Totalisator Co., Inc. v. Seligman, 489 Pa. 568, 414 A.2d 1037 (1980).  As the Court in Queen City Aviation stated on reconsideration, "[i]f plaintiff wishes to challenge the decision making of the defendants, a state court would provide a better forum . . . ."  1992 U.S. Dist. LEXIS 11456, at*4. (Attached hereto as Exhibit "B").

companies. See Queen City Aviation, Inc. v. City of Allentown, no. 91-7776, 1992 U.S. Dist. LEXIS 9042 *7 (E.D. Pa. June 5, 1992), aff'd 993 F.2d 225 (3d Cir. 1993). No matter how many ways Stambaugh's attempts to repackage its due process claim, Stambaugh's cannot avoid the fact that its failure to obtain a government contract is the only reason that it cannot provide FBO services at HIA.

Second, the decision not to renew Stambaugh's contract was a business decision made by Defendants' as a contracting party. It was not, as Stambaugh's argues, analogous to a governmental action undertaken by the state in its role as a regulator, such as those actions at issue in the land use cases cited by Stambaugh's.[3] The land use cases cited by Stambaugh's all involved governmental decisions made in the context of implementing or administering zoning laws and did not involve the non-renewal of a contract such as the case at bar.[4] Moreover, the fact that some of the interests at stake in the land use cases were leases does not serve to bring the facts of the instant case within the purview of the type of governmental decisions made in the land use cases.

Stambaugh's points to no case law where a governmental entity's decision regarding the renewal of a contract was held to be a property right worthy of constitutional protection. Moreover, Stambaugh's complains that the decision was arbitrary; however, case law is clear that even the breach of a contract by a governmental entity does not give rise to a constitutional

---

[3] Addressing Stambaugh's liberty interest argument, the Magistrate Judge identified the distinction between the governmental entity as regulator and the governmental entity as contracting party. "The state when acting in a governmental capacity of regulating persons' eligibility and suitability to practice their trade or profession gives rise to an application of due process principles and expectations whereas the state's contractual interactions with service providers do not." (Report and Recommendation, p. 10).

[4] See Woodward Estates, Ltd. v. Gretowski, 205 F.3d 118 (3d Cir. 2000) (involving denial of subdivision plan); DeBlasio v. Zoning Board of Adjustment, 53 F.3d 592 (3d Cir. 1995) (involving request for a use variance; Parkway Garage, Inc. v. City of Philadelphia, 5 F.3d 685 (3d Cir. 1993) (involving challenges to the City of Philadelphia's use of its police powers); Neiderhiser v. Borough of Berwick, 840 F.2d 213 (3d Cir. 1988) (addressing video business owner's challenge to zoning ordinance).

claim. See Unger v. National Residents Matching Program, 928 F.2d 1392 (3d Cir. 1991) (quoting "[t]hus, unless every breach of every public contract is to be actionable as a violation of constitutional rights, it is necessary to distinguish between "mere" contract rights and property rights created by contracts") (citing Yatvin v. Madison Metro. Sch. Dist., 840 F.2d 412 (7th Cir. 1988)); see also S&D Maintenance Co. v. Goldin, 844 F.2d 962, 965-67 (2d Cir. 1988) (hesitating to "constitutionalize contractual interests that are not associated with any cognizable status of the claimant beyond its temporary role as a government contractor").

In arguing that its property interest is similar to those asserted in the land use cases cited in support of its argument, Stambaugh's also misses the mark. All of these cases involved constitutionally fundamental property ownership interests and are therefore inapplicable here. See Independent Enter., Inc. v. Pittsburgh Water and Sewer Auth., 103 F.3d 1165, 1179 (3d Cir. 1997) (discussing the inapplicability of DeBlasio, Homar, Midnight Sessions and Neiderheiser to Independent's claim of a substantive due process property interest in a government contract).

Relying on the Independent decision, the Third Circuit recently emphasized that "a substantive due process claim grounded in an arbitrary exercise of government authority," such as Stambaugh's, "may be maintained only where the plaintiff has been deprived of a 'particular quality of property interest.'" Boyanowski v. Capital Area Intermediate Unit, 215 F.3d 396, 403 (3d Cir. 2000) (quoting Independent Enter., Inc., 103 F.3d at 1179).[5] Boyanowski involved allegations that a transportation contractor's property and liberty interests had been constitutionally violated by a governmental entity and its members who refused to contract with it. Similar to Stambaugh's claims, Mr. Boyanowski argued that the government officials acted in concert to deprive him of his substantive due process rights. Id.

---

[5] Accordingly, Stambaugh's argument that it has properly pled the arbitrary and irrational acts of Defendants and therefore deserves to survive a motion to dismiss is meaningless. Without a constitutionally protected property interest, the most artful of allegations must fail.

Although acknowledging that little guidance exists regarding what specific property interests are worthy of substantive due process protection, the Third Circuit has been clear that the infringed property interest must be fundamental and concrete.  Id.; see also Independent Enter., Inc., 103 F.3d at 1179-80.  Applying this reasoning to the claims of property interests in government contracts alleged in Boyanowski and Independent, the Third Circuit has had no trouble concluding that the alleged interests "[w]ere not the sort of fundamental interest[s] protected by substantive due process."  Boyanowski, 215 F.3d at 403; Independent Enter., Inc., 103 F.3d at 1180.

Thus, Stambaugh's claim of a constitutionally protected property interest in the award of the AMP Hangar contract and in the renewal of its lease to provide FBO services "bears 'little resemblance to the fundamental interests that previously have been viewed as implicitly protected by the Constitution.'"  Independent Enter., Inc., 103 F.3d at 1180 (citations omitted).  As discussed in Boyanowski, precedent on this issue has never been read to extend substantive due process protection to an individual's allegations of arbitrary governmental action regarding a governmental contract.  Boyanowski, 215 F.3d at 403.

### 2.  Stambaugh's Has Not Pled a Constitutionally Protected Liberty Interest

Magistrate Judge Smyser correctly decided that Stambaugh's claim of a liberty interest deprivation is without merit and must be dismissed.  In arguing against the Report and Recommendation, Stambaugh's reasserts the argument that its liberty interest has been compromised because Defendants have created an exclusive right regarding FBO services at HIA.  Further in the same paragraph, however, Stambaugh's contradicts this argument by admitting that both AERO and Peidmont, rather than a single operator, are providing FBO services at HIA.  In addition, therefore, to being factually unfounded, Stambaugh's "exclusive right" argument is legally misplaced.

First, whether the court can take judicial notice of the FAA's Advisory Circular regarding exclusive rights is irrelevant in the context of a substantive due process claim. It is well established that the "comprehensive enforcement scheme provided in the Federal Aviation Act manifests congressional intent to foreclose an action under §1983." Montauk-Caribbean Airways, Inc. v. Hope, 784 F.2d 91, 98 (2d Cir. 1986) (where the court granted a 12(b)(6) Motion to Dismiss plaintiff's 1983 claim that was based on the airport's refusal to grant plaintiff a year-round license to operate as an FBO provider and air carrier); see also Northeast Jet Center, Ltd. v. Lehigh-Northampton Airport Auth., 767 F. Supp. 672, 677 (E.D. Pa. 1991) (where the court, in relying upon Montauk held that a plaintiff cannot base its §1983 action on conduct alleged to be violative of the Federal Aviation Act). Instead, Stambaugh's "must look to the administrative agency responsible for the enforcement of these provisions."[6] Id. Thus, any allegation that Stambaugh's constitutional rights were violated by the Defendants' alleged failure to follow Section 47107(a)(4) of the Federal Aviation Act is of no consequence in connection with Stambaugh's 1983 claims. Id.; see also Defendants' Brief in Support of Motion to Dismiss at 7-8.

Additionally, contrary to Stambaugh's characterization, Stambaugh's has never been denied the "opportunity" to operate its FBO business at HIA. Stambaugh's has not been prevented or precluded from bidding on the AMP Hangar; it simply was not awarded the contract. Stambaugh's has not been prevented or precluded from leasing space at HIA or from operating as an FBO service provider up until the time its lease for providing such services was not renewed. Accordingly, Stambaugh's "denial of opportunity" argument is factually incorrect

---

[6] While Stambaugh's does allege FAA violations as a basis for its claims, it fails to mention that Stambaugh's has also filed an action with the Federal Aviation Administration seeking similar relief. That matter was initially docketed at Stambaugh's Aviation Service, Inc. v. Susquehanna Area Regional Airport Authority, Docket No. FAA-16-00-5. Attached hereto as Exhibit "C" are the Defendants responses to the claim made by Stambaugh's in the FAA action.

and is contradicted by the very allegations in its Complaint. Nowhere in the Complaint does Stambaugh's allege that it has been completely barred from operating its repair and maintenance business at HIA or its FBO business at another location. (Complaint ¶ 1 (listing Stambaugh's principal place of business at HIA); Complaint ¶ 9 (admitting that Stambaugh's is presently engaged in the business of repairing and maintaining airplanes at HIA); Complaint ¶ 20 (admitting that Stambaugh's has a present lease for its business at HIA until 2003); Complaint ¶¶ 86, 87, 88, 95, 96 (confirming that Stambaugh's intends to continue in the FBO business after relocation to another location)). As stated correctly by the Magistrate Judge, "[a] company's contractual expectation under a contract for a limited duration and involving a particular location is not analogous or comparable on a principled basis to an individual's expectation as to the practice of his or her trade, occupation or profession." (Report and Recommendation at 9-10).

Equating the failure to be awarded a government contract and lease termination "to a frustrated plaintiff's legal right to engage in the common occupations of life in a manner protected by the Fourteenth Amendment goes too far." Boyanowski, 215 F.3d at 403. The decisions in Boyanowski, Meyer v. Nebraska, as well as all of the other cases cited by Stambaugh's, do not support Stambaugh's substantive due process claim.[7] Such cases involve

---

[7] In Boyanowski, the court found Meyer v. Nebraska, 262 U.S. 390 (1923) inapplicable to the plaintiff's claim of a constitutionally protected liberty interest to engage in the transportation business through government contracts. The court instructed that Meyer "turned . . . on a direct bar to the teacher's teaching, as well as the concurrent interference in parental rights over children." Boyanowski, 215 F.3d at 405. The court opined that if Meyer were relevant, Boyanowski's situation would have to involve a prosecution targeted at him for merely bidding on transportation contracts. Id. Boyanowski's "actual situation was too remote from the facts of Meyer for that case to have particular applicability." Id. (stating that the Supreme Court has held "that Meyer cannot be read to constitutionalize all executive actions that affect the pursuit of a profession in any way"). The fact that Stambaugh's has not alleged that it has been targeted for simply bidding on the AMP Hangar project coupled with the fact that Stambaugh's is complaining about the failure to be awarded a single contract makes Meyer "too slender a reed on which to rest" its substantive due process argument. Id.

governmental interference with, or direct prohibition of, the liberty to pursue a chosen occupation or a particular calling, not the right to a government contract or the renewal of a lease agreement.  See, e.g., Hampton v. Mow Sun Wong, 426 U.S. 88 (1976) (involving a Civil Service regulation baring non-citizens from employment in the federal competitive civil service); Meyer v. Nebraska, 262 U.S. 390 (1923) (involving a direct prohibition to teachers to teach languages other than the English language); Hoffman v. Lehman, 926 F.Supp. 510 (M.D. Pa. 1996) (involving early termination of contract for medical services and complete disbarment from contracting with the Commonwealth); Santos v. City of Houston, Texas, 852 F.Supp. 601 (S.D. Tex. 1994) (involving an absolute ban on all jitney operations in the city of Houston).[8]

Accordingly, Stambaugh's has failed to allege a constitutionally protected liberty interest, thus compelling the approval of Magistrate Judge Smyser's Report and Recommendation on this claim.

### C.  MAGISTRATE JUDGE SMYSER CORRECTLY DETERMINED THAT A BUSINESS ENTITY'S CLAIM UNDER THE PENNSYLVANIA MUNICIPAL AUTHORITIES ACT SHOULD BE DISMISSED WHERE THERE IS NO ALLEGATION OF COMPETITION BY THE MUNICIPAL AUTHORITY

In addressing Stambaugh's Municipal Authorities Act claim, Magistrate Judge Smyser correctly concluded that SARAA's exercise of its contractual right not to renew Stambaugh's

---

[8] The case of Sammon v. New Jersey Board of Medical Examiners, 66 F.3d 639 (3d Cir. 1996) cited by Stambaugh's is wholly inapplicable to the instant case.  Whether the plaintiff midwives asserted a liberty interest appears not to have been raised by the litigants or addressed by the Sammon court.  Moreover, the case dealt with the issue of standing and whether the statutory scheme at issue passed muster under the rational basis test.  Sammon, 66 F.3d at 642, 645.  The court concluded it had.  Id. at 643.  Finally, the case involved a statutory scheme that was attacked for preventing people from pursuing their chosen profession of midwifery.  Id. at 644.  Stambaugh's allegations that its failure to receive one contract and the termination of its lease, by its own terms, hardly compares to the Sammon plaintiffs' argument that they had been completely statutorily barred from pursuing their chosen career.

FBO lease and its subsequent entry into a contract with another FBO service provider can not be seen to create an impermissible competitive environment in violation of the Municipality Authorities Act, 53 P.S. §306 et seq (the "Act"). (Report and Recommendation, P.21).

Section 306A(b)(2) of the Act, provides a limitation on the exercise of the powers granted to municipal authorities under the Act:

> (2) The purpose and intent of this act being to benefit the people of the Commonwealth by, among other things, increasing their commerce, health, safety and prosperity, and not to unnecessarily burden or interfere with existing business by the establishment of competitive enterprises, none of the power granted by this act shall be exercised in the construction, financing, improvement, maintenance, extension or operation of any project or projects which in whole or in part shall duplicate or compete with existing enterprises serving substantially the same purposes.

53 P.S. § 306A(b)(2).

Pennsylvania courts consistently have held that a municipal authority violates the Act when it directly duplicates or competes with an existing enterprise. See Evansburg Water Co. v. Perkiomen Township, 131 Pa. Commw. 89, 569 A.2d 428 (1990). In addition, the Act is violated when the authority participates in construction, financing, improvement maintenance, extension or operation of a "project" or "projects" "serving substantially the same purposes."

As the Magistrate Judge correctly found, however, SARAA's selection of a new FBO service provider did not serve to create a competitive environment where one had not previously existed. (Report and Recommendation, p. 21). Pennsylvania case law is clear that a municipal authority's termination of a contract with an existing service provider and subsequent entry into a contract with a new provider does not constitute impermissible competition under Section 306A(b)(2) of the Act. In Beaver Falls Municipal Authority v. Municipal Authority of the

Borough of Conway, 689 A.2d 379 (Pa. Commw. 1997), Beaver Falls Municipal Authority ("Beaver Falls") argued that Ambridge Authority ("Ambridge") violated the Act by supplying water to Conway Authority ("Conway") pursuant to a new contract which had in the past been awarded to Beaver Falls. Disagreeing with Beaver Falls, the court distinguished between the right to protection from non-competition under the Act where the right to provide water service is identified in the enabling legislation and where the right is acquired by way of contract. Beaver Falls, 689 A.2d at 383. Since Beaver Falls' ability to provide water services to Conway was derived from a contract with Conway, the court concluded that Conway was free to terminate the contract and enter into a contract with another provider. Id. According to the court, the rights and duties of contracting parties are limited by the terms of the contract and such rights cannot be extended or expanded by the Act. Id.; see also Highridge Water Auth. v. Lower Indiana County Mun. Auth., 689 A.2d 374 (Pa. Commw. 1997) (finding that where the right to provide service is fixed by a contract, the provisions of the contract govern rather than the provisions of the Act).

Here, as in Beaver Falls, Stambaugh's "right" to continue as an FBO service provider was derived from its contract with SARAA which expired on January 19, 2000. (Complaint, ¶ 16). Moreover, as the owner/lessor of the AMP Hangar, SARAA was, and is, free to lease the Hangar to whomever it chooses.

Even assuming, however, that SARAA's actions with regard to leasing the AMP Hangar could be viewed as a direct entry by SARAA into the FBO business, decisions under Section 306A(b)(2) are clear that "[t]his clause of the statute is phrased in the present tense" and must be applied to projects that compete with existing enterprises as opposed to potential

enterprises.  The Complaint acknowledges that the lease of the AMP Hangar to a new FBO was

not entered into until after Stambaugh's FBO contract at HIA had expired in January 2000.  See

(Complaint, ¶¶ 16, 52 and 53).  Accordingly, Stambaugh's was no longer an existing FBO at

HIA at the time of any alleged competition stemming from SARAA's lease of the AMP Hangar,

and SARAA was free to contract with another entity for those services.  See Northeast Jet

Center, Ltd., 1996 U.S. Dist. LEXIS 11177 (finding no violation of the Act where plaintiff was

no longer an existing FBO at the time of the alleged competition)[9]; Evansburg Water Co. v.

Perkiomen Township., 131 Pa. Commw. 89, 569 A.2d 428 (1990) (upholding preliminary

injunction where the complaining water company, at the time of the lawsuit, did not serve in

whole, or in part, the area to be developed); Northampton v. Bucks County. Water & Sewer

Auth., 96 Pa. Commw. 514, 508 A.2d 605 (1986) (finding that where plaintiff was not providing

services proposed by the project, § 306A(b)(2) of the Act was not implicated).

Despite Stambaugh's protestations to the contrary, SARAA's contractual choices here

did not serve to "destroy" Stambaugh's FBO business, create an exclusive right, or constitute

economic discrimination prohibited under the Act.  As stated herein, and as admitted in its

Complaint, Stambaugh's intends to remain in the FBO business at another location. Both AERO

and Piedmont operate FBO business at HIA, thus dispelling any argument of exclusive rights.

Finally, as the Magistrate Judge found, SARAA's decision to contract with another FBO service

provider, or providers, does not give rise to competitive duplication proscribed by the Act.

(Report and Recommendation, p.21).

---

[9] Attached as Exhibit "D"

Thus, Stambaugh's Claim IV against SARAA for violation of the Municipal Authorities Act must be dismissed.[10]

### D.    MAGISTRATE JUDGE SMYSER WAS CORRECT IN FINDING THAT THERE IS NO PRIVATE RIGHT OF ACTION FOR MONEY DAMAGES FOR VIOLATIONS OF THE PENNSYLVANIA CONSTITUTION

In his Report and Recommendation, Magistrate Judge Smyser properly dismissed Stambaugh's claims under the Pennsylvania Constitution since "[t]here is not a Pennsylvania statute that establishes a cause of action against a defendant acting under color of law for a violation of the Pennsylvania Constitution" and that "[t]he Pennsylvania Supreme Court has not stated that there is such a cause of action." (Report and Recommendation, p. 16). Since Stambaugh's only seeks money damages in this case and since money damages are not available for violations of the Pennsylvania Constitution, Stambaugh's claims under the Pennsylvania Constitution must be dismissed.

---

[10]It is important to note that even if Stambaugh's could establish a cause of action for violation of the Act, it would not be entitled to the damages remedy it seeks for alleged lost income, business interruption expenses, expenses for dismantling and relocating its business and employees, lost productivity, and the costs to construct new facilities. (Complaint, ¶¶ 204-225). An examination of the statutory language establishes the clear legislative intent to preclude a private right of action to recover monetary damages under the Act. As the court in Evansburg Water Co. instructed, Section 306A(b)(2), "by its own terms, is intended to benefit the people of the Commonwealth" generally, rather than a single entity. Evansburg Water Co., 131 Pa. Commw. at 94, 569 A.2d at 430. Additionally, all of the Pennsylvania court decisions addressing Section 306A(b)(2) involved claims for injunctive relief, not monetary damages. See Beaver Falls Mun. Auth., 689 A.2d at 381 (involving a request for preliminary injunction only); Highridge Water Auth., 689 A.2d at 376 (examining suit "for preliminary injunction. . . . contending that the sale of non-emergency water by Central would violate the non-competition clause of § 4A(b)(2) [306A(b)(2)] of the Act. . . . ."); Lower Bucks Cty. Joint Mun. Auth. v. Bristol Twp. Water Auth., 137 Pa. Commw. 415, 586 A.2d 512, (1991) (explaining "[w]ater authority brought action to enjoin competitor from servicing particular area"); Evansburg Water Co. v. Perkiomen Township, 131 Pa. Commw. 89, 569 A.2d 428 (1990) (denying action in which private water company sought "to enjoin township and municipal authority from establishing public water system for planning residential development" based on the non-competition clause in the Act); Bristol Township Water Auth. v. Lower Bucks Cty. Joint Mun. Auth., 130 Pa. Commw. 240, 250, 567 A.2d 110, 114-15 (1989) (appealing grant of "final injunctive relief" for competition in violation of Section 306A(b)(2); and Northampton, Bucks Cty. Mun. Auth. v. Bucks Cty. Water & Sewer Auth., 96 Pa. Commw. 514, 517, 508 A.2d 605, 607 (1986) (involving an action in equity to invalidate agreement alleged to cause competition). Finally, the sole federal case considering Section 306A(b)(2), Northeast Jet Center, Ltd. involved a claim for punitive damages only, not compensatory damages, which was rejected on the basis of Pennsylvania Political Subdivision Tort Claims Act. 1996 U.S. Dist. LEXIS 11177 at *43-*47.

In its Complaint, Stambaugh's alleges that the Defendants violated Article I, Sections 1 and 26 and Article III, Section 32 of the Pennsylvania Constitution. In all instances, Stambaugh's seeks money damages for these alleged constitutional violations. Stambaugh's, however, repeatedly concedes that the Pennsylvania Supreme Court has **never** decided whether a private right of action exists for money damages under that provision. (Response Brief, p. 29; Brief in Support of Objections, pp. 12-14). In its most recent filing, Stambaugh's admits, as it must, that its "research has uncovered no case law dealing with *damages* . . ." (Brief in Support of Objections, p. 14, emphasis in original). Likewise, there is no Pennsylvania statute analogous to Section 1983 that provides for such an action. Counts II and IV of Stambaugh's Complaint should be dismissed because Stambaugh's seeks only money damages in this matter, yet acknowledges that there is no right to money damages for violations of the Pennsylvania Constitution.

Stambaugh's claims under the Pennsylvania Constitution are barred in the first instance because there is no analogous statute to Section 1983 providing for private actions for damages of alleged state constitutional violations. Additionally, the vast weight of cases conclude that there is no private right of action for damages in situations like this. See Sabatini v. Reinstein, No. 99-2393, 1999 U.S. Dist. LEXIS 12820, *7 (E.D. Pa. August 20, 1999)[11] (stating "[a]lthough its courts have not decided whether a private cause of action exists under sections 7 and 20 of the Pennsylvania Constitution, federal courts have held that there is no such right"); Holder v. City of Allentown, No. 91-240, 1994 U.S. Dist. LEXIS 7220, *11-12 (E.D. Pa. May 27, 1994)[12] (stating "the Court concludes that no cause of action exists under article I, section 7"); Lees v. West Greene Sch. Dist., 632 F. Supp. 1327, 1335 (W.D. Pa. 1986) (declining to find a "private right of action for violations of an individual's right to free speech"); Western Pa. Socialist

---

[11] Attached hereto as Exhibit "E".

[12] Attached hereto as Exhibit "F".

Workers v. Connecticut Gen. Life Ins. Co., 335 Pa. Super. 493, 501, 485 A.2d 1, 5 (1984); Pendress v. Chatham College, 386 F. Supp. 341, 344 (W.D. Pa. 1974); Brown v. Commonwealth, 453 Pa. 566, 572, 305 A.2d 868, 871 (1973), rev'd on other grounds, Mayle v. Commonwealth, 479 Pa. 384, 399, 388 A.2d 709, 716 (1978) (expressly determining that "Article I, Section 11 is not self-executing"); Kelley v. Keiser, 340 Pa. 59, 63, 16 A.2d 307 (1940) (stating Article V, Section 12 "has been held not to be self-executing"); Bell v. Aubel, 151 Pa. Super. 569, 571, 30 A.2d 617, 618 (1943) (finding Article 16, § 7 of the Pennsylvania Constitution "is not self-executing. . . and the enforcement of the constitutional prohibition must be pursuant to and in accordance with the statutory provisions implementing it").

There appears to be only one case where a court, after specifically considering this issue, permitted a claim for money damages for a violation of the Pennsylvania Constitution to proceed. See Harley v. Schuylkill County, 476 F. Supp. 191 (E.D. Pa. 1979). That decision, however, goes against the great weight of authority both in the federal and state courts that there is no private right of action under the Pennsylvania Constitution, and improperly expands the holding of the 1903 decision of the Pennsylvania Supreme Court it relies upon.

The court in Harley based its decision on Erdman v. Mitchell, 207 Pa. 79, 56 A. 327 (1903). In Erdman, plaintiffs, a group of plumbers organized as a trade union, sought injunctive relief against defendants, another union that utilized intimidation and other unlawful means to prevent plaintiff from obtaining employment. Id. Plaintiffs attempted to invoke the Pennsylvania Constitution "to prevent further intimidation of those who would otherwise employ them, they seek by this suit to restrain defendants from future acts of intimidation." Id. The Court granted the **injunction**, finding that this Constitutional provision was self-executing, and created a private right of action. Id. The Harley court, without addressing the numerous cases holding to the contrary, expanded the Erdman decision to include claims for money damages. However, as found by Magistrate Judge Smyser, since the Harley decision is an unwarranted

expansion of <u>Erdman</u> and ignores the weight of authority that there is not a private right of action for violations of the Pennsylvania Constitution, this Court should dismiss Stambaugh's claim for damages which are premised on the Pennsylvania Constitution.

