**ORDER**  5190.6A

# AIRPORT COMPLIANCE REQUIREMENTS



## OCTOBER 2, 1989

**DEPARTMENT OF TRANSPORTATION**
FEDERAL AVIATION ADMINISTRATION



Distribution: A-W(PP/AS)-3; A-X(AS)-4; A-FAS-1(MAX)   Initiated By: AAS-300

installations under the surplus property laws. Many of the surplus property conveyances did not literally require conformity to the prohibition against exclusive rights in Section 303 of the Civil Aeronautics Act, but they contained the far more specific restrictions quoted in paragraph 31d above.

**b. Early Interpretations of Aeronautical Activity.** In approving grants of funds for airport development the CAA/FAA has always insisted that there could be no exclusive right for the use of such airports. Any activity which involved use of the landing area (e.g., flight school, airline, charter service, etc.) was considered to be subject to the statutory prohibition. However, a nonaeronautical activity, such as a restaurant or ground transportation service, was viewed as not subject to the prohibition. In early policy interpretations there were many activities which cater to or support flight operations, but which do not actually use the landing area (such as storage hangars, repair services, aircraft parts sales, and especially the sale of fuel and oil) and were viewed as not being subject to the prohibition. The FAA, as a matter of policy, advised against monopolies for such activities. However, in 1962 the FAA Policy on Exclusive Rights was published in the Federal Register and it declared the exclusive rights of these activities to be in violation of the law.

**c. Definition of Aeronautical Activity.** On July 17, 1962, the FAA issued Order OA 5250.1 which defined those aeronautical activities prohibited on an exclusive basis by Section 308(a) of the Federal Aviation Act. On October 12, 1965, this Order was superseded by Order 5190.1, Exclusive Rights at Airports, to further clarify the application of the statutory prohibition. Section 2 of this Chapter explains in detail the types of aeronautical activity covered by the prohibition and the FAA policies for interpreting and applying Section 308(a).

3-4.-3-7. RESERVED.

## SECTION 2. POLICY

**3-8. BASIS OF POLICY**

**a. Agency Position.** The FAA has concluded that the existence of exclusive right to conduct any aeronautical activity at an airport limits the usefulness of the airport and deprives the using public of the benefits of a competitive enterprise. Apart from legal considerations, the FAA considers it inappropriate to provide Federal funds for improvements to airports where the benefits of such improvements will not be fully realized due to the inherent restrictions of an exclusive monopoly on aeronautical activities.

**b. Application of Law.** The grant of an exclusive right to conduct an aeronautical activity at an airport on which Federal funds have been expended is considered a violation of Section 308(a) of the Federal Aviation Act, whether such exclusive right results from an express agreement, from the imposition of unreasonable standards or requirements, or by any other means. As an exception, the existence of an exclusive right to sell only fuel and oil will not be considered to be in violation of Section 308(a) where such right is specifically exempted from the activities prohibited by a deed under the Surplus Property Act of 1944, as amended (P.L. 80-289). However, presence of such an exclusive right would preclude issuance of a grant under the AAIA Act of 1982, as amended. (See Chapter 6, Section 2.)

**c. Duration of Prohibition Against Exclusive Rights.** Once any Federal funds have been expended at an airport, including a surplus property conveyance, the exclusive rights prohibition is applicable for as long as it is operated as an airport.

**3-9. INTERPRETATION.**

**a. Single Activity Not Necessarily an Exclusive Right.** The presence on an airport of only one enterprise engaged in any aeronautical activity will not be considered a violation of this policy if there is no understanding, commitment, express agreement, or apparent intent to exclude other reasonably qualified enterprises. In many instances, the volume of business may not be sufficient to attract more than one such enterprise. As long as the opportunity to engage in an aeronautical activity is available to those meeting reasonable qualifications and standards relevant to such activity, the fact that only one enterprise takes advantage of the opportunity does not constitute the grant of an exclusive right.

