# AC No: 150/5190-2A EXCLUSIVE RIGHTS AT AIRPORTS

**REPRINTED MARCH 1976**

**INCORPORATES CHG 1**

| Initiated by: AS-680 | Date: 4 Apr 72 |

1. **PURPOSE.** This circular is issued to make available to public airport owners, and to other interested persons, basic information and guidance on this agency's policy regarding exclusive rights at public airports on which Federal fluids, administered by the agency, have been expended.

2. **CANCELLATION.** AC 150/5190-2 dated 2 September 1966 is cancelled.

3. **CONTENT.** Included in this circular are discussions of the exclusive rights policy in general, the legislation requiring it, the history of its development and an explanation of how it applies to aeronautical activities conducted on public airports developed or improved with Federal assistance. Descriptions of some typical situations are presented to illustrate the agency's interpretation and administration of the policy. The material offered here is nonregulatory and is intended only to foster a better understanding of the exclusive rights policy by those public airport owners to whom it applies. For owners of public airports who have not received Federal aid, this circular will illustrate how they would be affected should they seek such aid in the future. Those engaged in a commercial activity on an airport should also find this information of interest.

4. **REFERENCES.**

   a. Policy Statement "Exclusive Rights at Airports" as published in the Federal Register (30 FR 13661), 27 October 1965.

   b. FAA Advisory Circular AC 150/5190-1, Minimum Standards for Commercial Aeronautical Activities on Public Airports. This circular can be obtained from the Department of Transportation (DOT) Distribution Unit, TAD-484.3, Washington, D.C. 20590.

5. **LEGISLATIVE BACKGROUND.**

   a. There have been statutory prohibitions against the granting of exclusive rights at an airport ever since the enactment of the Civil Aeronautics Act of 1938. Section 303 of that Act provided "there shall be no exclusive right for the use of any landing area or air navigation facility upon which Federal funds have been expended." More recently, this identical language was incorporated in section 308(a) of the Federal Aviation Act of 1958.

   b. During the course of World War II many civil airports were improved with Federal funds. This program was carried out under agreements requiring that these airports be operated "without the grant or exercise of any exclusive right for use of the airport within the meaning of section 303 of the Civil

© ATP US Aviation Regulatory Library

Printed: Wed Jan 12 11:12:58 2000



Aeronautics Act of 1938." Following World War II, a great many former military airports were conveyed to public agencies under the provisions of the Surplus Property Act of 1944. Initially, the deeds which transferred these surplus airports included a covenant that there would be no exclusive right contrary to the provisions of section 303. Subsequently, however, in 1947, the Surplus Property Act was amended by P.L. 80-289 which defined an exclusive right, but excluded from the definition the sale of gas and oil.

c. Since 1947, the Civil Aeronautics Administration (CAA) and its successors, the Federal Aviation Agency (FAA) and the Federal Aviation Administration (FAA), administered the Federal-aid Airport Program (FAAP) under the authority of the Federal Airport Act of 1946. The Federal Airport Act of 1946 was repealed by the Airport and Airway Development Act of 1970 and under the authority of the latter Act the Airport Development Aid Program (ADAP) was formulated. In approving grants of Federal funds under these programs, the CAA, and later the FAA, always maintained that there could be no exclusive right for any aeronautical activity which involved use of the airport's landing area. The acceptance of a grant under either of these programs prohibits the granting of an exclusive right of any aeronautical activity as long as the facility is operated as an airport. In recent years, the agency has refined and clarified its policies as referenced in paragraph 4. The following paragraphs explain how this policy will be administered and how it applies to specific circumstances frequently encountered.

6. **DEFINITIONS.** For the purpose of this circular, the following definitions apply:

a. **Exclusive Right.** A power, privilege, or other right excluding or debarring another from enjoying or exercising a like power, privilege, or right. An exclusive right may be conferred either by express agreement, by imposition of unreasonable standards or requirements, or by any other means. Such a right conferred on one or more parties but excluding others from enjoying or exercising a similar right or rights would be an exclusive right.

b. **Aeronautical Activity.** Any activity which involves, makes possible, or is required for the operation of aircraft, or which contributes to or is required for the safety of such operations.

(1) The following activities, commonly conducted on airports, are aeronautical activities within this definition; charter operations, pilot training, aircraft rental and sightseeing, aerial photography, crop dusting, aerial advertising and surveying, air carrier operations, aircraft sales and services, sale of aviation petroleum products whether or not conducted in conjunction with other included activities, repair and maintenance of aircraft, sale of aircraft parts, and any other activities which because of their direct relationship to the operation of aircraft can appropriately be regarded as an "aeronautical activity."

