IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| STAMBAUGH'S AIR SERVICE, INC., | : | |
| | : | CASE NO. 1:00-CV-0660 |
| Plaintiff, | : | |
| | : | |
| v. | : | Chief Judge Yvette Kane |
| | : | |
| SUSQUEHANNA AREA REGIONAL | : | |
| AIRPORT AUTHORITY, BAA | : | |
| HARRISBURG, INC., DAVID FLEET, | : | |
| individually, DAVID HOLDSWORTH, | : | |
| individually, and DAVID C. McINTOSH, | : | |
| individually, | : | |
| | : | |
| Defendants. | : | |

**BRIEF IN SUPPORT OF DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT**

Rhoads & Sinon LLP
Dean F. Piermattei
Attorney I.D. No. 53847
Heather Z. Kelly
Attorney I.D. No. 86291
One South Market Square
P. O. Box 1146
Harrisburg, PA 17108-1146
(717)  233-5731
Attorneys for Defendant

654468.1

## TABLE OF CONTENTS

**I.    PROCEDURAL HISTORY**                                    **1**

**II.   STATEMENT OF FACTS**                                    **2**

**III.  ARGUMENT**                                             **11**

   A. <u>The Court Should Grant Summary Judgment on Plaintiff's
      Equal Protection Claim (Count I)</u>

      1.  Plaintiff and AERO were not treated differently with respect
         to late rent payments

      2.  SARAA's decisions lease the AMP Hangar to Piedmont and
         to allow AERO to continue FBO operations were rationally
         related to a legitimate state interest

         a.  The award of the AMP lease to Piedmont was rational

            (i)    Plaintiff's RFQ response was incomplete
            (ii)   Plaintiff had a history of poor performance
            (iii)  SARAA had the right to waive bidding
                 irregularities and reject any or all proposals
            (iv)  Plaintiff's only complaint regarding the RFQ
                 process is unsubstantiated

         b.  The decision to allow AERO to continue FBO operations
            was rational

      3.  There is no evidence of any other different treatment of
         Plaintiff and AERO

      4.  There is no evidence that Defendants were motivated by
         "illegitimate animus"

      5.  In the alternative, the Individual Defendants are entitled to
         qualified immunity

B. The Court Should Grant Summary Judgment on Plaintiff's Tortious Interference Claim for tortious interference Claim (Count III)

    1. Any damages allegedly suffered by Plaintiff could not have be caused by the actions of BAA, Fleet, McIntosh or Holdsworth

    2. There is no evidence of existing contracts

    3. It is undisputed that neither Holdsworth or McIntosh contacted any of Plaintiff's FBO customers

    4. Any contact that Fleet made with Plaintiff's FBO customers was not made with the intent to harm Plaintiff and was made with privilege and justification

    5. Even if BAA, Fleet, Holdsworth or McIntosh could be held liable for SARAA's decision not to grant Plaintiff the right to provide FBO services, there is no evidence of intent to harm

    6. In the alternative, Defendants Holdsworth and McIntosh are entitled to governmental immunity

C. The Court should grant summary judgment on Plaintiff's conspiracy claim (Count II)

    1. Plaintiff cannot establish an underlying unlawful act

    2. Defendants cannot conspire together as a matter of law

    3. In the alternative, SARAA, Holdsworth, and McIntosh are entitled to governmental immunity

D. Defendants are entitled to summary judgment on Plaintiff's claim for damages related to relocation expenses, business interruption and lost productivity

## TABLE OF CITATIONS

Snowden v. Hughes, 321 U.S. 1, 8 (1944)

Gundling v. City of Chicago, 177 U.S. 183 (1990)

Queen City Aviation, Inc. v. City of Allentown, Civ. No. 91-7776, 1992 U.S. Dist. LEXIS 9042 (E.D. Pa. June 8, 1992)

Holt Cargo Systems, Inc. v. Delaware River Port Authority, Civ. No. 94-778, 1997 U.S. Dist. LEXIS 18073 (E.D. Pa. Nov. 13, 1997)

Northeast Jet Center v. Lehigh-Northampton Airport Authority, 767 F. Supp. 672, 677-78 (E.D. Pa. 1991)

Northeast Jet Center, LTD v. Lehigh-Northhampton Airport Authority, Civ. A. No. 90-CV-1262, 1997 U.S Dist. LEXIS 6493 (E.D. Pa. 1997).

Odyssey Waste Services, LLC v. BFI Waste System, 2007 U.S. Dist. LEXIS 13530 (E.D. Pa. Feb, 28, 2007)

Crivelli v. GMC, 215 F.3d 386, 394 (3d Cir. 2000)).

Village of Willowbrook v. Olech, 528 U.S. 562, 564 (2000), 528 U.S. at 564 (emphasis added)

Cleburne v. Cleburne Living Ctr., Inc., 473 U.S. 432, 440 (1985).

Huebschen v. Department of Health & Social Serv., 716 F.2d 1167, 1171 (7th Cir. 1983).

Gundling v. City of Chicago, 177 U.S. 183 (1990))

Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982).

Malley v. Briggs, 475 U.S. 335, 341 (1986)

Big Apple BMW, Inc. v. BMW of N. Am., Inc., 974 F.2d 1358,1382 (3d Cir. 1993)

Kachmar v. SunGuard Data Sys., Inc., 109 F.3d 173, 185 (3d Cir. 1997)

Strickland v. Univ. of Scranton, 700 A.2d 979, 987-88 (Pa. Super. 1997)

Thompson Coal Co. v. Pike Coal Co., 412 A.2d 466, 472 (1979)

In re Orthopedic Bone Screw Prod. Liab. Litig., 193 F.3d 781,

## I.    <u>PROCEDURAL HISTORY</u>

Plaintiff, Stambaugh's Air Services, Inc., initiated this action on April 10, 2000 by filing a seven (7) Count Complaint (Doc. 1).    On May 19, 2000, Defendants filed a Motion to Dismiss (Doc. 7), and on August 3, 2000 this Honorable Court issued a Report and Recommendation that (1) Counts I, II, IV, V, and VI be dismissed; (2) and Count VII (tortious interference) be dismissed as to Defendant SARAA.    (Doc. 21).    On September 11, 2002, the action was stayed pending resolution of a voluntary bankruptcy action filed by Plaintiff. (Doc. 32).

After the bankruptcy stay was lifted, the Honorable Yvette Kane issued an Memorandum and Order on March 16, 2006 (Doc. 71), adopting the Report and Recommendation, and granting Plaintiff leave to file an Amended Complaint as to Count V (conspiracy).    Plaintiff filed a First Amended Complaint on April 10, 2006 and a Second Amended Complaint on November 1, 2006 (Doc. 84).    The Second Amended Complaint contains three Counts:    Equal Protection (brought pursuant to 42 U.S.C. § 1983 (Count I); conspiracy (Count II) and tortious interference with existing contractual relationships (Count III).

This Brief is filed in support of Defendants' Motion for Summary Judgment, which is being filed concurrently herewith.

## II.  STATEMENT OF FACTS

### A.  The Defendants

Susquehanna Area Regional Airport Authority ("SARAA") took ownership of Harrisburg International Airport in January 1998 from the Commonwealth of Pennsylvania.  (SMF at ¶¶1, 10).  BAA Harrisburg, Inc. ("BAA") was retained to manage HIA from 1998-2001.  (Id. at ¶2).  The Individual Defendants were, during all relevant times, the Airport Director and BAA employee (David Fleet); SARAA Executive Director (David Holdsworth); and Chairman of the SARAA Board of Directors (David McIntosh).  (Id. at ¶¶3, 6, 8).

### B.  Plaintiff's Operations and Service Issues

Plaintiff, Stambaugh Air Services, Inc. ("Plaintiff"), began leasing space at HIA from the Commonwealth in 1969 in order to provide maintenance and repair services to aircraft, and in 1975 Plaintiff added the provision of fixed base operator ("FBO") services (including fueling, drop-in maintenance and cargo handling) to its business operations at HIA.  (Id. at ¶¶11-12).  While Plaintiff alleges that it had contracts with FBO customers during the time that it provided FBO services at HIA, it has not produced evidence of any such contracts.  (Doc. 84 at ¶139; SMF at ¶¶27-28).

In 1997, Plaintiff entered into a month-to-month Lease and Fixed Based Operator Agreement with the Commonwealth (the "1997 Lease") that could be

terminated by either party on thirty (30) days notice.  (SMF at ¶¶14-16).  Pursuant to the 1997 Lease, Plaintiff rented part of HIA Building 28 and all of HIA Building 134 (referred to by Plaintiff as the "Stambaugh Hangar"), an aircraft parking apron adjacent to Building 134, fuel storage systems ("fuel farms"), and visitor parking areas.  (Id. at ¶¶14-17).  Additionally, the 1997 Lease authorized Plaintiff to conduct FBO operations at HIA "in accordance with Airport Rules and Regulations."  (Id. at ¶¶17).

Effective January 19, 1999, SARAA entered into a one-year First Amendment to Lease and Fixed Base Operator Agreement, which amended the 1997 Lease (the "1999 Amendment"), adding additional apron space to the leasehold and incorporating some additional terms.  (Id. at ¶¶20-21).  The one-year term of the 1999 Amendment was more desirable to Plaintiff than the month-to-month arrangement that it had with the Commonwealth under the 1997 Lease.  (Id. at ¶¶22).  Mark Stambaugh admitted that when he executed the 1999 Amendment, he knew that his FBO rights would expire on January 19, 2000.  (Id. at ¶¶23-24).

