# EXHIBIT A

**Citation #1**
**1997 us dist lexis 6493**

LEXSEE



Cited
As of: Jul 10, 2007

**NORTHEAST JET CENTER, LTD., Plaintiff v. LEHIGH-NORTHAMPTON AIR-
PORT AUTHORITY; JACK YOHE; and STANFORD WARTELL, Defendants.**

**Civil Action No. 90-CV-1262**

**UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF
PENNSYLVANIA**

**1997 U.S. Dist. LEXIS 6493**

**May 5, 1997, Decided
May 5, 1997, FILED, ENTERED**

**DISPOSITION:** [*1] Defendants' Motion to Amend Answer GRANTED; Defendants' Motion for Partial Summary Judgment on Count One GRANTED; case DISMISSED without prejudice.

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** At a point in which the remaining claims in plaintiff company's complaint against defendant airport authority and others were a federal claim under 42 U.S.C.S. § 1983 and state claims for intentional interference with a prospective contractual relationship and defamation, the airport authority and others made a motion to amend their answer and for partial summary judgment on the federal claim.

**OVERVIEW:** The company's remaining federal claim against the airport authority and others was that they violated § 1983 by unconstitutionally discriminating against the company, because they refused to give the company a "through-the-fence" agreement subsequent to granting one to another company, because they enforced fixed-base operator (FBO) standards not in effect and not enforced against other FBOs at the airport. The airport authority and others made motions to amend their answer to add the defense of res judicata, and for partial summary judgment on the federal claim. The court granted the motions and dismissed the case without prejudice. The court ruled that the agreement claim was barred by res judicata, because a virtually identical claim in a prior federal suit that was dismissed with prejudice. As to the

standards claim based on an alleged violation of equal protection, the court ruled that the company failed to present sufficient evidence of discrimination. The court said that the company was not even able make an initial evidentiary showing of intent, so there was no genuine issue of credibility for the jury to sort out, and summary judgment was appropriate.

**OUTCOME:** The court granted the airport authority and others' motions to amend their answer and for partial summary judgment on the federal claim. Because the court no longer had jurisdiction over the remaining state claims, the court dismissed the case without prejudice.

**CORE TERMS:** summary judgment, lease, airport, property interest, defamation, res judicata, genuine issue of material fact, through-the-fence', deprivation, license, state law, equal protection, custom, deprive, affirmative defense, qualified immunity, arbitrarily, municipal, partial, amend, cause of action, municipality's, deprived, color, privy, final authority, business relationships, intentionally, certificate, policymaker

**LexisNexis(R) Headnotes**

*Civil Procedure > Summary Judgment > Motions for
Summary Judgment > General Overview*
*Civil Procedure > Summary Judgment > Standards >
Appropriateness*

*Civil Procedure > Summary Judgment > Standards > Genuine Disputes*
[HN1]Rule 56(c) of the Federal Rules of Civil Procedure provides that a motion for summary judgment shall be granted where the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Rule 56(e) further provides that, when a properly supported motion for summary judgment is made, the adverse party then must set forth specific facts showing that there is a genuine issue for trial. The court must view all inferences in a light most favorable to the non-moving party and facts asserted by the non-moving party, if supported by sufficient affidavits and other evidentiary matter, must be regarded as true. However, the nonmoving party's burden is more than insignificant; the plaintiff must present affirmative evidence in order to defeat a properly supported motion for summary judgment. The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff.

*Civil Procedure > Summary Judgment > Burdens of Production & Proof > Nonmovants*
*Civil Procedure > Summary Judgment > Standards > Genuine Disputes*
[HN2]Summary judgment must be entered after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. In such a situation, there can be no genuine issue as to any material fact, since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial. A genuine issue of fact is only present, precluding summary judgment, when a reasonable trier of fact, viewing all the evidence, could rationally find in favor of the nonmoving party in light of the burden of proof placed on the nonmover. Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. While the nature of its remedy is indeed powerful, the summary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed to secure the just, speedy and inexpensive determination of every action. The court attempts to balance the defendants' need for protection from unfounded claims and vexatious litigation, with the plaintiff's rights to vindicate his or her constitutional guaranteed rights.

*Constitutional Law > Bill of Rights > Fundamental Rights > General Overview*
*Constitutional Law > Substantive Due Process > Scope of Protection*
*Constitutional Law > Privileges & Immunities*
[HN3]Section 1983 provides for the imposition of liability on any person who, acting under color of state law, deprives another of rights, privileges, or immunities secured by the Constitution or the laws of the United States. 42 U.S.C.S. § 1983. The statute is not a source of substantive rights, but merely provides a method for vindicating federal rights elsewhere conferred. In conjunction with the Due Process Clause of the Fourteenth Amendment, Section 1983 allows plaintiffs to assert three kinds of federal claims: (1) claims for the deprivation by state officials of any of the specific protections defined in the Bill of Rights; (2) claims under the substantive component of the Due Process Clause that bar certain arbitrary, wrongful government actions, regardless of the fairness of the procedures used to implement them; and (3) claims under the procedural component of the Due Process Clause relating to the deprivations of life, liberty, or property without due process of law. To state a claim under § 1983, a plaintiff must show both that (1) the offending conduct deprived the plaintiffs of rights secured by the Constitution of the United States, and (2) that such conduct was committed by a person acting under color of state law.

*Civil Procedure > Pleading & Practice > Defenses, Demurrers, & Objections > Affirmative Defenses*
*Civil Procedure > Pleading & Practice > Pleadings > Amended Pleadings > Leave of Court*
*Civil Procedure > Judgments > Preclusion & Effect of Judgments > Res Judicata*
[HN4]Affirmative defenses not raised in an answer are usually deemed waived pursuant to Federal Rule of Civil Procedure 8(C); however, Federal Rule of Civil Procedure 15(a) permits a party to amend its answer at any time by leave of the court and states that leave shall freely be given when justice so requires.

*Civil Procedure > Pleading & Practice > Defenses, Demurrers, & Objections > Affirmative Defenses*
*Civil Procedure > Pleading & Practice > Pleadings > Amended Pleadings > General Overview*
[HN5]Failure to raise an affirmative defense by responsive pleading or appropriate motion does not always result in waiver. The court should permit an amendment unless the opposing party will be prejudiced. The passage of time alone is insufficient to create prejudice.

*Civil Procedure > Judgments > Preclusion & Effect of Judgments > Res Judicata*
*Evidence > Procedural Considerations > Burdens of Proof > General Overview*
[HN6]The doctrine of res judicata provides that a subsequent suit based on the same cause of action as a prior suit that involved the same parties or their privies is barred where there has been a final judgment on the merits in the prior suit. Of course, the party asserting the defense bears the burden of showing that it applies. Defendants must show that there has been (1) a final judgment on the merits in a prior suit involving (2) the same parties or their privies and (3) a subsequent suit based on the same causes of action has presently been filed.

*Civil Procedure > Dismissals > Involuntary Dismissals > General Overview*
*Civil Procedure > Dismissals > Voluntary Dismissals > General Overview*
*Civil Procedure > Judgments > Preclusion & Effect of Judgments > Res Judicata*
[HN7]Dismissal with prejudice constitutes an adjudication of the merits as fully and completely as if the order had been entered after trial.

*Civil Procedure > Judgments > Preclusion & Effect of Judgments > Res Judicata*
[HN8]A party is considered a privy to an action when it has a mutual interest in the same action by some relationship with a party to an action, or when its interests are represented by that party.

*Constitutional Law > Equal Protection > Level of Review*
*Constitutional Law > Equal Protection > Scope of Protection*
[HN9]A law that is fair on its face and impartial in its appearance may nonetheless constitute illegal discrimination between persons if it is applied and administered by public authority with an evil eye and an unequal hand. Even if the duty imposed by the applicable statute or standard is mandatory, public officials engage in unconstitutional discrimination when they seek to enforce the statute in order to prevent the exercise of a fundamental right. In an equal protection claim of this sort, though, the plaintiff must provide evidence of intentional, or purposeful, discrimination by the defendants. Mere unequal treatment via a standard fair on its face is insufficient; there must be a showing of clear and intentional discrimination. Moreover, to establish such intentional or purposeful discrimination, it is axiomatic that a plaintiff

must provide evidence that similarly situated persons have been treated differently.

*Civil Procedure > Summary Judgment > Burdens of Production & Proof > General Overview*
*Civil Procedure > Summary Judgment > Standards > Appropriateness*
*Civil Procedure > Summary Judgment > Standards > Genuine Disputes*
[HN10]Issues of intent are generally unsuited for summary judgment because courts should not resolve any genuine issues of credibility. Nevertheless, if the plaintiff is unable to make an initial evidentiary showing of intent, there is no genuine issue of credibility for the jury to sort out, and summary judgment is appropriate.

*Civil Rights Law > Section 1983 Actions > Elements > Protected Rights*
*Constitutional Law > Substantive Due Process > Scope of Protection*
[HN11]The Due Process Clause of the Fourteenth Amendment declares that no state shall deprive any person of life, liberty, or property, without due process of law. The clause has a substantive component that bars certain government actions regardless of the fairness of the procedures used to implement them. Thus, where public officials invoke administrative processes with an illicit purpose, they are violating substantive due process. In order to succeed on a substantive due process claim, plaintiff must prove that the governmental authority acted to infringe a property interest encompassed by the Fourteenth Amendment.

*Constitutional Law > Bill of Rights > Fundamental Rights > Procedural Due Process > Scope of Protection*
*Constitutional Law > Substantive Due Process > Economic Interests*
*Constitutional Law > Substantive Due Process > Scope of Protection*
[HN12]Substantive due process protects fundamental interests, not state-created contract rights. What constitutes a property interest for the purposes of procedural due process might not so constitute for the purposes of substantive due process, because property rights for procedural due process purposes are created by state law, and substantive due process rights are created by the Constitution. Were claims are more analogous to state-law tort claims, substantive due process is usually not implicated.

*Constitutional Law > Substantive Due Process > Scope of Protection*

[HN13]The fundamental question underlying a substantive due process claim is whether a statute or regulation irrationally or arbitrarily deprives an individual of an established right. This abuse occurs where actions are taken that are intentional or motivated by bias, bad faith, or partisan or personal motives unrelated to the merits of the matter before it.

*Civil Rights Law > Section 1983 Actions > Elements > Protected Rights*
*Constitutional Law > Substantive Due Process > Scope of Protection*
*Torts > Intentional Torts > Defamation > General Overview*

[HN14]Injury to reputation is not a liberty or property interest protected by the due process clause of the Fourteenth Amendment. To state a claim for defamation under 42 U.S.C.S. § 1983, a plaintiff must allege loss of a recognizable property or liberty interest in conjunction with the allegation of injury to reputation. This has been called the "stigma-plus" or "defamation-plus" test. To meet the "plus", the plaintiff must demonstrate that the defamation caused the denial of a federally protected right, or that the defamation occurred in connection with a federally protected right. Business losses and public scorn have been held to not meet the "plus" requirements, because such consequences would not usually be the direct result of any affirmative conduct by the parties making the defamation.

*Civil Procedure > Summary Judgment > Standards > General Overview*
*Civil Rights Law > Immunity From Liability > Local Officials > Customs & Policies*

[HN15]Government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known. In order to apply this test on summary judgment, the trial judge must determine whether the law was clearly established at the time the action occurred. The right an official is alleged to have violated must have been clearly established in a particularized sense. That is, the contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right. Indeed, qualified immunity protects all but the plainly incompetent or those who knowingly violate the law.

*Civil Procedure > Summary Judgment > Evidence*

*Civil Procedure > Summary Judgment > Standards > General Overview*
*Civil Rights Law > Section 1983 Actions > Elements > Causal Relationship*

[HN16]With regard to the final element of a 42 U.S.C.S. § 1983 claim, that the alleged unlawful policy or custom was the proximate cause of the injuries suffered, a plaintiff must demonstrate a plausible nexus or affirmative link between the municipality's custom and the specific deprivation of constitutional rights at issue. The question of proximate cause is generally a question for the factfinder; however, if the causal link is so tenuous or without evidence as to be implausible, it may be decided at summary judgment.

**COUNSEL:** For NORTHEAST JET CENTER, LTD., PLAINTIFF: JOEL E. LAIKS, GALLAND, KHARASCH, MORSE & GARFINKLE, P.C., WASHINGTON, DC USA. DAVID K. MONROE, GALLAND, KHARASCH, & GARFINKLE, P.C., WASHINGTON, DC USA.

For LEHIGH-NORTHAMPTON AIRPORT AUTHORITY, DEFENDANT: STEVEN M. JANOVE, TERESA N. CAVENAGH, WENDY R. HUGHES, DUANE, MORRIS & HECKSCHER, PHILA, PA USA. J. BRUCE MC KISSOCK, MC KISSOCK & HOFFMAN, P.C., PHILA, PA USA. RICHARD FEDER, FINE, KAPLAN & BLACK, PHILA, PA USA. JODY A.G. WERNER, DUANE, MORRIS & HECKSCHER, PHILA, PA USA. INGRID B. HOPKINSON, MC KISSOCK AND HOFFMAN, P.C., PHILA, PA USA. For JACK YOHE, Airport Director, DEFENDANT: STEVEN M. JANOVE, (See above), TERESA N. CAVENAGH, (See above), WENDY R. HUGHES, (See above). J. BRUCE MC KISSOCK, (See above). RICHARD FEDER, (See above). JODY A.G. WERNER, (See above). INGRID B. HOPKINSON, (See above). For SANFORD WARTELL, Chairman of the Board of Directors, DEFENDANT: STEVEN M. JANOVE, (See above), TERESA N. CAVENAGH, (See above), WENDY R. HUGHES, (See above). J. BRUCE MC KISSOCK, (See above) [*2] RICHARD FEDER, (See above). JODY A.G. WERNER, (See above). INGRID B. HOPKINSON, (See above).

**JUDGES:** Franklin S. Van Antwerpen, United States District Court

**OPINION BY:** Franklin S. Van Antwerpen

**OPINION**

**MEMORANDUM AND ORDER**

Van Antwerpen, J.

May 5, 1997

## I. INTRODUCTION

Plaintiff brought this action in its Second Amended Complaint under 42 U.S.C. §§ 1983, 1985; 15 U.S.C. §§ 1, 2; 15 U.S.C. § 15; the Fourteenth Amendment to the United States Constitution; 53 Pa. C.S.A. § 306; Article I, Section 1, 9, and 26 of the Pennsylvania Constitution; 42 Pa. C.S.A. § 8343 and the common law of the Commonwealth of Pennsylvania. However, pursuant to our order of August 1, 1996 granting partial summary judgment the only remaining claims are those contained in Count I, and two state claims: intentional interference with a prospective contractual relationship and defamation. We have jurisdiction over this action pursuant to 28 U.S.C. §§ 1331, 1337 and the doctrine of supplemental jurisdiction, 28 U.S.C. § 1367. Venue for this action lies in the Eastern District of Pennsylvania pursuant to 28 U.S.C. § 1391(b) and (c).

## II. PROCEDURAL HISTORY

This is not a case which is new to this court. Plaintiff [*3] filed a complaint on February 22, 1990. On May 31, 1991 we granted Defendants' Motion to Dismiss in part and denied it in part. 767 F. Supp. 672 (E.D. Pa. 1991). Plaintiff then filed its Second Amended Complaint on June 21, 1991. Subsequently, this case was delayed pending the criminal trials and subsequent conviction of Plaintiff's President, Mr. Earl M. Holtz for conspiracy to defraud the United States through improper filings with Federal Aviation Administration. See United States v. Holtz, 1993 U.S. Dist. LEXIS 16705, 1993 WL 482953 (E.D. Pa. Nov. 15, 1993), aff'd 31 F.3d 1174 (3d Cir. 1994); United States v. Holtz, 1994 WL 750674 (E.D. Pa. Feb. 6, 1994); United States v. Holtz, 1995 WL 106895 (E.D. Pa. March 13, 1995); United States v. Holtz, 1995 WL 312537 (E.D. Pa. May 19, 1995). Thereafter, Defendants filed for summary judgment through two motions on January 22, 1996 and February 8, 1996. We granted those motions in part, but denied them as to the constitutional violations alleged in Count One, and the state claims alleged in count three (intentional interference with a prospective contractual relationship) and count six (defamation). We noted in our opinion of August 1, 1996 that neither [*4] party had sufficiently discussed the charges alleged in Count One, and we denied summary judgment pending further briefing on the issues. Northeast Jet Center v. Lehigh-Northampton Airport Authority, 1996 U.S. Dist. LEXIS 11177, 1996 WL 442784 (E.D. Pa. Aug. 1, 1996). In a letter dated September 3, 1996 to Defendants' counsel, Plaintiff's counsel outlined its Constitutional claims to ease discussion of this issue; he specified that Plaintiff's claims in Count One are brought under 42 U.S.C. § 1983, and are based upon a violation of equal protection and substantive due process. Consequently, on February 19, 1997, Defendants filed a Motion for Partial Summary Judgment on Count One, and Plaintiffs responded thereto on March 21, 1997. We therefore focus our discussion on Count One, and on whether Defendants' actions rise to the level of a violation of Section 1983. Due to the large quantity this court has previously written on this matter, we will not repeat the detailed facts we set out in our May 31, 1991 and August 1, 196 opinions; rather we will simply make reference to them as the need arises.

## III. GENERAL STANDARD

[HN1]Rule 56(c) of the Federal Rules of Civil Procedure provides that a motion for summary judgment [*5] shall be granted where:

> the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law.

Rule 56(e) further provides that, when a properly supported motion for summary judgment is made, the adverse party then "must set forth specific facts showing that there is a genuine issue for trial."

Of course, we must view all inferences in a light most favorable to the non-moving party and facts asserted by the non-moving party, if supported by sufficient affidavits and other evidentiary matter, must be regarded as true. United States v. Diebold, Inc., 369 U.S. 654, 655, 8 L. Ed. 2d 176, 82 S. Ct. 993, (1962); Aman v. Cort Furniture Rental, 85 F.3d 1074, 1080 (3d Cir. 1996). However, the nonmoving party's burden is more than insignificant; "the plaintiff must present affirmative evidence in order to defeat a properly supported motion for summary judgment." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 257, 91 L. Ed. 2d 202, 106 S. Ct. 2505 (1986); see also J.F. Feeser Inc. v. Serv-A-Portion, [*6] Inc., 909 F.2d 1524, 1531 (3d Cir. 1990), cert. denied, 499 U.S. 921, 113 L. Ed. 2d 246, 111 S. Ct. 1313 (1991) (stating that, "the nonmovant must establish the existence of each element on which it bears the burden of proof") (citing Celotex Corp. v. Catrett, 477 U.S. 317, 323, 91 L. Ed. 2d 265, 106 S. Ct. 2548 (1986)). "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." Anderson, 477 U.S. at 252; Matsushita Electrical Industry Co. v. Zenith Radio Corp., 475 U.S. 574, 587, 89 L. Ed. 2d 538, 106 S. Ct. 1348 (1986). See also

Coolspring Stone Supply, Inc. v. American States Life Ins. Co., 10 F.3d 144, 148 (3d Cir. 1993); Petruzzi's IGA Supermarkets, Inc. v. Darling Delaware Co., Inc., 998 F.2d 1224, 1230 (3d Cir.), cert. denied, 510 U.S. 994, 126 L. Ed. 2d 455, 114 S. Ct. 554 (1993)(nonmovant cannot rest on pleadings and must do more than create some metaphysical doubt).

Therefore, [HN2]summary judgment must be entered "after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient [*7] to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. In such a situation, there can be no genuine issue as to any material fact, since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." Celotex, 477 U.S. at 322. More generally, a genuine issue of fact is only present, precluding summary judgment, "when a reasonable trier of fact, viewing all the evidence, could rationally find in favor of the nonmoving party in light of the burden of proof placed on the nonmover." U.S. v. Premises Known as RR No.1 Box 224, Dalton Tp. and North Abington Tp., Lackawanna County, Pa., 14 F.3d 864, 870 (3d Cir. 1994)[citations omitted]. "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." Anderson, 477 U.S. at 248. See also Kowalski v. L&F Products, 82 F.3d 1283, 1288 (3d Cir. 1996).

While the nature of its remedy is indeed powerful, the "summary judgment procedure is properly regarded not as a disfavored procedural shortcut, [*8] but rather as an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy and inexpensive determination of every action.'" Celotex, 477 U.S. at 327 [citations omitted]. As the Third Circuit noted, "we are, after all, attempting to balance the defendants' need for protection from unfounded claims and vexatious litigation, with the plaintiff's rights to vindicate his or her constitutional guaranteed rights." Grant v. City of Pittsburgh, 98 F.3d 116, 126 (3d Cir. 1996).

IV. DISCUSSION

A. 42 U.S.C. § 1983 Standard

[HN3]Section 1983 provides for the imposition of liability on any person who, acting under color of state law, deprives another of rights, privileges, or immunities secured by the Constitution or the laws of the United States. 42 U.S.C.A. § 1983 (1996). The statute is not a source of substantive rights, but merely provides "'a method for vindicating federal rights elsewhere conferred.'" Graham v. Connor, 490 U.S. 386, 393-94, 104 L. Ed. 2d 443, 109 S. Ct. 1865 (1989) (quoting Baker v.

McCollan, 443 U.S. 137, 144 n.3, 61 L. Ed. 2d 433, 99 S. Ct. 2689 (1979)).

In conjunction with the Due Process Clause of the Fourteenth [*9] Amendment, Section 1983 allows plaintiffs to assert three kinds of federal claims: (1) claims for the deprivation by state officials of any of the specific protections defined in the Bill of Rights; (2) claims under the substantive component of the Due Process Clause that bar certain arbitrary, wrongful government actions, regardless of the fairness of the procedures used to implement them; and (3) claims under the procedural component of the Due Process Clause relating to the deprivations of life, liberty, or property without due process of law. Zinermon v. Burch, 494 U.S. 113, 108 L. Ed. 2d 100, 110 S. Ct. 975 (1990).

To state a claim under Section 1983, a plaintiff must show both that (1) the offending conduct deprived the plaintiffs of rights secured by the Constitution of the United States, and (2) that such conduct was committed by a person acting under color of state law. Parratt v. Taylor, 451 U.S. 527, 535, 68 L. Ed. 2d 420, 101 S. Ct. 1908 (1981), overruled in part on other grounds, Daniels v. Williams, 474 U.S. 327, 88 L. Ed. 2d 662, 106 S. Ct. 662 (1986). The first issue we address is whether the plaintiff has presented evidence of a deprivation of a right [*10] secured by the Constitution. See Baker, 443 U.S. at 140; Collins v. City of Harker Heights, Texas, 503 U.S. 115, 121, 117 L. Ed. 2d 261, 112 S. Ct. 1061 (1992) ("when a § 1983 claim is asserted against a municipality, [look at] : (1) whether plaintiff's harm was caused by a constitutional violation, and (2) if so, whether the city is responsible for that violation"). In the instant case, Plaintiff alleges that the Defendants acted to deprive it of equal protection and to deprive it of substantive due process. We will address each of these in turn.

B. Deprivation of Right

1. Res Judicata

Before we can reach Plaintiff's equal protection claim, we must decide the extent to which Plaintiff's claim is precluded by res judicata. Defendants did not include res judicata as an affirmative defense in their answer as is required by Fed.R.Civ.P. 8(c). [HN4]Affirmative defenses not raised at that time are usually deemed waived pursuant to Rule 8(C); however, Rule 15(a) permits a party to amend its answer at any time by leave of the court and states that "leave shall freely be given when justice so requires." In an on-the-record telephone conference with the parties on [*11] April 10, 1997, a stipulation was entered into whereby Defendants' Motion for Partial Summary Judgment on Count One was deemed as also being a Motion to

Amend Defendants' Answer to Plaintiff's Second Amended Complaint. Both Plaintiff and Defendants were given leave to address themselves more fully to this issue.

