IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| STAMBAUGH'S AIR SERVICE, INC., | : |
| | : CASE NO. 1:00-CV-0660 |
| Plaintiff, | : |
| | : |
| v. | : Chief Judge Yvette Kane |
| | |
| SUSQUEHANNA AREA REGIONAL | Magistrate Judge Smyser |
| AIRPORT AUTHORITY, BAA | : |
| HARRISBURG, INC., DAVID FLEET, | : |
| individually, DAVID HOLDSWORTH, | : |
| individually, and DAVID C. McINTOSH, | : |
| individually, | : |
| | : |
| Defendants. | : |
| | : |

## DEFENDANTS' STATEMENT OF UNDISPUTED MATERIAL FACTS PURSUANT TO Pa.M.D. L.R. 56.1

## THE DEFENDANTS

1.     Defendant Susquehanna Area Regional Airport Authority ("SARAA")

is a municipal authority that owns Harrisburg International Airport ("HIA").  (Doc.

84 at ¶2).

2.     Defendant BAA Harrisburg, Inc. ("BAA") is a corporation that

SARAA retained to manage HIA from 1998 to 2001.  (Doc. 84 at ¶3).

3.    From January 1998 through August 2001, Defendant David Fleet ("Fleet") was the HIA Airport Director and an employee of BAA.  (Doc. 84 at ¶4).

4.    As the Airport Director, Fleet was responsible for overseeing and administering the operations at HIA.  (Deposition of David Fleet, attached hereto as Exhibit "1," "Fleet Dep.," at 9).

5.    Any involvement that Fleet would have had with Plaintiff or any other HIA tenant, including lease negotiations and input into selection of tenants and service providers, would have been within the scope of his duties and responsibilities as Airport Director.  (Deposition of David McIntosh (continuation), "McIntosh Dep.," attached hereto as Exhibit "2" at 38).

6.    From 1998 through 2003, Defendant David Holdsworth ("Holdsworth") was SARAA's Executive Director and an employee of SARAA. (Doc. 84 at ¶5; Deposition of David Holdsworth, "Holdsworth Dep.," attached hereto as Exhibit "3," at 6).

7.    Any involvement that Holdsworth would have had with Plaintiff or any other HIA tenant, including lease negotiations and input into selection of tenants and service providers, would have been within the scope of his duties and responsibilities as Airport Director.  (McIntosh Dep. (continuation), Ex. 2, at 38).

8.    Defendant McIntosh ("McIntosh," and, collectively with Fleet and Holdsworth, the "Individual Defendants") is a member of SARAA's Board of

Directors, and was the Chairman of the Board from 1998 through 2002.  (Doc. 84 at ¶6; McIntosh Dep., Ex. 2, at 12).

9.    Any involvement that McIntosh would have had with Plaintiff or any other HIA tenant, including lease negotiations, input into selection of tenants and service providers, and voting regarding these issues, would have been within the scope of his duties and responsibilities as a SARAA Board member.  (McIntosh Dep. (continuation), Ex. 2, at 38).

10.    Prior to January 1998, the Commonwealth of Pennsylvania was the owner and operator of HIA.  (Deposition of Mark Stambaugh, "M. Stambaugh Dep.," attached hereto as Exhibit "4," at 25).

**PLAINTIFF'S OPERATIONS**

11.    Plaintiff, Stambaugh Air Services, Inc. ("Plaintiff"), began leasing space at HIA from the Commonwealth in 1969 in order to provide maintenance and repair services to aircraft.  (M. Stambaugh Dep., attached as Ex. 4, at 25).

12.    In 1975, in addition to its repair and maintenance operations, Plaintiff also began to provide fixed based operator ("FBO") services to aircraft at HIA, such as fueling, drop-in maintenance and cargo handling.  (M. Stambaugh Dep., Ex. 4, at 26).

13.    Plaintiff had an adversarial landlord/tenant relationship with the Commonwealth.  (M. Stambaugh Dep., Ex. 4, at 63; Deposition of Scott

Stambaugh, "S. Stambaugh Dep.," attached hereto as Exhibit "5." at 36; July 22, 1999 Memo at SARAA03328).

14.    In 1997, Plaintiff entered into a Lease and Fixed Based Operator Agreement with the Commonwealth (the "1997 Lease").  (1997 Lease, attached hereto as Exhibit "6"; M. Stambaugh Dep., Ex. 4, at 85).

15.    The 1997 Lease provided that Plaintiff would lease part of a building at HIA designated as "Building 28," all of a another building designated "Building 134" (Plaintiff refers to these as the "Stambaugh Hangar"), an aircraft parking apron adjacent to Building 134, fuel storage systems ("fuel farms"), and visitor parking areas.  (1997 Lease, Ex. 6, at 2-3).

16.    The term of the 1997 Lease was month-to-month and could be terminated by either party upon thirty (30) days written notice.  (1997 Lease, Ex. 6 at 4).

17.    The 1997 Lease included the following provisions:

- authorization to conduct FBO operations at HIA "in accordance with Airport Rules and Regulations" (1997 Lease, Ex. 6, at 15-16);

- a requirement that Plaintiff "occupy and use only that space within the confines of the leased area at all times" (1997 Lease, Ex. 6, at 4);

- provisions for monthly rental payments (1997 Lease, Ex. 6, at 4-7);

- a provision for the payment of $10,000 per month to be "applied against [Plaintiff's] past due accounts," which addressed rental payments that were in arrears with the Commonwealth (1997 Lease Ex. 6, at 6; M. Stambaugh Dep., Ex. 4, at 100);

- a provision for payment of a monthly "fuel flowage charge" in the amount of $.05 per gallon (1997 Lease, Ex. 6, at 7; M. Stambaugh Dep., Ex. 4, at 33-35);

- a requirement that Plaintiff contact HIA management to schedule the use of common ramp space (1997 Lease, Ex. 6, at 10);

- a requirement that Plaintiff comply with the Minimum Standards for Fixed Based Operations at Commonwealth-Owned Airports, 67 Pa. Code, Ch. 476, 27 Pa.B. 1352 (1997 Lease, Ex. 6, at 15);

- a provision requiring that Plaintiff "guard against pollution of water, sewer, air, ground, etc." in compliance with all state and federal law (1997 Lease, Ex. 6, at 29);

- a provision requiring that Plaintiff observe and obey all HIA rules and regulations (1997 Lease, Ex. 6, at 29).