The Defendants agree with Stambaugh's that "Pennsylvania courts routinely hear cases involving claims of constitutional violations, even against governments." (Brief in Support of Objections, p. 14). But, as two of the cases cited by Stambaugh's for this proposition demonstrate, these cases generally arise in the context of constitutional challenges to legislation or ordinances, not constitutional claims for money damages. <u>See Hartford Accident and Indemnification Co. v. Insurance Commissioner</u>, 505 Pa. 571, 582, 482 A.2d 542, 547 (1984)(examining the constitutionality of the Insurance Commissioner's approval of gender based insurance rates); <u>Holland Enterprises, Inc. v. Joka</u>, 64 Pa. Commw. 129, 131, 439 A.2d 876, 877 (1982)(examining the constitutionality of a municipal ordinance.). Additionally, in the, two other cases cited by Stambaugh's in which money damages were arguably at issue, the Court did not consider whether such a right exists. <u>Coffman v. Wilson Police Department</u>, 739 F. Supp. 257, 266 (E.D.Pa. 1990)(examining only whether Pennsylvania constitutional claims were barred by the Pennsylvania Political Subdivisions Tort Claims Act); <u>Williams v. The City of Pittsburgh</u>, 109 Pa. Commw. 168, 179, 531 A.2d 42, 47 (1987)(recognizing that while the plaintiff does not indicate if her claim is under the United States or Pennsylvania Constitution, the analysis under both is the same.). Since Stambaugh's has failed to advance any arguments that change Magistrate Judge Smyser's analysis, his Report and Recommendation should be adopted.

**E.     MAGISTRATE JUDGE SMYSER PROPERLY FOUND THAT
         STAMBAUGH'S FAILS TO STATE A CLAIM FOR CONSPIRACY**

Despite its claim that it has properly pled its conspiracy count, Stambaugh's offers no new evidence or arguments as to why its conspiracy count was not properly dismissed by Magistrate Judge Smyser. Stambaugh's cannot escape that the crux of its conspiracy claim is its belief that the Defendants "agreed not later that [sic] November 1999 to force Stambaugh's out of the FBO business at HIA." (Complaint, ¶177). Nowhere in the Complaint does Stambaugh's explain what specific torts the Defendants conspired to violate. Rather the Complaint focuses entirely on the Defendants' failure to award an FBO contract to Stambaugh's according to the terms of the RFQ, (Complaint, ¶¶178-180, 185, 186), and the Defendants' failure to award Stambaugh's a lease for the AMP Hangar, (Complaint, ¶¶181-184). Stambaugh's claims that statements were made to its customers that Stambaugh's would not receive an FBO contract before the official announcement. (Complaint, ¶¶182, 183). The ultimate conclusion, however, with respect to alleged damages and the alleged conspiracy, is contained in Paragraph 187 of the Complaint, which provides, "As a result of the conspiracy, Stambaugh's has lost customers and substantial income due to its inability to provide FBO services at HIA."

To prevail on a claim for civil conspiracy, there must be "a separate underlying tort as a predicate for liability." In re Orthopedic Bone Screw Prod. Liab. Litig., 193 F.3d 781, 789 (3d Cir. 1999).[13] There is no indication in Stambaugh's Complaint what underlying torts the Defendants conspired to commit. Absent such an allegation, there can be no conspiracy claim.

Instead, a close reading of the Complaint leads to the conclusion that Stambaugh's is making a **separate** tort claim that the Defendants conspired and decided not to award an FBO contract to Stambaugh's. Since a conspiracy claim requires a predicate tort and is not itself a distinct tort, Stambaugh's conspiracy count should be dismissed. This requirement, as recognized by Magistrate Judge Smyser, complies with the pleading requirements contained in Rules 8 and 11 of the Federal Rules of Civil Procedure.

Additionally, while not addressed in the Report and Recommendation, it is well established that a business entity cannot conspire with its employees and/or agents. See, e.g., Thompson Coal Co. v. Pike Coal Co., 488 Pa. 198, 212-13, 412 A.2d 466, 470 (1979). Here, it is alleged that SARAA was the entity that awarded the FBO contracts. (Complaint, ¶¶38-46). It is also alleged that SARAA made its decision "in conjunction with BAA, Fleet, Holdsworth and McIntosh". (Complaint, ¶¶38, 46-51). BAA, Mr. Fleet, Mr. Holdsworth and Mr. McIntosh are all employees or agents of SARAA.

Mr. Holdsworth and Mr. McIntosh are respectively SARAA's executive director and chairman of the board. (Complaint, ¶¶5, 6). BAA "manages HIA on behalf of SARAA." (Complaint, ¶3). Mr. Fleet is "the Airport Director of HIA and an employee of BAA." (Complaint, ¶4). Since BAA, Mr. Fleet, Mr. Holdsworth and Mr. McIntosh are either agents or employees of SARAA there can be no conspiracy between the Defendants and the conspiracy claim should be dismissed.

---

[13] Stambaugh's reliance on Skipworth v. Lead Industries Association, Inc., 547 Pa. 224, 235-36, 690 A.2d 169, 174 (1997) is misplaced. In that case the Pennsylvania Supreme Court upheld a grant of summary judgment dismissing a conspiracy claim because the plaintiff failed to introduce evidence of malice or concerted action. Id. Thus, the Supreme Court did not examine and voiced no opinion on conspiracy pleading requirements.

## V.    CONCLUSION

Based upon the foregoing facts and law, this Court should approve and adopt the Magistrate Judge's Report and Recommendation.

Respectfully Submitted,

RHOADS & SINON LLP

By: _____

Dean F. Piermattei, Esquire
Timothy J. Nieman, Esquire
Susan E. Schwab, Esquire
One South Market Square
P. O. Box 1146
Harrisburg, PA 17108-1146
(717) 233-5731
Attorneys for Defendants

Date:  September 1, 2000

## CERTIFICATE OF SERVICE

I hereby certify that September 1, 2000, a true and correct copy of the foregoing Defendants' Reply to Brief in Support of Objections of Stambaugh's Air Service, Inc. to the Report and Recommendation of the Magistrate Judge to Grant in Part Defendants' Motion to Dismiss was served by means of United States mail, first class, postage prepaid, upon the following:

> Thomas B. Schmidt, III, Esquire
> Pepper Hamilton LLP
> 200 One Keystone Plaza
> North Front and Market Streets
> P. O. Box 1181
> Harrisburg, PA  17108-1181

Carolyn Hofecker

# EXHIBIT A

Get a Document - by Citation - 1992 U.S. Dist. LEXIS 9042    Page 1 of 6

Case 2:01-cv-00680-JK-JMS    Document EXIS 9042    Filed 09/01/2000    Page 29 of 100

Service: LEXSEE®
Citation: **1992 U.S. Dist LEXIS 9042**

*1992 U.S. Dist. LEXIS 9042, ***

QUEEN CITY AVIATION, INC., Plaintiff v. CITY OF ALLENTOWN, et al., Defendant

CIVIL ACTION No. 91-7776

UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF PENNSYLVANIA

1992 U.S. Dist. LEXIS 9042

June 5, 1992, Decided
June 8, 1992, Filed

**CORE TERMS:** airport, lease, antitrust claim, civil rights, motion to dismiss, bid, bidding, equal protection, discriminatory, conspiracy, dealer, competitor, Sherman Act, disappointment, negotiations, manufacturer, distributor, antitrust, animus, bidding process, Local Government Antitrust Act, failed to state, protected class, state action, new lease, et seq, geographic, monopolize, exhibited, franchise

**COUNSEL:** [*1] For the Plaintiff: GARY C. BENDER, CRAMP, D'IORIO, MC CONCHIE & FORBES, P.C., 215 N. OLIVE STREET, P.O. BOX 568, MEDIA, PA 19063, USA.

For the Defendants: CHARLES J. FONZONE, FONZONE & ASHLEY, 33 SOUTH SEVENTH STREET, P.O. BOX 4180, ALLENTOWN, PA 18105-4180, USA.

**JUDGES:** TROUTMAN

**OPINIONBY:** E. MAC TROUTMAN

**OPINION: MEMORANDUM**

Plaintiff, the former Fixed Based Operator ("FBO") at the Queen City Municipal Airport ("airport"), Allentown, Pennsylvania, filed a three count complaint against the City of Allentown and various city officials alleging that defendants violated its civil rights and certain of the antitrust laws. These claims arise out of the invitation to bid procedures used by the defendants and, ultimately, their award of the exclusive rights to service and operate the airport to another FBO. Defendants have filed a motion to dismiss. Since we agree with defendants that the complaint should be dismissed pursuant to Fed.R.Civ.P. 12(b)(6), but for reasons that differ somewhat from those articulated by defendants, we will grant the motion to dismiss.

I. BACKGROUND.

The facts, as alleged in plaintiff's complaint are as follows. The City of Allentown is a municipal corporation subject [*2] to the laws of Pennsylvania and the individual defendants are employees or elected officials of the City of Allentown. The City of Allentown obtained control of the Queen City Airport by a quitclaim deed granted by the United States in 1948.

Plaintiff was the FBO at the airport from 1981 under the terms of a ten year lease granted by the City of Allentown. The lease expired in May 1991 and continued on a month to month basis thereafter until the City of Allentown terminated the lease in February 1992. Plaintiff's sole operations were those at the airport and included air charter and taxi service, fuel sales,

Get a Document - by Citation - 1992 U.S. Dist. LEXIS 9042

Case 1:00-cv-00660-YK-LAS Document 27 Filed 09/01/2000 Page 30 of 100 Page 2 of 6

hanger and tie down leases, office space leasing, aircraft maintenance, sale of supplies, flight school and instruction training, aircraft rental, ground handling and customer services, snow removal, and grounds maintenance.

In June 1991, the defendants made public a proposal package for Request for Proposals to lease the airport to a full service FBO. The bids were to be received by October 10, 1991. Plaintiff and Cole Aviation submitted the only bids to be a full service FBO at the airport. In a letter dated November 27, 1991, plaintiff was informed that, pursuant to [*3] the Request for Proposals, the City of Allentown had selected a competitor, Cole Aviation, to be the FBO at the airport. Plaintiff was informed that its lease would be terminated on February 1, 1992, and that Cole Aviation would become the FBO on that date.

In counts I and II, plaintiff asserts claims pursuant to 42 U.S.C. § 1983 and 1985 against all the defendants for violating its civil rights. Plaintiff alleges in count I that the individual defendants were members of a selection committee chosen to represent the City of Allentown, and thus acted under color of state law, when they issued the Request for Proposals and selected Cole Aviation. The bid specifications and procedures, the plaintiff claims, were inconsistent, ambiguous, vague and contrary to law for a variety of reasons. Plaintiff also asserts that the selection of Cole Aviation was arbitrary, capricious, an abuse of discretion, contrary to law, and discriminatory for a variety of reasons. Plaintiff's complaint further alleges that the City of Allentown has exhibited an animus toward the plaintiff and has acted in an unfair and discriminatory manner. Thus, plaintiff concludes, the actions of the defendants amount [*4] to a taking of its property without due process or notice in violation of the 5th and 14th Amendments and in violation of the equal protection of law, as well as a conspiracy to deprive plaintiff of its business and property. Count II alleges that the actions of the individual defendants constituted an official policy and decision of the City of Allentown.

Count III assets an antitrust claim against the City of Allentown, and alleges in support thereof and in addition to the above described events, that plaintiff requested on numerous occasions to enter into lease negotiations with the City of Allentown regarding the airport and that the City of Allentown refused to enter into such negotiations. Plaintiff concludes that the refusal to negotiate a new lease with plaintiff and, instead, entering into a lease with Cole Aviation pursuant to the public bidding, is a restraint of trade prohibited by section 1 of the Sherman Act, 15 U.S.C. § 1. Plaintiff also claims that the City of Allentown and Cole Aviation have conspired to monopolize services at the airport in violation of section 2 of the Sherman Act, 15 U.S.C. § 2. Plaintiff, therefore, requests the Court to enjoin Cole Aviation [*5] and the City of Allentown from entering into a lease pursuant to the Request for Proposal.

II. STANDARDS FOR A MOTION TO DISMISS PURSUANT TO RULE 12(b)(6).

The Court, when faced with a motion to dismiss pursuant to Fed.R.Civ.P. 12(b)(6) must accept as true all the averments in plaintiff's well pleaded complaint; the court must construe the complaint in a light most favorable to plaintiff; and the court must determine whether, "under any reasonable reading of the pleadings, the plaintiff may be entitled to relief." Colburn v. Upper Darby Township, 838 F.2d 663, 665-666 (3rd Cir. 1988). The pleading requirements that a civil rights complaint must meet to survive a motion to dismiss, however, are heightened: the complaint is sufficient if, e.g., it alleges specific conduct which violates plaintiff's rights, the time and place of the conduct, and identifies the responsible officials. Id. at 666.

III. DISCUSSION.

Like the complaint in Dunn & Mavis, Inc. v. Nu-Car Driveaway, Inc., 691 F.2d 241 (6th Cir. 1982) (an antitrust action, discussed infra), plaintiff's complaint is nothing more than the expression [*6] of its disappointment that city officials, after inviting bids, decided to offer its franchise, its grant of an exclusive lease, to someone else. The Civil Rights laws were



never intended to establish liability under the current circumstances. We find that plaintiff's civil rights claims are nothing more than an attempt to federalize a routine dispute with local officials over municipal planning or procedures, i.e., bidding practices.

Further, and more specifically, plaintiff's section 1985 claim fails to show that it is a member of any protected class. Though paragraph 18 of the complaint states that the City of Allentown has exhibited an animus toward the plaintiff and has acted in an unfair and discriminatory manner, plaintiff has failed to state a claim under section 1985(3), the only subpart of section 1985 within which plaintiff could possibly and reasonably fall, n1 as it has showed no immutable characteristic, membership in a protected class, or any class based discriminatory animus. See, United Brotherhood of Carpenters and Joiners of America, Local 610 v. Scott, 463 U.S. 825, 103 S. Ct. 3352, 77 L.Ed.2d 1049 (1983); [*7] Burt v. Ferrese, 871 F.2d 14 (3rd Cir. 1989).

- - - - - - - - - - - - - - - - - - Footnotes- - - - - - - - - - - - - - - - - - -

n1 Once again the court is faced with a complaint brought by a frustrated business entity, represented by counsel, alleging broad and sweeping civil rights violations yet fails to identify with any particularity which subpart of section 1985 was supposedly violated, thus leaving the court to determine which of the three differing parts is to apply.

- - - - - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - - - - -

Regarding the section 1983 claims, plaintiff needs to show (1) that defendants acted under color of law and (2) that they deprived it of its constitutionally protected rights. Plaintiff's complaint meets the first requirement. As to the second requirement, however, we cannot discern from the complaint what constitutionally protected rights have been violated.

While plaintiff alleges that the defendants violated its constitutional rights to equal protection and due process, n2 which are protectable rights, the allegations of plaintiff's complaint do not rise to a constitutional violation. The only fact [*8] that could possibly, yet remotely, give rise to an equal protection claim is the allegation that "the City of Allentown improperly made contact with Cole Aviation after the bid proposals were submitted; . . . ." (Complaint at P16(f)). Presumably, plaintiff is concluding that this lead to an unfair advantage for Cole Aviation and thus implicated plaintiff's interest in equal protection. There is no support offered for why it was improper in constitutional proportions, or that it in fact could reasonably be construed to implicate constitutional equal protection.

- - - - - - - - - - - - - - - - - - Footnotes- - - - - - - - - - - - - - - - - - -

n2 Once again the court is faced with a complaint brought by a frustrated business entity, represented by counsel, alleging broad and sweeping violations of due process without specifying what aspect of its due process rights, procedural or substantive, was violated, thus leaving the court to determine which the plaintiff believes is implicated. In this case, we find that we need not make such a determination. For example, plaintiff has not pleaded that it never received notice of the Request for Proposals, or that it had a vested property interest in a lease beyond the ten year term, or that the bidding procedures violated some local ordinance or Pennsylvania law or that it is foreclosed from pursuing a claim that the bidding procedures violated some local ordinance or Pennsylvania law in the courts or other forums provided by the state and local governments.

- - - - - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - - - [*9]

In addition, from the complaint, it appears that plaintiff merely had a lease for a certain term, which expired, and thereafter the lease was month to month. We know of no requirement that the City of Allentown, as the landlord of the airport, must even consider entering into a new lease with plaintiff, or that it structure the Request for Proposals in a manner acceptable


to or approved by plaintiff. Plaintiff's complaint or its brief in opposition to the motion has not brought any such requirement to our attention. Absent that, there is no constitutional interest violated by the City of Allentown's decision to seek bids from competing companies and to chose one of plaintiff's competitors.

At best, plaintiff has alleged that it does not agree with the procedures employed by the defendants, that the Request for Proposal did not require, it seems, enough information, and that, in plaintiff's estimation, Cole Aviation is not as qualified as it to be the FBO at the airport. Plaintiff's complaint, read in its entirety, simply airs its disappointment that it is no longer the exclusive FBO at the airport. n3

- - - - - - - - - - - - - - - - - -Footnotes- - - - - - - - - - - - - - - - - -

n3 A reading of plaintiff's complaint gives the impression that it is proper for the City of Allentown to convey it the right to be the exclusive FBO at the airport, but not anyone else; that it is proper to convey these exclusive rights through private, non-competitive negotiations, but not through a public bidding process. Plaintiff's complaint, in short, leaves the impression that it is proper for the City of Allentown to disregard the public interest in competitive bidding and in open and public government, so long as it is treated specially. The fact that the bidding process may not have been perfect, which is plaintiff's basic claim, is not by itself a constitutional violation and is a matter best pursued at the state or local level. See note 6, infra.

- - - - - - - - - - - - - - - - -End Footnotes- - - - - - - - - - - - - - - - - [*10]

Defendants have argued that such a civil rights action against them is barred by the Federal Aviation Act, 49 U.S.C. § 1300 et seq., citing Montauk-Caribbean Airways, Inc. v. Hope, 784 F.2d 91 (2nd Cir. 1986). Because we conclude, as discussed above, that plaintiff has failed to state a civil rights claim against the defendants, we do not need to reach and, so, do not address, the issue regarding whether the claims are barred.

Plaintiff's final count is an antitrust claim. This sort of claim, when made in circumstances similar to those currently before us, was characterized in Dunn & Mavis, Inc. v. Nu-Car Driveaway, Inc., 691 F.2d 241 (6th Cir. 1982): n4

> The complaint states no set of facts which, if true, would constitute an antitrust offense, notwithstanding its conclusory language regarding the elimination of competition and improper purpose. When stripped to its essential allegations, the complaint does no more than state plaintiffs' commercial disappointment at losing Chrysler's patronage - the recurrent case of the jilted customer, dealer or supplier who loses a manufacturer's franchise and accuses the manufacturer and the [*11] new suitor of attempting to monopolize something. See Burdett v. Altec Corp., 515 F.2d 1245, 1249 (5th Cir. 1975). [footnote omitted] An agreement promising a new dealer the old dealer's business is presumptively reasonable, and the old dealer does not have an antitrust claim unless the conduct is incident to an unlawful arrangement or an attempt to monopolize an identifiable market. A contrary rule limiting a buyer's right to displace an old seller in favor of a new one would undermine the principle of competition the antitrust laws are designed to secure.

Id. at 243-244. In the footnote that was omitted from the above quote, the Court in Dunn & Mavis quoted from Burdett v. Altec Corp., 515 F.2d 1245, 1249 (5th Cir. 1975): "Lest any other former distributors succumb to the temptation of treble damages, we reiterate that it is

simply not an antitrust violation for a manufacturer to contract with a new distributor, even if the effect of the new contract is to seriously damage the former distributor's business." We find the thrust of these cases sufficiently analogous and entirely persuasive.

- - - - - - - - - - - - - - - - -Footnotes- - - - - - - - - - - - - - - - - -

n4 In Dunn & Mavis, the plaintiff had been the exclusive provider of auto transport services between Chrysler assembly plants in the Detroit area and railheads and other distribution points. When Chrysler replaced plaintiff with a competitor as the exclusive provider of these services, plaintiff asserted antitrust claims against Chrysler and the competitor.

- - - - - - - - - - - - - - -End Footnotes- - - - - - - - - - - - - - - - -  [*12]

To recover on its antitrust claim, plaintiff would need to prove "(1) that the defendants contracted, combined or conspired among each other; (2) that the combination or conspiracy produced adverse, anti-competitive effects within the relevant product and geographic markets; (3) that the objects of and the conduct pursuant to that contract or conspiracy were illegal; and (4) that the plaintiffs were injured as a proximate result of that conspiracy." Tunis Bros. Co., Inc. v. Ford Motor Co., 763 F.2d 1482, 1489 (3rd Cir. 1985) ("Tunis I") (vacated and remanded for other reasons, 475 U.S. 1105, 106 S. Ct. 1509, 89 L. Ed. 2d 909 (1986), as explained in Tunis Bros. Co., Inc. v. Ford Motor Co., 952 F.2d 715, 720 (3rd Cir. 1991) ("Tunis II")).

We note that plaintiff's complaint does not plead certain details of an antitrust claim, such as, inter alia, the appropriate product and geographic markets, the effects upon interstate commerce, nor does plaintiff inform us whether its claim proceeds on a per se or rule of reason theory. More detrimental to plaintiff's complaint is that, as explained above,  [*13] the circumstances plaintiff alleges simply do not rise to the level of a violation of the Sherman Act §§ 1 and 2.

Finally, defendants argue that the antitrust claim is barred due to the Local Government Antitrust Act, 15 U.S.C. § 34 et seq. As with the defendants' argument that the civil rights claims against them are barred, since we conclude that the plaintiff has failed to allege circumstances sufficient to state an antitrust claim, we do not reach the issue. n5

- - - - - - - - - - - - - - - - -Footnotes- - - - - - - - - - - - - - - - - -

n5 Plaintiff's brief in opposition argues that it is seeking only injunctive relief, not money damages, and therefore, the Local Government Antitrust Act does not bar its claim. On this point, considering the stage of the proceedings and the facts of the complaint, but for our determination otherwise, we would agree.

We note, however, that defendants might have asserted the "state action doctrine" which, it seems, would bar even the injunctive relief plaintiff seeks, Northeast Jet Center v. Lehigh-Northampton Airport Authority, 767 F. Supp. 672 (E.D. Pa. 1991), but for the dearth of infomation in the complaint. The exact authority of the defendants regarding their actions related to the entire bidding process, and from whence that authority stems, e.g., based upon a state statute requiring competitive public bidding, id., cannot be discerned from the complaint. Such information is crucial to determine if the "state action doctrine" would apply. Absent amendment to the complaint, which the defendants have sought in the alternative to their motion to dismiss, we would not be able to determine this issue on a motion to dismiss, which is presumably the reason why defendants did not raise the issue and instead sought a more definite statement.

- - - - - - - - - - - - - - - - -End Footnotes- - - - - - - - - - - - - - - - -  [*14]

IV. CONCLUSION.



Based upon the foregoing reasons we conclude that plaintiff's complaint fails to state a claim for which relief can be granted. n6 Hence, an appropriate order follows.

- - - - - - - - - - - - - - - - -Footnotes- - - - - - - - - - - - - - - - - -

n6 At best, plaintiff's complaint may allege the violation of some state or local law, although it has not specifically alleged. Regardless, "a violation of state law in itself does not constitute a denial of . . . due process. Federal courts do not sit in federal question cases to grant remedies for mere violations of state law. [footnote omitted]" Midnight Sessions, Ltd. v. City of Philadelphia, 945 F.2d 667, 684 (3rd Cir. 1991).

- - - - - - - - - - - - - - - - -End Footnotes- - - - - - - - - - - - - - - - -

## ORDER

And now, this 5th day of June, 1992, upon consideration the Motion of Defendants City of Allentown, Mayor Joseph Daddona, Carl Kercher, Donald Bernhard, Michael Hefele, Al Salinger, Linda Bodnar, William Cramsey, Michael Rosenfeld, Charles Burianek, and Jill Winters Pursuant to Federal Rule of Civil Procedure 12(b)(6) (Doc. #3), the response thereto and the complaint, [*15] IT IS **ORDERED** that the motion is **GRANTED** and the complaint is **DISMISSED** as to all defendants and the case is closed.

E. Mac Troutman, S.J.

Service: **LEXSEE®**
Citation: **1992 U.S. Dist LEXIS 9042**
View: **Full**
Date/Time: Friday, May 26, 2000 - 8:44 AM EDT

About LEXIS-NEXIS | Terms and Conditions

Copyright © 2000 LEXIS-NEXIS Group.  All rights reserved.

**EXHIBIT B**

Service: **LEXSEE®**
Citation: **1992 U.S. Dist. LEXIS 11456**

*1992 U.S. Dist. LEXIS 11456, \**

QUEEN CITY AVIATION, INC., Plaintiff vs. CITY OF ALLENTOWN, et al., Defendant

CIVIL ACTION NO. 91-7776

UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF PENNSYLVANIA

1992 U.S. Dist. LEXIS 11456

August 3, 1992, Filed

**DISPOSITION:** [*1] Plaintiff's motion will be denied.

**CORE TERMS:** memorandum, bid, animosity, civil rights, awarding, cure, reasons stated, plead

**COUNSEL:** For QUEEN CITY AVIATION, INC., PLAINTIFF: GARY C. BENDER, CRAMP, D'IORIO, MC CONCHIE & FORBES, P.C., 215 N. OLIVE STREET, P.O. BOX 568, MEDIA, PA 19063, USA.

For CITY OF ALLENTOWN, JOSEPH DADDONA, MAYOR, CARL KERCHER, DONALD BERNHARD, MICHAEL HEFELE, AL SALINGER, LINDA BODNAR, WILLIAM CRAMSEY, MICHAEL ROSENFELD, CHARLES BURIANEK, JILL WINTERS, DEFENDANTS: CHARLES J. FONZONE, FONZONE & ASHLEY, 33 SOUTH SEVENTH STREET, P.O. BOX 4180, ALLENTOWN, PA 18105-4180, USA.

**JUDGES:** Troutman

**OPINIONBY:** E. MAC TROUTMAN

**OPINION: MEMORANDUM**

Previously we dismissed plaintiff's complaint in the above captioned matter due to the deficiency of its pleading averments and its failure to state a claim. Slip Op., CA No. 91-7776 (June 8, 1992). Plaintiff has filed a Motion to Alter or Amend Judgment Pursuant to Fed. R. Civ. P. 59(e) and For Reconsideration under E.D. Loc. Civ. R. 20(g). For the reasons stated in our original memorandum and for reasons stated herein, we conclude that plaintiff's motion should be denied.