**b. Single Activity as Treated by Law.** The AAIA (P.L. 97-248) includes the following sponsor assurance under Section 511(a)(2):

"...There will be no exclusive right for the use of the airport by any person providing, or intending to provide, aeronautical services to the public. For purposes of this paragraph, the providing of services at an airport by a single fixed-based operator shall not be construed as an exclusive right if it would be unreasonably costly, burdensome, or impractical for more

than one fixed-based operator to provide such services, and if allowing more than one fixed-based operator to provide such services would require the reduction of space leased pursuant to an existing agreement between such single fixed-based operator and such airport..."

The Chief Counsel rendered an opinion dated December 21, 1982, which concludes that this amendment to Section 308(a) applies to those airports previously obligated under Section 308(a) where a single fixed-based operator (FBO) now exists. This assurance obligates the grant recipients to the same terms and conditions of amended Section 308(a). (Reference Order 5190.1.)

The exclusive rights policies that are outlined herein remain unchanged except for those airports which have a single FBO whose lease agreement with the airport owner must be amended to delete space for a second FBO to do business on the airport. In these cases, it must be determined if it would be unreasonably costly, burdensome, or impractical for more than one FBO to provide such services on the airport. This does not apply where the lease is being amended to delete space due to lack of demonstrable need (see below).

c. **Single Activity Due to Space Limitation.** The leasing to one enterprise of all available airport land and improvements planned for aeronautical activities will be construed as evidence of an intent to exclude others unless: (1) the lease meets the criteria of and contains the special provisions described in paragraph 6-5c; or (2) it can be demonstrated that the entire leased area is presently required and will be immediately used to conduct the activities contemplated by the lease.

(1) The complete saturation of space available for the service, storage, and repair of aircraft is prima facie evidence of a serious imbalance in the development of airport facilities. At a new or recently developed airport such saturation reflects poor planning and unrealistic forecasts of need. However, an arbitrary division or restriction to create an opportunity for a competitive enterprise is not required merely to comply with the exclusive rights policy.

(2) A single aeronautical enterprise although meeting all reasonable standards and qualifications should be limited, as a result of this policy, to the case of such space as is demonstrably needed. If the need for additional space becomes apparent at a later date, such space, as well as any new areas developed for the service and support of aeronautical activities, must be made available to all qualified proponents or bidders, including the incumbent. The advance grant of options or preferences (including right of first refusal) on all future sites to the incumbent enterprise must be viewed as an exclusive right. On the other hand, nothing in this policy should be construed as limiting the expansion of such an enterprise when space requirements become critical and where the proposed lease area will be immediately used to conduct activities, even though it could ultimately result in complete saturation of all space by the one enterprise.

d. **Aeronautical Activities Conducted by the Airport Owner (Proprietary Exclusive).** The owner of a public-use airport (public or private owner) may elect to provide any or all of the aeronautical services needed by the public at the airport. In fact, the statutory prohibition against exclusive rights does not apply to these owners and they may exercise but not grant the exclusive right to conduct any aeronautical activity. However, these owners must engage in such activities as principals using their own employees and resources. An independent commercial enterprise that has been designated as agent of the owner may not exercise nor be granted an exclusive right. (Reference Chief Counsel opinion dated April 13, 1984.)

(1) As a practical matter most public agencies recognize that these services are best provided by profit-motivated private enterprise. The exceptions are usually those instances in which a municipality or other public agency elects to provide fuel service or aircraft parking. If it does so, whether on an exclusive or nonexclusive basis, it may not refuse to permit an air carrier, air taxi, or flight school to fuel its own aircraft.

(2) The airport owner may establish reasonable standards covering the refueling, washing, painting, repairing, etc., of aircraft, but it may not refuse to negotiate for the space and facilities needed to meet such standards by an activity offering aeronautical services to the public. If the airport owner reserves unto itself the exclusive right to sell fuel, it can prevent an airline or air taxi from selling fuel to others but it must deal reasonably to permit such operators to refuel their own aircraft. The self-service fueling by such flight operators, however, must be done with their own employees and equipment.

(3) An aircraft operator does not have a right to bring a third party, such as an oil company, on the airport to refuel his aircraft. This would be an aeronautical activity undertaken by the fuel company which has only such rights as the airport owner may confer. It should be noted that air carriers invariably insist on a standard condition in their airport contracts reserving the right to obtain fuel from a supplier of their choice. However, this is not a right guaranteed by the terms of a grant agreement.

e. Restrictions on Self-Service.