(2) The following are examples of what are not considered aeronautical activities: ground transportation (taxis, car rentals, limousines); restaurants; barber shops; auto parking lots.

c. **Minimum Standards.** The qualifications which may be established by an airport owner as the minimum requirements to be met as a condition for the right to conduct an aeronautical activity on the airport.

d. **Federal-aid Airport Program (FAAP)**. A grant-in-aid program administered by the agency under the authority of the Federal Airport Act of 1946 (49 USC-1101), as amended, to assist public agencies in the development of a nationwide system of public airports. The Federal Airport Act of 1946 was repealed by the Airport and Airway Development Act of 1970.

e. **Airport Development Aid Program (ADAP)**. A grant-in-aid program administered by the FAA under the authority of the Airport and Airway Development Act of 1970 (49 USC-1701) to assist public agencies in the substantial expansion and improvement of the Nation's airport system.

7. **POLICY.** The grant of an exclusive right for the conduct of any aeronautical activity, on an airport on which Federal funds, administered by the FAA, have been expanded, is regarded as contrary to the requirements of applicable laws, whether such exclusive right results from an express agreement, from the imposition of unreasonable standards or requirements, or by any other means. However, the existence of an exclusive right to sell gasoline and oil will not be considered to be in violation of section 308(a) where such right has been specifically exempted by a deed under the Surplus Property Act, except where an agreement not to grant an exclusive right for the sale of gasoline and oil is controlling. (See subparagraph b.)

a. **Agency Position.** The agency considers that the existence of an exclusive right to conduct any aeronautical activity limits the usefulness of an airport and deprives the using public of the benefits of competitive enterprise. Apart from legal considerations, the agency believes it clearly inappropriate to apply Federal funds to improvement of an airport where full realization of the benefits would be restricted by the exercise of an exclusive right to engage in aeronautical activities."

b. **Application of Law.** The exemption contained in a surplus property deed permitting the grant of an exclusive right for the sale of gas and oil does not operate to confer a positive privilege. If the airport was already obligated by a prior agreement prohibiting an exclusive right, the deed does not relieve the owner from such obligation. Conversely, where such an exemption for gas and oil is in effect, any subsequent grant of Federal funds, administered by the agency, requires the airport owner to agree not to permit the establishment of an exclusive right to engage in aeronautical activities, including the sale of gas and oil, in the future and to terminate any existing agreement which permits such an exclusive right as soon as possible.

8. **INTERPRETATION OF POLICY.** The circumstances involved in arranging for the availability of adequate aeronautical services vary widely from airport to airport. The following material has been prepared in an effort to furnish general guidance based on experience with exclusive rights problems.

a. **Single Activity.** The presence on an airport of only one enterprise conducting aeronautical activities does not necessarily mean that an exclusive right has been granted. If there is no intent by express agreement, by the imposition of unreasonable standards, or by other means to exclude others, the absence of a competing activity is not a violation of this policy. This sort of situation frequently arises where the market potential is insufficient to attract additional aeronautical activities. So long as the opportunity to engage in an aeronautical activity is available to those who meet reasonable and relevant standards, the fact that only one enterprise takes advantage of the opportunity does not

constitute a grant of an exclusive right.

b. **Space Limitations.** The leasing of all available airport land or facilities suitable for aeronautical activities to a single enterprise will be construed as evidence of an intent to exclude others. This presumption will not apply if it can be reasonably demonstrated that the total space leased is presently required and will be immediately used to conduct the planned activity. The amount of space leased to a single enterprise should be limited to that for which it can clearly demonstrate an actual, existing need. If additional space becomes necessary at a later date, it must be made available, not only to an incumbent enterprise, but at the same time to all qualified proponents or bidders. The advance grant of options or preferences on future sites to a single incumbent is evidence of an intent to grant an exclusive right. On the other hand, nothing in this policy should be construed as limiting the expansion of a single enterprise when it needs additional space, even though it may ultimately reach complete occupancy of all space available.

c. **Restrictions Based on Safety.** Under certain circumstances, it is sometimes necessary to deny the right to engage in an aeronautical activity at an airport for reasons of safety. Where this denial has the effect of shielding an established enterprise from competition, it should be carefully and thoroughly justified by the airport owner.