Both before and after SARAA took ownership of HIA, Plaintiff had numerous service problems and lease issues, including lease violations, safety violations, hazardous material spills, Federal Aviation Administration ("FAA") inspection violations, quarterly fueling inspection violations, and security violations.  (Id. at ¶¶29-64).  For example, Plaintiff had a history of not making

rental payments to the Commonwealth and SARAA[1]; failed to make facilities repairs within the time required by the 1999 Amendment; failed to install a fuel storage tank as it had promised to do during lease negotiations; and utilized space outside of its leasehold.  (Id. at ¶¶30-43).  Plaintiff also had an inordinate number of safety violations and inspection citations, including 22 violations found during annual FAA inspections from 1996 to 1999; 7 violations noted by HIA operations personnel in 1999; 60 violations found during quarterly fueling inspections in 1998 and 1999; 9 hazardous materials spills in 1999[2]; 14 security violations in 1999[3]; and failing to properly maintain a fuel tank, which resulted in contaminates being detected in the soil.  (Id. at ¶¶44-52).  The number of safety and security violations that Plaintiff had were excessive by industry standards.  (Id. at ¶64).  Plaintiff's owner and general manager both admit that Plaintiff had an adversarial relationship with the Commonwealth.  (Id. at ¶13).

---

[1] Plaintiff's rental payments to the Commonwealth exceeded $800,000 in arrears at one time, and the 1997 Lease included a provision requiring Plaintiff to pay $10,000 per month for unpaid debt.  (Id. at ¶¶17, 31).

[2] One fuel spill of 350-400 gallons that occurred on May 20, was caused by one of Plaintiff's employees overriding a "deadman" switch.  Less than two (2) months later, another of Plaintiff's employees was again cited for overriding a deadman switch during fueling operations.  (Id. at ¶¶55-57).  As admitted by Mark Stambaugh, tying off a deadman switch is a "clear violations of FAA procedures," that would create a "high risk situation."  (Id. at ¶58).

[3] On at least one occasion, Plaintiff's employees were hiding in aircraft to avoid security checks by HIA security personnel.  (Id. at ¶113).

C.    **AERO Services**

In 1997, AERO Services International Incorporated ("AERO") also became a provider of FBO services at HIA after entering into a five year lease with the Commonwealth. AERO conducted its FBO services out of "clean, bright" modular office units. (Id. at ¶¶65-68). Many of Plaintiff's and AERO's lease terms were similar to Plaintiff's, including the authorization to conduct FBO operations contained in their respective leases, the expiration of authorization to conduct FBO operations concurrent with the expiration of the leaseholds, and identical payment terms for fuel sold by each entity ("fuel flowage fees"). (Id. at ¶¶78-79). Like Plaintiff, there were times when AERO was late making rental payments. (Id. at ¶¶72). SARAA never forgave any of AERO's rent, and AERO had to pay accrued interest on late payments. (Id. at ¶¶72-74). SARAA never terminated either Plaintiff's or AERO's leases for late payment of rent. (Id. at ¶77).

To the extent that there were any differences between Plaintiff and AERO, there is evidence that SARAA actually treated Plaintiff ***more favorably*** than it did AERO. (Id. at ¶¶80-82). As of July 1999, AERO was paying almost twice the amount per square foot for leased space that Plaintiff was paying, and AERO had to lease space for a fuel tank that it had installed, while Plaintiff had free access to an existing fuel farm at HIA. (Id. at ¶¶80-82). Moreover, there is no evidence that

AERO had the number or severity of safety violations, security violations, lease violations, or hazardous materials spills that Plaintiff did.

On April 11, 2000, SARAA/BAA issued FBO Minimum Standards that were applicable to all entities providing FBO services at HIA ("April 11, 2000 Minimum Standards"). (SMF at ¶83. While Mark Stambaugh (Plaintiff's owner) and Scott Stambaugh (Plaintiff's general manager) both speculate that AERO did not meet some of the April 11, 2000 Minimum Standards, AERO has always been in full compliance with them. (Id. at ¶¶84-89). Finally, contrary to Mark Stambaugh's unsupported beliefs, AERO's fuel storage system and fueling trucks have always met all applicable safety requirements and passed all inspections. (Id. at ¶¶94-95).

In contrast, Plaintiff did not satisfy the direct access requirement contained in the April 11, 2000 Minimum Standards because customers had to walk through the Stambaugh Hangar to reach Plaintiff's FBO facilities. (Id. at ¶¶92-93). It is undisputed that this was not only unappealing, it was dangerous to the customers to be walking through active maintenance operations. (Id. at ¶93).

Scott Stambaugh believes that Plaintiff and AERO were treated differently with respect to security measures at HIA, but he has no direct knowledge of what was happening at the AERO operation in this regard. (Id. at ¶¶97-98). Both Plaintiff and AERO were subject to FAA and HIA security regulations, both were

routinely subject to security compliance checks, and, if appropriate, both were issued citations. (Id. at ¶¶14-16). In fact, AERO's COO, like Plaintiff's management, felt that HIA security personnel were "overzealous" in their enforcement of security requirements. (Id. at ¶116).

### D.    Sale of the AMP Hangar and the Request for Qualifications

After taking ownership of HIA, SARAA determined that it wanted to provide high quality, first class, regional FBO services. (Id. at ¶119). In 1999, a hangar at HIA that had been owned by the AMP Corporation was available for purchase (the "AMP Hangar"). (Id. at ¶120). The SARAA Board purchased the AMP Hangar for $1.5 million because (1) HIA lacked space and wanted to ensure that it had long term control over how the AMP Hangar was used; and (2) the AMP Hangar would provide a "modern, state-of-the-art facility that would present the type of image that [SARAA was] looking for for an FBO in a capitol city." (Id. at ¶¶121-22).

Several FBO providers expressed an interest in operating out of the AMP Hangar, so in October 1999, SARAA issued a Request for Qualifications ("RFQ") seeking a response from FBO service providers, including Plaintiff, interested in leasing the AMP Hangar for operations. (Id. at ¶¶124-125). The RFQ originally contained a response deadline of November 2, 1999, but the deadline was extended

to December 3, 1999, for all interested FBO providers, including Plaintiff.  (Id. at ¶¶131-32).

Ultimately, four FBO providers submitted responses to the RFQ -- Plaintiff, AERO Services, HIA Signature Support, and Piedmont ("Piedmont").  (Id. at ¶134).  Plaintiff's response to the RFQ was incomplete because it did not disclose FAA violations, and it failed to include the required financial information.  (Id. at ¶¶135-138, 141).  Even when Fleet gave Plaintiff an opportunity to supplement the financial information, Plaintiff provided only "a single sheet of paper with a few numbers on it, very macro level that [was not] married up to where that came from."  (Id. at ¶¶142-45).  In contrast, Piedmont, a nationally known FBO provider, "brought thorough financial statements that clearly indicated to [SARAA] that they were in…strong shape financially [and] that they had a national presence."  (Id. at ¶154).

The Airport Operations Committee of the SARAA Board was responsible for collecting and evaluating responses to the RFQ and then making a recommendation to the full Board regarding which entity should be awarded an a lease of the AMP Hangar to conduct FBO operations.  (Id. at ¶150).  The Committee decided to recommend to the full Board that Piedmont be awarded the lease of the AMP Hangar and authorized David Fleet to begin lease negotiations with Piedmont.  (Id. at ¶¶150-151).  The ultimate decision to award it to Piedmont

"was a unanimous decision" voted on by the full Board on January 11, 2000, and was based on the fact of "[Piedmont's] experience with about 25 other FBOs that they were currently managing, as well as their financials, which were very strong." (Id. at ¶153).  In deciding not to award the AMP Hangar lease to Plaintiff, the SARAA Board took into consideration Plaintiff's history of problems with safety, security and lease compliance.  (Id. at ¶171).

In January 2000, when SARAA decided to award the lease in the AMP Hangar to Piedmont, AERO still had two (2) years remaining on its five (5) year lease with SARAA, while Plaintiff's 1997 Lease and FBO agreement were scheduled to expire on January 19, 2000.  (Id. at ¶¶160-61).  None of the Defendants ever took any steps to terminate or otherwise end the 1997 Lease or 1999 Amendment prior to the time that it expired by its own terms on January 19, 2000.  (Id. at ¶185).  However, given Plaintiff's history of poor performance, the tight margin upon which the FBO providers at HIA operated, and the lack of space at HIA, the SARAA Board decided not to enter into a new FBO agreement with Plaintiff in January of 2000.  (Id. at ¶171).

On or around January 10, 2000, the day before the SARAA Board met to vote on the Airport Operations Committee's recommendation to award the AMP Hangar lease to Piedmont and not to enter into a new lease containing the right to perform FBO services with Plaintiff, Fleet may have had contact with one or more

airlines during which he informed them that the SARAA Board would be voting the next day regarding FBO services at HIA.  (Id. at ¶174).  Fleet did so because the FBO customers are also customers of the airport, and it was important to keep them informed regarding changes in service.  (Id. at ¶¶176-77).  In fact, some of the airline managers were upset that they had not been told sooner.  (Id. at ¶178).  Neither McIntosh nor Holdsworth has ever had any contact with any of Plaintiff's customers.  (Id. at ¶181).

While SARAA initially permitted a sixty (60) day period of rent abatement for Piedmont to "get in and secure fueling contracts and business," which is a standard business practice in the aviation industry, Piedmont made all rental payments and paid all fuel flowage fees owed to SARAA pursuant to the terms of its lease during its tenancy at HIA.   (Id. at ¶¶157-58).