The Third Circuit has recognized that [HN5]"failure to raise an affirmative defense by responsive pleading or appropriate motion ... does not always result in waiver." Charpentier v. Godsil, 937 F.2d 859, 863 (3d Cir. 1991). Indeed, we should permit an amendment unless the opposing party will be prejudiced. Plaintiff contends prejudice because of the length of time since the answer, and the fact that discovery is closed. However, neither of these actually prejudice Plaintiff to the extent that Defendants should be precluded from amending their answer.

Certainly, the passage of time alone is insufficient to create prejudice. Adams v. Gould, Inc., 739 F.2d 858, 867 (3d Cir. 1984). In addition, due to the intense similarities between the prior suit and the instant one, Plaintiff cannot credibly claim that it is surprised by the affirmative defense, or that the defense is [*12] unexpected. Finally, the fact that discovery is closed does not greatly prejudice Plaintiff, because the amendment that Defendants seek to make presents only a legal question for which all of the relevant facts are already before the court. As such, the addition of res judicata as an affirmative defense does not require any further discovery. See Kleinknecht v. Gettysburg College, 989 F.2d 1360, 1376 (3d Cir. 1993); Brathwaite v. St. John's Episcopal Hospital, 1987 WL 25911, *2 (E.D.N.Y. Nov. 18, 1987). Therefore, we will permit Defendants to amend their answer to assert the affirmative defense of res judicata, and for purposes of the present motion will deem it to be so amended.

We now turn to the merits of the affirmative defense. [HN6]The doctrine of res judicata provides that "a subsequent suit based on the same cause of action as a prior suit that involved the same parties or their privies is barred where there has been a final judgment on the merits in the prior suit." Labelle Processing Co. v. Swarrow, 72 F.3d 308, 313 (3d Cir. 1995), (citing Board of Trustees of Trucking Employees v. Centra, 983 F.2d 495, 504 (3d Cir. 1992)). Of course, the party asserting [*13] the defense bears the burden of showing that it applies. United States v. Athlone Industries, Inc., 746 F.2d 977, 983 (3d Cir. 1984). Defendants must show that "there has been (1) a final judgment on the merits in a prior suit involving (2) the same parties or their privies and (3) a subsequent suit based on the same causes of action" has presently been filed. Arab African International Bank v. Epstein, 10 F.3d 168, 171 (3d Cir. 1993); see also A.C. Elfman & Sons, Inc. v. Clime, 355 Pa. Super. 394, 513 A.2d 488, 489 (Pa. Super. 1986).

Defendants here assert that Plaintiff's equal protection claim based on the denial of a "through-the fence" agreement is precluded because it was the subject of a prior federal suit that was dismissed with prejudice. We agree. In 1986, the Northeast Jet Company filed a complaint in this court against the Lehigh-Northampton County Airport Authority alleging, inter alia, a cause of action under Section 1983 for violation of its equal protection rights because the Authority had not granted it a "through-the-fence" agreement and had granted one to another company, ITT. Northeast Jet Company v. Lehigh-Northampton County Airport Authority, [*14] No. 86-CV-0179 (E.D. Pa. 1986). This case was dismissed with prejudice upon settlement of the parties. [HN7]"Dismissal with prejudice constitutes an adjudication of the merits as fully and completely as if the order had been entered after trial." Gambocz v. Yelencsics, 468 F.2d 837, 840 (3d Cir. 1972). Therefore, the dismissal with prejudice of the earlier suit in this case fulfills the first requirement of res judicata.

The second requirement is also satisfied, as the parties in the first and present suits are either the same or their privies. [HN8]A party is considered a privy to an action when it has a mutual interest in the same action by some relationship with a party to an action, or when its interests are represented by that party. See Lawlor v. National Screen Service Corporation, 349 U.S. 322, 329-30, 99 L. Ed. 1122, 75 S. Ct. 865 (1955). Certainly, given the closeness of the relationship between Northeast Jet Center and Northeast Jet Company, the fact that they are both controlled by the same man, and the fact that Jack Yohe and Sanford Wartell act at and for the direction of the Lehigh-Northampton Airport Authority, all of the parties involved in the instant suit can [*15] be considered either parties or privies of the first suit.

Finally, the third prong, a subsequent suit based on the same causes of action, is also satisfied. The instant suit alleges, inter alia, that Defendants violated Section 1983 by unconstitutionally discriminating against Plaintiff because Defendants refused to give Plaintiff a "through-the-fence" agreement subsequent to granting one to another company, ITT. This claim is virtually identical to the one in the original suit which was dismissed with prejudice. As such, to the extent that the instant claim of a violation of Section 1983 is based on the equal protection allegation concerning the desired 1985 "through-the-fence" agreement, that claim is barred from consideration by this court by res judicata.

2. Equal Protection Claim

To the extent that Plaintiff's equal protection claims are not barred by res judicata, we will discuss the merits of each. Plaintiff asserts that its equal protection rights were violated because the Defendants intentionally dis-

criminated against it by enforcing fixed-base operator ("FBO") standards that were both (1) not in effect and (2) not enforced against other FBOs at the airport; [*16] and by (3) not granting Plaintiff a "through-the-fence" agreement although they had granted one to another company previously. However, Plaintiff has failed to present sufficient evidence of discrimination, intentional or otherwise.

The Supreme Court has repeatedly held that [HN9]a law which is "fair on its face and impartial in its appearance may nonetheless constitute illegal discrimination between persons if it is applied and administered by public authority with an evil eye and an unequal hand." Holder v. Allentown, 987 F.2d 188, 197 (3d Cir. 1993), quoting Yick Wo v. Hopkins, 118 U.S. 356, 30 L. Ed. 220, 6 S. Ct. 1064 (1886). Even if the duty imposed by the applicable statute or standard is "mandatory," public officials engage in unconstitutional discrimination when they seek to enforce the statute in order "to prevent the exercise of a fundamental right." Holder 987 F.2d at 197, quoting United States v. Schoolcraft, 879 F.2d 64, 68 (3d Cir.), cert. denied, 493 U.S. 995, 107 L. Ed. 2d 543, 110 S. Ct. 546 (1989). In an equal protection claim of this sort, though, the plaintiff must provide evidence of intentional, or purposeful, discrimination by the defendants. [*17] Snowden v. Hughes, 321 U.S. 1, 8, 88 L. Ed. 497, 64 S. Ct. 397 (1944). Mere unequal treatment via a standard fair on its face is insufficient; there must be a showing of "clear and intentional discrimination." Id., citing Gundling v. City of Chicago, 177 U.S. 183, 186, 44 L. Ed. 725, 20 S. Ct. 633 (1900). Moreover, "to establish such intentional or purposeful discrimination, it is axiomatic that a plaintiff must [provide evidence] that similarly situated persons have been treated differently." Gagliardi v. Village of Pawling, 18 F.3d 188, 193 (2nd Cir. 1994).

Plaintiff points out that [HN10]issues of intent are generally unsuited for summary judgment because courts should not resolve any genuine issues of credibility. Coolspring Stone Supply, Inc. v. American States Life Insurance Company, 10 F.3d 144, 148 (3d Cir. 1993); Ness v. Marshall, 660 F.2d 517, 519 (3d Cir. 1981). Nevertheless, if the plaintiff is unable to make an initial evidentiary showing of intent, there is no genuine issue of credibility for the jury to sort out, and summary judgment is appropriate.

In the instant case, Plaintiff has not met even this light burden; it has instead made mere conclusory [*18] allegations without support in evidence. It alleges that Defendants enforced FBO standards against it and did not enforce them against other companies; however, there is no reference to the record or any evidence to support this argument. It alleges that Defendants gave another company, ITT, a "through-the-fence" agreement

but intentionally did not give it one; again, there is no reference to any evidence to support this. Plaintiff cannot survive at this stage solely on the statement that "there is ample evidence of animus against Center and its owner Earl Holtz by Defendants," Plaintiff's Brief at 22, without providing us with at least one example of this evidence.

Defendants, to the contrary, point us to many places in the record where an absence of an intent to discriminate is clear. They note that the lease which Plaintiff held with Defendants specifically references the applicable FBO standards; that those standards required that tenants providing FBO services have an FAA license which permitted them to do so; and that when Plaintiff turned in that license to the FAA, Defendants properly considered Plaintiff to be in breach of its lease. Defendant's Brief at 21-25 and [*19] included cites to the record therein. These actions seem eminently reasonable to us in light of the evidence which has been presented to us. There has been no evidence of the requirements within the leases of the other companies involved, or of whether there are differences or similarities therein to Plaintiff's lease that would require certain action by Defendants.

Plaintiff places a great deal of reliance on our dicta in our August 1, 1996 opinion that there is no mention of a Part 145 certificate in the lease or the applicable standards; however, this reliance is misplaced. Upon further review of the lease and standards, we find that fourth requirement under "Aircraft Maintenance" on page 10 of the FBO minimum standards incorporated into the lease states that, "The Fixed Base Operator must be able to obtain from the F.A.A. a license to operate a Class One and Three repair station." This statement, as Defendants point out, is a direct reference to a Part 145 certificate, and was relied upon by them in finding the plaintiff to be in breach of its lease.

Defendants also provide evidence to contradict Plaintiff's bare allegations regarding the "through-the-fence" agreement. [1] They [*20] state that they had provided anther company, ITT, with such an agreement in 1984; however, the FAA subsequently informed them that it did not approve of these agreements, it did not want Defendants to grant any more, and it then provided Defendants with a copy of its new policy "Minimum Compliance Standards for Through-the-Fence Operations" in July 1985. Therefore, Defendants declined to provide such an agreement with Plaintiff in 1985 not out of a desire to discriminate, but solely to acquiesce to a recent FAA mandate. Defendants Brief at 26-27 and included cites to the record therein. Plaintiff has provided us with absolutely no evidence to rebut this. As such, its claim cannot survive.

1   Although we have decided that this claim is barred by *res judicata*, above, we will discuss the issue for clarity.

2. Substantive Due Process

Plaintiff also bases its Section 1983 claim on an allegation of a violation of substantive due process. Plaintiff argues that Defendants, under color of state law, intentionally [*21] acted to deprive it of property rights protected by the Constitution. Specifically, it claims that Defendants forced Plaintiff into financial despair, destroyed Plaintiff's FBO business, and forced Plaintiff to leave the Lehigh Valley International Airport through defamation and intentional interference with potential business relations. Defendants' Brief, Exhibit A at 1. Regardless of the extent to which Plaintiff makes a state cause of action, it has not provided us with any evidence of a constitutional violation.

[HN11]The Due Process Clause of the Fourteenth Amendment declares that no state shall deprive any person of life, liberty, or property, without due process of law. The clause has a substantive component that bars "certain government actions regardless of the fairness of the procedures used to implement them." Planned Parenthood v. Casey, 505 U.S. 833, 846, 120 L. Ed. 2d 674, 112 S. Ct. 2791 (1992) (quoting Daniels v. Williams, 474 U.S. 327, 331, 88 L. Ed. 2d 662, 106 S. Ct. 662 (1986)). Thus, where public officials "invoke administrative processes with an illicit purpose, they are violating substantive due process." Grant v. City of Pittsburgh, 98 F.3d 116, 125 [*22] (3d Cir. 1996). In order to succeed on a substantive due process claim, Plaintiff "must prove that the governmental authority acted to infringe a property interest encompassed by the Fourteenth Amendment." DeBlasio v. Zoning Board of Adjustment for the Township of West Amwell, 53 F.3d 592, 600 (3d Cir.) [citations omitted], cert. denied, 133 L. Ed. 2d 247, U.S. , 116 S. Ct. 352 (1995).

The first question, whether a basic property interest has been alleged and supported with evidence, is a question of state law. Acierno v. Cloutier, 40 F.3d 597, 616 (3d Cir. 1994). However, "under the law of this circuit, 'not all property interests worthy of procedural due process protections are protected by the concept of substantive due process.'" Homar v. Gilbert, 89 F.3d 1009, 1021 (3d Cir. 1996) (quoting Reich v. Beharry, 883 F.2d 239, 244 (3d Cir. 1989)), cert. granted, U.S. , 117 S. Ct. 678 (U.S. Jan. 3, 1997) (No. 96-651). Therefore, plaintiff must instead have been deprived of "'a certain quality of property interest.'" Homar, 89 F.3d at 1021 (quoting DeBlasio, 53 F.3d at 600). This is because, [HN12]"substantive due process protects [*23] fundamental interests, not state-created contract rights." Charles v. Baesler, 910 F.2d 1349, 1353 (6th Cir. 1990)

Indeed, what constitutes a property interest for the purposes of procedural due process might not so constitute for the purposes of substantive due process, because "property rights for procedural due process purposes are created by state law, [and] substantive due process rights are created by the Constitution." DeBlasio, 53 F.3d at 599. The Supreme court has held that where claims are more analogous to state-law tort claims, substantive due process is usually not implicated. Collins v. City of Harker Heights, Texas, 503 U.S. 115, 128, 117 L. Ed. 2d 261, 112 S. Ct. 1061 (1992).

The second question to be considered is whether, in the context of a governmental deprivation, the government authority "deliberately and arbitrarily abused its power." Independent Enterprises Inc. v. Pittsburgh Water and Sewer Authority, 103 F.3d 1165, 1179 (3d Cir. 1997) (citing Midnight Sessions, Ltd. v. City of Philadelphia, 945 F.2d 667, 683 (3d Cir. 1991), cert. denied, 503 U.S. 984, 118 L. Ed. 2d 389, 112 S. Ct. 1668 (1992)); see also Rogers v. Bucks County Domestic [*24] Relations Section, 959 F.2d 1268, 1277 (3d Cir. 1992) [HN13]("the fundamental question underlying a substantive due process claim is whether a statute or regulation irrationally or arbitrarily deprives an individual of an established right"). [2] This abuse occurs where actions are taken that are intentional or "motivated by bias, bad faith, or partisan or personal motives unrelated to the merits of the matter before it." Id.

2   While Defendants contend that the appropriate standard is that the government action "shocks the conscience" per Fagan v. City of Vineland, 22 F.3d 1296, 1303 (3d Cir. 1994), this is incorrect. The Third Circuit has suggested, albeit not very clearly, that this standard is used only in police pursuit cases, or where there is a state created danger. See, Evans v. Avery, 100 F.3d 1033, 1037 (3d Cir. 1996), petition for cert. filed, 65 U.S.L.W. 3611 (U.S. Feb. 28, 1997) (No. 96-1390); Kneipp v. Tedder, 95 F.3d 1199, 1207 (3d Cir. 1996); Mark v. Borough of Hatboro, 51 F.3d 1137, 1153 n.13 (3d Cir. 1995), cert. denied, U.S. , 116 S. Ct. 165, 133 L. Ed. 2d 107 (1995). We note, though, that Defendants' actions are not only not arbitrary, they do not "shock the conscience."

[*25] Plaintiff frames its claim by saying that Defendants "undertook an intentional course of conduct designed to destroy plaintiff's FBO business, undermine the value of plaintiff's assets, force plaintiff off of the ABE Airport, and acquire plaintiff's hangar and business for less than it was worth." Defendants' Brief, Exhibit A at 1. Certainly, "ownership is a property interest worthy of substantive due process protection." DeBlasio, 53 F.3d

at 600. However, a closer examination of Plaintiff's claim demonstrates that it boils down to a claim of defamation (lost reputation), loss of the backing of a bank, and loss of a potential contract with another company, Union Pacific. Therefore, despite the ultimate result, Plaintiff has demonstrated no evidence that supports a tangible property interest protected by the Fourteenth Amendment.

In Paul v. Davis, 424 U.S. 693, 701, 47 L. Ed. 2d 405, 96 S. Ct. 1155 (1976), the Supreme Court held that [HN14]injury to reputation is not a liberty or property interest protected by the due process clause of the Fourteenth Amendment. To state a claim for defamation under Section 1983, "a plaintiff must allege loss of a recognizable property or liberty [*26] interest in conjunction with the allegation of injury to reputation." Cooper v. Dupnik, 924 F.2d 1520, 1532 (9th Cir. 1991). This has been called the "stigma-plus" or "defamation-plus" test. To meet the "plus", the plaintiff must demonstrate that the defamation caused the denial of a federally protected right, or that the defamation occurred in connection with a federally protected right. Business losses and public scorn have been held to not meet the "plus" requirements, because such consequences would not usually be the direct result of any affirmative conduct by the parties making the defamation. Id.; Buckley v. County of Los Angeles, 957 F.2d 652, 655 (9th Cir. 1992); Green v. DeCamp, 612 F.2d 368, 371 (8th Cir. 1980).

In the instant case, Plaintiff has not brought forth any evidence which connects the alleged defamation with any specific property or liberty interest protected by the Fourteenth Amendment. Plaintiff appears to assert that merely because this court found that Plaintiff had sufficiently pled a Section 1983 action following Defendants' Motion to Dismiss, we should consequently find, without more, that the claim withstands summary judgment. This is a gross [*27] misstatement of summary judgment law, as discussed above; Plaintiff cannot avert summary judgment by simple denials, and must at the very least produce sufficient evidence to support each element of its claim. Our earlier memorandum on Defendants' First Motion for Summary Judgment also does not provide Plaintiff with the support it seeks; we ruled only that the issues of equal protection and substantive due process had not adequately been briefed and thus the motion would be denied pending further briefing Northeast Jet Center, 1996 WL 442784 at *7.

Plaintiff also argues without evidentiary support that the "plus" part of their defamation can be found in the loss of prospective business relationships. Plaintiff's Brief at 29. However, we do not believe there is any support for the proposition that there is a constitutionally protected property interest in potential business. As the Ninth Circuit held in Cooper, business loss generally does not create the "plus" needed to turn defamation into a Section 1983 violation. Cooper, 924 F.2d at 1534. Plaintiff's reliance on DeBlasio, 53 F.3d 592 (3d Cir. 1995), is misplaced, as the statement regarding potential property [*28] interests came in dicta in the context of a procedural due process claim, not substantive due process. Plaintiff's reference to Petrone v. City of Reading, 541 F. Supp. 735 (E.D.Pa. 1982), in a footnote is similarly unavailing. That case, which is not controlling to us, held that the plaintiff had satisfied the "plus" requirement by asserting a direct loss of his business and his employment, not a loss of potential business relationships. Despite the interest that tort and contract law has in preserving business relationships, this is not a property interest worthy of constitutional protection. See Charles v. Baesler, 910 F.2d 1349, 1354 (6th Cir. 1990) (citing Regents of the University of Michigan v. Ewing, 474 U.S. 214, 229-30, 88 L. Ed. 2d 523, 106 S. Ct. 507 (1985)(Powell, J., concurring)); Reich v. Beharry, 883 F.2d 239, 243-44 (3d Cir. 1989). Simply, Plaintiff has not provided us with any evidence that would create a genuine issue as to the existence of a property or liberty interest protected by the Fourteenth Amendment. [3]

> 3 Nor does Plaintiff have the required level of property interest in the loss of potential business, relationships in and of themselves. Because actions which may state a claim in tort do not necessarily rise to the level of Constitutional protection, Plaintiff's must produce evidence of something more. Baker v. McCollan, 443 U.S. 137, 146, 61 L. Ed. 2d 433, 99 S. Ct. 2689 (1979). They have not done so, and thus have not met their very limited burden in this regard.

[*29] Even assuming a property interest, Plaintiff has not offered any evidence that Defendants "deliberately and arbitrarily" abused their power. Plaintiff argues rather summarily, and without reference to the record, that because there is no reference to a Part 145 license in the lease or the FBO standards, Defendants acted arbitrarily by finding Plaintiff in breach of its lease in October 1988. Further, Plaintiff states that Defendants acted arbitrarily by refusing to release Plaintiff from its breach of lease following the reissuance of its Part 145 license from the FAA in February of 1989 and instead waiting to do so until May, 1989. Finally Plaintiff states, without more, that "Defendants embarked upon a year-long campaign to undermine [Plaintiff's] business and drive it off the Airport." Plaintiff's Brief at 32.

None of these statements create a genuine issue of material fact in light of the evidence currently before the court. Rather, it is apparent that, as we noted above, the standards incorporated into the lease do require that Plaintiff, if acting as an FBO, to obtain the appropriate

FAA license. When Plaintiff voluntarily forfeited its license to the FAA, it was in breach [*30] of that lease, and it was far from arbitrary for the Defendants to so inform Plaintiff. The "consultant's opinion" to which Plaintiff refers does state that Plaintiff was not in breach of its lease when its sister company lost its Part 135 operating license following a plane crash; however, the opinion does not discuss the issue of whether the loss of a Part 145 license would create a breach and is therefore irrelevant. The lease additionally required Defendants to inform those holding a first mortgage lien on Plaintiff's leasehold of any breach. Defendant's Brief for Summary Judgment, January 22, 1996, Exhibit C at III D.1. Therefore, the notice provided to Plaintiff's bank was not done by arbitrary or bad faith decisions. As for the delay in the release of the breach, Plaintiff offers no evidence to contradict the testimony and evidence offered by Defendants that the sole reason Defendants did not declare Plaintiff to have repaired its breach as early as February, 1989 was that they were awaiting the final report from their consultants, Airport Corporation; when they received a report stating the conclusion that Plaintiff was in compliance with the lease on April 22, 1989, [*31] Defendants placed it on the agenda for the next board meeting in May. See Plaintiff's Brief, Exhibit 11 at 1740. Finally, despite the plethora of exhibits attached to Plaintiff's brief, Plaintiff makes no reference to any evidence therein which would create a genuine issue as to the arbitrariness or inappropriate nature of Defendants' actions regarding Union Pacific. It is clear to us that Defendants acted carefully and reasonably in the context of the situation, and in the absence of evidence to the contrary, summary judgment is appropriate.

**C. Under Color of State Law**

To set forth a claim under Section 1983, the plaintiff must not only show that it has been intentionally and arbitrarily deprived of a constitutionally protected right, but must also demonstrate that the person who deprived him of this right did so under the color of state law. We have found that Plaintiff has not been so deprived of a right protected by the Constitution, above; however, we will discuss the matter further for clarity.

1. Official Custom or Policy

It is well established that respondeat superior is not a basis for municipal liability under § 1983; however, municipalities may be directly [*32] liable under § 1983 for acts implementing a policy, practice, or custom which deprive a person of constitutional rights. Colburn v. Upper Darby Township, 946 F.2d 1017, 1027 (3d Cir. 1991); Monell v. City of New York Dep't of Social Services, 436 U.S. 658, 691-95, 56 L. Ed. 2d 611, 98 S. Ct. 2018 (1978). There are two predicates to direct municipal liability under section 1983: (1) identification of the

relevant policymakers and (2) evidence that the policymakers' decisions caused the deprivation of rights at issue by policies which affirmatively commanded that such deprivation occur or by acquiescence in a long-standing practice or custom which constituted the "standard operating procedure'" of the local government entity. Simmons v. Philadelphia, 947 F.2d 1042, 1062 (3d Cir. 1991). cert. denied, 503 U.S. 985, 118 L. Ed. 2d 391, 112 S. Ct. 1671 (1992); Bielevicz v. Dubinon, 915 F.2d 845, 850 (3d Cir. 1990). Execution of the government's policy or custom must inflict the injury Simmons, 947 F.2d at 1059 (citing Monell, 436 U.S. at 694).