18.    In January 1998, SARAA obtained ownership and control of HIA from the Commonwealth.  (M. Stambaugh Dep., Ex. 4, at 25).

19.    Effective January 19, 1999, SARAA entered into a First Amendment to Lease and Fixed Base Operator Agreement, which amended the 1997 Lease (the "1999 Amendment.").  (1999 Amendment, attached hereto as Exhibit "7").

20.    The 1997 Lease was incorporated into the 1999 Amendment, but the 1998 Amendment did make some changes to the agreement between Plaintiff and SARAA.  (1999 Amendment, Ex. 7).

21.    For example, the 1999 Amendment increased the amount of space that Plaintiff was leasing on the apron area adjacent to Building 134 and provided for a one (1) year term instead of the prior month-to-month arrangement that Plaintiff had with the Commonwealth under the 1997 Lease.  (1999 Amendment, Ex. 7).

22.    A one-year lease was more desirable to Plaintiff than the month-to-month lease that it had negotiated with the Commonwealth.  (M. Stambaugh Dep., Ex. 4, at 98).

23.    Mark Stambaugh admits that the terms of the 1997 Lease as amended by the 1999 Amendment, including the right to perform FBO services at HIA, expired on January 19, 2000.  (M. Stambaugh Dep., Ex. 4 at 96).

24.    Mark Stambaugh understood this at the time that he executed the 1999 Amendment.  (M. Stambaugh Dep., Ex. 4, at 96).

25.    The 1999 Amendment also required that Plaintiff perform routine maintenance in the buildings that it was leasing, and required that Plaintiff "perform all maintenance and repair on hangar doors…making all hangar doors mechanically operable within six (6) months of [January 19, 1998]."  (1999 Amendment, Ex. 7, at 3).

26.    Plaintiff has alleged that, during the period when it was providing FBO services at HIA, it had contracts with FBO customers.  (Doc. 84 at ¶139; M. Stambaugh Dep., Ex. 4, at 54).

27.    Mark Stambaugh, Plaintiff's owner, did not handle these contracts, does not know where the contracts are, and does not know whether he ever provided them to his counsel.  (M. Stambaugh Dep., Ex. 4, at 55).

28.    Mark Stambaugh said that Charles Beard, Plaintiff's Executive Assistant, would have handled contracts with FBO customers, but Mr. Beard has no knowledge of FBO customer contracts and that this was not part of his job duties.  (M. Stambaugh Dep., Ex. 4, at 55-56; Deposition of Charles Beard, "Beard Dep.," attached hereto as Exhibit "8," at 50-51).

## PLAINTIFF'S SERVICE AND LEASE ISSUES

29.    Plaintiff had an extensive history of service problems and lease issues, including lease violations, safety violations, hazardous material spills, Federal Aviation Administration inspection violations, quarterly fueling inspection violations, and security violations both with the Commonwealth and SARAA. (See infra).

### A.    Lease Violations

30.    Plaintiff had a history of not making rental payments being in arrears with the Commonwealth.  (Deposition of Timothy Tate, SARAA Board Member from 1998 to Present, "Tate Dep.," attached hereto as Exhibit "9," at 74; Fleet Dep., Ex. 1, at 218; M. Stambaugh Dep., Ex. 4, at 100).

31.    At one point in time while the Commonwealth had ownership of HIA, Plaintiff's rental payments were more than $800,000 in arrears.  (M. Stambaugh Dep., Ex. 4, at 199; Jan. 8, 1999 Memo, attached hereto as Exhibit "10").

32.    When SARAA took over ownership and control of HIA in 1999, Plaintiff was still behind on its rental payments. (Fleet Dep., Ex. 1, at 24-25; Jan. 8, 1999 Memo, Ex. 10).

33.    As of January 1999, one year after SARAA took ownership of HIA, Plaintiff still owed SARAA approximately $178,000 in back rent, and was on a payment plan of $10,000 per month. (Fleet Dep., Ex. 1, at 218; Jan. 8, 1999 Memo, Ex. 10; M. Stambaugh Dep., Ex. 4, at 201).

34.    At that time, Plaintiff had not made its $10,000 payback payment for December 1998 and had not paid rent on another building that it was leasing since August 1998. (Jan. 8, 1999 Memo, Ex. 10).

35.    As set forth above, Plaintiff was responsible under the 1999 Amendment to make repairs on the hangar doors in Hangar 28 by July 19, 1999. (1999 Amendment, Ex. 7; M. Stambaugh Dep., Ex. 4, at 104, 195).

36.    Plaintiff failed to make the repairs within the time required by the 1999 Amendment. (July 23, 1999 Correspondence, attached hereto as Exhibit "11," at Page Two).

37.    In fact, as of October 22, 1999, Plaintiff still had not made the required repairs. (Oct. 22, 1999 Airport Operations Committee Minutes, attached hereto as Exhibit "12," at p. 3).

38.    During the negotiations leading up to the 1999 Amendment, Plaintiff had represented to SARAA/BAA that it would be installing above-ground fuel storage tanks and, therefore, did not want to lease Fuel Farm 6.  (July 23, 1999 Correspondence, Ex. 11).

39.    Plaintiff indicated that it would install these above-ground tanks by May 1999.  (July 23, 1999 Correspondence, Ex. "11").

40.    However, as of July 23, 1999, Plaintiff had still not installed such tanks and was still utilizing Fuel Farm 6 without paying rent for it.  (July 23, 1999 Correspondence, Ex. 11; M. Stambaugh Dep., Ex. 4, at 164-65).

41.    Not until SARAA informed Plaintiff that it would be locked out of Fuel Farm 6 was Plaintiff willing to enter into an agreement to make rental payments for use thereof.  (Beard Dep., Ex. 8, at 37).

42.    Additionally, both the Commonwealth and SARAA had problems with Plaintiff utilizing space that was not part of Plaintiff's leasehold.  (Sept. 15, 1997 Correspondence, attached hereto as Exhibit "13"; Oct. 20, 1999 Correspondence, attached hereto as Exhibit "14").

43.    SARAA/BAA attempted to work with Plaintiff to best accommodate Plaintiff's customer if the need arose to park aircraft outside of Plaintiff's leased areas.  (Nov. 18, 1999 Correspondence, attached hereto as Exhibit "15").