Plaintiff requests that we alter our previous order to allow it to amend its complaint, and in support thereof, incorporates in its Brief in Support certain averments that [*2] it would include in an amended complaint. Plaintiff has not attached as an exhibit to its motion a proposed amended complaint for our review and which could also be filed if such were appropriate. n1 Plaintiff's memorandum, however, is insufficient for us to find that the filing of an amended complaint is justified in this case.

- - - - - - - - - - - - - - - - - -Footnotes- - - - - - - - - - - - - - - - - - -

n1 Defendants point out that plaintiff has not filed such any amended complaint which we could review. while it is true, as plaintiff states, that it could not "file" an amended complaint at this point, plaintiff could have provided a proposed amended complaint along with its motion. We have not asked plaintiff to supplement its motion in this manner since it has chosen to incorporate suitable material in its memorandum and we find that this additional information would not make a sufficient amended complaint.



- - - - - - - - - - - - - - - - -End Footnotes- - - - - - - - - - - - - - - - -

Plaintiff reiterates that the defendants denied its constitutionally protected property rights. Plaintiff asserts that it has a property right in the procedures leading to the award  [*3]  of the lease to be a fixed based operator at the Queen City Airport, in other words, that it has a constitutional right to a fair and even handed decision by the defendants. Plaintiff repeatedly asserts that it was not so treated by the defendants, that the defendants awarded the bid in an arbitrary, capricious and discriminatory manner. Such conclusory allegations are not a sufficient statement of a civil rights complaint, no matter how often repeated. For support, plaintiff cites <u>Teleprompter of Erie, Inc. v. City of Erie, 537 F. Supp. 6 (W.D. Pa. 1981)</u>. In Teleprompter, however, among the allegations to show wrongful treatment by city officials when awarding a contract was that at least one of the council members was accepting bribes. <u>Id. at 8-9.</u> Such specific pleading properly supports a civil rights action. Plaintiff's complaint and memorandum are void of any such specific instances from which it could be found that the defendants did not correctly exercise their discretion. n2

- - - - - - - - - - - - - - - - - -Footnotes- - - - - - - - - - - - - - - - - -

n2 Plaintiff writes: "Plaintiff can cite many examples of this long standing animosity and antagonism [between defendants and plaintiff] although plaintiff believes that these are more evidentiary matters as opposed to pleading matters . . . ." (Brief in Support at 4.) Contrary to plaintiff's statement, such matters are indeed pleadings matters as our original memorandum explains. Further, if indeed there exists a long standing animosity between defendants and plaintiff, certainly plaintiff would not need discovery to be aware of such animosity; plaintiff may need discovery to prove such, but not to specifically plead such.

- - - - - - - - - - - - - - - -End Footnotes- - - - - - - - - - - - - - - -  [*4]

Plaintiff, as appears from the face of the complaint and its Memorandum in Support, is simply challenging the discretion of the defendants. We agree with defendants that "plaintiff, at best, contests the City's evaluation of the various factors that were considered and the respective weight that it placed upon them is awarding the bid to Cole Aviation." (Brief in Opposition at 2.) "The plaintiff merely takes issue with the defendants' evaluation of the bid proposals." (Id. at 4.) If the discretion of local officials may be challenged in federal court on the basis of some nebulous, unfounded allegations, local officials will be subjected to deluge of frivolous claims. See, <u>Colburn v. Upper Darby Township, 838 F.2d 663, 666 (3d Cir. 1988).</u> If plaintiff wishes to challenge the decision making of the defendants, a state court would provide a better forum to question decisions made pursuant to 53 Pa. Con. Stat. Ann. § 36901 et seq. (See, Brief in Support at 3.)

Finally, while not permitting leave to amend a civil rights complaint for failure to plead specifically may be an abuse of our discretion, such is not an abuse of our discretion  [*5]  if amendment of the complaint "would be insufficient to cure the deficiency in the original complaint." <u>Colburn, 838 F.2d at 666.</u> Since it was our opinion, initially, that an amendment would not be able to cure the defects in the original complaint, and it is our opinion, currently, as well, leave to amend will not be permitted.

Based upon the foregoing, and for the reasons addressed in our Memorandum and Order entered June 8, 1992, plaintiff's motion will be denied. An appropriate order follows.

## ORDER

And now, this 30th day of July, 1992, upon consideration of the Motion of Plaintiff to Alter or Amend Judgment and for Reconsideration (Doc. #13), the response thereto and our



Memorandum and Order entered June 8, 1992, IT IS ORDERED that the motion is DENIED.

E. Mac Troutman S.J.

Service: **LEXSEE®**
Citation: **1992 U.S. Dist. LEXIS 11456**
View: Full
Date/Time: Friday, May 26, 2000 - 8:45 AM EDT

About LEXIS-NEXIS | Terms and Conditions

Copyright © 2000 LEXIS-NEXIS Group. All rights reserved.

**EXHIBIT C**



# HOPKINS & SUTTER

(A PARTNERSHIP INCLUDING PROFESSIONAL CORPORATIONS)

888 SIXTEENTH STREET, N. W., WASHINGTON, D.C.  20006-4103  (202) 835-8000
FAX (202) 835-8136
INTERNET http://www.hopsut.com

CHICAGO OFFICE   THREE FIRST NATIONAL PLAZA   60602-4209

THOMAS R. DEVINE
(202) 835-8096
Direct Fax: (202) 835-8238
E-Mail: TDevine@hopsut.com

June 14, 2000

**VIA FEDERAL EXPRESS**

Ms. Evelyn J. Martinez
Airport Certification and Compliance Inspector
Airports Division
U.S. Department of Transportation
Federal Aviation Administration
Fitzgerald Federal Building
John F. Kennedy International Airport
Jamaica, NY  11430

> Re:   Stambaugh's Air Service, Inc. Letter Complaint
> Against Susquehanna Area Regional Airport Authority

Dear Ms. Martinez:

This is in response to your letter of May 11, 2000 forwarding the May 2, 2000 letter of Pepper Hamilton (the "Pepper Letter"), counsel for Stambaugh's Air Service, Inc. ("Stambaugh's"). As you may know, Stambaugh's had previously filed a Part 16 complaint against the Susquehanna Area Regional Airport Authority ("SARAA" or the "Authority"), but the FAA dismissed that complaint for failure to attempt informal resolution of the issues raised in the complaint. (*See* April 17, 2000 Letter of Dismissal, from David Bennett, Director of Office of Airport Safety and Standards, attached at Tab 1). The Pepper Letter, while not acknowledging the dismissal of the complaint, is apparently an attempt to meet the requirement to undertake informal resolution. (*See* Pepper Letter at 1, "I understand from our conversation that the FAA prefers that the informal efforts be undertaken prior to the filing of a formal complaint. Therefore, Stambaugh's is submitting this letter to you.")

In the Pepper Letter, Stambaugh's requests that FAA take enforcement action against SARAA. Seeking FAA sanctions against the Authority does not strike us as an attempt at informal resolution. Rather, it appears to be a backdoor way for

F921 10-1

Ms. Evelyn J. Martinez
June 14, 2000
Page 2

Stambaugh's to obtain what it had sought in the dismissed complaint – the imposition of FAA sanctions against the Authority.  We question whether this request would qualify as an attempt at informal resolution should Stambaugh's ultimately file another Part 16 complaint.  Nonetheless, because you have requested that SARAA respond to Stambaugh's letter, we are doing so, and we are enclosing the materials you requested, as well.[1]  In so doing, however, SARAA does not waive any objection to procedural defects that may be pertinent in further proceedings.

At the outset, the Authority emphasizes that it takes seriously its compliance with the applicable statutory and regulatory requirements imposed on it by the federal government, as well as the grant assurances that are conditions of accepting federal Airport Improvement Program ("AIP") grants.  This includes requirements relating to safety, security, and protection of the environment, as well as exclusive rights and economic discrimination.

The Authority supports the avowed goals of the FAA in the various advisory circulars and orders (which are not regulatory documents) concerning exclusive rights

---

[1] Enclosed are the following:

April 17, 2000 Letter of Dismissal, from David Bennett, Director of Office of Airport Safety and Standards, copy attached at Tab 1;

Lease and Fixed Base Operator Agreement Between Stambaugh's Air Service and Commonwealth of Pennsylvania, Agreement No. 814690 (Dec. 19, 1997), copy attached at Tab 2 ("Stambaugh's Lease");

Temporary License for Access to the Harrisburg International Airport (between Susquehanna Area Regional Airport Authority and Hawthorne Aviation, dated Jan. 14, 2000), copy attached at Tab 3 ("License");

Minimum Standards for Conducting Fixed Base Operations at Commonwealth-Owned Airports, 67 Pa. Code Ch. 476 (1997), copy attached at Tab 4 ("Pennsylvania Minimum Standards");

Lease and Fixed Base Operator Agreement Between AERO Services International, Incorporated and Commonwealth of Pennsylvania, Agreement No. 814683 (March 1, 1997), copy attached at Tab 5 ("AERO Lease");

First Amendment to Lease and Fixed Base Operator Agreement (between Susquehanna Area Regional Airport Authority and Stambaugh's Air Service, Inc., effective Jan. 19, 1999), copy attached at Tab 6 ("First Amendment"); and

FBO Minimum Standards for Harrisburg International Airport and Capital City Airport, effective April 11, 2000, copy attached at Tab 7 ("HIA Minimum Standards").

Ms. Evelyn J. Martinez
June 14, 2000
Page 3

and minimum standards.  For example, the FAA states that existence of exclusive
rights at an airport "deprives the using public of the benefits that flow from a
competitive enterprise." *Advisory Circular 150/5190-5 (4/7/00)* ("*AC 5190-5*") at §1(2).
Moreover, "the FAA considers it inappropriate to grant Federal funds for improvements
to airports where the benefits of such improvements will not be fully realized due to
the inherent restrictions of a local monopoly on aeronautical activities at the airport."
*Id.*  In summary, the FAA states that "With few exceptions, an airport sponsor is
prohibited from granting an exclusive right to a single operator for the provision of an
aeronautical activity to the exclusion of others (see definition of exclusive right)." *Id.* at
§1(1).

In its order on Exclusive Rights, the FAA states that "It is the intent of the
foregoing policies to promote fair competition at public-use airports.  It is expected
that public-use airport owners will adopt and enforce minimum standards and
qualifications to be met by those who propose to engage in commercial aeronautical
activities.  *Primarily such standards should protect the interest of the public.*"  *Order
5190.1A Exclusive Rights At Airports* (10/10/85) at § 11(c) (Emphasis added).

In short, the FAA's avowed purpose is to foster a high level of service to the
aeronautical public through the promotion of competition and the elimination of
monopolies.  The actions taken by the Authority have promoted these goals.  Today,
there is more competition in the provision of FBO services and a higher level of service
to FBO customers than at any other time at Harrisburg International Airport ("HIA" or
the "Airport").

Indeed, the Pepper Letter acknowledges that, at various times from 1975
through 1996, Stambaugh's was the *only* FBO operating at the Airport.  (*See* Pepper
Letter at 2.)  Stambaugh's never complained about exclusive rights being granted to an
FBO when it had a monopoly on FBO services at the Airport.  Now that there are *two*
FBOs (AERO Services International Incorporated ("AERO") and Piedmont Hawthorne
("Hawthorne")) providing competing FBO services, Stambaugh's complains of the
granting of an "exclusive right."  In fact, the Authority has successfully injected
competition into the provision of FBO services at the Airport in an effort to raise the
quality of the services provided to the aeronautical public.

Moreover, the Authority did not make its decisions concerning FBOs in
isolation.  It kept the local FAA Airports District Office ("ADO") apprised of the issues it
was facing and the decisions it was making.  The ADO recognized that the Authority
was making business decisions based on valid reasons, and advised that there was no
problem with the Authority's decisions from the standpoint of compliance with federal
requirements.

In support of its letter complaint, Stambaugh's makes a number of allegations
that are either frivolous on their face or completely unsupported by the facts.  The
following is a brief response to those allegations.

Ms. Evelyn J. Martinez
June 14, 2000
Page 4

### Stambaugh's Would Have SARAA Violate FAA's Security Regulations

Stambaugh's complains that "SARAA has engaged in a policy of intimidation and harassment directed at Stambaugh's and its employees." Pepper Letter at 3. As "evidence" of this, Stambaugh's states that "SARAA has repeatedly harassed Stambaugh's employees and forced them to discontinue working on Stambaugh's projects under the guise of checking the identities of the employees. In order to continue this harassment, SARAA representatives routinely require Stambaugh's employees to stop working and to produce identification despite the fact that the SARAA representatives involved know both the identity of the Stambaugh's employees and are aware that the people involved are employed by Stambaugh's." *Id.*

Anyone familiar with aviation security issues knows that FAA's own regulations *require* airport employees (and any other badge holders) to challenge anyone who is in the Air Operations Area ("AOA") who is not displaying the proper, airport-issued identification demonstrating that the person is authorized to have access to the AOA. *See* 14 CFR §§ 107.13 and 107.14. The airport must have in place a system, method, or procedure to "ensure that only those persons authorized to have access to secured areas by the airport operator's security program are able to obtain that access and shall specifically provide a means to ensure that such access is denied immediately at the access point or points to individuals whose authority to have access changes." *Id.*, § 107.14(a). Thus, airport officials (as well as Stambaugh's own employees) must challenge any person on the AOA who is not displaying proper identification (unless escorted by an authorized person with proper identification) even if that person had the proper identification the day before, or even earlier that same day. One reason for this requirement is that a worker who has just been fired may pose a security risk as great as – or greater than – anyone else who does not have authorization to enter the AOA.

In short, Stambaugh's characterizes as "harassment" the Authority's compliance with FAA's own security regulations. Were the Airport not to challenge anyone failing to display the proper identification while in the AOA – whether a Stambaugh's employee or not – the Authority could be cited by the FAA for a violation of its security requirements. Moreover, the Authority has not singled out Stambaugh's employees, but rather, challenges *anyone* failing to display proper identification in the AOA.

The fundamental difference between Stambaugh's situation and that of other companies relates to the number of times that Stambaugh's employees appeared unbadged and unaccompanied on the AOA – in several instances because those employees had never obtained the necessary airport identification before Stambaugh's sent them out onto the AOA – and to the reaction of the individuals and the company to the Authority's efforts in fulfilling its security responsibilities. Two examples illustrate this point.

P32110-1

Ms. Evelyn J. Martinez
June 14, 2000
Page 5

In one case, a Stambaugh's employee flagged down an Airport police officer and asked him to open a gate (to the AOA) for him. The officer questioned him, and the Stambaugh's employee stated that he did not have an HIA ID card issued to him. The officer escorted him back to Stambaugh's, and spoke there with another employee, who said that he did not have an ID badge either, because of a background check hold up. The second employee actually became upset that the officer challenged the unbadged employees!

In another instance, a Stambaugh's employee was standing on top of a fuel truck with no visible airport ID. To make matters worse, he had tied the "deadman" cutoff rope from the fuel line to a truck – a practice that had led to a 350-gallon fuel spill by another Stambaugh's employee earlier in the year. He was challenged by the Airport's manager of operations and security and told to untie the deadman rope to stop the flow of fuel prior to coming down from the truck to produce his identification. The employee stated that he was a new employee, had not obtained an airport ID, and had been left at the ramp by himself.

The response of Stambaugh's president to the citation of his employee for this incident was to claim that the employee tied off the deadman when asked to produce identification so as to avoid delay in the refueling of the truck which "was urgently needed." (That is, Stambaugh's president implausibly claimed that the employee committed a violation of airport safety rules in plain view of an airport official in order to comply with the request to produce ID.) Further, Stambaugh's president wrote that "There should be no interference with individuals, who are obviously employees engaged in duties which involve some risk, just to check ID's unless there is reason to suspect they are a security threat." This is not the Authority's understanding of the FAA's security requirements, and Stambaugh's was told by the airport operations and security manager that it is mandatory that unbadged persons be challenged on the ramp, regardless of whether they appear to be working.

Stambaugh's president did not acknowledge any wrongdoing in sending an employee out onto the AOA who, not only did not *display* the proper ID, but who, in fact, had never *obtained* the proper ID. The practice of sending employees out into the AOA before a background check has been completed and they have been issued proper identification undercuts FAA's carefully crafted program of security access regulations and requirements. Stambaugh's lack of proper compliance disposition on security matters, and its continuing hostility towards airport personnel carrying out *their* security responsibilities is a cause of serious concern to the Authority. That this attitude is embedded in the company culture, and not merely isolated to individual employees, is evidenced by the indignant statement by Stambaugh's president, and the fact that the company to this day, in the Pepper Letter as well as in the aborted March 28, 2000 Part 16 Complaint, complains of the Airport's actions in challenging its unbadged employees.

Ms. Evelyn J. Martinez
June 14, 2000
Page 6

### Stambaugh's Claims that the Authority has Engaged in Economic Discrimination By Permitting AERO to Operate at the Airport Despite Its Failure to Remit Rental Payments – But AERO's Arrearages Were Dwarfed by Stambaugh's Own Arrearages

The Pepper Letter states that ". . . SARAA has not enforced lease terms against AERO that have been enforced against Stambaugh's. Specifically, on information and belief, SARAA has permitted AERO to continue to operate at HIA despite its failure to pay rent. As a result, SARAA has engaged in economic discrimination in violation of 49 U.S.C. § 47107(a)(5)." Pepper Letter at 3. This is an astonishing statement in light of the fact that the enclosed lease documents demonstrate that when the Airport entered into a new lease with Stambaugh's in 1997, Stambaugh's was seriously behind in its rent and fuel flowage payments.

At that time, the Commonwealth of Pennsylvania, the Authority's predecessor in interest, allowed Stambaugh's to enter into a new lease despite the fact that it owed the Airport $298,034.53 in past due rentals, fuel flowage fees, and interest dating back *prior to 1992*, i.e. five years earlier. *See* Stambaugh's Lease (under Tab 2) at §45 (p. 35) and § 4(f) (p. 6). To provide perspective as to the magnitude of Stambaugh's shortfall, its annual rental (but not fuel flowage) payments under the 1997 lease totaled approximately $117,000.

Stambaugh's was allowed, under the lease, to make payments of $10,000 per month for 29 months (with a 30th payment of $8,034.53) to make up the $298,034.53. In fact, it wasn't until Stambaugh's was about to enter into a new lease for its heavy maintenance facility in January of this year that Stambaugh's finally brought its account current.

In contrast, AERO has, at most, been behind by approximately $80,000 in its rent. Moreover, it has made payments needed to cover its arrearages, and has been paying its bills within 60 to 90 days. In light of these facts relating to the respective payment histories of AERO and Stambaugh's, Stambaugh's claim that it has been economically discriminated against is breathtaking in its audacity.

### While Claiming Exclusive Rights Violations, Stambaugh's Objects to the Fact that the Authority Did Not Limit the Bidding For the AMP Hangar to One Bidder (Stambaugh's)

Stambaugh's objects to the fact that SARAA sought competitive bids from more than one potential bidder to lease the AMP Hangar to provide FBO services from that site. Pepper Letter at 4. Stambaugh's hopes to convince the FAA that the Authority's consideration of more than one bid for the site is evidence of an effort to create an exclusive FBO. Under Stambaugh's twisted reasoning, allowing only one bidder,


Ms. Evelyn J. Martinez
June 14, 2000
Page 7

Stambaugh's, to bid to provide FBO services at the AMP Hangar site will not create an exclusive right, but entertaining more than one bid for the site will "create an exclusive FBO." In fact, neither would create an exclusive FBO, since AERO was already operating as an FBO from another site on the Airport.[2]

Moreover, limiting the number of bidders to one would not have increased the chances that a higher level of service would be provided to the aeronautical public; rather, competitive bidding from more than one bidder enhances the quality of the bids from which a selection may be made. This ultimately benefits the public, through the provision of enhanced service.

Stambaugh's also claims that it was "the only company that qualified to provide FBO services at the AMP Hangar" because it was "the only company that both participated in the pre-submission conference and tour and submitted a proposal in a timely fashion." Pepper Letter at 5. In fact, there were other defects with Stambaugh's bid, particularly the failure to include the required financial information. Thus, in a technical sense, there were *no* bids that met all of the requirements of the Request for Qualifications ("RFQ"), including Stambaugh's. However, the Authority had included standard language in the RFQ that allowed it to waive irregularities in the bids, if that was in the interest of the Authority to do so.

While the Authority could have required a new round of bids, it was not required to do so. Further, the Authority was perfectly within its rights in extending the response deadline in order to obtain more bids to evaluate. Of course, compliance with procurement requirements is an issue appropriately decided under state law, and Stambaugh's has also filed a civil complaint in court.[3] For the FAA's purposes, however, it is important to understand that Stambaugh's real complaint is not that *one* bidder was selected to operate an FBO out of the AMP Hangar. Rather, Stambaugh's complaint is merely that *it* was not selected. The selection of one bidder over another does not create an exclusive right, except, potentially, where the incumbent FBO is selected for the new site. That did not happen here. Instead,

---

[2] Contrary to Stambaugh's assertion that "SARAA promised to grant an exclusive arrangement to potential bidders in order to get them to submit bids to provide FBO services out of the AMP Hangar," Pepper Letter at 4, both the RFQ and the License granted to the successful extending bidder clearly state that the FBO services to be granted are non-exclusive. *See, e.g.,* License (under Tab 3) at § 7 "The Licensor hereby grants to the licensee the *non-exclusive* right and privilege to conduct its Fixed Base Operation at the Airport. It is specifically understood and agreed by the Licensee that *nothing herein contained shall be construed as granting or authorizing the granting of an exclusive right* to operate a Fixed Base Operation at the Airport." (Emphasis added.)

[3] Similarly, Stambaugh's has claimed that the Authority interfered with its contracts and business operations. The Authority denies these charges, and points out that they fall within the purview of the pending court case.



Ms. Evelyn J. Martinez
June 14, 2000
Page 8

whether Stambaugh's or Hawthorne or any other FBO but AERO was selected, there would be no exclusive right conferred by the selection of an FBO to operate from the site. Certainly, it is no more "exclusive" for the Authority to have selected Hawthorne (which Stambaugh's didn't want) than it would have been to select Stambaugh's (which Stambaugh's wanted).

Under the guise of protesting the award of an "exclusive" right, however, Stambaugh's seeks for the FAA to inject itself into state law procurement issues and airport management prerogatives and determine that, under federal law and the accompanying grant assurances, the Authority's selection of an FBO for the AMP site must be made from a pool of *exactly one* candidate, Stambaugh's. The FAA should not be persuaded by Stambaugh's cynical attempt to manipulate the agency's application of the exclusive rights prohibition.

### Stambaugh's Assertions of Premature Disclosure of the Authority's Selection Decision are False

Stambaugh's asserts that the Airport Director contacted various customers of Stambaugh's on January 10, 2000 "and informed them that Stambaugh's would not be awarded the lease to the AMP Hangar and would not have FBO rights at HIA." Pepper Letter at 5. This is simply not true. The Airport Director did not contact any such customers to inform them that Stambaugh's had not received the contract until after the Authority Board had made its selection on January 11, 2000. In fact, one of the airline customers complained to the Airport Director about the *lack of* advance warning that Stambaugh's would not be selected. However, the Airport Director could not – and did not – inform the airlines until the Board made its decision.

### Stambaugh's Assertions Concerning Minimum Standards are Incorrect

Stambaugh's claims that "SARAA abandoned the HIA Minimum Standards" when it assumed ownership of HIA. Pepper Letter at 3. This is not accurate. Under the Commonwealth's ownership and control, the minimum standards applicable to FBOs at HIA were codified at 67 Pa. Code Chapter 476. *See* Pennsylvania Minimum Standards (under Tab 4). This provision was incorporated by reference in each FBO lease entered into by the Commonwealth, to wit, with Stambaugh's and AERO. *See* Stambaugh's Lease (under Tab 2) at § 15 (p. 15) and AERO Lease (under Tab 5) at § 15 (p. 14). The imposition, through the lease, of the requirement to comply with the minimum standards was not removed from the lease when the Authority assumed control of the Airport, even when there was an opportunity to do so. For instance, in 1999, Stambaugh's and the Authority amended the 1997 lease, but did not delete or modify § 15 concerning minimum standards. *See* First Amendment (under Tab 6).

Ms. Evelyn J. Martinez
June 14, 2000
Page 9

Thus, the existing FBOs, AERO and Stambaugh's, were obligated to comply with the minimum standards through their leases with the Authority. In addition, the RFQ that the Authority issued concerning the AMP Hangar also had a section containing minimum standards (see *RFQ* (attached to the Pepper Letter) at 4-6). The temporary license granted to the selected bidder, Hawthorne, in January of this year also contained a similar provision concerning minimum standards. *See* License (under Tab 3) at § 7 and at Exhibit G. [4]

Finally, the Airport has adopted, by resolution, minimum standards that apply to FBOs and other providers of aeronautical services. *See* HIA Minimum Standards (under Tab 7). Moreover, as discussed below, the minimum standards adopted by the Authority are substantially similar to the previous standards adopted by the Commonwealth of Pennsylvania and incorporated into the FBO leases.

Those standards require, for example, that fueling operations be conducted in compliance with FAA regulations and advisory circulars and any federal, state, and local regulations. In addition, the Airport's standard leases contain provisions that require compliance with state and federal regulations and Airport rules and regulations. Noncompliance with, and a non-compliant attitude towards, such regulations, is a factor that can, and should, be taken into account by an airport in determining whether to renew a lease or award a lease to one bidder over another.

Stambaugh's would have the FAA determine that any FBO that proposed, for instance, to provide the specified square footage of space for certain activities, and the specified amount of fueling capability, must be granted the opportunity to conduct an FBO operation at an airport, regardless of how egregiously it had violated FAA, EPA state, and airport regulations. Such a proposition is absurd. Equally absurd is Stambaugh's apparent premise that an airport must allow an unlimited number of FBOs to operate on the airport. If this were truly the case, RFQs for FBO sites would be virtually meaningless, as the losing bidders could just force the airport to build additional FBO sites.