(1) Any unreasonable restriction imposed on the owners or operators of aircraft regarding the servicing of their own aircraft and equipment may be construed as a violation of this policy. Where no attempt has been made to perform such services for others, aircraft owners should be permitted to fuel, wash, repair, paint and otherwise take care of their own aircraft. A restriction which has the effect of diverting such business to a commercial operator amounts to an exclusive monopoly of an aeronautical activity contrary to law.

(2) Servicing one's own aircraft is not an aeronautical activity that can be preempted by the airport owner which elects to exercise the exclusive right to sell fuel. Quite apart from the prohibition against exclusive rights, the sponsor of an obligated airport is required to operate the airport for the use and benefit of the public on fair and reasonable terms. It may not, as a condition for the use of its airport, impose unreasonable requirements on aircraft operators to procure parts, supplies or services from specified sources. It can however, require the self-fueler, both individuals and operators, to pay the same fuel flowage fee as those operators on the airport who provide fueling services to the public. As long as the aircraft operators do not attempt to offer commodities or services to others, they have a right to furnish their own supplies and to do what is necessary to their aircraft in order to use the facilities of a public use airport.

(3) An airport owner is under no obligation to permit aircraft owners to introduce on the airport equipment, personnel or practices which would be unsafe, unsightly, detrimental to the public welfare, or which would affect the efficient use of airport facilities by others. Reasonable rules and regulations should be adopted to confine aircraft maintenance and fueling operations to appropriate locations with equipment commensurate to the job being done. Unless the aircraft owner is in a position to meet such standards with his own equipment and personnel, his right to service his own aircraft does not override the prerogative of the airport owner to control the sources of providing fuel and other aeronautical services. For example, airport agreements do not permit the owner of a private aircraft to contract with an off-airport company to enter upon the airport and refuel his aircraft. This would clearly be the conduct of an aeronautical activity, not by the aircraft owner, but by the fuel company. Also, the airport owner is under no obligation by the terms of the grant assurances to recognize a "CO-OP" (an organization formed by several aircraft owners for the purpose of self fueling) as a single aircraft owner for self fueling purposes. However, fueling activities by a "CO-OP" could be allowed by the airport owner provided appropriate agreements (safety standards, fees, conditions, etc.) were consummated. Where the sponsor has retained, on an exclusive basis, this right to fuel or service the aircraft of others it may prohibit such entries. With respect to fuel, therefore, the aircraft owner may assert the right to obtain fuel where he pleases and bring it onto the airport to service his own aircraft, but only with his own employees and only in conformance with the reasonable safety standards or other reasonable requirements of the airport. This policy also applies to aircraft owners who have obtained supplemental type certificates authorizing the use of automotive gasoline (mogas) in their aircraft and who wish to self service their aircraft with mogas.

(4) Local airport regulations may and should include such restrictions as are reasonably necessary for safety, preservation of facilities and protection of the public interest. For example:

(a) The use of paints, dopes, and thinners should be confined to structures meeting appropriate safety criteria.

(b) Storage and transport of aviation fuel, though not procured for resale, should be subject to reasonable restrictions and minimum standards for equipment, location and handling practices.

(c) Restraints should be placed on the use of aircraft washing solvents to protect sewage and drainage facilities.

(d) Weight limitations should be imposed on delivery trucks (including fuel trucks) and special purpose vehicles such as cranes where needed to protect airport roads and paving.

(e) Time limits should be placed on the open storage of nonairworthy aircraft, wreckage, or unsightly major components.

(f) Such restrictions as may be required by appropriate Federal or state agencies to protect the environment and minimize pollution or other adverse effects.