d. **Restrictions on Self-Service.** Any unreasonable restriction imposed on the owners and operators of aircraft regarding the servicing of their own aircraft and equipment may be considered as a violation of agency policy. The owner of an aircraft should be permitted to fuel, wash, repair, paint and otherwise take care of his own aircraft, provided there is no attempt to perform such services for others. Restrictions which have the effect of diverting activity of this type to a commercial enterprise amount to an exclusive right contrary to law. Local airport regulations, however, may and should impose restrictions on these activities necessary for safety, preservation of airport facilities and protection of the public interest. These might cover, for example, restrictions on the handling practices for aviation fuel and other flammable products, such as aircraft paint and thinners; requirements to keep fire lanes open; weight limitations on vehicles and aircraft to protect paving from over-stresses, etc.

e. **Monopolies Beyond Control of Airport Owners.** The Federal Communications Commission, which authorizes the use of "UNICOM" frequencies for air-to-ground use at airports, will not license more than one ground station at the same airport. Although these and similar exclusive franchises unquestionably give the recipient an advantage over competitors, they do not constitute a grant of an exclusive right contrary to agency policy. Airport owners are encouraged to obtain the UNICOM license in their own names and through droplines to make the facility available to all fixed base operators on a required basis.

9. **ENFORCEMENT.**

a. **Remedies.** At any airport where there has been a grant of an exclusive right contrary to law and this policy, that airport and any other airport owned or controlled by the offending airport owner will be ineligible for assistance under the ADAP, and the agency will not expend Facilities and Equipment funds for installations designed to benefit traffic at such airports. No grant agreement may be

executed, and no payment of funds due under prior grant agreements shall be made, nor shall any Facilities and Equipment funds be expended until the exclusive right has been terminated.

b. **National Defense and National Interest.** This policy shall not be construed as precluding the grant or expenditure of Federal funds when required for the national defense, or when determined by the Administrator to be in the national interest.

c. **Application to Preexisting Agreements.** On 17 July 1962, the agency defined the aeronautical activities prohibited by section 308(a) of the Federal Aviation Act. Prior to the publication of this definition, exclusive rights to conduct certain activities not involving the actual use of public landing areas were considered not to be in violation of the statute. Also, as noted in paragraph 7 hereof, the grant of an exclusive right to sell only gasoline and oil would not be in violation of the statute where the controlling agreement with the Government is a surplus property deed specifically exempting such sales from the activities otherwise prohibited on an exclusive basis. The agency will continue to participate in airport development in these instances if it can be demonstrated that an exclusive right agreement made prior to 17 July 1962, or pursuant to the exemption in a surplus property deed, will be effectively terminated as soon as possible. The termination date will in no event be later than the earliest renewal or cancellation date specified in the lease or agreement covering such an exclusive right agreement. However, in no case will ADAP participation in airport improvement be authorized where there exists an exclusive right which was prohibited under the interpretation prior to 17 July 1962.

10. **PROPRIETARY EXCLUSIVES.** The public agency that owns and operates a public airport may engage in any proprietary aeronautical activity and deny the same right to others without violating this policy. This means that the public agency may provide aeronautical services on an exclusive basis, but only if it does so as a principal, using its own employees and resources. This exemption is not effective where an independent commercial enterprise is designated an "agent" of the airport owner.

11. **ADMINISTRATION OF POLICY.**

a. As a material part of any grant agreement in anticipation of financial assistance under the Airport and Airway Development Act, all applicants for such assistance will be required to:

(1) Certify that there is no grant of an exclusive right which would preclude expenditure of funds by the agency under applicable law and agency policy at any public airport owned or controlled by the applicant, and

(2) Give assurances that none will be granted on any airport now owned or controlled by the applicant.

b. It is the intent of this policy to promote fair competition at public airports and not to expose those who have undertaken to provide commodities and services to irresponsible competition. Prudent airport owners will adopt and enforce minimum standards to be met by those who propose to conduct a commercial aeronautical activity. Such standards, by expressing minimum levels of service that must be offered, relate primarily to the public interest, but appropriate requirements uniformly applied discourage substandard enterprises, thereby protecting both the established aeronautical activity and

the airport patrons. The application of any unreasonable requirement, or standard not relevant to the proposed activity, or any requirement that is applied in a discriminatory manner shall be considered a constructive grant of an exclusive right contrary to applicable law and provisions of agency policy.

**12. HOW TO OBTAIN THIS PUBLICATION.** Obtain additional copies of this publication, AC 150/5190-2A, Exclusive Rights at Airports, from the Department of Transportation, Distribution Unit, TAD-484.3, Washington, D.C. 20590.

CHESTER G. BOWERS
Director Airports Service