### E.    Plaintiff's 2000 Lease

While SARAA did not enter into a new FBO agreement with Plaintiff in January 2000, it did enter into a subsequent lease for space in the Stambaugh Hangar where Plaintiff continued to perform maintenance and heavy repair operations (the "2000 Lease").  (Id. at ¶184).  In the 2000 Lease, SARAA leased more space to Plaintiff without increasing the rate per square foot.  (Id. at ¶¶186-87).  Approximately 5% of Plaintiff's maintenance work prior to 2000 was attributable to FBO operations; Plaintiff did not terminate any employees as a

result of the expiration of its FBO rights; and "[t]here wasn't much of a change" in Plaintiff's maintenance operations at HIA after its FBO rights expired in January 2000.  (Id. at ¶¶188-94).

In early 2003, the 2000 Lease expired, and Plaintiff vacated HIA.  (Id. at ¶¶195).  *After* the 2000 Lease expired, Plaintiff's repair station and equipment, as well 8 to 10 of Plaintiff's employees, were relocated from HIA to Brunswick, Georgia, where a related entity, Stambaugh Aviation, has been conducting aircraft maintenance since 1987.  (Id. at ¶196).  Plaintiff is no longer conducting any operations.  (Id. at ¶197).

## III.   ARGUMENT

### A.    The Court Should Grant Summary Judgment on Plaintiff's Equal Protection Claim (Count I)

In Count I of the Second Amended Complaint, Plaintiff asserts a claim for violation of its right to Equal Protection.  The claim is asserted pursuant to 42 U.S.C. §1983.[4]  An equal protection action may be asserted by a "class of one" if a plaintiff can prove that it has been "intentionally treated differently from others

---

[4] In order to state a claim under Section 1983 of the Civil Rights Act of 1866, 42 U.S.C § 1983, a plaintiff must prove two essential elements.  See Northeast Jet Center, Ltd. v. Lehigh-Northampton Airport Authority, Civ. No. 90-CV-1262, 1997 U.S. Dist LEXIS 6493, *9 (E.D. Pa. 1997), attached hereto as Exhibit "A".  The offending conduct must actually deprive the plaintiff of a constitutional or statutory right, and the defendants' actions must be taken "under color of state law."  Id.  In this case, Plaintiff alleged violations of its right to Equal Protection under the Fourteenth Amendment and that all Defendants are state actors for purposes of constitutional analysis.  (Doc. 84, at ¶¶ 72-78).  Solely, for purposes of summary judgment, Defendants will not challenge the state action requirement.

similarly situated *and* that there is no rational basis for the difference in treatment." Village of Willowbrook v. Olech, 528 U.S. 562, 564 (2000), 528 U.S. at 564 (emphasis added).  In this case, where no fundamental right is impinged and where no suspect classification is used, the difference in treatment must only be rationally related to a legitimate state interest.  See Cleburne v. Cleburne Living Ctr., Inc., 473 U.S. 432, 440 (1985).

While this Court held that Plaintiff's Equal Protection claim should survive Defendants' Motion to Dismiss, it did so recognizing that there was no factual record and that summary judgment on this Count might be appropriate after discovery.   (Doc. 21, at 11-12).   In adopting this Court's Report and Recommendation, Judge Kane stated that Plaintiff plead "just enough facts" to survive the Motion to Dismiss.  (Doc. 71, at 8).  Finally, Judge Kane stated that the Court was "***constrained to find*** that Plaintiff [] made a ***minimal showing*** of an equal protection violation to survive Defendants' motion to dismiss."   (Id.) (emphasis added).

While Plaintiff adequately alleged facts sufficient, albeit barely, to survive a Motion to Dismiss, fact discovery is now complete, and there are no genuine issues of material facts regarding any of the above allegations, or any other assertion of inequitable treatment made by Plaintiff during discovery.

An Equal Protection analysis must begin with the threshold issue of "whether the plaintiffs were treated differently than similarly situated entities." Holt Cargo Sys., Inc., 20 F. Supp. 2d 803, 825 (E.D. Pa. 1998) (quoting Huebschen v. Department of Health & Social Serv., 716 F.2d 1167, 1171 (7th Cir. 1983). To prevail on an equal protection claim, the plaintiff "must produce evidence of intentional, or purposeful, discrimination by the defendants." Northeast Jet Center, Ltd., 1997 U.S. Dist. LEXIS at *16, attached hereto as Exhibit "A" (citing Snowden v. Hughes, 321 U.S. 1, 8 (1944). A mere allegation of unequal treatment is insufficient; there must be "a showing of 'clear and intentional discrimination.'" Northeast Jet, 1997 U.S. Dist. LEXIS at *16 (citing Snowden, 321 U.S. at 8; Gundling v. City of Chicago, 177 U.S. 183 (1990)). Where "the plaintiff is unable to make an initial evidentiary showing of intent, there is no genuine issue of credibility for the jury," and summary judgment is appropriate. Northeast Jet Center Ltd., 1997 U.S. Dist. LEXIS at *16.

Here, the only allegation contained in Count I that Plaintiff was treated differently than any similarly situated are that (1) Defendants did not require AERO to pay rent, while they required Plaintiff to do so; and (2) Defendants

"refuse[d] to permit Plaintiff to provide FBO services at HIA, while allowing other similarly situated entities to do so."  (Doc. 84 at ¶¶80-81).[5]

### 1.    Plaintiff and AERO were not treated differently with respect to late rent payments

Plaintiff alleges that Defendants did not enforce rental payment obligations against AERO.  (Doc. 84, at ¶80).  However, Mark Stambaugh admits that he has no personal knowledge of AERO's rental payment history, and that this allegation is based solely upon inadmissible hearsay.  (SMF at ¶71).  While it is true that AERO was sometimes late paying its rent, Plaintiff also had a history of rental arrearages, including arrears of more than $800,000 to the Commonwealth at one point in time.  (Id. at ¶31).   When SARAA took over HIA in 1998, Plaintiff was making monthly payments of $10,000 per month for unpaid debt.  (Id. at ¶33).  In January 1999, Plaintiff still owed SARAA approximately $178,000 in back rent and had not paid rent on another lease for Hanger 133 since August 1998.  (Id. at ¶33).

Contrary to Plaintiff's allegations, AERO and Plaintiff were not treated differently when it came to late rent payments.  The SARAA Board of Directors

---

[5] Plaintiff also alleges that Defendants treated it differently than AERO "to inhibit or prevent Plaintiff from engaging in commercial activity and to afford others the opportunity to do so." (Doc. 84, at ¶82).  When asked what Plaintiff meant by "commercial activity," Mark Stambaugh testified that he meant only engaging in FBO services.  (SMF at ¶182).  Thus, the allegation in Paragraph 82 is indistinguishable to that contained in Paragraph 81, wherein Plaintiff alleges that it was treated differently than entities that were permitted to provide FBO services at HIA.  (Id. at ¶82).

made concessions to ***both*** SARAA and AERO when they were late in making rent payments; did not terminate ***either*** SARAA or AERO's leases as a result of delinquencies in making rental payments; and never forgave or abated any of Plaintiff's ***or*** AERO's rent obligations. (Id. at ¶¶76-77). In the absence of any evidence to the contrary, Defendants are entitled to judgment as a matter of law on Count I.

> **2.** **SARAA's decisions lease the AMP Hangar to Piedmont and to allow AERO to continue FBO operations were rationally related to a legitimate state interest[6]**

Other than the unsubstantiated and false allegations regarding AERO's rent payments, Plaintiff's only other allegation regarding differential treatment is that Defendants refused to permit Plaintiff to provide FBO services at HIA, while not allowing Plaintiff to do so. (Doc. 84, at ¶¶81-82). It is true that after the expiration of Plaintiff's FBO rights which were contained in the 1997 Lease as amended in 1999, AERO and Piedmont were the only authorized FBO operators at HIA. (Id. at ¶171). However, in order to establish its Equal Protection claim, Plaintiff must show that SARAA treated Plaintiff differently then these two entities without a "rational basis for doing so." Olech, 528 U.S. at 564. "Government action related

---

[6] It is also significant, and addressed at length herein, that Plaintiff has alleged numerous categories of damages that are in no way causally related to SARAA's decision not to enter into a new FBO agreement with Plaintiff in January 2000. See infra Section D. Moreover, the majority of Plaintiff's alleged damages are causally connected to any of the alleged differential treatment between SARAA and AERO.

to business or commercial activity," such as the management of an international airport, "is accorded deference because it does not involve a suspect class." <u>Id</u>.

In <u>Queen City Aviation, Inc. v. City of Allentown</u>, Civ. No. 91-7776, 1992 U.S. Dist. LEXIS 9042 (E.D. Pa. June 8, 1992), attached hereto as Exhibit "B," the Court explained, under similar factual circumstances:

> [I]t appears that plaintiff merely had a lease for a certain term, which expired… . We know of no requirements that the City of Allentown, as the landlord of the airport, must even consider entering into a new lease with plaintiff, or that it structure the Request for Proposals in a manner acceptable to or approved by plaintiff… [T]here is no constitutional interested violated by the City of Allentown's decision to seek bids from competing companies and to chose one of plaintiff's competitors.

<u>Id.</u> at *9.

As in <u>Queen City Aviation</u>, there is no issue of material fact that SARAA acted other than rationally in deciding to award the lease of the AMP Hangar to Piedmont, in deciding not to enter into new FBO contract with Plaintiff upon the expiration of its prior agreement, and in permitting AERO to continue its FBO operations after January 2000.