To show the first prong, the plaintiff must show that an official who has the final power to make policy is responsible [*33] for the particular course of action which caused the deprivation at issue. Bielevicz, 915 F.2d at 850. That is, "scienter-type evidence must have been adduced with respect to a high-level official determined ... in accordance with local law, to have final policymaking authority in the areas in question." Simmons, 947 F.2d at 1063. The Supreme Court has held that to be an "authorized decision maker," that official must be vested with full policy making authority; it is not enough that the official have discretionary authority to make a decision if that decision can be overturned by another who has the final authority to make policy that binds the municipality. Pembaur v. City of Cincinnati, 475 U.S. 469, 481, 89 L. Ed. 2d 452, 106 S. Ct. 1292 (1986); Bielevicz, 915 F.2d at 850 (the official must have "final, unreviewable discretion to make a decision or take an action"). Indeed, municipal liability attaches "where -- and only where -- a deliberate choice to follow a course of action is made from among various alternatives by the official or officials responsible for establishing final policy with respect to the subject matter in question. Pembaur, 475 U.S. at 483-84 [*34] Whether an individual or group is a policymaker for purposes of Section 1983 is a question of state law. Pembaur, 475 U.S. at 483.

In the case at bar, it is clear that the Board of Governors for the Airport Authority is the group responsible for establishing final airport policy. See Pa. Stat. Ann. tit. 53, § 309(A) (1996) ("Governing Body"). See also Jett v. Dallas Independent School District, 7 F.3d 1241, 1245-6 (5th Cir. 1994) (holding that pursuant to relevant municipal code, neither Superintendent nor Principal had final authority because the code vested such authority in the district's board of trustees) Neither Defendant Yohe nor Defendant Wartell have the final discretion required for their actions to bind the Authority, and Plaintiff has not demonstrated any evidence to the contrary

The second prong can be satisfied in a variety of ways. Certainly, the existence of a policy or custom authorizing the conduct is sufficient. A "policy" is a

"statement, ordinance, regulation, or decision officially adopted and promulgated by [the municipality's] officers." Simmons, 947 F.2d at 1059 (quoting Monell, 436 U.S. at 690). It is also made when "a decisionmaker [*35] possessing final authority to establish municipal policy with respect to the action issues an official proclamation, policy, or edict." Bielevicz, 915 F.2d at 850. A "custom" lacks formal approval but is a given course of conduct that is so well settled and permanent that it has the force of law. Monell, 436 U.S. at 651. In addition, the Supreme Court has held that the second prong can be satisfied for "a single decision by municipal policymakers under appropriate circumstances." Pembaur, 475 U.S. at 480.

Plaintiff points to the decision to find it in breach of its lease, the FBO standards, and the "through-the-fence" policy as policies approved and authorized by the Board of Governors. However, these examples disguise what appears to be Plaintiff's true argument: that Defendants "undertook an intentional course of conduct designed to destroy plaintiff's FBO business." Defendants Brief, Exhibit A at 1. Plaintiff is really contending that Defendants made specific decisions to destroy its business and force it off the Airport, but has produced no evidence to the effect that the Board of Governors either affirmatively approved such decisions or were deliberately indifferent [*36] to them. Moreover, even if Plaintiff could demonstrate that Defendants Yohe and Wartell had the requisite position of final authority, it has pointed us to no evidence that would support the conclusion that Defendants had made any decisions or actions to ruin Plaintiff's business or force it to leave the Airport.

2. Qualified Immunity

To the extent that it is necessary to discuss the qualified immunity of Defendants Yohe and Wartell, given the above, we find that they are so protected. The Supreme Court established the standard for a grant of qualified immunity in Harlow v. Fitzgerald, 457 U.S. 800, 73 L. Ed. 2d 396, 102 S. Ct. 2727 (1982). The Court stated that [HN15]"government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow, 457 U.S. at 818. In order to apply this test, the Court concluded that on summary judgment, the trial judge must determine "whether the law was clearly established at the time the action occurred." Id.

The Third Circuit expanded on this, saying [*37] that, "the right an official is alleged to have violated must have been 'clearly established' in a 'particularized' sense. That is, the contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." Abdul-Akbar v. Watson, 4 F.3d 195, 202 (3d Cir. 1993) (citing Anderson v. Creighton, 483 U.S. 635, 640, 97 L. Ed. 2d 523, 107 S. Ct. 3034 (1987) (holding that the question revolves around whether the official would know that his specific conduct was violate a clearly established right). Indeed, qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law." Malley v. Briggs, 475 U.S. 335, 341, 89 L. Ed. 2d 271, 106 S. Ct. 1092 (1986). We note that the Third Circuit has also delineated the tension between the Supreme Court's instruction that qualified immunity be determined preferably at the summary judgment stage, and the need to carefully examine the specific conduct of the defendants. Grant v. City of Pittsburgh, 98 F.3d 116, 122 (3d Cir. 1996).

In the instant case, we have reviewed the conduct of the Defendants in detail, and it is plain that Defendants Yohe [*38] and Wartell were neither incompetent nor knowingly violating the law. As we discussed more fully, above, express provisions in the lease warranted the notice of default, and FAA policy required the denial of the 'through-the-fence' agreement. Moreover, there has been no evidence that Defendants were acting to violate any law when they negotiated with Union Pacific, or issued a statement that the Airport did not have a satisfactory FBO operator. Rather, the evidence suggests legitimate reasons for Defendants actions such that qualified immunity for Mr. Yohe and Mr. Wartell is appropriate.

D. Proximate Cause

Finally, Plaintiff has also failed to produce evidence which demonstrates a genuine issue [HN16] with regard to the final element of a Section 1983 claim, that the alleged unlawful policy or custom was the proximate cause of the injuries suffered. To do so, "a plaintiff must demonstrate a 'plausible nexus' or 'affirmative link' between the municipality's custom and the specific deprivation of constitutional rights at issue." Bielevicz, 915 F.2d at 850 (citing City of Oklahoma City v. Tuttle, 471 U.S. 808, 823, 85 L. Ed. 2d 791, 105 S. Ct. 2427 (1985)). The question of proximate [*39] cause is generally a question for the fact-finder; however, if the causal link is so tenuous or without evidence as to be implausible, it may be decided at summary judgment. Bielevicz, 915 F.2d at 851.

In the instant case, Plaintiff attempts to combat a very tenuous causal link with blanket, conclusory statements and no reference to the record. The evidence demonstrates that as a result of a 1988 plane crash and FAA investigation, Plaintiff's sister company was required to turn in its Part 135 (flying) certificate. The ensuing business loss greatly affected Plaintiff's ability to provide FBO services, and consequently it turned in its Part 145

(FBO) certificate to the FAA. This put Plaintiff in breach of its lease, and caused Union Pacific, a potential business partner, a great deal of concern about the viability of any co-projects. This court therefore sees little causal connection between any of Defendants' actions and Plaintiffs loss of business. As such, Plaintiff has failed to create any genuine issues of material fact relating to its Section 1983 claims, and summary judgment for the Defendants is appropriate at this time.

## V. CONCLUSION

For the foregoing reasons, we will [*40] grant Defendants' Motion for Partial Summary Judgment on Count One.

The two remaining counts, defamation and interference with a prospective contractual relationship, are state counts. There is no diversity in this action, and we decline to retain supplemental jurisdiction now that all of the federal claims have been eliminated.

An appropriate order follows.

## ORDER

AND NOW, this 5th day of May, 1997, upon consideration of Defendants' Motion for Partial Summary

Judgment on Count One, filed February 19, 1997 and which we previously deemed to also be a Motion to Amend Answer, Plaintiff's Opposition to Defendants' Motion, filed March 21, 1997, Defendants' response thereto, filed April 16, 1997, Plaintiff's Opposition to Defendants' Motion to Amend Answer, filed April 17, 1997, and Defendants' response thereto, filed April 21, 1997, it is hereby ORDERED, consistent with the foregoing memorandum, that:

1. Defendants' Motion to Amend Answer is GRANTED;

2. Defendants' Motion for Partial Summary Judgment on Count One is GRANTED;

3. This court no longer has jurisdiction over the remaining two state claims, and therefore this case is DISMISSED without prejudice to Plaintiffs' ability [*41] to bring those claims in the appropriate state court. We express no opinion as to the merits of those claims; and

4. This case is CLOSED.

BY THE COURT

Franklin S. Van Antwerpen

United States District Court

# EXHIBIT B

**Citation #2**
**1992 us dist lexis 9042**

LEXSEE



Analysis
As of: Jul 10, 2007

QUEEN CITY AVIATION, INC., Plaintiff v. CITY OF ALLENTOWN, et al., Defendant

CIVIL ACTION No. 91-7776

UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF
PENNSYLVANIA

1992 U.S. Dist. LEXIS 9042

June 5, 1992, Decided
June 8, 1992, Filed

CASE SUMMARY:

PROCEDURAL POSTURE: When plaintiff former fixed based operator filed a three-count complaint against defendants, a city and its officials, alleging that they violated its civil rights under 42 U.S.C.S. §§ 1983, 1985, and certain of the antitrust laws, including the Sherman Act, 15 U.S.C.S. §§ 1, 2, the city and its officials filed a motion to dismiss.

OVERVIEW: The plaintiff filed a three-count complaint against the defendants, alleging that they violated its civil rights and certain of the antitrust laws. The claims arose out of the invitation to bid procedures used by the defendants and, ultimately, their award of the exclusive rights to service and operate an airport to another fixed based operator. The court held the following: (1) the complaint was to be dismissed pursuant to Fed. R. Civ. P. 12(b)(6) for failure to state a claim for which relief could be granted; (2) the civil rights claims were nothing more than an attempt to federalize a routine dispute with local officials over municipal planning or procedures; (3) the complaint did not plead certain details of an antitrust claim, such as the appropriate product and geographic markets and the effects upon interstate commerce, nor did the plaintiff tell the court whether its claim proceeded on a per se or rule of reason theory; and (4) more detrimental to the plaintiff's complaint was that the circumstances that the plaintiff alleged simply did not rise to the level of a violation of the Sherman Act §§ 1 and 2, 15 U.S.C.S. §§ 1, 2.

OUTCOME: The court granted the motion to dismiss.

CORE TERMS: airport, lease, bidding, antitrust claim, civil rights, bid, equal protection, discriminatory, conspiracy, dealer, competitor, Sherman Act, state law, local governments, disappointment, manufacturer, negotiations, distributor's, monopolize, municipal, antitrust, animus, unfair, Antitrust Act, antitrust laws, exclusive rights, state action, business entity, new lease, protected class

LexisNexis(R) Headnotes

Civil Procedure > Pleading & Practice > Defenses, Demurrers, & Objections > Motions to Dismiss
Civil Procedure > Pleading & Practice > Pleadings > Heightened Pleading Requirements > General Overview
Civil Procedure > Pleading & Practice > Pleadings > Rule Application & Interpretation
[HN1]The Court, when faced with a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6) must accept as true all the averments in plaintiff's well pleaded complaint; the court must construe the complaint in a light most favorable to plaintiff; and the court must determine whether, under any reasonable reading of the pleadings, the plaintiff may be entitled to relief. The pleading requirements that a civil rights complaint must meet to survive a motion to dismiss, however, are heightened:

the complaint is sufficient if, e.g., it alleges specific conduct which violates plaintiff's rights, the time and place of the conduct, and identifies the responsible officials.

*Civil Rights Law > Section 1983 Actions > Scope*
*Evidence > Procedural Considerations > Burdens of*
*Proof > General Overview*

[HN2]Regarding 42 U.S.C.S. § 1983 claims, a plaintiff needs to show (1) that a defendant acted under color of law and (2) that the defendant deprived the plaintiff of its constitutionally protected rights.

*Antitrust & Trade Law > Monopolization > Conspiracy*
*to Monopolize > Sherman Act*
*Criminal Law & Procedure > Criminal Offenses > Inchoate Crimes > Conspiracy > Elements*
*Evidence > Procedural Considerations > Burdens of*
*Proof > General Overview*

[HN3]To recover on an antitrust claim under the Sherman Act, 15 U.S.C.S. § 1, 2, a plaintiff would need to prove (1) that the defendants contracted, combined or conspired among each other; (2) that the combination or conspiracy produced adverse, anti-competitive effects within the relevant product and geographic markets; (3) that the objects of and the conduct pursuant to that contract or conspiracy were illegal; and (4) that the plaintiff was injured as a proximate result of that conspiracy.

**COUNSEL:** [*1]    For the Plaintiff: GARY C. BENDER, CRAMP, D'IORIO, MC CONCHIE & FORBES, P.C., 215 N. OLIVE STREET, P.O. BOX 568, MEDIA, PA 19063, USA.

For the Defendants: CHARLES J. FONZONE, FONZONE & ASHLEY, 33 SOUTH SEVENTH STREET, P.O. BOX 4180, ALLENTOWN, PA 18105-4180, USA.

**JUDGES:** TROUTMAN

**OPINION BY:** E. MAC TROUTMAN

**OPINION**

*MEMORANDUM*

Plaintiff, the former Fixed Based Operator ("FBO") at the Queen City Municipal Airport ("airport"), Allentown, Pennsylvania, filed a three count complaint against the City of Allentown and various city officials alleging that defendants violated its civil rights and certain of the antitrust laws. These claims arise out of the invitation to bid procedures used by the defendants and, ultimately, their award of the exclusive rights to service and operate the airport to another FBO. Defendants have filed a mo-

tion to dismiss. Since we agree with defendants that the complaint should be dismissed pursuant to Fed.R.Civ.P. 12(b)(6), but for reasons that differ somewhat from those articulated by defendants, we will grant the motion to dismiss.

*I. BACKGROUND*

The facts, as alleged in plaintiff's complaint are as follows. The City of Allentown is a municipal corporation subject [*2] to the laws of Pennsylvania and the individual defendants are employees or elected officials of the City of Allentown. The City of Allentown obtained control of the Queen City Airport by a quitclaim deed granted by the United States in 1948.

Plaintiff was the FBO at the airport from 1981 under the terms of a ten year lease granted by the City of Allentown. The lease expired in May 1991 and continued on a month to month basis thereafter until the City of Allentown terminated the lease in February 1992. Plaintiff's sole operations were those at the airport and included air charter and taxi service, fuel sales, hanger and tie down leases, office space leasing, aircraft maintenance, sale of supplies, flight school and instruction training, aircraft rental, ground handling and customer services, snow removal, and grounds maintenance.

In June 1991, the defendants made public a proposal package for Request for Proposals to lease the airport to a full service FBO. The bids were to be received by October 10, 1991. Plaintiff and Cole Aviation submitted the only bids to be a full service FBO at the airport. In a letter dated November 27, 1991, plaintiff was informed that, pursuant to [*3] the Request for Proposals, the City of Allentown had selected a competitor, Cole Aviation, to be the FBO at the airport. Plaintiff was informed that its lease would be terminated on February 1, 1992, and that Cole Aviation would become the FBO on that date.

In counts I and II, plaintiff asserts claims pursuant to 42 U.S.C. § 1983 and 1985 against all the defendants for violating its civil rights. Plaintiff alleges in count I that the individual defendants were members of a selection committee chosen to represent the City of Allentown, and thus acted under color of state law, when they issued the Request for Proposals and selected Cole Aviation. The bid specifications and procedures, the plaintiff claims, were inconsistent, ambiguous, vague and contrary to law for a variety of reasons. Plaintiff also asserts that the selection of Cole Aviation was arbitrary, capricious, an abuse of discretion, contrary to law, and discriminatory for a variety of reasons. Plaintiff's complaint further alleges that the City of Allentown has exhibited an animus toward the plaintiff and has acted in an unfair and discriminatory manner. Thus, plaintiff concludes, the actions of the defendants amount [*4] to a taking of its property without due process or notice in violation of

the 5th and 14th Amendments and in violation of the equal protection of law, as well as a conspiracy to deprive plaintiff of its business and property. Count II alleges that the actions of the individual defendants constituted an official policy and decision of the City of Allentown.

Count III asserts an antitrust claim against the City of Allentown, and alleges in support thereof and in addition to the above described events, that plaintiff requested on numerous occasions to enter into lease negotiations with the City of Allentown regarding the airport and that the City of Allentown refused to enter into such negotiations. Plaintiff concludes that the refusal to negotiate a new lease with plaintiff and, instead, entering into a lease with Cole Aviation pursuant to the public bidding, is a restraint of trade prohibited by section 1 of the Sherman Act, 15 U.S.C. § 1. Plaintiff also claims that the City of Allentown and Cole Aviation have conspired to monopolize services at the airport in violation of section 2 of the Sherman Act, 15 U.S.C. § 2. Plaintiff, therefore, requests the Court to enjoin Cole Aviation [*5] and the City of Allentown from entering into a lease pursuant to the Request for Proposal.

## II. STANDARDS FOR A MOTION TO DISMISS PURSUANT TO RULE 12(b)(6).

[HN1]The Court, when faced with a motion to dismiss pursuant to Fed.R.Civ.P. 12(b)(6) must accept as true all the averments in plaintiff's well pleaded complaint; the court must construe the complaint in a light most favorable to plaintiff; and the court must determine whether, "under any reasonable reading of the pleadings, the plaintiff may be entitled to relief." Colburn v. Upper Darby Township, 838 F.2d 663, 665-666 (3rd Cir. 1988). The pleading requirements that a civil rights complaint must meet to survive a motion to dismiss, however, are heightened: the complaint is sufficient if, e.g., it alleges specific conduct which violates plaintiff's rights, the time and place of the conduct, and identifies the responsible officials. Id. at 666.

## III. DISCUSSION.

Like the complaint in Dunn & Mavis, Inc. v. Nu-Car Driveaway, Inc., 691 F.2d 241 (6th Cir. 1982) (an antitrust action, discussed infra), plaintiff's complaint is nothing more than the expression [*6] of its disappointment that city officials, after inviting bids, decided to offer its franchise, its grant of an exclusive lease, to someone else. The Civil Rights laws were never intended to establish liability under the current circumstances. We find that plaintiff's civil rights claims are nothing more than an attempt to federalize a routine dispute with local officials over municipal planning or procedures, i.e., bidding practices.

Further, and more specifically, plaintiff's section 1985 claim fails to show that it is a member of any protected class. Though paragraph 18 of the complaint states that the City of Allentown has exhibited an animus toward the plaintiff and has acted in an unfair and discriminatory manner, plaintiff has failed to state a claim under section 1985(3), the only subpart of section 1985 within which plaintiff could possibly and reasonably fall, [1] as it has showed no immutable characteristic, membership in a protected class, or any class based discriminatory animus. See, United Brotherhood of Carpenters and Joiners of America, Local 610 v. Scott, 463 U.S. 825, 103 S. Ct. 3352, 77 L.Ed.2d 1049 (1983); [*7] Burt v. Ferrese, 871 F.2d 14 (3rd Cir. 1989).

> [1] Once again the court is faced with a complaint brought by a frustrated business entity, represented by counsel, alleging broad and sweeping civil rights violations yet fails to identify with any particularity which subpart of section 1985 was supposedly violated, thus leaving the court to determine which of the three differing parts is to apply.

[HN2]Regarding the section 1983 claims, plaintiff needs to show (1) that defendants acted under color of law and (2) that they deprived it of its constitutionally protected rights. Plaintiff's complaint meets the first requirement. As to the second requirement, however, we cannot discern from the complaint what constitutionally protected rights have been violated.

While plaintiff alleges that the defendants violated its constitutional rights to equal protection and due process, [2] which are protectable rights, the allegations of plaintiff's complaint do not rise to a constitutional violation. The only fact [*8] that could possibly, yet remotely, give rise to an equal protection claim is the allegation that "the City of Allentown improperly made contact with Cole Aviation after the bid proposals were submitted; . . . ." (Complaint at P16(f)). Presumably, plaintiff is concluding that this lead to an unfair advantage for Cole Aviation and thus implicated plaintiff's interest in equal protection. There is no support offered for why it was improper in constitutional proportions, or that it in fact could reasonably be construed to implicate constitutional equal protection.

> [2] Once again the court is faced with a complaint brought by a frustrated business entity, represented by counsel, alleging broad and sweeping violations of due process without specifying what aspect of its due process rights, procedural or substantive, was violated, thus leaving the court to determine which the plaintiff believes is implicated. In this case, we find that we need not

make such a determination. For example, plaintiff has not pleaded that it never received notice of the Request for Proposals, or that it had a vested property interest in a lease beyond the ten year term, or that the bidding procedures violated some local ordinance or Pennsylvania law or that it is foreclosed from pursuing a claim that the bidding procedures violated some local ordinance or Pennsylvania law in the courts or other forums provided by the state and local governments.

[*9] In addition, from the complaint, it appears that plaintiff merely had a lease for a certain term, which expired, and thereafter the lease was month to month. We know of no requirement that the City of Allentown, as the landlord of the airport, must even consider entering into a new lease with plaintiff, or that it structure the Request for Proposals in a manner acceptable to or approved by plaintiff. Plaintiff's complaint or its brief in opposition to the motion has not brought any such requirement to our attention. Absent that, there is no constitutional interest violated by the City of Allentown's decision to seek bids from competing companies and to chose one of plaintiff's competitors.

At best, plaintiff has alleged that it does not agree with the procedures employed by the defendants, that the Request for Proposal did not require, it seems, enough information, and that, in plaintiff's estimation, Cole Aviation is not as qualified as it to be the FBO at the airport. Plaintiff's complaint, read in its entirety, simply airs its disappointment that it is no longer the exclusive FBO at the airport. [3]

> 3   A reading of plaintiff's complaint gives the impression that it is proper for the City of Allentown to convey it the right to be the exclusive FBO at the airport, but not anyone else; that it is proper to convey these exclusive rights through private, non-competitive negotiations, but not through a public bidding process. Plaintiff's complaint, in short, leaves the impression that it is proper for the City of Allentown to disregard the public interest in competitive bidding and in open and public government, so long as it is treated specially. The fact that the bidding process may not have been perfect, which is plaintiff's basic claim, is not by itself a constitutional violation and is a matter best pursued at the state or local level. *See* note 6, *infra*.

[*10] Defendants have argued that such a civil rights action against them is barred by the Federal Aviation Act, 49 U.S.C. § 1300 *et seq*., citing *Montauk-Caribbean Airways, Inc. v. Hope*, 784 F.2d 91 (2nd Cir. 1986). Because we conclude, as discussed above, that plaintiff has failed to state a civil rights claim against the

defendants, we do not need to reach and, so, do not address, the issue regarding whether the claims are barred.

Plaintiff's final count is an antitrust claim. This sort of claim, when made in circumstances similar to those currently before us, was characterized in *Dunn & Mavis, Inc. v. Nu-Car Driveaway, Inc.*, 691 F.2d 241 (6th Cir. 1982): [4]

> The complaint states no set of facts which, if true, would constitute an antitrust offense, notwithstanding its conclusory language regarding the elimination of competition and improper purpose. When stripped to its essential allegations, the complaint does no more than state plaintiffs' commercial disappointment at losing Chrysler's patronage - the recurrent case of the jilted customer, dealer or supplier who loses a manufacturer's franchise and accuses the manufacturer and the [*11] new suitor of attempting to monopolize something. *See Burdett v. Altec Corp.*, 515 F.2d 1245, 1249 (5th Cir. 1975). [footnote omitted] An agreement promising a new dealer the old dealer's business is presumptively reasonable, and the old dealer does not have an antitrust claim unless the conduct is incident to an unlawful arrangement or an attempt to monopolize an identifiable market. A contrary rule limiting a buyer's right to displace an old seller in favor of a new one would undermine the principle of competition the antitrust laws are designed to secure.

*Id.* at 243-244. In the footnote that was omitted from the above quote, the Court in *Dunn & Mavis* quoted from *Burdett v. Altec Corp.*, 515 F.2d 1245, 1249 (5th Cir. 1975): "Lest any other former distributors succumb to the temptation of treble damages, we reiterate that it is simply not an antitrust violation for a manufacturer to contract with a new distributor, even if the effect of the new contract is to seriously damage the former distributor's business." We find the thrust of these cases sufficiently analogous and entirely persuasive.