**B.**    <u>**Safety Issues/Inspections**</u>

44.    In 1996, while HIA was still operated by the Commonwealth, the FAA noted 9 different violations during an annual inspection of Plaintiff's facilities.  (Nov. 21, 1996 Correspondence attached hereto as Exhibit "16").

45.    As of October 1997, Plaintiff had not corrected the 1996 FAA inspection violations.  (Oct. 15, 1997 Correspondence, attached hereto as Exhibit "17").

46.    Between 1997 and 1999, the FAA noted 22 safety violations at Plaintiff's facilities.  (Dec. 1999 Summary of Service Issues, "1999 Summary," attached hereto as Exhibit "18," at SARAA05727).

47.    Airport operations personnel at HIA noted 7 additional violations in their daily logs, including one incident where Plaintiff's personnel were pumping fuel from one truck to another truck within 200 feet of an aircraft in violation of applicable guidelines.  (1999 Summary, Ex. 18, at SARAA05727, 07171-72).

48.    Such a practice of fueling from truck to truck and then into an aircraft "would probably not be in any airlines manual…too many things could go wrong with an operation like that."   (Deposition of Bobby Adkins, Chief Operating Officer at AERO Services International, "Adkins Dep.", attached hereto as Exhibit "19," at 41).

49.    HIA fire personnel also conducted quarterly fueling inspections. (1999 Summary, Ex. 18, at SARAA07218-7245).

50.    Between 1998 and 1999, sixty (60) violations were noted on the quarterly fueling inspections.  (1999 Summary, Ex. 18, at SARAA05727, 7218-7245).

51.    Plaintiff has no evidence that any of the "Safety" violations contained in the 1999 Summary are inaccurate.  (M. Stambaugh Dep., Ex. 4, at 144).

### C.    **Hazardous Materials Spills**

52.    Plaintiff also had nine (9) hazardous materials spills in 1999.  (1999 Summary, Ex. 18, at SARAA05727, 7183-7209).

53.    Mark Stambaugh, Plaintiff's owner at all times, has "no idea whether [the fuel spills listed in the December 1999 Summary] occurred or not."  (M. Stambaugh Dep., Ex. 4, at 172).

54.    One hazardous materials spill, which Mark Stambaugh does acknowledge, was a spill of 350 to 400 gallons of fuel that occurred on May 20, 1999.  (1999 Summary, Ex. 18, at SARAA05728, 07192-94; M. Stambaugh Dep., Ex. 4, at 150-51).

55.    This fuel spill occurred after one of Plaintiff's employees overrode the "deadman" switch, which would have prevented the spill from happening.  (1999 Summary, Ex. 18, at SARAA07192-93; July 26, 1999 and August 2, 1999

Correspondence, collectively attached hereto as Exhibit "20," M. Stambaugh Dep., Ex. 4, at 150-55).

56.    This fuel spill resulted in the Pennsylvania Department of Environmental Protection becoming involved.   (July 6, 1999 Correspondence, attached hereto as Exhibit "21").

57.    Less than two months later, on July 13, 1999, another of Plaintiff's employees was again cited for tying off a deadman switch while fueling.   (M. Stambaugh Dep., Ex. 4, at 151-55; 1999 Summary, Ex. 18, at SARAA05728, 7178).

58.    Mark Stambaugh admits that both of these incidences of tying off the deadman switch occurred, and that both were "clear violations of FAA procedures," and that doing so would create a "high risk situation."   (M. Stambaugh Dep., Ex. 4, at 153-54).

59.    This was also a clear violation of Plaintiff's own safety procedures. (Beard Dep., Ex. 8, at 34).

60.    In 1999, Plaintiff leased a 28,000 gallon fuel storage system at HIA ("Fuel Farm 1").  (July 23, 1999 Correspondence, Ex. 11, at 2).

61.    It was Plaintiff's responsibility to maintain this fuel tank.   (M. Stambaugh Dep., Ex. 4, at 167; Beard Dep., Ex. 8, at 42).

62.    Plaintiff failed to properly maintain the storage system, which caused gasoline to leak into the soil.  (2000 Report of Soil Sampling HIA AST Fuel Farm No. 1, attached hereto as Exhibit "22," M. Stambaugh Dep., Ex. 4, at 167-69).

63.    In 1999 Plaintiff received 14 citations for security violations at HIA. (1999 Summary, Ex. 18, at SARAA05727).

64.    The number of safety and security violations that Plaintiff had at HIA were excessive by industry standards.  (Fleet Dep., Ex. 1, at 237).

## AERO SERVICES

65.    In 1997, AERO Services International Incorporated ("AERO") entered into a five-year Lease and Fixed Based Operator Agreement (the "AERO Lease") which authorized AERO to provide FBO services at HIA concurrently with Plaintiff.  (Doc. 84 at ¶ 12; Adkins Dep., Ex. 19, at 8; AERO Lease, attached hereto as Exhibit "23").

66.    There is no evidence that AERO the number or severity of safety violations, security violations, lease violations, or hazardous materials spills that Plaintiff had.  (Adkins Dep., Ex. 19, at 35-37).

67.    AERO operated its FBO services out of modular office units at HIA. (Adkins Dep., Ex. 19, at 10).

68.    These modular facilities were "clean, bright, [and had] good access to the air field [and] to parking."   (Deposition of Belinda Svirbely, Operations

Manager at HIA, "Svirbely Dep.," attached hereto as Exhibit "24," at 20).  See also (McIntosh Dep., Ex. 2, at 30).

69.    Like Plaintiff, AERO also leased space in Hangar 28, which AERO used solely to store aircraft.  (Adkins Dep., Ex. 9 at 11; M. Stambaugh Dep., Ex. 4, at 83-85).

70.    Plaintiff alleges that Defendants treated Plaintiff differently than AERO by refusing to enforce lease terms requiring AERO to pay rent, while requiring Plaintiff to comply with its lease terms.  (Doc. 84 at ¶¶22-23, 80).

71.    Mark Stambaugh, however, admits that he has no personal knowledge of AERO's rental payment history, and that these allegations are based entirely on hearsay.  (M. Stambaugh Dep., Ex. 4, at 251).