Simply put, in order to promote the FAA goals of high levels of service to the public, an airport must be allowed to take into account the changing circumstances at

---

[4]  Moreover, the License requires Hawthorne to comply with "current or future applicable federal or state laws, regulations, ordinances, codes, and rulings." *Id.* at § 7. Furthermore, "the right and privilege to conduct a Fixed Based Operations at the Airport shall exist only so long as the character of the facilities operated or services furnished by the Licensee shall be consistent with the high quality of facilities and services provided by other Fixed Based Operators at the Airport and in accordance with the standards required by the Licensor." *Id.* As a result, the standard the new FBO must meet at the Airport is a level of quality of facilities and services at least as great as that provided by AERO – which could be higher than the Minimum Standards.



Ms. Evelyn J. Martinez
June 14, 2000
Page 10

an airport (for example, whether, as an airport develops, it is appropriate to renew a lease to allow the continuing operation of an FBO facility with no landside access except through a heavy maintenance facility), and the compliance record and compliance disposition of a tenant whose lease is expiring or who is bidding on a new facility.

### Stambaugh's Assertions About the Authority's Treatment of AERO are False

Stambaugh's simultaneously complains that the Authority "improperly" allowed AERO to continue providing FBO services at the Airport (despite AERO's alleged failure to meet its lease obligations), Pepper Letter at 3, and that the Authority is conspiring (through the recent establishment of minimum standards) to drive AERO from the Airport, Pepper Letter at 5. In essence, Stambaugh's alleges that the airport has coddled and then turned against AERO. Together, these allegations make no sense, and neither one is true.

As noted above, the Airport has indulged Stambaugh's far more than it did AERO concerning past due rents, the one specific area Stambaugh's has cited as "evidence" of economic discrimination. Further, Stambaugh's assertions concerning AERO's supposed inability to meet minimum standards are highly speculative and unfounded. AERO currently meets those standards, and the Authority has every expectation that it will continue to do so. Moreover, the minimum standards currently in effect at the Airport are not significantly different from those imposed by the Commonwealth of Pennsylvania and incorporated into the leases of both Stambaugh's and AERO. Thus, there has been no manipulation of the standards to first keep in, and then drive out, AERO.

### Conclusion

The Authority's decision not to allow the continuation of an FBO operation co-located with Stambaugh's maintenance facility was a business decision based on the Authority's desire to upgrade the FBO services provides to the public. The Authority believes that, at this point in the Airport's development, it is not appropriate to have an FBO operation that cannot be accessed from the landside without passing through a storage area containing assorted wreckage and then through a heavy maintenance facility, particularly when there are two other sites on the Airport for FBO services, including the newly available AMP site. No one is or will be allowed to operate an FBO facility that does not provide direct landside access, whether at Stambaugh's location or at any other maintenance facility that may be located on the Airport in the future.

Stambaugh's was not selected as a lessee for the AMP site after an RFQ process that included several competitors. The Authority selected the competitor it believed would provide the best service to the public. Competition for FBO services at the

Ms. Evelyn J. Martinez
June 14, 2000
Page 11

Airport is very vigorous, with the result being an increase in the level and quality of service the public receives. That is the goal of the prohibition against exclusive rights, and the Authority is achieving that goal at the Airport.

Stambaugh's has provided the FAA only with Stambaugh's perspective, and has neglected to mention its past failures to pay huge amounts of rent, its failure to follow proper fueling procedures, even in the wake of a 350 gallon fuel spill, and its noncompliance with – and non-compliant attitude towards – FAA's own security requirements concerning access to the AOA. In light of these factors, the selection of another FBO over Stambaugh's to provide services at the AMP site is perfectly justified.

Stambaugh's argues that, in the name of not establishing an "exclusive right" at the Airport, the Authority should have limited the prospective bidders to only one entity, Stambaugh's, on the grounds that Stambaugh's alone complied with RFQ requirements. In fact, Stambaugh's response was deficient; the RFQ provided that the Authority could waive irregularities; extending the deadline allowed competition for the right to provide FBO services; and this has led to enhanced service at the Airport.

Moreover, by Stambaugh's own reasoning, if the Airport should have defaulted AERO for its arrearages in rents, the Airport should clearly have defaulted Stambaugh's years ago, for far greater arrearages. Thus, Stambaugh's claim of economic discrimination has no merit.

In short, the Authority's determinations concerning FBO facilities and services have enhanced competition at the Airport, with a resulting increase in the level of services provided to the aeronautical public. The Authority's decisions were consistent with the letter and the spirit of the applicable federal provisions concerning exclusive rights and economic discrimination, as demonstrated by the fact that the Authority kept the ADO informed of the actions it was taking and the reasons for them, and the ADO indicated no concerns with those actions.

Ms. Evelyn J. Martinez
June 14, 2000
Page 12


I trust that the above discussion provides you with sufficient information to determine that the Authority has neither granted an exclusive right nor economically discriminated against Stambaugh's.  If you have any questions or need additional information, please feel free to contact the Airport Director, David Fleet, at (717) 948-4600 or myself at (202) 835-8096.

                              Sincerely,

                              Thomas R. Devine

                              Counsel for Susquehanna Area
                              Regional Airport Authority


Attachments

**Attachments**

**Attachment 1**

   FAA Dismissal of Part 16 Complaint

**Attachment 2**

   Stambaugh's Lease

**Attachment 3**

   License (Hawthorne)

**Attachment 4**

   Pennsylvania Minimum Standards

**Attachment 5**

   AERO Lease

**Attachment 6**

   First Amendment (to Stambaugh's Lease)

**Attachment 7**

   HIA Minimum Standards



# HOPKINS & SUTTER

(A PARTNERSHIP INCLUDING PROFESSIONAL CORPORATIONS)

888 SIXTEENTH STREET, N. W., WASHINGTON, D.C. 20006-4103 (202) 835-8000
FAX (202) 835-8136
INTERNET http://www.hopsut.com

CHICAGO OFFICE  THREE FIRST NATIONAL PLAZA  60602-4205

THOMAS R. DEVINE
(202) 835-8096
Direct Fax: (202) 835-8238
E-Mail: Tdevine@hopsut.com

August 25, 2000

## VIA TELEFAX AND FEDERAL EXPRESS

Ms. Evelyn J. Martinez
Compliance Program Manager
Airports Division
Federal Aviation Administration
U.S. Department of Transportation
1 Aviation Plaza
Jamaica, NY 11434-4809

> Re:  Stambaugh's Air Service, Inc. Letter Complaint
> Against Susquehanna Area Regional Airport Authority

Dear Ms. Martinez:

Thank you for providing, through your letter of July 27, 2000, an opportunity for the Susquehanna Area Regional Airport Authority ("SARAA" or the "Authority") to submit a response to the July 11, 2000 reply of Stambaugh's Air Services, Inc. ("Stambaugh's" and "Stambaugh's Response") to the Authority's June 14, 2000 response (Authority's Response") to Stambaugh's May 2, 2000 letter complaint filed by its counsel, Pepper Hamilton, LLP ("Pepper Letter"). I also appreciate your allowing SARAA until August 25, 2000 to submit a reply. As I mentioned in my voicemail to you, I received your letter while I was in the midst of preparing an answer (due on August 16) for another client in a formal Part 16 proceeding brought by another disgruntled FBO. As you know, the formal Part 16 process involves very demanding deadlines for the drafting of an answer (and motion to dismiss) and the gathering and submission of evidence on which the airport relies, regardless of how frivolous the complaint by the FBO.

Stambaugh's Response, in essence, accuses the Authority of setting up straw men and then knocking them down, rather than responding to Stambaugh's actual arguments. Stambaugh's Response at 1-2. Having reviewed both the Pepper Letter, and the Authority's response, the Authority believes it accurately portrayed the Pepper Letter and addressed the real issues underlying Stambaugh's position. Ironically,

P33976-1



Ms. Evelyn J. Martinez
August 25, 2000
Page 2

Stambaugh's Response then adopts the practice it has wrongfully attributed to the
Authority, and mischaracterizes the Authority's position. We will point out some of
the more egregious examples of Stambaugh's misleading claims; however, the
Authority denies all of Stambaugh's substantive claims, regardless of whether we
specifically respond to them in this letter or not. The Authority stands by its June 14th
letter and will not repeat here all of the arguments contained in the Authority's
Response, as the FAA is quite capable of evaluating the competing claims of the
parties in this regard.

Regardless of the spin Stambaugh's puts on its complaint, to sustain
Stambaugh's case, the FAA would have to determine that an airport (1) is powerless to
discontinue an FBO's operation for violation of FAA regulations, as well as airport
regulations, (2) could not decide to upgrade the provision of FBO services, so that it
must accept with the lowest level of FBO service it has ever allowed at the airport, and
(3) would always have to renew an expired FBO lease. Nothing in the law, FAA
guidance or policy compels such a result, and the FAA should not reach that result
here. To the contrary, SARAA consulted with the ADO on its business decision not to
include Stambaugh's FBO operation in the lease it negotiated upon expiration of
Stambaugh's lease, and the ADO was comfortable with that position.

### The Failings of Stambaugh's Complaint Are Illustrated by Its Misguided Charges Concerning Security Issues

Concerning Stambaugh's violations of FAA and Authority security
requirements, Stambaugh's claims the Authority "misstates and then attacks
Stambaugh's complaint regarding SARAA's inspection practice." Stambaugh's
Response at 3. The accusation of "misstatement" is most peculiar, as the Authority
extensively *quoted*, accurately, Stambaugh's own statement of this issue in the Pepper
Letter. Authority's Response at 4. That Stambaugh's could claim that an accurate
quote from its letter complaint amounts to a "misstatement" of its position is
mindboggling. If it wants to back away from its earlier claims, Stambaugh's should
just state that it has rethought its position, instead of describing a quote of its
previous statements as "misleading."

The Authority neither mischaracterized nor misunderstood Stambaugh's
claims, it merely disputes them. Stambaugh's claims that "SARAA employees use
security as a ruse to check the identifications of Stambaugh employees who are
performing work on aircraft." Stambaugh's Response at 3. This is simply untrue, as
the Authority stated in its previous letter. Authority's Response at 4-5. As we said
then, what Stambaugh's claims is a "ruse," is instead Authority compliance with FAA
security requirements. It is not a ruse. The Authority supports, and carries out FAA
mandates on security. Checking identification is a key component of airport security.
The Authority does not "target" particular times to check ID's. Rather, *any time*
Authority personnel see *anyone* in a secured area without a proper ID, the Authority
personnel challenge them, as they must, under FAA rules. The solution to

Ms. Evelyn J. Martinez
August 25, 2000
Page 3

Stambaugh's problem is not to have Authority personnel ignore their FAA-mandated
security responsibilities at certain times for Stambaugh's convenience, but rather, for
Stambaugh's to ensure that its employees always display their proper Airport-issued
ID, as required by FAA.   Stambaugh's persistent refusal -- even in the July 11
response -- to recognize this, and, instead to characterize as "harassment" SARAA's
adherence to FAA requirements is compelling evidence that Stambaugh's does not
understand its responsibility to adhere to FAA security requirements.[1]   This
noncompliant attitude is troubling to SARAA, and it should trouble the FAA as well.
The Office of Civil Aviation Security should be apprised of this situation and take
appropriate action.

Stambaugh's also claims that the Authority's description of two incidents
involving unbadged employees is "misleading."[2]   Stambaugh's attempts to justify
sending unbadged employees onto the AOA because SARAA supposedly "experienced
substantial problems in producing badges for new employees."   Stambaugh's
Response at 4.  First, SARAA did not take an inordinate amount of time to produce the
badges; indeed, any time taken was to ensure compliance with FAA requirements,
such as criminal background checks.  Airports must, of course, comply with these
FAA security requirements, even when they take more time than airport tenants may
like.

----

[1] Stambaugh's characterization of "SARAA's *supposed* security concerns," (Stambaugh's
Response at 3 (emphasis added)), and its assertion that SARAA's checking of ID's at certain
times "certainly cannot be justified on the grounds of promoting airport security" (*id.*), evidence
the continuing total lack of understanding of FAA security requirements, and a noncompliant
attitude towards such requirements.

[2] Stambaugh's remarkably asserts that these are "apparently the only two incidents of such
conduct in twenty-five years," (Stambaugh's Response at 4) without providing any basis for
such an assertion. While the Authority only cited to two egregious examples in its June 14th
Response, that is no indication that there were not other incidents. In fact, Stambaugh's had
more than two incidents in 1999 alone.  For example, on June 25, 1999, the same employee
involved in the July 13 fueling incident was cited for being on the AOA without displaying ID.
On August 8, 1999, another Stambaugh's employee was cited for driving a Stambaugh's vehicle
on the AOA without an Airport ID.  The citation notes that the individual does not have an
Airport ID.  On August 9, 1999, an individual who did not have an Airport ID (and was not
escorted by an authorized Stambaugh's employee) was, himself, escorting another individual
onto the AOA to fill fuel tanks.  On June 28, 1999 a Stambaugh's employee was cited for not
displaying ID on the ramp with aircraft.  On December 21, 1999, two vans were cited when
they were observed driving away from Stambaugh's with no escort, no ID's, and no way to exit
the airfield at the gate.

Interestingly, despite Stambaugh's claims that the Authority "harassed" Stambaugh's
employees while performing engine work, none of these citations appeared to have taken place
while its employees were engaged in such work.

Ms. Evelyn J. Martinez
August 25, 2000
Page 4

Second, regardless of whether Stambaugh's thought the amount of time to produce the badges was excessive, *there is no justification for sending unbadged employees out onto the AOA in contravention of FAA security directives.* If airport tenants take it upon themselves to determine that unbadged personnel (for whom a background check may not have been performed) can be sent out to the AOA, the FAA security program will be compromised.

Stambaugh's then fulminates about SARAA's reference to the position taken by the President of Stambaugh's in describing the actions of a Stambaugh's employee who failed to display proper ID, and who tied off the deadman cutoff of a fuel truck. Stambaugh's states flatly that "Mr. Stambaugh did not make that claim at all." Stambaugh's Response at 4.

In fact, Mr. Stambaugh *did* describe the incident exactly as the Authority stated; he did so in a letter to the Airport dated August 2, 1999 (Attachment 1 hereto). Far from indicating that the employee was terminated, as Stambaugh's now claims (Stambaugh's Response at 4), Mr. Stambaugh stated that the employee was "counseled," and Mr. Stambaugh tried to distinguish the employee's behavior from that of another employee who had caused a 350-gallon fuel spill two months earlier by the same practice of tying off the deadman's cutoff. Instead of indicating in any way that the employee's "explanation" was false, Mr. Stambaugh spent three paragraphs presenting the "explanation" as fact:

> Mr. Kopara is a new employee. He was on top of his refueling truck, securing the rope to the deadman shut off on the storage tank, and observing the rising level of the fuel in the tank.

> The Airport Operations Manager approached the truck and asked him if he had an airport ID. He said not yet. She asked if he had any identification. He replied he had a driver's license. She asked if she could see it.

> The truck Mr. Kopara was filling was urgently needed. In order to reduce the delay caused by the interruption he tied off the deadman rope, knowing he had ample time to descend, show his drivers license and get back up to release the rope and finish filling his truck. He was immediately cited for his action.

*Id.*

While acknowledging that the employee was "wrong" to tie off the deadman cutoff, "even though there was really not a 'glaring safety violation clearly indicating a high risk situation,'" Mr. Stambaugh then wrote:

F339976-1



Ms. Evelyn J. Martinez
August 25, 2000
Page 5

> Mr. Kopara was confronted with a choice to ignore, temporarily, the request of the Operations Manager and continue his job hoping to avoid delay of aircraft needing fuel or comply [with the request for ID]. There should be no interference with individuals, who are obviously employees engaged in duties which involve some risk, just to check ID's unless there is reason to suspect they are a security threat.

*Id.*

Thus, Mr. Stambaugh *did not reject the employee's explanation*, as Stambaugh's now claims (Stambaugh's Reply at 4), but instead, *Mr. Stambaugh advanced the employee's explanation in his letter to the Authority*, intended for the Authority to believe it, and attempted to justify this version of the employee's actions by arguing that the Authority should not have checked the employee's ID under these circumstances.

It is entirely appropriate to "assign that explanation to Mr. Stambaugh" (Stambaugh's Response at 4), when that explanation is contained in a letter to the Authority signed by Mr. Stambaugh. While Stambaugh's now acknowledges that the employee's explanation is "unacceptable" (*id.*), it is disturbing to the Authority, and should be disturbing to the FAA, that at the time, Stambaugh's president attempted to convince the Airport of the employee's concocted story — which was contradicted by the eyewitness account of the Airport's Manager of Operations and Security.

It is equally disturbing that Stambaugh's, when confronted with the accurate characterization of its President's troubling statements, chose to deny that he ever made them. They were contained in a letter that he wrote, so their existence should be no surprise to Stambaugh's, and Stambaugh's could certainly have checked before accusing the Authority of unfairness.

The misdirection contained in Stambaugh's letter should not be allowed to distract from the main point — Stambaugh's, to this day, does not acknowledge the necessity of following FAA's requirements concerning security. Further, Stambaugh's mischaracterizes as "harassment," Authority actions to carry out those FAA requirements, e.g., challenging those persons not displaying proper ID. Far from constituting harassment, the Authority's actions are mandated by the FAA. Thus, the FAA should give no credence to Stambaugh's charges and should note Stambaugh's non-compliant attitude and actions.

### Stambaugh's Distorts Its Record on Fuel Spills, Which is Less Than Exemplary

Stambaugh's further objects to the fact that the Authority did not provide "any detail" on the fuel spill caused by its employee who tied off the deadman cutoff and caused 350 gallons to leak onto the Airport because, Stambaugh's claims, "the facts speak so favorably for Stambaugh's." Stambaugh's Response at 4. First, while



Ms. Evelyn J. Martinez
August 25, 2000
Page 6

Stambaugh's did fire the person who caused that spill, the Authority is concerned that Stambaugh's, in the August 2, 1999 letter, misstated the facts surrounding a subsequent incident in which another employee had similarly tied off the deadman's cutoff, and then tried to defend the employee's supposed actions, rather than acknowledging that the employee had followed the same practice that had led to the fuel spill just two months before. In short, after the first incident, Stambaugh's should have ensured that its employees never again engaged in the dangerous practice of tying off the deadman cutoff.

Second, the fuel spill was contained due to the efforts of a great number of people, including Authority, state, and local government teams, among them the 193rd Air National Guard wing. It is not as if Stambaugh's, which single-handedly caused the spill, was solely responsible for preventing significant environmental damage. Indeed, it would be fair to state that Stambaugh's did not even take a leading role in the containment effort.

Third, contrary to Stambaugh's claims, this was not the only fuel spill to have occurred in a "quarter century" of Stambaugh's fueling aircraft at the Airport. Stambaugh's Response at 4. In fact, it was not even the only fuel spill in 1999! The Authority has documented seven (7) fuel spills by Stambaugh's in 1999, ranging from under a gallon to over 300 gallons each. [3]

Stambaugh's did not report one of the fuel spills, which occurred on December 6, 1999. The quantity of the spill was thus unknown. Authority personnel discovered the spill the next day, when they noticed granular absorbent materials still on the ramp (not swept up), fuel-soaked booms in a spill response cart mixed in with clean booms, and contaminated absorbent material loose in the response cart. Obviously this was not a spill that was unnoticed by Stambaugh's. Someone was aware of it, and tried to clean it up without reporting it, in violation of Authority regulations. This hardly evidences a "company culture which is reflected in Stambaugh's *sterling* record . . ." Stambaugh's Response at 4 (emphasis added).

### Stambaugh's Claim of Economic Discrimination is Ill-Founded

Stambaugh's asserts that its own huge arrearages to the Airport cannot be considered when determining whether the Authority has discriminated against Stambaugh's by, allegedly, allowing AERO Services International Incorporated ("AERO") to operate rent-free while not allowing Stambaugh's the same privilege. Stambaugh's clever contrivance is that its own arrearages, and the settlement thereof, occurred on the Commonwealth of Pennsylvania's watch, and therefore, it contends,

---

[3] In addition, there was an unreported hydraulic spill from a Stambaugh's fuel truck on April 29, 1999 and an oil leak from a fuel truck on September 9, 1999.

Ms. Evelyn J. Martinez
August 25, 2000
Page 7

are irrelevant to its charge of discrimination by the Authority in favor of AERO.
However, the Commonwealth was the Authority's predecessor-in-interest, the
agreement was reached in 1997, and payments were still being made to the Airport
after the Authority assumed control in 1998. Thus, this is not ancient history, but
directly relevant to the issue raised by Stambaugh's.[4]

It is clearly relevant to the issue of whether there has been economic
discrimination against one tenant in favor of another tenant to determine whether the
complaining tenant has received similar indulgence, or has always been held strictly
liable to make timely payments. Stambaugh's still had not made up its arrearages
through 1999; thus, it is simply wrong when it claims that it was economically
discriminated against at any time in the recent past because AERO did not make all of
its payments on time.

Stambaugh's also accuses the Authority of a "sleight of hand" in comparing
Stambaugh's arrearages to AERO's. Stambaugh's has admitted that it owed the
Airport $298,034.53[5]. In the Authority's Response, the Authority stated that AERO
had been behind, at most, by approximately $80,000. Authority's Response at 6. In
that letter, the Authority mistakenly characterized AERO's arrearage as "rent." Id. In
fact, AERO was current on its rental payments, and the arrearage related to fuel
flowage fees that were more than 60 days due. We regret any confusion caused by
mistakenly referring to the arrearage as "rent." The significant point, however, is that
$80,000 was the *total amount* that AERO had owed the Airport for more than 60 days.

Simply put, $80,000 is much less than the $298,000 that Stambaugh's had
owed the Airport. While the amount Stambaugh's owed included a significant interest
component, that was because some of the amounts were owing for up to five years.
AERO too, has been charged interest for its arrearages, but since its longest
delinquency was just over 120 days, the total interest charges were significantly lower.
When AERO's arrearage was at its peak (at approximately $100,000 in June) it was
charged $3000 in monthly interest/late fees.

---

[4] Stambaugh's meritless position can be refuted by a simple hypothetical: if Stambaugh's had
paid its rent to the Commonwealth two years in advance, just before the Commonwealth
transferred the Airport to the Authority, would Stambaugh's agree that it still owed rent to the
Authority on an ongoing basis for those two years, because the prior payments were made to
the Commonwealth and not the Authority?

[5] This is the amount Stambaugh's agreed to pay, not the amount that was originally in dispute.
Thus, Stambaugh's attempt to characterize its failure to pay this amount as somehow justified
in its lease dispute with the Commonwealth (Stambaugh's Response at 5) is misguided. The
amount the Commonwealth forgave is irrelevant to the current dispute, and was never raised
by the Authority.

Ms. Evelyn J. Martinez
August 25, 2000
Page 8

Moreover, AERO has recently brought its over 60-day arrearage to virtually zero (specifically, $24.75). Thus, AERO is not behind in its rent or its fuel flowage fees. The Authority has diligently pursued the fees AERO had owed, and AERO has been very responsive in clearing up its account. The respective payment histories of AERO and Stambaugh's and the current payment status thus demonstrate that there has been no economic discrimination *against* Stambaugh's.

In addition, as Stambaugh's has complained elsewhere in its letter, Stambaugh's is not currently operating an FBO operation at the Airport, so AERO's payments do not affect Stambaugh's business.

Concerning Piedmont Hawthorne ("Hawthorne"), the other FBO that operates at the Airport, Stambaugh's complains that Hawthorne would not be paying rent if Stambaugh's were selling fuel at the Airport (i.e., operating as an FBO). Stambaugh's Response at 6. *See also id.* at 3. First, as noted above, Stambaugh's is not operating as an FBO or selling fuel at the Airport, so this provision is not in effect, and there is no on-going practice about which Stambaugh's can complain.[6]

Second, when Stambaugh's was operating as an FBO, it did not pay additional rent for its space above and beyond what it paid for the heavy maintenance facility, although it did pay fuel flowage fees based on its fuel sales. That is, its rental payments were all allocated to its maintenance facility only.[7] Thus, the provision in the Hawthorne license would equalize the circumstances between Stambaugh's and Hawthorne.[8]

Having complained of allegedly discriminatory treatment, Stambaugh's then complains that its lease payments were increased (Stambaugh's Response at 6), when that increase merely brought its rental rate for hangar space in line with that paid by other tenants, such as AERO. This is hardly "disparate treatment." Stambaugh's

---

[6] Even if Stambaugh's were operating an FBO or selling fuel at the Airport, different lease terms and conditions may be warranted by different leasing time frames. *Wilson Air Center, LLC v. Memphis and Shelby County Airport Authority*, Docket No. 16-99-10, 2000 WL 1130530 at *14 (F.A.A., Director's Determination filed August 2, 2000).

[7] For instance, when the FBO facility was deleted from Stambaugh's lease, its rent did not go down, reflecting the fact that there never was an additional rental component for the FBO facility.

[8] This provision was included in contemplation of a lawsuit that had been filed by Stambaugh's, which was not operating an FBO at the Airport, to obtain an injunction to reinstate its FBO operation. As noted above, Stambaugh's would not pay additional rent (but would pay fuel flowage fees) if its FBO operation were reinstated.



Ms. Evelyn J. Martinez
August 25, 2000
Page 9

then states that it is required to pay rent and others are not. *Id.* However, as noted above, AERO is, and has been, current on its rent.

### Stambaugh's Rehashes its Complaint Regarding the RFQ Process

Stambaugh's repeats its assertion that it was the only qualified bidder under the RFQ process for the AMP hangar. Stambaugh's Response at 6. The Authority already refuted that assertion in its earlier submission. Authority's Response at 6-7. The Authority noted that Stambaugh's had not provided the required financial information. *Id.* at 7. Stambaugh's now claims that this is a new concern (Stambaugh's Response at 6, n. 2), and includes a letter from the Airport Director stating that Stambaugh's bid would be complete upon review by the Airport Director of the required financial information at a meeting. Stambaugh's states the meeting took place, and therefore the application was complete.