(g) Restraints should be placed on the storage of nonaeronautical vehicles such as boats, cars, trailers and mobile homes, etc., in hangars or on the aeronautical facilitie areas.

f. Licenses Not Controlled by Airport Owner. The Federal Communications Commission (FCC) authorizes use of special UNICOM frequencies for air-to-ground communication at airports. The primary purpose of the communications station is to disseminate aeronautical data, such as weather, wind direction, runway information, etc. To preclude the issuance of

conflicting reports, the FCC will not license more than one UNICOM station at the same airport. An aeronautical activity having a UNICOM station or similar exclusive privilege has an advantage over competitors in attracting aeronautical users. However, since such an exclusive right is not subject to the airport owner's control, it does not constitute a grant of exclusive rights to which the statutory prohibition of Section 308(a) applies. Airport owners should be encouraged to obtain the UNICOM license in their own names. Through droplines they can make the facility available to all FBO's on an equal basis.

   g. **Flying Clubs.** Flying clubs are nonprofit entities (corporations, associations or partnerships) organized for the express purpose of providing its members with an aircraft or aircraft for their personal use and enjoyment only. The ownership of the aircraft, or aircraft, must be vested in the name of the flying club (or owned ratable by all its members). The property rights of the members of the club shall be equal and no part of the net earnings of the club will inure to the benefit of any form (salaries, bonuses, etc.). The club may not derive greater revenue from the use of its aircraft than the amount for the operation, maintenance and replacement of its aircraft. A flying club qualifies as an individual under the grant assurances and, as such, has the right to fuel and maintain the aircraft with its members. The airport owner has the right to require the flying club to furnish such documents, insurances policies, and maintain a current list of members as reasonably necessary to assure that the flying club is a nonprofit organization rather than a FBO masquerading as a flying club. (See Appendix 8, Sample Flying Club Lease.)

**3-10. IMPLEMENTATION OF POLICY.**

   a. **Voluntary Compliance.** The FAA will consider as a breach of compliance obligations by the airport owner, any grant of an exclusive right in violation of the policy outlined herein at any airport obligated to the United States as a result of a grant agreement (FAAP/ADAP/AIP), AP-4 agreement, or a conveyance of Federal property under the Surplus Property Act, or under Section 16, 23, or 516. Every reasonable effort shall be made to influence a voluntary termination of the objectionable exclusive right using the guidance and techniques suggested in Chapter 5.

   b. **Remedies.** At any airport where there has been a grant of an exclusive right contrary to law and this policy, that airport and any other airport owned or controlled by the offending airport owner will be ineligible for assistance under AIP and the FAA will not expend Facilities and Equipment (F&E) funds for installations designed to benefit traffic at such airports unless necessary to remedy a safety problem. See Chapter 6, Section 2 for discussion of procedural enforcement matters.

   c. **Exceptions.** Nothing herein shall be construed as precluding the grant of Federal funds where required for the national defense, or when determined by the Administrator to be essential to the national interest.

**3-11. IMPROVEMENTS BY OTHER FEDERAL AGENCIES.**

   a. **Expenditures on Civil Airports.** From time to time various Federal agencies and activities other than the FAA have expended Federal funds to bring about permanent or temporary improvement of civil airports, usually in furtherance of essential Federal programs for which they are responsible. The Chief Counsel of the FAA has determined that any such expenditures which result in the improvement of airport facilities constitute an expenditure of funds within the meaning of the Federal Aviation Act. Consequently, such action has the effect of imposing the prohibition against the grant of exclusive rights at such an airport. In instances of this kind, the Chief Counsel has concluded that the FAA has primary responsibility for enforcing the prohibition regardless of the source of the Federal funds.

   b. **Statutory Requirement.** As noted in paragraph 31a of this Order the language of Section 308(a) of the Federal Aviation Act not only prohibits exclusive rights but restricts the use of Federal funds for airport development (other than military) to those landing areas certified by the FAA Administrator as being reasonably needed for air commerce or national defense. FAA approval of the National Plan of Integrated Airport System (NPIAS) satisfies this requirement for federally-funded airport development projects. Federal agencies proposing to expend Federal funds on airport improvements not included in the NPIAS are responsible for obtaining a Certificate of Air Navigation Facility Necessity.

   c. **FAA Responsibility.** Whenever consulted, FAA personnel will advise the representatives of other Federal agencies contemplating the improvement of airport facilities as to the applicability of the above described statutory provision. Both the airport owner and the Federal agency involved should understand that the expenditure of such funds will result in the imposition of the prohibition against exclusive rights at such airports.

   d. **Federally-Owned Airports.**

      (1) **Military and Special Purpose Airports.** The prohibition against exclusive rights contained in the Federal Aviation Act does not apply to the actions