### a.    The Award of the AMP Lease was Rational

SARAA's decision to award Piedmont, and not Plaintiff, the lease of the AMP Hangar in January 2000 was a decision that was clearly "rationally related to a legitimate state interest." <u>Cleburne</u>, 473 U.S. at 440. Specifically, Defendant

SARAA, at all relevant times, had a primary goal of providing a high quality, first class regional FBO facility at HIA.  (SMF at ¶119).  Mark Stambaugh admits that financial stability, experience, clean and orderly facilities, and assisting with maintaining security at an airport are all important characteristics of a first class FBO provider.  (Id. at ¶¶140-170).

Plaintiff alleges that it is the only entity that "both participated in the pre-submission conference and tour and submitted a timely proposal."  (Doc. 84, at ¶45).  Plaintiff thereby intimates that it should have automatically been awarded the lease of the AMP facility.  However, the undisputed evidence of record is that Plaintiff's response to the RFQ was incomplete while Piedmont brought a national reputation and financial stability, Plaintiff had a history of poor performance at HIA, and SARAA had the right to waive any irregularities in the bidding process and reject any bids.

(i)    Plaintiff's Response was Incomplete

Although Plaintiff attended the pre-submission walk through and submitted its proposal on November 2, 1999, **Plaintiff's response to the RFQ was incomplete**.  Plaintiff's response to the RFQ failed to provide any documents regarding Plaintiff's "financial status and wherewithal," despite the RFQ's unequivocal requirement that such information be provided.  (SMF at ¶¶139-141).  Mark Stambaugh admits that financial stability is important for an FBO provider

because they need to have sufficient finances to actually purchase fuel.  (Id. at ¶140).

Even though Plaintiff failed to provide such financials at the time that it submitted its response to the RFQ, Fleet met with Plaintiff's representative, Charles Beard, on or about December 1, 1999 to allow Plaintiff the opportunity to provide additional financial information.  (Id. at ¶142).  At that meeting, Mr. Beard showed Defendant Fleet "a single sheet of paper with a few numbers on it, very macro level that [was not] married up to where that came from."  Mr. Beard does not even recall what he provided.  (Id. at ¶145).  Furthermore, the RFQ also required respondents to provide a record of FAA violations for the past three years, which Plaintiff's response failed to do, despite the fact that it had a total of 22 violations in 1996, 1997 and 1998.  (Id. at ¶46).

In contrast to Plaintiff, Piedmont's bid contained detailed information and met all of the other requirements for written bid submissions.  (Id. at ¶149).  Piedmont "brought thorough financial statements that clearly indicated…that they were in…strong shape financially [and] they had a national presence.  They had a plan to use that national presence to leverage business at HIA and, you know, they clearly presented a very professional class front door opportunity to the Airport Authority."  (Id. at ¶154).  Plaintiff has not produced any evidence contrary to the reasons given by SARAA for its decision to award the lease of the AMP Hangar to

Piedmont.   Thus, as a matter of law, the decision was rationally related to a legitimate state interest.

(ii)    <u>Plaintiff Had a History of Poor Performance at HIA</u>

In deciding not to award the lease of the AMP Hangar to Piedmont, the SARAA Board also took into consideration Plaintiff's history of safety, security, and lease violations, as well as the condition in which it maintained its facilities.  Defendant Fleet explained:

> The problems with the performance of the company both safety oriented and security oriented in executing their role as an FBO in the airport[,]…their financial issues not only that were inherited by the Airport Authority, but also at some point in early 1999, the condition of the facilities were poor and ill kept, messy would be the word…So it was not a place ultimately that the authority wanted to provide FBO services out of and it was not the tenant they wanted to operate out of that facility either.

(<u>Id.</u> at ¶172).

In addition to late rental payments, Plaintiff had numerous lease obligations that it failed to satisfy.  For example, the 1999 Amendment required Plaintiff to make hanger door repairs within six months, which it failed to do.  (<u>Id.</u> at ¶25).  Plaintiff also never installed an above-ground fuel storage tank that it had promised to install so that it would not have to lease a fuel farm at HIA.  (<u>Id.</u> at ¶¶38-41).  Other lease violations included utilizing ramp space that was not part of Plaintiff's leasehold, and failing to properly maintain its fuel storage facility, which resulted in soil contamination.  (<u>Id.</u> at ¶62).  Plaintiff has provided no evidence during

discovery that AERO, or any other HIA tenant, had the same or similar lease violations that SARAA ignored.[7]

Plaintiff's leasing problems also involved well-documented safety and security violations, including violations recorded by SARAA/BAA personnel (7 violations in 1999); violations noted in quarterly fueling inspections (a total of 60 violations in 1998 and 1999); FAA inspection violations (a total of 22 violations in 1997, 1998 and 1999); numerous hazardous materials spills (9 spills in 1999); and 14 security violations in 1999. (Id. at ¶¶46-63).

Plaintiff does not dispute that the substantial majority of these violations occurred, including one hazardous material spill of 350 to 400 gallons of fuel in May 1999. (Id. at ¶54). Not only is it undisputed that this fuel spill occurred as a result of an employee overriding a "deadman" switch on fueling equipment, Mark Stambaugh admits that another of Plaintiff's employees again tied off a deadman switch less than two months after that spill. (Id. at ¶¶55-57). Mark Stambaugh admits that both of these incidences of tying off the deadman switch occurred, and that both were "clear violations of FAA procedures," and that doing so would create a "high risk situation." (Id. at ¶57).

---

[7] While SARAA/BAA may have issued citations to Plaintiff or sent letters notifying Plaintiff of lease issues, it never actually took any legal or other action against Plaintiff as a result. Mark Stambaugh admits that SARAA never cancelled or terminated its 1997 Lease. Rather, the 1997 Lease expired by its own terms. (Id. at ¶77).

The number of safety and security violations that Plaintiff had at HIA were excessive by industry standards.  (Id. at ¶64).  Plaintiff's allegations that these problems were fabricated by Defendants wholly ignores the fact that many of these problems were identified by the FAA, and that the Commonwealth had issues with Plaintiff before SARAA ever took ownership of HIA.  (Id. at ¶¶46-63).  As with Plaintiff's other performance problems, evidence that any other tenant at HIA at any time had a similar number or type of violations and was treated differently.

Again, Plaintiff has failed to produce any evidence that it was similarly situated to Plaintiff in this regard.  There is no evidence that Piedmont had safety or security violations at HIA or any other location.  Again, there is no issue of fact that SARAA's decision was rationally related to its legitimate interest in providing a first class FBO operation at HIA.

> (iii)    SARAA Had the Right to Waive Bidding Irregularities and
>          Reject any and all Proposals

Even if it was true that Plaintiff had fully complied with the requirements of the RFQ, which it is undisputed that it did not, and Piedmont failed to so comply, SARAA was still within its rights to award the AMP Hangar lease to Piedmont.  The RFQ unequivocally informed bidders that the RFQ was "not a contract or commitment of any kind…  ."  Moreover, SARAA had the right, among other things, to "waive any irregularities" in responses to the RFQ and "reject any and all submittal(s), should it be in the best interest of SARAA."  (Id. at ¶129).  As

explained in <u>Queen City Aviation</u>, "[t]he fact that the bidding process may not have been perfect, which is plaintiff's basic claim, is not by itself a constitutional violation… ." <u>Queen City Aviation</u>, 1992 U.S. Dist. LEXIS 9042, at *9 n. 3.

In sum, this is a case where the evidence of record establishes that "plaintiff, at best, contests [SARAA's] evaluation of the various factors that were considered and the respective weight that it placed upon them in awarding the bid to [Piedmont]." <u>Queen City Aviation,</u> 1992 U.S. Dist. LEXIS at *4. Such evidence is insufficient as a matter of law for Plaintiff to sustain an Equal Protection claim, and the Court should grant Defendants summary judgment on Count I.

    (iv)   <u>Plaintiffs' only complaint about the RFQ process is unsubstantiated</u>

When Mark Stambaugh was asked whether he felt the RFQ process was improper, he testified:

> I think it's really improper to pretend to put out an RFQ when you've already made the determination and then to waive all of your requirements in order to get somebody in there that you think is a national name and actually beg them on the phone to come in and then guarantee them that you will run all of the other operators off the field if they come.

(SMF at ¶146-48). Mark Stambaugh's testimony in this regard is based on hearsay that he obtained with conversations with someone named "Dan or Don" at Piedmont and a comment he allegedly heard from Fleet. (<u>Id.</u>). Mark Stambaugh was not even aware that Piedmont submitted a bid in response to the RFQ process.

(Id.).  Plaintiff's unsubstantiated beliefs about the RFQ process are insufficient to state a claim for violation of its right to Equal Protection.

### b.    The Decision to Allow AERO to Continue FBO Operations

SARAA's decision to allow AERO to continue its FBO operations in January 2000[8] was also clearly rational.  While Plaintiff's 1997 Lease and FBO Agreement was to expire by its own terms in January 2000, AERO was only in the third year of a five year lease.  (Id. at ¶160).  Thus, HIA had little option but to continue to allow AERO to provide FBO services at HIA.  Moreover, there is no evidence of record that AERO had any of the performance-based problems or lease issues that Plaintiff had at HIA.  While Aero was late in making its payments, as noted above, SARAA had not used this as a basis to cancel either Plaintiff or Aero's Leases.