> 4   In *Dunn & Mavis*, the plaintiff had been the exclusive provider of auto transport services between Chrysler assembly plants in the Detroit area and railheads and other distribution points. When Chrysler replaced plaintiff with a competitor as the exclusive provider of these services, plaintiff asserted antitrust claims against Chysler and the competitor.

[*12] [HN3]To recover on its antitrust claim, plaintiff would need to prove "(1) that the defendants contracted, combined or conspired among each other; (2) that the combination or conspiracy produced adverse, anti-competitive effects within the relevant product and geographic markets; (3) that the objects of and the conduct pursuant to that contract or conspiracy were illegal; and (4) that the plaintiffs were injured as a proximate result of that conspiracy." *Tunis Bros. Co., Inc. v. Ford Motor Co., 763 F.2d 1482, 1489 (3rd Cir. 1985)* ("*Tunis I*") (vacated and remanded for other reasons, *475 U.S. 1105, 106 S. Ct. 1509, 89 L. Ed. 2d 909 (1986)*, as explained in *Tunis Bros. Co., Inc. v. Ford Motor Co., 952 F.2d 715, 720 (3rd Cir. 1991)* ("*Tunis II*")).

We note that plaintiff's complaint does not plead certain details of an antitrust claim, such as, *inter alia*, the appropriate product and geographic markets, the effects upon interstate commerce, nor does plaintiff inform us whether its claim proceeds on a per se or rule of reason theory. More detrimental to plaintiff's complaint is that, as explained above, [*13] the circumstances plaintiff alleges simply do not rise to the level of a violation of the Sherman Act §§ 1 and 2.

Finally, defendants argue that the antitrust claim is barred due to the Local Government Antitrust Act, *15 U.S.C. § 34 et seq.* As with the defendants' argument that the civil rights claims against them are barred, since we conclude that the plaintiff has failed to allege circumstances sufficient to state an antitrust claim, we do not reach the issue.[5]

> 5   Plaintiff's brief in opposition argues that it is seeking only injunctive relief, not money damages, and therefore, the Local Government Antitrust Act does not bar its claim. On this point, considering the stage of the proceedings and the facts of the complaint, but for our determination otherwise, we would agree.
>
> We note, however, that defendants might have asserted the "state action doctrine" which, it seems, would bar even the injunctive relief plaintiff seeks, *Northeast Jet Center v. Lehigh-Northampton Airport Authority, 767 F. Supp. 672*

(E.D. Pa. 1991), but for the dearth of information in the complaint. The exact authority of the defendants regarding their actions related to the entire bidding process, and from whence that authority stems, *e.g.*, based upon a state statute requiring competitive public bidding, *id.*, cannot be discerned from the complaint. Such information is crucial to determine if the "state action doctrine" would apply. Absent amendment to the complaint, which the defendants have sought in the alternative to their motion to dismiss, we would not be able to determine this issue on a motion to dismiss, which is presumably the reason why defendants did not raise the issue and instead sought a more definite statement.

[*14] *IV  CONCLUSION*

Based upon the foregoing reasons we conclude that plaintiff's complaint fails to state a claim for which relief can be granted.[6] Hence, an appropriate order follows.

> 6   At best, plaintiff's complaint may allege the violation of some state or local law, although it has not specifically alleged. Regardless, "a violation of state law in itself does not constitute a denial of . . . due process. Federal courts do not sit in federal question cases to grant remedies for mere violations of state law. [footnote omitted]" *Midnight Sessions, Ltd. v. City of Philadelphia, 945 F.2d 667, 684 (3rd Cir. 1991)*.

*ORDER*

And now, this 5th day of June, 1992, upon consideration of the Motion of Defendants City of Allentown, Mayor Joseph Daddona, Carl Kercher, Donald Bernhard, Michael Hefele, Al Salinger, Linda Bodnar, William Cramsey, Michael Rosenfeld, Charles Burianek, and Jill Winters Pursuant to Federal Rule of Civil Procedure 12(b)(6) (Doc. #3), the response thereto and the complaint, [*15] IT IS **ORDERED** that the motion is **GRANTED** and the complaint is **DISMISSED** as to all defendants and the case is closed.

E. Mac Troutman, S.J.

# EXHIBIT C

**Citation #3**
1992 us dist lexis 11456

LEXSEE



Analysis
As of: Jul 10, 2007

QUEEN CITY AVIATION, INC., Plaintiff vs. CITY OF ALLENTOWN, et al., Defendant

CIVIL ACTION NO. 91-7776

UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF
PENNSYLVANIA

1992 U.S. Dist. LEXIS 11456

August 3, 1992, Filed

**DISPOSITION:**    [*1]  Plaintiff's motion will be denied.

**CORE TERMS:** civil rights, amend, bid, animosity, reasons stated, property rights, local officials, leave to amend, awarding, cure, discovery

**COUNSEL:** For QUEEN CITY AVIATION, INC., PLAINTIFF: GARY C. BENDER, CRAMP, D'IORIO, MC CONCHIE & FORBES, P.C., 215 N. OLIVE STREET, P.O. BOX 568, MEDIA, PA 19063, USA.

For CITY OF ALLENTOWN, JOSEPH DADDONA, MAYOR, CARL KERCHER, DONALD BERNHARD, MICHAEL HEFELE, AL SALINGER, LINDA BODNAR, WILLIAM CRAMSEY, MICHAEL ROSENFELD, CHARLES BURIANEK, JILL WINTERS, DEFENDANTS: CHARLES J. FONZONE, FONZONE & ASHLEY, 33 SOUTH SEVENTH STREET, P.O. BOX 4180, ALLENTOWN, PA 18105-4180, USA.

**JUDGES:** Troutman

**OPINION BY:** E. MAC TROUTMAN

**OPINION**

*MEMORANDUM*

Previously we dismissed plaintiff's complaint in the above captioned matter due to the deficiency of its pleading averments and its failure to state a claim. Slip Op., CA No. 91-7776 (June 8, 1992). Plaintiff has filed a Motion to Alter or Amend Judgment Pursuant to Fed. R. Civ. P. 59(e) and For Reconsideration under E.D. Loc. Civ. R. 20(g). For the reasons stated in our original memorandum and for reasons stated herein, we conclude that plaintiff's motion should be denied.

Plaintiff requests that we alter our previous order to allow it to amend its complaint, and in support thereof, incorporates in its Brief in Support certain averments that [*2] it would include in an amended complaint. Plaintiff has not attached as an exhibit to its motion a proposed amended complaint for our review and which could also be filed if such were appropriate. [1] Plaintiff's memorandum, however, is insufficient for us to find that the filing of an amended complaint is justified in this case.

> 1    Defendants point out that plaintiff has not filed such any amended complaint which we could review, while it is true, as plaintiff states, that it could not "file" an amended complaint at this point, plaintiff could have prepared a proposed amended complaint along with its motion. We have not asked plaintiff to supplement its motion in this manner since it has chosen to incorporate suitable material in its memorandum and we find that this additional information would not make a sufficient amended complaint.

Plaintiff reiterates that the defendants denied its constitutionally protected property rights. Plaintiff asserts that it has a property right in the procedures leading to the award [*3] of the lease to be a fixed based operator at the Queen City Airport, in other words, that it has a constitutional right to a fair and even handed decision by

1992 U.S. Dist. LEXIS 11456, *

the defendants. Plaintiff repeatedly asserts that it was not so treated by the defendants, that the defendants awarded the bid in an arbitrary, capricious and discriminatory manner. Such conclusory allegations are not a sufficient statement of a civil rights complaint, no matter how often repeated. For support, plaintiff cites *Teleprompter of Erie, Inc. v. City of Erie*, 537 F. Supp. 6 (W.D. Pa. 1981). In *Teleprompter*, however, among the allegations to show wrongful treatment by city officials when awarding a contract was that at least one of the council members was accepting bribes. *Id.* at 8-9. Such specific pleading properly supports a civil rights action. Plaintiff's complaint and memorandum are void of any such specific instances from which it could be found that the defendants did not correctly exercise their discretion. [2]

> 2   Plaintiff writes: "Plaintiff can cite many examples of this long standing animosity and antagonism [between defendants and plaintiff] although plaintiff believes that these are more evidentiary matters as opposed to pleading matters . . . ." (Brief in Support at 4.) Contrary to plaintiff's statement, such matters are indeed pleadings matters as our original memorandum explains. Further, if indeed there exists a long standing animosity between defendants and plaintiff, certainly plaintiff would not need discovery to be aware of such animosity; plaintiff may need discovery to *prove* such, but not to specifically plead such.

[*4]  Plaintiff, as appears from the face of the complaint and its Memorandum in Support, is simply challenging the discretion of the defendants. We agree with defendants that "plaintiff, at best, contests the City's evaluation of the various factors that were considered and the respective weight that it placed upon them is awarding the bid to Cole Aviation." (Brief in Opposition

at 2.) "The plaintiff merely takes issue with the defendants' evaluation of the bid proposals." (*Id.* at 4.) If the discretion of local officials may be challenged in federal court on the basis of some nebulous, unfounded allegations, local officials will be subjected to deluge of frivolous claims. *See, Colburn v. Upper Darby Township*, 838 F.2d 663, 666 (3d Cir. 1988). If plaintiff wishes to challenge the decision making of the defendants, a state court would provide a better forum to question decisions made pursuant to 53 Pa. Con. Stat. Ann. § 36901 *et seq* (*See*, Brief in Support at 3.)

Finally, while not permitting leave to amend a civil rights complaint for failure to plead specifically *may* be an abuse of our discretion, such is not an abuse of our discretion [*5]  if amendment of the complaint "would be insufficient to cure the deficiency in the original complaint." *Colburn*, 838 F.2d at 666. Since it was our opinion, initially, that an amendment would not be able to cure the defects in the original complaint, and it is our opinion, currently, as well, leave to amend will not be permitted.

Based upon the foregoing, and for the reasons addressed in our Memorandum and Order entered June 8, 1992, plaintiff's motion will be denied. An appropriate order follows.

### ORDER

And now, this 30th day of July, 1992, upon consideration of the Motion of Plaintiff to Alter or Amend Judgment and for Reconsideration (Doc. #13), the response thereto and our Memorandum and Order entered June 8, 1992, IT IS ORDERED that the motion is DENIED.

E. Mac Troutman S.J.

# EXHIBIT D

**Citation #4**
**1997 us dist lexis 18073**

LEXSEE

⚠
Caution
As of: Jul 10, 2007

**HOLT CARGO SYSTEMS, INC., et al. v. DELAWARE RIVER PORT AUTHOR-
ITY, et al.**

**CIVIL ACTION NO. 94-7778**

**UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF
PENNSYLVANIA**

**1997 U.S. Dist. LEXIS 18073**

**November 13, 1997, Decided
November 13, 1997, Filed; November 14, 1997, Entered**

**DISPOSITION:** Defendants' motions granted in part
and denied in part.

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Plaintiffs, companies that
provide stevedoring, warehousing, and terminal services,
sued defendants, the Delaware River Port Authority, the
Philadelphia Regional Port Authority and the Port of
Philadelphia and Camden alleging constitutional viola-
tions actionable under 42 U.S.C.S. § 1983. All defen-
dants filed motions to dismiss the complaint. Defendants
were all state-created entities.

**OVERVIEW:** Defendants entered into an agreement
with a public entity of New Jersey and others to unify a
port district to eliminate intra-port competition. Plaintiffs
contended that defendants conspired to obtain control of
the entire port district, including the marine terminals
controlled by plaintiffs, by driving plaintiffs from the
port district. The complaint alleged ten specific predatory
acts by defendants and stated three counts under 42
U.S.C.S. § 1983. A substantive due process claim was
based on alleged harassment and an attempt to destroy
the business and property interests of plaintiffs. Legisla-
tive authority to unify the ports could not constitutionally
authorize destroying a business to take property without
compensation. Taking the plaintiffs' allegations as true,
they stated a cause of action against all three defendants.
Plaintiffs' equal protection claim was that defendants
engaged in acts to drive them out of business. Such acts

could not be rationally related to a legitimate government
purpose. As to the procedural due process claim, plain-
tiffs failed to show that defendants deprived them of a
protected property interest without affording an opportu-
nity to be heard.

**OUTCOME:** The court held that plaintiffs stated a
cause of action for violations of their substantive due
process and equal protection rights, and defendants' mo-
tions to dismiss those claims was denied. Plaintiffs failed
to state a claim upon which relief can be granted for vio-
lation of their procedural due process rights, and it dis-
missed that claim and that portion of plaintiffs' request
for injunctive relief.

**CORE TERMS:** port, cargo, lease, terminal, compact,
master plan, unification, predatory, marine, arbitrarily,
entity, notice, injunctive relief, property interest, ware-
housing, stevedoring, competitors, cause of action, sub-
stantive rights, equal protection, similarly situated, con-
spiracy, destroy, customers, state statute, private enter-
prise, private sector, process protection, process rights,
classification

**LexisNexis(R) Headnotes**

*Civil Rights Law > Practice & Procedure > Civil Rights
Commissions > General Overview*
[HN1]See 42 U.S.C.S. § 1983.

*Constitutional Law > Bill of Rights > Fundamental Rights > Procedural Due Process > General Overview*
[HN2]See U.S. Const. amend XIV.

*Civil Procedure > Pleading & Practice > Defenses, Demurrers, & Objections > Failures to State Claims*
[HN3]In considering a motion to dismiss under Fed. R. Civ. P. 12(b)(6), the court must take all the well pleaded allegations as true, construe the complaint in the light most favorable to the plaintiff, and determine whether, under any reasonable reading of the pleadings, the plaintiff may be entitled to relief. The court must decide whether relief could be granted on any set of facts which could be proved.

*Civil Procedure > Pleading & Practice > Defenses, Demurrers, & Objections > Failures to State Claims*
*Civil Procedure > Pleading & Practice > Defenses, Demurrers, & Objections > Motions to Dismiss*
[HN4]A motion to dismiss may be granted only if the court finds the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.

*Constitutional Law > Bill of Rights > Fundamental Rights > Eminent Domain & Takings*
*Constitutional Law > Substantive Due Process > Scope of Protection*
[HN5]Substantive due process is implicated where a governmental authority infringes a property interest encompassed by the Fourteenth Amendment. The touchstone of due process is protection of the individual against arbitrary action of the government.

*Civil Rights Law > Section 1983 Actions > Due Process in State Proceedings*
*Civil Rights Law > Section 1983 Actions > Scope*
[HN6]The substantive component of the Due Process Clause can only be violated by government employees when their conduct amounts to an abuse of official power that shocks the conscience.

*Constitutional Law > Bill of Rights > Fundamental Rights > Eminent Domain & Takings*
*Constitutional Law > Substantive Due Process > General Overview*
[HN7]Property ownership, an interest protected by substantive due process, cannot be "arbitrarily or irrationally" restricted. A lessee's property interest has been accorded substantive due process protection. "Actual and prospective business relationships" have received substantive due process protection.

*Constitutional Law > Bill of Rights > Fundamental Rights > Eminent Domain & Takings*
*Evidence > Inferences & Presumptions > Presumption of Regularity*
[HN8]Regardless of the presumption of legislative rationality, legislative authority to unify ports cannot constitutionally authorize destroying a business to take property without compensation.

*Civil Rights Law > Conspiracy > General Overview*
[HN9]On a motion to dismiss, the court will assume government agencies can be liable for conspiracy.

*Civil Procedure > Justiciability*
[HN10]The United States District Court for the Eastern District of Pennsylvania will not intervene to micromanage an entire port district. Such judicial interference would be disruptive of state efforts to establish a coherent policy with respect to a matter of substantial public concern: the development and management of the port district.

*Constitutional Law > Equal Protection > General Overview*
[HN11]The Equal Protection Clause does not require that all persons be treated alike; it provides a direction that all persons similarly situated should be treated alike.

*Constitutional Law > Equal Protection > Level of Review*
[HN12]The level of scrutiny applied to ensure that classifications comply with this guarantee differs depending on the nature of the classification. Classifications involving suspect or quasi-suspect class, or impacting certain fundamental constitutional rights, are subject to heightened scrutiny. Other classifications, however, need only be rationally related to a legitimate government goal. Under a rational basis analysis, the government's action will be upheld as long as it is not "irrational."

*Civil Rights Law > Conspiracy > General Overview*
[HN13]Each defendant is responsible for the acts of its co-conspirator in furtherance of the conspiracy.

*Civil Rights Law > Conspiracy > General Overview*

[HN14]Government agencies may legitimately act to ensure competition in the marketplace, but intentional discrimination to destroy or reduce the value of a particular business would not be rationally related to a legitimate government purpose.

*Civil Rights Law > Section 1983 Actions > Due Process in State Proceedings*
[HN15]To prevail on a procedural due process claim, the plaintiffs must demonstrate the defendants deprived them of a protected property interest without affording an adequate opportunity to be heard in connection with that deprivation.

*Constitutional Law > Bill of Rights > Fundamental Rights > Eminent Domain & Takings*
[HN16]Property interests are not created by the Constitution, they are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law.

*Constitutional Law > Bill of Rights > Fundamental Rights > Eminent Domain & Takings*
*Constitutional Law > Bill of Rights > Fundamental Rights > Procedural Due Process > Scope of Protection*
[HN17]The Procedural Due Process Clause only applies to substantive rights granted by the Constitution or statutory law. But a state statute that merely prescribes procedure, yet places no substantive limitations on official discretion creates no liberty interest entitled to protection under the Due Process Clause.

*Constitutional Law > Bill of Rights > Fundamental Rights > Procedural Due Process > Scope of Protection*
*Civil Rights Law > Section 1983 Actions > Due Process in State Proceedings*
[HN18]The violation of a state statute outlining procedure does not necessarily equate to a due process violation under the federal constitution. If otherwise, federal courts would have the task of insuring strict compliance with state procedural regulations and statutes.

*Constitutional Law > Bill of Rights > Fundamental Rights > Procedural Due Process > Scope of Protection*
[HN19]Procedural due process protections only apply if plaintiffs have an independent, substantive right that is being taken away.

*Civil Procedure > Pleading & Practice > Defenses, Demurrers, & Objections > Motions to Dismiss*
*Civil Procedure > Parties > Joinder > Indispensable Parties*
*Civil Procedure > Parties > Joinder > Necessary Parties*
[HN20]Whether in equity and good conscience an action should proceed among the parties before it, or should be dismissed, Paul. R. Civ. P. 19(b) enumerates four factors to consider: first, to what extent a judgment rendered in a person's absence might be prejudicial to the person or those already parties; second, the extent to which, by protective provisions in the judgment, by shaping of relief, or other measures, the prejudice can be lessened or avoided; third, whether a judgment rendered in the person's absence will be adequate; fourth, whether the plaintiff will have an adequate remedy if the action is dismissed for nonjoinder.

COUNSEL:  [*1]  For HOLT CARGO SYSTEMS, INC., ASTRO HOLDINGS, INC., HOLT HAULING AND WAREHOUSING SYSTEMS, INC., PLAINTIFFS: PAUL R. ROSEN, SPECTOR, GADON & ROSEN, P.C., PHILA, PA USA. BRUCE S. MARKS, SPECTOR GADON & ROSEN, P.C., PHILADELPHIA, PA USA. JEFFREY M. GOLDSTEIN, SPECTOR, GADON & ROSEN, P.C., PHILA, PA USA. RICHARD J. PERR, SPECTOR, GADON AND ROSEN, PHILA, PA USA.

For DELAWARE RIVER PORT AUTHORITY, DEFENDANT: HENRY F. SIEDZIKOWSKI, JOHN M. ELLIOTT, TIMOTHY T. MYERS, MICHAEL P. WALSH, ELLIOTT, REIHNER, SIEDZIKOWSKY AND EGAN, P.C., BLUE BELL, PA USA. For PORTS OF PHILADELPHIA AND CAMDEN, DEFENDANT: TRACY MOONEY SCHAEFFER, SPRAGUE, CREAMER & SPRAGUE, PHILA, PA USA. RICHARD A. SPRAGUE, DENISE PALLANTE, SPRAGUE & SPRAGUE, PHILA, PA USA. CHARLES HARDY, PHILA, PA USA. GEOFFREY C. JARVIS, SPRAGUE AND SPRAGUE, PHILA, PA USA. For PHILADELPHIA REGIONAL PORT AUTHORITY, DEFENDANT: PATRICK J. O'CONNOR, COZEN & O'CONNOR, PHILA, PA USA. KARL L. PRIOR, COZEN AND O'CONNOR, PHILA, PA USA. RICHARD M. ROSENBLEETH, WILLIAM H. ROBERTS, LISA A. ROSENBLATT, BLANK ROME COMISKY & MCCAULEY, PHILADELPHIA, PA USA.

For JOSE DIAZ, TIOGA FRUIT TERMINAL, INC., CHILEAN LINE, INC., RESPONDENTS: RICHARD J. CAMPBELL,  [*2]  PEPPER, HAMILTON & SCHEETZ, LLP, PHILA, PA USA. For DELAWARE RIVER STEVEDORES INC., RESPONDENT: JOHN

W. BUTLER, ANNE E. MICKEY, SHER AND BLACKWELL, WASHINGTON, DC USA. For CROWLEY AMERICAN TRANSPORT, INC., RESPONDENT: STEVEN L. FRIEDMAN, DILWORTH, PAXSON, KALISH & KAUFFMAN LLP, PHILA, PA USA. For JOSEPH BALZANO, AL CASTAGNOLA, SOUTH JERSEY PORT CORPORATION, RESPONDENTS: ALAN A. TURNER, TURNER AND MC DONALD, PHILA, PA USA. For BARWIL WIGHTMAN SHIPPING, RESPONDENT: MATTHEW H. ADLER, PEPPER, HAMILTON & SCHEETZ, PHILA, PA USA

For PENN TERMINALS, INC., INCHCAPE SHIPPING SERVICES, RICE, UNRUH, REYNOLDS CO., NORTON LILLY INTERNATIONAL INC., MOVANTS: JOHN A. LORD, HEPBURN, WILLCOX, HAMILTON AND PUTNAM, PHILA, PA USA. For GEOFFREY C. JARVIS, ESQUIRE, MOVANT: GEOFFREY C. JARVIS, SPRAGUE AND SPRAGUE, PHILA, PA USA.

**JUDGES:** Norma L. Shapiro, J.

**OPINION BY:** NORMA L. SHAPIRO

**OPINION**

*MEMORANDUM and ORDER*

**Norma L. Shapiro, J.**

November 13, 1997

Plaintiffs Holt Cargo Systems, Inc. ("Holt Cargo"), Astro Holdings, Inc. ("Astro") and Holt Hauling and Warehousing Systems, Inc. ("Holt Hauling") in their Second Amended Complaint against defendants Delaware River Port Authority ("DRPA"), [*3] Philadelphia Regional Port Authority ("PRPA") and Port of Philadelphia and Camden ("PPC") allege constitutional violations actionable under 42 U.S.C. § 1983. All defendants filed motions to dismiss the Second Amended Complaint. For the reasons stated below, defendants' motions will be granted in part and denied in part.

*ALLEGED FACTS*

Plaintiff Holt Cargo is a Delaware corporation with its principal place of business in Philadelphia, Pennsylvania. (Compl. P 3). Holt Cargo is in the business of stevedoring, warehousing and providing terminal services in the Port District of Philadelphia and Camden (the "Port District"). Holt Cargo entered into an amended and restated lease and operating agreement dated December 30, 1990, with PRPA (the "amended lease") for the Packer Avenue Marine Terminal ("Packer Avenue Terminal") in the Port District. See id. at PP 4,8. The

amended lease is for a term of fifty years. See id. at P 46. On June 14, 1991, Holt Cargo assigned its interest in the amended lease to plaintiff Astro. On the same date, Astro entered into a sublease with Holt Cargo for the Packer Avenue Terminal. See id. at PP 6-7. Holt Cargo currently occupies and operates [*4] the Packer Avenue Terminal. See id. at P 7.