72.    While AERO may have, at times, been late with rental payments, SARAA never made any rent concessions, never abated AERO's rent, and never forgave AERO's rent obligations.  (Tate Dep., Ex. 9, at 125; Adkins Dep., Ex. 19, at 42; Holdsworth Dep., Ex. 3, at 132).

73.    To the contrary, AERO made all rental payments due pursuant to the terms  of its lease from 1998 through 2003.  (Tate Dep., Ex. 9, at 125; Adkins Dep., Ex. 19, at 42; Holdsworth Dep., Ex. 13, at 132; Deposition of Tom Pieffer, Accounting Manager at HIA, attached hereto as Exhibit "25" at 19-20; AERO

Services International Rent & Fuel Flowage Records, attached hereto as Exhibits "26" (dating back to May 1998) and "27" (including dates of payment)).

74.    To the extent that AERO was ever significantly in arrears with rent payments, AERO was required, and in fact did, pay accrued interest on such late payments.   (Pieffer Dep., Ex. 25, at 20-21; Records of AERO Rent Payments Involving Interest Payments, attached hereto as Exhibit "28").

75.    As set forth above, Plaintiff was also delinquent in making payment to SARAA pursuant to the terms of its Lease.  (See supra).

76.    SARAA gave **both** Plaintiff and AERO opportunities to cure payment delinquencies.  (Fleet Dep., Ex. 1, at 220).

77.    SARAA never terminated Plaintiff's **or** AERO's lease as a result of delinquencies in making rental payments.  (Fleet Dep., Ex. 1, at 220).

78.    Many of Plaintiff's and AERO's lease terms were similar.   For example, both Plaintiff and AERO's right to conduct FBO operations were contained within their leases and expired concurrent with the expiration of their leases.  (1997 Lease, Ex. 6; Aero Lease, Ex. 23).

79.    SARAA charged both AERO and Plaintiff the same fees for fuel that they sold ("fuel flowage fees").  (AERO Lease, Ex. 23; 1999 Amendment, Ex. 7).

80.    To the extent that there were dissimilarities in how Plaintiff and AERO were treated, there is evidence that Plaintiff received more favorable lease

terms and conditions than AERO.  (AERO Lease, Ex. 23; 1999 Amendment, Ex. 7).

81.    In July 1999, AERO was concerned that Plaintiff had an unfair economic advantage because, at one point in time, AERO had been paying almost twice the amount per square foot for leased space that Plaintiff was paying.  (July 16, 1998 Correspondence, attached hereto as Exhibit "29;" SARAA Position Paper re: Aero Services International, Inc. Business Issues, attached hereto as Exhibit "31;" AERO Lease, Ex. 23; 1997 Lease, Ex. 6; Fleet Dep., Ex. 1, at 221-25).

82.    Additionally, AERO was paying to lease land for a fuel farm that it had financed itself, while Plaintiff was using an existing fuel farm at HIA and was not paying rent for it.  (July 16, 1998 Correspondence, Ex. 29; AERO Lease, Ex. 23; 1997 Lease, Ex. 6; 1999 Amendment, Ex. 7; Adkins Dep., Ex. 19 at 14, 17).

83.    On April 11, 2000, SARAA/BAA issued FBO Minimum Standards that were applicable to all entities providing FBO services at HIA ("April 11, 2000 Minimum Standards").  (April 11, 2000 Minimum Standards, attached hereto as Exhibit "30").

84.    When asked how SARAA treated AERO differently than it did Plaintiff, Mark Stambaugh testified that he *believes* that SARAA (1) waived the April 11, 2000 Minimum Standards for AERO (specifically the requirement that they have a mechanic on staff); (2) did not require AERO to pay rent; (3) did not

require the fuel farm installed by AERO to "meet any criteria;" and (4) allowed AERO to utilize fuel trucks that were older than Plaintiff's and did not "meet the updated standards."  (M. Stambaugh Dep., Ex. 4, at 250-54).  With the exception of (2), none of these issues were specifically pled in Plaintiff's Second Amended Complaint.  (Doc. 84).

85.    Scott Stambaugh also speculated that AERO did not meet certain of the April 11, 2000 Minimum Standards.  (S. Stambaugh Dep., Ex. 5, at 190-95).

86.    There is no evidence that either Mark Stambaugh or Scott Stambaugh have any personal knowledge regarding AERO's FBO operations.

87.    Scott Stambaugh has never been affiliated with, personally involved with, or privy to AERO's day-to-day operations.  (Adkins Dep., Ex. 19, at 52).

88.    Nor has Scott Stambaugh ever even been inside of AERO's facilities, and his belief that AERO did not meet the Minimum Standards is based on hearsay and speculation.  (S. Stambaugh Dep., Ex. 5, at 190-95).

89.    AERO always complied with the April 11, 2000 Minimum Standards, including the requirement to have a mechanic on staff.  (Adkins Dep., Ex. 19, at 43-45, 53-58; Holdsworth Dep., Ex. 3, at 133).

90.    AERO made all rental payments due consistent with its lease obligations, including interest for late payments.  Pieffer Dep., Ex. 25, at 19-20; Adkins Dep., Ex. 19, at 42; supra).

91.    In contrast to AERO, Plaintiff did not and could not meet the April 11, 2000 Minimum Standards for FBO operators at HIA.  (M. Stambaugh Dep., Ex. 4, at 253).

92.    Most significantly, Plaintiff's facilities did not satisfy the direct access requirement contained in Section 2.3 of the April 11, 2000 Minimum Standards which posed a safety risk to Plaintiff's customers because this section required that access to the FBO lounge and planning areas be separate from the Hanger.  (M. Stambaugh Dep., Ex. 4, at 186-95, 253; July 29, 1999 Memo, attached hereto as Exhibit "32," at STM 0013; Deposition of Fred Testa "Testa Dep.", attached hereto as Exhibit "33," at 49-50; Beard Dep., Ex. 8, at 53-57).

93.    Both Charles Beard, Plaintiff's executive assistant, and Fred Testa, former Executive Director at HIA, testified that Plaintiff's customers had to walk through the Stambaugh Hangar to reach Plaintiff's FBO facilities which was unsafe because heavy maintenance operations were being performed.  (Testa Dep., Ex. 33, at 49; Beard Dep., Ex. 8, at 53-57).

94.    AERO's fuel storage system has, at all times, met all applicable safety requirements and passed all inspections.  (Adkins Dep., Ex. 19, at 56-57).