In fact, at the referenced meeting, Stambaugh's tendered only a one page summary of financial information (which was inadequate), the Airport Director asked if Stambaugh's would be submitting anything more, Stambaugh's said it would not, and the Airport Director indicated that Stambaugh's application would therefore be considered based on the information it provided. The Airport Director did not indicate that the financial information submitted was deemed adequate or that Stambaugh's application was considered complete by virtue of that submission. Stambaugh's has not produced any documentation to that effect, merely the Airport Director's letter stating that viewing the required information would complete the RFQ. [9]

The same arrogance Stambaugh's displayed in assuming that it could provide inadequate financial information and yet still have its application considered complete, is reflected in its response that it has "identified the RFQ process as part of SARAA's pattern of creating an exclusive FBO," and that "[t]he RFQ process was nothing more than a subterfuge" (Stambaugh's Response at 6) as if these are facts that must be accepted by the FAA, when they are merely Stambaugh's arguments.

Stambaugh's argues that it never complained that other bidders were allowed to participate in the RFQ (Stambaugh's Response at 6), but that is exactly what its complaint concerning the RFQ is about. This remains the case, whether it mixes in its complaint about not being able to operate out of its maintenance facility (*id.* at 7), which has nothing to do with the RFQ issue, repeats its false mantra that AERO is not paying rent (*id.*), or asserts that AERO is not operating its FBO from the AMP hangar

---

[9] This failure is compounded by the fact that the information was not timely submitted with Stambaugh's original application. Although Stambaugh's has complained earlier about the fact that the Authority extended the original RFQ submission deadline (Pepper Letter at 4), this was done, in part, to permit Stambaugh's to remedy the deficiency in its application. This hardly evidences unfair treatment of Stambaugh's.



Ms. Evelyn J. Martinez
August 25, 2000
Page 10

(*id.*) which is true, but irrelevant to the RFQ issue. As noted in the Authority's Response, an exclusive rights claim with respect to the RFQ would only be cognizable if the incumbent FBO, AERO's, had been awarded the AMP facility. It was not.

**Stambaugh's Claim About Premature Disclosure of the Board Action is False**

Stambaugh's continues to assert that the Airport Director informed various individuals before the Board action on the RFQ that Stambaugh's would not be allowed to provide fueling services. This is not true. The Airport Director certainly had discussions with various tenants and operators about the staff's *recommendation* to the Board, which was publicly available information, and it is conceivable that some of them might have assumed the Board would follow that recommendation. The Board is not required to adopt the staff recommendation, and it certainly does not always do so. Only after the Board acted upon the staff recommendation, however, did the action become an official Authority action that was reported as such by the Airport Director.

**Stambaugh's Does Not Accurately Portray the State of
Minimum Standards at the Airport or Its Compliance with Them**

As stated in the Authority's Response, the Authority never deleted the incorporation by reference of the Commonwealth's minimum standards from Stambaugh's lease or any other lease. Moreover, the minimum standards adopted by the Authority are substantially similar to those Commonwealth Minimum Standards incorporated by reference. Notable upgrades include the fact that "The entrance to the lounge and planning areas shall be separate from the hangar space and any space used for maintenance," (sec. 2.3), and "all buildings will be constructed of high quality materials, satisfactory to the Airport Authority, and provide a first class image (sec. 2.5)." As noted in the Authority's Response, the Authority does not intend to allow any FBO facilities at the airport where access is through a maintenance facility. Authority's Response at 10.

Notably, Stambaugh's now concedes that the Airport would be justified in refusing to allow anyone to provide FBO services if they do not have a willingness or ability to comply with applicable laws, not just the minimum standards. Stambaugh's Response at 8.

**Stambaugh's Misrepresents the Provision of Services by AERO
and Hawthorne, Which, in Fact, Meet the Airport's Minimum Standards**

Stambaugh's asserts that AERO only provides fueling services. Stambaugh's Response at 8. In fact, AERO provides aircraft maintenance, more specifically airframe and powerplant, and ground handling services. Stambaugh's also asserts that Hawthorne provides only fueling services, and has no qualified airframe mechanic. In fact, Hawthorne does employ a qualified mechanic at the Airport, and

Ms. Evelyn J. Martinez
August 25, 2000
Page 11

Hawthorne's general manager is also a qualified mechanic, who has provided back-up service for the staff mechanic. For avionics, Hawthorne contracts out for these services, as did Stambaugh's. Hawthorne provides ground support maintenance as well. Thus, Stambaugh's assertions regarding failure of these FBOs to meet the minimum standards are off the mark.

**The Authority's Actions have not Created an Exclusive FBO Right at the Airport**

For the reasons set forth above -- particularly Stambaugh's persistent refusal to follow FAA-mandated security requirements (and its continuing objection to the Authority following such mandates), and its poor record regarding fueling practices (and its failure to acknowledge its violations), combined with the Authority's desire to upgrade the provision of FBO services to first-class operations in terms of facilities and interface with the public, as noted in the Authority's minimum standards -- the Authority was justified in not allowing Stambaugh's to continue to provide FBO services from its maintenance facility.[10]

The Authority will not allow any tenant to provide such services from a heavy maintenance facility. Consistent with that policy, Hawthorne is developing a maintenance facility, and its FBO services will not be allowed to be co-located there. While Stambaugh's claims that most of its customers did not gain access to the FBO facility through the maintenance facility (Stambaugh's Response at 9), many, in fact, did. The problem with such access is the same as the circumstances that can be found at any local gas station or car dealer service department. Typically such facilities have signs indicating that customers are not allowed in the service areas, because of safety or insurance concerns. Similarly, given the availability of other locations to provide FBO services, it did not make sense to allow Stambaugh's to continue its FBO operation in conjunction with its maintenance facility.[11]

---

[10] Contrary to Stambaugh's assertion (Stambaugh's Response at 2), SARAA accurately stated the record when it wrote that the Authority has promoted FBO competition by increasing the number of FBOs at the Airport. That increase occurred before the instant procurement, and SARAA has not suggested otherwise. SARAA's point has been that Stambaugh's was not concerned about "exclusive" rights during the years it was the exclusive FBO at the Airport, but ironically now is vitally concerned, notwithstanding the vigorous competition for FBO services at the Airport.

[11] In addition to the access problems with Stambaugh's FBO location discussed above, is the further problem that other customers accessed Stambaugh's FBO through a secure gate to the air cargo area, then traversed the air cargo apron. Stambaugh's concedes this to be the case. Stambaugh's Response at 9. This arrangement is well short of optimal service, and presents administrative and security problems. It is a sound business decision for the Authority to insist on FBO locations that avoid these problems.



Ms. Evelyn J. Martinez
August 25, 2000
Page 12

The Authority's business decision is altogether consistent with FAA policy and the grant assurances, and does not constitute an exclusive right. As the FAA recently held:

> The fact that the Complainant does not enjoy the ability to offer every variety of aeronautical service upon terms it deems sufficiently advantageous or *at the location of its choice* does not constitute the granting of an exclusive right to its FBO competitor.

*Wilson Air Center*, 2000 WL 130530 at *23 (emphasis added).[12]

The Authority points out that it consulted with the ADO about its decision not to include Stambaugh's FBO operation in the lease it negotiated when the existing lease expired. The ADO recognized that the Authority was making a legitimate business decision regarding the operation of its Airport and raised no objections. Indeed, FAA has recently noted that airports "can pursue agreements with the more recent leaseholders that more nearly serve the interests of the public and provide for more professional business practices." *Id.* at *13-14. The same principle of allowing airports to upgrade business practices for the public interest are equally applicable to new leases with existing leaseholders whose leases have expired.

At this point, even Stambaugh's acknowledges that an airport is entitled to prohibit a tenant from providing FBO services if that tenant has violated laws or regulations. Stambaugh's Response at 8. Thus, the violations described above, in and of themselves, would be sufficient to prohibit Stambaugh's from continuing its FBO operation at the maintenance site.[13]

---

[12] In addressing unjust discrimination, the FAA similarly held:

> No Federal obligation requires a sponsor to forgo improved business practices or efficient allocation of airport property, even if to do so would [im]pose differing terms and conditions among users of the Airport. Of course, a sponsor must not unjustly discriminate; however, it should not be punished for exposing past practice in attempts to improve those practices.

*Wilson Air Center*, 2000 WL 130530 at *14. Thus, the fact that previous Airport management had allowed FBO services to be co-located with a maintenance facility does not preclude the Authority from determining, at the expiration of Stambaugh's lease, that such practice should not be continued.

[13] Stambaugh's argument that its absence from the Airport is a *de facto* exclusivity violation (Stambaugh's Response at 2), is not reached on these facts. Ample grounds support the Authority's decision in this case, and the exclusivity prohibition does not trump all other airport issues such as improved business practices and intelligent airport land use decisions. *E.g.*, *Wilson Air Center*, 2000 WL 1130530 at *14.

Ms. Evelyn J. Martinez
August 25, 2000
Page 13

With this background in mind, Stambaugh's only remaining issue with respect to exclusive rights concerns the RFQ process employed to select an FBO to operate out of the AMP facility. As discussed above, the Authority was well within its rights, as well as FAA requirements, in conducting the RFQ process as it did. The very concept of the RFQ process is that, if there is more than one bidder, only one will be successful, and the others will not. It does not convey an exclusive right to select Bidder A over Bidder B, unless Bidder A is the incumbent FBO. The selected bidder, Hawthorne, was not the incumbent. While Stambaugh's claims that it was the only bidder, that claim has been shown to be untrue in the discussion above and in the Authority's Response at 6-8.

In view of the foregoing, the FAA should determine that the Authority has not conveyed an exclusive right for FBO services at the Airport.

### Conclusion

For the reasons stated above, the FAA should determine that the Authority has not violated any law or grant assurance and should not propose or take any enforcement action against the Airport, as requested by Stambaugh's.

If you need any further information or have any questions, please contact the Airport Director, David Fleet, at (717) 948-4600, or me at (202) 835-8096.

Sincerely yours,

**HOPKINS & SUTTER**

Thomas R. Devine
Counsel for Susquehanna Area
Regional Airport Authority

Attachment

P33976-1

S T A M B A U G H  A V I A T I O N

August 2, 1999

Mr. James F. White
Environmental Manager
BAA Harrisburg, Inc.
135 York Drive, Suite 100
Middletown, PA  17057

Dear Mr. White:

This is a response to your letter of July 26, 1999 concerning the violation notice to our employee for tying off the deadman fuel control while transferring fuel into his truck.

Of course you are correct in that safety violations cannot be tolerated. We agree and we immediately terminated the employee responsible for the May 20, 1999 incident. The circumstances surrounding the July 13, 1999 incident were quite different.

Mr. Kopara is a new employee. He was on top of his refueling truck, securing the rope to the deadman shut off on the storage tank, and observing the rising level of the fuel in the tank.

The Airport Operations Manager approached the truck and asked him if he had an airport ID. He said not yet. She asked if he had any identification. He replied he had a drivers license. She asked if she could see it.

The truck Mr. Kopara was filling was urgently needed. In order to reduce the delay caused by the interruption he tied off the deadman rope, knowing he had ample time to descend, show his drivers license and get back up to release the rope and finish filling his truck. He was immediately cited for his action.

Of course, he was wrong even though there was really not a "glaring safety violation clearly indicating a high risk situation." He will not, under any circumstances, again interfere with the operation of this system.

Mr. Kopara was confronted with a choice to ignore, temporarily, the request of the Operations Manager and continue his job hoping to avoid delay of aircraft needing fuel or comply immediately. There should be no interference with individuals, who are obviously employees engaged in duties which involve some risk, just to check ID's unless there is reason to suspect they are a security threat.

At all levels of this company, safety is paramount. We find no failure on the part of supervision of our fuel handling

personnel. It is, however, a complex and demanding job. In each incident you have related, there was failure of an individual to follow established procedures. One was terminated. The other has been counselled regarding priorities.

We have two other letters from BAA which address a number of issues regarding the May 20, 1999 spill and the above ground tank in question. You will receive a copy of our reply to those letters.

We appreciate your interest in this incident. Be assured we share your concern in environmental matters at HIA.

Sincerely,

Mark R. Stambaugh
President

**EXHIBIT D**

Service: **LEXSEE®**
Citation: **1996 U.S. Dist. LEXIS 11177**

*1996 U.S. Dist. LEXIS 11177, \**

NORTHEAST JET CENTER, LTD., Plaintiff v. LEHIGH-NORTHAMPTON AIRPORT AUTHORITY; JACK YOHE; and SANFORD WARTELL, Defendants

CIVIL ACTION No. 90-1262

UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF PENNSYLVANIA

1996 U.S. Dist. LEXIS 11177

August 1, 1996, Decided
August 1, 1996, FILED, ENTERED

**DISPOSITION:** [\*1] Said motions are DENIED with respect to count one alleging constitutional violations. Said motions are DENIED with respect to that part of count three alleging intentional interference with a prospective contractual relationship. Said motions are DENIED with respect to count six alleging defamation. Said motions are GRANTED in all other respects and judgment is entered in favor of Defendants and against Plaintiff on all claims except those above. This is not a final judgment.

**CORE TERMS:** hangar, summary judgment, airport, lease, aircraft, defamatory, tenant, defamation, contractual, default, charter, repair, lease agreement, intentional interference, genuine issue, certificate, financing, space, deposition testimony, defamatory meaning, respect to count, completion, revocation, precluding, station, duty, reasonably find, innuendo, entities, contractual relationship

**COUNSEL:** For NORTHEAST JET CENTER, LTD., PLAINTIFF: DAVID K. MONROE, JOEL E. LAIKS, GALLAND, KHARASCH, MORSE & GARFINKLE, P.C., WASHINGTON, DC USA.

For LEHIGH-NORTHAMPTON AIRPORT AUTHORITY, JACK YOHE, Airport Director, SANFORD WARTELL, Chairman of the Board of Directors, DEFENDANTS: STEVEN M. JANOVE, TERESA N. CAVENAGH, WENDY R. HUGHES, DUANE, MORRIS & HECKSCHER, PHILA, PA USA. J. BRUCE MC KISSOCK, INGRID B. HOPKINSON, MC KISSOCK & HOFFMAN, P.C., PHILA, PA USA.

**JUDGES:** Franklin S. Van Antwerpen, United States District Judge

**OPINIONBY:** Franklin S. Van Antwerpen

**OPINION: MEMORANDUM AND ORDER**

Van Antwerpen, J.

August 1, 1996

**I. INTRODUCTION**

Plaintiff makes claims in this case under 42 U.S.C. §§ 1983, [\*2] 1985; 15 U.S.C. §§ 1 and 2; 15 U.S.C. § 15; the Fourteenth Amendment to the United States Constitution; 53 Pa C.S.A. § 306; Article I, Sections 1,9, and 26 of the Pennsylvania Constitution; 42 Pa.C.S.A. § 8343 and the common law of the Commonwealth of Pennsylvania. This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331, 1337 and the doctrine of supplemental jurisdiction, 28 U.S.C. § 1367. Venue for this action lies in the Eastern District of

Get a Document - by Citation - 1996 U.S. Dist. LEXIS 11177    Page 70 of 100   Page 2 of 21

Case 1:00-cv-00660-YK-JAS    Document 27    Filed 09/01/2000    Page 70 of 100

Pennsylvania pursuant to 28 U.S.C. § 1391(b) and (c). It is alleged that the matter in controversy exceeds the sum or value of $ 50,000, exclusive of interest and costs.

On May 31, 1991, we previously addressed this case in our prior opinion and order, at 767 F. Supp. 672 (1991). At that time, we granted a motion to dismiss in part and denied it in part. In particular, we held that: (1) the Plaintiff had failed to show how its right to be free of certain alleged misconduct rose to the level of federal right protected by § 1983 but that Plaintiff had adequately alleged a denial of equal protection actionable under § 1983; and (2) under the Local Government Antitrust Act, Defendant Airport Authority was absolutely immune [*3] from a damage claim based upon alleged violation of Sherman Act but that plaintiff had managed to avoid application of the state action exemption to the antitrust laws with respect to its claim for injunctive relief. This case was delayed pending the trial and subsequent conviction of Plaintiff's President, Mr. Earl M. Holtz for conspiracy to defraud the United States through improper filings with the Federal Aviation Administration. That prosecution has been the subject of several decisions of the District Court. See 1993 WL 482953; 1994 WL 750674; 1995 WL 106895; and 1995 WL 312537.

In its second amended complaint, filed June 21, 1991, Plaintiff Northeast Jet Center has alleged seven causes of action arising out of circumstances surrounding the closing of its operations and those of its affiliate, Northeast Jet Company, at the Allentown-Bethlehem-Easton Airport. n1 Defendants -- the airport authority, its director and board chairman -- through two motions filed on January 22, 1996 and one on February 8, 1996, have moved for summary judgment on all counts as well as partial summary judgment on most counts separately. n2

- - - - - - - - - - - - - - - - - -Footnotes- - - - - - - - - - - - - - - - - - -

n1 We take notice of the fact that this airport is now called the Lehigh Valley International Airport. [*4]

n2 In their motions filed on January 22, 1996, Defendants moved for summary judgment on counts three through seven. Their motion filed on February 8, 1996 seeks summary judgment on all counts based on our Order of January 22, 1996, precluding Plaintiff from presenting expert testimony. That order was in turn based on Plaintiff's failure to comply with the parties' stipulated scheduling order, approved by this Court on August 2, 1995 and filed August 3, 1995.

- - - - - - - - - - - - - - - - - -End Footnotes- - - - - - - - - - - - - - - - - - -

## II. STATEMENT OF FACTS

We have taken the facts from the Plaintiffs' papers wherever they are supported by citations to the record. For the purpose of deciding these summary judgment motions, we assume they are true.

Plaintiff Northeast Jet Center, Ltd. was engaged in the business of providing ground-based aviation services at A.B.E. Airport from 1986 until February 1990. Plaintiff operated out of a large hangar on land leased from A.B.E. Airport. As a so-called fixed-base operator ("FBO"), Plaintiff provided a range of aviation services including aircraft parking, tie-down and storage services; aircraft repair, maintenance [*5] and inspection services; flight-line servicing, including the sale and delivery of aviation petroleum products; ground transportation services for crew and passengers within the Airport's boundaries; aircraft charter, rental and air taxi services; brokerage services for new and used aircraft; purchase and sale of aircraft parts and accessories; and lease of hangar space to aircraft owners.

During most of the period from 1986 until 1990, Plaintiff had a "Part 145" License from the Federal Aviation Administration (FAA) to provide certain specialized maintenance and

inspection services. Plaintiff also employed FAA-licensed mechanics to provide routine aircraft maintenance and repair independently of its Part 145 Certificate. Plaintiff's major tenants for hangar space included two local business corporations, Union Pacific and Mack Truck.

Plaintiff provided substantial maintenance, inspection, fueling and other services for Northeast Jet Company, Inc. an affiliated company, which operated an air taxi service out of Plaintiff's hangar. Northeast Jet Company had a "Part 135" Certificate from the FAA permitting it to operate as an on-demand air taxi charter airline. Although Plaintiff and [*6] Northeast Jet Company were jointly owned, and both operated out of Plaintiff's hangar, for purposes of this motion they were different corporations and were in different lines of business. (See Earl M. Holtz Deposition Transcript, hereinafter "Holtz Dep.," Exhibit 24, Plaintiff's Opposition to Defendants' Motions for Summary Judgment, filed February 8, 1996 at 25.) In particular, Northeast Jet Company operated as a charter airline under Part 135 which Plaintiff did not. Similarly, Plaintiff operated as an FBO at A.B.E. Airport which Northeast Jet Company did not do. Id. at 185.

Plaintiff and the Defendant Airport Authority had an agreement which included a forty-year lease of the property from the airport. At the end of 20 years, or sooner if the lease was terminated, the Airport Authority was to take title to the hangar facility itself. Id. Exhibit 1, at Art. III.

In March 1988, Union Pacific planned to expand its airplane fleet at A.B.E. Airport. Union Pacific approached Plaintiff about obtaining additional hangar space for its use at the Center facility. Following negotiations, Plaintiff and Union Pacific entered into a written agreement whereby Plaintiff agreed to [*7] lease half of the expanded portion of a new hangar for 10 years upon its completion. Pursuant to the Center/Union Pacific agreement, the hangar expansion was scheduled to be completed by February 1989. Id., Exhibit 24, at p. 460. The extension agreement committed Union Pacific to lease the new hangar, but allowed Union Pacific to opt out of the project under certain conditions.

Plaintiff obtained financing for the hangar expansion from Northeastern Bank, and began the process of hiring professionals to design and build the expansion. During the summer of 1988, Plaintiff retained the services of architectural and construction companies and began the process of obtaining permits for the construction. Id. Exhibit 24, at 328-330. The hangar expansion, like the original hangar, was to be built upon the land Plaintiff had leased from the Airport.

In the Summer of 1988, The FAA began an investigation of the operations of Northeast Jet Company and the air taxi charter service it operated out of Plaintiff's hangar. On September 30, 1988, the FAA issued an emergency revocation order revoking Northeast Jet Company's Part 135 Certificate, thereby grounding Northeast Jet Company's aircraft. [*8] Id. Exhibit 24, at 53. Northeast Jet Company contested the revocation order and a hearing was scheduled before the National Transportation Safety Board (NTSB) for November 7-9, 1988.

That hearing was subsequently canceled following a settlement reached by Northeast Jet Company and the FAA on October 27, 1988. Pursuant to that settlement, the FAA authorized Northeast Jet Company to apply for recertification as a Part 135 charter air carrier. The recertification was granted in May 1990.

The issues raised in the revocation order were addressed solely to Northeast Jet Company's air charter service -- not the Plaintiff's FBO operations. The FAA took no direct action against Plaintiff, nor was its Part 145 repair station license involved in the investigation. Nonetheless, the FAA enforcement action against Northeast Jet Company did have a substantial indirect effect upon Plaintiff's business operations. Because Northeast Jet Company could not fly its aircraft following the revocation, and in fact sold most of its aircraft, Plaintiff was faced with losing a substantial amount of maintenance and repair business which normally would have arisen from Northeast Jet Company's aircraft. [*9] Id., Exhibit 24, at 82-83.

Get a Document - by Citation - 1995 U.S. Dist. LEXIS 11772    Page 72 of 100    Page 4 of 21

Case 2:00-cv-00684-JAK-JPS  U.S. District LEXIS 11  Filed 09/01/2000    Page 72 of 100

Shortly after the revocation, Plaintiff took responsive measures in light of the loss of maintenance and repair work. Plaintiff laid off a number of personnel and voluntarily turned in its Part 145 repair station certificate on October 21, 1988. Id., at 342. Plaintiff also advised its general contractor to halt work on the hangar expansion project on October 7, 1988. Although Plaintiff hoped to recommence construction at a later date, Plaintiff conferred with its bank which expressed willingness to continue financing. During this time Plaintiff's tenant, Union Pacific, continued to express interest in Plantiff's plans for hangar expansion. That interest continued into early 1989.

The Airport sought the advice of an airport consultant as to whether the revocation of Northeast Jet Company's Part 135 License constituted an event of default under Plaintiff's lease with the Airport. The consultant advised the Airport against placing Plaintiff in default because Northeast Jet Company was no longer operating an air taxi service. He suggested that the Airport await the outcome of the scheduled November 7-9, 1988 NTSB hearing regarding the revocation order. [*10]

On November 4, 1988, after consultation with its attorneys, the Airport notified Plaintiff that it was in breach of its lease. Plaintiff's Opposition to Defendants' Motions for Summary Judgment, filed February 8, 1996, Exhibit 5. The Airport sent the breach notice without prior discussion with Plaintiff. The Airport also sent a copy of the breach notice to Plaintiff's bank. The Airport's director was also quoted in a newspaper article that Plaintiff was in breach of its lease. Id., Exhibit 6. In that article, Defendant Yohe stated that Plaintiff had surrendered its "ground maintenance certificate" and therefore it could no longer meet the terms of the lease. Id.

Plaintiff reapplied to the FAA for a new Part 145 repair station certificate on December 8, 1988. Around the same time, Defendant Yohe, Airport Director, contacted several FAA officials in Washington with regard to the reapplication. Id Exhibits 9, 24 (at 506-510, and 25 (at 146-147, 170-171). Plaintiff was recertified in February 1989. Defendants once again hired the same consultant who again advised them there was no basis for placing Plaintiff in default of its lease. Id., Exhibits 10 and 25 (at 120-122). [*11] On May 25, 1989, the Airport notified Plaintiff that it had rescinded its November 4, 1988 notice of default. Id., Exhibits 11 and 25 (at 122-125). During the period in which Plaintiff had been held in breach of its lease by Airport, Plaintiff's bank withdrew its financing for the proposed hangar expansion. The Airport held Plaintiff in breach of its lease from November 4, 1988 until May 25, 1989.

Also at this time, Defendants had numerous discussions with Plaintiff's tenant, Union Pacific. These discussions involved possible alternatives for Union Pacific's increasing hangar needs. Union Pacific continued to be interested in the hangar expansion originally proposed by Plaintiff. Union Pacific's interest in a new Northeast Jet Center hangar expansion continued into March 1989, one month after the completion date specified in their binding agreement. On April 25, 1989, Union Pacific notified Plaintiff that it was pulling out of the project because it had found a satisfactory alternative. Id., Exhibit M.

In October 1989, the Airport director sent a letter to all tenants of the A.B.E. Airport -- except Plaintiff itself -- indicating that the Airport was making plans to deal [*12] with "A.B.E.'s lack of an adequate and reliable fixed-base operator." Id., Exhibit 21. The Airport also drafted a new FBO and charter requirements at this time. By early 1990, Plaintiff was in poor financial condition. It had lost the opportunity of constructing a hangar expansion with a 10-year commitment from its anchor tenant. Union Pacific had notified Plaintiff that it would be vacating its space in the original hangar in a short period. Plaintiff was forced to sell.

Plaintiff sold its facilities to Jaindl Aviation on February 2, 1990. Id., Exhibit 23. Jaindl subsequently assigned its rights in that purchase to the Defendant Airport Authority. The Airport subsequently installed an "interim FBO" on a management fee basis to operate out of

Plaintiff's former hangar. Thus, eventually, the Airport essentially replaced Plaintiff as the sole FBO at A.B.E. Airport.