It is also critical that in April 2000, SARAA issued new Minimum Standards that all FBOs at HIA had to meet.  It is undisputed that Plaintiff did not meet certain of these standards.  (SMF at ¶¶83, 91-92).  Particularly, as it related to Section 2.3.  Section 2.3 required that the entrance to the FBO Lounge and Planning area be separate from the entrance to the Hangar, and it is undisputed that

---

[8] It should be noted that AERO also submitted a response to the RFQ and was not awarded a lease at the AMP Hangar in 2000.  (SMF at ¶134).  In that way Plaintiff and AERO were again treated the same.  Similarly, a fourth entity, HIA Signature Support, submitted a response to the RFQ and was not awarded the AMP Hangar lease nor is there any evidence of record that it was ever permitted to provide FBO services at HIA.  Thus, to the extent that Plaintiff alleges that it was treated differently because it allowed "others the opportunity" to provide FBO services at HIA, not every entity that wanted to provide such services was permitted to do so.

Plaintiffs facility did not meet these requirements.  (Id. at ¶¶92-93).  It is further undisputed that based on testimony from Plaintiffs own employee, Mr. Beard and from testimony from Mr. Testa, that continued access to Plaintiff's FBO facility through Plaintiffs maintenance hangar created a safety risk.  (Id.).  In contrast, while Plaintiffs' witnesses speculated to the contrary, the only credible evidence of record is that AERO at all relevant times did meet all of the Minimum Standards. (SMF at ¶89).  Finally, there is evidence that HIA did not have enough FBO business to support three FBO operators or enough space at HIA for three to operate concurrently.  (SMF at ¶¶162-163).  It was, therefore, rational for SARAA to decide not to enter into a new FBO agreement with Plaintiff upon the expiration of its prior agreement.  Thus, there is no genuine issue of material fact as to the rationality of SARAA's decision regarding FBO services at HIA.

### 3.    There is No Evidence of Any Other Different Treatment of Plaintiff and AERO

Mark Stambaugh was specifically asked in his deposition how he believes Plaintiff was treated differently then Aero.  Although not alleged in the Second Amended Complaint, and, therefore, not sufficient to survive a Motion for Summary Judgment, Mark Stambaugh testified that he *believes* that SARAA waived the April 11, 2000 Minimum Standards for AERO (specifically the requirement that they have a mechanic on staff) and did not require AERO's fuel farm and fuel trucks to meet applicable "criteria" or "standards."  (Id. at ¶84).

However, there is no evidence that Mark Stambaugh has any personal knowledge whatsoever of AERO's operations, and there is no evidentiary support for his beliefs in this regard. Scott Stambaugh also testified that he believed AERO did not meet the Minimum Standards, but he admits that he has never even been inside AERO's facilities and that this belief is based entirely on hearsay. (SMF at ¶¶85-88).

In fact, the only credible evidence of record that is based on personal knowledge came from Aero's C.O.O. that AERO always complied with the April 11, 2000 Minimum Standards, including the requirement to have a mechanic on staff. (Id. at ¶89). In contrast, it is undisputed that Plaintiff did not meet the April 11, 2000 Minimum Standards for FBO operators at HIA because FBO customers had to go through its heavy maintenance operations, which was dangerous, to get to its FBO facilities. (Id. at ¶167). Finally, AERO's fuel farm and fuel trucks have always met all applicable safety requirements and passed all inspections. (Id. at ¶¶94-95).

Likewise, Scott Stambaugh was also asked directly how he believes Plaintiff was treated differently from Aero. Scott Stambaugh testified, again without personal knowledge, that Defendants treated Plaintiff differently with respect to security measures taken at HIA. Scott Stambaugh however, was never part of the Aero operations. The only credible evidence of record that is based on personal

knowledge undisputedly establishes that SARAA/BAA personnel did routinely check Plaintiff's employees' identification when they were in secure areas at HIA. It is also evident that SARAA/BAA personnel needed to be vigilant in doing so, as Plaintiff had 14 security violations in 1999 alone. (Id. at ¶63). On at least one occasion, Belinda Svirbely, who has been in charge of security at HIA since 1998, noted that Plaintiff's employees displayed their identification and would hide in aircraft to avoid identification checks. (Id. at ¶113).

The issue of SARAA/BAA personnel checking identification was explored in depth during discovery. During relevant times, there was an FAA regulation in place that required individuals in secure areas of HIA to display their identification badges on their outermost garment. (Id. at ¶100). Mark Stambaugh, Plaintiff's owner, admitted that he should have been aware of this regulation and that his personnel should have been trained regarding this requirement. (Id. at ¶¶100-03). HIA has a "challenge procedure" in place whereby SARAA/BAA personnel approach individuals in secure areas and check their identification. (Id. at ¶106).

The record is also clear that Plaintiff's employees were not singled out for security compliance. Scott Stambaugh admits that he did not always wear his identification, but feels that there should be an "personal recognition" exception to the FAA and HIA rules regarding the display of identification in secure areas. (Id. at ¶109). Plaintiff alleges such in its Second Amended Complaint. (Doc. 84 at

¶26).  However, no such exception exists.  Plaintiff's own witness, Charles Beard, testified that after SARAA took over HIA in 1998, everyone in Plaintiff's operation knew that there was no exception for personal recognition and that SARAA was requiring universal compliance with FAA and HIA identification requirements.  (Id. at ¶¶111-12).

In this regard, BAA security personnel and SARAA police routinely and uniformly checked the identifications of *any and all* individuals in secure areas. (SMF at ¶¶114-16).  Bob Adkins, the former COO of AERO, Plaintiff's direct competitor at HIA for many years, felt that the HIA security personnel were "overzealous" in checking the identifications of his own employees.  (SMF at ¶¶116).

In summary, the differences in treatment as perceived by both Mark Stambaugh and Scott Stambaugh are based on speculation and hearsay.  However, the facts of record as noted by the individuals with personal knowledge demonstrate there was no difference in treatment between Plaintiff and Aero.

### 4.     There is no evidence that Defendants were motivated by "illegitimate animus"

In denying Defendants' Motion to Dismiss Plaintiff's Equal Protection claim, Judge Kane relied upon *allegations* that Defendants intimidated and harassed Plaintiff, fabricated lease disputes, ignored the RFQ requirements, rejected Plaintiff's lease application outside the normal process, violated FAA

Order 5190.1A, and treated Plaintiff "differently from other similarly situated entities" without a rational basis for doing so. (Doc. 71, at 8, citing Compl., Doc. 1, at ¶¶25-26, 47, 51-53, 62, 65, 128-29). Judge Kane found that these allegations "*if true*, could demonstrate that Defendants treated Plaintiff differently based on an *illegitimate animus* toward it." (Id. at 8) (emphasis added) (citing Village of Willowbrook v. Olech, 528 U.S. 562, 566 (U.S. 2000)). In Olech, the majority opinion declined to address whether allegations that differential treatment based solely on "subjective ill will" are sufficient to state an Equal Protection claim. Id. at 565. However, Justice Breyer's concurring view was that the added element of "vindictive action," "illegitimate animus," or "ill will," is a sufficient allegation to transform a "run-of-the-mill" case of differential treatment into a cognizable Equal Protection claim. Id. at 566. Here, Plaintiff did not allege in its Second Amended Complaint any illegitimate animus or ill-will on the part of any Defendant. (Doc. 84). Notwithstanding, Defendants will briefly address the allegations mentioned in Judge Kane's decision.

First, the only "intimidation and harassment" alleged in the Second Amended Complaint is that Defendants harassed Plaintiff's employees "and forced them to discontinue working…under the guise of checking the identities of those employees…despite the fact that the SARAA representatives involved know both the identity of [Plaintiff's] employees and are aware that the people involved are

employed by [Plaintiff]." (Doc. 84 at ¶26). Defendants have addressed the issue of identification challenges at length above, including Defendants' suggestion that there should be a personal recognition exception to the FAA and HIA requirements for wearing badges in secure areas. See supra. Suffice to restate that there is no issue of material fact in this regard, and this allegation, which is not even contained in Plaintiff's Equal Protection claim, is wholly unsupported by the evidence.

Similarly, Plaintiff's allegations of fabricated lease disputes are also without any evidentiary support and certainly do not establish any "illegitimate animus" on the part of any Defendant. Moreover, Plaintiff has no evidence that it was treated differently than any other tenant with respect to lease violations or that there is any other HIA tenant that had the same number and severity of violations. Plaintiff's lease violations, including safety and security violations, rent arrearages, and leasehold issues, began long before SARAA ever took ownership and control of HIA in 1998. (SMF at ¶¶30-64). These issues are well documented and unchallenged by Defendants.

Plaintiff's contentions that Defendants ignored the RFQ requirement and rejected Plaintiff's lease application outside the normal process are discussed at length above and do not warrant further discussion.

Finally, when asked why any of the Defendants would harass Plaintiff, Scott Stambaugh said that there may have been "political reasons" that he could not

substantiate, or desire to bring Piedmont into HIA because of "interrelationships" between SARAA, BAA and Piedmont, for which he provided no specifics. (SMF at ¶99). Thus, Plaintiff has presented no evidence whatsoever of illegitimate animus.

### 5.  In the Alternative, the Individual Defendants are Entitled to Qualified Immunity

The Individual Defendants are entitled to qualified immunity from Plaintiff's Equal Protection Claim. "[G]overnment officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982).

While the Court previously held that Plaintiff's allegations were sufficient to survive Defendant's Motion to Dismiss, both of the cases relied upon, Holt Cargo Systems, Inc. v. Delaware River Port Authority, Civ. No. 94-778, 1997 U.S. Dist. LEXIS 18073 (E.D. Pa. Nov. 13, 1997), attached hereto as Exhibit "C" and Northeast Jet Center v. Lehigh-Northampton Airport Authority, 767 F. Supp. 672, 677-78 (E.D. Pa. 1991), involved denials of 12(b)(6) motions. (Doc. 21, at 13). In Northeast Jet Center, the individual defendants subsequently moved for summary judgment, in part on the basis of qualified immunity, and the Court held that they were entitled to such immunity. Northeast Jet Center, LTD v. Lehigh-

Northhampton Airport Authority, Civ. A. No. 90-CV-1262, 1997 U.S Dist. LEXIS 6493 (E.D. Pa. 1997).