Plaintiff Holt Hauling is a Pennsylvania corporation with its principal place of business in New Jersey. See id. at P 9. Holt Hauling holds title to a marine terminal warehouse complex in Gloucester City, New Jersey (the "Gloucester Terminal") and leases this facility to tenants providing stevedoring, warehousing and terminal services in the Port District. See id. at P 10.

Defendants are all state-created entities. Defendant DRPA is a public corporate entity created by the Commonwealth of Pennsylvania and the State of New Jersey by interstate compact (the "Amended Compact"). Congress and the President approved the Amended Compact under the Interstate Compact Clause, U.S. Const. art. 1, § 10. cl. 3. See id. at P 12.

Defendant PPC is a public corporate entity of the Commonwealth of Pennsylvania and the State of New Jersey created under the Amended Compact by DRPA in 1994 to unify the Port District. See id. at PP 13, 35.

Defendant PRPA, a public entity of the Commonwealth of Pennsylvania, was formed to promote port development in southeastern Pennsylvania. PRPA owns marine terminals and other facilities in the Philadelphia [*5] region of the Port District. See id. at P 11. PRPA owns the Packer Avenue Terminal, Piers 84, 86 and 96 South, the Tioga Marine Terminal, the Tioga Container Terminal and Piers 96, 98 and 100 (the "additional parcels"). See id. at P 11.

Plaintiffs have named a variety of non-defendant co-conspirators. These include: South Jersey Port Corporation ("SJPC"), a public entity of the State of New Jersey analogous to PRPA; it owns and operates Broadway Marine Terminal ("Broadway") and Beckett Marine Terminal ("Beckett") in the Port District; PASHA Auto Warehousing, Inc. ("Pasha"), a party to two PRPA leases (the "Pasha leases") of Pier 96 South in the Philadelphia region of the Port District; James McDermott ("McDermott"), PRPA's executive director; Paul DiMariano ("DiMariano"), PPC's president and chief executive officer; Paul Drayton ("Drayton"), DRPA's executive director; and Joseph Balzano ("Balzano"), SJPC's chief executive officer (collectively the "executive directors"). See id. at PP 14-17.

In 1992, Pennsylvania and New Jersey agreed to unify the Port District to eliminate intra-port competition and "churning" of cargo and to strengthen the Port Dis-

trict's ability to [*6] compete against other regional ports. *See id.* at PP 22, 25. Pennsylvania and New Jersey both enacted legislation (the "Unification Acts") to unify the Port District. *See* Pa. Stat. Ann. tit. 36 § 3503; N.J. Stat. Ann. § 32:3-1. *et seq.*; (Compl. P 26.) Congress and the President approved the Amended Compact on October 27, 1992. *See* 106 Stat. 3576 (1992); (Compl. P 26.)

Unification of the Port District was intended to place the power to maintain the Port District in DRPA and its subsidiary, PPC. (Compl. P 31). Unification of the Port District was supposed to occur within two years of the Amended Compact's approval, i.e., October 27, 1994 (the "unification date"). *See id.* at P 32. After unification, PPC was to take over PRPA's and SJPC's functions. *See id.* at P 34. The executive boards of PRPA, SJPC and DRPA approved a Term Sheet in 1994 to govern the merger of PRPA and SJPC into PPC. *See id.* at 36. Plaintiffs assert all port development activities after unification were to be conducted solely by DRPA or its subsidiary PPC.

Plaintiffs claim unification occurred *de jure* on the unification date. Alternatively, unification occurred *de facto* "because [*7] DRPA, PPC, PRPA and SJPC have joined together to control the Port District, both pursuant to the Term Sheet approved in 1994 and by joint adoption of business plans and goals by the boards and Executive Directors of DRPA, PPC, PRPA and SJPC, even though a final merger has technically not taken place." *Id.* at PP 37-38. PPC's 1994-95 Handbook states unification "became a reality in 1994." *Id.* at PP 39-40.

The Amended Compact provides that DRPA shall prepare a comprehensive master plan (the "master plan") for the development of the Port District to include "plans for construction, financing, development, reconstruction, purchase, lease, improvement and operation of any terminal, terminal facility, transportation facility or any other facility of commerce or economic development activity." Amended Compact, art. XII(7); Compl. P 27.

"Prior to adopting such master plan, the commission shall give written notice to, afford a reasonable opportunity for comment, consult with and consider any recommendations from State, county and municipal government, as well as commissions, public corporations and authorities from the private sector." *Id.* If DRPA modifies or changes the master [*8] plan, it must follow these same procedures. *See id.*

When DRPA authorizes any "project or facility," it must provide the governor and legislature of both states with a "detailed report on the project." Amended Compact, art. XII(7). In those reports to the two states, DRPA "shall include therein its findings which fully set forth that the facility or facilities operated by private enterprise within the Port District and which it is intended shall be supplanted or added to are not adequate." Amended Compact, art. IV(q); Compl. P 28.

In 1994, DRPA, PPC, PRPA and SJPC produced a "Strategic Business Plan" providing for "a unified government agency to take over the entire Port District" by purchasing PRPA leases with private businesses so that "the private sector would not be the operator of the facilities." Id. at PP 41-42. PRPA sought "not only to be a lessor, but to operate its marine terminals with the aid of SJPC and in competition with Holt Cargo, Astro, and Holt Hauling." *Id.* at P 45.

Holt Cargo's fifty-year amended lease, its plan to develop the Publicker Site, Pier 96 South and the additional parcels, and Holt Hauling's ownership and operation of the Gloucester Terminal [*9] "stood in the way of the hidden goal of total government ownership, operation, and control of the Port District." *Id.* at P 46. PRPA informed the other defendants it had no right to condemn the property covered by the amended lease. *See id.* at P 47. PRPA, SJPC, DRPA and PPC could not afford to purchase the property of the plaintiffs. *See id.* at P 48.

Therefore, DRPA, PPC, PRPA and SJPC allegedly entered into a conspiracy to obtain control of the entire Port District, including the marine terminals controlled by the plaintiffs, by driving Holt Cargo, Astro and Holt Hauling from the Port District. *See id.* at PP 49, 50. DRPA, PPC, PRPA and SJPC sought to obtain the customers of Holt Cargo and Holt Hauling. *See id.* at P 53. During a meeting between Thomas Holt, a shareholder of Holt Cargo, Astro and Holt Hauling, McDermott threatened to "destroy Holt." *Id.* at P 51. DRPA, PPC, PRPA and SJPC sought to "destroy" Holt to "control the entire Port District under the guise of Unification ... [and] maximize their profits, to the detriment of private enterprise." *Id.* at P 54.

The plaintiffs in their Second Amended Complaint allege ten specific predatory acts by the [*10] defendants: (1) PRPA agreed to join with Holt Cargo and Astro in an application for environmental permits to develop the Publicker Site and the additional parcels and then arbitrarily and in bad faith withdrew its support, *see id.* at PP 55-60; (2) PRPA and Pasha have arbitrarily and in bad faith denied Holt Cargo and Astro their rights under the amended lease to use and develop Pier 96 South, *see id.* at PP 61-65; (3) in October, 1994, PRPA arbitrarily threatened to evict Holt Cargo and Astro from the Packer Avenue Terminal, and knew Holt would have to report this eviction notice to the attention of its lenders, customers and prospective financing sources, *see id.* at PP 66-70; (4) PRPA arbitrarily refused to honor its obligations under the amended lease "to dredge berths, provide capital improvements, and repair property, including container cranes," and DRPA arbitrarily refused to

provide funds to PRPA for dredging, *see id.* at PP 71-75; (5) DRPA, PPC and PRPA jointly published advertisements falsely attributing operation of the Packer Avenue Terminal to them in order to mislead customers into contacting them for business, *see id.* at PP 76-78; (6) PRPA arbitrarily [*11] refused to lease Piers 82 and 84 to Holt Cargo and to another company that planned to use Holt Cargo for its stevedoring needs, *see id.* at PP 79-83; (7) PRPA and SJPC have diverted customers from Holt Cargo and Holt Hauling by offering subsidized rates, free rent and other benefits to competitors, solely to cause economic loss to Holt Cargo and Holt Hauling, *see id.* at PP 84-86; (8) DRPA approved a master plan in 1996 that concealed numerous subsidized leases between PRPA and plaintiffs' competitors, including leases with American Transport Lines, Inc. (the "Crowley lease"), Tioga Fruit Terminal, Inc. (the "Tioga lease"), Marine Terminals of Pennsylvania (the "Marine Terminal lease") and Delaware River Stevedores, Inc. (the "DRS lease") (collectively the "unauthorized leases), *see id.* at PP 87-94; (9) DRPA's master plan and capital budget, approved by DRPA, PRPA and SJPC, concealed numerous capital projects included in PPC's budget, *see id.* at PP 95-101; and (10) DRPA failed to give an opportunity for notice and comment regarding the unauthorized leases and capital projects as required under the Amended Compact, *see id.* at PP 102-107. Plaintiffs did not raise predatory [*12] acts seven through ten prior to their Second Amended Complaint. Plaintiffs contend these predatory acts were undertaken in an effort to destroy or appropriate plaintiffs' business.

The plaintiffs claim DRPA, PPC, PRPA, SJPC, Pasha and the executive directors have "conspired together by joint meetings, joint understandings and agreements, joint participation in unlawful conduct, and joint adoption of (i) budgets, (ii) capital, (iii) approval of leases, (iv) term sheets, (v) management agreements, (vi) interlocking board members, (viii) combined strategy meetings, (ix) joint adoption of [a] Sham Master Plan, (x) joint adoption of Amendments to the Sham Master Plan, all to effect each of the above predatory acts." *Id.* at P 107.

Plaintiffs have stated three counts under 42 U.S.C. § 1983 [1] for violations of the Fourteenth Amendment [2] by all three defendants and against all three defendants: Count I alleges violations of substantive due process; Count II alleges violations of equal protection; and Count III alleges procedural due process violations. [3] All defendants have filed motions to dismiss the Second Amended Complaint, either in part or in its entirety.

1  [HN1]42 U.S.C. § 1983 provides:

Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress....

[*13]

2  [HN2]The Fourteenth Amendment provides no "State shall deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend XIV.

3  In their earlier complaints, the plaintiffs attempted to raise a cause of action for violation of the Amended Compact either directly under the Amended Compact itself or as a violation of a federal statute, 42 U.S.C. § 1983. The plaintiffs have not presented these claims in their revised Second Amended Complaint.

## DISCUSSION

### I. Standard of Review

[HN3]In considering a motion to dismiss under Rule 12(b)(6), the court "must take all the well pleaded allegations as true, construe the complaint in the light most favorable to the plaintiff, and determine whether, under any reasonable reading of the pleadings, the plaintiff may be entitled to relief." *Colburn v. Upper Darby Township*, 838 F.2d 663, 665-66 (3d Cir. 1988) (citations omitted), *cert. denied*, 489 U.S. 1065, 103 L. Ed. 2d 808, 109 S. Ct. 1338 (1989); *see Rocks v. City of Philadelphia*, 868 F.2d 644, 645 (3d Cir. [*14] 1989). The court must decide whether "relief could be granted on any set of facts which could be proved." *Ransom v. Marrazzo*, 848 F.2d 398, 401 (3d Cir. 1988). [HN4]A motion to dismiss may be granted only if the court finds the plaintiff can prove no set of facts in support of his claim which would entitle him to relief. *See Conley v. Gibson*, 355 U.S. 41, 45-46, 78 S. Ct. 99, 2 L. Ed. 2d 80 (1957).

### II. Substantive Due Process

[HN5]Substantive due process is implicated where a governmental authority "infringed a property interest encompassed by the Fourteenth Amendment." *Acierno v. Cloutier*, 40 F.3d 597, 616 (3d Cir. 1994); *see Midnight Sessions, Ltd. v. City of Philadelphia*, 945 F.2d 667, 679 (3d Cir. 1991), *cert. denied*, 503 U.S. 984, 118 L. Ed. 2d 389, 112 S. Ct. 1668 (1992). "'The touchstone of due process is protection of the individual against arbitrary action of the government'" *Bello v. Walker*, 840 F.2d

1124, 1129 (3d Cir. 1988) (quoting *Davidson v. Cannon*, 474 U.S. 344, 353, 88 L. Ed. 2d 677, 106 S. Ct. 668 (1974)), *cert denied*, 488 U.S. 851 (1988) [HN6]"The substantive component of the Due Process Clause can only be violated by government employees when their conduct amounts to an abuse of official power that 'shocks the conscience.'" *Fagan* [*15] *v. City of Vineland*, 22 F.3d 1296, 1303 (quoting *Collins v. City of Harker Heights*, 503 U.S. 115, 126, 117 L. Ed. 2d 261, 112 S. Ct. 1061 (1992)).

[HN7]Property ownership, an interest protected by substantive due process, cannot be "arbitrarily or irrationally" restricted. *DeBlasio v. Zoning Bd. of Adjustment*, 53 F.3d 592, 600 (3d Cir.), *cert denied*, 133 L. Ed. 2d 247, 116 S. Ct. 352 (1995). A lessee's property interest has been accorded substantive due process protection. *See id.* at 601 n.10 (citing *Neiderhiser v. Borough of Berwick*, 840 F.2d 213, 217 (3d Cir. 1988), *cert denied*, 488 U.S. 822, 102 L. Ed. 2d 44, 109 S. Ct. 67 (1989). "Actual and prospective business relationships" have received substantive due process protection. *Northeast Jet Center, Ltd. v. Lehigh-Northampton Airport*, 767 F. Supp. 672, 677 (E.D. Pa. 1991).

Holt Cargo is a lessee and sub-lessee of the Packer Avenue Terminal. Holt Cargo also provides stevedoring and other marine services. Astro is the assignee of Holt Cargo's leasehold interest in the Packer Avenue Terminal. Holt Hauling owns the Gloucester Terminal and leases this facility to tenants providing various services in the Port District. Plaintiffs have alleged property interests protected by the Due Process Clause. [*16] *See DeBlasio*, 53 F.3d at 601 n.10 (citing *Neiderhiser*, 840 F.2d at 217).

The plaintiffs have alleged predatory acts that, if true, evidence harassment and an attempt to destroy the business and property interests of the plaintiffs. As the court stated in its April 19, 1996 Memorandum and Order, the defendants cannot "conspire to reduce the value of plaintiffs' businesses to acquire plaintiffs' assets for less than their actual worth. [HN8]Regardless of the presumption of legislative rationality, legislative authority to unify the ports cannot constitutionally authorize destroying a business to take property without compensation." *Holt Cargo Systems, Inc. v. Delaware River Port Auth.*, 1996 U.S. Dist. LEXIS 5323, *16, No. 94-7778 (E.D. Pa. April 19, 1996) ["*Holt I*"].

PPC, admitting *Holt I* precludes dismissal of the plaintiffs' substantive due process claims, does not seek dismissal of Count I. DRPA and PRPA argue they cannot be liable for the actions of each other, so the predatory acts committed by each of them cannot form the basis of a substantive due process claim against the other. The plaintiffs have alleged these three defendants

conspired to drive them out of business. [HN9]On a motion [*17] to dismiss, the court will assume government agencies can be liable for conspiracy. *See, e.g., Billups v. Millet*, 1996 U.S. Dist. LEXIS 2645, No. 91-6326, 1996 WL 99399, *6 (S.D.N.Y. Mar. 6, 1996); *Peavey v. Polytechnic Institute*, 775 F. Supp. 75, 77 (E.D.N.Y. 1991), *aff'd*, 969 F.2d 1042 (2d Cir.), *cert denied*, 506 U.S. 922, 121 L. Ed. 2d 257, 113 S. Ct. 341 (1992) [4] If a conspiracy is proved, DRPA and PRPA may be held accountable for the actions of one another in furtherance of that conspiracy. *See N.A.A.C.P. v. Claiborne Hardware Co.*, 458 U.S. 886, 927, 73 L. Ed. 2d 1215, 102 S. Ct. 3409 (1982); *McKenzie v. Doctors' Hosp.*, 765 F. Supp. 1504, 1507 (S.D. Fla. 1991), *aff'd*, 974 F.2d 1347 (11th Cir. 1992).

    4  No party has addressed this issue.

Plaintiffs have abandoned their causes of action arising directly under the Amended Compact, but they still base alleged predatory acts on violation of the terms of the Amended Compact by defendants' failure to make findings that private enterprise was "inadequate" before authorizing port projects, failure to adopt a master plan by October [*18] 27, 1994, concealment of various leases and independent funding of fund port development projects by PRPA and SJPC rather than by DRPA or PPC having assumed total control. The court will not entertain the claims raised in predatory acts eight and nine. The Amended Compact does not create a private cause of action to enforce the terms of the Amended Compact. *See Blessing v. Freestone*, 137 L. Ed. 2d 569, 117 S. Ct. 1353, 1359 (1997); *Cort v. Ash*, 422 U.S. 66, 78, 45 L. Ed. 2d 26, 95 S. Ct. 2080 (1975). [HN10]The court will not intervene to micro-manage the entire Port District. Such judicial interference "would be disruptive of state efforts to establish a coherent policy with respect to a matter of substantial public concern": the development and management of the Port District. *Colorado River Water Conservation Dist. v. United States*, 424 U.S. 800, 814-16, 47 L. Ed. 2d 483, 96 S. Ct. 1236 (1976); *see Louisiana Power & Light Co. v. City of Thibodaux*, 360 U.S. 25, 79 S. Ct. 1070, 1072-73, 3 L. Ed. 2d 1058 (1959); *Alabama Pub. Serv. Comm'n v. Southern R. Co.*, 341 U.S. 341, 349-50, 95 L. Ed. 1002, 71 S. Ct. 762 (1951); *Burford v. Sun Oil Co.*, 319 U.S. 315, 332-33, 87 L. Ed. 1424, 63 S. Ct. 1098 (1943).

Taking the plaintiffs' allegations as true, they have stated a cause of action against all three defendants for a violation of substantive due process. [*19] The court will deny the motions to dismiss Count I.

## III. Equal Protection

[HN11]The Equal Protection Clause does not require that all persons be treated alike; it provides "a di-

rection that all persons similarly situated should be treated alike." *City of Cleburne v. Cleburne Living Center*, 473 U.S. 432, 439, 87 L. Ed. 2d 313, 105 S. Ct. 3249 (1985). [HN12]"The level of scrutiny applied to ensure that classifications comply with this guarantee differs depending on the nature of the classification." *Airway v. Attorney General of the State of N.J.*, 81 F.3d 1235, 1267 (3d Cir. 1996). "Classifications involving suspect or quasi-suspect class, or impacting certain fundamental constitutional rights, are subject to heightened scrutiny. Other classifications, however, need only be rationally related to a legitimate government goal." *Id.; see Chapman v. United States*, 500 U.S. 453, 465, 114 L. Ed. 2d 524, 111 S. Ct. 1919 (1991); *Taylor Inv., Ltd. v. Upper Darby Township*, 983 F.2d 1285, 1294 (3d Cir. 1993), *cert. denied* 510 U.S. 914, 126 L. Ed. 2d 252, 114 S. Ct. 304 (1993). Under a rational basis analysis, the government's action will be upheld as long as it was not "irrational." *Vance v. Bradley*, 440 U.S. 93, 97, 59 L. Ed. 2d 171, 99 S. Ct. 939 (1979); *Rogin v. Bensalem Township*, 616 F.2d 680, 687 (3d [*20] Cir. 1980), *cert. denied sub nom.*, *Mark-Garner Assoc. v. Bensalem Township*, 450 U.S. 1029, 68 L. Ed. 2d 223, 101 S. Ct. 1737 (1981).

The plaintiffs have alleged PRPA arbitrarily refused to lease facilities to Holt Cargo and another company planning to rely on Holt Cargo's stevedoring services, offered subsidized leases to competitors of Holt Cargo, Astro and Holt Hauling in order to draw customers away from the plaintiffs and made millions of dollars of capital improvements to competing facilities in the Port District. At the same time, PRPA failed to fulfill its obligations to dredge and develop facilities operated by the plaintiffs. Plaintiffs state DRPA arbitrarily refused to provide funding to PRPA for dredging plaintiffs' facilities. Plaintiffs claim PRPA and DRPA engaged in these acts to drive them out of business. Allegedly, all three defendants acted in concert to achieve this goal.

The plaintiffs claim American Transport Lines, Inc., Tioga Fruit Terminal, Inc., Marine Terminals of Pennsylvania and the Delaware River Stevedores, Inc. are similarly situated, non-public companies that have received leases from the PRPA on terms more favorable than any offered to plaintiffs. Allegedly, these other companies [*21] are involved in stevedoring, warehousing and other port-related activities. DRPA argues that public entities (such as SJPC) cannot be similarly situated to private companies, such as plaintiffs. Accepting that as true, *see Wood v. Rendell*, 1995 U.S. Dist. LEXIS 17052, No. 94-1489, 1995 WL 676418, *4 (E.D. Pa. Nov. 3, 1995) (non-profit entity and for-profit entity not similarly situated), the port companies listed by the plaintiffs appear to be private entities. DRPA also asks the court narrowly to distinguish between the plaintiffs

and each of the listed companies, because "land is unique." The companies need not be exactly like the plaintiffs if they all engage in the same kinds of port-related commercial activity; plaintiffs' allegations are sufficient to allow their equal protection claim to survive a motion to dismiss. Whether the competitors are similarly situated will be an issue of fact.

Taking all of the plaintiffs' allegations as true, the three defendants have conspired together to drive Holt Cargo, Holt Hauling and Astro out of business. DRPA, PRPA and PPC intentionally and arbitrarily offered the plaintiffs' competitors more favorable lease terms, provided extensive development and construction [*22] of facilities used by plaintiffs' competitors while refusing to fulfill their obligations under the amended lease to dredge areas operated by Holt Cargo. [HN13]Each defendant is responsible for the acts of its co-conspirator in furtherance of the conspiracy. *See McKenzie, 765 F. Supp. at 1507.*

[HN14]Government agencies may legitimately act to ensure competition in the marketplace, but "intentional discrimination to destroy or reduce the value of a particular business would not be rationally related to a legitimate government purpose." *Holt I*, at 10. The defendants' motions to dismiss Count II of the revised Second Amended Complaint will be denied. [5]

> 5 Plaintiffs may not base their equal protection claim on alleged predatory acts involving certain defendants' failure to comply with the Amended Compact by not making findings that private enterprise was "inadequate" before authorizing port projects, by failing to adopt a master plan by October 27, 1994, and by allowing PRPA and SJPC to fund port development projects independently rather than having DRPA or PPC assume total control. *See Colorado River*, 424 U.S. at 814-16.

## [*23] IV. Procedural Due Process

Plaintiffs raised a procedural due process claim for the first time in their Second Amended Complaint. [HN15]To prevail on a procedural due process claim, the plaintiffs must demonstrate the defendants deprived them of a protected property interest without affording an adequate opportunity to be heard in connection with that deprivation. *See Taylor Inv., Ltd.*, 983 F.2d at 1293.

[HN16]"Property interests are not created by the Constitution, 'they are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law...'" *Cleveland Bd. of Ed. v. Loudermill*, 470 U.S. 532, 538, 84 L. Ed. 2d 494, 105 S. Ct. 1487 (1985) (quoting *Board*

_of Regents v. Roth_, 408 U.S. 564, 577, 33 L. Ed. 2d 548, 92 S. Ct. 2701 (1972)).

The plaintiffs argue DRPA violated their procedural due process rights by failing to provide notice in the master plan and a chance to comment on the various capital improvements and leases PRPA was associated with directly (and that were attributed to DRPA as a co-conspirator). [6] Article XII of the Amended Compact states: "Prior to adopting [a] master plan, [DRPA] shall give written notice to, afford a reasonable opportunity for comment, [*24] consult with and consider any recommendations from State, county and municipal government, as well as commissions, public corporations and authorities and the private sector."