95.    The fuel trucks utilized by AERO have, at all times, met all applicable safety requirements and passed all inspections.  (Adkins Dep., Ex. 19, at 57).

96.     Scott Stambaugh has no knowledge of what criteria were applied to AERO during inspections.  (S. Stambaugh Dep., Ex. 5, at 121).

97.     When asked how SARAA treated AERO differently than it did Plaintiff, Scott Stambaugh testified that he *believes* that SARAA/BAA personnel treated Plaintiff differently with respect to security measures taken at HIA.  (S. Stambaugh Dep., Ex. 5, at 124-26).

98.     However, Scott Stambaugh admits that he has no direct knowledge of what was going on inside the AERO operation with respect to security measures.  (S. Stambaugh Dep., Ex. 5, at 126).

99.     Moreover, when asked why any of the Defendants would harass Plaintiff, Scott Stambaugh believed that Plaintiff wanted to "get somebody else in there to do the fuel business" based on "political reasons" that he could not substantiate, or a desire to bring Piedmont into HIA because of "interrelationships" between SARAA, BAA and Piedmont, for which he provided no specifics.  (S. Stambaugh Dep., Ex. 5, at 198-99).

100.   In 1998 and 1999, there was a Federal Aviation Regulation in place that required all individuals in secure areas of airports to "continuously display on their outermost garment, an airport-approved identification medium unless under airport-approved escort."  ("FAA Part 107").  (FAA Part 107, attached hereto as Exhibit "34," at Part 107.25).

101.  It was Plaintiff's responsibility to understand this FAA regulation and educate its employees regarding the same.  (M. Stambaugh Dep., Ex. 4, at 128).

102.  Additionally, Defendant BAA put out a pamphlet in 1998 entitled "Airport Security is Everyone's Business" (hereinafter "HIA Security Policy") ("HIA Security Policy," attached hereto as Exhibit "35").

103.  Mark Stambaugh acknowledges having received the HIA Security Policy.  (M. Fleet Dep. Ex. 1, at 16; M. Stambaugh Dep., Ex. 4, at 132-33).

104.  This HIA Security Policy would have been made available to all of Plaintiff's employees and they would have been expected to comply with the information contained therein.  (Beard Dep., Ex. 8, at 24-25).

105.  Consistent with FAA Part 107.25, the HIA Security Policy required that individuals in designated secure areas at the airport must wear identification badges at all times, above the waist and on their outermost garments.   (HIA Security Policy, Ex. 35).

106.  HIA had a "challenge procedure" which required all persons subject to the HIA Security Policy to challenge anyone in secure areas who was not wearing an approved identification badge.  (HIA Security Policy, Ex. 35).

107.  The challenge procedure was not a new procedure; it had been in place for at least 20 to 30 years when HIA was owned and operated by the Commonwealth.  (Beard Dep., Ex. 8, at 27).

108. While the airport was still operated by the Commonwealth, the security level was much looser at HIA than it was after 1998 when SARAA took control. (Beard Dep., Ex. 8, at 92).

109. Scott Stambaugh said that he didn't always display his identification badge, but believes that individuals should not be asked to produce identification if security knew who the person was: "Personal recognition plays in. I didn't wear an ID badge every day inside the hangar." (S. Stambaugh Dep., Ex. 5, at 60).

110. It is true that while the Commonwealth was operating HIA, it was a small airport and most of the security people were acquainted with individuals who worked in the secure areas, so identification checks were much less frequent. (Beard Dep., Ex. 8, at 90).

111. However, after SARAA took control of HIA, there was no "personal recognition" exception to wearing identification as required by the FAA and the HIA Security Policy. (Beard Dep., Ex. 8, at 94-95).

112. Beard admits that everyone at Plaintiff's operation knew that there was no personal recognition system after SARAA took over HIA and that SARAA was requiring everyone to wear identification badges. (Beard Dep., Ex. 8, at 93-94).

113. Belinda Svirbely reported that Plaintiff's employees rarely displayed their identification and were hiding in aircraft to avoid security checks by HIA

security personnel.  (Fleet Dep., Ex. 1, at 76; July 30, 1999 e-mail, attached hereto as Exhibit "36").

114.  SARAA/BAA personnel did not treat Plaintiff's employees any differently than they did AERO employees with respect to checking identification. (Fleet Dep., Ex. 1, at 232-34; Svirbely Dep., Ex. 24, at 93; Adkins Dep., Ex. 19, at 53).

115.  In fact, AERO also felt that its personnel were being challenged to present their identification too frequently.  (Fleet Dep., Ex. 1, at 233; Adkins Dep., Ex. 19, at 53).

116.  Bob Adkins, the COO of AERO from 1997 (when AERO came to HIA) through 2006 (when AERO was sold) testified that he felt HIA security personnel were "overzealous" in their enforcement of security violations.  (Adkins Dep., Ex. 19, at 39).

117.  Notwithstanding, there is no evidence that AERO had the number or severity of security violations that Plaintiff did.

## SALE OF THE AMP HANGAR

118.  Prior to SARAA obtaining control of HIA in January 1998, the airport had not been run with business considerations in mind.  (McIntosh Dep., Ex. 2, at 15-16).

119.   After taking ownership of HIA, SARAA determined that it wanted to provide high quality, first class, regional FBO services.  (Fleet Dep., Ex. 1, at 29, 230-31; Tate Dep., Ex. 9, at 101-02; McIntosh Dep., Ex. 2, at 15-16, 28).

120.   In 1999, a hangar at HIA that had been owned by the AMP Corporation was available for purchase (the "AMP Hangar").  (Doc. 84 at ¶30).

121.   The SARAA Board of Directors decided to purchase the AMP Hangar for two reasons:  (1) HIA lacked space and the Board wanted to ensure the best use of the space and long term control over how it was used; and (2) HIA needed a facility to provide first class FBO operations.  (McIntosh Dep., Ex. 2, at 23, 44-45, 53; Holdsworth Dep., Ex. 3, at 16-20; Fleet Dep., Ex. 1, at 56; April 21, 1999 Economic Development Committee Minutes, attached hereto as Exhibit "37;" Tate Dep., Ex. 9 at 14, 135-36).