## III. GENERAL LEGAL STANDARD

Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment shall be rendered where:

> the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material [*13] fact and the moving party is entitled to judgment as a matter of law.

Rule 56(e) further provides that, when a properly supported motion for summary judgment is made, the adverse party "must set forth specific facts showing that there is a genuine issue for trial."

In making its ruling on a summary judgment motion, the court must view all inferences in a light most favorable to the non-moving party. United States v. Diebold, Inc., 369 U.S. 654, 655, 82 S. Ct. 993, 994, 8 L. Ed. 2d 176 (1962). A "genuine issue of fact" is present, precluding summary judgment, when a reasonable trier of fact, viewing all the evidence, could rationally find in favor of the nonmoving party in light of the burden of proof placed on the nonmover. U.S. v. Premises Known as RR No.1 Box 224, Dalton Tp. and North Abington Tp., Lackawanna County, Pa., 14 F.3d 864 (3d Cir. 1994). The substantive law identifies which facts are material. "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S. Ct. 2505, 2510, 91 L. Ed. 2d 202 (1986). See also [*14] Josey v. John R. Hollingsworth, 996 F.2d 632 (3d Cir. 1993) on remand 1993 WL 523686 (summary judgment is precluded if disputed fact exists which might affect outcome of suit under controlling substantive law).

The Supreme Court has held that:

> Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. In such a situation, there can be "no genuine issue as to any material fact," since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial."

Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S. Ct. 2548, 2552, 91 L. Ed. 2d 265 (1986).

In a motion for summary judgment, the nonmoving plaintiff's burden is more than insignificant. See J.F. Feeser Inc. v. Serv-A-Portion, Inc., 909 F.2d 1524, 1531 (3d Cir. 1990) cert. denied, 499 U.S. 921, 113 L. Ed. 2d 246, 111 S. Ct. 1313 (1991) (although the moving party has the initial burden of identifying [*15] the evidence that demonstrates the absence of a genuine issue of material fact, the nonmovant must establish the existence of each element on which it bears the burden of proof). "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." Anderson, supra, 477 U.S. 242, 252, 106 S. Ct.

2505, 2512 (1986). See also Coolspring Stone Supply, Inc. v. American States Life Ins. Co.,
10 F.3d 144, 148 (3d Cir. 1993); Petruzzi's IGA Supermarkets, Inc. v. Darling Delaware Co.,
Inc., 998 F.2d 1224, 1230 (3d Cir. 1993) cert. denied 126 L. Ed. 2d 455, 114 S. Ct. 554
(nonmovant must do more than create some metaphysical doubt).

While the nature of its remedy is indeed powerful, the "summary judgment procedure is
properly regarded not as a disfavored procedural shortcut, but rather as an integral part of
the Federal Rules as a whole, which are designed 'to secure the just, speedy and inexpensive
determination of every action.'" Celotex, supra, 477 U.S. 327, 106 S. Ct. 2555 [citation
omitted].

## IV. DISCUSSION

### A. *Piercing the Corporate* [*16] *Veil*

In deposition, Mr. Earl Holtz testified that he was the President, sole shareholder and sole
director of both Northeast Jet Center and Northeast Jet Company. Holtz Deposition, August 8,
1990 at 28-29., filed as Exhibit A to Defendants' Motion for Partial Summary Judgment, filed
January 22, 1996. He further testified that the two corporations kept separate records,
conducted separate director and shareholder meetings, and kept separate minutes. Northeast
Jet Company purchased maintenance, fuel and hangar space from Northeast Jet Center. Mr.
Holtz testified that the two companies were cross-guaranteed and cross-collateralized in
addition to being backed by his personal guarantee. Exhibit A to Defendants Motion for Partial
Summary Judgment, filed January 22, 1996, also includes a letter on Northeast Jet *Company*
stationary requesting Twin County construction company to cease its efforts to build a new
hangar addition for Northeast Jet *Center*. This letter was signed by Mr. Earl Holtz with the
title "President."

While the similarity of interests and personnel might lead us to consider piercing the
corporate veil that separates these companies, n3 such action would be [*17] inappropriate
at this time in light of the presumption that corporations are separate entities, n4 and
without a full record before us. In Re Cohn, 54 F.3d 1108, 1116 (3d Cir. 1995). Accordingly,
at this time we treat the two companies herein as distinct entities from each other and from
Mr. Holtz.

- - - - - - - - - - - - - - - - - -Footnotes- - - - - - - - - - - - - - - - - - - -

n3 See Kaplan v. First Options of Chicago, Inc., 19 F.3d 1503, 1521 (3d Cir. 1994); Manville
Sales Corp. v. Paramount Systems, Inc., 917 F.2d 544, 552 (Fed. 1990); Joyce v. Super
Fresh Food Markets, Inc., 815 F.2d 943, 945 (3d Cir. 1987); Solomon v. Klein, 770 F.2d 352,
353 (3d Cir. 1985).

n4 See Mellon Bank, N.A. v. Metro Communications, Inc., 945 F.2d 635, 643 (3d Cir. 1991),
cert. denied, 503 U.S. 937, 112 S. Ct. 1476, 117 L. Ed. 2d 620; Craig v. Lake Asbestos of
Quebec, Ltd., 843 F.2d 145, 150 (3d Cir. 1988); American Bell Inc. v. Federation of Tel.
Workers, 736 F.2d 879, 886 (3d Cir. 1984); Jiffy Lube International, Inc. v. Jiffy Lube of
Pennsylvania, 848 F. Supp. 569, 580 (E.D.Pa. 1994).

- - - - - - - - - - - - - - - - -End Footnotes- - - - - - - - - - - - - - - - - [*18]

### B. *Preclusion Order Barring Expert Testimony*

Defendants contend that our preclusion order barring Plaintiff from presenting expert
testimony fatally injures Plaintiff's entire case because without such testimony Plaintiff would
be unable to establish the amount of damages it suffered. Defendants' Supplemental Motion
for Summary Judgment on All Counts, filed February 8, 1996 (hereinafter "Defendants'
Supplemental Motion"). The law of this circuit is to the contrary.

Federal Rule of Evidence 701 provides that:

> If the witness is not testifying as an expert, the witness' testimony in the form of opinions or inferences is limited to those opinions or inferences which are (a) rationally based on the perception of the witness and (b) helpful to a clear understanding of the witness' testimony or the determination of a fact in issue.

In interpreting this Rule, the Third Circuit has repeatedly recognized that "the modern trend favors the admission of lay opinion testimony, provided that it is well founded on personal knowledge and susceptible to specific cross-examination." Lightning Lube, Inc. v. Witco Corp., 4 F.3d 1153, 1175 (3d Cir. 1993) (citations [*19] omitted). More recently, the Third Circuit has said that "Rule 701 requires that a lay opinion witness have a reasonable basis grounded either in *experience or specialized knowledge* for arriving at the opinion that he or she expresses." Asplundh Mfg. Div. v. Benton Harbor Engineering, 57 F.3d 1190, 1201 (3d Cir. 1995) (emphasis in original).

At this stage in the litigation, prior to any hearings before us, it appears that Mr. Holtz, as President of both Plaintiff Northeast Jet Center and its affiliate, Northeast Jet Company, has relevant first-hand experience and specialized knowledge of both companies' operations. In his deposition of September 5, 1995, Mr. Holtz testified as to how he prepared financial documents purporting to show Plaintiff's projected income as well as the value of Plaintiff and each of its components. Plaintiff's Opposition to Defendants' Supplemental Motion, and Exhibit 2 thereto, filed February 22, 1996. Defendants have asserted Mr. Holtz's subsequent deposition testimony of September 8, 1995 demonstrates that Mr. Holtz is "unable to elaborate on how he allegedly calculated [plaintiff's] damages." Defendants' Supplemental Motion, at 4. Nonetheless, [*20] In addition to his position as President, Mr. Holtz was the sole shareholder and director of Plaintiff Northeast Jet Center and its affiliate, Northeast Jet Company. In those positions, his personal experience and knowledge of Plaintiff's operations appears to be "germane to the lay opinion offered." Asplundh Mfg. Div. 57 F.3d at 1201. We believe that "at least some of" Mr. Holtz's assumptions are valid and that his testimony would be helpful to a jury. Lightning Lube, 4 F.3d at 1175. Taking the Plaintiff's claims as true for our purposes here, Mr. Holtz's lay opinion qualifies under Federal Rule of Evidence 701. That opinion represents the "best evidence available -- first-hand knowledge versus second-hand knowledge" that must be presented to the jury. Joy Mfg. Co. v. Sola Basic Indus., Inc., 697 F.2d 104, 111 (3d Cir. 1982). While Mr. Holtz's assumptions may well be subject to vigorous cross examination, their credibility is ultimately a question for a jury to decide. Douglas v. Owens, 50 F.3d 1226, 1230, n.6 (3d Cir. 1995).

Defendants' Supplemental Motion to Dismiss on all grounds, filed February 8, 1996, must accordingly be DENIED at this time.

**C. *Count* [*21] *One: Violation of Plaintiff's Constitutional Rights.***

Plaintiff broadly asserts that Defendants deprived and conspired to deprive Plaintiff of its equal protection and due process rights under the Fourteenth Amendment to the United States Constitution and Article I, §§ 2, 9 and 26 of the Pennsylvania Constitution. This alleged deprivation consisted of selective enforcement of "certain regulations and requirements which the Airport Defendants knew were not in effect." Second Amended Complaint, filed June 21, 1991, P41. n5

- - - - - - - - - - - - - - - - - -Footnotes- - - - - - - - - - - - - - - - - - - - -

n5 Specifically, Plaintiff alleges seven instances of purposeful discrimination that evidence a



Case 1:00-cv-00660-YK-JAS    Document 27    Filed 09/01/2000    Page 76 of 100

"pervasive pattern of arbitrary, capricious and discriminatory acts." Second Amended Complaint, P42. Additionally, Plaintiff asserts Defendants have violated its Due Process rights in at least four instances. Id., P44. A demand is made for money damages. Id., P46.

- - - - - - - - - - - - - - - - -End Footnotes- - - - - - - - - - - - - - - - - -

With the possible exception of their Motion to Dismiss on All Counts discussed above, Defendants have yet to address Plaintiff's [*22] equal protection and due process claim. Defendants maintain that Plaintiff cannot recover on its constitutional claims without first showing a quantified business loss. Defendants' Supplemental Motion at 3. Although Plaintiff has been precluded from presenting expert testimony, for purposes of the summary judgment motions we must view all facts and inferences in favor of Plaintiff. United States v. Diebold, Inc., 369 U.S. 654, 655, 82 S. Ct. 993, 994, 8 L. Ed. 2d 176 (1962). At this stage, we believe a jury could reasonably find Mr. Holtz's testimony sufficiently credible to form the basis of a damages award. As set forth above, because we do not find our order precluding presentation of expert testimony fatal to Plaintiff's entire case.

Defendants have not otherwise briefed or argued this count before us, and we believe it clearly merits further consideration. We would like to know the exact nature of Plaintiff's constitutional claims. n6 We are also concerned about what evidence, if any, supports Plaintiff's claims and whether qualified immunity applies to some defendants.

- - - - - - - - - - - - - - - -Footnotes- - - - - - - - - - - - - - - - - -

n6 Some limitations on these claims are obvious. If plaintiff is making claims directly under the Constitution, these claims are deemed stricken because if they do have merit, they can be sufficiently vindicated by an action under 42 U.S.C. § 1983. Rogin v. Bensalem, 616 F.2d 680, 686-87 (3d Cir. 1980); Mahone v. Waddle, 564 F.2d 1018, 1024 (3d Cir. 1977); Hammond v. Creative Planning Organization, 800 F. Supp. 1244, 1248 (E.D.Pa. 1992); La Plant v. Frazier, 564 F. Supp. 1095, 1097-1098 (E.D.Pa. 1983); DiGiovanni v. City of Philadelphia, 531 F. Supp. 141, 144 (E.D.Pa. 1982).

We note additionally that if Plaintiff is making procedural due process claims for the taking of legal property, as the result of random and unauthorized conduct, then resort must be had to state rights and procedures rather than a § 1983 action. Hudson v. Palmer, 468 U.S. 517, 533, 104 S. Ct. 3194, 3204, 82 L. Ed. 2d 393 (1984); Williamson Co. Regional Planning v. Hamilton Bank, 473 U.S. 172, 195, 105 S. Ct. 3108, 3121, 87 L. Ed. 2d 126 (1985). Zilich v. Lucht, 981 F.2d 694, 696 (3d Cir. 1992); Hicks v. Feeney, 770 F.2d 375, 378 (3d Cir. 1985); Berlanti v. Bodman, 780 F.2d 296, 301 (3d Cir. 1985).

- - - - - - - - - - - - - - - -End Footnotes- - - - - - - - - - - - - - - -  [*23]

## D. Count Two: Violation of the Sherman Act

In our prior opinion, we dismissed Plaintiff's claim for damages under the Sherman Act with prejudice. See 767 F. Supp. 672, 681. We further allowed Plaintiff to amend its complaint to seek injunctive relief. Id. at 682. Defendants' now argue that this claim is moot due to the hypothetical nature of Plaintiff's claim. We agree that the case law of the Third Circuit supports Defendants' position.

In Acierno v. New Castle County, 40 F.3d 645 (3d Cir. 1994), the Court stated that for an injunction to be granted,

> more than a risk of irreparable harm must be demonstrated. The requisite for
> injunctive relief has been characterized as a 'clear showing of immediate

irreparable injury,' or a 'presently existing actual threat; an injunction may not be
used simply to eliminate a possibility of a remote future injury.'

Id., at 655 (citing Continental Group, Inc. v. Amoco Chem. Corp., 614 F.2d 351, 359 (3d Cir.
1980); Ammond v. McGahn, 532 F.2d 325, 329 (3d Cir. 1976); Holiday Inns of America, Inc.
v. B & B Corp., 409 F.2d 614, 618 (3d Cir. 1969); and Campbell Soup Co. v. Conagra, Inc.
977 [*24] F.2d 86, 91-92 (3d Cir. 1992). Plaintiff is no longer in business. Plaintiff asserts
however that "Center and/or its principal *may at some point in time seek to re-enter the FBO
market,*" Defendants' Supplemental Motion, at 12 (emphasis added). We believe the basis of
Plaintiff's Count Two represents a mere possibility of a remote injury, and presently nothing
more. "[A] permanent injunction will issue only where a threat of harm exists, not just where
potential harm exists." McLendon v. Continental Can Co., 908 F.2d 1171, 1182 (3d Cir.
1990). See also Natural Footwear Ltd. v. Hart, Schaffner & Marx, 760 F.2d 1383, 1404 (3d
Cir. 1985); Northeast Women's Center, Inc. v. McMonagle, 665 F. Supp. 1147, 1154 (E.D.Pa.
1987).

Defendants' Motion for summary judgment, filed February 8, 1996 is accordingly GRANTED
with respect to count two of Plaintiff's second amended complaint.

## E. *Count Three: Tortious Interference with Business Relations*

Count three of Plaintiff's second amended complaint claims that Defendants intentionally
disrupted an agreement between Plaintiff Northeast Jet Center and Union Pacific by: (1)
wrongfully declaring Plaintiff in default of [*25] its lease; (2) contacting Plaintiff's bank in
late 1988 and early 1989, falsely informing it that Plaintiff was in default of the lease, and
expressing doubts as to Plaintiff's financial viability to discourage the bank's financing of the
proposed new hangar; and (3) attempting to persuade Union Pacific to abandon Plaintiff's
facility and move to an alternative facility at the A.B.E. airport.

The Pennsylvania Supreme Court has adopted the Restatement (Second) of Tort's formulation
of the tort of interference with existing contractual relationships. n7 A chief and threshold
requirement of this tort is the existence of a contract. As we discuss below, we do not believe
the agreement and the proposed lease were one and the same nor that Defendants' alleged
interference with the lease (in draft form) relates back to the agreement itself. We conclude
that the agreement was a binding agreement to enter into a lease upon the fulfillment of
conditions precedent.

- - - - - - - - - - - - - - - - - - -Footnotes- - - - - - - - - - - - - - - - - - - - -

n7 As recited in Silver v. Mendel, 894 F.2d 598 (3d Cir. 1990), the elements of a claim for
intentional interference with existing contractual relations are:

> (1) the existence of one or more contracts; (2) the purpose or intent to harm
> plaintiff by preventing the completion of the contractual relation(s); (3) conduct
> by defendant which is not proper as a matter of law and which a factfinder could
> reasonably find improper; and (4) harm actually resulting from defendants'
> actions.

Id. at 604-605, citing Adler Barish v. Epstein, 482 Pa. 416, 393 A.2d 1175, 1183 (1978).

- - - - - - - - - - - - - - - - - -End Footnotes- - - - - - - - - - - - - - - - - - [*26]

In their Motion for Partial Summary Judgment filed January 22, 1996, Defendants claim this
count must fail as a matter of law because no such lease agreement existed at the time
between Plaintiff and Union Pacific. Instead they assert Plaintiff had a contract with Union

Pacific to enter into such a lease agreement. Defendants maintain that Plaintiff has offered no objective proof that there was a reasonable probability that the proposed lease agreement would ever have been executed, as required by Thompson Coal Co. v. Pike Coal Co., 488 Pa. 198, 209, 412 A.2d 466, 471 (1979). Defendants' Brief in support of their motion for partial summary judgment, filed January 22, 1996 at 24.

Defendants further state that prior to their own in actions, it was clear to Plaintiff and to Union Pacific that Plaintiff would not complete the proposed hangar by the deadline specified in their agreement. Defendants claim that the FAA's revocation of Northeast Jet Company's operations and its poor financial condition ended the prospects of its affiliate, Northeast Jet Center, for the proposed new hangar facility. Defendants' Motion for Partial Summary Judgment, filed January 22, 1996 at 25.

According [*27] to Defendants, Union Pacific began searching for an alternative site for their aircraft on their own initiative and were apparently successful through an "internal connection." Id. at 26 and Exhibit M thereto, at 35-38. Union Pacific's Vice President, Mr. John Halan testified that his company was never approached by Defendants, and that Union Pacific initiated conversations with Defendants -- not vice versa -- concerning its desire to acquire land on the airport to build its own hangar. Defendants Motion for Partial Summary Judgment, filed January 22, 1996, Exhibit M, at 24-26. Mr. Halan testified that the accident involving Northeast Jet Company's plane and the FAA's revocation of Northeast Jet Company's operating license was one factor in Union Pacific's decision to look elsewhere for hangar space. Exhibit N to Defendants' Motion for Partial Summary Judgment, filed January 22, 1996, at 79-80. However, he stated repeatedly that the primary factor was that time was running out and the hangar would not be completed in time for the worst period of winter. Mr. Halan stated that Defendants were reluctant to consider providing Union Pacific with land because their objective was to strengthen [*28] Plaintiff's position at A.B.E. Airport. Id. at 83-84. According to Mr. Halan, Defendants went so far as to discourage Union Pacific from acquiring land independently and attempted to reinforce rather than undermine Plaintiff's viability at the airport. Defendants Motion for Partial Summary Judgment, filed January 22, 1996, Exhibit M, at 24-26.

In March and April, 1989, Mr. Halan sent three letters on behalf of Union Pacific to Mr. Holtz as President of Northeast Jet Center, Ltd. Id. On March 6, 1989, Mr. Halan stated that Union Pacific was "concerned about the project" since the initial target occupancy time had passed, but was "encouraged" concerning plans to go forward with the new hangar. "In the meantime," he continued, "we will be reviewing our various options and alternatives should you elect not to go forward with the new facility." Id.

Ten days later, Mr. Halan sent another letter which stated in its entirety:

> With regard to our discussions on the new facility you are planning to build, I would like to confirm that Union Pacific has *no commitment* with respect to this facility unless a new written agreement is signed. *We are not waiving any rights* [*29] *under our previous agreement that we might have because of the passage of the February 1989 completion date.*

Id., (emphasis added). On April 25, Mr. Halan sent a final letter informing Mr. Holtz that Union Pacific had no further interest in the proposed hangar addition because it had found a "satisfactory alternative." Id.

Plaintiff claims that conditions precedent do not render the agreement illusory and that the agreement contains all essential terms of the arrangement between Union Pacific and Plaintiff, including price. Id. at 20. Plaintiff asserts, "Put another way, had Center been able

Get a Document - by Citation - 198 U.S. Dist. LEXIS 11171

Case 1:00-cv-00660-YK-JAS   Document 27   Filed 09/01/2000   Page 79 of 100   Page 11 of 21

to construct the hangar expansion, Union Pacific could not have arbitrarily refused to execute the form lease..." Id. Plaintiff further contends both parties intended to honor these obligations -- including executing the form lease --under the lease extension agreement. We cannot help but make the plain observation that Center never was able to build the new hangar and thus by Plaintiff's own reasoning Union Pacific's obligation never arose.

Plaintiff maintains that the 10-year lease extension agreement is not an illusory contract but instead obligates it to use its [*30] best efforts to take all steps necessary to construct the hangar extension while simultaneously obligating Union Pacific to lease hangar and office space in the new facility upon its completion. Plaintiff's Opposition to Defendants' Motions for Summary Judgment, filed February 8, 1996 at 19. Plaintiff's maintain that the scheduled completion date set forth in the lease extension agreement was a waivable condition which was indeed waived as "clearly evidenced" until Union Pacific was "lured away by the Airport's offers of alternative hangar space in early 1989." Id. at 21.

Plaintiff has failed to persuade us any such clear evidence exists to counter the plain language of Mr. Halan's letter which specifically and conclusively shows Union Pacific's intention not to waive the time condition. Indeed, Mr. Halan's letters and his deposition testimony make clear that the time condition was the most important consideration in Union Pacific's decision whether to continue to do business with Mr. Holtz and his companies.

> To constitute a waiver of a legal right, there must be a clear, unequivocal and decisive act of the party who is claimed to have waived its rights, with knowledge [*31] of such right and an evident purpose to surrender it.

Keenan v. Scott Tp. Authority, 151 Pa. Commw. 226, 616 A.2d 751, 755 (Pa.Cmwlth. 1992) (citation omitted). Even if the language of the March and April 1989 letters could reasonably be construed to evidence a continued willingness on the part of Union Pacific to occupy Plaintiff's proposed hangar, there is absolutely no evidence of record that Union Pacific would have done so under the terms and conditions set forth in the original draft 10-year lease agreement.

Defendants cite and Plaintiff's attempt to distinguish Schulman v. J.P. Morgan Inv. Management, Inc., 829 F. Supp. 782 (E.D.Pa. 1993), which held that where a draft lease agreement was prepared for execution but never signed, that alone did not create a lease. Id at 785. Plaintiff asserts that the agreement involved in Schulman was a draft whereas here it was an "executed final agreement." Plaintiff's Opposition to Defendants' Motions for Summary Judgment, filed February 8, 1996 at 21. In Schulman, the Court held that references to a draft by a real estate developer's employees as a "lease" did not transform an agreement to open a food service [*32] operation into a formal lease where the developer never signed the agreement as required. Id. Similarly here, the executed agreement required Union Pacific and Plaintiff to execute a 10-year lease when certain conditions were met. Those conditions were not met; and while the proposed 10-year lease agreement was indeed prepared for execution, we similarly conclude that that proposal alone did not create a lease.

On March 1, 1988 Plaintiff and Union Pacific entered a signed, written Agreement which outlined their relationship with regard to the proposed hangar expansion. Id Exhibit 2. In pertinent part, the Agreement states:

> Subject to the terms and conditions of this Agreement, upon the occurrence or waiver of the conditions precedent set forth...below, Northeast and Union Pacific shall enter the form of lease agreement for the Premises attached hereto...

Id. at 1. The Agreement then lists the duties of each side including compliance with the interim lease by both parties and financing and regulatory approval for Northeast Jet Center. Id. at 2-4. Union Pacific's portion of the Agreement states at the outset that Union Pacific's obligations are subject [*33] to the condition, among others, that:

> (a) The intended Aviation Complex shall have been substantially completed and the Premises shall be suitable for the intended use by Union Pacific on or before February 1, 1989. Northeast shall give Union Pacific at least 30 days prior written notice of the anticipated date of substantial completion of the Premises.

Id. at 3. The undated and unsigned "Lease Agreement" was attached to the signed "Agreement." The lease purports to concern a "Contemplated Aviation Complex" located at A.B.E. International Airport. Id. It includes the terms of a 10-year lease between Union Pacific and Plaintiff for the proposed hangar expansion, including rents, taxes, services, use, maintenance, regulations, insurance, fire risk, assignment & subletting, condemnation, entry and access, default & remedy, subordination, surrender and waiver. Id.

To defeat summary judgment the non-moving party -- Plaintiff Northeast Jet Center, Ltd. in this case -- must respond with facts of record that contradict the facts identified by the movant, and may not rest on mere denials. Celotex Corp. v. Catrett, 477 U.S. at 321, n.3, 106 S. Ct. at 2552, n.3 [*34] (quoting Fed. R. Civ. P. 56(e)); see also First National Bank of Pennsylvania v. Lincoln National Life Insurance Co., 824 F.2d 277, 282 (3d Cir. 1987). In a case where the non-moving party is the plaintiff and therefore bears the burden of proof, it must by affidavits or by the depositions and admissions on file, "make a showing sufficient to establish the existence of [every] element essential to that party's case." Celotex Corp., 477 U.S. at 322-24, 106 S. Ct. at 2552-53; Anderson, 106 S. Ct. at 2514; Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986); Fed. R. Civ. P. 56(e). Plaintiff has failed to meet this burden and we find that no such intentional action was taken by Defendants to interfere with the business relationship between Plaintiff and Union Pacific.

In sum, we believe the original agreement was a binding contract subject to conditions precedent. However, we do not believe that those conditions were met. Even if they were, and even if the deadline was waived, Defendants' proffer of Union Pacific's John Halan deposition testimony unequivocally refutes the core of Plaintiff's allegation -- that Defendant's [*35] intentionally interfered with the business relationship between Union Pacific and Plaintiff. Plaintiff simply has not offered sufficient testimony or other evidence to counter Mr. Halan's testimony.