There, the plaintiff was an FBO operator who had alleged that the airport and individual defendants had violated equal protection by their enforcement of FBO standards and not granting plaintiff an certain FBO agreement that they had previously granted to another provider. Id. at *15-16. The Court noted that the plaintiff failed to create any issue of fact with respect to intent to discriminate, and that the overwhelming evidence established that the Defendants' conduct was reasonable. Id. at *17-19. In discussing qualified immunity, the Court held explained that "qualified immunity protects 'all but the plainly incompetent or those who knowingly violate the law." Id. at *37 (citing Malley v. Briggs, 475 U.S. 335, 341 (1986).

While the Northeast Jet Center court had previously denied a motion to dismiss on the same basis, it held at the summary judgment stage that, because of the rational basis for the conduct of the individual defendants in their handling of FBO rights, these defendants "were neither incompetent nor knowingly violated the law." Id. at *38.

As set forth at length above, every action taken by the Fleet, McIntosh and Holdsworth involving Plaintiff and other FBO providers was rationally related to the legitimate governmental interest of having first class FBO operations at HIA.

See supra.  There is no evidence that the Individual Defendants in this case either intended to infringe upon the rights of Plaintiff, or that they were incompetent in their respective positions.  In fact, the opposite is true.  Defendants acted in what they believed to be the best interests of HIA.

Absent any evidence to rebut the legitimacy of Defendants' actions or to prove that they knowingly violated the law, the Individual defendants are entitled to qualified immunity from Plaintiff's Equal Protection claim.

**B.    The Court Should**

Count III of Plaintiff's Second Amended Complaint purports to state a claim against all five Defendants.  However, the Court already dismissed the claim against SARAA based on governmental immunity (Docs. 21, 71), and all of the factual allegations contained in Count III refer only to BAA, Fleet, Holdsworth, and McIntosh.  Thus, Defendants will address those Defendants herein.

In order to prevail on a cause of action for tortious interference with existing contractual relationships, a plaintiff must prove the following four elements:

> (1) the existence of a contractual relation between the complainant and a third party; (2) purposeful action on the part of the defendant, specifically intended to harm the existing relation, or to prevent a prospective relation from occurring; (3) the absence of privilege or justification on the part of the defendant; and (4) the occasioning of actual damage as a result of the defendant's conduct.

Odyssey Waste Services, LLC v. BFI Waste System, 2007 U.S. Dist. LEXIS 13530 (E.D. Pa. Feb, 28, 2007) attached hereto as Ex. "D" (citing Crivelli v. GMC, 215 F.3d 386, 394 (3d Cir. 2000)).  Unless these are genuine issues of material fact as to all four elements, Plaintiff's cause of action fails as a matter of law.

In Count III of the Second Amended Complaint, the allegations supporting the Claim for Tortious Interference are that the Defendants: (1) contacted Plaintiff's FBO customers prior to a vote of the SARAA Board and informed the customers that Plaintiff would no longer be permitted to provide FBO services at HIA; (2) refused to allow Plaintiff to provide FBO services out of Hangar 28 "despite the prohibition or creating exclusive arrangements"; and (3) refused to allow Plaintiff to provide FBO services out of the AMP Hangar "despite the fact that Stambaugh's was the only entity to satisfy the requirements of the RFQ."  (2d Amen. Compl. at ¶¶ 142-44).

This Court, in recommending the denial of Defendants' Motion to Dismiss the tortious interference claim, relied solely upon the contact with Plaintiff's (alleged) FBO customers, and not upon SARAA's decision not to enter into a new FBO agreement with Plaintiff or SARAA's decision not to award the AMP Lease to Plaintiff.  (Doc. 21, at 24).

**1. <u>The Claim for Tortious Interference Must be Dismissed as a Matter of Law Because Any Damages Allegedly Suffered by the Plaintiff Could Not Have</u>**

## Been Caused by the Actions of BAA, Fleet, McIntosh and Holdsworth

To prevail on the Claim for Tortious Interference, the Plaintiff must establish, "The occasioning of actual damages as a result" of any alleged interference. Crivelli, 215 F.3d at 394. With respect to the three allegations which comprise the Claim for Tortious Interference, two of the claims relate to SARAA's refusal to allow Plaintiff to provide FBO services, either at Hangar 28 or the AMP Hangar. (Doc. 84 at ¶¶ 143-44). To the extent that Plaintiff ties its claim for tortious interference to the decision not to allow Plaintiff to provide FBO services at HIA, this Court's prior decision forecloses the claim against any Defendant other than Plaintiff. Specifically, the Court explained:

> The defendants' interference with Stambaugh's relationships with Stambaugh's FBO customers was the product of the **defendants' exercise of the prerogatives and duties as HIA owner and operator under the FBO contract with Stambaugh's, which they declined to renew. As the owner of HIA and the party with the authority to extend Stambaugh's lease, SARAA had the capacity and apparent authority to exercise a contractual option not to renew a lease with Stambaugh's**.

(Doc. 21, at 24) (emphasis added)

Consistent with this Court's prior decision, and with the evidentiary record, it is undisputed that SARAA was the only Defendant that had the authority to decide whether or not Plaintiff would be permitted to provide FBO services at

HIA.  This authority was exercised by a unanimous vote of the SARAA Board in January 2000 to enter into a new lease with Plaintiff, but <u>not</u> to include within that lease the right to conduct FBO operations at HIA.  (SMF at ¶153).

Because SARAA, and only SARAA, had the authority to make this decision, no other Defendant can be held liable for tortious interference with contract based on the decision not to enter into an FBO agreement with Plaintiff.  Moreover, tortious interference has been dismissed as against SARAA based on governmental immunity.

Accordingly, the only remaining allegation against the remaining Defendants of BAA, Fleet, Holdsworth and McIntosh, is that they committed tortious interference by contacting Plaintiff's customers and informing the same that Plaintiff would no longer be permitted to provide FBO services at HIA.  (Doc. 84 at ¶141).  However, based on Plaintiff's own admissions and pleading, this is not the cause for its alleged damages suffered from the tortious interference.

Specifically, Plaintiff contends that it suffered damages in the form of lost past and future "income it would have derived from providing FBO services at HIA *due to its inability to provide FBO services at HIA*."  (Doc. 84 at ¶¶146-47).[9] Plaintiff's damages, as alleged and admitted by Plaintiff, result not from any

---

[9] Nowhere does Plaintiff allege in the Second Amended Complaint that these contacts affected Plaintiff's heavy maintenance operations.  In fact, Plaintiff's general manager, Scott Stambaugh, testified that there was little change to Plaintiff's heavy maintenance operation after January 2000.  (SMF at ¶189).

contact any Defendant may have had with Plaintiff's customers, but rather, from SARAA's decision not to enter into an FBO agreement with Plaintiff once the previous contract had expired.

Plaintiff has failed to produce any evidence that the contact itself with its customers prior to the Board approval of Piedmont in any way caused it to lose FBO business.    Rather, to the contrary, Plaintiff's pleading and statements throughout these proceedings have indicated that it was SARAA's decision to not include FBO Rights in the Lease entered into in January of 2000 that caused it to cease performing FBO services at HIA.   Accordingly, as a matter of law the act with contacting the customer in and of itself could not have caused Plaintiff's alleged damages.

### 2.     There is No Evidence of Plaintiff's Existing Contracts

Count III must be dismissed as a matter of law because Plaintiff has not produced any evidence of a contractual relation between Plaintiff and a third party beyond Mark Stambaugh's general assertions that Plaintiff did have contracts with its customers.    Mark Stambaugh was questioned about the existence of such contracts and he testified that he thinks Plaintiff had written contracts with FBO providers, but that he did not handle such contracts, does not know where any such contracts are, or whether he provided them to his counsel.   (SMF at ¶¶26-27). While Mark Stambaugh said that Charles Beard would have handled contracts with

FBO customers, Mr. Beard testified that he had no knowledge of any such violations.

Because Plaintiff has failed to produce any evidence of the terms or conditions, or even the existence, of contracts with third parties, Defendants are entitled to judgment as a matter of law on Count III.

### 3.    It is Undisputed that Neither, Holdsworth Nor McIntosh Contacted Any of Plaintiff's FBO Customers

While Plaintiff alleges that BAA, Fleet, Holdsworth and McIntosh all contacted Plaintiff's FBO customers, it is undisputed that neither Holdsworth nor McIntosh made any such contact.  (SMF at ¶181).  Mark Stambaugh admits that he heard (through hearsay) that Fleet had contacted U.S. Air and Federal Express, and he has no evidence or personal knowledge of Holdsworth or McIntosh making such contact.   Additionally, Holdsworth and McIntosh both testified that they never contacted Plaintiff's FBO customers.  (Id. ¶¶182).  Accordingly, neither Holdsworth nor McIntosh can be held liable for tortious interference based on contact with Plaintiff's customers as it is undisputed neither had said contact.

**4.** **Even Assuming Fleet Did Contact Plaintiff's Customers, there is No Evidence this was Done with the Intent to Harm Plaintiff and Said Contact would have been Made with Priviledge and Justification**

The only evidence of record regarding any contact between any Defendant and any of Plaintiff's FBO customers prior to the SARAA Board vote is evidence that Defendant Fleet may have made contact with one or more airlines to inform them that the SARAA Board would be voting on Plaintiff's lease and FBO arrangements on January 11, 2000. (Id. at ¶¶174). For the reasons set forth below, Plaintiff cannot maintain Count II on the basis of such contact.