> 6    The plaintiffs also attempt to base a procedural due process violation on DRPA's failure to make findings that private industry was inadequate before supporting PRPA's expenditures. The court will not consider DRPA's failure to make findings of industrial inadequacy in the Port District. _See Colorado River_, 424 U.S. at 814-16.

[HN17]The Procedural Due Process Clause only applies to substantive rights granted by the Constitution or statutory law. But "a state statute that merely prescribes procedure, yet 'places no substantive limitations on official discretion ... creates no liberty interest entitled to protection under the Due Process Clause.'" _Townsend v. Cramblett_, 892 F.2d 80, 1989 WL 153979, **3 (6th Cir. 1989) (quoting _Olim v. Wakinekona_, 461 U.S. 238, 249, 75 L. Ed. 2d 813, 103 S. Ct. 1741 (1983)), _cert. denied_, 497 U.S. 1026 (1990). "Process is not an end in itself. [*25] Its constitutional purpose is to protect a substantive interest to which the individual has a legitimate claim of entitlement." _Olim_, 461 U.S. at 250. "The State may choose to require procedures for reasons other than protection against deprivation of substantive rights, of course, but in making that choice the State does not create an independent substantive right." _Id._, 461 at 250-51; _see Shango v. Jurich_, 681 F.2d 1091, 1100-1101 (7th Cir. 1982).

[HN18]"The violation of a state statute outlining procedure does not necessarily equate to a due process violation under the federal constitution. If otherwise, federal courts would have the task of insuring strict compliance with state procedural regulations and statutes." _Harris v. Birmingham Bd. of Ed._, 817 F.2d 1525, 1527-28 (11th Cir. 1987) (citing _Hewitt v. Helms_, 459 U.S. 460, 471-72, 74 L. Ed. 2d 675, 103 S. Ct. 864 (1983), _implicitly overruled on other grounds_, _Sandin v. Conner_, 515 U.S. 472, 132 L. Ed. 2d 418, 115 S. Ct. 2293 (1995)).

The Amended Compact outlines a procedure by which DRPA is supposed to inform the private sector of proposed projects included in its master plan. The fact that it describes a notice and comment process does not mean the plaintiffs' interest [*26] in receiving that notice is protected by the Fourteenth Amendment. [HN19]Procedural due process protections only apply if plaintiffs have an independent, substantive right that is being taken away.

In _Harris_, the plaintiff was deprived of a tenured position in a public school. A state statute required a detailed description of the reasons for termination in the notice provided to an employee. The plaintiff argued the school violated his procedural due process rights by failing to give him the detailed notice required under the statute. The court held the state statute was a "purely procedural requirement" and did not give the plaintiff a property interest worthy of procedural due process protection. _Harris_, 817 F.2d at 1527. The plaintiff had no procedural due process right to receive the process specified in the statute, because the statute accorded no substantive rights. _See id._ at 1528.

Plaintiffs can only state a procedural due process claim if they have been deprived of a substantive right created by the Amended Compact; there is no such right. Plaintiffs' procedural due process claim based on or related to alleged predatory act number ten will be dismissed.

## V. Injunctive [*27] Relief

DRPA, arguing the alleged acts do not violate the plaintiffs' constitutional rights, moves to dismiss the plaintiffs' request for permanent injunctive relief. _See_ DRPA's Mem. Supp. Mot. Dismiss at 56. Because the court concludes the plaintiffs have stated a cause of action for violation of substantive due process and equal protection, DRPA's argument is premature.

Plaintiffs also request the court enjoin all three defendants from future "violation of the Amended Compact and Unification Acts." Plaintiffs are attempting to insert the court into the midst of local political policy over the appropriate role of the DRPA, PPC, PRPA and SJPC in developing and maintaining the Port District. This is a unique and highly important matter of local policy. The court will address plaintiffs' claims for constitutional violations but will not interpret the Amended Compact or intervene in vital matters of state policy. _See supra_ note 4. Accordingly, DRPA's motion to dismiss plaintiffs' request for injunctive relief will be granted to the extent plaintiffs seek an injunction based on the Amended Compact itself.

## VI. Joinder of Pennsylvania and New Jersey

DRPA and PRPA move [*28] to dismiss the Second Amended Complaint for failure to join Pennsylvania and New Jersey as indispensable parties under Federal Rule of Civil Procedure 19. They base their argument on the fact that the plaintiffs seek a permanent injunction, barring all other state-related entities from funding development in the Port District. The court will dismiss plaintiffs' request for injunctive relief concerning the terms and scope of the Amended Compact. *See Baltimore Bank for Coops. v. Farmers Cheese Coop., 583 F.2d 104, 108 (3d Cir. 1978).* Joinder of Pennsylvania and New Jersey is not possible under the Eleventh Amendment. Because Pennsylvania and New Jersey cannot be joined, the court must determine [HN20]"whether in equity and good conscience the action should proceed among the parties before it, or should be dismissed." Fed. R. Civ. P. 19(b). Rule 19(b) enumerates four factors to consider:

first, to what extent a judgment rendered in a person's absence might be prejudicial to the person or those already parties; second, the extent to which, by protective provisions in the judgment, by shaping of relief, or other measures, the prejudice can be lessened or avoided; third, whether a judgment [*29] rendered in the person's absence will be adequate; fourth, whether the plaintiff will have an adequate remedy if the action is dismissed for nonjoinder.

The court can render judgment in the absence of Pennsylvania and New Jersey; the Amended Compact created DRPA as an independent agency that operates distinctly from either Pennsylvania and New Jersey. If the plaintiffs are successful on their claims, the court can fashion any relief in a manner avoiding any restriction on the ability of either Pennsylvania or New Jersey independently to engage in port development activities. Any judgment rendered in plaintiffs' favor can be adequate even without New Jersey and Pennsylvania joined as parties to this action. Finally, plaintiffs have no other adequate remedy if this court dismisses their action for failure to join Pennsylvania and New Jersey. Therefore, the action will not be dismissed for inability to join Pennsylvania and New Jersey.

## CONCLUSION

Holt Cargo, Astro and Holt Hauling have stated a cause of action for violations of their substantive due process and equal protection rights, and the defendants' motions to dismiss those claims will be denied. The plaintiffs have [*30] failed to state a claim upon which relief can be granted for violation of their procedural due process rights, and the court will dismiss Count III of the revised Second Amended Complaint. The court will dismiss the portion of plaintiffs' request for injunctive relief dealing with any alleged violations of the terms of the Amended Compact.

An appropriate order follows.

## ORDER

AND NOW, this 13th day of November, 1997, upon consideration of the motions to dismiss the Second Amended Complaint filed by defendants Delaware River Port Authority ("DRPA"), Port of Philadelphia and Camden ("PPC") and Philadelphia Regional Port Authority ("PRPA"), their supplemental memoranda, the response by plaintiffs Holt Cargo Systems, Inc. ("Holt Cargo"), Astro Holdings, Inc. ("Astro") and Holt Hauling and Warehousing Systems, Inc. ("Holt Hauling"), after a hearing in which counsel for all parties were heard, and in accordance with the attached Memorandum, it is hereby ORDERED that:

1. As to Count I, alleging violations of substantive due process, the defendants' motions to dismiss are **DENIED**; the court will not consider alleged predatory acts eight (8) or nine (9).

2. As to Count II, [*31] alleging violations of equal protection, the defendants' motions to dismiss are **DENIED**.

3. As to Count III, alleging violations of procedural due process, defendants' motions to dismiss are **GRANTED**; the court will not consider alleged predatory act ten (10).

4. DRPA's motion to dismiss plaintiffs' claim for injunctive relief is **GRANTED IN PART AND DENIED IN PART**; the motion is **GRANTED** as to any claim for injunctive relief arising out of alleged violations of the Amended Compact's terms; the motion is **DENIED** as to any claim for injunctive relief arising out of alleged violations of substantive due process or equal protection.

Norma L. Shapiro, J.

# EXHIBIT E

**Citation #5**
2007 us dist lexis 13530

LEXSEE



Analysis
As of: Jul 10, 2007

**ODYSSEY WASTE SERVICES, LLC, Plaintiff, v. BFI WASTE SYSTEMS OF
NORTH AMERICA, INC., TAC TRANSPORT, INC., and SAMUEL RINGGOLD,
Defendants**

CIVIL ACTION NO. 05-cv-1929

UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF
PENNSYLVANIA

2007 U.S. Dist. LEXIS 13530

**February 27, 2007, Decided
February 28, 2007, Filed**

**PRIOR HISTORY:** <u>Odyssey Waste Servs., LLC v. BFI
Waste Sys. of N. Am., Inc., 2006 U.S. Dist. LEXIS
63861 (E.D. Pa., Aug. 31, 2006)</u>

**CORE TERMS:** summary judgment, tortious interference, hauler, station, third-party, contractual, genuine issue, negotiations, waste material, transport, regulations, interfere, hauling, third person, reliability, intentional interference, breach of contract, subcontractor, interfered, undisputed, municipal, favorable, termination, privileged, replace, notice, hired, contractual relationship, expert testimony, third party

**COUNSEL:** [*1] For ODYSSEY WASTE SERVICES, LLC, Plaintiff: ALBERT A. CIARDI, JR., LEAD ATTORNEY, CIARDI & CIARDI, P.C., PHILADELPHIA, PA; MICHAEL A. BOWMAN, LEAD ATTORNEY, CIARDI & CIARDI, P.C., PHILADELPHIA, PA; ALBERT ANTHONY CIARDI, III, CIARDI & CIARDI PC, PHILADELPHIA, PA.

For BFI WASTE SYSTEMS OF NORTH AMERICA, INC., Defendant: VINCENT J. MARRIOTT, III, LEAD ATTORNEY, BALLARD SPAHR ANDREWS & INGERSOLL, PHILADELPHIA, PA; JULIA M. SCHARFF, BALLARD SPAHR ANDREWS & INGERSOLL LLP, PHILADELPHIA, PA; MELISSA J. LORE, BALLARD SPAHR ANDREWS & INGERSOLL, L.L.P., PHILADELPHIA, PA.

For TAC TRANSPORT, INC., Defendant: KENNETH A. MURPHY, LEAD ATTORNEY, DRINKER BIDDLE & REATH LLP, PHILADELPHIA, PA; TIMOTHY J. O'DRISCOLL, DRINKER BIDDLE & REATH LLP, PHILADELPHIA, PA.

For SAMUEL RINGGOLD, Defendant: VINCENT J. MARRIOTT, III, LEAD ATTORNEY, BALLARD SPAHR ANDREWS & INGERSOLL, PHILADELPHIA, PA; JULIA M. SCHARFF, BALLARD SPAHR ANDREWS & INGERSOLL LLP, PHILADELPHIA, PA; MELISSA J. LORE, BALLARD SPAHR ANDREWS & INGERSOLL, L.L.P., PHILADELPHIA, PA.

For BFI WASTE SYSTEMS OF NORTH AMERICA, INC., SAMUEL RINGGOLD, Counter Claimants: VINCENT J. MARRIOTT, III, LEAD ATTORNEY, BALLARD SPAHR ANDREWS & INGERSOLL, [*2] PHILADELPHIA, PA; JULIA M. SCHARFF, BALLARD SPAHR ANDREWS & INGERSOLL LLP, PHILADELPHIA, PA; MELISSA J. LORE, BALLARD SPAHR ANDREWS & INGERSOLL, L.L.P., PHILADELPHIA, PA.

For ODYSSEY WASTE SERVICES, LLC, Counter Defendant: ALBERT ANTHONY CIARDI, III, CIARDI & CIARDI PC, PHILADELPHIA, PA.

**JUDGES:** GENE E.K. PRATTER, UNITED STATES DISTRICT JUDGE

**OPINION BY:** GENE E.K. PRATTER

**OPINION:**

**MEMORANDUM AND ORDER**

PRATTER, DISTRICT JUDGE

Odyssey Waste Services, LLC ("Odyssey") has sued BFI Waste Systems of North America, Inc. ("BFI") for breach of contract and intentional interference with business and economic relations, and has sued Samuel Ringgold and Mr. Ringgold move for summary judgment on Counts II and III of the Complaint, respectively, and TAC moves for summary judgment on Count IV. For its part, Odyssey seeks summary judgment on Count I. BFI and Mr. Ringgold also have filed a "Motion to Exclude Odyssey Valuation Opinions and Any Testimony of Plaintiff's Expert With Respect Thereto," which Odyssey opposes. For the reasons discussed more fully below, the Court grants BFI's, Mr. [*3] Ringgold's and TAC's motions as to Counts II, III and IV, and denies Odyssey's Motion for Summary Judgment as to Count I, as well as BFI's and Mr. Ringgold's Motion to Exclude.

**BACKGROUND**

The uncontested facts disclose the following context for this dispute. Odyssey and TAC are certified minority-owned waste hauling companies. At various times these two firms were hired by BFI, a corporation that operates waste transfer stations and disposal sites. In 1998, BFI entered into a Waste Disposal Agreement with the City of Philadelphia ("City Contract"), pursuant to which BFI was obligated to receive, transport and dispose of 65% of the City's municipal solid waste in exchange for annual compensation of approximately $27 million. The City Contract had a term of four years, commencing on July 1, 1998, with an option for the City to extend the term for three one-year renewal periods. The City Contract was indeed renewed for the three one-year renewal periods, making its ultimate expiration date June 30, 2005. Pursuant to the City Contract, municipal waste disposal trucks delivered waste to two BFI transfer stations, the TRC Station and the 58th Street Station. From there, BFI used [*4] third-party haulers to transport the waste to BFI's Conestoga landfill or to an incinerator in the city of Chester.

The City Contract required BFI to include participation by minority-owned subcontractors ("Minority Participation Program"). In order to fulfill this obligation, BFI entered into a Waste Transportation Agreement (the "WTA") with Odyssey on June 17, 1998, by which Odyssey was to transport municipal and commercial waste to BFI's Conestoga landfill. The WTA provided that Odyssey would haul all of the municipal and commercial waste delivered to BFI's TRC and 58th Street transfer stations, with the exception of construction and demolition waste. The initial term of the WTA was four years, with three one-year options to renew. Renewal of the City Contract automatically extended the term of the WTA, making it coterminous with the City Contract. Accordingly, the WTA, like the City Contract, had the ultimate expiration date of June 30, 2005.

BFI employed Mr. Ringgold from 1997 to September 1, 1999, when he entered into a Consulting Agreement with BFI. As a consultant, Mr. Ringgold's primary responsibilities included responsibility for BFI's compliance with the Minority Participation [*5] Program, which required Mr. Ringgold to solicit minority and women-owned firms. BFI and Mr. Ringgold also intended for Mr. Ringgold to help BFI secure the extension or rebid of the City Contract. In August 2004, Mr. Ringgold became a full-time employee of Allied Waste Industries, Inc. ("Allied"), BFI's corporate parent. Mr. Ringgold's responsibilities on behalf of BFI with respect to the City and the Minority Participation Program remained the same. He was also directed to help BFI secure a new waste disposal contract with the City, to begin July 1, 2005.

In 2003, Donald Neukam, then BFI's Regional Vice President of its Capital Region, instructed Mr. Ringgold to look for other potential minority haulers for the Philadelphia market. In 2004, Mr. Ringgold and Mr. Neukam identified TAC as a potential candidate to replace Odyssey for the subcontract under the new contract with City. Negotiations then began with TAC.

In December 2004, the City sent BFI a notice of default under the City Contract due to "excessive delays" and the accumulation of trash at the transfer stations. BFI had previously hired third-party haulers in addition to Odyssey, and at least by the end of 2004, it appeared [*6] that TAC would likely begin work for BFI before the expiration of the WTA. BFI sought approval from the City's Minority Business Enterprise Council ("MBEC") to replace Odyssey with TAC and Danella Transport, Inc., a female-owned firm. On March 24, 2005, the MBEC approved BFI's request, and by April 2005, BFI had negotiated and entered into substitute contracts with TAC and Danella, each with anticipated commencement dates in April 2005.

On March 29, 2005, Odyssey brought this action in the Court of Common Pleas of Philadelphia County against BFI, Mr. Ringold and TAC. The Defendants properly removed the case to this Court. n1 BFI and Mr. Ringold filed an Answer with affirmative defenses, along

with a single-count counterclaim against Odyssey alleging breach of contract (Docket No. 6). TAC filed a Motion to Dismiss (Docket No. 5), which the Court subsequently denied in its Order of November 18, 2005.

> n1 Before commencing the instant suit, Odyssey filed a petition for relief under Chapter 11 of Title 11 of United States Code, 11 U.S.C. § 101-1330, in the United States Bankruptcy Court for the Eastern District of Pennsylvania. The bankruptcy suit, Case No. 05-13719, has subsequently been dismissed.

[*7]

## LEGAL STANDARD

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). An issue is "genuine" if the evidence is such that a reasonable jury could return a verdict for the non-moving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986). A factual dispute is "material" if it might affect the outcome of the case under governing law. Id.

A party seeking summary judgment bears the initial responsibility for informing the district court of the basis for its motion and identifying those portions of the record that demonstrate the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986). Where the non-moving party bears the burden of proof on a particular issue at trial, the moving party's initial burden can be met simply by "pointing out to the district court that [*8] there is an absence of evidence to support the non-moving party's case," id. at 325, or offer affirmative evidence which demonstrates that the plaintiff cannot prove his case, Lawrence v. Nat'l Westminster Bank N.J., 98 F.3d 61, 69 (3d Cir. 1996). After the moving party has met its initial burden, "the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e).

The evidence provided by the nonmovant is to be believed, and the court must draw all reasonable and justifiable inferences in the nonmovant's favor. Anderson, 477 U.S. at 255. However, a nonmovant plaintiff cannot defeat a motion for summary judgment by merely restating the allegations of the complaint, but instead must "point to concrete evidence in the record

that supports each and every essential element in his case." Orsatti v. New Jersey State Police, 71 F.3d 480, 484 (3d Cir. 1995) (citing Celotex, 477 U.S. at 322). Thus, the non-moving party cannot rely on unsupported assertions, [*9] conclusory allegations, or mere suspicions to survive a summary judgment motion. Williams v. Borough of West Chester, 891 F.2d 458, 460 (3d Cir. 1989) (citing Celotex, 477 U.S. at 325).

## DISCUSSION

### A. Odyssey's Motion for Summary Judgment as to Count I: Breach of Contract

Odyssey moves for summary judgment as to Count I, its breach of contract claim against BFI. In evaluating this Motion, the Court must view the facts in the light most favorable to BFI and draw all inferences in its favor. Todish v. Cigna Corp., 206 F.3d 303, 305 (3d Cir. 2000).

Pursuant to Pennsylvania law, the elements required to establish a breach of contract claim are (1) the existence of a contract, including its essential terms; (2) a breach of a duty imposed by the contract; and (3) resulting damages. Ware v. Rodale Press, Inc., 322 F.3d 218, 225 (3d Cir. 2003); J.F. Walker Co., Inc. v. Excalibur Oil Group, Inc., 2002 PA Super 39, 792 A.2d 1269, 1272 (Pa. Super. 2002).

It is undisputed that Odyssey and BFI entered into a contract that was valid and binding on both parties. The basic terms of the contract [*10] are also undisputed. n2 Essentially, BFI was obligated to make available to Odyssey all of the "municipal and commercial waste" received at the Transfer Stations and give Odyssey "priority" in loading and disposing of such material. (WTA §§ 1.01, 1.03, 1.04.) For its part, Odyssey was obligated to "accept" and transport to the specified disposal sites all of such waste material, as well as to supply the "labor and equipment," including at least 46 trailers and the tractors to pull them. (Id. at §§ 1.01, 1.02, 3.02.) Both parties agreed to comply "with all applicable federal, state and local statutes, ordinances, rules and regulations in the performance of this Agreement." (Id. at § 20.)

> n2 The WTA provides in relevant part:
>
> > 1.01. Loading and Transportation: Odyssey agrees that it will accept and BFI agrees that it will deliver to Odyssey pursuant to this Agreement, municipal and commercial solid waste material (the "Waste Material"). BFI will load all Waste Material into Odyssey's trailers at BFI's transfer stations at

TRC and the Transcyclery (the "Transfer Stations").

1.02. Disposal Sites: All Waste Material will be transported by Odyssey to BFI's disposal sites at the Chester, Pennsylvania incinerator and the Conestoga Landfill in Morgantown, Pennsylvania (the "Disposal Sites").

1.03. Access to Transfer Stations and Disposal Sites: BFI agrees that Odyssey will have priority over other operators using the Transfer Stations for loading Waste Material and that Odyssey will have priority over other operators using the Disposal Sites as set forth in the Operations Manual.

1.04. Tonnage Guarantee: During the term of this Agreement, BFI agrees to deliver to Odyssey, for transport under this Agreement, all Waste Material delivered to BFI's Transfer Stations pursuant to the Solid Waste Disposal Agreement (the "City Contract") executed between the City of Philadelphia and BFI dated June    [sic] 1998. (Except as otherwise provided, the terms used herein and not defined herein shall have the meanings given to them in the City Contract). BFI guarantees to deliver to Odyssey the following "Guaranteed Quantity" of Waste Material: (a) not less than the [sic] one hundred (100) of all of the Waste Material delivered to the Transfer Stations under the City Contract except for construction and demolition waste; and (b) all Waste Material generated from commercial sources and available at the Transfer Stations except for construction and demolition waste.

. . .

8.01. Events of Default: The following events shall constitute an "Event of Default" hereunder: (A) Failure of BFI to (i) provide the Guaranteed Quantity as set forth in Section One; or (ii) pay Odyssey an amount equal to the

Fees due for the Guaranteed Quantity as set forth in Section One . . . (D) If Odyssey fails to transport the Guaranteed Quantity as set forth in Section One and fails to reimburse BFI for costs incurred by BFI in excess of the Fees that would have been due Odyssey if Odyssey had not failed to transport the Guaranteed Quantity . . . .

8.02. Termination: Upon the occurrence of an Event of Default, the aggrieved party shall have the right to terminate this Agreement upon forty-five (45) days written notice to the other party (the "Notice"), in addition to all other rights and remedies of the aggrieved party existing at law or in equity. However, if the defaulting party has cured the Event of the Default within forty-five (45) days of the date of the Notice, this Agreement shall not terminate but shall remain in full force and effect.

[*11]

Odyssey moves for summary judgment on the grounds that (1) it is undisputed that BFI repeatedly hired third-party haulers between 2002 and 2003, and (2) it is undisputed that BFI did not provide Odyssey with priority loading status at the Transfer Stations. Odyssey contends that this conduct constitutes a breach of the WTA because BFI violated the priority and exclusivity provisions (§§ 1.03 and 1.04, respectively). BFI does not dispute that it used third-party haulers in addition to Odyssey during the period from January 1, 2003 until the expiration of the WTA, or that Odyssey did not receive priority at the transfer stations over those other third-party haulers. Likewise, BFI has not presented evidence sufficient to raise a genuine issue as to whether Odyssey suffered damages as a result of this conduct. Thus, the issue is whether BFI's non-performance of the remainder of the WTA was in some way excused or discharged.

While BFI does not dispute that its use of third-party haulers violated the exclusivity and priority provisions of the WTA, it opposes summary judgment for Odyssey on the ground that Odyssey's failure to fully perform under the WTA effectively discharged BFI's obligations [*12] and entitled BFI to use third-party haulers in order to mitigate its damages. According to BFI, Odyssey failed to transport all of the waste in accordance with the re-

quirements of the WTA and failed to maintain the necessary levels of equipment. These failures, argues BFI, necessitated BFI's use of third-party haulers and prompted giving those haulers equal access to the transfer stations. Specifically, BFI contends that Odyssey failed to provide 46 trailers as required under § 3.02 of the WTA, causing the build-up of waste at the transfer stations in violation of Pennsylvania Department of Environmental Protection ("PDEP") regulations.