122.   The AMP Hangar was a "modern, state-of-the-art facility that would present the type of image that [SARAA was] looking for an FBO in a capitol city." (Tate Dep., Ex. 9, at 16, See also Fleet Dep., Ex. 1, at 56).

123.   SARAA ultimately purchased the AMP Hangar for $1.5 million, and Mark Stambaugh admits that SARAA had the right to acquire the AMP Hangar. (M. Stambaugh Dep., Ex. 4, at 224).

## REQUEST FOR QUALIFICATIONS

124.  After purchasing the AMP Hangar, several FBO providers expressed an interested in conducting FBO operations at HIA.  (Tate Dep., Ex. 9, at 19).

125.  SARAA issued a Request for Qualifications ("RFQ") seeking a response from FBO service providers interested in leasing the AMP Hangar to provide FBO services at HIA.  (Doc. 84 at ¶ 38; RFQ, attached hereto as Exhibit "38").

126.  The purpose of the RFQ was for SARAA to "find the best operator [it] could for the AMP building after [SARAA] purchased it."  (Tate Dep., Ex. 9, at 72).

127.  The RFQ stated that RFQ respondents must attend a pre-submission conference and tour of the AMP Hangar on October 19, 1999.  (RFQ, Ex. 38, at SARAA03725).

128.  The RFQ also stated that it was "not a contract or commitment of any kind…  ."  (RFQ, Ex. 38, at SARAA03730).

129.  In the RFQ, SARAA reserved the rights, among other things, to "waive any irregularities" of responses to the RFQ and "reject any and all submittal(s), should it be in the best interest of SARAA."  (RFQ, Ex. 38, at SARAA03730).

130.   Plaintiff and Harrisburg Jet Center, a separate entity, attended the October 19, 1999 pre-submission tour, and Piedmont Hawthorne ("Piedmont") subsequently toured the facility.  (Tate Dep., Ex. 9, at 61; Oct. 22, 1999 Air Operations Committee Minutes, Ex. 12).

131.   The RFQ also originally contained a response deadline of November 2, 1999.  (RFQ, Ex. 38, at SARAA03729).

132.   However, SARAA subsequently extended to the deadline for all interested FBO providers, including Plaintiff, to submit their responses to the RFQ. (Fleet Dep., Ex. 1, at 96-97; Dec. 1, 1999 Correspondence, attached hereto as Exhibit "39").

133.   Notwithstanding the performance problems that Plaintiff had with both the Commonwealth and SARAA/BAA (outlined above) SARAA still solicited a response to the RFQ from Plaintiff and gave consideration to allowing Plaintiff to remain on site at HIA as an FBO provider.  (Fleet Dep., Ex. 1, at 104-05, 133; Tate Dep., Ex. 9, at 79-80; Oct. 5, 1999 Correspondence, attached hereto as Exhibit "40;" M. Stambaugh Dep., Ex. 4, at 226).

134.   Ultimately, four FBO providers submitted responses to the RFQ -- Plaintiff, AERO Services, HIA Signature Support, and Piedmont.  (Jan. 11, 2000 memo re: "Letter of Intent," attached hereto as Exhibit "41;" Fleet Dep., Ex. 1, at 154).

135.   Plaintiff's response to the RFQ was incomplete.  ("Stambaugh's RFQ Response," attached hereto as Exhibit "42").

136.   Pursuant to the RFQ, respondents were "required to provide a record of any violations of FAA part 139, Part 145 and any other applicable FAA regulation having occurred at any of its operations during the past three years." (RFQ, Ex. 38, at Bates No. SARAA03727, Sec. II.2.2).

137.   Plaintiff's response to the RFQ did not include any such record of FAA violations, notwithstanding they had received a combined 22 FAA violations in 1997, 1998 and 1999.   (RFQ, Ex. 38, at SARAA03727; Stambaugh's RFQ Response, Ex. 4; 1999 Summary, Ex. 18).

138.   The RFQ also required respondents to provide current balance sheets and income statements prepared pursuant to generally accepted account principles, as well as the most recent audited financial statements.   (Stambaugh's RFQ Response, Ex. 42, at STM497).

139.   SARAA wanted this information so that it would evaluate the "financial status and financial wherewithal" of potential FBO providers at HIA. (Fleet Dep., Ex. 1 at 120-21).

140.   Mark Stambaugh admits that financial stability is important for an FBO provider because they need to have sufficient finances to purchase fuel.  (M. Stambaugh Dep., Ex. 4, at 52).

141.  While Plaintiff's response to the RFQ indicated that financial statements were attached, Plaintiff did not attached any such documentation. (Stambaugh RFQ Response, Ex. 42, at STM 497; Fleet Dep., Ex. 1, at 120; M. Stambaugh Dep., Ex. 4, at 237; Holdsworth Dep., Ex. 3 at 70).

142.  Even though Plaintiff had failed to provide such financials at the time that it submitted its response to the RFQ, Fleet agreed to meet with Charles Beard on or about December 2, 1999 to allow Plaintiff the opportunity to provide additional financial information.   (Fleet Dep., Ex. 1, 120-21; Dec. 1, 1999 Correspondence, attached hereto as Exhibit "43").

143.  The only thing that Mr. Beard recalls about the meeting is that he was given and envelope to pass on to Defendant Fleet.  (Beard Dep., Ex. 8, at 68-69).

144.  Mr. Beard does not recall what was in the envelope, and he did not have the responsibility to understand or convey any specific financial information to Fleet.  (Beard Dep., Ex. 8, at 69).

145.  At the meeting, Beard provided to Defendant Fleet "a single sheet of paper with a few numbers on it, very macro level that [was not] married up to where that came from."  (Fleet Dep., Ex. 1, at 12-22).

146.  When Mark Stambaugh was asked whether he felt the RFQ process was improper, he testified:

> I think it's really improper to pretend to put out an RFQ
> when you've already made the determination and then

> to waive all of your requirements in order to get somebody in there that you think is a national name and actually beg them on the phone to come in and then guarantee them that you will run all of the other operators off the field if they come.

(M. Stambaugh Dep., Ex. 4, at 256-57).

147.    Mark Stambaugh's testimony in this regard is based on hearsay that he obtained with conversations with someone named "Dan or Don" at Piedmont and a comment he allegedly heard from Fleet.  (M. Stambaugh Dep., Ex. 4, at 257-58).