Defendants' Motion for partial summary judgment, filed January 22, 1996 is accordingly GRANTED with respect to that portion of count three of Plaintiff's second amended complaint covering intentional interference with existing contract.

### F. Count Three: Interference with Prospective Business Relations

Plaintiff has also alleged that Defendants' actions amounted to an intentional interference with Plaintiff's prospective contractual relationship with Union Pacific. Plaintiff's Opposition to Defendants' Motions for Summary Judgment, filed February 8, 1996, at 21.

In Pennsylvania, the elements of the tort of intentional interference with prospective contractual relations are: (1) a prospective contractual relation; (2) intent to harm the plaintiff by preventing the relation from occurring; (3) absence of privilege or justification on



the defendant's part; and (4) actual damage resulting from defendant's conduct. Silver v. Mendel, 894 F.2d 598, 601-02 (3d Cir. 1990); [*36] Thompson Coal Co. v. Pike Coal Co., 488 Pa. 198, 412 A.2d 466, 471 (1979), cert. denied, 496 U.S. 926, 110 S. Ct. 2620 (1990)). See also Schulman v. J.P. Morgan Inv. Management, Inc., 829 F. Supp. 782, 786 (E.D.Pa. 1993). As the Pennsylvania Supreme Court has stated:

> We are not dealing with certainties, but with reasonable likelihood or probability. This must be something more than a mere hope or the innate optimism of the salesman...The rule to be applied is that the [plaintiff] may recover when the jury is satisfied that but for the wrongful acts of the defendant it is *reasonable* [sic] *probable* that the plaintiff would have [entered and performed the contract].

Thompson Coal Co. v. Pike Coal Co., 488 Pa. 198, 412 A.2d 466, 471 (Pa. 1979).

Plaintiff has set forth sufficient allegations of Defendants' interference with prospective business relations to proceed beyond the summary judgment stage. Although we do not believe the signed agreement and unsigned draft lease amount to an existing contract, for the purposes of summary judgment they do amount to a prospective business relation. To be "prospective," a contractual relation must have [*37] "objectively appeared to be reasonably probable." Schulman, 829 F. Supp. 782, 786. Plaintiff maintains that Union Pacific would have signed the lease even when a delay in constructing the new hangar was apparent and that the delay itself was caused by Defendants' notice of default to Plaintiff. This version of events markedly contrasts with that of Defendants and should more appropriately be decided at trial.

As already discussed above, Union Pacific expressed to Plaintiff as late as March 6, 1989 that it was "encouraged" concerning plans to proceed with the new hangar and stating Union Pacific's intention to review its options "should [Plaintiff] elect not to go forward with the new facility." Plaintiff has alleged that Defendants wrongfully contacted Plaintiff's bank as early as late 1988 and early 1989, informed the bank that Plaintiff was in default of its lease, and expressed doubts as to Plaintiff's financial viability. P55(b), Plaintiff's Second Amended Complaint, filed June 21, 1991. At this stage, we believe a jury could find a reasonable probability that Plaintiff and Union Pacific would have entered into a lease agreement for the expanded hangar, even if such a lease [*38] agreement were not identical with the original draft lease.

Defendants' Motion for partial summary judgment, filed January 22, 1996 is accordingly DENIED at this time with respect to that portion of count three of Plaintiff's second amended complaint covering intentional interference with a prospective contractual relationship.

## G. *Count Four: Tortious Interference with Prospective Business Relations with Other Companies*

In its Count Four, Plaintiff also asserts that there was a reasonable probability of its entering into contractual relationships with various entities other than Union Pacific, n8 and that Defendants interfered with those prospective contractual relationships. Plaintiff's Opposition to Defendants' Motions for Summary Judgment, filed February 8, 1996, at 23-25. It is well-established that summary judgment cannot be avoided unless the non-moving party sets forth *"specific facts"* showing that there is a genuine issue for trial." Matsushita Elec. Ind. Co. v. Zenith Radio Corp., 475 U.S. 574, 587, 89 L. Ed. 2d 538, 106 S. Ct. 1348 (1985) (emphasis added) (quoting Fed.R.Civ.P. 56(e)). Plaintiff has failed to provide the requisite specific facts to [*39] defeat a motion for summary judgment. In their brief, Plaintiff sufficiently states the standard to be applied for determining whether an action for intentional interference with prospective contractual relations will lie. However, they make no citations or

Get a Document - by Citation - 1998 U.S. Dist. LEXIS 11117

Case 1:00-cv-00660-YK-JAS Document 28 Filed 09/01/2000 Page 82 of 100    Page 14 of 21

references whatsoever to deposition testimony or other evidence before us. In contrast, Defendants have in several instances cited to deposition testimony and exhibits strongly supporting their position that Plaintiff did not enjoy a prospective contractual relationship with any of the various entities (other than Union Pacific as discussed above) listed by Plaintiff. Defendants' Motion for Partial Summary Judgment, filed Jan. 22, 1996, at 27-35.

- - - - - - - - - - - - - - - -Footnotes- - - - - - - - - - - - - - - - -

n8 Plaintiff claims these entities include USAir, United Airlines, Delta Airlines, Continental Airlines, Northwest Airlines, Union Pacific, Bethlehem Steel, K.C. Aviation, Duncan Aviation and Universal Jet Sales. Plaintiff's Opposition to Defendants' Motion for Summary Judgment, filed February 8, 1996, at 24, n.2.

- - - - - - - - - - - - - - - -End Footnotes- - - - - - - - - - - - - - - -  [*40]

Plaintiff bases this count on the supposition that had it stayed in business into early 1990, it would have been, at that point,

> the sole FBO at the Airport, thus greatly increasing its opportunity to service airlines it had not previously served. Moreover, Center had the only useable fuel farm at the Airport, thus assuring it the lion's share of fuel sales at A.B.E.

Plaintiff's Opposition to Defendants' Motions for Summary Judgment, filed February 8, 1996, at 25. Plaintiff suggests that as a result of outside factors, it would have enjoyed a windfall, if not a monopoly, n9 in providing fueling and maintenance services at the A.B.E. Airport. In response, Defendants quite accurately point to Plaintiff's lack of citations to the record to support this assertion. Even before Plaintiff's one and only competitor at A.B.E. airport, Suburban Aviation, closed its doors in March 1990, Plaintiff had agreed to sell its facility and equipment. See Exhibit D-61 attached to Exhibit "V" to Defendants' Motion for Partial Summary Judgment, filed January 22, 1996. Also, the fact that the Airport sought to replace Suburban with an "interim FBO" does not preclude the possibility  [*41]  that another suitable FBO could have entered the Airport at some time. Plaintiff's evidence of prospective contractual relationships more accurately represents the dreams of its president and is simply too weak to sustain a motion for summary judgment.

- - - - - - - - - - - - - - - -Footnotes- - - - - - - - - - - - - - - - -

n9 We find it interesting to compare this explanation with count two of Plaintiff's complaint. There, Plaintiff charges Defendants with anti-trust violations of the Sherman Act by unreasonably restraining trade in the provision of ground-based aviation support services by FBOs at the airport. Specifically, Plaintiff asserts:

> As a result of the Airport Defendants' activities, competition in the provision of ground-based aviation support service by FBOs at A.B.E. has been eliminated and Dynair, operating on behalf of the Airport Authority, will be the only FBO at A.B.E. as of March 1, 1990. Accordingly, Dynair and the Airport Authority will have a total monopoly on FBO services at A.B.E. as of March 1, 1990.

Plaintiff's Second Amended Complaint, filed June 21, 1990, P49. Plaintiff apparently accepts some monopolies while rejecting others.

- - - - - - - - - - - - - - - -End Footnotes- - - - - - - - - - - - - - - -  [*42]

Because Plaintiff has failed to raise any objective proof that there was a reasonable

probability that it would have developed a contractual or business relationship with any of the other listed entities other than Union Pacific, Defendants' Motion for Summary Judgment with respect to Count Four is accordingly GRANTED.

## H. Count Five: Violation of the Municipal Authorities Act of 1945

Plaintiff contends that the Defendant Airport Authority has violated § 306(2) of their enabling act, the Municipal Authorities Act of 1945, 53 Pa. C.S.A. § 306 (the "Act"). Second Amended Complaint, PP 66, 67. According to Plaintiff, it is entitled to punitive damages because the Authority' maliciously violated the Act by: (1) misusing its powers under the Act "to establish an enterprise to compete" with Plaintiff on an unfair basis; and (2) unlawfully misappropriating Plaintiff's property "in an effort to secure unfair and unlawful advantages contrary to the requirements of the Act." Second Amended Complaint at P 67.

Unless the contrary is proven, the acts of municipal officials are presumed to be valid and in compliance with the Act. Helmerick Drive-It-Yourself v. Erie Municipal [*43] Airport Authority, 149 Pa. Commw. 1, 612 A.2d 562, 564 n.2 (1992). Summary judgment is appropriate on Count Five because Plaintiff has failed to overcome this presumption with evidence sufficient to support either of its claims.

Section 306 A(b)(2) of the Pennsylvania Municipal Authorities Act reads in part:

> None of the powers granted by this act shall be exercised in the construction, financing, improvement, maintenance, extension or operation of any project or projects or providing financing for insurance reserves *which in whole or part shall duplicate or compete with existing enterprises serving substantially the same purpose.*

(emphasis added). Pennsylvania courts have held that in order to violate the Act, the municipal authority must "duplicate" or "compete" with services provided by an "existing" enterprise. Evansburg Water Co. v. Perkiomen Township, 131 Pa. Commw. 89, 569 A.2d 428 (1990). In Evansburg, the plaintiff complained that the township would be providing water service in a geographic area not served by the plaintiff at the time, but which the plaintiff wished to service. The Court held that the Act does not afford a plaintiff the unfettered [*44] right to expand its business into different areas that are already being serviced by a municipal authority, and thus found no violation of the Act. 131 Pa. Commw. at 93, 569 A.2d at 430. In so holding, the Court relied on its earlier decision, Northampton v. Bucks County Water & Sewer Authority, 96 Pa. Commonwealth Ct. 514, 508 A.2d 605 (1986), quoting it as follows:

> The plain wording of the statute is such that it prohibits projects which *'shall duplicate ... existing* enterprises *serving* substantially the same purposes.'* This clause of the statute is phrased in the present tense, it is not worded in such a manner that what Northampton could *possibly* do is in any way relevant.

Id., 508 A.2d at 430 (emphasis in original). Plaintiff's claim that the Airport Authority's actions interfered with its operations fail to acknowledge the clear evidence that at the time of those alleged acts, Plaintiff itself was no longer an "existing enterprise[] serving substantially the same purposes" as the operation that succeeded it.

In Lower Bucks County Joint Municipal Authority v. Bristol Township Water Authority, 137 Pa. Commw. 415, 586 A.2d 512 (1991), [*45] the Court held that an attempt by a township

and its associated water authority to "take over" an area to which the plaintiff had long provided water services constituted an act of competition prohibited by the Act. Id., 586 A.2d at 516. While Lower Bucks found a violation of the Act had occurred, we believe the case is distinct from the instant one. In Lower Bucks, The Commonwealth Court agreed with the trial court's reasoning that the defendants' furnishing of water in the contested area "constituted 'existing enterprises' which competed with those of [plaintiff]." Id. By contrast here, the Airport Authority could not and did not violate the Act because Plaintiff was no longer an existing FBO at the airport at the time of the alleged competition. Plaintiff's allegation of the Authority's "misuse" refers to the Authority's selection of DynAir Fueling as an interim provider of FBO services at the airport on February 2, 1990. See Exhibit 2, Brief in Support of Defendants' Motion for Partial Summary Judgment, filed January 22, 1996. By this time, however, Plaintiff and Mr. Holtz had already signed an agreement to sell Plaintiff's assets including hangar and leasehold [*46] rights at the Airport to Jaindl Aviation. According to deposition testimony cited by Defendants, the Authority did enter into an agreement with DynAir to act as an FBO. At the time that agreement was signed, however, Plaintiff had already agreed to sell its assets and was effectively out of business. Further, DynAir did not commence operations until March 1, 1990 -- after Plaintiff closed its sales of assets to Jaindl on February 16, 1990. See Exhibit Y, Brief in Support of Defendants' Motion for Partial Summary Judgment, filed January 22, 1996.

Plaintiff's claim of unlawful misappropriation must also be discounted. There is no evidence of any such misappropriation by the Authority of any property belonging to Plaintiff. The only property the Authority "appropriated" was effectuated by way of Jaindl's assignment to the Authority of its right to purchase Plaintiff's hangar facilities. Furthermore, that assignment was expressly agreed to by Mr. Holtz and Plaintiff. See Exhibit V, Brief in Support of Defendants' Motion for Partial Summary Judgment, filed January 22, 1996.

Despite their frequent assertion that factual disputes exist rendering summary judgment inappropriate on [*47] this count, Plaintiff has made no citations to the record to support its claim. In the record before us on this count, we conclude there is no "genuine issue as to any material fact." Fed. R. Civ. P. 56(c). Partial summary judgment is accordingly GRANTED with respect to count five. n10

- - - - - - - - - - - - - - - - - -Footnotes- - - - - - - - - - - - - - - - - - - - -

n10 We note in passing that even if Plaintiff could establish a cause of action for unlawful misappropriation (which we have concluded it cannot) Plaintiff would most probably not be entitled to punitive damages against the Authority. 42 Pa. C.S.A. § 8553(c) precludes the award of punitive damages in actions against municipal authorities.

- - - - - - - - - - - - - - - - -End Footnotes- - - - - - - - - - - - - - - - - - - -

## I. Count Six: Defamation

Plaintiff's count six alleges that Defendants maliciously and falsely published and disseminated false and disparaging statements regarding Plaintiff. At issue are: (1) statements made to Plaintiff's bank that Plaintiff was in default of its lease and that doubts existed as to whether Plaintiff could meet its financial obligations; and (2) communications [*48] made to tenants of A.B.E. Airport that the Airport lacked "an adequate and reliable fixed-base operator." Second Amended Complaint, filed June 21, 1991, P73.

In a claim of defamation, the Court must first make a threshold determination as to whether the statement is capable of defamatory meaning. "The test is the effect the [statement] is fairly calculated to produce, the impression it would naturally engender, in the minds of the average persons among whom it is intended to circulate." U.S. Healthcare v. Blue Cross of Gr. Philadelphia, 898 F.2d 914, 923 (3d Cir. 1990). A critical factor to be considered by the Court in making that determination is the nature of the statement's audience. Id. The

relevant audiences in this case were the bank officers and the airport tenants who received Defendants' letters. We are confident that both groups were sufficiently sophisticated to understand the plain meaning of Defendants' letters. Nothing in the record has led us to believe otherwise. While we have not concluded that these letters were defamatory in nature, it is reasonably possible that either the bank or the airport tenants could interpret them as attacks on the viability of  [*49]  Plaintiff's business.

Defendants argue that their statements were good faith opinions based upon two disclosed non-defamatory facts -- (1) that Northeast Jet Company had lost its Part 135 charter license; and (2) that Plaintiff temporarily voluntarily surrendered its Part 145 repair station license. A quick review of the lease in question reveals that it did not require Plaintiff to maintain a Part 135 Certificate. Indeed Plaintiff never did have such a certificate, and never directly provided charter service even prior to the revocation. Similarly, the Airport lease never mentioned a Part 145 repair station certificate. Nor did the Airport's minimum standards for FBO's-- upon which Defendants apparently seek to rely -- require that Plaintiff have a Part 145 repair station certificate.

Plaintiff argues that Defendants' lack of good faith can be seen in the fact that Defendants did not immediately lift the default upon learning that Plaintiff had obtained a Part 145 Certificate. Instead, they waited an additional three months, during which time Plaintiff lost its anchor tenant for the expansion project. Plaintiff's Opposition to Summary Judgment, filed February 8, 1996, at 35-36.  [*50]  While we need not conclude at this point that Defendants' statements were indeed defamatory, we do believe that they are reasonably capable of such an interpretation.

Once the threshold test has been met, the plaintiff has the burden of showing a prima facie case for defamation under Pennsylvania law. The elements of such a claim are:

> (1) The defamatory character of the communication.
> (2) Its publication by the defendant.
> (3) Its application to the plaintiff.
> (4) The understanding by the recipient of its defamatory meaning.
> (5) The understanding by the recipient of it as intended to be applied to the plaintiff.
> (6) Special harm resulting to the plaintiff from its publication. [and]
> (7) Abuse of a conditionally privileged occasion.

42 Pa. C.S.A. § 8343(a) (1982). Even if a conditional privilege were to apply, a genuine issue might still exist as to whether the Defendants have abused the privilege. Abuse of the privilege is shown where a defendant's defamatory communication is motivated by malice, consisting of a wrongful act, done intentionally without just cause or excuse, or generated from reckless or wanton disregard of another's rights. See Elia v. Erie  [*51]  Ins. Exchange, 430 Pa. Super. 384, 634 A.2d 657 (1993), 634 A.2d 657, appeal den., 644 A.2d 1200.

When the plaintiff has established these elements, the defendant then has the burden of proving:

> (1) The truth of the defamatory communication.
> (2) The privileged character of the occasion on which it was published. [or]
> (3) The character of the subject matter of defamatory comment as of public concern.



42 Pa. C.S.A. § 8343(b) (1982). See also <u>U.S. Healthcare, supra, at 923.</u>

Defendant Yohe, the Airport Director, sent a letter to all tenants and potential customers at A.B.E. Airport on October 27, 1989. See Exhibit E to Defendants' Motion for Partial Summary Judgment on Count Six, filed January 22, 1996. That letter states, "A.B.E.'s lack of an adequate and reliable fixed-based operator has caused us considerable anxiety during my tenure here." Defendants argue that because the letter does not explicitly identify Plaintiff as an inadequate or unreliable FBO, that the statement cannot reasonably be interpreted as defamatory to Plaintiff. We do not agree.

A communication is capable of defamatory meaning by innuendo even though the words used are not themselves [*52] defamatory. Li<u>vingston v. Murray, 417 Pa. Super. 202, 612 A.2d 443,</u> appeal den., 533 <u>Pa. 601, 617 A.2d 1275 (1992).</u> To establish defamation by innuendo, the "innuendo must be warranted, justified and supported by the publication." Id., citing <u>Thomas Burton Center v. Rockwell International Corp., 49</u>7 <u>Pa. 460, 467, 442 A.2d 213, 217 (1981),</u> cert. den., <u>457 U.S. 1134, 102 S. Ct. 2961, 73 L. Ed. 2d 1351 (1982)).</u> Moreover, innuendo cannot be used to introduce new matter, or to enlarge the natural meaning of words. Id. However, in the present case, the context and circumstances of Defendants' letter are clearly capable of defamatory meaning as to Plaintiff. Since there were only two FBO's at A.B.E. Airport, Defendants' reference to the absence of an adequate and reliable FBO could very reasonably be interpreted as a critique of Plaintiff's adequacy and reliability.

Section 564 of the Restatement (Second) of Torts, comment b, states:

> It is not necessary that the plaintiff be designated by name; it is enough that there is such a description of or reference to him that those who hear or read reasonably understand the plaintiff to be the person intended. Extrinsic [*53] facts may make it clear that a statement refers to a particular individual although the language used appears to defame nobody.

Where words are reasonably susceptible to defamatory meaning as well as to an innocent one, the plaintiff may by innuendo ascribe defamatory meaning to the statement. See <u>Stompler v. Richman, 125 Pa. Super. 385, 189 A. 730 (1937).</u> See also <u>Saenz v. Playboy Enterprises, Inc., 653 F. Supp. 552, 559 (N.E.Ill. 1987)</u> ("a statement could be shown to be 'of and concerning' [a plaintiff] through inference as well as direct reference."). Applying this analysis to the circumstances of this case, it is clear at this stage that an inference of defamation to Plaintiff could reasonably be made by a jury.

Defendants claim protection under the Political Subdivision Tort Claims Act, 42 Pa. C.S.A. § 8541 et seq. (1982), on the grounds that nothing in the record establishes that Defendants acted with knowledge of falsity or reckless disregard for the truth. As discussed above, however, there is evidence in the record to support the conclusion that Defendants acted maliciously with knowledge that their statements were false, and with the intent of injuring [*54] Plaintiff. Under these circumstances, Defendants are not entitled to automatic immunity under the statute.

Courts have been reluctant to grant summary judgment in defamation cases where there remained outstanding issues of fact as to whether defendants acted with malice in defaming plaintiff. See, e.g., <u>Savitsky v. Shenandoah Valley Pub. Corp., 566 A.2d 901, 904, 389 Pa. Super. 176 (1989)</u> (genuine issue of material fact existed, precluding summary judgment for editor and newspaper, on whether they exhibited recklessness necessary to constitute actual malice in publishing report that incumbent union official was transported to polling places by coal company helicopter); <u>Chicarella v. Passant, 343 Pa. Super. 330, 494 A.2d 1109, 1115 (1985)</u> (allegations by plaintiff that credit manager of hospital had made defamatory

statements to employees of investigator hired by insurance company raised genuine issue of material fact as to whether credit manager actually made such statements, in light of manager's specific denial, precluding summary judgment); <u>Braig v. Field Communications</u>, <u>310 Pa. Super. 569, 456 A.2d 1366, 1376 (Pa. Super. 1983)</u> (in judge's defamation actions against [*55] assistant district attorney and television station owner, there were fact questions, precluding summary judgment, as to existence of actual malice as to defendant and his "state of mind" in deciding to rebroadcast program over judge's objection); and <u>Brophy v. Philadelphia Newspapers Inc., 281 Pa. Super. 588 422 A.2d 625, 632 (1980)</u> (trial court confronted with motion for summary judgment in public official or figure defamation case must deny motion if, viewing evidence and all inferences arising therefrom in light most favorable to plaintiff, there appears genuine issue of fact from which jury could reasonably find actual malice with convincing clarity).

We conclude that a jury could reasonably find that statements made by Defendants were defamatory in nature. Partial summary judgment is accordingly DENIED at this time with respect to count six.

### J. *Count Seven: Breach of Contractual Duty of Good Faith Dealing*

Count seven alleges that Defendants breached a duty of good faith and fair dealing to Plaintiff. Defendants aver that no such duty existed because: (1) no confidential relationship existed between Plaintiff and Defendants; and (2) an established cause of [*56] action already exists upon which Plaintiff could recover for the alleged wrongdoing.

The Third Circuit has recognized that under Pennsylvania law,

> In the absence of a dispute about the parties' reasonable expectations under a particular term of the contract, an independent duty of good faith has been recognized only in limited situations. After all, if contracting parties cannot profitably use their contractual powers without fear that a jury will second-guess them under a vague standard of good faith, the law will impair the predictability that an orderly commerce requires.

<u>Duquesne Light Co. v. Westinghouse Elec. Corp., 66 F.3d 604, 618 (3d Cir. 1995)</u> (citations omitted). Pennsylvania courts in this District have recognized a duty of good faith performance of contracts only in special limited situations such as a confidential or fiduciary relationship.

> <u>Chrysler Credit Corp. v. B.J.M., Jr., Inc., 834 F. Supp. 813 (E.D.Pa. 1993).</u>
> A confidential or fiduciary relationship exists when "one person has reposed a special confidence in another to the extent that the parties do not deal with each other on equal terms, either because of an over-mastering dominance [*57] on one side, or weakness, dependence or justifiable trust, on the other. A business association may be the basis of a confidential relationship only if one party surrenders substantial control over some portion of the affairs to the other.

<u>Id., 834 F. Supp. 841</u> (citations omitted). Plaintiff has not shown it enjoyed such a confidential, fiduciary relationship with Union Pacific. There is no evidence before us that Union Pacific exercised an unequal dominance over Plaintiff nor that Plaintiff had surrendered substantial control over its affairs to Union Pacific. As the Third Circuit has concluded,

> In this context -- where two sophisticated business entities have engaged in an

arms-length transaction -- we do not believe that Pennsylvania courts would impose an independent duty of good faith not tied to a contractual term.

Duquesne Light Co. v. Westinghouse Elec. Corp., 66 F.3d 604, 618 (3d Cir. 1995) (citations omitted). n11

- - - - - - - - - - - - - - - - -Footnotes- - - - - - - - - - - - - - - - - -

n11 Plaintiff has cited several decisions of the Pennsylvania Superior Court in support of its assertion that a good faith duty exists for all contracts in Pennsylvania. See Somers v. Somers, 418 Pa. Super. 131, 613 A.2d 1211, 1213 (Pa. Super. 1992) and Liazis v. Kasta, Inc., 613 A.2d 450, 454 (Pa. Super. 1992). We recognize there is some basis for this position. See also Garvey v. National Grange Mutual Ins. Co., 1995 WL 461228, (E.D.Pa), citing Bethlehem Steel Corp v. Litton Indus. Inc., 507 Pa. 88, 488 A.2d 581, 600 (1985) (opinion in support of reversal) and Restatement (Second) of Contracts § 205, (every contract in Pennsylvania also imposes on each party the duty of good faith and fair dealing); Atlantic Richfield Co. v. Razumic, 480 Pa. 366, 390 A.2d 736, 742 n.7a (Pa. 1978) (recognizing Restatement (Second) of Contracts § 231 which imposes standard of good faith on contracting parties). Nonetheless, we follow the Third Circuit's interpretation which we note was based in part on Somers v. Somers, supra, amongst others. Duquesne Light, 66 F.3d 604.

- - - - - - - - - - - - - - - -End Footnotes- - - - - - - - - - - - - - - - - [*58]

Defendants' Motion for partial summary' judgment, filed January 22, 1996 is accordingly GRANTED with respect to count seven of Plaintiff's second amended complaint.

## IV. CONCLUSION

Consistent with the preceding discussion, partial summary judgment for Defendants will be granted at this time with respect to all counts except count 1 (alleging constitutional violations); that part of count 3 alleging intentional interference with a prospective contractual relationship; and count 6 (defamation). Although we will include the entry of judgment in our order, this judgment will not be final or appealable under Fed.R.Civ.P. 54(b).

An appropriate order follows.