(i) There is no evidence that Fleet intended to harm Plaintiff

Assuming Plaintiffs produced credible evidence of existing contracts to provide FBO services, there is no evidence whatsoever that Fleet made contact with any such customers with the specific intent to harm Plaintiff or to interfere with its contractual relationships. Any airlines that were contacted were not only Plaintiff's customers, but also customers of HIA who needed to be kept informed of a change in FBO services so that they were not "blindsided" after the Board vote. (Id. at ¶¶176-77). Scott Stambaugh admits that FBO customers need prior notice of changing service providers, and Fleet explained that it was a good business practice to do so. (Id. at ¶¶176-79). Tate, a SARAA Board member at the

time, also stated that it was good business practice for Fleet to make contact with the customers in advance of the Board vote. (Id. at ¶¶ 176).

In response to Fleet's testimony in this regard, Plaintiff has not and cannot produce evidence of an intent to harm. Accordingly, there is no genuine issue of material fact for trial.

(ii)     Fleet Acted with Privilege or Justification

This Court was clear in its Report and Recommendation on Defendants' Motion to Dismiss that "the defendants' contacts with Stambaugh's customers **might reasonably be seen as conduct that was justified**." (Doc. 21, at 24) (emphasis added). Plaintiff bears the burden of establishing an absence of privilege or justification. See Odyssey, 2007 U.S. Dist. LEXIS at *39.[10] The determination is to be based on the circumstances of the particular case and "requires an inquiry into the mental and moral character of the defendant's conduct." Id. at *40 (quoting Big Apple BMW, Inc. v. BMW of N. Am., Inc., 974 F.2d 1358,1382 (3d Cir. 1993)). Proper conduct in the context of a tortious interference action is generally characterized as socially acceptable conduct that comports with "recognized standards of business ethics and custom . . . fair play

---

[10] Pennsylvania courts have adopted Section 767 of the Restatement (Second) of Torts, for determining whether an actor's conduct was improper, which requires an application of the following factors: (1) the nature of the actor's conduct; (2) the actor's motive; (3) the interests of the party with which the actor's conduct interferes; (4) the interests sought to be advanced by the actor; (5) the social interests in protecting the freedom of action of the actor and the contractual interests of the other; (6) the proximity or remoteness of the actor's conduct to the interference; and (7) the relations between the parties., indicating an absence of privilege or justification.

and the 'rules of the game.'"  Odyssey, 2007 U.S. Dist. LEXIS at *40; see also Kachmar v. SunGuard Data Sys., Inc., 109 F.3d 173, 185 (3d Cir. 1997).  The Pennsylvania Supreme Court has also interpreted the absence of privilege or justification element as being "*closely related to the element of intent.*"  Adler, 393 A.2d at 1183-84.

As set forth above, Fleet's intent in contacting FBO customers was to make sure that they were aware ahead of time of the likelihood of a change in FBO providers.  (SMF at ¶¶176-79).  In fact, some FBO customers were upset that they were not given more advance notice.  (Id. at ¶¶178). Certainly, given Scott Stambaugh's testimony that an entity cannot provide FBO services to major airlines without going through a training, audit and approval process, Fleet's conduct complied with proper conduct and standards of business ethics.  (Id. at ¶¶176-79).

Because Defendant Fleet acted with privilege and justification, his contact with alleged FBO customers does not give rise to a claim for tortious interference with contract.

In sum, the contact with Plaintiff's customers cannot as a matter of law, have caused Plaintiffs alleged damages.  Moreover, Fleet's contact with entities that utilized FBO services at HIA was (1) not done with the specific intent to harm Plaintiff; and (2) was privileged and justified. Accordingly, such action is

insufficient as a matter of law to establish a claim for tortious interference with contract, and the Court should grant summary judgment on Count III.

**5.     Even if BAA, Fleet, McIntosh and Holdworth Could be Held Liable for SARAA's Decision Not to Grant to Plaintiff the Right to Provide FBO Services, there is No Evidence of Specific Intent to Harm**

Even if Defendants BAA, Fleet, Holdsworth or McIntosh could be held responsible for the decision not to enter into a new FBO agreement with Plaintiff, there is no evidence that the decision was motivated by a specific intent to harm Plaintiff. Scott Stambaugh was unable to identify a single reason why any Defendant would want to cause specific harm to Stambaugh. Specifically, Scott Stambaugh testified that he believed that SARAA operations employees were harassing Plaintiff in order to "get somebody else in there to do the fuel business." (Id. at ¶99). When pressed, Scott Stambaugh said he thought there might be "political reasons" for wanting to "get rid" of Plaintiff, but he could not specify any facts or identify any facts to support these accusations. (Id.).

In sum, because there is no genuine issue of material fact regarding any Defendant's intent to cause specific harm to Plaintiff, the Court should grant summary judgment on Count III.

6.    **In the Alternative, Defendants Holdsworth and McIntosh are entitled to Governmental Immunity under 42 Pa.C.S. § 8546**

The Court has already held that SARAA is enjoys governmental immunity from Plaintiff's tortious interference claim.   (Doc. 21, at 25-26).   Defendants Holdsworth and McIntosh also enjoy governmental immunity in their individual capacities.   Liability for employees and individuals associated with local agencies is separately provided for in Subchapter C of the Political Subdivision Tort Claims Act, which provides:

> [a]n employee of a local agency is liable for civil damages on account of any injury to a person or property caused by acts of the employee which are within the scope of his offices or duties only to the same extent as his employing local agency and subject to the same limitations imposed by this subchapter.

42 Pa.C.S. § 8545.

The Court previously discussed governmental immunity as it applies to Holdsworth and McIntosh with respect to the tortious interference claim.   (Doc. 21, at 26).   Specifically, the Court declined to dismiss the claim as against these Defendants because Plaintiff had alleged willful misconduct on the part of these defendants, which is an exception to immunity.   42 Pa. C.S. § 8550 (providing no official immunity for damages "caused by the act of the employee in which it is judicially determined that the act caused injury and that such act constituted a crime, actual fraud, actual malice, or willful misconduct").   The Court also noted

that there was not a factual record upon which to make a determination regarding the "scope of office or duties" determination.  (Doc. 21, at 26).

Now that fact-discovery is complete, it is clear that there is no genuine issue of material fact regarding Defendants' Holdsworth and McIntosh's right to governmental immunity from Plaintiff's state law claims.  Again, Plaintiff alleges that Defendants Holdsworth and McIntosh intentionally interfered with its contracts by:  (1) contacting Plaintiff's customers and informing them that Plaintiff would no longer be providing FBO services at HIA; and (2) refusing to allow Plaintiff to provide FBO services at HIA. (Doc. 84, at ¶¶142-44).

With respect to the first allegation, there is no evidence of record whatsoever that Defendant Holdsworth or Defendant McIntosh contacted any of Plaintiff's customers.  (SMF at ¶181).  Thus, a claim for tortious interference against Holdsworth and McIntosh cannot be predicated on allegations of customer contact.

Regarding the decision not to enter into a new FBO agreement with Plaintiff, as set forth above, SARAA alone had the authority to make this decision.  Any part that Fleet (on behalf of BAA), Holdsworth or McIntosh played in the decision-making process was undisputedly within the scope of their offices or duties.  (Id. at ¶¶ 5,7,9).  Again, Fleet, Holdsworth and McIntosh did not make the decision.  The decision was a ***unanimous decision of the entire SARAA Board of Directors***.  (Id. at 153).  Fleet and Holdsworth were not even Board members, and McIntosh

certainly did not act alone.  Rather, the entire Board voted with him to make the decision.  (Id.).  Moreover, all actions that Defendants Fleet, Holdsworth and McIntosh did take in conjunction with FBO rights at HIA were done within the scope of their offices and duties.  (Id. at ¶¶5,7,9).

Finally, even if Plaintiff could establish a genuine issue of material fact regarding the scope of Fleet, Holdsworth and McIntosh's duties, there is no evidence of record that any of their conduct constituted "crime, actual fraud, actual malice, or willful misconduct."  42 Pa.C.S. § 8550.

Because they enjoy governmental immunity from a tortious interference with contract claim, Defendants SARAA, Holdsworth and McIntosh are entitled to judgment as a matter of law on Count III.

## C.    Conspiracy (Count II)

In order to prevail in a cause of action for civil conspiracy under Pennsylvania law, a plaintiff must prove three elements:  "(1) a combination of two or more persons acting with a common purpose to do an unlawful act or to do a lawful act by unlawful means or for an unlawful purpose; (2) an overt act done in pursuance of a common purpose; and (3) actual legal damage."  Strickland v. Univ. of Scranton, 700 A.2d 979, 987-88 (Pa. Super. 1997).  "Proof of malice, i.e., an intent to injure, is essential in proof of a conspiracy."  Thompson Coal Co. v. Pike Coal Co., 412 A.2d 466, 472 (1979) (citations omitted) (emphasis added).  A cause

of action for civil conspiracy must be based on a "separate underlying tort as a predicate for liability." In re Orthopedic Bone Screw Prod. Liab. Litig., 193 F.3d 781, 789 (3d Cir. 1999).