It is an implied condition of each party's remaining duties under a contract that the other party have performed. Restatement (Second) of Contracts § 237. At a minimum, the failure of a condition suspends the obligation to perform any corresponding duty unless and until the condition is met. Id. at § 225(1) ("Performance of a duty subject to a condition cannot become due unless the condition occurs or its non-occurrence is excused."); Shovel Transfer & Storage, Inc. v. Pennsylvania Liquor Control Bd., 559 Pa. 56, 739 A.2d 133, 139 (Pa. 1999) [*13] ("Where a condition has not been fulfilled, the duty to perform the contract lays dormant and no damages are due for non-performance.") (citation omitted); Oak Ridge Construction Co. v. Tolley, 351 Pa. Super. 32, 504 A.2d 1343, 1348 (Pa. Super. 1985) ("If a breach constitutes a material failure of performance, then the non-breaching party is discharged from all liability under the contract.") A party to a contract is also entitled to suspend its performance if it has demanded, but not received, adequate assurance of performance from the other party when there are reasonable grounds to be concerned about such performance. Restatement (Second) Contracts § 251(1).

There is sufficient evidence in this record to raise a genuine issue of fact as to whether Odyssey performed its obligation to remove all of the waste from the transfer stations on a daily basis. If it did not, then BFI's alleged breach that is the basis for Count I of the Complaint may have been excused. As an initial matter, it is undisputed that there was a significant problem with insufficient removal of waste from the transfer stations, problems that led to citations [*14] and fines by PDEP (see Def. Exs. 14, 15, 17, 30), and a declaration by the City of BFI's default under the City Contract as a result of "excessive delays" at both the TRC and 58th Street stations (Def. Ex. 29). Viewed in the light most favorable to BFI, the evidence in the record thus far suggests that a factfinder could conclude that Odyssey was responsible for these problems. For example, in 2004, Odyssey acknowledged in writing that "inconsistent performance" by one of its subcontractors was "leaving the transfer stations under-served." (Def. Ex. 9, at 2.) Additionally, in response to a request by Odyssey in July 2003 that BFI stop using third-party haulers, BFI stated that the 58th Street Station required an average of 32 loads per day

while Odyssey was averaging only 24 outbound loads per day. (Pl. Ex. 26, at 2.) BFI further stated that "[w]ithout the supplemental [third-party] trucking, 58 Street would be shut down . . . [and] TRC would have 2000 tons outside the building right now." (Id.) Thus, there is a genuine issue as to whether Odyssey failed to maintain the necessary equipment as required by the WTA and as to whether this failure and consequent inability [*15] to meet BFI's hauling needs constituted a material breach by Odyssey.

In addition to Odyssey's alleged inability provide the requisite equipment, BFI argues that the violation of PDEP regulations also constitutes a breach of the WTA. Specifically, the City Contract required BFI to accept a minimum amount of waste from the City into the transfer stations each day. Thus, BFI had little control over how much trash came into the transfer stations, although BFI remained subject to PDEP regulations that prohibited transfer station operators such as BFI to allow waste "to remain at the transfer facility at the end of the day or for more than 24 hours." See 25 PA Code § 279.217(b). Accordingly, BFI depended on Odyssey, as BFI's hauler, to remove waste from the transfer stations as required by the PDEP regulations. BFI contends that Odyssey's failure to do so constitutes an additional breach of the WTA on the part of Odyssey because the WTA required both parties to perform under the contract in compliance with "applicable rules and regulations," including PDEP regulations regarding the storage and timing of transportation of waste. n3 BFI characterizes its use of third-party haulers as [*16] an attempt to obtain substitute performance and/or mitigate its damages in the face of Odyssey's allegedly inadequate performance, notices of violation and fines, and default under the City Contract. This characterization is supported by evidence which, viewed in the light most favorable to BFI, is sufficient for a reasonable jury to find in favor of BFI on these issues. n4

n3 See, e.g., 25 Pa. Code §§ 279.201(b); 279.213(b); 279.215(a), 279.216(f), 279.217(b). It is unclear to what extent Odyssey was aware of the PDEP requirements. For example, Carl Singley, Odyssey's principal shareholder, testified that Odyssey "had no knowledge of what was required under the permits." (Singley Dep. 87.) However, William Johnson, Odyssey's Chief Executive Officer, testified that although he had "not seen BFI's permits with their facilities," he was "aware that most facilities, most transfer station facilities, require that trash be moved within a given time frame." (Johnson Dep. 195.) Dennis Jones, a transfer station site manager for Odyssey, also confirmed that he understood that the transfer permits required trash to be removed

from the transfer stations within 24 hours and stated that Odyssey management was aware of this requirement. (Dennis Dep. 72.)

[*17]

n4 At this stage, therefore, the Court need not reach the question of whether, under Pennsylvania law, BFI, as a result of Odyssey's conduct, was entitled to use third-party haulers and provide them equal access to the transfer stations. There are sufficient questions of fact as to whether Odyssey breached at all, and whether that breach was material or minor, to deny summary judgment without reaching the question of whether BFI's nonperformance was excused by Odyssey's conduct.

For its part, Odyssey argues that its own performance problems could not and did not discharge BFI's obligations under the WTA because BFI did not provide Odyssey with notice of any "performance issues" before January 2003, when BFI began using other third-party haulers. In addition, Odyssey contends that there was no "daily hauling requirement" in the WTA and, therefore, its inability to remove all the waste from the transfer stations was not a breach. These contentions, however, only serve to illustrate that genuine issues of fact do exist on the question of breach. For example, there is a genuine factual dispute [*18] concerning the hauling requirements under the contract, such as whether the operation of PDEP regulations, with which the parties agreed to comply, effectively creates a daily hauling requirement. Factual disputes also exist concerning any notice provided by BFI to Odyssey regarding performance problems, the time period when such performance problems began, and whether notice was given before or after BFI began using third-party haulers. n5 Finally, there is a factual dispute concerning responsibility for the failure to adequately remove waste from the transfer stations.

n5 For example, there is evidence, namely a letter from BFI to Odyssey dated July 17, 2002, in the record demonstrating that BFI informed Odyssey of performance problems prior to January 2003. (See BFI Ex. 15; BFI Reply to TAC MSJ Ex. 18, Bates BFI000220.)

In sum, BFI has presented evidence sufficient to raise a genuine issue as to whether Odyssey's conduct amounted to a breach of the WTA or otherwise discharged BFI's obligations under [*19] the exclusivity

and priority provisions. Therefore, the Court will deny Odyssey's Motion.

## B. Defense Motions for Summary Judgment as to Counts II, III and IV: Tortious Interference with Economic and Business Relationships

BFI, Ringgold and TAC each have moved for summary judgment as to Odyssey's tortious interference claims (Counts II, III and IV, respectively). In evaluating these motions, the Court must view the facts in the light most favorable to Odyssey and draw all inferences in its favor. Todish, 206 F.3d at 305.

With respect to tortious interference claims, Pennsylvania has specifically adopted Section 766 of the Restatement (Second) of Torts, which provides that "[o]ne who intentionally and improperly interferes with the performance of a contract . . . between another and a third person by inducing or otherwise causing the third person not to perform the contract, is subject to liability to the other for the pecuniary loss resulting to the other from the failure of the third person to perform the contract." Restatement (Second) of Torts § 766; Adler, Barish, Daniels, Levin & Creskoff v. Epstein, 482 Pa. 416, 393 A.2d 1175, 1183 (Pa. 1978). [*20] To prevail on a cause of action for tortious interference with an existing or prospective contractual relation, a plaintiff must prove the following elements:

(1) the existence of a contractual, or prospective contractual relation between the complainant and a third party; (2) purposeful action on the part of the defendant, specifically intended to harm the existing relation, or to prevent a prospective relation from occurring; (3) the absence of privilege or justification on the part of the defendant; and (4) the occasioning of actual damage as a result of the defendant's conduct.

Crivelli v. GMC, 215 F.3d 386, 394 (3d Cir. 2000); see also Strickland v. University of Scranton, 700 A.2d 979, 985 (Pa. Super. 1997).

### 1. COUNT II (Odyssey v. BFI)

Odyssey alleges that BFI interfered with "existing contractual relations" between Odyssey and its subcontractors, including Danella and Long Riders Trucking ("Long Riders"), by hiring those subcontractors directly and causing them to cease working for Odyssey. BFI seeks summary judgment on the ground that there is no evidence of any contract between Odyssey and either

[*21] subcontractor and, therefore, the record is insufficient to establish a genuine issue of fact as to the first required element for a tortious interference claim.

The Court previously determined that Odyssey's claim against BFI for "tortious interference with business and economic relations" is limited to the alleged interference with *existing* contracts n6 Although Pennsylvania recognizes causes of action for interference with both existing and prospective contracts, each is a *distinct* cause of action, Brokerage Concepts, Inc. v. U.S. Healthcare, Inc., 140 F.3d 494, 529-30 (3d Cir. 1998), n7 and Odyssey failed to plead sufficient facts to state a claim for tortious interference with *prospective* contractual relations n8

n6 The Court clarified this issue when it denied Odyssey's Motion to Amend the Complaint. Odyssey proposed amending the Complaint to include averments that Odyssey had "started negotiating" with Danella and Long Riders in 2004 and, therefore, BFI interfered with "Odyssey's prospective business relations." (Def. Ex. A at PP 62, 65.) The Court denied Odyssey's Motion to Amend, in part because the Court viewed the amended complaint as a tardy attempt to "recast[] Odyssey's intentional interference with contractual relations claims as intentional interference with prospective contractual relations," and held that adding "new causes of action" would cause undue delay and prejudice the Defendants. (Order of August 31, 2006.) Moreover, in the original Complaint, Odyssey does not allege that *BFI* interfered with Odyssey's "prospective business advantage;" rather, Odyssey specifically avers that "[t]he loss of these existing contractual and business relationships has . . . interfered with Odyssey's prospective business advantage with the customers and the hauling companies." (Compl. P 34.) Thus, as BFI correctly points out, paragraph 34 is Odyssey's assertion of *damages*, rather than an assertion of tortious interference with prospective business relations.

[*22]

n7 Odyssey cites the Court's Memorandum and Order of November 17, 2005, which denied TAC's motion to dismiss, and which refers to "tortious interference with business and economic relations" interchangeably with "tortious interference with actual and prospective business relationships." The Court, however, denied the motion to dismiss on the ground that Odyssey had pleaded sufficient facts to state a claim against

TAC for alleged interference with an *existing* contract and did not reach the issue of whether Odyssey had stated a claim for interference with any *prospective* contracts. At least with respect to BFI, the Court made clear that Odyssey had only stated a claim for interference with *existing* contractual relations, and denied Odyssey's late attempt to broaden its allegations to include the separate and distinct tort of interference with *prospective* contractual relations, claims which Odyssey should have known about from the start of this litigation and which did not first suggest itself from discovery.

n8 Federal pleading standards do not allow a party "to raise new claims at the summary judgment stage. . . . Liberal pleading does not require that, at the summary judgment stage, defendants must infer all possible claims that could arise out of the facts set forth in the complaint." Gilmour v. Gates, McDonald & Co., 382 F.3d 1312, 1314-15 (11th Cir. 2004); see also Shanahan v. City of Chicago, 82 F.3d 776, 781 (7th Cir. 1996) ("A plaintiff may not amend his complaint through arguments in his brief in opposition to a motion for summary judgment") (citation omitted); Speziale v. Bethlehem Area Sch. Dist., 266 F. Supp. 2d 366, 371 n.3 (E.D. Pa. 2003) ("Plaintiff's counsel cannot reasonably expect to amend the complaint after the close of discovery merely by raising new arguments in the [summary judgment] responsive papers").

[*23]

The fundamental issue, therefore, is whether Odyssey had contracts with Danella or Long Riders with which BFI interfered. For a contract to be formed, there must be a manifestation of an intent by each party to be bound. University Graphics, Inc. v. Pro-Image Corp., et al., 913 F. Supp. 338, 342 (M.D. Pa. 1996) (citing Philmar Mid-Atlantic v. York Street Assoc. II, 389 Pa. Super. 297, 566 A.2d 1253, 1255 (Pa. Super. 1989)). The intent to later formalize an agreement in writing does not prevent the formation of a contract where the parties have settled on the terms of the agreement. Id. at 342 (quoting Philmar-Atlantic, 566 A.2d at 1255). However, "[a]bsent a manifestation of an intent to be bound, . . . negotiations concerning the terms of a possible future contract do not result in an enforceable agreement." Id. (quoting Philmar-Atlantic, 566 A.2d at 1255).

Odyssey concedes that it never executed a contract with either Danella or Long Riders, the two entities named in the Complaint and in the testimony of Messrs. Johnson, Singley and Nicholas Pisacano, the human re-

sources coordinator at [*24] Odyssey. (See Compl. PP 29-34; Pisacano Dep., Def. Ex. 3 at 306-10; Johnson Dep., Def. Ex. 2 at 249-51; Singley Dep., Def. Ex. 1 at 143.) Although Count II is not expressly limited to Danella and Long Riders, Mr. Johnson and Mr. Pisacano, when asked under oath, did not identify any others, (Johnson Dep., Def. Ex. 2 at 363-64; Pisacano Dep., Def. Ex. 3 at 324-25), and Odyssey did not produce any signed contracts in response to discovery requesting any such contracts (Def. Mem. 15) n9

> n9 Mr. Johnson's deposition testimony transcript states that Odyssey signed a contract with Long Riders, but both Odyssey and BFI agree that this was a transcription error, and Mr. Johnson has submitted an errata sheet confirming the error.

Similarly, Odyssey has not demonstrated that the parties reached an agreement on the material terms, whether or not memorialized. (See Piscacano Dep., Def. Ex. 3 at 306-10; Johnson Dep., Def. Ex. 2 at 29-251.) In addition, there is nothing in the record indicating that Long Riders or [*25] Danella performed any work for, or received any payment from, Odyssey. Mr. Johnson described Odyssey's relationship with Danella and Long Riders as follows:

> Q: Am I correctly interpreting that language to say that -- that you and -- sorry, Odyssey and Long Riders never, in fact, entered into a contract?
>
> A: We negotiated. We discussed rates, and I provided them at our mutual -- upon our mutual agreement, a draft of the language, our standard language, and a contract for them to review.

. . .

> Q: Did Danella ever sign a contract with Odyssey?
>
> A: No.
>
> Q: Tell me about how far negotiations between Odyssey and Danella progressed.
>
> A: We discussed volumes. We discussed equipment. We discussed rates. And again, when we left the conversation, they wanted, and we agreed, that I would provide them with a draft agreement that [sic] could review the language, et cetera.

(Johnson Dep. 248-51.) Likewise, in a June 8, 2004 letter to BFI, Mr. Johnson characterized Odyssey's interactions with Long Riders and Danella as "discussions" and "negotiations," but did not state that an agreement had been reached. (See Def. Response to Odyssey Motion, Ex. 9.) Mr. Pisacano also testified [*26] that he did not think Danella or Long Riders "really responded" to Odyssey's proposed pricing in the draft contracts. (Pisacano Dep. 309. n10) Thus, based on the evidence currently in the record, no reasonable jury could find that Odyssey had entered into an agreement or contract with either Danella or Long Riders by the time of BFI's alleged interference. n11

> n10 On this point, the Pisacano testimony was as follows:
>
>> Q: Do you know how Long Riders or Danella responded to the proposed pricing in the draft contracts?
>>
>> A: I know that they were able to work directly with BFI, so I don't think they really responded or they did not complete a contract.
>
> (Pisacano Dep. 309.)

> n11 Odyssey has not asserted to the Court that an oral agreement between Odyssey and either Danella or Long Riders was reached.

Instead, Odyssey argues that, even without an executed contract, its existing "commercial relationships" with Danella and Long Riders suffice to establish the requisite predicate contractual relationship [*27] for a tortious interference claim. Apparently hoping to finesse the difference between "contractual" relationships and "commercial" relationships, Odyssey has produced evidence sufficient to raise a genuine issue as to whether such "commercial relationships" existed, such as unsigned draft contracts and testimony regarding contract negotiations. Presumably, the "commercial relationships" that Odyssey suggests were the relationships between the entities by which they were aware of each other, aware of their respective business interests and willing to at least consider doing business with each other. However, while such evidence may be sufficient to defeat summary judgment on a claim for interference with *prospective* contractual relationships, it does not forestall summary judgment on a claim for interference with *existing* con-

tractual relationships. See <u>Daniel Adams Associates, Inc. v. Rimbach Publishing, Inc., 360 Pa. Super. 72, 519 A.2d 997, 1000 (Pa. Super. 1987)</u> (Essential to the right of recovery under a tortious interference with contract claim is the existence of a contractual relationship between the plaintiff and a third person other than the defendant. [*28] ); <u>Al Hamilton Contracting Co. v. Cowder, 434 Pa. Super. 491, 644 A.2d 188, 191 (Pa. Super. 1994)</u> ("A critical element of the tort is a current contractual relationship between the plaintiff and another.") (citation omitted).

Thus, because Odyssey has failed to raise a genuine issue of fact as to the existence of any existing contractual agreement with any subcontractors, n12 the Court will grant summary judgment in favor of BFI on Count II.

> n12 Because Odyssey has failed to raise a genuine issue as to the first required element of a tortious interference claim, the Court will not address the remaining three elements.

## 2. COUNT III (Odyssey v. Samuel Ringgold)

Odyssey alleges that Mr. Ringgold interfered with the WTA between BFI and Odyssey both by recruiting TAC to haul waste for BFI, and by participating in efforts by BFI to obtain permission from the MBEC to terminate the WTA, to certify TAC as a minority-owned company, and to replace Odyssey with TAC. Mr. Ringgold moves for summary [*29] judgment on the grounds that (1) he was an agent of BFI acting within the scope of his responsibilities and, therefore, cannot interfere with the principal's contracts, and (2) the actions taken by Mr. Ringgold did not tortiously interfere with the WTA.

As set forth above, one of the essential elements of tortious interference is the existence of a contract between the plaintiff and a 'third person' *other than the defendant*." <u>Daniel Adams, 519 A.2d at 1000</u> (citing <u>Glenn v. Point Park College, 441 Pa. 474, 272 A.2d 895, 898 (Pa. 1971)</u>) (emphasis added); see also <u>Maier v. Maretti, 448 Pa. Super. 276, 671 A.2d 701, 707 (Pa. Super. 1995)</u> ("Essential to recovery on the theory of tortious interefference with contract is the existence of three parties . . . . As a result there must be a contractual relationship between the plaintiff and a party other than the defendant.")

The acts of an agent within the scope of his agency are imputed to and binding on the corporation. <u>Daniel Adams, 519 A.2d at 1000</u>. Accordingly, an agent of a corporation has immunity from a claim of tortious interference with a contract between his [*30] principal, i.e., the corporation, and a third party, <u>CGB Occupational</u>

<u>Therapy v. RHA Health Servs., 357 F.3d 375, 385 (3d Cir. 2004)</u>. This is because "holding an agent liable would be like holding the principal itself liable for the tort of interfering with its own contract, instead of holding the principal liable for breach of contract." Id.; see also <u>Daniel Adams, 519 A.2d at 1002</u> (concluding that "where, as here, a plaintiff has entered into a contract with a corporation, and that contract is terminated by a corporate agent who has acted within the scope of his or her authority, the corporation and its agent are considered one so that there is no third party against whom a claim for contractual interference will lie").

Thus, the issue is whether BFI may be considered a "third person," separate and distinct from Mr. Ringgold, that is, whether Mr. Ringgold, while he was a consultant, was acting as BFI's agent or, even if so, whether he acted outside the scope of his agency. Under Pennsylvania law, a principal-agent relationship is created by the manifestation of the principal that the agent shall act for the principal, the agent's acceptance [*31] of the undertaking, and the understanding of the parties that the principal is to be in control of the undertaking. <u>Basile v. H & R Block, Inc., 563 Pa. 359, 761 A.2d 1115, 1120 (Pa. 2000)</u>.

Here, Mr. Ringgold provided paid consulting services to BFI pursuant to a written agreement (the "Consulting Agreement") from September 1, 1999 until August 2004, at which time he was hired as a full-time employee by Allied, of which BFI is a wholly-owned subsidiary. Thus, at all relevant times, Mr. Ringgold was authorized to act on behalf of BFI, duties which Mr. Ringgold accepted by signing the Consulting Agreement and, later, the Employment Agreement. Therefore, the record establishes that Mr. Ringgold acted as BFI's agent in his capacity a business consultant since at least 1999. See <u>Restatement (Second) of Agency § 228</u> ("[C]onduct is within the scope of employment if, but only if: (a) it is the kind [the employee] is employed to perform; (b) it occurs substantially within the authorized time and space limits [and] (c) it is actuated, at least in part, by a purpose to serve the master . . . .").

The inquiry, however, does not [*32] end there. Agents may be liable where they act in their personal capacity or outside the scope of their authority, <u>American Trade Partners v. Int'l Importing Enters., 757 F. Supp. 545, 555 (E.D. Pa. 1991)</u>. An intentional interference claim also may be asserted against a corporate agent where that agent, acting in his personal capacity or outside the scope of his authority, acted with malice towards the plaintiff or against the corporation's best interests. <u>Kiely v. University of Pittsburgh Medical Ctr., No. 98-1536, 2000 U.S. Dist. LEXIS 3156, at *33-34 (E.D. Pa. Jan. 20, 2000)</u>. Under Pennsylvania law, however, "the mere existence of a personal motivation is insufficient to

relieve the employer from liability where the conduct also benefitted him and was within the scope of employment generally." Brumfield v. Sanders, 232 F.3d 376, 380-381 (3d Cir. 2000) (citations omitted). The burden of establishing that an agent acted outside the scope of the agent's engagement falls on the party advancing that argument, in this case, Odyssey Tucker v. Merck & Co., No. 02-2421, 2002 U.S. Dist. LEXIS 23062, 2002 WL 31689256, at *2 (E.D. Pa. Dec. 2, 2002). [*33]

Odyssey does not dispute that as a paid consultant to BFI, Mr. Ringgold's primary responsibilities involved the management of BFI's relationship with the City of Philadelphia under the City Contract and responsibility for compliance with the Minority Participation Program. (See Pl's Response to Statement of Undisputed Facts PP 15-18.) Assuring compliance with the Minority Participation Program required Mr. Ringgold to solicit on behalf of BFI minority- and women-owned firms. Odyssey also does not dispute that, as of August 2004, BFI explicitly directed Mr. Ringgold to help BFI "[s]ecure the City of Philadelphia Solid Waste Disposal contract beginning July 1, 2005." (Def. Ex. 16 at 4; Def. Ex. 14 at 43.) In addition, in late 2003 or early 2004, BFI instructed Mr. Ringgold to investigate other potential minority haulers for the Philadelphia market. (Def. Ex. 14, Ringgold Dep. 84-85.)

To try to carry its burden of proving that Mr. Ringgold acted outside the scope of his authority, Odyssey alleges that Mr. Ringgold, in order to receive a bonus tied to bringing TAC into the Philadelphia market, concealed from BFI that the WTA covered *all* waste (as opposed to just City waste) [*34] and thereby deceived BFI into contracting with TAC. n13 Odyssey argues that "[s]uch an intentional nondisclosure by Ringgold, combined with his actions as to recruiting TAC, were clearly against BFI's best interests as it subjected BFI to potential liability under the WTA," and were in Mr. Ringgold's own interests because he allegedly would receive a bonus for securing TAC. Therefore, argues Odyssey, Mr. Ringgold was acting in his personal capacity and outside the scope of his authority.