148.    Mark Stambaugh was not even aware that Piedmont submitted a bid in response to the RFQ process.  (M. Stambaugh Dep., Ex. 4, at 258).

149.    In fact, Piedmont submitted a bid in response to the RFQ process which contained detailed financial information and met all of the other requirements for written bid submissions.  (Piedmont Response to RFQ, attached hereto as Exhibit "44;" Jan. 11, 2000 memo re: "Letter of Intent," Ex. 41; Fleet Dep., Ex. 1, at 124).

150.    The Airport Operations Committee of the SARAA Board of Directors, was responsible for collecting and evaluating responses to the RFQ and then making a recommendation to the full Board of Directors regarding which entity should be awarded an FBO contract and lease of the AMP Hangar.  (Tate Dep., Ex. 9, at 85-86).

151.   After receiving and evaluating responses to the RFQ, the Air Operations Committee decided to recommend to the full Board that Piedmont be awarded the lease of the AMP Hangar, and the Committee authorized David Fleet to begin lease negotiations with Piedmont.  (Tate Dep., Ex. 9, at 91; McIntosh Dep., Ex. 2, at 90-91).

152.   The decision to recommend that Piedmont be awarded the lease for the AMP Hangar would have been made by the Airport Operations Committee several days prior to the Board meeting at which official action would be taken to vote upon the recommendation.  (Tate Dep., Ex. 9, at 85, 90-91).

153.   The decision to award the lease and FBO agreement to Piedmont "was a unanimous decision based on the fact of [Piedmont's] experience with about 25 other FBOs that they were currently managing, as well as their financials, which were very strong."  (Tate Dep., Ex. 9, at 91).

154.   Piedmont was a nationally known FBO provider, and the SARAA Board selected Piedmont because:  "[T]hey brought thorough financial statements that clearly indicated to us that they were in a reasonable shape financially, strong shape financially but that they had a national presence.  They had a plan to use that national presence to leverage business at HIA and, you know, they clearly presented a very professional class front door opportunity to the Airport Authority."  (Fleet Dep., Ex. 1; at 107; M. Stambaugh Dep., Ex. 4, at 244).

155.  The decision to award the lease of the AMP Hangar to Piedmont was made by SARAA's Board of Directors at a vote of the full Board on January 11, 2000.  (Jan. 11, 2000 Minutes, attached hereto as Exhibit "45").

156.  Holdsworth was not involved at all in the decision to award the RFQ; he did not review the responses and did not give any input into which entity should be selected for the lease of the AMP Hangar.  (Holdsworth Dep., Ex. 3, at 77).

157.  During Piedmont's tenure as a lessee at HIA, it made all rental payments and paid all fuel flowage fees owed to SARAA pursuant to the terms of its lease.  (Holdsworth Dep., Ex. 3, at 128-29; Pieffer Dep., Ex. 25, at 11-12; Piedmont Hawthorn Rent History, attached hereto as Exhibit "46").

158.  Initially, SARAA permitted a sixty (60) day period of rent abatement for Piedmont to "get in and secure fueling contracts and business," which is a standard business practice in the aviation industry.  (Holdsworth Dep., Ex. 3, at 125-28; Tate Dep., Ex. 9, at 112-13; March 24, 2000 Minutes, attached hereto as Exhibit "47").

159.  Additionally, pursuant to Piedmont and SARAA's lease agreement, Piedmont made capital contributions in the amount of $500,000, which included Piedmont transferring equipment to HIA for its operation.  (Piedmont Lease, attached hereto as Exhibit "48," at 6, Section 3.01(a)(i) and Exhibit "H" thereto, attached hereto as Exhibit "49;" Holdsworth Dep., Ex. 3, at 126-27).

160.  In January 2000, when SARAA decided to award the lease in the AMP Hangar to Piedmont, AERO still had two (2) years remaining on its five (5) year lease with SARAA.  (Fleet Dep., Ex. 1, at 204).

161.  In contrast, Plaintiff's 1997 Lease and FBO agreement were scheduled to expire on January 19, 2000.  (1999 Amendment, Ex. 7).

162.  The FBOs at HIA (Plaintiff and AERO) operated on an extremely tight margin.  (M. Stambaugh Dep., Ex. 4, at 215-16; Tate Dep., Ex. 9, at 99; Adkins Dep., Ex. 19, at 32).

163.  Additionally, HIA is very limited in the amount of space that is has available for all aviation related operations.  (Testa Dep., Ex. 33, at 39-40, 48-49).

164.  Michael Davis, Plaintiff's consultant, had acknowledged in July 1999 that Plaintiff's facilities were not adequate for providing FBO services at HIA.  (July 29, 1999 Memo, Ex. 31, at STM 0013).

165.  Specifically, Mr. Davis wrote:  "The facility is not adequate to [providing FBO services].  There is no parking, difficult ramp access, and no space to construct decent facilities.  The roof leaks…customer access is through the hangars, and the signage is not available in appropriate locations."  (July 29, 1999 Memo, Ex. 32, at STM 0013).

166.  Mark Stambaugh agrees with Mr. Davis's description of the facility.  (M. Stambaugh Dep., Ex. 4, at 186-95).

167.   The access issue identified above ("access is through the hangars") posed a safety risk to FBO customers.  (Beard Dep., Ex. 8, at 56-57).

168.   "[T]he level of service and the cleanliness and neatness of [Plaintiff's] facility was well below standards in the industry."  (Tate Dep., Ex. 9, at 103-05).

169.   The hangar out of which Stambaugh operated was slated for demolition in HIA's master plan.  (Tate Dep. Ex.9, at 68, 76.

170.   Mark Stambaugh admits that financial stability, experience, clean and orderly facilities, and assisting with maintaining security at an airport are all important characteristics of a first class FBO provider.  (M. Stambaugh Dep., Ex. 4, at 52-53).

171.   Because HIA could not support three FBO providers, Plaintiff's facilities were insufficient for the provision of FBO services, and Plaintiff had a history of poor performance at HIA, the SARAA Board decided not to enter into a new FBO agreement with Plaintiff in January of 2000.  (McIntosh Dep., Ex. 2, at 75, 85; Holdsworth Dep., Ex. 3, at 72).