AND NOW, this 1st day of August 1996, upon consideration of Defendants' Motions for Summary Judgment, filed on January 22, 1996 and February 8, 1996, it is hereby ORDERED, consistent with the foregoing memorandum, that said motions are GRANTED in part and DENIED in part as follows:

1. Said motions are DENIED with respect to count one alleging constitutional violations. However, the parties are directed to further brief the issues pertaining to this count;

2. Said motions are DENIED with respect to that part of [*59] count three alleging intentional interference with a prospective contractual relationship;

3. Said motions are DENIED with respect to count six alleging defamation; and

4. Said motions are GRANTED in all other respects and judgment is entered in favor of Defendants and against Plaintiff on all claims except those enumerated above. This is not a final judgment.

BY THE COURT

Franklin S. Van Antwerpen

United States District Judge

Service: **LEXSEE®**
Citation: **1996 U.S. Dist. LEXIS 11177**
View: Full
Date/Time: Friday, May 26, 2000 - 9:00 AM EDT

About LEXIS-NEXIS | Terms and Conditions

Copyright © 2000 LEXIS-NEXIS Group.  All rights reserved.

**EXHIBIT E**

Service: **LEXSEE®**
Citation: **1999 U.S. Dist. LEXIS 12820**

*1999 U.S. Dist. LEXIS 12820, \**

DONALD S. SABATINI v. ROBERT J. REINSTEIN, DEAN OF TEMPLE UNIVERSITY SCHOOL OF
LAW AND VICE PRESIDENT, TEMPLE UNIVERSITY and TEMPLE UNIVERSITY SCHOOL OF LAW
and TEMPLE UNIVERSITY

Civil Action No. 99-2393

UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF PENNSYLVANIA

1999 U.S. Dist. LEXIS 12820

August 18, 1999, Decided
August 20, 1999, Filed

**DISPOSITION:** [\*1] Motion to dismiss of defendants Robert J. Reinstein, Temple University
School of Law, and Temple University granted. Counts III, IV, V, and VI dismissed against all
defendants. Counts I and II dismissed without prejudice as to defendant Reinstein.

**CORE TERMS:** cause of action, leaflets, Temple University School Of Law, motion to dismiss,
equal protection, first amendment, personally, distributing, equal protection clause, equal
protection claim, constitutional rights, treated differently, freedom of speech, protected class,
civil rights, free speech, self-executing, supplemental, participated, selectively, acquiesced,
police officers, compl, graduation, supervisor, ceremony, campus

**COUNSEL:** DONALD S. SABATINI, PLAINTIFF, Pro se, PHILADELPHIA, PA USA.

For ROBERT J. REINSTEIN, DEAN OF TEMPLE UNIVERSITY SCHOOL OF LAW AND VICE
PRESIDENT, TEMPLE UNIVERSITY; TEMPLE UNIVERSITY SCHOOL OF LAW; TEMPLE
UNIVERSITY, DEFENDANTS: CARRIE E. WATT, BALLARD, SPAHR, ANDREWS AND INGERSOLL,
PHILA, PA USA.

**JUDGES:** Edmund V. Ludwig, J.

**OPINIONBY:** EDMUND V. LUDWIG

**OPINION:** MEMORANDUM

Ludwig, J.

August 18, 1999

Defendants Robert J. Reinstein, Temple University School of Law, n1 and Temple University
move to dismiss the complaint for failure to state a claim. Fed. R. Civ. P. 12(b)(6). n2
Jurisdiction is federal question and supplemental. 28 U.S.C. §§ 1331, 1367.

- - - - - - - - - - - - - - - - - - -Footnotes- - - - - - - - - - - - - - - - - - - -

n1 Defendants note that the case-caption incorrectly designates James E. Beasley School of
Law as Temple University School of Law.

n2 Under Rule 12(b)(6), the allegations of the complaint are accepted as true and all
reasonable inferences are drawn in the light most favorable to plaintiff. See Weiner v. Quaker



Oats Co., 129 F.3d 310, 315 (3d Cir. 1997). Claims alleging civil rights violations are held to a "liberal standard," and should not be dismissed "unless it is readily discernable that the facts cannot support entitlement to relief." Lake v. Arnold, 112 F.3d 682, 684-85 (3d Cir. 1997) (quoting Carter v. City of Philadelphia, 989 F.2d 117, 118 (3d Cir. 1993)).

- - - - - - - - - - - - - - - - -End Footnotes- - - - - - - - - - - - - - - - -  [*2]

The following is alleged in the complaint. Both in May 1997 and May 1998, Temple campus police officers ordered plaintiff to stop distributing leaflets in the lobby of McGonigle Hall while law school's graduation ceremonies were being held. Compl. P 30. The leaflets consisted of newspaper articles accusing Temple University of having a poor civil rights record. Id. at PP 23-24. Thereafter, a campus police supervisor threatened to arrest plaintiff unless he stopped distributing the leaflets on Temple property. Id. at PP 32-39.

On May 10, 1999, plaintiff filed this § 1983 action asserting violations of freedom of speech and equal protection under the federal constitution together with supplemental claims under the Pennsylvania Constitution were also alleged. Defendants moved to dismiss the first amendment claims against defendant Reinstein (Counts I and II) as well as those under the equal protection clause of the fourteenth amendment (Counts III and IV) and article I of the Pennsylvania Constitution (Counts V and VI) against all defendants. The motion to dismiss will be granted and the claims dismissed.

1. Claims solely against defendant Robert J. Reinstein - "It is  [*3]  well-settled that liability under § 1983 may not be based on the doctrine of respondeat superior." Rouse v. Plantier, 1999 U.S. App. LEXIS 14608, 182 F.3d 192, 200 (3d Cir. 1999) (citation omitted). To hold individual supervisors liable under § 1983, plaintiff must prove "that they personally 'participated in violating [plaintiff's] rights, . . . that [they] directed others to violate them, or that [they] . . . had knowledge of and acquiesced in [their] subordinates' violations.'" Robinson v. City of Pittsburgh, 120 F.3d 1286, 1293 (3d Cir. 1997) (quoting Baker v. Monroe Twp., 50 F.3d 1186, 1190-91 (3d Cir. 1995).

Here, the complaint does not specify that Reinstein personally participated in the disputed incidents or that he approved of or acquiesced in the actions taken against plaintiff. Nor are the allegations sufficient to support such inferences. The only persons alleged to have been personally involved are Temple police officers - who are not named as defendants. Plaintiff's statement that "at all times material thereto, defendants acted through their agents and employees, whose conduct defendants had a duty to supervise and control," compl. P 10, sounds in  [*4]  respondeat superior liability. Accordingly, the claims against Reinstein must be dismissed. n3

- - - - - - - - - - - - - - - - -Footnotes- - - - - - - - - - - - - - - - - - -

n3 The factual matters set forth in plaintiff's rebuttal brief may not be considered in determining whether Reinstein had the requisite personal involvement. "It is axiomatic that the complaint may not be amended by the briefs in opposition to a motion to dismiss." Commonwealth of Pa. v. Pepsico, Co., 836 F.2d 173, 181 (3d Cir. 1988) (quoting Car Carriers, Inc. v. Ford Motor Co., 745 F.2d 1101, 1107 (7th Cir. 1984)). However, plaintiff's request for leave to amend will be granted. "Leave [to amend] shall be freely given when justice so requires." Fed. R. Civ. P. 15(a).

- - - - - - - - - - - - - - - - -End Footnotes- - - - - - - - - - - - - - - - -

2. Equal protection claims (Counts III and IV) - To state an equal protection claim, plaintiff must show that:

   (1) the person, compared with others similarly situated, was selectively treated,

and (2) the selective treatment was motivated by an intention to discriminate on the basis of impermissible considerations, [*5] such as race or religion, to punish or inhibit the exercise of constitutional rights, or by a malicious or bad faith intent to injure the person."

Homan v. City of Reading, 963 F. Supp. 485, 490 (E.D. Pa. 1997) (quoting Zahra v. Town of Southold, 48 F.3d 674, 683 (2d Cir. 1995)); see also Government of Virgin Islands v. Harrigan, 791 F.2d 34, 36 (3d Cir. 1986); Knepp v. Lane, 848 F. Supp. 1217, 1221 (E.D. Pa. 1994). n4

- - - - - - - - - - - - - - - - - -Footnotes- - - - - - - - - - - - - - - - - - -

n4 Plaintiff correctly maintains that it is not necessary for the complaint to plead that he is a member of a protected class in order to state a claim under the fourteenth amendment equal protection clause. A complaint need only allege that plaintiff was intentionally treated differently from those similarly situated. See Jubilee v. Horn, 975 F. Supp. 761, 766-67 (E.D. Pa. 1997); see also Esmail v. Macrane, 53 F.3d 176 at 176-80 (7th Cir. 1995) ("Neither in terms nor in interpretation is the [fourteenth amendment's equal protection] clause limited to protecting members of identifiable groups."). Whether the alleged discrimination is based on membership in a protected class or, as here, exercise of a fundamental right implicates the level of scrutiny required. See Artway v. Attorney General of State of N.J., 81 F.3d 1235, 1267 (3d Cir. 1996).

- - - - - - - - - - - - - - - - - -End Footnotes- - - - - - - - - - - - - - - - [*6]

Here, no facts have been averred that demonstrate that plaintiff was selectively treated. The basis of his equal protection claim is the same as that of his first amendment claim - that he was prevented from distributing leaflets at the law school graduation ceremony. Plaintiff does not contend that other persons or groups were engaged in similar conduct or that they were treated differently. It is not enough to allege that defendants violated plaintiff's first amendment rights; his rights must have been violated while the rights of others engaged in like conduct were not. Accordingly, Counts III and IV must be dismissed.

3. Pennsylvania Constitutional law claims (Counts V and VI) - The complaint also alleges violations of Pennsylvania's constitutional rights to freedom of expression and petition. Pa. Const. art. I, §§ 7, 20.

Although its courts have not decided whether a private cause of action exists under sections 7 and 20 of the Pennsylvania Constitution, federal courts have held that there is no such right. See Lees v. West Greene School Dist., 632 F. Supp. 1327, 1335 (W.D. Pa. 1986) (article 1, § 7 "contains no provision, express or implied, which creates [*7] a private right of action for violations of an individual's right to free speech"); Pendrell v. Chatham College, 386 F. Supp. 341, 344 (W.D. Pa. 1974) ("Article I, Section 7 . . . imposes a limitation upon the power of the State to interfere with freedom of the press and freedom of speech, but contains no self-executing private cause of action, express or implied."); Holder v. City of Allentown, 1994 U.S. Dist. LEXIS 7220, 1994 WL 236546, at *3 (E.D. Pa. May 27, 1994) (granting summary judgment as to § 7 claim because no such cause of action exists); cf. Western Pa. Socialist Workers 1982 Campaign v. Conn. General Life Ins. Co., 335 Pa. Super. 493, 500, 485 A.2d 1, 5 (1985) (section 7 "is not a self-executing, affirmative declaration" of an individual's right to free speech; constitutional provisions "are usually only commands to the legislature to enact laws to carry out the purposes of the framers of the Constitution, or mere restrictions upon the power of the legislature to pass laws") (citations omitted). n5 Accordingly, these claims will also be dismissed.

- - - - - - - - - - - - - - - - - -Footnotes- - - - - - - - - - - - - - - - - - -

Get a Document - by Citation - 1999 U.S. Dist. LEXIS 12820    Page 94 of 100

Case 1:00-cv-00660-YK-JAS    Document 26    Filed 09/01/2000    Page 4 of 4

n5 Although case law has not specifically dealt with the right to bring a cause of action under
§ 20, the prohibition against such claims under § 7 applies with equal force to the analogous
freedom of petition provision. See Western Pa. Socialist Workers 1982 Campaign v. Conn.
General Life Ins. Co., 335 Pa. Super. 493, 499, 485 A.2d 1, 4 (1985) (the court's
"interpretation of section 7 is controlling also of any interpretation of section[] . . . 20.").

- - - - - - - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - - - - - [*8]

Edmund V. Ludwig, J.

**ORDER**

AND NOW, this 18th day of August, 1999, the motion to dismiss of defendants Robert J.
Reinstein, Temple University School of Law, and Temple University is granted. Fed. R. Civ. P.
12(b)(6). Counts III, IV, V, and VI are dismissed against all defendants. Counts I and II are
dismissed without prejudice as to defendant Reinstein.

Edmund V. Ludwig, J.

Service: **LEXSEE®**
Citation: **1999 U.S. Dist. LEXIS 12820**
View: Full
Date/Time: Friday, May 26, 2000 - 8:57 AM EDT

About LEXIS-NEXIS | Terms and Conditions

Copyright © 2000 LEXIS-NEXIS Group. All rights reserved.

**EXHIBIT F**

Service: **LEXSEE®**
Citation: **1994 U.S. Dist. LEXIS 7220**

*1994 U.S. Dist. LEXIS 7220, *; 9 BNA IER CAS 1170*

JOHN W. HOLDER, Plaintiff v. CITY OF ALLENTOWN, EMMA TROPIANO, BENJAMIN HOWELLS, JOSEPH S. DADDONA, CHARLES F. WILSON, HOWARD D. KUNIK, Defendants

CIVIL ACTION No. 91-240

UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF PENNSYLVANIA

1994 U.S. Dist. LEXIS 7220; 9 BNA IER CAS 1170

May 19, 1994, Decided
May 27, 1994, Filed

**CORE TERMS:** summary judgment, custom, ordinance, termination, genuine issue, residency, uniformly, entirety, moving party, deprivation, terminated, terminate, memorandum, first amendment, protected activity, preclusive effect, burden of proof, matter of law, factual issue, motivation, non-moving, referee, civil rights action, expressing, resident, license, openly, voted

**COUNSEL:** [*1] For JOHN W. HOLDER, PLAINTIFF: MALCOLM J. GROSS, GROSS, MC GINLEY, LA BARRE & EATON, ALLENTOWN, PA, JOHN D. LYCHAK, GROSS, MC GINLEY, LABARRE, & EATON, ALLENTOWN, PA.

For CITY OF ALLENTOWN, JOSEPH S. DADDONA, Individually and in his official capacity as the Mayor of the City of Allentown, CHARLES F. WILSON, Individually and in his official capacity as the Manager of Personnel and Labor Relations for the City of Allentown, HOWARD D. KUNIK, Individually and in his official capacity formerly as the Director of Administration and Finance of the City of Allentown, DEFENDANTS: ALAN M. BLACK, BLACK, MC CARTHY, EIDELMAN & FEINBERG, ALLENTOWN, PA, ALAN M. BLACK, BLACK, MC CARTHY, EIDELMAN, FEINBERG, ANEWALT & KERCHER, P.C., ALLENTOWN, PA. For EMMA TROPIANO, Individually and in her official capacity as a Councilwoman of the City of Allentown, BENJAMIN HOWELLS, Individually and in his official capacity as a Councilman of the City of Allentown, DEFENDANTS: CHARLES J. FONZONE, FONZONE & ASHLEY, ALLENTOWN, PA, ALAN M. BLACK, BLACK, MC CARTHY, EIDELMAN & FEINBERG, ALLENTOWN, PA, ALAN M. BLACK, BLACK, MC CARTHY, EIDELMAN, FEINBERG, ANEWALT & KERCHER, P.C., ALLENTOWN, PA.

**JUDGES:** HUYETT, J.

**OPINIONBY:** HUYETT

**OPINION: MEMORANDUM** [*2]

**HUYETT, J.**

Plaintiff and Defendants have filed cross-motions for summary judgment in this civil rights action. For the reasons set forth below, both motions are **DENIED** in their entirety.

I. FACTS

The City of Allentown ("Allentown") employed John W. Holder ("Plaintiff") as a systems analyst and supervisor in Allentown's Bureau of Information Systems from 1985 until 1990. Section 121.07 of the Codified Ordinances for the City of Allentown ("Residency Ordinance")

required that all new municipal employees reside in Allentown within twelve (12) months of commencing employment. The Residency Ordinance mandated that violations would result in termination.

Although Plaintiff and his wife searched for suitable housing, for various reasons they never moved to Allentown. In or about December of 1989, Plaintiff began openly expressing opposition to the Residency Ordinance to city council members who were soon to vote on a proposal to abolish the Ordinance. On February 7, 1990, the city council voted to retain the Residency Ordinance. On February 16, 1990, the Morning Call, an Allentown newspaper, published a letter to the editor (the "Letter"), submitted by Plaintiff which criticized [*3] the Residency Ordinance and the council members who voted to retain it.

Around this time and following his meetings with council members and an incident in which Plaintiff's driver's license was reviewed by an Allentown employee n1 , several council members suspected that Plaintiff was not an Allentown resident. Defendant council members Tropiano and Howells requested that an investigation be conducted by Defendant Kunik, the former Director of Administration and Finance for the City of Allentown. The investigation, consisting of vehicle and voter registration checks, inquiries with the post office and utilities, and consultation with the City Solicitor revealed that Plaintiff was not a resident. The findings were summarized in a memorandum from Kunik to Mayor Daddona recommending termination. n2

- - - - - - - - - - - - - - - - - -Footnotes- - - - - - - - - - - - - - - - - - -

n1 Plaintiff's driver's license listed a Bethlehem address.

n2 The memorandum was dated February 28, 1990.

- - - - - - - - - - - - - - - -End Footnotes- - - - - - - - - - - - - - - - -

On March 5, 1990, Mayor Daddona confronted Plaintiff with the results of the investigation and requested that [*4] he resign. Plaintiff was at that time suspended for thirty days without pay. He resigned on March 28, 1990. Plaintiff brings this action pursuant to 42 U.S.C. § 1983, against the City of Allentown and several of its officials, claiming that he was terminated in retaliation for openly expressing his opposition to the residency requirements in violation of his first, fifth and fourteenth amendment rights. n3

- - - - - - - - - - - - - - - - -Footnotes- - - - - - - - - - - - - - - - - - -

n3 By Order dated March 26, 1992, this Court dismissed Plaintiff's complaint in its entirety. On appeal, the Third Circuit reversed, holding that Plaintiff had stated a claim for the violation of his rights to freedom of speech.

- - - - - - - - - - - - - - - -End Footnotes- - - - - - - - - - - - - - - - -

## II. DISCUSSION

### A. Plaintiff's Motion for Summary Judgment

Following his termination, Plaintiff applied for unemployment compensation benefits. The Office of Employment Security denied his application on the grounds that he had been constructively terminated for the wilful violation of a city ordinance. Plaintiff appealed and the Unemployment Compensation [*5] Board of Review ("UCBR") reversed, finding that Plaintiff had not wilfully violated the Residency Ordinance because there was no history of enforcement of the residency requirement. In so holding, the referee found that the City had not uniformly applied the Residency Ordinance. Plaintiff moves for summary judgment on the grounds that the factual findings of the UCBR are preclusive and, therefore, Defendants are

collaterally estopped from relitigating the issue of whether the residency ordinance was applied uniformly. The Court of Appeals for the Third Circuit recently held that findings of the UCBR are not to be given preclusive effect in Section 1983 actions. Swineford v. Snyder County, Pa. 15 F.3d 1258 (3d Cir. 1994). Unemployment benefits proceedings determine whether a petitioner wilfully violated a law or regulation whereas the issue in a Section 1983 action is whether the defendant terminated the plaintiff for engaging in a protected activity. Id. at 1268. Accordingly, the issues are not sufficiently identical for preclusion purposes.

Further, the nature of the adjudicative process at the agency level and in the [*6] district court are too dissimilar to permit the findings of the agency to have preclusive effect in the district court. Because the goals of Pennsylvania Unemployment Compensation Law are to provide quick and basic compensation for workers who become unemployed through no fault of their own, the procedures to determine benefit eligibility are quick and informal. Id. Additionally, referees lack the expertise to issue binding pronouncements in the area of federal constitutional law. The Court concluded that these policy reasons warrant a blanket prohibition against issue preclusion.

In accordance with the mandate of Swineford, Plaintiff's motion for summary judgment is **DENIED.**

B. Defendants' Motion for Summary Judgment

Summary judgment is proper when the record shows "that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). This Court's role is to determine "whether there is a genuine issue for trial." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249, 91 L. Ed. 2d 202, 106 S. Ct. 2505 (1986); Josey v. John R. Hollingsworth Corp., 996 F.2d 632, 637 (3d Cir. 1993). [*7] The moving party has the burden of demonstrating that no genuine issue of fact exists. Celotex Corp. v. Catrett, 477 U.S. 317, 323, 91 L. Ed. 2d 265, 106 S. Ct. 2548 (1986). Further, the evidence must be viewed in the light most favorable to the non-moving party. United States v. Diebold, Inc., 369 U.S. 654, 655, 8 L. Ed. 2d 176, 82 S. Ct. 993 (1962). However, if the non-moving party fails to adduce sufficient evidence in connection with an essential element of the case for which it has the burden of proof, the moving party is entitled to summary judgment as a matter of law. Celotex, 477 U.S. at 322.

There are several requisite elements which Plaintiff must prove to establish a Section 1983 claim arising out of the termination of public employment based on allegations of conduct protected by the First Amendment. Plaintiff must first establish that the activity in question was protected. Czurlanis v. Albanese, 721 F.2d 98, 103 (3d Cir. 1983). The parties do not dispute that [*8] Plaintiff's conduct constituted protected first amendment activity.

Next, Plaintiff must prove that the protected activity was a substantial or motivating factor in the termination. Mt. Healthy City School Dist. Bd. of Ed. v. Doyle, 429 U.S. 274, 50 L. Ed. 2d 471, 97 S. Ct. 568 (1977). Defendants fail to demonstrate that no genuine issue of fact exists with respect to whether the motivation to terminate Plaintiff was the Morning Call Letter. Motivation is an inherently factual issue. Moreover, Plaintiff has adduced evidence that the Residency Ordinance was not uniformly enforced.

With respect to any particular defendant, Plaintiff must demonstrate that the defendant caused the wrongful termination or that the deprivation is fairy attributable to the defendant's conduct. Commonwealth Bank & Trust Co. v. Russell, 825 F.2d 12, 14 (3d Cir. 1987). The lack of authority personally to terminate Plaintiff does not necessarily alleviate Defendants Tropiano, Howells, Kunik and Wilson from responsibility. In Bartholomew v. Fischl, 782 F.2d 1148 (3d Cir. 1986), the Third [*9] Circuit held that allegations that policy making officials with no specific authority to discharge had conducted a retaliatory campaign against a public employee in order to suppress free speech was sufficient to establish a civil rights action. See also Burns v. County of Cambria, 764 F. Supp. 1031, 1037-39 (W.D. Pa.

1991), aff'd, 971 F.2d 1015 (3d Cir. 1992), cert. denied 113 S. Ct. (1993).

Genuine issues of fact exist as to causation with respect to each defendant. With respect to Defendants Daddona, Tropiano, Howells, Kunik and Wilson, it is unclear from the record the extent of influence each defendant had in urging the dismissal of Plaintiff, but the evidence suggests that any of these Defendants could have influenced the decision.

Once plaintiff has met his burden of proof, a defendant may defeat plaintiff's claim by demonstrating that the termination would have occurred even absent the protected conduct. Czurlanis, 721 F.2d at 103. This is clearly a factual issue, and the evidence suggesting uneven enforcement of the Residency Ordinance is sufficient on this issue to preclude summary [*10] judgment.

With respect to the City of Allentown, in order for a local governing body to be subject to Section 1983 liability, Plaintiff must demonstrate that constitutional deprivations occurred pursuant to a government custom or policy. Schwartz v. Montgomery, 823 F. Supp. 296, 300 (E.D. Pa. 1993). Thus, municipal liability attaches only when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts may be said to represent official policy, inflicts the injury. Id. A course of conduct is considered a "custom when, though not authorized by law, such practices of state officials are so well settled as to virtually constitute law." Andrews v. City of Philadelphia, 895 F.2d 1469, 1480 (3d Cir. 1990). A Plaintiff must show that a policy maker is responsible for the policy or through acquiescence, for the custom. A Plaintiff must also demonstrate a plausible link or nexus between the municipality policy or custom and the specific deprivation of the constitutional rights at issue. Id. at 1480, citing Jett v. Dallas Independent School District, 491 U.S. 701, 105 L. Ed. 2d 598, 109 S. Ct. 2702 (1989). [*11]

The City of Allentown has in effect a residency ordinance which ostensibly requires the mayor of the city to terminate any employee not residing in Allentown. Evidence suggests that the Ordinance was not uniformly enforced. Plaintiff's deposition testimony suggests that other incidents occurred where the city retaliated for expression of an employee's views. The issue of whether the City of Allentown engaged in a custom of enforcing the residency ordinance in a discriminatory and unconstitutional manner is factual, precluding summary judgment.

C. Article I, Section 7 Claim

Defendants maintain that no private right of action exists for violations of article I, section 7 of the Pennsylvania Constitution. Plaintiff does not contest this aspect of Defendants' motion for summary judgment. Because the Court concludes that no cause of action exists under article I, section 7, this claim is dismissed. Western Pa. Socialist Workers 1982 Campaign v. Connecticut General Life Ins. Co., 335 Pa. Super. 493, 485 A.2d 1 (Pa. Super. 1984), aff'd, 512 Pa. 23, 515 A.2d 1331 (Pa. 1986); Pendrell v. Chatham College, 386 F. Supp. 341 (W.D. Pa. 1974).
 [*12]
III. Conclusion

For the reasons set forth above, Plaintiff's motion for summary judgment is **DENIED**. Defendants' motion for summary judgment is **DENIED** with respect to each defendant. An appropriate Order is attached.

**Daniel H. Huyett, 3rd, Judge**

**ORDER**

**HUYETT, J.**

Upon consideration of Plaintiff's motion for summary judgment and Defendants' motion for


summary judgment and the parties' respective responses:

(1) Plaintiff's motion for summary judgment is **DENIED** in its entirety;

(2) Defendants' motion for summary judgment is **DENIED** in its entirety.

**IT IS SO ORDERED.**

**Daniel H. Huyett, 3rd, Judge**

Service: **LEXSEE®**
Citation: **1994 U.S. Dist. LEXIS 7220**
View: Full
Date/Time: Friday, May 26, 2000 - 8:51 AM EDT

About LEXIS-NEXIS | Terms and Conditions

Copyright © 2000 LEXIS-NEXIS Group. All rights reserved.