### 1.    Plaintiff Cannot Establish an Underlying Unlawful Act

In recommending the dismissal of the conspiracy count in the original Complaint, this Court rejected Plaintiff's argument that the Court look to the entirety of the Complaint to ascertain the unlawful act or acts that were the object of an alleged conspiracy. (Doc. 21, at 18). The Court went on to recommend dismissal of the conspiracy claim "in that there is no reference to the provision or provisions of law that were allegedly violated by the [alleged] conspirators." (Doc. 21, at 19). In adopting this Court's Report and Recommendation, Judge Kane noted that Plaintiff had argued that the underlying unlawful act was tortious interference with contract. (Doc. 71, at 10).

In the Second Amended Complaint, Plaintiff adds little more to its conspiracy Count than some additional conclusory allegations regarding tortious interference with existing contract, such as the existence of contracts, Defendants' knowledge thereof, and Defendants' intent to interfere therewith. (2d Amend. Compl. at ¶¶100, 101, 107-09). Thus, it is clear from the Second Amended Complaint that the only underlying unlawful conduct alleged is tortious interference with contract.

As set forth at length above, the Court has already dismissed SARAA and the remaining Defendants are entitled to Summary Judgment on Plaintiff's tortious interference claim because: (1) As a matter of law the alleged damages for tortious interference flow from the lack of a Lease containing the right to provide FBO services, rather than from a contact with Plaintiff's customers; (2) Plaintiff cannot establish the terms or existence of any contracts; (3) Fleet's contact with FBO customers was not done with the intent to harm Plaintiff, rather it was done with privilege and justification, and did not cause Plaintiff harm; (4) it is undisputed neither Holdsworth nor McIntosh had any contact with Plaintiff's customers; and (5) SARAA's decision not enter into a new FBO agreement with Plaintiff was not done with the intent to harm Plaintiff and was made with privilege and justification. See supra.

It is well-established that "Absent a civil cause of action for a particular act, there can be no cause of action for civil conspiracy." Nix v. Temple University of Commonwealth System of Higher Educ., 596 A.2d 1132, 1137 (Pa. Super. Ct. 1991) (citing to Pelagatti v. Cohen, 370 Pa.Super. 422, 432, 536 A.2d 1337, 1342 (1987)). Accordingly, because Plaintiff's tortious interference claim fails as a matter of law, Defendants are also entitled to summary judgment on the conspiracy claim.

## 2.    Defendants Cannot Conspire Together as  Matter of Law

It is well-established that a business entity cannot conspire with its employees and/or agents.  See, e.g., Thompson Coal Co. v. Pike Coal Co., 488 Pa. 198, 212-13, 412 A.2d 466, 470 (1979).  Here, by Plaintiff's allegations BAA, Fleet, McIntosh and Holdsworth were, at all times, acting as employees and/or agents of SARAA.  (Doc. 84, at ¶¶ 2-6).  It is undisputed that, to the extent that any of the Individual Defendants participated in leasing decisions, FBO services decisions or any other decision involving Plaintiff, they did so within the scope of their duties and responsibilities as agents of SARAA.

Because all of the SARAA cannot conspire with its own employees or agents, and Defendants BAA, Fleet, Holdsworth and McIntosh were, at all times, employees and/or agents of SARAA, Count II fails as a matter of law.

## 3.    In the Alternative, SARAA, Holdsworth, and McIntosh are Entitled to Governmental Immunity

In disposition of Defendants' Motion to Dismiss, the Court held that SARAA was entitled to governmental immunity on Plaintiff's tortious interference claim, but declined to address the issue with respect to conspiracy because that count was dismissed on other grounds.  (Doc. 21, at 25-26).  The general rule of governmental immunity is that "no local agency shall be liable for any damages on account of any injury to a person or property caused by any act of the local agency or employee thereof or any other person."  42 Pa.C.S. § 8541.  SARAA is "a

municipal authority created pursuant to the Municipal Authorities Act of 1945, 53 P.S. § 301, *et seq.*"  (2d Amend. Compl. ¶ 2).  As such, SARAA is afforded the protection of governmental immunity.  See Weinerman v. City of Philadelphia, 785 F. Supp. 1174, 1178 (E.D. Pa. 1997); Marshall v. Port Auth. of Allegheny Cty., 106 Pa. Commw. 120, 134-36, 525 A.2d 857, 858-59 (1987).  Plaintiff's conspiracy claim does not fall within any statutory exceptions to the general grant of immunity, 42 Pa. C.S. § 8542(b).[11]  Therefore, SARAA is entitled to judgment as a matter of law on this claim.  See E-Z Parks, Inc. v. Philadelphia Parking Auth., 110 Pa. Commw. 629, 633, 532 A.2d 1272 (1987).  However, for the same reasons set forth above, Defendants SARAA, Holdsworth and McIntosh are entitled to governmental immunity on Count II.  Furthermore, this Count has dismissed the tortious interference claim against SARAA.  Because the conspiracy count is based on tortious interference, SARAA must necessarily be dismissed from this claim as well.

### D.    PLAINTIFF'S DAMAGES

Plaintiff alleges that it "has suffered, and will continue to suffer, substantial business losses *as the result of its inability to provide FBO services at HIA*," which business losses Plaintiff identifies as follows:  loss in value of its

---

[11] The acts which may impose liability upon a government actor are outlined in 42 Pa.C.S. § 8542(b), including: vehicle liability; care, custody or control of personal property; real property; trees, traffic control, street lighting; utility service facilities; streets; sidewalks; care, custody or control of animals.

FBO business ($5,000,000); expenses incurred to dismantle, remove and relocate its FBO and maintenance operations ($1,000,000); expenses incurred in order to relocate employees ($1,000,000); past and future income from providing FBO services at HIA ($13,000,000); expenses related to business interruption ($1,500,000); expenses related to lost productivity ($3,000,000 to $5,000,000), and damages related to the construction of a new facility at a different location ($16,000,000).  (Doc. 84, at ¶¶84-98; 119-36).

On July 2, 2007, Defendants filed a Motion for Sanctions for Failure to Properly and Timely Disclose Documents Supporting Damages Claim.  Therein, Defendants outline in detail Plaintiff's failure to produce any evidence regarding any of the above-listed damages despite repeated requests from Defendants to do so, and request that the Court preclude Plaintiff from introducing any evidence of damages at trial.  (Id.).

Even if the Court decides not to grant the Motion for Sanctions in its entirety, the Defendants are entitled to judgment as a matter of law on the following various catetories of damages: (1) One million dollars related to the dismantling and relocation of its FBO and maintenance operations (¶88 of the 2d Amend. Compl.); (2) one million dollars related to relocation of Plaintiff's employees (¶90 of the 2d Amend. Compl.); (3) one million five hundred thousand related to business interruption damages (¶94 of the 2d Amend. Compl.); (4) three

to five million dollars related to lost productivity which the Plaintiff's owner Mark Stambaugh testified related to the retraining of employees.  (Doc. 84 at ¶)[12]  The undisputed facts of this case clearly show that these damages do not flow from the decision not to renew the Plaintiff's right to provide FBO services, but rather flowed directly from Plaintiff's need to vacate the airport in 2003, after expiration of the 2000 Lease.

Plaintiff lost its FBO Rights when they exired in January of 2000, pursuant to the 1999 Amendment of the 1997 Lease.  Scott Stambaugh testified that none of Plaintiff's employees were terminated or laid off as a result of the expiration of Plaintiff's FBO rights in January 2000, and the number of employees that Plaintiff had from 2000 to 2003 did not change.  Plaintiff continued conducting heavy maintenance operations at HIA from 2000 until 2003, and "[t]here wasn't much of a change" in Plaintiff's operations during this time.  Moreover, any costs associated with relocating equipment and/or employees from Harrisburg to Georgia were not incurred until *after* the 2000 Lease expired in March 2003 and Plaintiff was forced to vacate HIA.  It was only at this time that Plaintiff's repair station and equipment, as well as 8 to 10 of its employees, were relocated to Brunswick, Georgia, where a related entity, Stambaugh Aviation, has been conducing aircraft maintenance since 1987.

---

[12] These damages cited in the equal protection claim are also repeated in their entirety or in part in the Counts for Conspiracy and Tortious Interference.  Furthermore, the claim for 16 million dollars being put forth for costs related to construction of a new facility has been withdrawn as represented by counsel for the Plaintiff.

Accordingly, the damages mentioned above, based on Plaintiff's General Manager's own testimony flowed directly from the need to vacate the airport in 2003 upon expiration of the 2000 Lease. There was absolutely no Pleading set forth in the Second Amended Complaint that the Plaintiff is attempting to collect any damages as a result of the 2000 Lease. Furthermore, there is no allegation set forth in the Second Amended Complaint that HIA inappropriately required Plaintiff to vacate the airport premises upon expiration of the 2000 Lease. Accordingly, Summary Judgment should be granted as a matter of law with respect to these damages.

## IV.   CONCLUSION

For the reasons set forth above, Defendants SARAA, BAA, David Fleet, David Holdsworth, and David McIntosh respectfully request that this Honorable Court grant their Motion for Summary Judgment and enter judgment against Plaintiff Stambaugh's Air Service, Inc.

Respectfully submitted,

RHOADS & SINON LLP

By:   _____

Dean F. Piermattei
Attorney I.D. No.
Heather Z. Kelly
Attorney I.D. No.
One South Market Square
P. O. Box 1146

Harrisburg, PA 17108-1146
(717)  233-5731
Attorneys for Defendant

## <u>CERTIFICATION OF COMPLIANCE WITH COURT ORDER</u>

The undersigned hereby certifies that it attempted to keep this Brief within this Court's Order dated July 2, 2007.  The brief exceeds the Court's 10,000 word limit by approximately 1,000.  Defendants will file a Motion nunc pro tunc to exceed the page limit by 1,000.

<u>/s/ Dean F. Piermattei</u>