> n13 Odyssey did not raise this theory of liability in the Complaint. While Odyssey alleged in the Complaint that Mr. Ringgold *acted in concert and conspired with* BFI, Odyssey now argues that Mr. Ringgold *acted at odds with* BFI (and thus in his own interest and outside the scope of his authority). Although a plaintiff "cannot . . . change theories after a motion for summary judgment has been filed," Andrews v. Abbott Labs., No. 00-901, 2002 U.S. Dist. LEXIS 6832, at *12 n.2 (E.D. Pa. Apr. 18, 2002), the Court need not address the question here because,

even under its new theory, Odyssey fails to defeat Mr. Ringgold's motion for summary judgment.

[*35]

The record, however, belies Odyssey's assertions and supports summary judgment in favor of Mr. Ringgold. First, by the terms of his Employment Contract, Mr. Ringgold would receive a bonus only for securing a new contract with the City, not for bringing TAC into the Philadelphia market. Moreover, even if the evidence raised a legitimate question as to whether Mr. Ringgold was to receive additional money for recruiting TAC (see Hee Dep., Pl. Ex. 60), Mr. Ringgold was nonetheless acting under the direction, and, hence, in the interest of BFI. Second, there is no evidence in the record indicating that Mr. Ringgold deliberately withheld any information from BFI. And finally, nothing in the record indicates that BFI entered into its contract with TAC under any misapprehension about its obligations under the WTA. n14

> n14 Odyssey agrees that any confusion about the terms of the WTA was resolved in June 2004, and BFI did not enter into the contract with TAC until, at the earliest, February 2005.

Thus, Odyssey has [*36] failed to raise a genuine issue of fact as to whether Mr. Ringgold was BFI's agent, or as to whether he acted outside the scope his authority and in his personal capacity during the relevant time period. Therefore, Mr. Ringgold is immune from liability for tortious interference with the WTA, and the Court will grant him summary judgment as to Count III. n15

> n15 Mr. Ringgold also argues, in the alternative, that even if he was not BFI's agent or acting within the scope of his authority, his conduct did not interfere with the WTA because he acted with the intention of replacing Odyssey, not during the term of the WTA, but rather after its expiration in 2005, for the *next* contract with the City. The Court need not reach this argument because the record supports the conclusion that, with respect to TAC and the MBEC, Mr. Ringgold was acting on behalf of BFI and in compliance with BFI's explicit directions.

### 3. COUNT IV (Odyssey v. TAC)

Odyssey alleges that TAC intentionally interfered with the actual and [*37] prospective business relationships of Odyssey by "(a) conspiring with Ringgold and BFI to develop a strategy to violate Odyssey's agreement

with BFI; (b) encouraging employees of Odyssey to leave its employ and began [sic] working directly for TAC; (c) taking actions to divert revenue that Odyssey was legally entitled to under the Agreement; and (d) conspiring with Defendant Ringgold to exploit Odyssey's prospective business opportunities." (Compl. P 41.) TAC moves for summary judgment on the ground that the record fails to raise a genuine issue of fact as to each of the elements of tortious interference.

As previously stated, plaintiff must prove the following elements to prevail on a claim for tortious interference:

> (1) the existence of a contractual, or prospective contractual relation between the complainant and a third party; (2) purposeful action on the part of the defendant, specifically intended to harm the existing relation, or to prevent a prospective relation from occurring; (3) the absence of privilege or justification on the part of the defendant; and (4) the occasioning of actual damage as a result of the defendant's conduct.

Crivelli, 215 F.3d at 394. [*38] To avoid summary judgment, Odyssey must affirmatively come forward with "specific facts" in the form of admissible evidence demonstrating that a genuine issue exists for the fact-finder. Fed. R. Civ. P. 56; Pamintuan v. Nanticoke Mem'l Hosp., 192 F.3d 378, 387 n.13 (3d Cir. 1999); Williams v. Borough of W. Chester, 891 F.2d 458, 460 (3d Cir. 1989) (stating that the nonmovant cannot rely on unsupported assertions, conclusory allegations or mere suspicions). Where, as here, the plaintiff would bear the burden of proof at trial, summary judgment in favor of the defendant is appropriate when the plaintiff cannot establish the existence of an element essential to its case. Cleveland v. Policy Mgmt. Sys. Corp., 526 U.S. 795, 805-06, 119 S. Ct. 1597, 143 L. Ed. 2d 966 (1999).

Since Odyssey has failed to demonstrate a genuine issue of fact as to the two final elements -- that is, whether TAC acted in the absence of privilege or justification and whether TAC's conduct caused any harm to Odyssey -- the Court need not address the first two elements and will focus the analysis on the third and fourth elements.

### a. Absence [*39] of Privilege or Justification

Odyssey must establish the absence of privilege or justification on TAC's part to prevail on a claim for tortious interference with contractual relations. Thompson

Coal Co. v. Pike Coal Co., 488 Pa. 198, 412 A.2d 466, 471 (Pa. 1979). In the context of tortious interference claims, "[t]he presence of a privilege is not an affirmative defense, rather, the absence of such a privilege is an element of the cause of action which must be pleaded and proven by the plaintiff." Bahleda v. Hankison Corp., 228 Pa. Super. 153, 323 A.2d 121, 122-23 (Pa. Super. 1974).

To determine whether an actor's conduct was improper or wrong, Pennsylvania courts embrace Section 767 of the Restatement (Second) Torts, which states that courts should look to the following factors: (1) the nature of the actor's conduct; (2) the actor's motive; (3) the interests of the party with which the actor's conduct interferes; (4) the interests sought to be advanced by the actor; (5) the social interests in protecting the freedom of action of the actor and the contractual interests of the other; (6) the proximity or remoteness [*40] of the actor's conduct to the interference; and (7) the relations between the parties. Windsor Secs., Inc. v. Hartford Life Ins. Co., 986 F.2d 655, 663 (3d Cir. 1993); Adler, 393 A.2d at 1184. The determination as to whether a party's behavior was improper such that it constituted tortious interference is based on the circumstances of each case and "requires inquiry into the mental and moral character of the defendant's conduct." Big Apple BMW, Inc. v. BMW of N. Am., Inc., 974 F.2d 1358, 1382 (3d Cir 1992). Proper conduct in this context is "socially acceptable conduct that comports with the rules of the game which society has adopted." Id. at 1381.

Odyssey contends that TAC's actions do not comply with recognized standards of business ethics and custom -- that is, fair play and the "rules of the game." See Kachmar v. SunGard Data Sys., Inc., 109 F.3d 173, 185 (3d Cir. 1997); Franklin Music Co. v. Am. Broadcasting Cos., Inc., 616 F.2d 528, 544 (3d Cir. 1979). Urging the Court to consider the factual scenario as a whole, see Ruffing v. 84 Lumber Co., 410 Pa. Super. 459, 600 A.2d 545, 549 (Pa. Super. 1991), [*41] Odyssey asserts that the record at least raises a question of fact as to whether TAC improperly "lobbied" for BFI's business when it knew that BFI was then party to a contract with Odyssey. n16 In addition, Odyssey argues that TAC was "complicit in BFI's bad business behavior" because TAC accepted payments from BFI before the termination of the WTA, and that this complicity was improper.

> n16 Citing Adler, Barish, Daniels, Levin & Creskoff v. Epstein, 482 Pa. 416, 393 A.2d 1175 (1978), Odyssey asserts that Pennsylvania courts have held this type of conduct to be improper. In Adler, the court held that the conduct of former law firm associates in actively soliciting the law firm's clients was improper and thus the law firm

could maintain its action against the former associates for intentional interference with existing contracts. Id. at 1185. The Adler court, however, relied heavily on the fact that the associates' conduct violated the then extant Pennsylvania Code of Professional Conduct and breached the duty an agent owes the principal. Id. (right to pursue own business interests is not absolute since "unless otherwise agreed, after the termination of the agency, the agent . . . has a duty to the principal not to take advantage of a still subsisting confidential relation created during the prior agency relation) (quoting Restatement (Second) of Agency § 396(d)) The fact that the clients' contracts with the law firm were term contracts, as opposed to at-will contracts, had no bearing on the court's finding. Odyssey cites no other cases for the proposition that solicitation of a party to a contract is improper for purposes of a tortious interference claim.

[*42]

The evidence in the record, however, merely demonstrates the existence of negotiations between BFI and TAC and, when viewed in the light most favorable to Odyssey, the inference of possible solicitation on the part of TAC with respect to BFI. The affirmative actions taken by TAC are as follows: (1) expression of interest in the Philadelphia market at a meeting with BFI in the spring of 2004; (2) correspondence with BFI throughout 2004; (3) discussions and negotiations in November and December of 2004, by which point TAC knew of the WTA and which indicate TAC's expressions of its ability and willingness to begin work in early 2005 (see Pl. Exs. JJ, KK).

TAC's conduct cannot be said to be objectively improper. It is entirely "fair" and, indeed, commonplace, for competitors to compete for business contracts, and such solicitation may take place prior to the termination of current contracts in anticipation of new arrangements. There is nothing in the record that displays an explicit effort on the part of TAC to interfere with the WTA or to provide an incentive for BFI to breach the WTA. Rather, the record demonstrates that TAC entered into negotiations with BFI and expressed a [*43] willingness to meet BFI's Philadelphia hauling needs. This alone cannot be said to violate standards of fair play and the "rules of the game." A contrary holding here risks saddling third parties with the responsibility of policing the current contracts of their prospective business partners and exercising a kind of in loco parentis conscience for those potential partners for the protection of the very party sought to be replaced. Not only would such a duty be unrealistic, the Court gravely doubts it could ever be

workable, much less successful. See P.V.C. Realty v. Weis Mkts., Inc., 56 Pa. D. & C.4th 304, 2000 WL 33406981, at *14 (Pa. Com. Pl. 2000) ("The issue in each case is whether the interference is improper or not under the circumstances; whether upon a consideration of the relative significance of the factor involved, the conduct should be permitted without liability, despite its effect of harm to another. The decision therefore depends upon a judgment and choice of values in each situation."). Finally, TAC's conduct lacks proximity to Odyssey's alleged loss because the record establishes BFI's dissatisfaction with Odyssey's performance predating and [*44] independent of its negotiations with TAC and BFI's hiring of other contractors in addition to TAC.

In sum, Odyssey's position substantially depends on unwarranted inferences from its own suspicions to suggest that TAC's conduct was any way wrongful. These unsupported allegations by Odyssey are insufficient to raise a genuine issue of fact with respect to the absence of privilege or justification. n17 Thus, because TAC's conduct, viewed objectively, falls within the "area of socially acceptable conduct which the law regards as privileged," and because neither the parties nor the Court have discovered any case holding analogous conduct to be improper or otherwise actionable, n18 simply stated, Odyssey has failed to raise a genuine question of fact as to whether TAC acted without privilege or justification.

> n17 The Pennsylvania Supreme Court has noted that "[t]he absence of privilege or justification in [tortious interference] is closely related to the element of intent. . . . What is or is not privileged conduct in a given situation is not susceptible of precise definition." Adler, Barish, Daniels, Levin & Creskoff, 393 A.2d at 1183-84. The amorphous "rules of the game" standard, otherwise defined as the "area of socially acceptable conduct which the law regards as privileged," marks the boundary between privileged conduct and liability. See id. at 1184 ("[W]here, as in most cases, the defendant acts at least in part for the purpose of protecting some legitimate interest which conflicts with that of the plaintiff, a line must be drawn and the interests evaluated. This process results in according or denying a privilege which, in turn, determines liability.") (quoting Harper & James, The Law of Torts § 6.11). Odyssey has succeeded only in pointing to evidence which could be interpreted as an intent to interfere, which is closely related but nonetheless distinct from the question of whether or not TAC's conduct was privileged or justified. Thus, while Odyssey may have marshalled sufficient evidence to create an issue as to intent, it has not

done so as to the separate, required element of lack of privilege or justification

[*45]

n18  In Air Terminal Servs. v. Lehigh-Northampton Airport Auth., No. 96-2314, 1996 U.S. Dist. LEXIS 11501, 1996 WL 460059 (E.D. Pa. Aug. 1, 1996), the court denied a motion to dismiss on a tortious interference claim where the defendant, "while knowing of the pre-existing contract between Plaintiff and the Airport, contracted with the Airport to establish a competing food business on the Airport premises, thereby preventing the Airport from fulfilling its alleged responsibility under the exclusivity provision of the contract." 1996 U.S. Dist. LEXIS 11501, [WL] at *3. Here, however, at the summary judgment stage, there is insufficient evidence in the record to establish (1) that TAC contracted with BFI prior to the (albeit premature) termination of the WTA, (2) that TAC's actions in any way caused BFI to breach or prevented BFI from fulfilling its obligations, or (3) that TAC intended to replace Odyssey under BFI's existing City Contract (as opposed to the prospective 2005 contract).

**b. Damages**

To prevail on a tortious interference claim, Odyssey must prove that actual damage occurred *as a result of* TAC's interference [*46] with the WTA. See Crivelli, 215 F.3d at 394. Liability for tortious interference with prospective or existing contractual relations includes "the pecuniary loss of the benefits of the contract or the prospective relation; consequential losses for which the interference is a legal cause; and emotional distress or actual harm to reputation, if they are reasonably to be expected to result from the interference." Pawlowski v. Smorto, 403 Pa. Super. 71, 588 A.2d 36, 40 (Pa. Super. 1991).

TAC contends that even if Odyssey could establish the requisite improper interference by TAC, Odyssey cannot establish that any damages to it resulted from such interference because (1) Odyssey did not lose its contract with BFI as a result of any action on the part of TAC, and (2) BFI recruited TAC to replace Odyssey. Odyssey responds that, at a minimum, TAC is liable to Odyssey for the payments TAC received from BFI between March 2005 and June 30, 2005, during which time the WTA should have remained in effect.

Odyssey's argument is flawed, however, because it begs the question of whether TAC's conduct *caused* BFI

to use third-party haulers while still under contract [*47] with Odyssey. While Odyssey may have suffered damages due to BFI's use of third-party haulers, there is nothing in the record demonstrating that Odyssey's alleged losses occurred as a result of TAC's actions. On the contrary, it is undisputed that BFI sought and obtained permission from the City to terminate the contract with Odyssey, that BFI affirmatively made the initial contact with TAC *and other third-party haulers*, n19 and, finally, that TAC initially declined BFI's offers. As Ron Adolph, TAC's Chief Executive Officer, explained, "We negotiated with BFI to do work for them under the new contract in July of 2005. They mentioned they were having some problems and needed some help earlier . . . ." (Adolph Dep. 61.)

n19  Indeed, Odyssey does not dispute that BFI recruited and hired other third-party haulers, including Danella, Long Riders, Seagull Environmental and Jesse Baro, beginning in 2002, (Def. Statement of Undisputed Facts at PP 6-7; Pl. Response to Undisputed Facts at PP 6-7), or that BFI did not have any contact with TAC until the summer of 2003 (Pl. Mem. at 8).

[*48]

Thus, although a contract existed between BFI and Odyssey during the relevant time period, this record would not support a finding by a rational trier of fact in favor of Odyssey as to the third and fourth required elements of a claim for tortious interference. There is nothing in the record that supports the notion that TAC acted improperly, or that Odyssey's loss of the contract and revenue in any way resulted from TAC's actions. Therefore, the Court will grant summary judgment in favor of TAC on Count IV.

**C. BFI's and Mr. Ringgold's Motion to Exclude Odyssey Valuation Testimony and Any Testimony by Plaintiff's Expert With Respect Thereto**

Odyssey has claimed two categories of damages: lost profits and lost business value. In accordance with Federal Rule of Civil Procedure 26(a)(2), Odyssey tenders the report of George L. Miller (the "Odyssey Expert Report"). Mr. Miller proposes that Odyssey is entitled to *both* lost profits (by his calculation, $2,310,000) *and* lost business value (by his calculation, $2,000,000). Mr. Miller calculated the profits Odyssey allegedly lost as a result of BFI's "failure to allow Odyssey to be [*49] the exclusive hauler of 100% of the Solid Waste from the Transfer Stations" for the period from January 1, 2003 to June 30, 2005, and Odyssey's "fair market value" as of December 31, 2003. (Odyssey Expert Report, Def. Ex. 1 at 5, 7.)

BFI moves to exclude the Odyssey Export Report and Mr. Miller's testimony on the grounds that Mr. Miller's valuation is methodologically unsound because (1) it values Odyssey as of the wrong date; (2) as a result, it double-counts most of the lost profit damages; and (3) it is based on assumptions that, even if arguably reasonable as of the valuation date actually used, are demonstrably unreasonable as of the proper valuation date. BFI contends that, at a minimum, Mr. Miller's lost profits and lost business value figures should be presented as *alternative* measures of damages because the calculation of lost business value incorporates the concept of loss of value due to lost profits.

BFI fits these objections into the Federal Rule of Evidence 702 / Daubert frame work on the grounds that, to be reliable, an expert's opinion must be compatible with applicable law, i e, an expert cannot propose damages that are [*50] not legally recoverable. JMJ Enters. v. Via Veneto Italian Ice, No. 97-652, 1998 U.S. Dist. LEXIS 5098, at *22-23 (E.D. Pa. Apr. 15, 1998), aff'd, 178 F.3d 1279 (3d Cir. 1999) (holding that an expert's opinion was methodologically unreliable because, among other things, it made the "significant error" of aggregating damage measurements that were, in fact, alternatives). BFI asserts that lost profits and lost business value may be cumulatively recovered *when measured for separate periods*, but may not be cumulatively recovered when measured, as Mr. Miller proposes to do for Odyssey, for the *same* period because a plaintiff may not recover twice for the same injury. See Judge Tech. Servs., Inc. v. Clancy, 2002 PA Super 391, 813 A.2d 879, 887 (Pa. Super. 2002) ("An injured party cannot recover twice for the same injury, based on the theory that double recovery results in unjust enrichment.").

Pursuant to F.R.E. Rule 104, district courts are charged with determining "the qualification of a person to be a witness, the existence of a privilege, or the admissibility of evidence." Fed. R. Evid. 104(a) [*51]. This "gatekeeping" function of the district court extends to the evidence and testimony of proposed expert witnesses. Daubert v. Merrell Dow Pharms., 509 U.S. 579, 592, 113 S. Ct. 2786, 125 L. Ed. 2d 469 (1993); Kumho Tire Co. v. Carmichael, 526 U.S. 137, 141, 119 S. Ct. 1167, 143 L. Ed. 2d 238 (1999). Rule 702, which governs the admissibility of expert testimony, provides:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if

> (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Fed. R. Evid. 702. Thus, Rule 702, as interpreted in Daubert, provides "three distinct substantive restrictions on the admission of expert testimony: qualifications, reliability and fit." Elcock v. Kmart Corp., 233 F.3d 734, 741 (3d Cir. 2000). The party offering [*52] the expert testimony has the burden of establishing that the proffered testimony meets each of the three requirements by a preponderance of the evidence. Padillas v. Stork-Gamco, Inc., 186 F.3d 412, 418 (3d Cir. 1999). Here, at this juncture BFI disputes only the reliability of Mr. Miller's opinion and report.

The determination of "reliability" may be guided by various factors, including a non-exclusive list set forth in Daubert itself. n20 Ultimately however, "the inquiry as to whether a particular scientific technique or method is reliable is a flexible one." In re Paoli Railroad Yard Litigation, 35 F.3d 717, 748 (3d Cir. 1994) (citing Daubert, 509 U.S. at 594; United States v. Downing, 753 F.2d 1224, 1238-39 (3d Cir. 1985)). An expert's opinions must be based on the "methods and procedures of science" rather than on "subjective belief or unsupported speculation," and the expert must have "good grounds" for his or her belief. Id. at 742. However, an expert's opinion may still be based on "good grounds" where a court thinks that there are better grounds for an alternative conclusion. Main Street Mortgage, Inc. v. Main Street Bancorp., Inc., 158 F. Supp. 2d 510, 514 (E.D. Pa. 2001). [*53] Moreover, the fact that an expert's methodology has some flaws that, had they been corrected, would have caused a different result, does not necessarily make the expert unreliable. Id. Courts may not exclude expert testimony if the sole basis for such exclusion is a flaw in the expert's investigative process which renders the expert's conclusions incorrect. Id.

> n20 Important factors to consider in assessing reliability include (1) whether a method consists of a testable hypothesis; (2) whether the method has been subject to peer review; (3) the known or potential rate of error; (4) the existence and maintenance of standards controlling the technique's operation; (5) whether the method is generally accepted; (6) the relationship of the technique to methods which have been established to be reliable; (7) the qualifications of the expert witness testifying based on the methodol-

ogy; and (8) the non-judicial uses to which the method has been put. In re Paoli R.R. Yard PCB Litigation, 35 F.3d at 742 (citing Daubert, 509 U.S. at 590-94; Downing, 753 F.2d at 1238-39).

[*54]

Although BFI couches its arguments in terms of reliability, BFI and Mr. Ringgold concede that their Motion to Exclude is more specifically a challenge to the appropriateness of Mr. Miller's method and the accuracy of the dates, rates and figures he used in applying the method, rather than the reliability of the method itself. Therefore, the Court will deny the Motion without prejudice to BFI and Mr. Ringgold to later raise the issue as a motion *in limine* or as otherwise appropriate with respect to an evaluation of the correct measure of damages in this case.

## CONCLUSION

For the foregoing reasons, the Court will grant summary judgment to the Defendants as to Counts II, III and IV, and deny summary judgment as requested by Odyssey as to Count I, and deny the Motion to Exclude. An Order consistent with this Memorandum follows.

BY THE COURT:

S/ GENE E.K. PRATTER

UNITED STATES DISTRICT JUDGE

**ORDER**

AND NOW, this 27th day of February, 2007, upon consideration of:

. The Motion for Summary Judgment of Odyssey Waste Services, LLC (Docket No. 46), the Responses of BFI Waste Systems, Inc. and Samuel Ringgold thereto (Docket No.53), Odyssey's Reply (Docket [*55] No. 61) and the Surreply of BFI and Mr. Ringgold (Docket No. 63);

. The Motion for Summary Judgment of BFI and Mr. Ringgold (Docket No. 40), the Response of Odyssey thereto (Docket

No. 50), the Reply of BFI and Mr. Ringgold (Docket No. 59) and Odyssey's Surreply (Docket No. 62);

. The Motion for Summary Judgment of TAC Transport, Inc. (Docket No. 39), the Response of Odyssey thereto (Docket No. 42), TAC's Reply (Docket No. 48), the Reply of BFI and Mr. Ringgold (Docket No. 49) and Odyssey's Surreply (Docket No. 52); and

. The Motion to Exclude Odyssey Valuation Opinions and Any Testimony of Plaintiff's Expert with Respect Thereto (Docket Nos. 44 and 47), Odyssey's Response thereto (Docket No. 57) and the Reply of BFI and Mr. Ringgold (Docket No. 60);

it is hereby ORDERED that:

1. The Motion for Summary Judgment of Odyssey as to Count I (Docket No. 46) is DENIED;

2. The Motion for Summary Judgment of BFI and Mr. Ringgold as to Counts II and III (Docket No. 40) is GRANTED;

3. The Motion for Summary Judgment of TAC as to Count IV (Docket No. 39) is GRANTED; and

4. The Motion to Exclude Odyssey Valuation Opinions (Docket Nos. 44 and 47) is DENIED without prejudice. [*56]

It is further ORDERED that a status conference to discuss a final pretrial schedule will be held with the Honorable Gene E.K. Pratter Thursday, March 8, 2007 at 10:00 a.m. in Chambers, Room 7614, United States Courthouse. A continuance of the conference will be permitted only if no knowledgeable counsel for each party is available to attend.

BY THE COURT:

S/ GENE E.K. PRATTER

UNITED STATES DISTRICT JUDGE