172.   David Fleet explained this decision:

> The problems with the performance of the company both safety oriented and security oriented in executing their role as an FBO in the airport[,]…their financial issues not only that were inherited by the Airport Authority, but also at some point in early 1999, the condition of the facilities were poor and ill kept, messy would be the word…So it was not a place ultimately that the authority wanted to provide FBO services out of and it was not the tenant they wanted to operate out of that facility either.

(Fleet Dep., Ex. 1, at 132, 231).

173.   Similarly, Defendant McIntosh explained that general aviation FBO customer "expect[s] reasonable, decent facilities to use when they land at an airport…" but when he first viewed Plaintiff's FBO operations and facilities, he was "ashamed."  (McIntosh Dep., Ex. 2, at 29-30).

174.   On or around January 10, 2000, the day before the SARAA Board met to vote on the Airport Operations Committee's recommendation to award the AMP Lease to Piedmont and not to enter into a new FBO agreement with Plaintiff, Fleet may have had contact with one or more airlines during which he informed them that the SARAA Board would be voting on FBO service issues the next day. (Fleet Dep., Ex. 1, at 147).

175.   Fleet explained that the Board had not yet voted on the issue and he could not say for certain that there would be a change, but that it was on the agenda for the January 11, 2000 SARAA Board meeting.  (Fleet Dep., Ex. 1, at 148).

176.   It was "good business practice" for Fleet, as the Airport Director, to keep FBO customers informed regarding the status of service providers at HIA. (Fleet Dep., Ex. 1, at 147; Tate Dep., Ex. at 112-13).

177.   Plaintiff's FBO customers "are the airport customers as well, and you don't want to blindside them."  (McIntosh Dep., Ex. 2, at 40).

178.   In fact, some airline managers were upset that they were not told sooner about the change in FBO providers.  (Fleet Dep., Ex. 1, at 147).

179.   Scott Stambaugh admits that "You can't provide FBO services to a major airline without having a training and audit from them and those types of approvals prior to providing service."  (S. Stambaugh Dep., Ex. 5, at 25).

180.   To the extent Fleet did contact FBO customers to inform them of the change in service providers, he did so within the authorized scope of his duties and responsibilities.  (McIntosh Dep. (continuation), Ex. 2, at 38-39).

181.   Mark Stambaugh testified that he heard through hearsay that Fleet had made contact with U.S. Air and Federal Express, but he has no evidence or knowledge of Holdsworth or McIntosh making such contact.  Both McIntosh and Holdsworth testified that they never had any contact with any of Plaintiff's customers.  (M. Stambaugh Dep., Ex. 4, at 54-56; McIntosh Dep. (continuation), Ex. 2, at 38; Holdsworth Dep., Ex. 3, at 135).

182.   Plaintiff was referring to the ability to engage in FBO operations at HIA when it alleged in the Second Amended Complaint that Defendants had discriminated against it by inhibiting its ability to engage in "commercial activity." (Doc. 84 at ¶2; M. Stambaugh Dep., Ex. 4, at 254).

**PLAINTIFF'S 2000 LEASE**

183. Plaintiff's 1997 Lease (and the 1999 Amendment) expired on January 19, 2000. (1999 Amendment, Ex. 7).

184. While SARAA did not enter into a new FBO agreement with Plaintiff, it did enter into a new lease for hangar space to continue heavy maintenance operations (the "2000 Lease"). (Doc. 84 at ¶ 19; 2000 Lease, attached hereto as Exhibit "49").

185. None of the Defendants ever took any steps to terminate or otherwise end the 1997 Lease or 1999 Amendment prior to the time that it expired by its own terms on January 19, 2000. (M. Stambaugh Dep., Ex. 4, at 115-16).

186. In the 2000 Lease, SARAA agreed to lease almost triple the ramp space to Plaintiff than had been leased under the 1997 Lease or the 1999 Amendment. (2000 Lease, Ex. 5; M. Stambaugh Dep, Ex. 4, at 116-17).

187. The square footage rental rate remained the same under the 2000 Lease as it had been in the 1999 Amendment. (1999 Amendment, Ex. 7; 2000 Lease, Ex. 50; M. Stambaugh Dep., Ex. 4, at 118-19).

188. Plaintiff continued conducting heavy maintenance operations at HIA from January 2000 through March 2003. (S. Stambaugh Dep., Ex. 5, at 10).

189.    Scott Stambaugh that "[t]here wasn't much of a change" in Plaintiff's maintenance operations at HIA after its FBO rights expired.  (S. Stambaugh Dep., Ex. 5, at 18-19).

190.    95%, of the aircraft maintenance work performed by Plaintiff at HIA was "heavy maintenance," as opposed to "drop-in" maintenance associated with FBO operations.  (S. Stambaugh Dep., Ex. 5, at 19).

191.    After Plaintiff ceased providing FBO services at HIA, it experienced a 2-3% drop in its "drop-in maintenance" operations.  (S. Stambaugh Dep., Ex. 5, at 20).

192.    After Plaintiff ceased providing FBO services at HIA in January 2000, only one or two employees voluntarily left Plaintiff's employ.  (S. Stambaugh Dep., Ex. 5, at 21).

193.    From 2000 to 2003, the number of employees that Stambaugh had at HIA stayed the same.  (M. Stambaugh Dep., Ex. 5, at 47).

194.    No employees were terminated or laid off as a result of Plaintiff ceasing to provide FBO services at HIA.  (S. Stambaugh Dep., Ex. 5, at 21).

195.    In March 2003, Plaintiff's 2000 Lease expired, and Plaintiff vacated HIA.  (S. Stambaugh Dep., Ex. 5, at 10).

196.    *After* Plaintiff's lease expired in 2003, Plaintiff's repair station and equipment, as well as 8 to 10 of its employees, were relocated to Brunswick,

Georgia, where a related entity, Stambaugh Aviation, has been conducing aircraft maintenance since 1987. (S. Stambaugh Dep., Ex. 5, at 10-12).

197.  For a short time after physically vacating HIA, Plaintiff conducted some additional maintenance work, but it is no longer conducting any business operations.  (S. Stambaugh Dep., Ex. 5, at 8-11).

Respectfully submitted,

RHOADS & SINON LLP

By:     /s/ Dean F. Piermattei
        Dean F. Piermattei
        Heather Z. Kelly
        One South Market Square
        P. O. Box 1146
        Harrisburg, PA 17108-1146
        (717)  233-5731

        Attorneys for Defendants